# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HUNTINGTON TECHNOLOGY FINANCE, INC. f/k/a MACQUARIE EQUIPMENT FINANCE, INC. f/k/a MACQUARIE EQUIPMENT FINANCE, LLC | Case No. _____ |
| Plaintiff, | |
| vs. | |
| GARETT ALAN NEFF a/k/a GARY NEFF, JOHN MARK SCHMID, and DAVID KARL SCHMID | |
| Defendants. | |

## COMPLAINT

Plaintiff Huntington Technology Finance, Inc. f/k/a Macquarie Equipment Finance, Inc. f/k/a Macquarie Equipment Finance, LLC, by the undersigned counsel, files the within Complaint, and in support states the following:

### Parties

1.     Plaintiff Huntington Technology Finance, Inc. f/k/a Macquarie Equipment Finance, Inc. f/k/a Macquarie Equipment Finance, LLC ("Huntington") is a lease finance corporation organized under the laws of the State of Delaware, with a place of business located at 310 Grant Street, Pittsburgh, Pennsylvania 15219.

2.     Defendant Garett Alan Neff a/k/a Gary Neff ("Neff") is an adult individual with a last known address of 22 Mountaincrest Drive, Cheshire, Connecticut 06410.

3.     Defendant John Mark Schmid ("J. Schmid") is an adult individual with a last known address of 167 Fern Avenue, Litchfield, Connecticut 06759.

{N5522796;2}

4.     Defendant David Karl Schmid ("D. Schmid") is an adult individual with a last known address of 4 Old Orchard Way, Tolland, Connecticut 06084.

5.     Neff, J. Schmid, and D. Schmid are referred to collectively as "Guarantors."

## Jurisdiction and Venue

6.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(1).

7.     Venue is proper in the United States District Court for the District of Connecticut pursuant to 28 U.S.C. §1391(b)(1).

## Factual Background

8.     Huntington and Garage Media NY LLC ("Lessee") are parties to that certain Lease No. 001 dated October 26, 2010 (the "Lease Agreement"), pursuant to which, Lessee leases from Huntington a 6,010 square foot Mediamesh digital signage installation as more fully described therein.  A true and correct copy of the Lease Agreement is attached hereto marked as **Exhibit A** and is incorporated herein by reference.

9.     The terms and conditions of the Lease Agreement were modified pursuant to Amendment No. 1 dated June 13, 2010[1] ("Amendment 1"), Amendment No. 2 dated July 28, 2011 ("Amendment 2"), Amendment No. 3 dated September 1, 2012 ("Amendment 3"), and Amendment dated as of March 31, 2013 ("Amendment 4"), true and correct copies of which are attached hereto marked as **Exhibit B**, **Exhibit C**, **Exhibit D**, and **Exhibit E**, respectively, and are incorporated herein by reference.

10.     The Lease Agreement, Amendment 1, Amendment 2, Amendment 3, and Amendment 4 are referred to hereinafter collectively as the "Lease Documents."

11.     By the terms and conditions of that certain Guaranty dated October 26, 2010 (the "Guaranty"), Guarantors absolutely and unconditionally guaranteed the full and prompt payment,

---

[1] While this amendment bears a date of June 13, 2010, it was actually executed in June of 2011.

observance, and performance when due of all obligations of Lessee under the Lease Documents. A true and correct copy of the Guaranty is attached hereto marked as **Exhibit F** and is incorporated herein by reference.

12.     Huntington Bancshares acquired all the outstanding shares of stock of Macquarie Equipment Finance, Inc. in a transaction closing on or about March 31, 2015. Thereafter, Macquarie Equipment Finance, Inc. changed its name to Huntington Technology Finance, Inc.

13.     Lessee is in default of its obligations under the Lease Documents for, among other reasons, failure to make payment of rent, taxes, and other amounts due under the Lease Documents in accordance with the terms thereof.

14.     Guarantors are in default under the terms of the Lease Documents and the Guaranty for, among other reasons, failure to make payment to Huntington when due and owing.

15.     Section 18 of the Lease Agreement provides that, upon default, Huntington is entitled to payment of a "Lessor's Return" calculated by Huntington as of the date of Huntington's demand, plus all other amounts outstanding under the Lease Documents, together with attorneys' fees and all costs.

16.     As of October 1, 2018, the Lessor's Return, plus all other amounts due and payable to Huntington under the Lease Documents by Guarantors, totals $8,302,118.35, which amount may change from day to day, together with attorneys' fees and all costs.

17.     By letters sent on various dates from time to time, most recently by letter dated October 2, 2018 (the "Notice"), Huntington furnished the Lessee and Guarantors notice of past due payments under the terms of the Lease Documents and the Guaranty and demanded payment of amounts past due under the Lease Documents. A true and correct copy of the Notice is

attached hereto marked as **Exhibit G** and is incorporated herein by reference. Notwithstanding receipt of the Notice, the Guarantors have failed and/or otherwise refused to pay.

## Count I
## Breach of Contract

18.    Huntington incorporates by reference the allegations of Paragraphs 1 through 17 of this Complaint as if more fully set forth herein.

19.    As more fully described herein, Guarantors have absolutely and unconditionally guaranteed the payment of all sums due and owing by Lessee to Huntington under the terms and conditions of Lease Documents.

20.    Guarantors are in default under the terms and conditions of the Guaranty for, among other reasons, failure to make payments when due in accordance with the terms of the Lease Documents and the Guaranty.

21.    Guarantors have expressly waived presentment, demand for payment as to Lessee, and any notice of default respecting Lessee's breach of the Lease Documents.

22.    Section 18 of the Lease Agreement provides that, upon Lessee's default, Huntington is entitled to payment of the Lessor's Return plus all other amounts outstanding under the Lease Documents, together with attorneys' fees and all costs.

23.    Guarantors has failed or otherwise refused to pay this sum to Huntington, which constitutes a breach of their contract as memorialized in the Guaranty.

**[This space left intentionally blank.]**

WHEREFORE, Plaintiff Huntington Technology Finance, Inc. f/k/a Macquarie Equipment Finance, Inc. f/k/a Macquarie Equipment Finance, LLC respectfully requests that this Court enter judgement in its favor and against Defendants Garett Alan Neff a/k/a Gary Neff, John Mark Schmid, and David Karl Schmid in an amount in excess of $75,000.00 to be determined at trial, plus pre-judgment and post-judgment interest, attorneys' fees, all costs of suit, and such other relief as the Court deems appropriate.

**Carmody Torrance Sandak & Hennessey LLP**

By:

Thomas J. Sansone, Esq.
Federal Bar No. ct00671
195 Church Street, 18th Floor
P.O. Box 1950
New Haven, CT 06509-1950
Tel. No.: 203-777-5501
Fax No.: 203-784-3199
tsansone@carmodylaw.com

# EXHIBIT A

C҃RIGINAL 

MACQUARIE

**Lease No. 001**
**dated October 26, 2010**

| Lessee: | Garage Media NY LLC<br>1 Union Place<br>Hartford, CT 06103 | Lessor: | Macquarie Equipment Finance, LLC<br>2285 Franklin Road, Suite 100<br>Bloomfield Hills, MI 48302 |
|---|---|---|---|

| Item | Seller | Description | Lessor's Basis |
|---|---|---|---|
| 01 | A2a Media Inc. (*"A2a"*) and GKD USA, Inc. (*"GKD US"*) | The Equipment is a 6,010 square foot Mediamesh installation manufactured by GKD – Gebr. Kufferath AG of Metallweberstraße 46, D-52353 Düren, Germany (*"Manufacturer"*) comprising two approximately 3,000 square foot panels, five LED per pixel, full color, outdoor design and including: stainless steel or aluminum housing; cover ducts and cabinets with hinged surfaces for easy service access and covering all cable and data/power components from public tampering; lighting to illuminate approximately 25,000 square feet of the exterior wall area of the Equipment Location; media and license(s) for Interactive Media Pool Platform (IMPP) software; design; all necessary control computers and hardware and other system display electronics; delivery to the Equipment Location; and all installation hardware, materials, and labor necessary to complete the full construction, installation, illumination, and operability of all of the foregoing. | $ 6,026,000 |
| 02 | Lessee | Working capital for Lessee | 275,000 |
| 03 | Johnsen and Fretty | Commission due by Lessee | 150,000 |
| 04 | Various | Permitting and legal fees incurred by Lessee with Seller | 70,000 (estimate) |
| 05 | Various | Inspection fees and costs incurred by Lessee with Seller | 79,000 (estimate) |
| | | Total: | $ 6,600,000 |

**Equipment Location:** The two exposed façades adjoining the northeast corner of the Port Authority Bus Terminal located near Times Square at 625 8ᵗʰ Avenue, New York, NY 10036.

**Base Term:** 60 months.

**Base Term Commencement Date:** The first day of the first whole Rental Period occurring on or after the Final Acceptance Date.

**Final Expiration Date:** December 31, 2018.

**Rental Period:** Each calendar month during the Term.

| Rental Payments: | Rental Period | Rental Payment |
|---|---|---|
| | 1 – 4 | $0 |
| | 5 – 12 | $140,000 |
| | 13 – 24 | $150,000 |
| | 25 – 36 | $160,000 |
| | 37 – 60 | $125,000 |

**Reference Rate:** 1.65% (Applicable Rate in effect on August 23, 2010).

**Outside Date:** March 31, 2011.

**1. Lease.** Lessor agrees to lease to Lessee the Equipment described in this Lease and finance for Lessee the costs of those software, services, consumables, and other nonhardware items described in this Lease (*"Soft Cost Items"*) and included in the Lessor's Basis (which is Lessor's agreed-upon cost basis to be paid to Seller under this Lease). The Lessor's Basis will not exceed the amounts stated in this Lease for any item of Equipment or Soft Cost Item. If any of the provisions of this Lease preceding this section are inconsistent with the rest of this Lease, the provisions preceding this section shall control.

**2. Purchase and Delivery of Equipment; Security; Other.** Lessee is responsible for delivery and installation of the Equipment at the Equipment Location. Lessor will purchase the Equipment from, and pay for Soft Cost Items to, Seller and lease the Equipment to Lessee on the following terms, each of the following conditions to be satisfied in a manner acceptable to Lessor as determined by Lessor in its sole discretion, including: all documents referred to being in such form and of such substance as is so acceptable; all conditions specified therein having been similarly satisfied; for each payment, if required by Lessor, Lessor's receipt of Seller's correct and complete invoice for the payment to be made and, if payment is not to be made directly to Seller, evidence of payment to Seller by the person being reimbursed; Lessor receiving such other documents or agreements as it may reasonably request, including such as it may consider necessary to implement the Mediamesh Lease

Transaction Proposal dated September 10, 2010 between Lessor and GM (which will nonetheless remain nonbinding and not be a part of this Lease); no Putative Default by Lessee under this Lease or Lessee or any other party under any of the other agreements or document referred to is continuing; and all of the foregoing and following conditions are satisfied on or before the Outside Date or such later date as Lessor in its sole discretion may determine:

(a) *THIRD PAYMENT. A TOTAL OF* $2,075,000 as follows:

- $2,015,000 to the Equipment's Seller, and
- up to $75,000 to the Seller of the Soft Cost Items, when:

(i) *Lease.* Lessee and Lessor enter into this Lease;

(ii) *GM Agreements.* Garage Media, LLC (*"GM"*) guarantees Lessee's obligations to Lessor (*"GM Guaranty"*); and GM and Lessor enter into a security agreement (*"GM Security Agreement"*);

(iii) *GM Principal Agreements.* Garett (Gary) Alan Neff, 22 Mountaincrest Drive, Cheshire, CT 06410, John Mark Schmid, 243 Chestnut Hill Rd., Litchfield, CT 06759, and David Karl Schmid, 4 Old Orchard Way, Tolland CT 06084 (*"GM Principals"*) guarantee Lessee's and GM's obligations to Lessor (*"GM Principal Guaranty"*); and GM Principals and Lessor,

Y:\mmk\ag\80069656.DOC

enter into a security agreement (*"GM Principal Security Agreement"*);

(iv) *Equipment Agreement.* GM, A2a, GKD US, and Lessee enter into (and Lessor Acknowledges) an Equipment Purchase in such form and substance as Lessor may require, including: as to the purchase of the Equipment by GM, GM's payments to A2a under for the Equipment totaling $1,050,000 (*"Initial Deposit"*) (referred to therein as a "First Payment" of $50,000 and a "Second Payment" of $1,000,000); GM's assigning the purchase rights and right to the Initial Deposit to Lessor; and GM's contributing Lessee's (third party beneficiary) rights and any remaining rights it may have in connection with the purchase of the Equipment or the Equipment itself to Lessee (*"Equipment Agreement"*);

(v) *Services Agreement.* Lessee and A2a enter into a Services Purchase Agreement in such form and substance as Lessor may require, including: as to the services to be rendered in connection with the Equipment; and Lessee's collaterally assigning the Services Agreement to Lessor (*"Services Agreement"*);

(vi) *Maintenance Agreement/GKD Warranty.* GKD US and Lessee enter into the Maintenance Agreement required under Section 8(e), in such form and of such substance as Lessor may require, including Lessee's collaterally assigning the Maintenance Agreement to Lessor;

(vii) *Permit.* CBS Outdoor Group, Inc. (f/k/a Viacom Outdoor Group, Inc. f/k/a Transportation Displays, Incorporated) (*"CBS"*) and The Port Authority of New York and New Jersey (*"Port Authority"*) enter into Supplemental Agreement No. 2 to the Agreement dated May 20, 1996, referred to as Permit No. P-BT-168, between them, as previously amended by Supplemental Agreement No. 1 dated May 4, 2004 (collectively, the *"Permit"*);

(viii) *Display Agreement/Subpermit.* Lessee and CBS enter into a Display Agreement (subcontracting the Permit) that is acknowledged and agreed to by the Port Authority (collectively with the Permit, as applicable thereto, *"Display Agreement"*);

(ix) *Acknowledgment.* Lessor, Lessee, CBS, and the Port Authority enter into an acknowledgment and agreement (*"Acknowledgment"*);

(x) *Performance Bond In Process.* That an insurance company reasonably acceptable to Lessor has been requested to issue and is processing for issuance, as a matter included within the price (and Lessor's Basis) to be paid to the Seller of the Equipment, to A2a, GM, Lessee, and Lessor a performance bond in at least the amount of the Lessor's Basis of the Equipment, the terms and conditions of the Performance Bond to be in all respects satisfactory to Lessee and Lessor, including that first proceeds shall belong and be paid to Lessor to the extent of the Reimbursement Amount (as defined in Section 3), and all other proceeds to belong and be paid to Lessee and/or A2a as they may determine (*"Performance Bond"*);

(xi) *GKD Authorization.* Lessor receives a certificate as to the names, titles, signatures, and authority of those individuals executing the Equipment Agreement for GKD;

(b) FOURTH PAYMENT. A total of $1,100,000 as follows:

• $1,000,000 to the Equipment's Seller, and

• up to $100,000 to the Seller of the Soft Cost Items, plus any unused portion of the cost of the Soft Cost Items that were permitted to be included in the payments under subsection (a) above, when:

(i) *Bring-Down.* All of the foregoing conditions are (and continue to be) satisfied;

(ii) *Insurance.* Lessor has received evidence of the Insurance required under Section 11;

(iii) *A2a Agreements.* A2a, Lessee, and Lessor enter into a security agreement (*"A2a Security Agreement"*); A2a establishes a segregated account for funds relating to the Services Agreement (*"A2a Account"*); and A2a, A2a's bank, and Lessor enter into a deposit account control agreement for the A2a Account (*"A2a DACA"*);

(iv) *Onsite Inspection.* Onsite (in Germany) management inspection/approval of the Equipment, as confirmed in writing to Lessor by Lessee;

(v) *Shipment.* The Equipment ships, or immediately upon Seller's receipt of this payment it will ship, from Germany as confirmed to Lessor by GKD US in writing;

(vi) *Lessee Security Agreement.* Lessee and Lessor enter into a security agreement (*"Lessee Security Agreement"*); Lessee establishes the Lessee Account as provided in Section 22(b); and Lessee, Lessee's bank, and Lessor enter into the Lessee DACA (as defined in Section 22(b) below);

(vii) *Performance Bond.* The Issuer issues the Performance Bond;

(viii) *Opinions.* Lessor receives opinions of counsel to Lessee, GM, GM Principals, and A2a as to such matters as it shall request;

(ix) *CBS and Port Authority Authorization.* Lessor receives certificates as to the names, titles, signatures, and authority of those individuals executing the Permit, Display Agreement, and Acknowledgment on CBS's and Port Authority's behalf, and the due execution and enforceability thereof;

(x) *Marketing and Sharing.* GM, Lessee, and Lessor enter into a marketing and sharing Agreement(s) on such terms as they may determine (individually and collectively, *"Marketing and Sharing Arrangement"*) (the rights and obligations of the parties to the Marketing and Sharing Arrangement shall be in addition to their respective rights and obligations under this Lease and, except as express reference to the Marketing and Sharing Arrangement is made in this Lease, or express reference to this Lease is made in the Marketing and Sharing Arrangement, this Lease and the Marketing and Sharing Arrangement shall be independent and either of them will not affect, limit, or condition the rights and obligations of the parties to the other of them);

(c) FIFTH PAYMENT. A total of $1,175,000 as follows:

• $980,500 to the Equipment's Seller, and

• up to $194,500 to the Seller of the Soft Cost Items, plus any unused portion of the cost of the Soft Cost Items that were permitted to be included in the payments under subsections (a) and (b) above, when:

(a) *Bring-Down.* All of the foregoing conditions are (and continue to be) satisfied;

(b) *Substantial Completion.* Acceptance testing is substantially complete as agreed to in writing by Lessee, GKD US or Manufacturer, CBS, PA, and their and Lessor's engineers;

(d) FINAL PAYMENT. A total of $1,200,000 as follows:

• $980,500 to the Equipment's Seller,

• $1,050,000 to GM (reimbursing GM for the Initial Deposit, provided, however, this amount shall be paid by Lessor's crediting GM with this amount as the funding of a security deposit to be made by GM and held by Lessor as collateral under the GM Security Agreement) (*"Security Deposit"*), and

• up to $219,500 to the Seller of the Soft Cost Items, plus any unused portion of the cost of the Soft Cost Items that were permitted to be included in the payments under subsections (a), (b), and (c) above, when:

(i) *Bring-Down.* All of the foregoing conditions are (and continue to be) satisfied;

80069656 2

Y:\mnk\ag\S0069656 DOC

(ii) *Final Sign-Off.* Final completion of the delivery, construction, installation, and testing of the Equipment at the Equipment Location is complete and is (A) approved in writing by CBS and the Port Authority in a manner satisfactory to Lessor; (B) unequivocally and irrevocably approved and accepted under this Lease by Lessee, including as to all matters such as Seller's compliance with the Equipment Agreement, the Equipment and its installation meeting all specifications, zoning, permitting, and other legal requirements that may be applicable; and (C) Lessor is satisfied with all of the foregoing approvals and events; and

(iii) *Final Acceptance Certificate.* Lessee provides Lessor with an acceptance certificate satisfactory to Lessor under this Lease (*"Final Acceptance Certificate"*).

For the avoidance of doubt, any payment made by Lessor without any one or more of the conditions to that payment having been satisfied as provided in this section shall be considered a waiver only of that condition as applicable to that payment, and not of that condition as applicable to any other payment to be made at the same time or any subsequent payments. The satisfaction (or Lessor's written waiver) of all of the foregoing conditions set forth in this section is the *"Final Acceptance Date."*

3. **Progress Payments.** The payments referred to in Sections 2(a), (b), and (c) are referred to as *"Progress Payments."*

If Lessee rejects any Equipment or Soft Cost Items before the Final Acceptance Date in accordance with the terms of the Equipment Agreement then this Lease shall terminate. Or, if the Final Acceptance Date for all of the Equipment and Soft Cost Items does not occur for any reason on or before the Outside Date, or if Lessor does not for any reason receive the Final Acceptance Certificate for all of the Equipment and Soft Cost Items by that date, then Lessor shall have the right in its sole discretion to terminate this Lease by written notice to Lessee at any time before it pays Seller in full for the Equipment and Soft Cost Items.

If this Lease terminates for any reason before Lessor pays Seller in full for the Equipment and Soft Cost Items, Lessee shall thereupon reimburse Lessor for any and all Progress Payments and other amounts paid by Lessor to Seller in connection with the Equipment and Soft Cost Items, plus interest on all such amounts at the rate of 12% per annum from the time any such payment was remitted by Lessor until all such payments and interest have been paid in full to Lessor, plus applicable Taxes Lessor may reasonably determine to be imposed by an applicable taxing authority in connection with a transfer of the Equipment to Lessee upon the payment of the foregoing amounts (determined on and as of the date of the transfer) as provided in the next sentence (collectively, *"Reimbursement Amount"*). Upon such payments Lessor will transfer the Equipment to Lessee, and all of Lessor's rights against Seller in respect of the Equipment and Soft Cost Items, As-Is, Where-Is, and without warranty of title or other warranty, other than Lessor warrant the Equipment to be free and clear of any liens arising by, through, or under Lessor.

Without limiting the generality of any provisions of this Lease regarding the absolute and unconditional nature of payments to be made and regarding risk of loss, and notwithstanding any such provisions, Lessee specifically shall at all times bear all risk of (a) loss or taking of or damage to or nondelivery or nonprovision of the Equipment and Soft Cost Items, including, without limitation, as a result of the inability of the Seller, or the Manufacturer of the Equipment, or any of Seller's, to deliver or provide any Equipment and Soft Cost Items due to financial inability, lack of creditworthiness or credit availability, bankruptcy, receivership, improper management, inability to obtain sufficient labor, *force majeure*, legal inability or prohibition, war or act of war (whether or not war is declared), insurrection, riot, civil disturbance or commotion, labor dispute or shortage, strike, act of public enemy, accident, fire, flood or other act of God, act of any governmental authority or other third party, judicial action, short or reduced supply of energy, fuel, raw materials, or components,

technical failure, or for any other reason whatsoever, whether nor not within the control of any person, and whether or not similar to the matters herein enumerated, (b) nonconformance of the Equipment and Soft Cost Items with specifications or requirements or applicable laws, (c) the lack of fitness of the Equipment and Soft Cost Items for any particular or intended use by Lessee, (d) the Equipment and Soft Cost Items not being merchantable or provided in a good or workmanlike manner, or (e) in general, the Equipment and Soft Cost Items being in any way or for any reason unavailable or unacceptable to Lessee so as to prevent Lessee from accepting the Equipment and Soft Cost Items and executing an Acceptance Certificate with respect thereto. Accordingly, without limiting the effect of any provisions of this Lease regarding the absolute and unconditional nature of payments to be made or any other provision of this Lease, any reimbursements or other payments to be made by Lessee under this section shall be made unconditionally and without abatement, reduction, offset, recoupment, cross-claim, counterclaim, or any other defense whatsoever, arising under this Lease or otherwise, or against Lessor, Assignee, Seller, Manufacturer, or any other person.

4. **Term.** The initial term of this Lease (*"Initial Term"*) begins on the Final Acceptance Date and continues through the Base Term Commencement Date and then for the Base Term. Any renewal term (*"Renewal Term"*) begins at the end of, as applicable, the Initial Term or any preceding Renewal Term (the Initial Term and all Renewal Terms currently in effect, previously in effect, or that are to come into effect as provided in this Lease or by other similar agreement of the parties, collectively, *"Term"*).

5. **Rent and Payments.** The Rental Payments originally stated in this Lease for the Base Term (with Rental Period #1 beginning on the Base Term Commencement Date) and the Rental Payments specified in Section 6 are based on the Applicable Rate (as defined below) being the Reference Rate. The rate for all Rental Periods during the Base Term having a nonzero Rental Payment and the Rental Payments specified in Section 6 will be adjusted by Lessor as of the Final Acceptance Date to preserve its yield (including as necessary to account for the actual timing of Progress Payments), if: the Final Acceptance Date occurs after the Outside Date (and Lessor nonetheless determines to continue with the transaction); the Applicable Rate increases over the Reference Rate; the final costs of the Equipment and Soft Cost Items change from the amounts stated in this Lease (and in such a case, the Lessor's Basis will likewise change by the same amount). In making any such adjustment of Rental Payments, Lessor will use the same methodology, spreads, and assumptions originally used by it in establishing the pricing originally stated herein. Lessor will notify Lessee of any change in the Rental Payments (and Lessor's Basis) and Lessee agrees to execute such documents as may be required to reflect any such change. However, the failure of Lessee and Lessor to enter into any such documents will not in any way affect Lessee's obligations under this Lease which will be based on the final Rental Payments determined by Lessor (and final Lessor's Basis) in accordance with the foregoing. The "Applicable Rate" is the rate of 5-year interest rate swaps as described in Federal Reserve Statistical Release H.15–Selected Interest Rates, or any successor publication of the US Federal Reserve System for the most recently reported business day occurring on or before the date of determination. If Lessee does not agree with Lessor's determination of the Rental Payments (or the final Lessor's Basis) as provided in this paragraph, it will nonetheless make payments based solely on Lessor's determination until the correct amounts are finally determined, at which time the parties will make an adjusting payment as appropriate. Once any adjustment of the Rental Payments pursuant to this paragraph is final, Rental Payments will be fixed for the Initial Term.

Lessee will pay the Rental Payments, plus all applicable Taxes, for the Term, at such address as Lessor may specify in writing (including in any invoice), in advance on the first day of each Rental Period. Lessor

Y \ninklag\80069656 DOC

will invoice Lessee for Rental Payments, with the sole remedy for any failure to invoice being that no late interest shall accrue under Section 25 on any Rental Payment until payment has been demanded in writing (including in any invoice) for at least 30 days. This Lease is a net lease and is noncancelable during its Term (except as expressly provided in this Lease). Lessee's obligation to pay Rental Payments and other amounts under this Lease shall be, except to the limited extent provided for in Section 23, absolute and unconditional and not subject to abatement, reduction, offset, recoupment, compensation, crossclaim, counterclaim, notice or demand, or any other defense whatsoever, arising under this Lease or otherwise, or against Lessor, Assignee, Seller, Manufacturer, any Location Rights Holder, or any other person. However, the foregoing does not limit Lessee's enforcement of rights against Lessor in a separate action at law for damages.

6. **End of Term.**

(a) At the end of the Base Term, Lessee may exercise one (only) of the following options, but only if Lessee gives irrevocable notice to Lessor unequivocally electing one of these options (*"Exercise Notice"*) and the Exercise Notice is received by Lessor at least 180 days before the end of the Term:

   (i) *Return.* Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term.

   (ii) *1-Year Renewal.* Lessee may renew the Term for a 1-year Renewal Term, with a Rental Payment of $99,850 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 1-year Renewal Term, Lessee may exercise one (only) of the following options, but only if Lessee gives a further irrevocable Exercise Notice unequivocally electing one of these options, and the Exercise Notice is received by Lessor at least 180 days before the end of this 1-year Renewal Term: (i) Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term; or (ii) Lessee may purchase all of the Equipment for the Purchase Amount.

   (iii) *2-Year Renewal.* Lessee may renew the Term for a 2-year Renewal Term, with a Rental Payment of $74,250 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 2-year Renewal Term, Lessee may exercise one (only) of the following options, but only if Lessee gives a further irrevocable Exercise Notice unequivocally electing one of these options, and the Exercise Notice is received by Lessor at least 180 days before the end of this 2-year Renewal Term: (i) Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term; or (ii) Lessee may purchase all of the Equipment for the Purchase Amount.

   (iv) *3-Year Renewal With End-Of-Term Purchase.* Lessee may renew the Term for a 3-year Renewal Term, with a Rental Payment of $65,017 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 3-year Renewal Term, Lessee shall unconditionally purchase the Equipment for the Purchase Amount.

   (v) *3-Year Renewal With End-Of-Term Ownership.* Lessee may renew the Term for a 3-year Renewal Term, with a Rental Payment of $71,987 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section),

and with all other provisions of this Lease continuing to apply. At the end of this 3-year Renewal Term, if Lessee has made all payments then due under this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee for $1.

If one of the foregoing options is not exercised, or if Lessee having elected a return or purchase fails to comply with the terms of the option so elected, the Term will automatically extend from its previous expiration date for successive 1-month Renewal Terms, with a Rental Payment of $133,650 (as such amount may be adjusted under the first paragraph of Section 5), and with all other provisions of this Lease continuing to apply. At the end of any such 1-month automatic Renewal Term, Lessee may exercise one (only) of the options set forth above in the preceding clauses of this subsection, but only if Lessee gives an irrevocable Exercise Notice (or further irrevocable Exercise Notice) unequivocally electing the option and the Exercise Notice is received by Lessor at least 180 days before the end of such 1-month automatic Renewal Term (and the option selected will be effective at the end of the 1-month automatic Renewal Term whose expiration date is to occur on or after 180 days from Lessor's receipt of the Exercise Notice).

(b) Where a purchase option or purchase obligation applies at the end of a Renewal Term, as provided above, Lessee will make all payments required for the rest of the Term (including after it has given any Exercise Notice) and on the last day of the Term Lessee will pay Lessor the following (*"Purchase Amount"*): (i) the sum total of the Rental Payments which would have been due and payable for the full 3-year Renewal Term provided for in subsection (a)(v) above had Lessee properly elected that option at the end of the Base Term, minus (ii) the sum total of all Rental Payments scheduled for all Renewal Terms (up to the amount specified in the preceding clause), plus (iii) all applicable Taxes; and on payment of all such amounts and any other outstanding amounts under this Lease as required by this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee.

(c) Any renewal option available to Lessee at the end of the then scheduled Term (whether it be the end of the Initial Term or a Renewal Term in effect or to come into effect under the terms of this Lease, as the case may be, *"Applicable Term"*), would result in the Term extending beyond the Final Expiration Date for any reason (e.g., if the Base Term Commencement Date occurs after January 1, 2011 or if any intervening 1-month automatic Renewal Terms occur), then the Rental Payment for the Renewal Term for each of the renewal options available to Lessee at the end of the Applicable Term will, instead of the amount originally stated in subsections (a)(ii) through (v) above, as applicable, be determined as (i) the Rental Payment so stated, (ii) multiplied by the number of months in the Renewal Term for which such Rental Payment was to have been applicable (i.e., 12, 24, or 36, as applicable), and (iii) divided by the number of months actually remaining following the Applicable Term to (and including) the Final Expiration Date.

7. **Taxes.** Lessee will pay Lessor (or pay directly to the applicable taxing authority if instructed in writing by Lessor) all taxes, fees, and assessments that may be imposed by any governmental entity or taxing authority on the Rental Payments or the Equipment or Soft Cost Items, or their purchase (by Lessee or Lessor), ownership, delivery, return, possession, operation, sale (by Lessor to Lessee), or rental, whether imposed on Lessor or Lessee or any of their affiliates or the Equipment, any Soft Cost Item, or any portion of this Lease or any related document (*"Taxes"*). Taxes include all license and registration fees, electronic waste, recycling, and other environmental fees, and all sales, use, personal property, business transfer, value added, goods and services, and other taxes, and governmental and transaction charges, together with any penalties, fines and interest thereon (except to the extent resulting from

Y:\mnk\ap\80069656.DOC

Lessor's negligence or willful misconduct), that may be imposed during the Term or Possession Period or after the Term or Possession Period and relating to events or conditions occurring or existing during the Term or Possession Period. Lessee will not be liable for: Taxes imposed on or measured by Lessor's net income or tax preference items; overall business taxes that are in lieu of net income taxes; or Lessor's corporate franchise or net worth taxes. If Lessee is required by law or administrative practice to make any report or return with respect to Taxes, Lessee will promptly give Lessor notice and cooperate with Lessor to ensure that such action is properly made and Lessor's interests accurately reflected. Lessor has no obligation to contest or preserve any right to contest Taxes. However, Lessee may contest Taxes in its own name and at its own expense so long as, in Lessor's opinion, the contest will not result in an encumbrance on any Equipment or otherwise jeopardize Lessor's rights or interests in any Equipment.

**8. Covenants.** Lessee will during the Term and Possession Period:

(a) Maintain the Equipment in good working order and condition, in accordance with the Manufacturer's recommended engineering and maintenance standards, and at the Manufacturer's current engineering change level.

(b) Use the Equipment only in connection with its business operations and for the purposes for which it was designed and in compliance with all applicable Manufacturer operating standards and all insurance requirements.

(c) Keep the Equipment at the Equipment Location.

(d) Affix to the Equipment any labels Lessor may supply stating the Equipment is owned by Lessor.

(e) Establish and keep in effect a maintenance contract for the Equipment with the Manufacturer (or with GKD US with the guaranty of the Manufacturer) on such terms as are satisfactory to Lessor, including the GKD Warranty and such provisions as may supplement, amend, or replace the GKD Warranty (as referred to in the Equipment Agreement) (*"Maintenance Agreement"*).

(f) Make all alterations or additions to the Equipment that may be required (or supplied at no cost or under the Maintenance Agreement) by the Manufacturer or which are otherwise required to comply with subsection (b) above or subsection (h) below.

(g) Make no other alterations or additions to the Equipment except additions that: do not impair the value or performance of the Equipment, are readily removable without damage to the Equipment, and do not result in an encumbrance on the Equipment.

(h) Comply with all laws and regulations applicable to or affecting this Lease, the Equipment, or Lessee, including maintaining all required insurance and obtaining all governmental permissions necessary for it to so comply or that may be required of Lessor in so complying, and including laws in any way relating to occupational safety, employment, hazardous materials, or the environment, and also including any licenses for Lessee's business operations or possession or operation of the Equipment.

(i) Furnish Lessor with (i) Lessee's certified or audited financial statements, annually, as soon as they are available after the end of each of Lessee's fiscal years, but in no event more than 120 days after any such year-end, (ii) Lessee's quarterly financial statements, as soon as they are available after the end of each quarter, but in no event more than 30 days after any such quarter-end, and (iii) such other financial or business or operations information of Lessee (or of A2a that is applicable to Lessee, and Lessee shall cause the same to be provided by A2a) readily available to Lessee (or A2a) as Lessor may from time to time request, promptly, but in no event more than 10 days after Lessor's request (and Lessee represents and warrants that: all such financial statements and all other financial information previously or at any time provided to Lessor has been and will be prepared in accordance with generally accepted accounting principles

and accurately present Lessee's financial position as of the dates given; and all such financial or business or operations information of Lessee previously or at any time provided to Lessor, whether or not requested was or shall be, at the time provided, true and complete).

(j) Furnish Lessor with resolutions, opinions, certifications of the names, titles, signatures, and authority of those persons executing Lease documents on Lessee's behalf, information (including verification of identity, location, legal status, and formation) as may required for Lessor's voluntary or necessary compliance with the US Patriot Act and other law, and such other information and documents as Lessor may reasonably request.

(k) Not permit the Equipment to become a fixture (as defined in the Uniform Commercial Code) or an accession to or otherwise a part of real or immoveable property.

(l) Permit Lessor to inspect the Equipment and Lessee's applicable Maintenance Agreements and records at any reasonable time (subject to Lessor giving reasonably prior notice to Lessee and to Lessee's usual, reasonable security procedures),

(m) Promptly notify Lessor of: any change in Lessee's name, any change in the location of Lessee's chief executive or registered office, any transfer by Lessee, authorized or not, of any interest in or benefit from the Equipment, and any change, authorized or not, in the location of any Equipment.

(n) Ensure that neither Lessee nor its successors or assigns is a tax-exempt entity (as described in the Internal Revenue Code) at any time during the Term or the five years preceding the Term.

**9. Title to Equipment.** The Equipment will remain personal or moveable property even if physically attached to real or immoveable property. Lessee will keep the Equipment free and clear of encumbrances (other than this Lease or encumbrances created by Lessor or Assignee). Lessee has no right or interest in the Equipment except that set forth in this Lease.

**10. Possession Period; Risk of Loss.** From the delivery of the Equipment to Lessee until the Equipment is returned to and received by Lessor (*"Possession Period"*), Lessee bears the entire risk of whole or partial loss, theft, destruction or damage to the Equipment from any cause whatsoever, or requisition of the Equipment by any governmental entity, or expropriation or the taking of the Equipment by eminent domain or otherwise (collectively, *"Loss"*). Lessee will give Lessor prompt notice of any Loss. Except as provided in this section, no Loss will condition, reduce, or relieve Lessee's Lease obligations, including its obligation to pay Rental Payments in full. If any Equipment is damaged but can be economically repaired, Lessee will promptly place the Equipment in good working order and condition. Upon the occurrence of any other kind of Loss, or if Lessee does not place the Equipment in good working order and condition within 30 days of any economically repairable damage, Lessee will upon Lessor's demand pay Lessor the Lessor's Return, calculated by Lessor as of the date of demand; and upon Lessor's receipt thereof, plus all other outstanding amounts under this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee.

**11. Insurance.** Lessee will at its expense during the Possession Period maintain the following insurance and any additional insurance that may be reasonably requested by Lessor or that may be reasonably determined by Lessee to be necessary to protect the Equipment or Lessee's enterprise or stakeholders and that is reasonably acceptable to Lessor in all respects, including as to terms and conditions, premiums, and the purpose of the insurance (collectively, *"Insurance"*): (a) insurance against all risks to the Equipment, including risks of loss, theft, damage, or destruction for any and all causes whatsoever (including acts of war (whether or not war is declared), insurrection, riot, civil disturbance or commotion, labor dispute or shortage or strike, act of public enemy, accident, fire, flood or other act of God, *force majeure*, and other events beyond the control of Lessee or any person), for the costs of the Equipment's full replacement, reconstruction, and reinstallation by Manufacturer, naming Lessor as sole

80069656 2

Y:\mink\ag\80069656 DOC

loss payee; and (b) public liability and third party property damage insurance in the amount of $5,000,000, per occurrence, naming Lessor as an additional insured. Such insurance shall be reasonably satisfactory to Lessor; shall contain the insurer's agreement to give Lessor 30 days' written notice before any cancellation or material change; shall be payable to Lessor regardless of any act, omission or breach by Lessee; and shall provide for commercially reasonable deductibles satisfactory to Lessor. Lessee will provide Lessor with certificates of all such insurance from time to time upon request. Any insurance proceeds of such insurance received by Lessor or Assignee in respect of events with respect to which Lessee has concurrent Lease obligations (including obligations under Sections 10 or 15) will be applied by Lessor to those obligations. Lessee has no right to the benefit of any insurance maintained by Lessor.

12. **Assignment of Warranties.** Lessee is entitled under the Uniform Commercial Code—Leases (Article 2A) to the promises and warranties provided to Lessor by Seller or any third party in connection with the Equipment. Lessor assigns to Lessee, during the Term, and upon any transfer of the Equipment to Lessee hereunder, any assignable representations, warranties, and promises made by Seller or Manufacturer or any other third party in connection with the Equipment, but any claims arising therefrom may only be pursued by Lessee in its own name. Lessor will reasonably cooperate with Lessee, at Lessee's request and expense, in pursuing any such claims and obtaining for Lessee the benefit of all such rights (whether or not assignable). Lessee may communicate with Seller or any third party and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations thereon or on any remedies.

13. **Disclaimers and Limitations.** As to Lessor, Lessee leases the Equipment and finances the Soft Cost Items **As-Is, Where-Is, and on a nonrecourse basis.** Any transfer of the Equipment to Lessee by Lessor is **As-Is, Where-Is and without warranty** except that Lessor will warrant good title to any transfer Equipment to be free and clear of any encumbrances and provide Lessee with Lessor's standard bill of sale on request. Lessor disclaims any other representation or warranty, **including with respect to the design, compliance with specifications, durability, quality, operation, or condition (whether discoverable or not) of the Equipment or Soft Cost Items, title, the merchantability of the Equipment or Soft Cost Items, the fitness of the Equipment or Soft Cost Items for particular purposes, status of this Lease for tax or accounting classification purposes, or issues regarding the design or operation of the Equipment or infringement of industrial or intellectual property rights of any person or any patent, trademark, or copyright infringement, or the like.** Lessor does not make any statement, representation, warranty, or promise made by Seller or any Location Rights Holder, and neither Seller and any Location Rights Holders (on the one hand) nor Lessor (on the other hand) are agents of one another (even if Lessor has or does participate in Lessee's negotiations with any of them). Lessor will have no liability to Lessee, or its customers, or any other persons, for damages or specific performance arising out of this Lease or concerning any Equipment or Soft Cost Items, including direct, indirect, special, or consequential damages, or damages based on strict or absolute tort liability, and also as to any programs or data residing on any Equipment at any time, including upon return to or repossession by Lessor. However, Lessor shall remain liable to Lessee, in a separate action at law, for direct damages resulting from Lessor's negligence, willful misconduct, or breach of Lease. This Lease is intended to be governed solely by its terms and be (and shall by this agreement be) a finance lease as that term defined in the Uniform Commercial Code—Leases (Article 2A) (but the parties do not by this provision any agreement as to the status of this Lease as a "finance lease," "true lease," "capital lease," or "operating lease" for tax classification or accounting purposes). This Lease, the parties' performance of this Lease, and their other actions relating to this Lease are to be considered so as to give the

fullest possible effect to such intent. This section does not affect Lessee's rights against persons other than Lessor, including Seller and Manufacturer and any Location Rights Holders.

14. **Lessee Warranties.** Lessee represents and warrants when it executes this Lease and whenever Lessor is required to or does make any payment to Seller hereunder:

(a) Lessee is duly organized and in good standing under applicable law in the jurisdictions of its organization and domicile and in which Equipment may be located with full power and authority to enter into this Lease.

(b) This Lease is enforceable against Lessee in accordance with its terms, subject to laws of general application affecting creditors' rights generally, and does not breach or create a default under any document or agreement binding on Lessee.

(c) No proceedings exist before any court or administrative agency that would have a material adverse effect on Lessee, this Lease, or the Equipment, nor has Lessee been threatened with any such proceedings.

(d) The financial statements and other financial information made available by Lessee have been prepared in accordance with generally accepted accounting principles and accurately present Lessee's financial position as of the dates given.

(e) Lessee's chief executive and registered office is located at its address specified in this Lease.

(f) Lessee has selected the Equipment, Soft Cost Items, and Seller, and it knows the Seller's identity.

(g) Lessee's right in respect of the Equipment being located, delivered, constructed, installed, possessed, operated, and deinstalled at the Equipment Location is pursuant agreements by the owners and other holders of any and all necessary rights in respect thereof (**"Location Rights Holders"**). The only Location Rights Holders are the Port Authority and CBS.

15. **Indemnity.** Lessee will indemnify Lessor against and hold Lessor harmless from all liabilities, damages, Taxes, losses, penalties, expenses (including reasonable legal fees and disbursements and costs), claims, actions, and suits, whether based on a theory of strict liability or statutory or regulatory liability of Lessor or otherwise (collectively, **"Claims"**), relating to the operation, construction, installation, selection, manufacture, purchase (by Lessee or Lessor), ownership (for strict liability in tort or for statutory or regulatory liability), leasing, possession, maintenance, delivery, return, or sale (by Lessor to Lessee) of the Equipment, or the selection, licensing, provision, return or relinquishment, obtaining, use, creation, or ownership of Soft Cost Items, including Claims relating to: (a) the condition of any Equipment arising or existing during the Possession Period, including undiscoverable defects; (b) infringement by Lessee or the Equipment or Soft Cost Items of any patent, trademark, copyright, or industrial or other intellectual property rights of any person; and (c) Lessee's contest of Taxes or Lessor's contest of Taxes at Lessee's behest. However, Lessee will not be liable: (y) after the time Lessor is required to purchase the Equipment and pay for the Soft Cost Items, for the net price of the Equipment or Soft Cost Items included in the Lessor's Basis and due to Seller; or (z) to a person for Claims resulting from the person's negligence, willful misconduct, or breach of this Lease.

16. **Surrender of Equipment.** Whenever Lessee is required or permitted to return Equipment, Lessee will have the Manufacturer deinstall, inspect, and properly pack the Equipment, and return the Equipment to Lessor at such location in the world as Lessor shall determine. The Equipment is not be deinstalled or taken out of operation more than one month before it is required to be returned, and then only if at that time Lessee had previously given notice of return under the Lease or the Final Expiration Date is to occur within the month. When received by Lessor, the Equipment shall be: in good working order, clean and cosmetically good; in the same condition as when originally installed, reasonable wear and

Y:\mnk\ag\80069656 DOC

tear excepted, and in such condition as may be required by the Manufacturer for deployment and installation at another facility without the need for Lessor to incur any repair or rehabilitation or replacement expense. Lessee shall be to Lessor liable for the cost to Lessor of placing the Equipment in the condition required by the Lease. Any return of Equipment accepted by Lessor releases Lessee of its leasehold rights and possessory interest in the Equipment, but will not otherwise constitute a termination of the Term or this Lease or Lessee's related obligations. Any additions to the Equipment not removed before return shall become Lessor's exclusive property (lien free) or, at Lessor's option and Lessee's expense, removed and returned to Lessee or sold, destroyed, or otherwise disposed of, and the Equipment restored to its original condition, all without any liability on the part of Lessor or any other person to Lessee or any other person. Before returning any Equipment to Lessor hereunder, Lessee shall remove all password protection.

17. **Default.** It is an *"Event of Default"* by Lessee under this Lease if:

(a) PAYMENT. Lessee's failure to pay any Rental Payment or other amount under this Lease when due continues for 10 days after notice.

(b) PERFORMANCE. Lessee's failure to observe any provision of this Lease continues for 30 days after notice or, if the failure of a nature that it cannot be cured within such period, Lessee fails diligently to pursue a cure and actually cure the failure within 60 days after such notice.

(c) MISREPRESENTATION. A representation or warranty or statement made by Lessee in this Lease or in any other document provided by Lessee is incorrect in any material respect when made.

(d) ASSIGNMENT; RELOCATION. Lessee fails to comply with Section 8(c) or Section 21.

(e) LESSOR PRIORITY. The Equipment is levied against, seized, or attached or Lessor shall not have a first priority, continuing security interest in all of Lessee's assets and property of any kind or nature (other than any lien for taxes not yet due or that Lessee is with Lessor's prior approval diligently contesting).

(f) INSOLVENCY, ETC. Any administrator, examiner, administrative receiver, compulsory manager, trustee, or liquidator of Lessee (or any similar person contemplated by the laws of the United States of America or other applicable laws) is appointed, elected, nominated, or otherwise instituted with respect to Lessee or its assets, or Lessee makes or seeks an assignment for the benefit of creditors or any arrangement or composition with its creditors, or becomes insolvent, or commits any act of bankruptcy, or is the subject of a petition or proceeding under any bankruptcy, reorganization, arrangement of debts, insolvency, or receivership law, or Lessee seeks to effectuate a bulk sale of its inventory, equipment, or assets, or any action is taken with a view to Lessee's termination or the termination of its business, and, if any of the foregoing events is involuntary, it continues for 60 days.

(g) OTHER LESSEE AGREEMENTS. Lessee is the subject of a Default under the Lessee Security Agreement, the Lessee DACA, the Maintenance Agreement, the Display Agreement, the Acknowledgment, the Equipment Agreement, the Services Agreement, the Marketing and Sharing Arrangement, any of the contracts contemplated by Sections 22(b)(vi) through (b)(ix), or any other agreements approved by Lessor as contemplated in Section 22(e), or any agreement that, in Lessor's sole opinion, is material to Lessee or any of its businesses or operations or this Lease or the Equipment or any of its assets (individually or collectively).

(h) GM AGREEMENTS. GM is the subject of a Default under the GM Guaranty, the GM Security Agreement, the Equipment Agreement, or any agreement that, or any agreement that, in Lessor's sole opinion, is material to Lessee or GM or any of their businesses or operations or this Lease or the Equipment or any of their assets.

(i) GM PRINCIPAL AGREEMENTS. At any time before Lessor agrees to the termination of the GM Principal Guaranty as contemplated in Section 22(g), a GM Principal is the subject of a Default under the GM Principal Guaranty, the GM Principal Security Agreement, or any agreement that, in Lessor's sole opinion, is material to the GM Principal or GM or Lessee or any of their businesses or operations or this Lease or the Equipment or any of their assets.

(j) A2A. A2a is the subject of a Default under the Equipment Agreement, the Services Agreement, the A2a Security Agreement, the A2a DACA, or any agreement with GM and/or Lessee, or any agreement that, in Lessor's sole opinion, is material to any portion of A2a's business relating to the Equipment or to this Lease or the Equipment or the Services Agreement or is material to A2a's business or operations as a whole.

(k) MAINTENANCE AGREEMENT. The Maintenance Agreement shall cease to be in full force and effect.

*"Default"* means, with respect to a person and an agreement to which that person is a party, that: (w) such person dies or is the subject of an event of the types listed in subsection (f); (x) such person breaches or defaults under or otherwise fails to comply with any of the terms of such agreement or any related agreement (y) a "default" occurs on the part of such person under such agreement (as such term or a similar term may be defined therein); or (z) such agreement terminates for any reason resulting from such person's actions or inactions (including a failure to meet performance standards or targets), and any of the foregoing events continues after the giving of any required notices and the expiration of any required cure periods provided for in such agreement.

*"Putative Default"* means, with respect to a person and an agreement to which that person is a party, an event occurs that is, or with any required or permitted notices and/or the expiration of any cure periods and/or other lapse of time (or any combination of the foregoing) would be, a Default on the part of such person.

18. **Remedies.** If an Event of Default is continuing, or if at any time during the continuance of an Event of Default under this Lease or any other lease entered into between Lessor and Lessee Lessor notifies Lessee of the occurrence of an Event of Default, Lessor may in its absolute discretion and with notice to Lessee exercise any one or more of these remedies:

(a) Terminate this Lease.

(b) Take control or possession of, or render unusable, any Equipment wherever located (without liability for damages occasioned by such action other than direct damages for Lessor's negligence or willful misconduct (and such actions will not constitute a termination of Lessee's obligations under this Lease), all as though Lessee had failed to surrender the Equipment when required to do so.

(c) Require Lessee to return the Equipment to a location designated by Lessor in accordance with Section 16 and there surrender control of the Equipment to Lessor pursuant to Section 16 as though the Term had expired (and such actions will not constitute a termination of Lessee's obligations under this Lease).

(d) Require Lessee to pay the Lessor's Return, calculated by Lessor as of the date of Lessor's demand, and upon Lessor's full receipt of the Lessor's Return as a result of Lessor's demand under this section, plus all other amounts outstanding under this Lease, this Lease will terminate and Lessor will transfer to Lessee any Equipment still in Lessee's possession).

(e) Proceed by court action to enforce performance by Lessee of this Lease and/or to recover all damages and expenses suffered by Lessor as a result of any Event of Default.

Lessee will also reimburse Lessor for all expenses (including reasonable legal fees and disbursements) incurred by Lessor in enforcing this Lease. Lessor's sole obligation to mitigate its damages is that if it repossesses any Equipment pursuant to this section Lessor will lease, sell, or otherwise

80069656 2

dispose of the Equipment in a commercially reasonable manner, with or without notice, and at public or private sale, and apply the net proceeds (after deducting all expenses of disposition), if any, to the amounts owed to Lessor; but Lessee will remain liable to Lessor for any deficiency that remains after any such disposition. With respect to any notice of sale required by law, 10 days' notice is reasonable notice. The remedies provided in this Lease are in addition to all other rights or remedies now or hereafter existing under this Lease, or at law or in equity, and may be enforced concurrently therewith, and from time to time.

**19. Lessor's Return.** Lessor may become entitled to the Lessor's Return, which shall be Lessor's anticipated benefit of its bargain and profit from this Lease transaction (to which it will specifically be entitled). The Lessor's Return, as stipulated to herein, includes amounts attributed by the parties to (and a loss to Lessor upon a Loss or Event of Default is dependent in part upon) unpaid Rental Payments to become due, the original cost of the Equipment and Soft Cost Items to Lessor, the unrealized anticipated value of the Equipment to Lessor, the future observance by Lessee of its nonrental Lease obligations for the benefit of Lessor. In addition, the calculation of the Lessor's Return provided for in this Lease is intended to recompense Lessor, as liquidated and not as a penalty, for additional costs Lessor may incur in documenting, negotiating, and performing this Agreement, including such amounts as the costs of outside counsel, commissions, overhead allocable to this transaction, and the like. Accordingly, the parties agree that the Lessor's Return shall be calculated as the unamortized portion of 122.7% of the Lessor's Basis calculated on a straight-line amortization basis for eight (8) years beginning on the Base Term Commencement Date; provided, however, that if the Lessor's Return is determined as of a date before the Base Term Commencement Date, the Lessor's Return shall be the total of such percentage of the Lessor's Basis determined without amortization. Such unamortized portion will be determined by multiplying such percentage of Lessor's Basis by a fraction, the numerator of which shall be 96 minus the number of whole calendar months elapsing since the Base Term Commencement Date, and the denominator of which shall be 96. The Lessor's Return as defined in this section is inclusive of New York sales Taxes imposed on sales of personal property occurring at the Equipment Location of up to 8.875% of the sale price (but, for the avoidance of doubt, exclusive of any other Taxes, including New York sales or use Taxes on Rental Payments or other amounts previously due and thus not included in the calculation of Lessor's Return).

**20. Assignment By Lessor.** Lessor may assign this Lease or any Equipment, in whole or in part, including granting or assigning any encumbrance or other interest in this Lease or any Equipment, without notice to Lessee, to any person (*"Assignee"*). No assignment will relieve Lessor of its Lease obligations. **Lessee and Lessor acknowledge that any such assignment will not materially change Lessee's or Lessor's obligations under this Lease.** If notified of an assignment, Lessee will: (a) unless otherwise directed, unconditionally pay all amounts due under this Lease to Assignee without abatement, reduction, offset, recoupment, compensation, crossclaim, counterclaim, notice or demand, or any other defense whatsoever it may have against Lessor, Assignee, Seller, Manufacturer, or any other person; (b) not permit this Lease to be amended or any of its terms waived without the Assignee's written consent; (c) not require Assignee to perform any of Lessor's obligations other than the warranty of quiet enjoyment provided for in Section 23 and any other obligations expressly assumed by the Assignee in writing; and (d) execute such acknowledgments of assignment as may be reasonably requested by Lessor or Assignee. Assignee will have all of Lessor's rights, powers, and privileges under this Lease to the extent of the assignment, including the right to make further assignments.

**21. Assignment By Lessee.** Without the prior written consent of the Lessor (not to be unreasonably withheld) Lessee cannot assign any interest in this Lease or assign or sublet any interest in Equipment (including in

connection with a sale of all or some of Lessee's assets) to any person not in control of or under common control with Lessee, or undergo a change in control, e.g., by merger, amalgamation, or other event whereby those in control of Lessee immediately before the event are not in control of Lessee or its successor immediately after the event (with control being established by the direct and indirect holding of more than ½ of the equity and voting power of the controlled entity and any intervening entities), or issue any voting or equity or other securities. No assignment or sublease by Lessee will discharge or diminish Lessee's obligations, and Lessee will continue to be primarily, absolutely, unconditionally, and independently liable for the full and prompt observance of all of its obligations under this Lease.

**22. Lessee Security and Additional Covenants.**

(a) SECURITY. Lessee hereby grants Lessor a first priority continuing security interest in all of its assets and property of any kind or nature whatsoever as security for all of its obligations under this Lease, all as more particularly provided in the Lessee Security Agreement.

(b) LESSEE ACCOUNT. Lessee will maintain all cash, funds, or other monies received by it or held on hand by it, in a single deposit account with a bank acceptable to Lessor (*"Lessee Account"*), and effect all inflows and outflows of such cash, funds, or other monies only through the Lessee Account. The Lessee Account shall be under the control of Lessor under a deposit account control agreement among Lessee, Lessor, and Lessee's bank (*"Lessee DACA"*). Without Lessor's consent, which may be given or withheld in Lessor's sole discretion, Lessee will not pay out any amounts from the Lessee Account, or permit any amounts to be removed from the Lessee Account—and in general and in all events no assets of Lessee shall in any manner or by any method be transferred directly or indirectly away from Lessee (or encumbered)—except Lessee may pay out of Lessee Account the following:

(i) *Lease.* Amounts due Lessor under this Lease and the minimum amounts that this Lease requires Lessee to pay to third parties (which shall be made only under any usual and customary contract reasonable in the circumstances);

(ii) *Display Agreement.* Amounts due by Lessee under the Display Agreement;

(iii) *Maintenance Agreement.* Amounts due under the Maintenance Agreement;

(iv) *Insurance.* Premiums for Insurance;

(v) *Services Agreement.* Management fees due A2a under the Services Agreement;

(vi) *Utility.* Amounts due the Port Authority (or a public utility) for electricity to operate the Equipment under any usual and customary contract reasonable in the circumstances;

(vii) *Back Office.* Payments to GM or ProPark for documented back office functions not to exceed $50,000 in the aggregate during any calendar year under any usual and customary contract reasonable in the circumstances;

(viii) *Promotion and Operating.* Documented promotion and operating expenses not to exceed $50,000 in the aggregate during any calendar year under any usual and customary contract reasonable in the circumstances;

(ix) *Salary.* Reasonable and customary documented salary for the administration and management of the Lessee not to exceed $250,000 in the aggregate during any calendar year under any usual and customary contract reasonable in the circumstances;

(x) *Income Tax Distributions.* Provided no Event of Default is continuing, on or before April 15 of each year (as may be extended in accordance with the Internal Revenue Code), distributions to Garage Media or each of Garage Media's Principals limited to Garage Media's Principals' respective federal and state tax liability with respect to the income of the

Lessee only (assuming the applicability of the maximum federal and state tax bracket), for the year ending on the prior December 31, which is based on supporting documentation delivered to and approved by Lessor at least 10 business days prior to any such distribution; and

(xi) *Other Distributions*. As of the last day of any calendar quarter, beginning with the next calendar quarter ending 18 months following the Base Term Commencement Date (the end of each such calendar quarter a *"Test Date"*), funds may be transferred to Garage Media 15 business days after the Test Date, if and to the extent Lessor agrees in writing (not to be unreasonably withheld) that:

A. Lessee is not the subject of a Putative Default under this Lease and A2a is not the subject of a Putative Default under the Equipment Agreement, the Services Agreement, the A2a Security Agreement, the A2a DACA, or any agreement with GM and/or Lessee, or any agreement that, in Lessor's sole opinion, is material to A2a's businesses or operations taken as a whole or this Lease or the Equipment.

B. Lessee has a cash balance in the Account, less Lessee's current liabilities, of no less than $500,000;

C. As of the Test Date, projected advertising revenue annualizes to $5,500,000 under executed contracts with an average remaining term of not less than 60 days, as determined by Lessor, provided, however, upon the request of Lessee, Lessor will consider whether to include contracts of a shorter duration, using its reasonable discretion and considering, without limitation, such factors as the financial performance of the Lessee to the Test Date;

D. As of the Test Date, Lessee's ad revenues for the immediately ended consecutive 12-month period total at least $5,500,000;

E. No material adverse change shall have occurred after the date of this Lease in the business, financial condition, or prospects of Lessee, GM, or, at any time before Lessor agrees to the termination of the GM Principal Guaranty as provided in Section 22(g), a GM Principal, in any such case, as determined by Lessor; and

F. Lessor has received a certification from Lessee within 5 business days following the Test Date, certifying the foregoing together with documentation verifying the same, in each case in form satisfactory to Lessor.

(c) SUBSIDIARY STATUS. Lessee shall remain a directly- and wholly-owned subsidiary of GM. Lessee shall issue no further voting or equity securities to anyone except GM, and then only with the prior written approval of Lessor. Lessee shall not engage in any business other than that relating to the Equipment as contemplated by this Lease and the agreements and arrangements referred to in this Lease.

(d) INDEBTEDNESS. Lessee shall not issue, undertake, incur, or suffer to exist any indebtedness, payment obligations, or nonmonetary performance obligations of any kind except those obligations existing under any of the following: this Lease, the Lessee Security Agreement, the Maintenance Agreement, the Display Agreement, the Acknowledgment, the Equipment Agreement, the Services Agreement, and the contracts contemplated by subsections (b)(vi) through (b)(ix), any amendments or supplements to any of the foregoing approved by Lessor in its sole discretion, and any other agreements that Lessor may in its sole discretion approve (including as to terms, amounts, kind) if Lessee's obligations under such other agreements are subject and subordinate to Lessee's obligations to Lessor in such manner as may be determined by Lessor in its sole discretion.

(e) GUARANTIES. The GM Guaranty and the GM Principal Guaranty shall be unlimited and unconditional and remain in full force and effect at all times the Lessee (or GM in the case of the GM Principal Guaranty) may have obligations to Lessor. However, the GM Principal Guaranty will terminate when Lessor agrees in writing (not to be unreasonably withheld) that all of the following have occurred:

(i) Lessee's ad revenues for any consecutive 12-month period total at least $5,500,000;

(ii) Lessee's projected advertising revenue annualizes to $5,500,000 under executed contracts with an average remaining term of not less than 60 days, as determined by Lessor, provided, however, upon the request of Lessee, Lessor will consider whether to include contracts of a shorter duration, using its reasonable discretion and considering, without limitation, such factors as the financial performance of the Lessee and the project to date;

(iii) Lessee has a cash balance in the Account, less Lessee's current liabilities, of no less than $500,000;

(iv) no material adverse change shall have occurred after the date of this Lease in the business, financial condition, or prospects of Lessee, as determined by Lessor;

(v) no Putative Default shall be continuing on the part of any GM Principal under the GM Principal Guaranty (including as a result of a Putative Default on the part of either of GM or Lessee of

⟨⟩ any of their obligations which are the subject of the GM Principal Guaranty).

(a) SECURITY AGREEMENTS. Immediately upon the Final Acceptance Date, if there is no Putative Default on the part of Lessee, GM, or the GM Principals under this Lease, the Lessee Security Agreement, the GM Guaranty, the GM Security Agreement, the GM Principal Guaranty, or the GM Principal Security Agreement, Lessor will in writing agree to: (y) terminate the GM Principal Security Agreement, including any financing statements filed for the collateral thereunder; and (z) amend the GM Security Agreement in a manner mutually acceptable to GM and Lessor, to exclude from the collateral thereunder any right, title and interest of GM that is not (and does not relate to) GM's ownership of Lessee, the Security Deposit, this Lease, the Equipment, and the sale or display of advertising or other content on the Equipment or at the Equipment Location.

23. **Counterparts; Financing Statements.** This Lease may be executed in one or more counterparts. If there is only one such counterpart, it will be the *"Original,"* otherwise, one such counterpart will be marked as and be the *"Original"* and any other counterparts will be marked as and be the *"Duplicates."* No transfer of or security interest in this Lease may be created except through the transfer or possession of the Original, and Lessee agrees to deliver any Original to Lessor. Unless Lessee has the right to acquire Lessor's interest in the Equipment at the end of the Term for nominal or no additional consideration, the parties intend this Lease to be a true lease and not one intended merely for security. Lessor is authorized to file financing statements to give public notice of Lessor's interest in any items it may lease to Lessee or its affiliates under this Agreement.

24. **Quiet Enjoyment.** So long as no Event of Default is continuing, Lessor will not interfere with Lessee's quiet enjoyment of the Equipment. If a failure by Lessor to materially observe the foregoing warranty of quiet enjoyment continues for 10 days after notice, Lessee may in its absolute discretion exercise any one or more of the following remedies (which shall be its exclusive remedies for such failure): (a) by notice terminate this Lease (including its obligation to pay Rental Payments) as it relates to such Equipment; and/or (b) proceed in a separate action at law to recover all direct damages suffered by Lessee resulting from such failure.

25. **Late Performance; Interest Limitations.** Amounts due under this Lease that are not paid within 30 days of their due date will bear interest, payable upon demand, at the rate of 12% per year, or such lesser rate as

may be the maximum legal rate, from their due dates. If any payment required to be made under this Lease would otherwise be considered the collection of interest in excess of the maximum amount permitted by applicable law: Lessee will not be obligated to pay the excess; any excess which may have been collected will be credited to Lessee's other obligations to Lessor or refunded; and this Lease will be considered to have been amended so as to eliminate Lessee's obligation to pay such excess.

26. **Prorations.** Rental Payments for Rental Periods not consisting of a whole month or a whole quarter or another whole period, as applicable, will be prorated on the basis of a 360-day year comprised of four 90-day quarters and twelve 30-day months.

27. **Further Assurances.** Lessee will promptly execute such documents and take such further action as Lessor may from time to time reasonably request in order to carry out the intent of this Lease or protect or perfect Lessor's rights, interests, and remedies reasonably intended to be created thereunder.

28. **Notices.** Notices under this Lease shall be in writing and received when delivered to the receiving party's address set forth in this Lease, or at such other address for notice as it may previously have notified the other party of. A party may give notices in the ordinary course (including under Sections 6, 8, or 10, but not including under Sections 17 or 18 or formal notices such as notices of default, demands for performance, or notices of termination) by conventic<sI email, or by a PDF attachment to conventional email. Emailed notice shall be received on the business day that the receiving party's employee having regular duties relating to this Lease actually reviews the email at the receiving party's physical address for notice. A party giving notice by email bears all risk of nonreceipt of notice (including as a result of email being blocked by the sender's, receiver's, or any intermediary's software monitoring or controlling outgoing or incoming communications or presuming a communication to be spam or to contain inappropriate content).

29. **Interpretation.** Terms of inclusion mean inclusion without limitation. Time is of the essence. The provisions of this Lease will survive its termination, and any return or sale of Equipment, and remain in full force and effect with respect to events or conditions occurring or existing during (or fairly attributable to) the Term or Possession Period. Any waiver or failure of a party to require strict observance of this Lease, will not constitute a waiver of any other breach of the same or any other provision of the same Lease or any other lease. This Lease will not be binding upon a party until executed by the party. This Lease cannot be amended except in a document executed by both parties. This Lease binds and benefits the parties' successors and permitted assigns. The parties hereby acknowledge that they have required this contract, and other agreements and notices required or permitted to be entered into or given pursuant hereto, to be drawn up in the English language only. If any such document or communication is prepared in or contains both the English

language and another language, only the English language provisions shall have import and the versions in any other language shall not be binding upon the parties thereto and shall have no effect whatsoever on the interpretation or construction of the English language version. The page numbering of this Lease may be exclusive of exhibits, if any. The terms "signed," "executed," "entered into," and the like require that a document be manually signed, even if it is permitted to be transmitted as an electronically scanned copy. A party having executed a document need not be advised by the other party of the other party's acceptance of the document. Headings of the sections, subsections, and other provisions of this Lease are not a part of or to affect the interpretation of this Lease.

30. **Soft Cost Items.** The Equipment may contain software in which the parties have no ownership or other proprietary rights. Where required by a software owner or manufacturer or the Seller of other Soft Cost Items, Lessee will enter into a license or other agreement for the use of the software and the provision of the Soft Cost Items. Any such agreement will be separate and distinct from this Lease, and Lessor will have no rights or obligations thereunder unless otherwise agreed by it in writing. For the avoidance of doubt, upon Lessee's execution of the Final Acceptance Certificate, Lessee will pay rent attributable to Lessor's financing of Soft Cost Items as provided in Section 5 and regardless of Lessee's dissatisfaction with, or the failure or quality of, or Seller's failure to provide for any reason, any software, services, or other Soft Cost Items). Lessee acknowledges that all Soft Cost Items are provided directly to Lessee by Seller, and not by Lessor, regardless of anything to the contrary in this Lease or in any purchase documents with Seller (and any documentation entered into by Lessor in relation to Soft Cost Items shall be solely for Lessee's benefit), and, in general, regardless of any characterization by the parties of Soft Cost Items as equipment, machines, goods, or the like.

31. **Scanned Documents.** In any proceeding relating to this Lease, a party may produce an electronically scanned copy or photocopy of a document rather than the original and such copy will have the same force as the original. Each party acknowledges that it has received and reviewed all of the pages of this Lease and that none of its provisions are missing or illegible.

33. **Invalidity.** A provision of this Lease that is or becomes invalid will be ineffective only to the extent of the invalidity, without affecting the rest of such provision or this Lease.

34. **Applicable Law.** This Lease is governed by New York law without regard to conflicts of law principles. The parties consent and submit to the jurisdiction of the local, state, and federal courts located within that state. The parties waive any objection relating to improper venue or *forum non conveniens* to the conduct of any proceeding in any such courts. To the extent permitted by law, the parties irrevocably waive all right to trial by jury in any proceeding between them relating to this Lease or the Equipment.

**Lessee acknowledges receipt of a true copy of this Lease. This Lease constitutes the entire agreement of the parties relating to the leasing of the Equipment.**

**Garage Media NY LLC (Lessee)**

By: Garage Media, LLC

Manager

By: _____
Name/Title: Garret Neff, Member

Date: _____ 10/26/10 _____

**Macquarie Equipment Finance, LLC (Lessor)**

By: _____

Name/Title: Andrew R. Feldstein
V.P. and Asst. Gen. Counsel

Date: _____ 10-26-10 _____

ORIGINAL

# EXHIBIT B



**Amendment No. 1**
**dated June 13, 2010**
**to Lease No. 001 dated October 26, 2010**

| **Lessee:** | Garage Media NY LLC<br>1 Union Place<br>Hartford, CT 06103 | **Lessor:** | Macquarie Equipment Finance, LLC<br>2285 Franklin Road, Suite 100<br>Bloomfield Hills, MI 48302 |
|---|---|---|---|

Lessor and Lessee amend the above-referenced lease ("Lease") between them as provided herein. Capitalized terms used herein without definition are as defined in the Lease. Except as provided in this Amendment, the Lease remains the same.

A. The description and Lessor's Basis table of the Lease is amended to read as follows:

| Item | Seller | Description | Lessor's Basis |
|---|---|---|---|
| 01 | A2a Media Inc. ("*A2a*") and GKD USA, Inc. ("*GKD US*") | The Equipment is a 6,010 square foot Mediamesh installation manufactured by GKD – Gebr. Kufferath AG of Metallweberstraße 46, D-52353 Düren, Germany ("*Manufacturer*") comprising two approximately 3,000 square foot panels, five LED per pixel, full color, outdoor design and including: stainless steel or aluminum housing; cover ducts and cabinets with hinged surfaces for easy service access and covering all cable and data/power components from public tampering; lighting to illuminate approximately 25,000 square feet of the exterior wall area of the Equipment Location; media and license(s) for Interactive Media Pool Platform (IMPP) software; design; all necessary control computers and hardware and other system display electronics; delivery to the Equipment Location; and all installation hardware, materials, and labor necessary to complete the full construction, installation, illumination, and operability of all of the foregoing. | $ 6,026,000 |
| 02 | Lessee | Working capital for Lessee. | 140,023 |
| 03 | Johnsen and Fretty | Commission due by Lessee. | 150,000 |
| 04 | Various | Permitting and legal fees incurred by Lessee with Seller. | 70,000 |
| 05 | - | Deleted. | 0 |
| 06 | A2a and GKD US | Additional Equipment cost per change order to Equipment Agreement. | 213,977 |
| | | Total: | $ 6,600,000 |

B. The Final Expiration Date shall be:

The occurrence of the "Expiration Date" of the Permit (as provided in Section 2(a) thereof) and the Display Agreement (as provided in Section 3 thereof) as they may be supplemented or amended from time to time (with the consent of the Lessor as contemplated by Section 1(g) of the Acknowledgment).

C. The Outside Date shall be July 31, 2011.

D. The Reference Rate shall be 1.87% (Applicable Rate in effect on June 6, 2011).

E. The Rental Payments shall be:

| **Rental Payments:** | **Rental Period** | **Rental Payment** |
|---|---|---|
| | 1 – 7 | $0 |
| | 8 | $50,044 |
| | 9 – 12 | $154,249 |
| | 13 – 24 | $165,267 |
| | 25 – 36 | $176,284 |
| | 37 – 60 | $137,722 |

F. In Section 2 of the Lease:

* In subsection (a), the total amount of the third payment is corrected to be $2,090,000 (all of which has been paid).

* In subsection (b), the total amount of the fourth payment remains $1,100,000 (all of which has been paid).

* In subsection (c): total amount of the fifth payment shall be $1,379,500; the amount to be paid to the Equipment's Seller shall be $1,194,477 (comprising $980,500 of the cost identified in Item No. 01 plus the $213,977 cost identified in Item No. 06); and the amount that may be paid to the Seller of the Soft Cost Items shall be $185,023.

* In subsection (d): the total amount of the final payment shall be $2,030,500 ; the amount to be paid to the Equipment's Seller shall remain $980,500; • the amount to be paid to GM (and credited to the Security Deposit) shall remain $1,050,000; and the amount that may be paid to the Seller of the Soft Cost Items shall be $0.

G. In Section 5 of the Lease, second sentence, after the last semicolon, insert "or."

H. Replace Section 6 of the Agreement with:

6. **End of Term.**

(a) At the end of the Base Term, Lessee may exercise one (only) of the following options, but only if Lessee gives irrevocable notice to Lessor unequivocally electing one of these options (*"Exercise Notice"*) and the Exercise Notice is received by Lessor at least 180 days before the end of the Term:

(i) *Return.* Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term.

(ii) *1-Year Renewal.* Lessee may renew the Term for a 1-year Renewal Term, with a Rental Payment of $104,992 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 1-year Renewal Term, Lessee may exercise one (only) of the following options, but only if Lessee gives a further irrevocable Exercise Notice unequivocally electing one of these options, and the Exercise Notice is received by Lessor at least 180 days before the end of this 1-year Renewal Term: (i) Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term; or (ii) Lessee may purchase all of the Equipment for the Purchase Amount.

(iii) *2-Year Renewal.* Lessee may renew the Term for a 2-year Renewal Term, with a Rental Payment of $79,095 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 2-year Renewal Term, Lessee may exercise one (only) of the following options, but only if Lessee gives a further irrevocable Exercise Notice unequivocally electing one of these options, and the Exercise Notice is received by Lessor at least 180 days before the end of this 2-year Renewal Term: (i) Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term; or (ii) Lessee may purchase all of the Equipment for the Purchase Amount.

(iv) *2½-Year Renewal.* Lessee may renew the Term for a 2½-year (30-month) Renewal Term, with a Rental Payment of $83,705 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 2½-year Renewal Term, Lessee shall unconditionally purchase the Equipment for its fair market value, defined as the price that would be obtained at arm's length between informed and willing parties, neither under compulsion to contract, for the sale or lease of Equipment assuming the Equipment is: in installed, continued, and uninterrupted use by the buyer; in the condition required by this Lease and certified by Manufacturer or GKD US as eligible for a maintenance agreement in favor of the buyer on substantially the same terms as the Maintenance Agreement but at the Manufacturer's then usual rates; and being sold with the software necessary for its use. Such fair market value will be determined by Lessor, but if Lessee objects in writing to Lessor's determination within 10 days after Lessor communicates its determination to Lessee's representative in writing or by email, then such fair market value will at Lessee's expense be determined by an independent appraiser selected by Lessor and reasonably satisfactory to Lessee.

(v) *2½-Year Renewal With End-Of-Term Ownership.* Lessee may renew the Term for a 2½-year (30-month) Renewal Term, with a Rental Payment of $92,825 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 2½-year Renewal Term, if Lessee has made all payments then due under this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee for $1.

(vi) *3½-Year Renewal With End-of-Term Purchase.* If the Final Expiration Date at the time of Lessee's exercise of this option is December 31, 2019 or later, Lessee may renew the Term for a 3½-year (42-month) Renewal Term, with a Rental Payment of $71,670 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 3½-year Renewal Term, Lessee shall unconditionally purchase the Equipment for the Purchase Amount.

(vii) *3½-Year Renewal With End-Of-Term Ownership.* If the Final Expiration Date at the time of Lessee's exercise of this option is December 31, 2019 or later, Lessee may renew the Term for a 3½-year (42-month) Renewal Term, with a Rental Payment of $75,878 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 3½-year Renewal Term, if Lessee has made all payments then due under this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee for $1.

If one of the foregoing options is not exercised, or if Lessee having elected a return or purchase fails to comply with the terms of the option so elected, the Term will automatically extend from its previous expiration date for successive 1-month Renewal Terms, with a Rental Payment of $141,451(as such amount may be adjusted under the first paragraph of Section 5), and with all other provisions of this Lease continuing to apply. At the end of any such 1-month automatic Renewal Term, Lessee may exercise one (only) of the options set forth above in the preceding clauses of this subsection, but only if Lessee gives an irrevocable Exercise Notice (or further irrevocable Exercise Notice) unequivocally electing the option and the Exercise Notice is received by Lessor at least 180 days before the end of such 1-month automatic Renewal Term (and the option selected will be effective at the end of the 1-month automatic Renewal Term whose expiration date is to occur on or after 180 days from Lessor's receipt of the Exercise Notice).

(b) Where a purchase option or purchase obligation applies at the end of a Renewal Term for a price equal to the Purchase Amount, as provided above, Lessee will make all payments required for the rest of the Term (including after it has given any Exercise Notice) and on the last day of the Term Lessee will pay Lessor the following (*"Purchase*

*Amount"*): (i) (A) in the case of an option under subsections (a)(ii) or (iii) above, the sum total of the Rental Payments which would have been due and payable for the full 2½-year Renewal Term provided for in subsection (a)(v) above had Lessee properly elected that option at the end of the Base Term, or (B) in the case of an option under subsection (a)(vi) above, the sum total of the Rental Payments which would have been due and payable for the full 3½-year Renewal Term provided for in subsection (a)(vii) had Lessee properly elected that option at the end of the Base Term, minus (ii) the sum total of all Rental Payments scheduled for all Renewal Terms (up to the amount specified in the preceding clause (A) or (B), as applicable), plus (iii) all applicable Taxes; and on payment of all such amounts and any other outstanding amounts under this Lease as required by this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee.

(c) Any renewal option available to Lessee at the end of the then scheduled Term (whether it be the end of the Initial Term or a Renewal Term in effect or to come into effect under the terms of this Lease, as the case may be, *"Applicable Term"*), would result in the Term extending beyond the Final Expiration Date for any reason (e.g., if the Base Term Commencement Date occurs after July 1, 2011 or if any intervening 1-month automatic Renewal Terms occur), then the Rental Payment for the Renewal Term for each of the renewal options available to Lessee at the end of the Applicable Term will, instead of the amount originally stated in subsections (a)(ii) through (vii) above, as applicable, be determined as (i) the Rental Payment so stated, (ii) multiplied by the number of months in the Renewal Term for which such Rental Payment was to have been applicable (i.e., 12, 24, 30, or 42, as applicable), and (iii) divided by the number of months actually remaining following the Applicable Term to (and including) December 31, 2018 (in the case of a renewal under subsections (a)(ii) through (v) or December 31, 2019 (in the case of a renewal under subsections (a)(vi) and (vii)).

I.   Add a new Section 35 to the Lease:

35. **Right to Perform For Lessee: Insurance.** If Lessee fails to procure or maintain (or pay any premium due for) the insurance required under this Lease or otherwise perform or observe the provisions of this Lease, including in respect of the insurance required under Section 11, Lessor in its own name or in the name of Lessee as Lessee's attorney-in-fact may obtain such insurance (or pay any such premium), and Lessee shall reimburse the costs thereof to Lessor on demand. Lessee hereby irrevocably appoints Lessor, as Lessee's attorney-in-fact to file, settle or adjust, and receive payment of claims under any such insurance policy and to endorse Lessee's name on any checks, drafts or other instruments on payment of such claims (and Lessee will immediately and unconditionally deliver over to Lessor any such checks, drafts, or other instruments).

**Garage Media NY LLC (Lessee)**                    **Macquarie Equipment Finance, LLC (Lessor)**

By: _____                By: _____

Name/Title: ___Garett Neff___                       Name/Title: __Andrew R. Feldstein__
                                                                V.P. and Asst. Gen. Counsel
Date: _____6/21/2011_____                     Date: _____6·23·11_____

# EXHIBIT C



**Amendment No. 2
dated July 28, 2011
to Lease No. 001 dated October 26, 2010**

| | | | |
|---|---|---|---|
| **Lessee:** | Garage Media NY LLC<br>1 Union Place<br>Hartford, CT 06103 | **Lessor:** | Macquarie Equipment Finance, LLC<br>2285 Franklin Road, Suite 100<br>Bloomfield Hills, MI 48302 |

Lessor and Lessee amend the above-referenced lease (as previously amended, *"Lease"*) between them as provided herein. Capitalized terms used herein without definition are as defined in the Lease. Except as provided in this Amendment, the Lease remains the same.

A. From Item 01 of the Equipment, remove "lighting to illuminate approximately 25,000 square feet of the exterior wall area of the Equipment Location," and the delivery, installation hardware, materials, and labor necessary to complete the full construction, installation, illumination, and operability thereof (collectively, the *"Architectural Lighting"*). The Lessor's Basis of Item 01 is reduced by the sum of $125,000, the cost of the Architectural Lighting. The Lessor's Basis of Item 02 of the Equipment (working capital) is increased by the sum of $566,952 (*"Additional Financing"*). As a result of the foregoing, the total Lessor's Basis of all of the Equipment is $7,041,952 (i.e., $6,600,000 - $125,000 + $566,952).

B. Lessee hereby affirms its certification that on June 30, 2011 (which, as described in Acceptance Certificate No. 4, is the Acceptance Date of Item 01 of the Equipment, the Acceptance Date of the rest of the Equipment being as described in the other Acceptance Certificates), all of the Equipment was delivered to the Equipment Location, fully constructed, installed, inspected, and tested and approved and accepted by Lessee for all purposes of the Lease, the Equipment Agreement, the Services Agreement, the Permit, and the Display Agreement, and all related documents. In addition, Lessee certifies that: (a) on and as of June 30, 2011 (which shall be the Acceptance Date for the Additional Financing portion of the Soft Cost Items) Lessee accepted such costs as Soft Cost Items for all purposes; and (b) no Event of Default or event that with notice or the lapse of time would constitute an Event of Default is continuing. For the avoidance of doubt, this section is the Final Acceptance Certificate under the Lease.

C. As a result of the removal of the Architectural Lighting as Equipment under the Lease, and the foregoing acceptance of the Additional Financing portion of the Soft Cost Items, all of the Equipment has been accepted. The Base Term Commencement Date is July 1, 2011.

D. The Rental Payments shall be:

| ***Rental Payments:*** | *Rental Period* | *Rental Payment* |
|---|---|---|
| | 1 – 4 | $0 |
| | 5 – 12 | $151,559 |
| | 13 – 24 | $162,385 |
| | 25 – 36 | $173,209 |
| | 37 – 60 | $135,320 |

E. In Section 2 of the Lease:

* In subsection (a), the total amount of the third payment remains $2,090,000 (all of which has been paid).

* In subsection (b), the total amount of the fourth payment remains $1,100,000 (all of which has been paid).

* In subsection (c): total amount of the fifth payment remains $1,379,500 (all of which has been paid).

* In subsection (d): the total amount of the final payment shall be $2,597,452; the amount to be paid to the Equipment's Seller shall be $855,500 (all of which has been paid); the amount to be paid to GM (and credited to the Security Deposit) shall remain $1,050,000 (which amount is hereby paid to GM by crediting it to the Security Deposit to be held by Lessor as collateral under the GM Security Agreement); and the amount to be paid to the Lessee as Seller of the Additional Financing portion of the Cost Items shall be $566,952 (to be paid to Lessee upon satisfaction of any of the conditions to payment remaining outstanding).

F. In Section 6(a) of the Lease:

* In clause (ii), replace "$104,992" with "$103,161."

* In clause (iii), replace "$79,095" with "$77,715."

* In clause (iv), replace "$83,705" with "$82,245."

* In clause (v), replace "$92,825" with "$91,206."

* In clause (vi), replace "$71,670" with "$70,420."

* In clause (vii), replace "$75,878" with "$74,555."

Macintosh HD:Users:garymeff1:Library:Mail Downloads:Lease Amd2 v1 doc

- In the sentence following clause (vii), replace "$141,451" with "$138,984."

G. This Amendment is conditioned upon the execution by the parties of Lease No. 002 providing for a lease of the Architectural Lighting (the *"Lighting Lease"*). The Lease shall be coterminous with the Lighting Lease. No notice by Lessee exercising any of its options or rights of termination, extension, renewal, purchase, or return shall be effective for either the Lease or the Lighting Lease unless similar and corresponding notice is given under both the Lease and the Sign Lease.

**Garage Media NY LLC (Lessee)**

By: _____

Name/Title: _Gary H Neff_ / _M. P._

Date: _7 | 28 | 11_

**Macquarie Equipment Finance, LLC (Lessor)**

By: _____

Name/Title: _Andrew R. Feldstein_
_V.P. and Asst. Gen. Counsel_

Date: _7 - 29 - 11_

Macintosh HD:Users:garyneff1:Library:Mail Downloads:Lease Amd2 v1.doc

# EXHIBIT D



### Amendment No. 3
### dated as of September 1, 2012
### to Lease No. 001 dated October 26, 2010

| Lessee: | Garage Media NY LLC<br>1 Union Place<br>Hartford, CT 06103 | Lessor: | Macquarie Equipment Finance, LLC<br>2285 Franklin Road, Suite 100<br>Bloomfield Hills, MI 48302 |
| --- | --- | --- | --- |

Lessor and Lessee amend the above-referenced lease (as previously amended, *"Lease"*) between them as provided herein. Capitalized terms used herein without definition are as defined in the Lease. Except as provided in this Amendment, the Lease remains the same.

The Rental Payments shall be:

| Rental Period | Rental Payment | Number of Payments |
| --- | --- | --- |
| 1 – 4 | $0 | 4 |
| 5 – 12 | $151,559 | 8 |
| 13 – 14 | $162,385 | 2 |
| 15 – 17 | $50,000 | 3 |
| 18 – 24 | $162,385 | 7 |
| 25 – 36 | $173,210 | 12 |
| 37 – 48 | $156,203 | 12 |
| 49 – 60 | $156,203 | 12 |

This Amendment will when executed be effective as of the date first stated above.

Garage Media NY LLC (Lessee)

By: _____

Name/Title: _____

Date: __10/29/12__

Macquarie Equipment Finance, LLC (Lessor)

By: _____

Name/Title: __Andrew R. Feldstein__
__V.P. and Asst. Gen. Counsel__

Date: __10-30-12__

# EXHIBIT E

**Amendment**
**dated as of March 31, 2013**

**I. In General**

The parties to this Amendment are Macquarie Equipment Finance, Inc. (f/k/a Macquarie Equipment Finance, LLC) (*"Macquarie"*), Garage Media NY LLC (*"GMNY"*), Garage Media LLC (*"GM"*). Macquarie and GMNY amend Lease No. 001 dated October 26, 2011 between them (as previously amended, the *"Lease"*) as provided in Articles I and II of this Amendment; Macquarie and GM amend the Pledge and Security Agreement dated October 26, 2011 between them (*"GM Security Agreement"*) as provided in Articles I and III of this Amendment; and Macquarie and GMNY amend the Security Agreement dated October 26, 2011 between them (*"GMNY Security Agreement"*) as provided in Article I and IV of this Amendment.

Capitalized terms used in this Amendment without definition are as defined in the Lease, the GM Security Agreement, or the GMNY Security Agreement, as applicable. Each of the parties to this Amendment acknowledge and agree to all of the provisions of this Amendment. Except as provided in this Amendment, the Lease GM Security Agreement, and GMNY Security Agreement remain the same and any or all interest, rights, and obligations of Macquarie, GMNY, and GM are not changed. Each of the provisions of this Amendment will be effective only when this Amendment is executed by Macquarie, GM, and GMNY. When effective, this Amendment will be effective on and as of the date first stated above.

For clarity, Macquarie's rights in respect of the Security Deposit provided for in the Lease and GM Security Agreement (as hereby amended) are independent of and cumulative with its rights in respect of the Lessee Security Deposit provided for in the GMNY Security Agreement (as hereby amended).

**II. Amendment No. 4 to Lease No. 001**

The Base Term of the Lease is amended to be 81 months.

The Rental Payments of the Lease are amended to be:

| Rental Period | Rental Payment | Number of Payments | Dates |
|---|---|---|---|
| 1 – 4 | $    0.00 | 4 | 07/01/11 – 10/31/11 |
| 5 – 12 | 151,559.00 | 8 | 11/01/11 – 06/30/12 |
| 13 – 14 | 162,385.00 | 2 | 07/01/12 – 08/31/12 |
| 15 – 17 | 50,000.00 | 3 | 09/01/12 – 11/30/12 |
| 18 – 20 | 162,385.00 | 3 | 12/01/12 – 02/28/13 |
| 21 | 505,166.48 | 1 | 03/01/13 – 03/31/13 |
| 22 – 27 | 100,000.00 | 6 | 04/01/13 – 09/30/13 |
| 28 – 81 | 135,500.00 | 54 | 10/01/13 – 03/31/18 |

Section 6 of the Lease is amended to be:

> **6.   End of Term.** At the end of the Base Term, Lessee may exercise one (only) of the following options, but only if Lessee gives irrevocable notice to Lessor unequivocally electing one of these options (*"Exercise Notice"*) and the Exercise Notice is received by Lessor at least 180 days before the end of the Base Term:
> (a) *Return.* Lessee may elect to return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Base Term.
> (b) *Renewal With End-Of-Term Ownership.* Lessee may elect to renew the Base Term for a 9-month Renewal Term (i.e., through the Final Expiration Date), in which case: the Rental Payment for each Rental Period of the Renewal Term will be $135,500 plus all applicable Taxes; all other provisions of this Lease will continue to apply; and, at the end of the Renewal Term, this Lease will terminate and Lessor will be entitled to Lessor's interest in the Equipment for $1.
> (c) *Purchase Option.* Lessee may elect to purchase all of the Equipment on the last day of the Base Term, in which case: Lessee will make all payments required during the remainder of the Base Term; on or before the last day of the Base Term Lessee will pay Lessor a purchase price for the Equipment equal to $1,170,000 (*"End-of-Term Purchase Option Price"*), plus all applicable Taxes; and, on the last day of the Base Term, if Lessee has paid such amounts and all other payments then due under this Lease, this Lease will terminate and Lessee will be entitled to Lessor's interest in the Equipment.

If one of the foregoing options is not exercised, or if having elected a return or purchase option Lessee fails to comply with the terms of the elected option, Lessee will automatically be deemed to have elected the renewal option provided in subsection (b) above.

Macintosh HD:Users:garynell:Library:Containers:com.apple.mail:Data:Library:Mail Downloads:Lease Amd4 v1 doc

The last three sentences of Section 19 of the Lease are replaced with:

> Accordingly, the parties agree that the Lessor's Return shall be (a) when determined for a date that is on or before the last day of the Base Term (i.e., on or before March 31, 2018), the sum of the present value of the Rental Payments to become due for the remainder of the Base Term, discounted from their respective due dates to the date of determination at 7.5% per annum, plus the present value of End-of-Term Purchase Option Price discounted from the last day of the Base Term to the date of determination at the same rate; and (b) when determined for a date that is after the last day of the Base Term, the product of one-ninth of the End-of-Term Purchase Option Price, multiplied by the number of whole calendar months remaining in the Term. For clarity, the Lessor's Return does not include, and Lessee shall be additionally liable for amounts due under this Lease on or before the date for which Lessor's Return is being determined and other amounts that may become due under this Lease after such date, including Taxes and other indemnity obligations.

### III. Amendment No. 1 to GM Security Agreement

The GM Security Agreement is amended to reduce the amount of the Security Deposit from $1,050,000 to $500,000. GMNY hereby presently and absolutely pays to Lessor the entirety of the funds held by Macquarie representing the $550,000 reduction in the Security Deposit to be applied toward payment of GMNY's outstanding obligation under the Lease (and GM's Obligation under the GM Security Agreement and its Guaranty of GMNY's obligation), including the obligation to pay Lessor $550,000 for the Rental Payment plus all applicable Taxes due under the Lease (as hereby amended) on March 1, 2013.

### IV. Amendment No. 1 to GMNY Security Agreement

Section 1.1 of the GMNY Security Agreement is amended to add the following paragraph:

> "Lessee Security Deposit" means, initially, $0. When in a calendar year Debtor's gross annual sales revenue earned from the Mediamesh equipment that is the subject of the Lease (the "Sign") exceeds $4,250,000, the amount of the Lessee Security Deposit shall be increased, up to $550,000 in the aggregate, by the amount of the excess less up to 15% of the excess that is sales commissions actually payable or to become payable on the excess ("Excess Net Revenues"). Debtor shall unconditionally pay any such increase in the amount of the Lessee Security Deposit to Secured Party within 45 days of the end of the calendar year in which any Excess Net Revenues are earned, and Secured Party shall hold the Lessee Security Deposit as Collateral under this Agreement. The Lessee Security Deposit shall bear no interest and need not be segregated from Lessor's general assets. The Lessee Security Deposit shall not be considered an advance payment of rental or other Obligations or a measure of Lessor's damages in case of default under the Obligations or this Agreement or as conditioning, limiting, or affecting any other Collateral. Secured Party may from time to time, without prejudice to any other remedy, use the Lessee Security Deposit to the extent necessary to make good any payment arrearages or to satisfy any other covenant or obligation of Secured Party hereunder and following any such application of Lessee Security Deposit, Debtor shall pay to Secured Party on demand the amount so applied in order to restore the Lessee Security Deposit to the amount that would have been in the possession of Secured Party had no such application been made. If Secured Party transfers its interest in the Obligations to an assignee who assumes Secured Party's obligations under this Agreement, Secured Party may assign the Lessee Security Deposit to the transferee and thereafter shall have no further liability for the return of the Lessee Security Deposit. Upon satisfaction in full of all Obligations and all commitments of Secured Party which may result in further Obligations, Secured Party shall pay over to Debtor, on demand, the Lessee Security Deposit to the extent not applied.

| Macquarie Equipment Finance, Inc. | Garage Media NY LLC | Garage Media, LLC |
|---|---|---|
| By: _____ | By: _____ | By: _____ |
| Name/Title: Andrew R. Feldstein V.P. and Asst. Gen. Counsel | Name/Title: Gary Neff / MP | Name/Title: Gary Neff / MP |
| Date: 3-18-13 | Date: March 17, 2013 | Date: March 17, 2013 |

Macintosh HD:Users:garyneff:Library:Containers:com.apple.mail:Data:Library:Mail Downloads:Lease Amd4 v1.doc

# EXHIBIT F

**Guaranty**
**October 26, 2010**

| **Obligor:** | **Macquarie:** | **Guarantor:** |
|---|---|---|
| Garage Media NY LLC and Garage Media, LLC, and either or both of them | Macquarie Equipment Finance, LLC 2285 Franklin Road, Suite 100 Bloomfield Hills, MI 48302 | Garett Alan Neff a/k/a Gary Neff |
| 1 Union Place Hartford, CT 06103 | | 22 Mountaincrest Drive Cheshire, CT 06410 |
| | | John Mark Schmid |
| | | 243 Chestnut Hill Rd Litchfield, CT 06759 |
| | | David Karl Schmid |
| | | 4 Old Orchard Way Tolland CT 06084 |

**1. Agreements.** The "Agreements" are any and all of the various agreements, instruments, documents, or other arrangements, now or hereinafter arising, or from time to time in effect, by Obligor in favor of Macquarie or which Macquarie may be entitled to the benefit of, including such as are executed, entered into, or made by Obligor directly with or to Macquarie, or of which Macquarie is a third-party beneficiary, or which may be assigned or collaterally assigned, in whole or in part, to Macquarie, including any promissory notes, any personal property leases, and also including any security agreements, collateral agreements, or other agreements entered into in connection with or in furtherance of any of the foregoing or otherwise providing for additional collateral or security to Macquarie, in connection with a loan, lease, or other financial accommodation made by Macquarie to or for Obligor, or in connection with any other transaction to which Obligor is a party or otherwise bound, whether any of the foregoing are written or oral or electronic or otherwise established. Guarantor represents and warrants that his legal name, as set forth on his birth certificate and his driver's license in the state of his residence, is as set forth above and that his address set forth above is his sole residence address. Guarantor will give Secured Party notice of any change in his name or address within 30 days of the change. The obligations of Guarantor under this Guaranty are joint and several, but as a matter with respect to which Macquarie shall have no obligation or concern and which will not condition, limit, or affect the obligations of Guarantor under this Guaranty, the persons who are the Guarantor under this Guaranty may allocate their obligations solely as among themselves in a separate written agreement.

**2. Guaranty.** As Guarantor will derive commercial benefit from the provisions of this Guaranty, and in order to induce Macquarie to enter into the Agreements, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor unconditionally guarantees to Macquarie the full and prompt payment, observance and performance when due of all obligations of Obligor arising under the Agreements (collectively, the "Guaranteed Obligations"). This Guaranty is absolute, continuing, unlimited, and independent, and shall not be affected, diminished or released for any reason whatsoever, including the following: (a) any invalidity or lack of enforceability of any of the Guaranteed Obligations; or (b) the absence of any attempt by Macquarie to collect any of the Guaranteed Obligations from Obligor or any other guarantor of the Guaranteed Obligations, or the absence of any other action to enforce the same; or (c) the renewal, extension, acceleration or any other change in the time for payment of, or other terms relating to the Guaranteed Obligations; or (d) any modification, amendment, waiver, or other change of the terms of the Agreements, including any such modification, amendment, waiver, or change which expands or increases Guarantor's obligations under this Guaranty; or (e) the failure by Macquarie to take any steps to perfect and maintain any security interest in, or to preserve its rights to, any security or collateral relating to the Guaranteed Obligations; or (f) any action affecting Obligor or any other guarantor of the Guaranteed Obligations; or (g) any judicial or governmental action affecting Obligor or the Guaranteed Obligations, including

Page 1 of 3

Obligor's release from the Guaranteed Obligations or the rejection or disaffirmance of the Agreements or other agreement or any of the terms thereof; or (h) any disability, defense or cessation of the liability of Obligor; or (i) any assignment or transfer of any rights relating to the Guaranteed Obligations; or (j) any other circumstance which might otherwise constitute a defense or a discharge of Obligor, Guarantor or any other guarantor of the Guaranteed Obligations, including the disallowance of all or any portion of Macquarie's claims for payment or performance of the Guaranteed Obligations under Section 502 of Title 11 of the United States Code.

3. **Waivers; Subordination.** Guarantor waives demand, protest or notice of any default or nonperformance by Obligor, all affirmative defenses, offsets and counterclaims against Macquarie, any right to the benefit of any security, and any requirement that Macquarie proceed first against Obligor, any other guarantor of the Guaranteed Obligations, or any collateral security. So long as any Guaranteed Obligations remain outstanding, Guarantor hereby unconditionally and irrevocably waives and releases any and all claims against Obligor now or hereafter arising out of or related directly or indirectly to any of the obligations of Guarantor under this Guaranty or any liabilities of Obligor to Macquarie, including any and all such claims arising from rights of subrogation, indemnity, reimbursement, contribution or setoff of Guarantor against Obligor, whether arising by contract or otherwise.

Guarantor hereby unconditionally and irrevocably subordinates any and all claims and rights it has or may have against Obligor now or hereafter however arising, including such as arise out of or relate directly or indirectly to any of the obligations of Guarantor under any other guaranty of Obligor's obligations to any other person, whether as a result of subrogation, indemnity, reimbursement, contribution or setoff, and whether arising by contract or otherwise.

4. **Payments.** Guarantor agrees that all payments made or required to be made or otherwise payable by Obligor or Guarantor to Macquarie on any of the Guaranteed Obligations will, when made, be final. Guarantor agrees that if any Payment is recovered from or repaid by Macquarie, in whole or in part, in any bankruptcy, insolvency or other proceeding instituted by or against Obligor or Guarantor or any other guarantor of the Guaranteed Obligations, or any creditor of any of theirs, this Guaranty shall continue to be fully applicable to the Guaranteed Obligations to the same extent as though the payment so recovered or repaid had never been originally made.

5. **Continuing Guaranty.** This is a continuing Guaranty and shall not be revoked or terminated by Guarantor so long as any amount owed to Macquarie under the Agreements remains unpaid. Accordingly, this Guaranty shall not be satisfied by any intermediate payment of any Guaranteed Obligation, but shall remain in full force and effect until all Guaranteed Obligations which may at any time or from time to time be outstanding have been satisfied in full.

6. **Assignment.** This Guaranty may not be assigned by Guarantor without Macquarie's prior written consent. Macquarie shall have the unqualified right to assign this Guaranty or any portion hereof or any benefits hereunder to any party, without the consent of Guarantor or Obligor. Macquarie's Assignee shall have all of the rights, privileges and powers granted hereunder to Macquarie and shall have the right to rely upon this Guaranty. This Guaranty shall be binding upon, and inure to the benefit of, Guarantor and Macquarie and their respective successors and assigns (including any personal representatives).

7. **Costs.** Guarantor agrees to pay all costs and expenses, including all court costs and legal fees and expenses incurred by Macquarie in connection with the enforcement of this Guaranty (on an indemnity basis).

8. **Interpretation.** This document contains the entire agreement of the parties concerning the guaranty of the Guaranteed Obligations by Guarantor, and may not be amended or modified except by a writing signed by Guarantor and Macquarie. The section headings and captions contained herein are for purposes of reference and convenience only and shall not in any way affect the meaning or interpretation of this Guaranty. This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. None of the waivers, limitations, agreements, or other terms made or agreed to by Guarantor in the various provisions of this Guaranty shall limit or affect the extent of the waivers,

Page 2 of 3

limitations, agreements, or other terms made or agreed to by Guarantor elsewhere in this Guaranty. The performance of any obligation required of Guarantor hereunder may be waived only by a written waiver signed by Macquarie, and such waiver shall be effective only with respect to the specific obligation described. The waiver by Macquarie of a breach of any provision of this Guaranty by Guarantor shall not operate or be construed as a waiver of any subsequent breach of the same provision or another provision of this Guaranty. As to each Guaranteed Obligation, this Guaranty shall become effective automatically and without further action (and, for the avoidance of doubt, without notice thereof to Guarantor or notice of the acceptance by Macquarie of this Guaranty). In this Guaranty: the singular shall include the plural, and *vice versa*; the use of any gender shall be applicable to all genders; and terms of inclusion are without limitation. The English language shall be the language used for the interpretation of and the giving of all notices under this Guaranty.

**9. Choice of Law.** This Guaranty shall be governed by the internal laws (as opposed to conflicts of law provisions) of the State of New York, USA provided that nothing contained herein shall prevent Macquarie from proceeding at its election against Guarantor in the courts of any other jurisdiction. If any provision of this Guaranty shall be prohibited by or invalid under that law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty. Guarantor hereby unconditionally and irrevocably consents to the jurisdiction of any courts of record having jurisdiction within the State of New York, USA and waives any objection relating to improper venue or *forum non conveniens* to the conduct of any proceeding in any such court. **The parties hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding brought to enforce or defend this Guaranty.**

Garett Alan Neff

Date: _____ 10 26 10

John Mark Schmid

Date: _____ 10/26/10

David Karl Schmid

Date: _____ 10 26/2010

# EXHIBIT G



## METZ LEWIS BRODMAN MUST O'KEEFE LLC

535 Smithfield Street Suite 800 Pittsburgh, Pennsylvania 15222
T: 412.918.1100 F: 412.918.1199 www.metzlewis.com

October 2, 2018



**ATTORNEYS AT LAW**

JOHN R. O'KEEFE, JR.

Garage Media NY LLC
1 Union Place
Hartford, CT 06103
Attention: Garett A. Neff

Garage Media, LLC, Guarantor
1 Union Place
Hartford, CT 06103

Garett A. Neff, Guarantor
22 Mountaincrest Drive
Cheshire, CT 06410

John M. Schmid, Guarantor
167 Fern Avenue
Litchfield, CT 06759

David K. Schmid, Guarantor
4 Old Orchard Way
Tolland, CT 06084

> **Re: Notice of Past Due Payments -**
> **October 26, 2010 Lease Agreement, as amended**

Gentlemen:

Reference is made to that certain Lease Agreement dated October 26, 2010 between Garage Media NY LLC (the "Lessee") and Huntington Technology Finance, Inc. (formerly known as Macquarie Equipment Finance, Inc. and formerly known as Macquarie Equipment Finance, LLC) (the "Lessor") (as amended, the "Lease Agreement"). Payment and performance of all obligations of Lessee under the Lease Agreement were unconditionally guaranteed by Garage Media, LLC, Garett Alan Neff, John Mark Schmid and David Karl Schmid (each a "Guarantor" and together, the "Guarantors").

According to Lessor's records, rental payments, taxes and other amounts due under the Lease Agreement have not been paid since on or about May 8, 2015. As of October 1, 2018, the amount past due to the Lessor was computed as follows:

| | |
|---|---|
| Past Due Payments | $6,568,663.35 |
| Late Interest | 1,450,380.00 |
| **TOTAL:** | **$8,019,043.35** |

These amounts, as adjusted from day to day, are overdue and must be paid immediately. You should contact Edward Kitchen to determine the exact amount due on the date you anticipate making payment. The contact information for Edward Kitchen is as follows:

Direct Dial: 412.918.1133          e-mail: jokeefe@metzlewis.com          Cellular: 412.848.4356

Page 2 of 2
October 2, 2018


Edward Kitchen, Senior Vice President
The Huntington National Bank
310 Grant Street
Grant Building, 2nd Floor
Pittsburgh, PA 15219
Telephone: (412) 667-6527


In the meantime, the Lessor expressly reserves all rights and remedies available to it by agreement, at law or in equity because due to the past due rental payments, taxes and other amounts due under the Lease Agreement. No delay of the Lessor to take any action with respect to the same shall be construed to constitute a waiver of Lessor's rights under the Lease Agreement, at law or in equity or impair or otherwise prejudice the later exercise of any such rights or remedies. Nothing contained in this letter, in any prior or subsequent communication among or between the Lessor, its counsel, the Lessee, the Guarantors and/or their counsel, or any action by the Lessor or any failure by it to act, shall be construed to constitute or shall be deemed as: (i) a course of dealing obligating the Lessor to take or not take any action at any time, (ii) a commitment or an agreement to make a commitment with regard to any possible restructure of the Lease Agreement, or (iii) an agreement to forbear from exercising any rights or remedies.

Very truly yours,

John R. O'Keefe, Jr.

JRO/sal

cc:     Christopher Blau, Esquire     cblau@zeislaw.com
        Edward J. Kitchen, Senior Vice President edward.kitchen@huntington.com

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Huntington Technology Finance, Inc. f/k/a Macquarie Equipment Finance, Inc. f/k/a Macquarie Equipment Finance, LLC | Neff, Garrett A. a/k/a Neff, Gary; Schmid, John M.; and Schmid, David K. |

**(b)** County of Residence of First Listed Plaintiff   Allegheny
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   New Haven
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Carmody Torrance Sandak & Hennessey LLP, 195 Church Street, P.O. Box 1950, New Haven, Connecticut 06509-1950; (203) 777-5501

Attorneys *(If Known)*

Zeisler & Zeisler, P.C., 10 Middle Street, 15th Floor, Bridgeport, Connecticut 06604; (203) 368-4234

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |    Product Liability | |    28 USC 157 |    3729(a)) |
| ☐ 140 Negotiable Instrument |    Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |    Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|    & Enforcement of Judgment |    Slander |    Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |    Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|    Student Loans | ☐ 340 Marine |    Injury Product | |    New Drug Application | ☐ 470 Racketeer Influenced and |
|    (Excludes Veterans) | ☐ 345 Marine Product |    Liability | | ☐ 840 Trademark |    Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |    Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending |    Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract |    Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) |    Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |    Property Damage |    Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |    Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - |    Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| |    Medical Malpractice | |    Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** |    Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee |    Income Security Act |    or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party |    Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ |    Sentence | |    26 USC 7609 |    Agency Decision |
| ☐ 245 Tort Product Liability |    Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | |    State Statutes |
| |    Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |    Other | ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | |    Conditions of | | | |
| | |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1332(a)(1)
Brief description of cause:
breach of contract of guaranty (of equipment lease)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
8,100,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE   10/15/2018

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____