# EXHIBIT 5

## DISPLAY AGREEMENT

THIS DISPLAY AGREEMENT (the "Agreement") is dated as of October 26, 2010 by and among CBS OUTDOOR GROUP INC., a Delaware corporation, whose address is 405 Lexington Avenue, New York, NY 10174 (hereinafter referred to as "CBS" or "Permittee"), GARAGE MEDIA NY LLC, a New York limited liability company (hereinafter referred to as "G-M"), as agreed to and acknowledged by THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, a body corporate and politic created by Compact between the States of New York and New Jersey, with the consent of the Congress of the United States of America, whose address is 225 Park Avenue South, New York, NY 10008 (hereinafter referred to as "PA"). The PA, CBS and G-M may hereinafter be collectively referred to as the "Parties" and individually as a "Party."

WHEREAS, CBS and PA have entered into that certain Permit Agreement, dated May 20, 1996, as amended by that certain Supplemental Agreement No. 1 dated as of May 4, 2004 and that certain Supplemental Agreement No. 2 dated as of October 26, 2010 (collectively, the "Master Agreement"), whereby CBS has the permission to install, place, maintain and operate outdoor advertising signs and spectacular displays along the exposed steel facade of the exterior of the Port Authority Bus Terminal located at 625 8th Avenue, New York, NY (the "Facility"); and

WHEREAS, pursuant to Section 7 of the Master Agreement, CBS has the right to license its rights under the Master Agreement (the "CBS Rights") to a third party with the prior approval of PA; and

WHEREAS, G-M and CBS desire to enter into an agreement whereby G-M would license the CBS Rights and install a Mediamesh® digital display (the "Sign") and other ancillary equipment associated therewith (collectively, the "Equipment") at the Facility in order to advertise digital signage ("G-M Work");

NOW, THEREFORE, in consideration of mutual covenants and conditions as herein contained and other good and valuable consideration, the Parties agree as follows:

1.    Conflict.    The terms and conditions of the Master Agreement are hereby incorporated into this Agreement. If there is any conflict between this Agreement and the Master Agreement, the terms of this Display Agreement shall control. Notwithstanding anything to the contrary herein, all of the terms and conditions of the Master Agreement, shall apply to this Agreement with G-M being replaced for CBS therein as the Permittee, except for Sections 2, 4, 6, 15, 20, 30, 38 and 39, which shall not apply except to the extent specially set forth herein to the contrary.  Nothing contained herein shall affect, impair, diminish, or change any of the duties, responsibilities, liabilities and obligations imposed on CBS under the Master Agreement; except as specifically set forth herein or in the Supplemental Agreement No. 2 of the Master Agreement.

2.    Right.  For and during the Term (as defined herein) of this Agreement, with the approval of PA as demonstrated by PA's execution of this Agreement, CBS hereby grants to G-M the right to install and operate the Sign and the Equipment at the Facility to display digital

1

80067136.20

advertising. The Parties specifically understand, acknowledge, and agree, if and to the extent that any right or privilege granted to G-M hereunder is greater than that granted by PA to CBS under the Master Agreement, the greater right and privilege is granted to G-M under this agreement directly by PA, and not by or through CBS.

3.     Term.   The Term of this Agreement shall commence on the date hereof (the "Commencement Date") and shall expire on the earlier of: (a) the date of expiration or earlier termination of the Master Agreement, (b) December 31, 2018, or (c) upon termination of this Agreement (as the case may be, the "Expiration Date").

4.     License Fee.

(a) G-M shall pay to CBS the guaranteed revenue fee ("Fee") as set forth on Exhibit A attached hereto per license year to be paid monthly, without setoff or notice, on the first of every calendar month during the Term hereof.   Fee payments shall commence the earlier of: (a) four (4) full calendar months after the drawings, plans and other specifications for the Sign and the Equipment are approved by PA and CBS; (b) the date following the completion of G-M's Work as the PA may designate to CBS as the date on which public operation may be commended for G-M's Work; or (c) December 31, 2010; provided that in the event the Sign is not operational by December 31, 2010, the payment of the Fee shall be deferred until such time as the Sign is operational, provided however, such deferral shall not exceed sixty (60) days.

(b) In addition to the Fee, bonus revenue shall be calculated by G-M and CBS in accordance with Section 10 and the parameters set forth on Exhibit B (the "Bonus Revenue") and payable as follows: (i) sixty (60) days following the quarter in which any of the annual thresholds set forth on Exhibit B are achieved and exceeded by G-M as evidenced by the quarterly statements required pursuant to Section 10 hereof; and (ii) sixty (60) days following the fourth quarter for any additional Bonus Revenue earned in any year where the threshold had previously been achieved and exceeded in an earlier quarter of that respective year.

5.     Security.   (a) Prior to the earlier of (i) ten (10) days after the date hereof or (ii) the date G-M commences installation of the Sign and/or Equipment, G-M shall deliver to CBS as security of the performance by G-M of all its obligations hereunder an irrevocable letter of credit drawn by a bank reasonably acceptable to CBS in a form reasonably acceptable to CBS in the amount equal to Six Hundred Thousand and 00/100 Dollars ($600,000.00).

(b)     PA and CBS hereby subordinate their interest in the Sign and the Equipment to a lender, lessor, or other financer of G-M ("Lender").    The financing agreement between G-M and Lender has been submitted to PA and CBS for their approval (and such approval is hereby given) ("Lender Financing Agreement"). In the event of a G-M default pursuant to the terms and conditions of a loan, lease, or other financing arrangement G-M receives from its Lender whereas Lender forecloses on its security interest (or otherwise divests G-M from any or all of its right, title, or interest) in the Sign and the Equipment, Lender shall have the option to (i) remove the Sign and the Equipment and restore the Facility to its condition prior to any installation in accordance with the terms of the Master Agreement or (ii) continue to operate the Sign and the

Equipment and assume all obligations of G-M as outlined herein, including but not limited to, the payment to CBS of all Fees and Bonus Revenue.

(c)     In the event that CBS terminates or breaches this Agreement or the Master Agreement, CBS shall promptly transfer the Security to PA.

6.     Removal of Existing Advertising Display at the Facility. Prior to the installation of the Equipment, G-M shall be, at its sole cost and expense, responsible for the removal and disposal of the existing advertising display at the Facility façade and any damage caused by the removal thereof.

7.     Installation, Maintenance and Removal of the Equipment. The Facility shall be accepted in "as is" condition without any obligation of the PA or CBS to prepare or construct the Facility for the permitted use. G-M shall furnish to PA, copying CBS, copies of drawings, plans and other specifications necessary to detail the location and size of the Sign and all Equipment to be installed at the Facility. Such submissions or any approvals or rejections shall be subject to the prior written approval of the PA, to the extent required by the Master Agreement. G-M's submission or any approvals or rejections shall impose no liability or responsibility on the PA or CBS. Submissions shall be made to PA, copying CBS within thirty (30) days from the execution of this Agreement. Any resubmissions required by PA shall be made to PA, copying CBS, within fifteen (15) days from notification to G-M of the changes required by PA. G-M is responsible, at their cost, for the partial removal of the existing grid. CBS and PA shall provide to G-M with copies of all readily available plans, drawings and specifications with respect to the existing grid in order to enable G-M to complete such removal efficiently and expeditiously.

In addition to the installation of the Sign and Equipment, PA hereby approves the installation of the architectural lighting scheme, subject to PA's Tenant Alteration Application process, at G-M's cost, as set forth on Exhibit E hereto. It is understood that such lighting will provide visual support for the Sign and illuminate approximately 25,000 square feet of steel structure on the "X" bracing trusses. It is hereby agreed that the mounting of the light fixtures and the painting of the steel trusses by PA will be coordinated between PA and A2a MEDIA, Inc., subject to G-M's prior approval of the costs incurred.

As of the date hereof, G-M will be responsible for purchasing, delivering, installing, assembling, and maintaining the Sign and the Equipment, at no cost to the PA or CBS; provided, that the installation of the Sign and Equipment shall be subject to the reasonable requirements and approval of the PA. G-M will install the Sign and the Equipment, including all its necessary components to provide digital advertising at the Facility within the earlier of (i) one hundred and fifty (150) days after the date hereof; or (ii) March 31, 2011, subject to any Force Majeure Event (as hereinafter defined). In addition, G-M will procure, at its sole cost and expense, all licenses, certificates, permits and other authorizations necessary for the conduct of its operations hereunder from all governmental authorities having jurisdiction over such operations. It being expressly understood by all parties that G-M shall not procure any licenses, certificates, permits and other authorizations from the New York City Department of Buildings, including but not limited to any permits to construct, install and maintain the Sign and Equipment. PA and CBS

each agrees to cooperate, at no expense or cost to PA or CBS, with G-M in its procurement of such licenses and certificates.

PA acknowledges and agrees that the nature of the Sign and the Equipment render it not feasible of being relocated without significant expense and interruption of service, and accordingly, absent an emergency, PA agrees that it shall not request the relocation of the Sign and Equipment.  In the event G-M agrees to a relocation requested by PA pursuant to the provisions of Section 3(b) of the Master Agreement, (a) no Fee or Bonus Revenue shall be due and payable to CBS appropriately allocable for period the Sign is not illuminated as a result of relocation; (b) PA shall be solely responsible for reimbursing (or paying) the costs of deinstalling the Sign and/or Equipment, of reinstalling the Sign and/or Equipment, regardless of whether the relocation is performed by CBS, PA, or G-M; and (c) all deinstallation and reinstallation shall be performed by the Sign's manufacturer/GKD-USA, Inc.  However, if G-M earns revenue from an advertiser during a relocation, the appropriately prorated Fee and the applicable Bonus Revenue shall be due and payable to CBS.

G-M shall otherwise comply with all applicable Facility regulations or requirements in performing any of its responsibilities under this Agreement, including but not limited to any requirements with regard to employees and agents as well as the Equipment to be installed hereunder.

G-M shall, at G-M's sole cost and expense, maintain the portions of the Facility used by the Sign and Equipment in good, clean and safe condition and make all necessary nonstructural repairs thereto within forty-eight (48) hours of receiving notice from the PA and/or CBS; provided, however, no prior notice shall be required in the event of an emergency.

In the event of early termination of this Agreement before the Expiration Date for any reason whatsoever, G-M shall remove the Sign and the Equipment from the Facility and shall restore the Facility to accept a new advertising display of like character and form as the existing advertising display within forty-five (45) days of the date of termination of this Agreement; provided that upon any revocation or termination by PA without cause, PA shall not enter into any agreement with any party, including but not limited to CBS, to provide same or similar display technology as G-M through term of this Agreement.

8.   Electricity at the Facility.  Subject to Section 21 of the Master Agreement, PA shall furnish and supply to G-M and G-M shall take and pay for, in reasonable quantities, the supply of electricity to be made available by the PA to G-M at such points at the Facility as PA shall designate for connection to its various electrical distribution systems; provided, however, that given the nature of the Sign and the Equipment, PA shall cooperate with G-M in assuring adequate connection points and power supply; provided, however, that there shall be no right to suspend providing any services pursuant to Section 21(f) of the Master Agreement unless notice has been provided to G-M and, in the case of a default in respect of the failure to pay an amount due under by G-M, G-M shall not have cured the default within 10 business days of receipt of such notice or, in the case of any other default, G-M shall not have immediately upon receipt of such notice commenced taking all reasonable steps to cure the default, and continue therewith until a cure is effected.  The PA shall have no responsibility for the distribution of electrical

4

800671 36.20

current at the Facility or for the maintenance therein of any electrical usage. The quantity of electricity used by G-M shall be metered by the PA and paid for by G-M. G-M shall be invoiced for its electricity use and shall submit payment within fifteen (15) days of receipt of invoice. Notwithstanding that the PA has agreed to supply electricity to G-M, the PA shall be under no obligation to provide or continue such service if the PA is prevented by law, agreement or otherwise from metering as hereinabove set forth or elects not to so meter the same, then in any such event G-M shall make all arrangements and conversions necessary to obtain electricity directly from the public utility; provided, that PA and CBS shall reasonably cooperate, at no expense or cost to CBS or PA, with G-M in any actions taken in order to facilitate obtaining electricity from a public utility. Upon reasonable prior notice to G-M, PA shall have the right to temporarily discontinue the supply of electricity when necessary or desirable in the opinion of the PA in order to make repairs, alterations, changes or improvements in the Facility; provided, however, that if such disruption in electricity shall endure for a twenty-four (24) hour period, the Fees payable hereunder appropriately allocable to the period of disruption shall be proportionately reduced, and, further, except in emergencies, all such activities shall be scheduled in full consultation with G-M and so as not to unduly interrupt Sign activities.

9.    Advertising Restrictions.

(a)    All advertising copy or material to be displayed at the Facility shall be subject to the written approval of the PA. G-M shall immediately remove any advertising copy or material if notified by the PA for which approval has not been given. G-M agrees to display public service announcements during any time in which G-M has no agreements with advertisers (a "Sublicense Agreement") contracted to display copy on the Sign. G-M agrees to only enter into arms' length transactions, and no barters or bonus space will be allotted at the Facility. In addition to the foregoing, G-M agrees to preempt the display of copy in order to utilize the Sign for public service messages in connection with (a) an Amber Alert, or (b) the request of any Federal, State or local authority, any public emergency (including but not limited to emergencies related to homeland security); provided, however, that if such preemption shall endure for more than a twenty-four (24) hour period, the Fees payable hereunder Fees payable hereunder appropriately allocable to the applicable period shall be proportionately reduced.

(b)    In the event CBS intends to install any advertising signs along the exposed steel façade of the Facility, it shall give G-M thirty (30) days advance notice of its intention to do so. Such installation shall be subject to G-M's written approval, not to be unreasonably withheld, delayed or conditioned, it being the intention of the parties that any CBS signs shall in no way unreasonably or materially interfere with the use of G-M's sign or equipment or adversely effect its value

10.    Quarterly Statements. Within twenty (20) days of the end of each whole quarter of the Term, G-M shall submit to CBS a written statement reflecting the total revenue earned by G-M for its operation of the Sign for such period evidenced solely by invoices issued by G-M, less commissions actually paid, not to exceed sixteen and sixty-six hundredths percent (16.66%), at the Facility (the "Gross Revenue") from the immediately preceding quarterly period.

80067136.20

5

11.    Annual Certified Statement of Revenue.  G-M shall submit to CBS on or before the date which is forty-five (45) days after the end of each license year, a complete statement showing clearly, accurately and in reasonable detail the Gross Revenue during the immediately preceding license year and the total Bonus Revenue that is payable to CBS for that license year. Such statement shall be certified by an independent certified public accountant or an authorized officer of G-M.

12.    Record Keeping.  G-M agrees to keep, retain and preserve at its notice address as set forth in Paragraph 25 of this Agreement or at such other principal place of business as designated by G-M to CBS in writing, for at least three (3) years after the expiration of the respective license year of the Term, all sales records, checks and other pertinent records of each transaction or accurate and legible copies of same, complete accurate books and records (including but not limited to copies of all Sublicense Agreements) in accordance with generally accepted accounting practices of all sales and service as well as all other data or facts necessary to determine or verify Gross Revenue and the Bonus Revenue hereunder.

13.    Audit.  CBS may, at its own expense, conduct an audit of the books and records of G-M pertaining to the operations of the Sign at the Facility and any other documents relevant to any statement G-M is required to submit to CBS, including but not limited to Sublicense Agreements (the "CBS Audit").  If the CBS Audit demonstrates that G-M has underpaid CBS the Bonus Revenue (a "Deficiency"), CBS shall promptly notify G-M in writing the details of such Deficiency (the "Notice of Deficiency").  If G-M does not dispute the Deficiency within thirty (30) days, G-M shall pay to CBS (i) an amount equal to the Deficiency and (ii) all audit expenses incurred by CBS in the event that the Deficiency in the amount of Gross Revenue is more than five percent (5%) of the amount of Bonus Revenue reported by G-M.  In the event G-M disputes the CBS Audit, an independent auditor (the "Auditor") shall be appointed by the mutual agreement of each of the CBS and G-M within thirty (30) days following the expiration of the thirty (30) day period referred to above.  For the purpose of performing the audit, the Auditor shall be given access to, and may review, subject to appropriate confidentiality arrangements, all books, records and information reasonably available to G-M, and applicable to such determination.  The Auditor shall prepare and submit its written determination as to the existence of a Deficiency (the "Audit Report").  If the CBS and G-M are unable within that thirty (30) day period to agree on an Auditor, then the each of G-M and CBS shall appoint an Auditor within an additional fifteen (15) day period.  If either party does not appoint an Auditor in such period, the other party's appointed Auditor shall solely be responsible for the determination of the existence of a Deficiency.  Each Auditor shall submit a written report.  Each of the Auditors' reports shall be submitted to a third independent auditor appointed by the American Arbitration Association who shall be permitted to determine the existence and the amount of a Deficiency based on the Audit Reports.  The determination of the existence of a Deficiency pursuant to the foregoing procedures shall be conclusive and binding on the parties.  The parties shall pay the fees and expenses of any Auditor designated or appointed by the parties that submitted an Audit Report in accordance with this Section 13; provided, that if it is determined that a Deficiency reported by G-M to CBS is more than five percent (5%) of the amount of Bonus Revenue reported by G-M, all audit expenses incurred by CBS shall be paid within 30 days to CBS by G-M.

14.    Indemnification.  G-M shall indemnify, hold harmless and defend the PA and CBS and their respective parents, subsidiaries and affiliates, commissioners, principals, partners,

800671136.20

members, agents, trustees, shareholders, officers, directors and employees and their respective successors and assigns (collective "Indemnified Parties") from and against any and all claims, actions, damages, liability and expense, including but not limited to attorneys and other professional fees, in connection with personal injury or damage to property and all other claims arising from or alleged to arise from or out of the use by or occupancy of G-M of the Facility or wholly or in part by (i) an act or omission of G-M, or any of its subsidiaries, or its respective officers, agents, representatives, contractors or employees or persons doing business with or on behalf of G-M, (ii) installation or removal of and/or the existence of the Sign or any Equipment at the Facility, or (iii) a breach of G-M's obligations under this Agreement or the Master Agreement.  If so directed, G-M shall at its own expense defend any suit based upon any such claim or demand (even if such claim or demand is groundless, false or fraudulent), and in handling the same it shall not, without obtaining express advance permission from the General Counsel of the PA, raise any defense involving in any way the jurisdiction of the tribunal over the person of the PA, the immunity of the PA, its Commissioners, officers, agents or employees, the governmental nature of the PA, or the provisions of any statutes respecting suits against the PA.

(b) CBS shall indemnify, hold harmless and defend G-M and its parents, subsidiaries and affiliates, commissioners, principals, partners, members, agents, trustees, shareholders, officers, directors and employees and their respective successors and assigns, including, without limitation, Lender and its successors and assigns (collective "G-M Indemnified Parties") from and against any and all claims, actions, damages, liability and expense, including but not limited to attorneys and other professional fees, in connection with any default or breach by CBS of its existing obligations under the Master Agreement (except as the same are obligations of G-M under this Agreement), arising from or alleged or in part by (i) an act or omission of CBS, or any of its subsidiaries, or its respective officers, agents, representatives, contractors or employees or persons doing business with or on behalf of CBS, or (ii) a breach of CBS's obligations under this Agreement or the Master Agreement.

15.    Disclosure.   Except to the extent as may be necessary to disclose to a governmental agency or as required by law and except for confidential disclosures to Lender and its financing sources, the Parties each agree not to disclose the terms of this Agreement to any third parties without the consent of the remaining Parties. Each Party shall keep confidential all information obtained by that respective Party pursuant to this Agreement.

16.    Insurance and Indemnification.   G-M shall procure and maintain comprehensive public liability insurance, including automotive, bodily-injury (including death), property-damage liability and premises-operation, or if the work is to be done by an independent contractor, G-M shall require such contractor to procure and maintain such insurance in the name of the contractor, in either case, in limits not lower than those set forth below:

(a) Bodily Injury Liability:

|  | | |
|---|---|---|
| i. | For injury or wrongful death to one person: | $2,000,000.00 |
| ii. | For injury or wrongful death to more than one person from any one accident: | $2,000,000.00 |

7

80067136.20

(b) Property damage liability (for all damages
    arising out of injury or destruction of property
    in any one accident:                                $2,000,000.00

Each such policy shall include a contractual liability endorsement covering the indemnity obligations assumed by G-M pursuant to the provisions of this Agreement. The PA and CBS and Lender shall be named as additional insured of any policy as their respective interests shall appear, and each such policy shall contain an endorsement providing that the protection afforded G-M with respect to any claim or action against G-M by a third party shall pertain and apply with like effect with respect to any claim or action against G-M by the PA or CBS or Lender and against the PA or CBS or Lender by G-M, but such endorsement shall not limit, vary, change or affect the protection afforded the PA and CBS and Lender as additional insured, and an endorsement providing that the insurer shall not, without obtaining express advance permission from the General Counsel of the PA, raise any defense involving in any way the jurisdiction of the tribunal over the person of the PA, the immunity of the PA, its Commissioners, officers, agents or employees, the governmental nature of the PA or the provisions of any statutes respecting suits over the PA.

A certificate evidencing the existence of the policies of insurance, in a form reasonably acceptable to the PA and CBS, shall be delivered to CBS at least fifteen (15) days prior to G-M's commencement of any work at the Facility.

17.    Liens.  G-M shall not create, permit to be created or permit to remain and will discharge, remove or cause to be removed and discharged promptly, at its sole cost and expense, any lien, encumbrance, or charge at the Facility which arises out of or is in any way connected with the use of the Facility by G-M, its contractors, subcontractors, agents, sublicenses, licensees and invitees, except in accordance with Section 19 of the Master Agreement for any security interest or other right, title and interest granted by G-M to Lender. G-M shall indemnify and hold the PA and CBS harmless from any and all liability, judgments, decrees and costs (including but not limited to attorneys fees and costs) in connection therewith. Each of PA and CBS agrees that there shall be no lien, claim, or encumbrance on the Sign or Equipment arising by, through, or under it, and it will discharge, remove or cause to be removed and discharged promptly, at its sole cost and expense, any lien, encumbrance, or charge on the Sign or the Equipment; provided, in the event of uncured default by G-M with respect to which a judgment is entered by a court of competent jurisdiction in favor of CBS and/or PA, nothing in the foregoing shall condition, limit, or affect any judgment lien the Party obtaining the judgment shall be entitled to on the Sign or Equipment, that is subordinate to the Lender's right, title, and interest in the Sign or Equipment; provided further that CBS and/or PA shall not enforce any such lien without providing Lender thirty (30) days written notice of its intention to do so; provided further, that in the event of any uncured default by Lender with respect to which a judgment is entered by a court of competent jurisdiction in favor of CBS and/or PA, nothing in the foregoing shall condition, limit, or affect any judgment lien the Party obtaining the judgment shall be entitled to on the Sign or Equipment.

18.    Force Majeure.

8

80067136.20

(a)    CBS shall not be liable for any failure, delay or interruption in performing its obligations hereunder due to causes or conditions beyond the control of CBS.  Further, CBS shall not be liable unless the failure, delay or interruption shall result from failure on the part of CBS to use reasonable care to prevent or reasonable efforts to cure such failure, delay or interruption.

(b)    G-M shall not be liable for any failure, delay or interruption in performing its obligations hereunder due to causes or conditions beyond the control of G-M (a "Force Majeure Event").  Further, G-M shall not be liable unless the failure, delay or interruption shall result from failure on the part of G-M to use reasonable care to prevent or reasonable efforts to cure such failure, delay or interruption.   During a Force Majeure Event, no Fee or Bonus Revenue shall be due and payable to CBS appropriately allocable for the period the Sign is not illuminated, is inoperable and/or the view from the Sign is materially obstructed; provided, however, if G-M earns revenue from an advertiser during a Force Majeure Event, the appropriately prorated Fee and the applicable Bonus Revenue shall be due and payable to CBS.

(c)    As used herein, "causes or conditions beyond the control" shall mean and include acts of God, the elements, weather conditions, tides, earthquakes, settlements, fire, acts of Governmental authority, war, shortage of labor or materials, acts of third parties for which the respective party is not responsible, terrorist attacks, disruption in electrical services, injunctions, labor troubles or disputes of every kind and, in general, any other conditions or circumstances whether similar to or different from the foregoing which are beyond the control of the respective party or which could not be reasonably foreseen and prevented, or remedied, by reasonable effort and at reasonable expense.

19.    Defaults and Remedies.  G-M shall be considered to be in default of this Agreement upon the occurrence of any of the following events ("Events of Default"): (a) in the event that no advertising copy or public service announcements are displayed on the Sign or the Sign is not illuminated for thirty (30) consecutive days, except in the event of a Force Majeure Event; (b) G-M's failure to pay when due all or any portion of the Fee, which failure to pay is not cured within five (5) business days of receipt of notice of the payment being delinquent ("Monetary Failure"); (c) G-M's failure, other than a Monetary Failure, to comply with any term, provision or covenant of this Agreement, if such failure is not cured within ten (10) business days after written notice to G-M or sooner if required by PA or, if failure of a nature that cannot be cured within such period, G-M fails to diligently pursue a cure and actually cure the default within sixty (60) days of such notice; or (d) in the event that a petition shall be filed by or against G-M to declare G-M bankrupt or to delay, reduce or modify G-M's debts or obligations or if G-M is declared bankrupt or deemed bankrupt or insolvent, or if any assignment of G-M's property shall be made for the benefit of creditors, or if a receiver or trustee is appointed for G-M, and any such filing, proceeding, assignment or other action that is involuntary continues unstayed or undismissed for 60 days after the commencement thereof (collectively, "Events of Default").

Upon any Event of Default, CBS shall have the right, in its sole and reasonable discretion, to take either or both of the following actions:  (i) to terminate this Agreement and require G-M to remove the Sign and the Equipment from the Facility and restore the Facility,

80067136.20

9

including the restoration of the existing advertising display, to its original condition within sixty (60) days of the date of the termination of this Agreement; and (ii) to make one or more draws upon the letter of credit serving as Security in an amount or amounts in the aggregate equal to the amount of any past due Fee or Bonus Revenue and any and all other losses or damages (including, without limitation attorneys fees) suffered by CBS as a result of such Event of Default. G-M shall pay CBS on demand the amount of any past due Fee or Bonus Revenue and any and all other losses or damages (including, without limitation attorneys fees) suffered by CBS as a result of the Event of Default. In the event CBS elects to terminate this Agreement, at CBS' sole option, any Sublicense Agreements shall terminate effective as of the date CBS elects to terminate this Agreement. Notwithstanding the foregoing upon an Event of Default hereunder and termination, at the sole election of CBS, G-M's interest under the Sublicense Agreements shall be deemed to have automatically been assigned to CBS and CBS shall have the right to receive 100% of any revenue or fees payable to the sublicensee under any Sublicense Agreement. The aforesaid remedies shall be in addition to any other remedies available to CBS under the law of the State of New York and CBS' right to require removal of the Sign pursuant to this Agreement.

Subject to G-M's rights and obligations under the last paragraph of Section 7, G-M hereby expressly waives any and all defenses to any action by CBS or PA to recover possession of the Facility for any Event of Default continuing G-M hereunder.

20.    Termination Fee.  In the event PA elects to terminate the Master Agreement the "Unamortized Capital Cost" which PA shall pay to G-M (and which payment obligation will be absolute and unconditional upon the date of such termination) will be the sum of the unamortized portion of the G-M's cost basis ("Cost Basis") for the Sign and Equipment plus the unamortized portion of a termination fee equal to $9,795,000 where such amounts are calculated on a straight-line amortization basis for eight (8) years beginning on the Final Acceptance Date, all as further described and stipulated to on Exhibit C attached hereto; provided, however, that if the termination is effective before the Final Acceptance Date, the termination fee shall be the sum of such amounts without amortization; and provided further, however, that such termination fee, collectively, shall not exceed $11,000,000.  The Final Acceptance Date is the acceptance date of the Equipment as provided in the Equipment Agreement, by and between G-M, A2A Media, Inc., Lender and GKD USA, Inc. (the "Equipment Purchase Agreement").

21.    Assignment.  G-M shall not assign, sell, convey, transfer, mortgage or pledge in whole or in part this Agreement or the privileges hereunder, except for (i) the security interest and other right, title, or interest held by Lender; and (ii) upon the acquisition of G-M by a sale or other disposition of all or substantially all of the assets of the G-M or any merger, consolidation or other form of reorganization; in either case to be submitted to the PA and CBS for their prior written consent, not to be unreasonably withheld, conditioned or delayed.  G-M shall not use or authorize any person to use the Facility for any other purpose except as set forth herein.

22.    Representations and Warranties; Covenants.

80067136.20

(a)    G-M hereby represents and warrants that it holds the license or sub-license to all applicable patents and trade secrets and other intellectual properties necessary for the ordinary operation of the Sign and Equipment. G-M shall indemnify and hold the PA and CBS harmless from any and all liabilities, costs and expenses (including but not limited to reasonable attorney's fees) arising from or relating to the failure of the above representations and warranties, as well as from any claim that the Sign and the Equipment provided by G-M hereunder infringes on any patent, copyright, trade secret or other intellectual property rights.

(b)    G-M covenants and agrees to operate the Sign and Equipment throughout the term the Agreement in accordance with the Equipment Purchase Agreement, previously provided to PA and CBS, and as the same may be amended with the approval of PA and CBS (not to be unreasonably withheld, delayed, or conditioned).

(c)    G-M shall cause Garage Media, LLC, a Connecticut limited liability company, to execute and deliver a Guaranty for the benefit of CBS and PA, as applicable, in the form attached hereto as Exhibit D.

(d)    Upon the expiration and termination of this Agreement, if and only if the Expiration Date is on and as of December 31, 2018, G-M hereby covenants and agrees to: (i) exercise the option to purchase the Sign and Equipment pursuant to the agreement by and between G-M and the Lender and thereafter to transfer ownership of the Sign and Equipment to PA; (ii) assign such right to option to purchase the Sign and Equipment to PA; or (iii) in the event that G-M has previously purchased the Sign and Equipment from Lender, the ownership of the Sign and Equipment shall vest with PA AS-IS, WHERE-IS, in accordance with the terms set forth in Section 44 of the Master Agreement.

23.    <u>Independent Contractors</u>.  The Parties intend that PA, CBS and G-M shall at all times be independent contractors.  No representations made by each Party shall create an agency, employment, partnership or joint venture.  No Party shall be responsible for the acts or omission of the other.

24.    <u>No Joint Venture or Partnership</u>.  Nothing in this Agreement shall be construed as establishing a joint venture or partnership between PA, CBS and G-M.  No Party shall have the right to enter into any agreement that binds or obligates the other Party in any way without the written consent of the other Party or as otherwise provided in this Agreement.

25.    <u>Late Charges</u>.  (a) If G-M should fail to pay any amount under this Agreement when due to CBS, including without limitation any payment of any basic or percentage rent or any payment of utility or other charges, or if any such amount is found to be due as the result of an audit, then, in such event, CBS may impose (by statement, bill or otherwise) a late charge with respect to each such unpaid amount for each late charge period (herein below described) during the entirety of which such amount remains unpaid, each such late charge not to exceed an amount equal to eight-tenths of one percent of such unpaid amount for each late charge period. There shall be twenty-four late charge periods on a calendar year basis; each late charge period shall be for a period of at least fifteen (15) calendar days.  Without limiting the generality of the foregoing, late charge periods in the case of amounts found to have been owing to CBS as the

11

result of CBS' audit findings shall consist of each late charge period following the date the unpaid amount should have been paid under this Agreement. Each late charge shall be payable immediately upon demand made at any time therefore by CBS. No acceptance by CBS of payment of any unpaid amount or of any unpaid late charge or late charges payable under the provisions of this Section shall be deemed a waiver of the right of CBS to payment of any late charge or late charges payable under the provisions of this Section with respect to such unpaid amount. Nothing in this Section is intended to, or shall be deemed to, affect, alter, modify or diminish in any way (i) any rights of CBS under this Agreement or (ii) any obligations of the G-M under this Agreement. In the event that any late charge imposed pursuant to this Section shall exceed a legal maximum applicable to such late charge, then, in such event, each such late charge payable under this Agreement shall be payable instead at such legal maximum. Notwithstanding this Late Charge provision, PA's late charge provision in its Master Agreement with CBS will control the relationship between CBS and PA.

(b)      Notwithstanding anything to the contrary in this Agreement, in the event that CBS shall default or cause any breach under the Master Agreement, beyond any applicable cure, notice or grace periods, PA hereby acknowledges that G-M shall succeed to all rights and obligations held by CBS, in which case:  (i) PA shall be bound by (and G-M's rights and obligations shall continue to be) determined by all of the terms of this Agreement; (ii) G-M shall pay in full to PA that which it otherwise would have paid to CBS and in general otherwise perform this Agreement for PA in in the same manner and to the same extent it would have performed it for CBS; and (iii) in general, in the event of an inconsistency between this Agreement and the Master Agreement, the terms of this Agreement shall control. Thus, by way of clarification and not of limitation:  any defaults and termination for default shall be determined as provided under Section 19 of this Agreement and not under Section 38 of the Master Agreement; and fees to be paid by G-M to PA under this Agreement shall be the Fees and Bonus Revenue provided for in this Agreement, and not as provided in Sections 4 and 6 of the Master Agreement).

26.      Notices. All notices and other communications required or permitted under this Agreement shall be in writing and shall be either: (i) delivered by hand, in which event the notice shall be deemed effective when delivered; (ii) delivered by prepaid registered or certified mail, return receipt requested in which event the notice shall be deemed effective when received; or (iii) delivered by recognized overnight courier services and shall be deemed to have been received as of the regularly scheduled time for delivery established by such courier service. All notices and other communications under this Agreement shall be given to the Parties hereto at the following addresses:

G-M:            Garage Media LLC NY
                One Union Place
                Hartford, CT 06103
                Attn: Gary Neff
                Facsimile: (203) 413-2933

With a copy
to:             Mark D. Geraghty

Steve N. Spanolios
Davidoff Malito & Hutcher LLP
650 Third Avenue, 34th Floor
New York, NY 11105
Facsimile: (212) 286-1884

CBS:           CBS Outdoor Group Inc.
                   405 Lexington Avenue
                   New York, NY 10174
                   Attn: Richard Ament

With a copy
to:            CBS Outdoor Group Inc.
                   405 Lexington Avenue
                   New York, NY 10174
                   Attn: General Counsel

PA:            Port Authority of New York and New Jersey
                   225 Park Avenue South
                   New York, NY 10003
                   Attn: Roy Bickley

The parties may designate that a notice be given to such other address as they may from time to time specify by written notice as herein provided to the other party.

27.     <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall be, as to such jurisdiction, ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement.

28.     <u>Non-waiver</u>. Failure by either party at any time to enforce any of the terms hereof or a breach by the other party shall not constitute a waiver of any of the provisions hereof or of subsequent breaches.

29.     <u>Governing Law, Jurisdiction, Waiver, Attorneys' Fees Counterparts, Facsimile Signatures</u>. This Agreement is the entire agreement between the Parties and, except as otherwise provided herein, can only be changed, modified, amended or terminated by an instrument in writing executed by the Parties. The Parties hereby mutually waive their respective right to a jury trial. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. Any legal proceedings arising pursuant to this Agreement shall be instituted in, and the Parties each hereby submit themselves to the jurisdiction of the State of New York, New York County. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one instrument. For purposes of this Agreement, facsimile signatures shall be deemed originals.

[Signature Page to Follow]

13

IN WITNESS OF WHEREOF, the Parties have signed this Agreement as of the date hereof.

GARAGE MEDIA NY LLC

By: GARAGE MEDIA, LLC
     Manager

        Name:   Gary Neff
        Title:    Member

CBS OUTDOOR GROUP INC.

Name:
Title:

**AGREED TO AND ACKNOWLEDGED BY:**

THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY

Name:
Title:                  Francis A. DiMola
                              Director
                    Real Estate Services Department

| Approval as to Terms: | Approval as to Form: |
|---|---|
| BB | RR |

RB/RR

14

80067136.20

**EXHIBIT A**

Guaranteed Revenue Fee

| | |
|---|---|
| Year 1 | $600,000 |
| Year 2 | $650,000 |
| Year 3 | $700,000 |
| Year 4 | $750,000 |
| Year 5 | $800,000 |
| Year 6 | $850,000 |
| Year 7 | $900,000 |
| Year 8 | $950,000 |

15

**EXHIBIT B**
Bonus Revenue Share

A.     In any license year where Gross Revenue is at least $3,000,000 but less than $4,500,000, G-M shall pay CBS, twenty percent (20%) of the difference between the total Gross Revenue amount and $3,000,000.

By way of an example, if G-M's Gross Revenue for any license year is $4,000,000, G-M shall pay CBS Bonus Revenue equal to $200,000.

$$(\$4,000,000 - \$3,000,000) * .2 = \$200,000)$$

B.     In any license year where Gross Revenue is at least $4,500,000 but less than $6,000,000, G-M shall pay CBS, twenty percent (20%) of the difference between the $4,500,000 and $3,000,000, **plus** twenty-five percent (25%) of the difference between the total Gross Revenue amount and $4,500,000.

By way of an example, if G-M's Gross Revenue for any license year is $5,500,000, G-M shall pay CBS Bonus Revenue equal to $550,000.

$$((\$4,500,000 - \$3,000,000) * .2) + ((\$5,500,000 - \$4,500,000) * .25) = \$550,000$$

C.     In any license year where Gross Revenue is at least $6,000,000, G-M shall pay CBS, twenty percent (20%) of the difference between $4,500,000 and $3,000,000, **plus** twenty-five percent (25%) of the difference between $6,000,000 and $4,500,000, **plus** thirty percent (30%) of the difference between the total Gross Revenue amount and $6,000,000.

By way of an example, if G-M's Gross Revenue for any license year is $7,000,000, G-M shall pay CBS Bonus Revenue equal to $550,000.

$$((\$4,500,000 - \$3,000,000) * .2) + ((\$6,000,000 - \$4,500,000) * .25)) + ((\$7,000,000 - \$6,000,000 * .3)) = \$975,000$$

16

## EXHIBIT C

### Cost Basis

In determining the Unamortized Capital Investment to be paid to G-M if and as required under this Agreement, the Cost Basis (previously or hereinafter to be incurred by or on behalf of G-M or Lender) shall is hereby agreed and stipulated to by the Parties to include, without limitation, the following:

| Description | Payee | Amount |
|---|---|---|
| Purchase Price for the Sign/Equipment/Garage Media Work | G-M | $8,100,000 |
| Site Reconfiguration, Remove Old Display | G-M | 600,000 |
| Professional Fees | G-M | 400,000 |
| Inspections | G-M | 79,000 |
| Pre Illumination Project Management | G-M | 400,000 |
| Network Operating Station | G-M | 216,000 |
| Total | | $9,795,000 |

PA hereby acknowledges and agrees that of the total Cost Basis the amount described above for the Purchase Price for the Sign/Equipment/Garage Media Work has been incurred and that—subject to the sole condition that PA receives evidence of Lender's payment of the "Lessor's Basis" as provided in the Lender Financing Agreement (as the term "Lessor's Basis" is defined therein)—PA has received such evidence thereof as it may have required to document such costs and execute this Agreement with this stipulation. The "Approved Amounts" hereunder shall be proportion of the Purchase Price stated above that is equal to the proportion that (i) the amount of such payments by Lender for which such evidence of payment is so received by PA bears to (ii) the total amount of such Lessor's Basis originally stated in the Lender Financing Agreement (without, for the avoidance of doubt, giving effect to any changes therein, whether pursuant to its terms or as the same may be amended by written agreement of the parties).

After any Cost Basis (that is not Approved Amounts) is incurred (and as a condition to the incurring and/or payment thereof, if requested by G-M or Lender), PA agrees with all due haste to consider any statements detailing such Cost Basis amounts (paid or unpaid), including copies of invoices and contracts, and certified by a responsible officer of G-M, and G-M shall permit PA, by its agents, employees and representatives, at all reasonable times prior to a final settlement or determination of such cost, to examine and audit the records and books of account of G-M within the Port of New York District during such time.

If G-M includes in Cost Basis (that is not Approved Amounts) any items as having been incurred but which, in the reasonable opinion of the PA, if so incurred are not items identified as elements of cost in this Exhibit C or otherwise properly chargeable to cost under sound accounting practice, then the PA will with all due haste, and in all events within ninety (90) days after receipt of said statement of cost, give written notice to G-M stating its objection to any such item and the grounds therefor (it being specifically agreed by all Parties that the purchase price for the Sign/Equipment/Garage Media Work and any other Approved Amounts are hereby stipulated to

80067136.20

as being Cost Basis that has been incurred (without further examination, evidence, or condition) and any other elements of Cost Basis identified in this Exhibit C, as and when incurred, shall qualify as elements of Cost Basis hereunder. If such notice is given and if the dispute is not settled within ninety (90) days of PA's notice by agreement between the parties, then such dispute shall be disposed of by arbitration in accordance with the then existing rules of the American Arbitration Association or any successor association. Costs of said arbitration shall be borne equally by PA and G-M.

In any such arbitration as to whether any item included by G-M in its computation of cost (other than Approved Amounts) has been incurred, the question to be submitted to the arbitrators for decision shall be as follows:

> "Was all or any part of such cost incurred by G-M; and if part but not all of such cost was incurred, what was the amount which was so incurred?"

In any such arbitration as to whether any item included by G-M in its computation of Cost Basis (that is not Approved Amounts) is properly chargeable thereunder under this Agreement, the question to be submitted to the arbitrators for decision shall be as follows:

> "Can it reasonably be held that all or any part of such cost is properly chargeable under their agreement or otherwise under sound accounting practice; and if part but not all of such cost can reasonably be held to be chargeable, then what amount can reasonably be held to be so chargeable?"

The arbitrators to whom such questions shall be submitted shall be accountants or auditors.

In amortizing Cost Basis as provided in this Agreement and the Master Agreement, Unamortized Cost Basis will be determined by multiplying Cost Basis by a fraction, the numerator of which shall be the 96 minus the number of whole calendar months elapsing since the Final Acceptance Date, and the denominator of which shall be 96.

Notwithstanding anything to the contrary herein contained, the Unamortized Capital Cost PA shall be obligated to pay to G-M hereunder shall not be diminished by the amount of any unsatisfied lien, mortgage or other encumbrance on the Sign and Equipment, it being agreed that the ownership of the Sign and Equipment being vested with G-M or its financer, as applicable.

For the avoidance of doubt, if there is any inconsistency between this Exhibit C and Section 26 of the Master Agreement, this Exhibit C shall be controlling, as it pertains solely to G-M.

18

**EXHIBIT D**

**PARENT GUARANTY**

19

80067136.20

## GUARANTY

THIS GUARANTY (this "Guaranty"), dated as of October 26, 2010, is executed by GARAGE MEDIA LLC, a Connecticut limited liability company (the "Guarantor"), in favor of CBS OUTDOOR GROUP INC., a Delaware corporation ("CBS").

WHEREAS, in order to induce CBS to enter into the Display Agreement (the "Agreement"), dated as of October 26, 2010, between CBS and GARAGE MEDIA NY LLC, a New York limited liability company ("Garage Media") and to enter into that certain Supplemental Agreement with the Port Authority of New York and New Jersey ("PA") for benefit of Garage Media and Guarantor, Guarantor has agreed, subject to the terms and conditions contained in this Guaranty, to guarantee the payment and performance of all obligations, liabilities and indemnities of Garage Media now existing or hereafter arising under the Agreement (collectively, the "Obligations") and to execute and deliver this Guaranty;

WHEREAS, Guarantor will benefit, directly or indirectly, from the consummation of the transactions contemplated by the Agreement;

WHEREAS, each capitalized term defined in the Agreement and not otherwise defined herein shall have the meaning ascribed thereto in the Agreement when used herein;

NOW, THEREFORE, in consideration of the foregoing, and intending to be legally bound hereby, Guarantor agrees as follows:

Section 1.     Unconditional Guaranty.

(a)     Guarantor fully and irrevocably guarantees the payment and performance of the Obligations when due.  Guarantor is hereby made fully responsible for the acts and omissions of Garage Media that constitute a breach of the Agreement.  This Guaranty shall be a full, unconditional, irrevocable, absolute and continuing guarantee of payment and performance and not a guarantee of collection, and Guarantor shall remain liable on the Obligations hereunder until the payment in full of the Obligations.

(b)     Except as provided in Section 1(f) below, Guarantor's guarantee and responsibility shall not be discharged, released, diminished, or impaired in whole or in part by any setoff, counterclaim, defense, act or occurrence which Guarantor may have against CBS as a result of or arising out of the Agreement or from any other agreement or matter.

(c)     The Obligations of Guarantor hereunder shall not be released, discharged, diminished or impaired by (i) the renewal, extension, modification or alteration by CBS and Garage Media, with or without the knowledge or consent of Guarantor, of the Agreement or of any liability or obligation of Garage Media thereunder or of any document or instrument under which the Obligations arise, (ii) any forbearance or compromise granted to Garage Media by CBS when dealing with Garage Media except to the extent of such forbearance or compromise, (iii) any change in corporate structure or ownership of Garage Media or the bankruptcy,

80069963.2

insolvency, liquidation, receivership, dissolution, winding-up or termination of Garage Media or the fact that at any time Garage Media does not exist, (iv) the inaccuracy of any of the representations and warranties of Garage Media under the Agreement, (v) any neglect, delay, omission, failure or refusal of Garage Media to take or prosecute any action in connection with the Agreement, (vi) the full or partial release of Garage Media on any liability or obligation, except that Guarantor shall be released *pro tanto* to the extent CBS expressly releases Garage Media from liability with respect to the Obligations, or (vii) any other circumstance relating to the Obligations that might otherwise constitute a legal or equitable discharge of or defense to the Guarantor not available to Garage Media who is liable for such Obligations.

(d)     Guarantor waives notice of (i) acceptance of this Guaranty, (ii) the creation, renewal, extension, modification, alteration or existence of any liability or obligation of Garage Media constituting part of the Obligations, and (iii) any breach of or default in the performance of the Obligations.

(e)     If Garage Media fails to perform Obligations requiring payment, in whole or in part, when such Obligations are due, Guarantor shall promptly pay such Obligations in lawful money of the United States. Guarantor shall pay such amount within 5 business days after receipt of demand for payment from CBS. CBS may enforce Guarantor's obligations under this Guaranty without first suing Garage Media or joining Garage Media in any suit against Guarantor, or enforcing any rights and remedies against Garage Media, or otherwise pursuing or asserting any claims or rights against Garage Media or any other person or entity or any of its or their property which may also be liable with respect to the matters for which Guarantor is liable under this Section 1.

(f)     Guarantor reserves the right to assert defenses which Garage Media may have to payment or performance of any Obligation, other than defenses that Garage Media may possess relating to (i) lack of validity or enforceability of the Agreement against Garage Media arising from Garage Media's defective incorporation or lack of qualification to do business in any applicable jurisdiction, (ii) Garage Media's lack of corporate authority to enter into or perform the Agreement or the due execution and delivery thereof, or (iii) the termination of existence, dissolution, liquidation, insolvency, bankruptcy, receivership, or other reorganization of Garage Media.

Section 2.     Refund of Payments by CBS. If under applicable bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium or other similar laws of general application with respect to creditors, CBS is required to refund part or all of any payment hereunder to Guarantor, such payment shall not constitute a release from any liability hereunder, and Guarantor's liability hereunder shall be reinstated to such extent.

Section 3.     Rescission of Obligations. If under applicable bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium or other similar laws of general application with respect to creditors, any payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by CBS, this Guarantee shall continue to be effective, or be reinstated, as the case may be, all as though such payment had not been made.

80069963.2

Section 4.    <u>Representation as to Benefit</u>.  Guarantor warrants and represents for and as to itself that it has received, or will receive, direct or indirect benefit from the making of this Guaranty.

Section 5.    <u>Representations and Warranties of Guarantor</u>.  Guarantor hereby represents and warrants to CBS as follows:

(a)    <u>Organization</u>.  Guarantor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Connecticut and has the requisite power to carry on its business as it is now being conducted.

(b)    <u>Authority Relative to this Guarantee</u>.  Guarantor has full power and authority to execute and deliver this Guaranty and to consummate the transactions contemplated hereby.  The execution and delivery by Guarantor of this Guaranty and the consummation by Guarantor of the transactions and performance of the terms and conditions contemplated hereby have been duly and validly authorized, and no other proceedings on the part of Guarantor are necessary to authorize this Guaranty or consummate the transactions so contemplated.  This Guaranty has been duly and validly executed and delivered by Guarantor, and this Guaranty constitutes a valid and binding agreement of Guarantor, enforceable against Guarantor in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

(c)    <u>Consents and Approvals; No Violation</u>.  Neither the execution and delivery by Guarantor of this Guaranty nor the performance of its obligations under the Guaranty contemplated hereby do or will (i) conflict with or result in any breach of any provision of the operating agreement (or other similar governing documents) of Guarantor, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except where it is reasonably expected that the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not prevent or delay in any material respect such performance, (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, license, agreement or other instrument or obligation to which Guarantor is a party or by which Guarantor or any of its assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or will be obtained prior to the Expiration Date, or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Guarantor, or any of its assets.

(d)    <u>Litigation; Claims</u>.  There is no claim, action, proceeding or investigation pending or, to the knowledge of Guarantor, threatened against Guarantor before any court or governmental or regulatory authority or body that would prevent or delay in any material respect the performance by Guarantor of the guarantee contemplated hereby.  Guarantor is not subject to any judgment or outstanding order, writ, injunction or decree that would have a material adverse effect on its ability to perform its obligations under the guarantee contemplated hereby and that would prevent or delay in any material respect the performance by Guarantor of the guarantee.

80069963.2

Section 6.  Costs and Expenses.  Each party agrees to pay to the prevailing party, upon demand, all reasonable costs and expenses, including reasonable attorneys' fees, that may be incurred by the prevailing party in enforcing or defending its rights under this Guaranty.

Section 7.  Governing Law and Consent to Jurisdiction.  This Guaranty shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

Section 8.  Benefit.  This Guaranty shall inure to the benefit of CBS and its successors and assigns, and shall be binding upon Guarantor and its successors and assigns; provided, however, that (i) neither CBS nor Guarantor shall assign its rights or obligations under this Guaranty without the prior written consent of the other except by operation of law, and except that CBS may assign its rights or obligations under this Guaranty to an affiliate, (ii) no assignment or other transfer by, through or under CBS shall operate to increase Guarantor's obligations hereunder, and (iii) Guarantor shall be fully protected in making and shall receive full credit for any payments or other performance made by it to CBS or its successors and assigns with respect to the Obligations prior to the time Guarantor receives written notice of such assignment or succession.  In the event that CBS shall default upon its Agreement with the PA, this Guaranty shall pass to the PA, wherein the PA shall assume the role of CBS.

Section 9.  Continuing Guarantee.  Subject to the terms, conditions and limitations hereof, this Guaranty is a continuing guarantee and shall remain in full force and effect and be binding upon Guarantor until the Obligations have been satisfied in full.

Section 10.  Notices.  Any notice, demand or other communication required or permitted under this Guaranty shall be in writing and given by hand delivery, facsimile, overnight courier, or United States mail.  All notices shall be properly addressed to the recipient, with all postage and other charges being paid by the party giving notice.  Notices shall be effective when actually received by the party being notified.  The addresses of the parties for purposes of notice are as follows:

|  |  |
|---|---|
| If to Guarantor, to: | Garage Media LLC NY<br>One Union Place<br>Hartford, CT 06103<br>Attn: Gary Neff<br>Facsimile: (203) 413-2933 |
| With a copy to: | Mark D. Geraghty<br>Steve N. Spanolios<br>Davidoff Malito & Hutcher LLP<br>650 Third Avenue, 34th Floor<br>New York, NY 11105<br>Facsimile: (212) 286-1884 |

80069963.2

CBS:   CBS Outdoor Group Inc.
      405 Lexington Avenue
      New York, NY 10174
      Attn: Richard Ament

With a copy
to:    CBS Outdoor Group Inc.
      405 Lexington Avenue
      New York, NY 10174
      Attn:  General Counsel

Either party may change its address by giving two (2) days' advance written notice to the other party.

   Section 12.  Subrogation.  Upon payment of all of the Obligations owing to CBS, Guarantor shall be subrogated to the rights of CBS against Garage Media, and CBS agrees to take, at Guarantor's expense, such steps as Guarantor may reasonably request to implement such subrogation.

    IN WITNESS WHEREOF, the undersigned has executed this Guarantee as of the date first above written.

        GUARANTOR:

        GARAGE MEDIA LLC

        By:
          Name: Garret Neff
          Title: Member

80069963.2

# EXHIBIT E

## ADDITIONAL LIGHTING SCHEME

80067136.20

A2aMEDIA



Lam Partners
ARCHITECTURAL LIGHTING DESIGN



Light Fixture

NOTES

| Fixture: | Lumenpulse Lumenbeam LBX |
| | RGB Fixture with 6 degree beam |
| Number of Fixtures: | 72 |
| Lumens: | 4392 |
| Wattage: | 132 |
| Weight: | 7.83 kg/17.26 lbs. |
| Dimensions (WxHxD): | 17 1/16" x 22 7/8" x 4 7/8" |
| Warranty: | 5 years |



OUTLINE OF 6,000sf MEDIAMESH DISPLAY

# Lighting Scheme Elevation

A2aMEDIA

Lam Partners

ARCHITECTURAL LIGHTING DESIGN



A2aMEDIA

Lighting Scheme Elevation

Lumenpulse Lumenbeam LBX RGB
6 degree beam spread
6 degree beam spread
Aiming centerline
6 degree beam spread

Lam Partners
ARCHITECTURAL LIGHTING DESIGN

A2aMEDIA

Luminance Readings






Lam Partners
ARCHITECTURAL LIGHTING DESIGN