EXHIBIT 6

# EQUIPMENT PURCHASE AGREEMENT

This agreement ("Agreement") is entered into as of the 26th day of October, 2010, by and between Garage Media, LLC, a Connecticut Limited Liability Company ("GM"), Garage Media NY LLC, a New York Limited Liability Company ("Lessee"), and A2a Media, Inc. ("A2a"), a Delaware corporation, GKD-USA Inc. ("GKD"), a Maryland corporation (A2a and GKD collectively, "Contractor"), and Macquarie Equipment Finance, LLC, a Delaware Limited Liability Company ("Lessor"). The "Purchaser" under this Agreement shall be GM before giving effect to the assignments and assumptions described in Section 26, and, thereafter, Lessee and Lessor as further described in such section.

## RECITALS

**WHEREAS,** the Purchaser desires to purchase from the Contractor the equipment, software goods, and installation services, more particularly described herein; and

**WHEREAS,** GM has arranged (subject to the assignment provisions contained in this Agreement) to lease the Equipment (as hereinafter defined) from Lessor under Lease No. 001 dated October 26, 2010 ("Lease") between Lessor and Lessee, GM's wholly-owned subsidiary; and

**WHEREAS,** Contractor is desirous of providing such goods and services;

**NOW THEREFORE,** in consideration of the above recitals, which recitals are contractual in nature, the mutual promises herein contained, and for other good and valuable consideration hereby acknowledged, the parties and each of them agree as follows:

## TERMS AND CONDITIONS

1.    <u>Goods and Services Purchased</u>.  The Contractor covenants and agrees to furnish all of the following:

   A.    Good and unencumbered title to those items of equipment specifically referenced in <u>Exhibit "A"</u> attached hereto (the "Equipment") comprising (i) the equipment manufactured and supplied by GKD – Gebr. Kufferath AG, Metallweberstraße 46, D-52353 Düren, Germany ("Manufacturer") ("GKD Equipment" or the "Media Façade") and (ii) the equipment not manufactured and supplied by Manufacturer ("Non-GKD Equipment"); together with a warranty bill of sale for the Equipment warranting that good, unencumbered title is being conveyed to Purchaser, together with such reasonable evidence of the non-existence of liens as shall be requested by Purchaser.

   B.    A non-transferable, non-exclusive license to use all accompanying software referenced in Exhibit "A" attached hereto ("Software") comprising (i) the software owned, made, licensed, or supplied by Manufacturer ("GKD Software") and (ii) the software not owned, made, licensed, or supplied by Manufacturer ("Non-GKD Software"), which shall be all

80069926.3

of the software associated with, and necessary, for the proper use of the Equipment . Contractor shall provide written approval of this license of the Software from the owner of the Software described on Exhibit "A."

2.    <u>Performance of Contractor's Duties.</u>

2.1    The GKD Equipment shall be manufactured, and all Equipment and Software shall be installed by Contractor, in a good and workmanlike manner, in compliance with all applicable laws and regulations.

2.2    The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions in connection with installation of the Equipment and Software. Installation of the Equipment and Software is hereinafter referred to as the "Work".  The Contractor shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to (a) its employees and other persons who may be affected by the Work, (b) the Work and materials and equipment to be incorporated therein, and (c) other property at the site of the Work (the "Site").

2.3    The Contractor shall substantially complete the Work such that the acceptance testing described in Section 2.4 below may be commenced, on or before five (5) months following receipt by the Contractor of the Third Payment required by Section 3(a) of the Equipment Payment Schedule (Exhibit A-1) (or such later date as Lessor in its sole discretion may determine, the "Commitment Expiration Date").  Contractor will work closely with Purchaser to coordinate the completion of the Work and acceptance testing, to align as closely as reasonably possible with the commencement of the Display Agreement between Purchaser and the owner of the property where the Equipment will be installed.

2.4    The following procedure shall be followed in connection with the Purchaser's final acceptance of the Equipment and Software:

The Contractor and the Purchaser shall agree upon the substantial completion of the Work as provided in subsection 4(e) of Exhibit A-1, and Contractor shall notify Purchaser of a date upon which acceptance testing shall be conducted.  For purposes of this Agreement, "acceptance testing" shall mean testing of the Work to confirm that the Equipment and Software meets the plans and specifications as defined by GKD's shop drawings and meets the terms of this Agreement.

Not later than seven (7) business days after the following conditions are satisfied ("Contractor Acceptance"):

(i) conduct of the acceptance testing,

(ii) GKD's written advice to A2a, Purchaser, and Lessor that the GKD Equipment and GKD Software have been delivered and installed and are operating with full functionality in accordance with all specifications and satisfy the requirements of the GKD Warranty, and

> (iii) A2a's written advice to GKD, Purchaser, and Lessor that the Non-GKD Equipment and Non-GKD Software have been delivered and installed and are operating with full functionality in accordance with all specifications,

the Purchaser or Lessor or (in the case of the GKD Equipment or GKD Software) A2a or (in the case of the Non-GKD Equipment or Non-GKD Software) GKD shall provide the Contractor with written notice specifying in reasonable detail any deficiencies in the Equipment and Software which are at variance with the provisions of this Agreement (the "Deficiency Notice"), or, upon Purchaser's and Lessor's further receipt of A2a's written certification that the Equipment and Software are fully capable of operation as contemplated by the Services Purchase Agreement dated October 28, 2010 entered into between A2a and Lessee (which has been assigned to and acknowledged by Lessor, such agreement, "Services Agreement"; such certification, "A2a Certification"), both Purchaser and Lessor shall provide Contractor with written acceptance of the Equipment and Software under this Agreement ("Acceptance").

C.    If a party to this Agreement so delivers a Deficiency Notice, then the Contractor shall have thirty (30) days from receipt of the Deficiency Notice to correct, at its own expense, the deficiencies identified in the Deficiency Notice and to conduct a new acceptance testing.  Following a second Contractor Acceptance, a party may deliver a second Deficiency Notice identifying the same or any later discovered deficiencies, or Purchaser and Lessor may deliver a written Acceptance, not later than seven (7) business days following said second Contractor Acceptance and Purchaser's and Lessor's receipt or further receipt of an A2a Certification.  If a party so delivers a second Deficiency Notice, then the Contractor shall have thirty (30) days from receipt of the second Deficiency Notice to correct, at its own expense, the deficiencies identified in the second Deficiency Notice and to conduct a new acceptance testing.  Following a third Contractor Acceptance, a party may deliver a third Deficiency Notice, or Purchaser and Lessor may deliver a written Acceptance.  After a third Deficiency Notice, Purchaser and Lessor each in their sole discretion may either allow as many additional acceptance testing cycles as are necessary in order to eliminate all deficiencies, or at any time thereafter and before Purchaser and Lessor deliver a written Acceptance, but not earlier than the Commitment Expiration Date (as identified in Section 2.3), provide a final rejection notice to the Contractor, in which event the Contractor, upon request of the Purchaser, shall promptly remove the Equipment and Software and Contractor shall repay all payments previously made on account of or under this Agreement in accordance with Section 29.

D.    The date that Purchaser and Lessor provide written Acceptance of the Equipment and Software, as described above, is hereinafter referred to as the "Acceptance Date".

2.5    Upon execution hereof, the Contractor shall deliver to the Lessor the warranty set forth in Exhibit "B" hereto (the "GKD Warranty") executed by GKD, which GKD acknowledges will be assigned by Lessor to Purchaser for the term of the Lease and upon any purchase of the Equipment by Purchaser from Lessor.  A2a represents and warrants that at all times the Equipment shall be free of liens, claims, or encumbrances arising by, through, or under A2a.  Contractor represents and warrants that upon Contractor's receipt of the Purchase Price Lessor will have and continue to have good title to the Equipment free of encumbrances not arising by through, or under Lessor.  GKD agrees that nothing in this section shall affect the

80069926.3

GKD Warranty or any maintenance agreement entered into by Purchaser in respect of the Equipment and Software (with the Manufacturer, GKD, or any other person).

GM, LESSEE AND LESSOR HEREBY ACKNOWLEDGE THAT THE WARRANTIES EXPRESSLY STATED IN THIS AGREEMENT AND THE GKD WARRANTY ARE THE ONLY WARRANTIES BEING GIVEN IN CONNECTION WITH THE WORK, EQUIPMENT AND SOFTWARE. ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED AND WAIVED. GM, LESSEE AND LESSOR FURTHER ACKNOWLEDGE THAT THE CONTRACTOR IS ENTERING INTO THIS AGREEMENT, AND GKD IS EXECUTING AND DELIVERING THE GKD WARRANTY, IN RELIANCE UPON SUCH DISCLAIMER AND WAIVER, AND WOULD NOT ENTER INTO THIS AGREEMENT OR DELIVER THE GKD WARRANTY BUT FOR THE INCLUSION HEREIN OF SUCH DISCLAIMER AND WAIVER.

2.6     To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Purchaser from and against any and all claims, liabilities, obligations, damages, losses, costs, penalties, fines, judgments and expenses (at equity or at law, including statutory or common), including without limitation, reasonable attorneys' fees, arising out or resulting from the Contractor's performance of the Work, but only to the extent arising from the negligence or willful misconduct of Contractor or its licensees, agents, servants, subcontractors, third party suppliers or anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by the Purchaser.

2.7     The Contractor shall obtain and maintain, or cause to be maintained, at its cost and expense, the following insurance coverages:

A.     Worker's Compensation Insurance and Occupational Disease Disability Insurance for not less than the statutory limits, including Employer's Liability (at a minimum limit of Five Hundred Thousand ($500,000)) for all persons whom it employs in carrying out the Work, including a waiver of subrogation by the insurance carrier with respect to the Purchaser, its employees and agents. All insurance required under this subparagraph shall be in accordance with the requirements of the most current and applicable State Workers' Compensation Insurance Laws in effect from time to time at the site of the Work.

B.     A commercial general liability insurance policy or umbrella policy (or a combination thereof) covering its activities hereunder, in an amount not less than Three Million Dollars ($3,000,000) for bodily injury and property damage, including all Equipment and Software. Contractor's insurance will remain in full force and effect until installation is complete, and Accepted by Purchaser.

C.     Owned, hired and non-owned Comprehensive Automobile Liability Insurance and Property Damage Insurance covering all use of all automobiles, trucks and other motor vehicles utilized by the Contractor with a combined single limit for bodily injury and property damage of not less than One Million Dollars ($1,000,000).

80069926.3

D.      All insurance policies shall provide for thirty (30) days' prior written notice to be given to the parties names as additional insureds in the event coverage is cancelled or not renewed. All insurance policies referenced above shall be primary as to all insurable incidents arising out of the performance of the Contractor under this Agreement, regardless of whether the Purchaser subscribes to insurance policies that might otherwise provide coverage for such insurable incidents.

E.      Certificates of insurance, as evidence of the coverages required by this Section 2.7 shall be submitted to the Purchaser prior to commencement of the Work.

3.    Payment. In consideration of the Equipment and Software to be provided by the Contractor in accordance with this Agreement, the Purchaser shall pay to the Contractor the sum of Six Million Eleven Thousand Dollars ($6,026,000) (the "Purchase Price"), such sum to be paid in accordance with the payment schedule set forth in Exhibit "A-1" attached hereto (the "Payment Schedule").

4.    Changes in the Work.

4.1    The Purchaser (which for the purposes of this Section 4.1. means GM or Lessee, but subject to the terms of item 3 of Exhibit A-1) may order changes in the Work within the general scope of this Agreement, consisting of additions, deletions or other revisions, provided however that in such event the Purchaser shall pay to the Contractor all costs of labor, material, and equipment arising therefrom, including reasonable overhead and profit. No change in the Work shall be binding upon the Contractor unless it is in writing and countersigned by the Contractor. However, if the Equipment does not conform to the specifications of this Agreement, Contractor shall pay for all changes required to bring the Equipment into compliance, as per the Acceptance process described in Section 2.4.

4.2    If concealed or unknown physical conditions are encountered at the Site that differ materially from those described in this Agreement or from those conditions ordinarily found to exist, the Purchase Price and the time for completion shall be equitably adjusted.

5.    Permits. Purchaser shall secure, and pay for, the building and zoning permits. Contractor shall secure and A2a shall pay for all other permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Work.

6.    Consequential Damages. The Contractor, GM, Lessee and Lessor hereby waive any and all claims against each other for consequential damages arising out of or relating to this Agreement.

7.    Hazardous Materials.

7.1    To the fullest extent permitted by law, the Purchaser shall indemnify and hold harmless the Contractor and its agents and employees from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in any area affected by hazardous materials, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to

or destruction of tangible property (other than the Work itself), and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

       7.2    If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by this Agreement, Purchaser shall indemnify the Contractor for all cost and expense thereby incurred.

       7.3    Contractor understands that Purchaser does not own the property where Work will occur, and has no control or knowledge of hazardous material.  However, Purchaser agrees to require the property owner to indemnify and hold Purchaser harmless in their Display Agreement, to the same or greater extent as described above, and provide pass-through indemnification to Contractor.

      8.    Default.  This Agreement and the relationship, rights, and obligations created hereunder may be terminated by a party not then in default or breach of this Agreement upon the occurrence of the following:  (i) the filing of Lessee, GKD, or A2a for protection under the federal bankruptcy laws, or any bankruptcy petition or petition for receiver commenced by a third party against Lessee, GKD, or A2a (which is not dismissed within 60 days); or (ii) any breach or default of a material obligation of this Agreement by another party hereto that has not been cured following thirty (30) days' written notice (and such additional time in the case of a non-monetary default as may be necessary to cure such default provided that the other party is diligently pursuing such cure) to the other party (and such additional time as may be required under Section 26.1.2).

      9.    Notice.  All notices given as provided for in this Agreement shall be in writing and shall be deemed given if delivered by a nationally recognized overnight delivery service, or sent by confirmed facsimile transmission to, the party to whom notice is directed, or on the third day after mailing, if mailed by certified mail to the party to whom notice is directed, return receipt requested, postage prepaid and properly addressed as set forth below:

80069926.3

<u>A2A</u>

A2a Media, Inc.
171 Milk Street
Boston, MA  02109
Attn:  Andrew Melton
Telephone:  (617) 456-1190
Fax:  (617) 292-2323

<u>GM OR LESSEE</u>

Garage Media, LLC
Garage Media NY LLC
1 Union Place
Hartford, CT 06103
Attn: Gary Neff
Telephone: _____
Fax: _____

<u>GKD</u>

GKD-USA, Inc.
825 Chesapeake Drive
Cambridge, MD 21613
Attn: Tom Powley
Telephone: (800) 453-8616
Fax: (410) 221-0544

<u>LESSOR</u>

Macquarie Equipment Finance, LLC
2285 Franklin Road, Suite 100
Bloomfield Hills, MI  48302
Attn:  John Zimmeth
Telephone:  (248) 253-9000
Fax: (248) 339-1590

Any party may change its address or other contact information by giving notice to the other party as set forth above.

10.    <u>Headings; Interpretation</u>.  The headings and subheadings of the sections of this Agreement are inserted for convenience of reference only & shall not control or affect the meaning or construction of any of the agreements, terms, covenants & conditions of this Agreement in any manner.  In this Agreement, terms of inclusion are without limitation, the singular includes the plural (and vice versa), and gender-specific terms may include the other genders.

11.    <u>Waiver</u>.  Nothing herein or any act or failure to act on the part of either party shall be construed as a waiver of the rights of either party hereto.  No waiver shall be valid unless the same is in writing.

12.    <u>Amendment</u>. No alteration, modification, or variation of this Agreement or any term or provision hereof shall be valid unless made in a writing signed by the parties hereto.

13.    <u>Final Agreement</u>. This Agreement and all documents, materials or instruments referenced or incorporated herein shall constitute the entire agreement between the parties on the subject matter hereof.  This Agreement supersedes all prior understandings or agreements, oral, parol, or otherwise.  No such understanding or agreement not incorporated herein shall be binding upon the parties hereto.

14.    <u>Severability</u>.  Should any of the provisions of this Agreement be declared or be determined by a court of competent jurisdiction to be illegal or invalid, the validity of the remaining parts, provisions or terms shall not be affected thereby (except as otherwise ordered

80069926.3

by the court), and said illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement.

15.   Attorneys' Fees. In any action or proceeding brought by a party hereto, seeking to enforce rights or obligations hereunder, the prevailing party in such action or proceeding shall be entitled to reasonable attorneys' fees and costs (including costs recoverable as attorneys' fees), incurred therein in addition to any other relief to which such party may be entitled.

16.   Governing Law. This Agreement shall be governed by and construed in accordance with laws of the State of New York without giving effect to the principles of conflicts of law thereof. Each party submits to the non-exclusive jurisdiction of the state and federal courts located in the State of New York and waives any objection relating to improper venue or *forum non conveniens* to the conduct of any proceeding in any such courts.

17.   Delivery, Risk Of Loss. Equipment will be delivered F.O.B. job site. The Contractor will remain liable for risk of loss until the Equipment and Software are installed and Accepted by Purchaser. The Purchaser agrees to assume all risk for loss or damage after Acceptance of the Equipment and Software. In the event that the Equipment and Software is destroyed, in whole or in part, prior to delivery, the performance of the parties will be delayed in accordance with Section 20. The Contractor shall not be held liable for either delays in delivery or total failure to deliver, due to any cause or event beyond the Contractor's control.

18.   Confidentiality. GM, Lessee and the Contractor, on behalf of themselves and each of their affiliates and subcontractors, acknowledge that any or all of them may, while fulfilling this Agreement, have access to proprietary information, including but not limited to, customer lists, technical drawings, formulas, processes, computer programs, trademarks, logos, copyrighted material, intellectual property and other proprietary information belonging to or licensed by one of the other parties and/or their affiliates or agents (individually or collectively "Proprietary Information'). Each party on behalf of itself and each of its affiliates and subcontractors hereby warrants and represents that it shall not disclose to any third party, attempt to reverse engineer or otherwise attempt to use such Proprietary Information in any manner whatsoever; provided, however, that it may disclose such Proprietary Information on a need to know basis to those individuals within their respective companies that are bound by a duty of confidentiality, provided that such disclosure is limited to the extent necessary to perform any obligations hereunder. Under no circumstances may such Proprietary Information be shared with any third party except as required by subpoena or other legal process; provided that each party shall give the other parties prompt notice of such request in order to provide the other parties with an opportunity to seek an appropriate protective order. In such event, each party shall use its best efforts to cooperate in efforts to obtain a protective order against such disclosure of such Proprietary Information. Each party agrees that it shall inform each of its affiliates and subcontractors that will perform services hereunder of this confidentiality obligation and expressly assumes responsibility for any breach of this provision by any of them. Each party further understands that money damages might not be a sufficient remedy for any breach of this provision. Accordingly, each party shall be entitled to injunctive relief without the need of posting a bond and such remedy shall not be the exclusive remedy, but rather shall be in

addition to all other remedies for breach of this provision available at law or equity, including monetary damages.

Except to the extent necessary to be disclosed in a proceeding to enforce a party's rights under this Agreement, notwithstanding anything to the contrary contained herein and without limiting any of the other confidentiality provisions, the parties agree that the Purchase Price, any portion of an Exhibit that states the Purchase Price, and any testing results obtained from acceptance testing shall be held and treated in the strictest of confidence, and no party shall disclose the same or permit anyone under its control to disclose the same to any person, firm, or entity without the prior written authorization of the other party.

Lessor's only obligation under this section, including upon any assumption of this Agreement, shall be as provided in this paragraph. Lessor agrees not to disclose any Proprietary Information received by it to a third party or attempt to reverse engineer or otherwise attempt to use such Proprietary Information in any manner whatsoever; provided, however, that Lessor may disclose such Proprietary Information to its affiliates and financing source and, in so doing, remain responsible to Contractor and Lessee for compliance by such persons with Lessor's obligations in respect of such Proprietary Information under this Agreement. In addition, Lessor may disclose such Proprietary Information as required by legal process or other law; provided that it shall give Contractor and Lessee prompt notice of such request in order to provide them with an opportunity to seek an appropriate protective order. In such event, Lessor shall use its best efforts to cooperate in efforts to obtain a protective order against such disclosure of such Proprietary Information, at no expense to Lessor. Lessor understands that money damages might not be a sufficient remedy for Lessor's breach or threatened breach of its obligations under this Agreement in respect of such Proprietary Information and, accordingly, in the event of any such breach the party whose Proprietary Information it is shall be entitled to seek injunctive relief without the need of posting a bond and such remedy shall not be its exclusive remedy, but rather shall be in addition to all other remedies for breach of Lessor's obligations under this Agreement in respect of such Proprietary Information available at law or equity, including monetary damages.

19.    Publicity. The parties agree to work together to coordinate a mutually agreeable press release and public relations program, to publicize the transaction described in this Agreement, and to agree upon the timing of this release and public relations program. Any news releases, public announcement, advertisement or publicity concerning this Agreement or such transaction is subject to prior approval of all parties identified therein. No party shall use or reference any other party in any marketing materials or presentation without the express consent of the party to be referenced, including, without limitation, in complying with the first sentence of this section. Each party agrees to consider a request for any such approval or consent as expeditiously as is commercially feasible.

20.    Force Majeure. The rights and obligations of the parties to this Agreement (including the satisfaction of any conditions precedent to any obligations to make payments to become due hereunder) shall be subject to delays or cancellations caused by fire, accident, acts of God, orders of any military, civil, or governmental authority or other cause beyond the reasonable control of the parties, other than financial inability (collectively, "Force Majeure"), and should Force Majeure occur from time to time the rights or obligations of the parties affected thereby, if any, except for obligations to make payments which were already then due hereunder,

shall be continued for a period equal to the period resulting from such delay or suspended pro tempore. Notwithstanding anything to the contrary herein, no Force Majeure shall act to extend the Commitment Expiration Date beyond June 30, 2011 or condition, delay, limit, or affect the rights and obligations of the parties accruing hereunder upon or following the Commitment Expiration Date, including the right of Purchaser and Lessor to provide a final rejection notice to the Contractor under Section 2.4(C), and including the obligation of GKD and A2a to pay the Reimbursement Amount to Lessor under Section 29 (whether or not a final rejection notice has been given), regardless of whether any previous obligation of any party is then, or had any time previously been, continued or suspended as a result of Force Majeure.

21.     <u>Exclusions</u>. The application and cost of securing building and zoning permits are not included in this Agreement.

22.     <u>Authority; Access</u>. The Purchaser and the Contractor represent and warrant that they have all authority to enter into this Agreement and to fulfill their duties and obligations as contemplated herein. The Purchaser shall provide the Contractor and its subcontractors reasonable access, ingress and egress to the Site for purposes of performing its obligations hereunder.

23.     <u>Contingencies</u>. This Agreement is contingent on the following items, and will not become effective until Lessor has itself (and not by GM or Lessee or their sureties) paid the Third Payment (as defined in Exhibit "A-1") to Contractor ("Effective Date"). Lessor will not be obligated to pay the Third Payment until all of these conditions have occurred or been waived by Lessor (any such waiver as evidenced only by the making of such Third Payment, and the making of the Third Payment shall mean that for purposes of this Section 23 all of these conditions have occurred or been waived by Lessor), each of the these conditions to be satisfied in a manner acceptable to Lessor as determined by Lessor in its sole discretion, including that all documents referred to being in such form and of such substance as is so acceptable and all conditions specified therein having been similarly satisfied:

(a)  A2a, GKD, GM, Lessee, and Lessor shall have duly executed this Agreement;

(b)  CBS Outdoor Group, Inc. (f/k/a Viacom Outdoor Group, Inc. f/k/a Transportation Displays, Incorporated) ("CBS") and The Port Authority of New York and New Jersey ("Port Authority") shall have duly entered into Supplemental Agreement No. 2 to the Agreement dated May 20, 1996, referred to as Permit No. P-BT-168, between them, as previously amended by Supplemental Agreement No. 1 dated May 4, 2004 (collectively, the "Permit");

(c)  Lessee and CBS shall have duly entered into a Display Agreement subcontracting the Permit to Lessee and it shall have been acknowledged and agreed to by the Port Authority;

(d)  Lessee shall have duly collaterally assigned the Display Agreement and the Permit as applicable thereto to Lessor, and CBS, the Port Authority, Lessee, and Lessor shall have duly entered into an acknowledgment and agreement in respect thereof;

(e)   GKD shall have duly executed the GKD Warranty;

(f)   Lessee and Lessor shall have duly entered into the Lease;

(g)   Lessee and A2a shall have duly entered into the Services Agreement and collaterally assigned it to Lessor;

(h)   Lessor shall have received Contractor's correct and complete invoice for the Third Payment (including acknowledging the amount of the total Purchase Price and its receipt and application of the Initial Payments); and

(i)   Written confirmation (which may include electronic mail) from an insurance company reasonably acceptable to Lessor ("Issuer") that such Issuer has been requested to issue and is processing for issuance to A2a, GM, Lessee, and Lessor a performance bond in the amount of the Purchase Price ("Performance Bond"). The Performance Bond shall be a matter included within the Purchase Price to be paid to Contractor for the Equipment hereunder and the terms and conditions of the Performance Bond shall be in all respects satisfactory to Lessee and Lessor, including that all proceeds thereof shall first belong and be paid to Lessor to the extent of the Reimbursement Amount (as defined in Section 29).

24.    Contractor. Each reference to Contractor in this Agreement shall be deemed to mean references to both A2a and GKD, and they shall be jointly and severally liable and responsible for the full and prompt payment, observance and performance when due of all obligations of Contractor under this Agreement. Purchaser may enforce this Agreement against either or both of A2a and GKD as Contractor. Any performance (including the giving of notice and the making of any payment) rendered or made by Purchaser to either A2a or GKD as Contractor shall be deemed to have been rendered and made to both of them, regardless of whether the other is referenced or acknowledged in connection with the performance (including payment to either of them under an invoice issued by the same one of them or the other one of them). As "Contractor", each of A2a and GKD are executing this Agreement as a principal and not as surety for the other and, accordingly, the liability and obligation of either of them under this Agreement (as the case may be, a "First Contractor") shall not be affected, diminished, defended, or released by reason of: (a) any event, condition, circumstance, or action applicable to or taken by the other one of them (the "Other Contractor"); (b) any invalidity or lack of enforceability of this Agreement against the Other Contractor; (c) the absence of any attempt by a party to enforce any obligation against the Other Contractor or any other person; (d) any waiver or other change of the terms of this Agreement by the Other Contractor (but no such waiver or change shall apply to the First Contractor unless enforceable under law, provided, however, that no such change that would increase First Contractor's liabilities, obligations or duties under this Agreement shall apply to the First Contractor unless agreed to by First Contractor); (e) the Other Contractor's rejection or disaffirmance of this Agreement or any other disability, defense or cessation of the liability of Other Contractor for any reason whatsoever; (f) any transfer of any rights or obligations of relating to this Agreement by the Other Contractor, whether or not contemplated or permitted by this Agreement; (g) any impairment of any rights the First Contractor may have against the Other Contractor or any other person, under contract,

under law, or otherwise, express or implied, in the nature of subrogation, indemnity, reimbursement, contribution, setoff; (h) any suretyship-type defense by the First Contractor; and (i) in general, any circumstance which might otherwise constitute a defense or a discharge of the Other Contractor under this Agreement. Notwithstanding anything in the Agreement to the contrary, GKD shall have no liability or obligation under the Services Agreement or arising out of the Services Agreement.

25. <u>Initial Payments</u>. On May 21, 2010, GM paid $50,000 to Contractor to cover design costs and on July 15, 2010, GM paid $1,000,000 to Contractor to accelerate delivery of certain components of the Equipment ("Initial Payments"). Although made before the execution of this Agreement, the Initial Payments have been received by Contractor and applied in full by Contractor to this Agreement and the obligations of Purchaser hereunder.

26. <u>Assignment to Lessor and Lessee</u>.

26.1 *Assignment to Lessor*. Lessor will be leasing the Equipment to Lessee under the Lease. Lessor, GM and Lessee acknowledge and agree that nothing contained in the Lease shall affect the obligations of GM, Lessee and Lessor under this Agreement or impose any obligations on Contractor. In order to facilitate the Lease, GM's agreement to buy the Equipment from Contractor for the Purchase Price provided in this Agreement, and all of Lessee's right, title, and interest in, to, and under this Agreement and the Equipment (including all credit and benefit of GM's having made the Initial Payments and all rights in or under or in respect of the Performance Bond), are hereby assigned to Lessor (the "Assigned Interest"). Lessor shall have no risk of loss or other obligation or responsibility with respect to the Equipment until the conditions to any payment in respect of the Purchase Price set forth in Section 23 and Exhibit "A-1" have been satisfied, and even then, and in all events, Lessor's only obligation to Contractor relating to this Agreement or the Equipment or Software, except as otherwise provided in this Agreement, is to pay Contractor the Purchase Price and any applicable sales/use taxes (to the extent Lessor is not entitled to a tax exemption, as a result of Lessor's resale or rental of the Equipment to Lessee, or otherwise) as so provided. GM agrees that it (or Lessee, as provided in Section 26.2 below) shall remain liable for all of the obligations of Purchaser under this Agreement, including the obligation to make payments required of Lessor if Lessor does not make them and, following Acceptance under Section 2.4, bearing all risk of loss to the Equipment. In connection with such assignment, to which Contractor consents, and in addition to the other provisions of this Agreement benefiting Lessor, Contractor and Lessee acknowledge and agree:

26.1.1 Section 8 of this Agreement shall not apply following Acceptance (as defined in Section 2.4 above).

26.1.2 Lessor may assume the rights and obligations of Lessee under this Agreement upon the occurrence of the events described in Section 8 (insofar as such provision applies) or any other Lessee breach or default hereunder or under the Lease. Contractor shall not exercise any termination rights or other remedies (available under this Agreement or at law or in equity) against Lessee, nor shall any termination of this Agreement occur, unless Contractor shall have provided Lessor with at least 30 days' prior written notice of its intent to exercise any

remedy or terminate, and within such period Lessor shall not have cured the breach or default or other event in question by assuming the rights and obligations of Lessee under this Agreement and curing any performance defaults reasonably capable of cure within such period (and Contractor shall accept any such assumption and, without limiting Lessor's obligation to continue to cure all defaults, any such cure of any such defaults). In the event Lessor shall not have so cured such breach or default, Contractor may thereafter exercise its termination rights or other remedies.

26.1.3  None of Contractor, GM or Lessee shall make any change or modification to this Agreement without Lessor's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

26.2  *Assignment to Lessee.*  GM organized Lessee as a wholly-owned subsidiary in order to facilitate the purchase, financing, and operation of the Equipment, including the financing of GM's obligations under this Agreement. Accordingly, GM has (and it hereby does and does confirm that it has) unconditionally and indefeasibly contributed to Lessee:

26.2.1  any and all of GM's right, title, and interest in, to, and under this Agreement remaining after giving effect to the assignment of this Agreement to Lessor as provided herein, including the right to receive, and the benefit of, any such right, title, or interest upon any assignment of the Assigned Interest (including all credit and benefit of GM's originally having made the Initial Payments) to Lessee as contemplated by Section 29.2 below (and as provided in the Lease) on Lessor's receipt of the Reimbursement Amount as defined and provided for in the Lease) and any other rights under this Agreement or Lease in respect of the Assigned Interest provided for in this Agreement in favor of Lessee;

26.2.2  any and all of GM's obligations of payment and performance under this Agreement remaining after giving effect to the assumption of this Agreement by Lessor as provided herein, including the obligation to make payments required of Lessor under this Agreement if Lessor does not make them and all payment or nonpayment obligations under this Agreement that are not assumed by Lessor or, if assumed by Lessor, are subject to unfulfilled conditions to payment by Lessor that are not conditions to payment by GM.

26.3  *Summary.*  Such contributions by GM to Lessee comprise, to the extent of the contribution, an assignment to and assumption by Lessee of this Agreement, all as more particularly provided in and confirmed by this Agreement. As a result of the assignments and assumptions and contributions described in this section, Lessee is now "Purchaser" under this Agreement, subject to the rights of and obligations of Lessor as assignee of GM (who was the original Purchaser—and Lessor's and Lessee's predecessor-in-interest—under this Agreement).

27.  Payment of Purchase Price by Lessor.  The Purchase Price shall be paid by Lessor or GM and/or Lessee in installments as provided in Section 23 and Exhibit A-1 to this Agreement.

28.   Equipment and Software.

28.1    GKD agrees with Lessor that the GKD Equipment includes all necessary control computers, master and slave controllers, and hardware, and all installation hardware, and services necessary for its full delivery, installation, and operation as contemplated by the terms and provisions of this Agreement and all specifications previously provided to Purchaser by GKD.  GKD agrees that the GKD Equipment includes a perpetual, transferable, non-exclusive license allowing Purchaser and Lessor to use (which license shall upon payment in full of the Purchase Price be fully-paid up) the GKD Software in connection with the GKD Equipment. GKD agrees that the GKD Software includes any applicable software and documentation pertaining to the use of the GKD Equipment that is delivered with the GKD Equipment or that is necessary for the use of the GKD Equipment in accordance with specifications and as presently contemplated by this Agreement.  GKD shall and shall cause with respect to the GKD Software that (a) if any of Purchaser and Lessor (or its their respective successors and assigns) subsequently sells or leases the GKD Equipment to a new end-user who agrees in writing to the GKD Software owner's, maker's, or licensor's license terms applicable to Purchaser (including if the GKD Software owner, maker, or licensor is Contractor or Leurocom or any other person), the new end-user will be entitled to a GKD Software license on those same terms at no additional charge to the new end-user (or Lessor or its successors and assigns); and (b) GKD shall, and shall use commercially reasonable efforts to cause the owner, maker, or licensor of any GKD Software to, make such written confirmations of the foregoing as Purchaser, Lessor, or their respective successors and assigns may from time to time reasonably request.

28.2    A2a agrees with Lessor with respect to all of the Equipment and all of the Software, that (a) the Equipment includes all necessary control computers, master and slave controllers, and hardware, and all installation hardware, and services necessary for its full delivery, installation, and operation as contemplated by the terms and provisions of this Agreement and all specifications previously provided to Purchaser by either of them (and, in the case of the A2a Equipment, the Services Agreement);  (b) the Equipment includes a perpetual transferable, non-exclusive license allowing Purchaser and Lessor to use (which license shall upon payment in full of the Purchase Price be fully-paid up) the Software in connection with the Equipment; (c) that the Software includes any applicable software and documentation pertaining to the use of the Equipment that is delivered with the Equipment or that is necessary for the use of the Equipment as presently contemplated by the parties to this Agreement (and, in the case of A2a, the Services Agreement); (d) it shall and shall cause with respect to the Software (and, in the case of the Non-GKD Software, A2a shall, and shall use commercially reasonable efforts upon request to cause), that (i) if any of Purchaser or Lessor (or their respective successors and assigns) subsequently sells or leases the Equipment to a new end-user who agrees in writing to the Software owner's, maker's, or licensor's Software license terms applicable to Lessee (including if the Software owner, maker, or licensor is Contractor or Leurocom or any other person), the new end-user will be entitled to a Software license on those same terms at no additional charge to the new end-user (or Lessor or its successors and assigns); and (ii) the owner, maker, or licensor of any Software to make such written confirmations of the foregoing as Purchaser, Lessor,  or their respective successors and assigns may from time to time reasonably request.

29.   <u>Reimbursement; Replacement Agreement; Remarketing</u>.

29.1   *Reimbursement Amount.*  The "Reimbursement Amount" under this Agreement is defined as all amounts paid by Purchaser or Lessor to Contractor under this Agreement (including the Initial Payments, collectively, the "Contractor Payments"), plus applicable taxes, if any, imposed by an applicable taxing authority in connection with a transfer of the Assigned Interest to Purchaser upon the payment of the foregoing amounts (determined on and as of the date of the transfer) ("Taxes").  The "GKD Reimbursement Amount" means that portion of the Reimbursement Amount that is collectively: (a) the Contractor Payments for which GKD was entitled to the credit for under any agreement between GKD and A2a (which respect to which agreement Purchaser and Lessor shall have no obligation) ("GKD Contractor Payments"), and (b) Taxes relating to the GKD Contractor Payments.  The "A2a Reimbursement Amount" means the Reimbursement Amount minus the GKD Reimbursement Amount.  All Contractor Payments shall be presumed to be GKD Contractor Payments unless and until GKD and A2a prove to the contrary.  Without limiting the foregoing presumption, Contractor represents, warrants, and agrees, to and with each of Purchaser and Lessor, that not less than 80% of each and every Contractor Payment is and will be GKD Contractor Payments and, thus, the GKD Reimbursement Amount is and will be not less than 80% of Reimbursement Amount.  As a matter with respect to which Contractor shall have no right or concern, Purchaser and Lessor agree that the Reimbursement Amount, if due hereunder, while it shall and will be paid entirely to Lessor, shall be retained by Lessor only to the extent Lessor has received the entirety of the Contractor Payments made by it, plus the Taxes relating to the entirety of the Reimbursement Amount associated with all Contractor Payments, regardless of by whom made; and Lessor will remit any excess to Purchaser (but if any such payment made to Purchaser is recovered from or repaid by Lessor, in whole or in part, in any bankruptcy, insolvency or other proceeding instituted by or against Purchaser or any other principal or surety of Purchaser's obligations to Lessor, or any creditor of any of theirs, Purchaser shall reimburse the recovered or repaid amount to Lessor and Lessor shall nonetheless continue to be entitled to retain all portions of the Reimbursement Amount until the amount to which is entitled is indefeasible paid to it).

29.2   *Reimbursement Payment.*  If, on the Commitment Expiration Date, the Acceptance has not occurred and the Reimbursement Amount has not been paid in full under the Lease by Purchaser or any of its guarantors or under the Performance Bond by the Issuer, and if the Issuer has not in a writing and in a manner satisfactory to Lessor acknowledged to Lessor the Issuer's unconditional obligation forthwith to pay the Reimbursement Amount in full to Lessor ("Commitment Expiration Event"), or if the Reimbursement Amount is required to be paid as provided in Section 2.4(C) ("Rejection Event"), then upon the occurrence of the Commitment Expiration Event (in the former case) or the Rejection Event (in the latter case), as the case may be:

(a) GKD will on the Commitment Expiration Date (in the case of a Commitment Expiration Event) or on the date for payment under Section 2.4(C) (in the case of a Rejection Event) pay Lessor the GKD Reimbursement Amount; and

(b) A2a will on the same date pay Lessor the A2a Reimbursement Amount;

and, upon the indefeasible payment of the entire Reimbursement Amount to Lessor, Lessor shall have no further right, title, interest, liability, obligation, or concern with respect to the Assigned Interest or otherwise in, to, or under or relating to this Agreement, except that Lessor shall, without prejudice to the rights and obligations of Contractor and Purchaser among themselves under this Agreement, be deemed to have assigned the Assigned Interest to Purchaser, AS-IS, WHERE-IS, and without recourse or warranty of title or other warranty, other than that Lessor, when it shall determine that such obligation is fully satisfied, shall warrant that the Assigned Interest to be free of any lien, claim, or encumbrance arising by, through, or under Lessor.

The obligation of GKD to pay Lessor the GKD Reimbursement Amount under subsection (a) above, and the obligation of A2a to pay Lessor the A2a Reimbursement Amount under subsection (b) above, shall, in each case, except to the extent that the GKD Reimbursement Amount and/or the A2a Reimbursement Amount, as the case may be, has previously been paid, be absolute and unconditional and not subject to any abatement, offset, recoupment, counterclaim, or defense whatsoever, arising under this Agreement or otherwise, or against Lessor or any other one or more of the other parties to this Agreement or other persons (including any defense resulting from the testing, deficiency notice, Force Majeure, or other provisions of this Agreement), and, without limiting the foregoing, not be not be affected, diminished, defended, or released by reason of: (t) any event, condition, circumstance, or action applicable to or taken by or against Lessor or any other one or more of the other parties to this Agreement or other persons; (u) any invalidity or lack of enforceability of this Agreement or the Lease against Lessee or Lessor or any other one or more of the other parties to this Agreement; (v) the absence of any attempt by any Lessor or any one or more of the other parties to this Agreement to enforce any obligation against any one or more of parties to this Agreement or the Lease (hereunder and/or thereunder), whether such party is a principal or surety; (w) any waiver or other change of the terms of this Agreement or the Lease (but no such waiver or change shall affect a party thereto unless enforceable against it under the applicable law of contract or other applicable law); (x) any rejection or disaffirmance of this Agreement or the Lease by any of the parties hereto or thereto, whether such party is a principal or surety, or any other disability, defense, or cessation of the liability of any of such parties for any reason whatsoever; (y) any transfer of any rights or obligations of relating to this Agreement or the Lease by Lessor or any other one or more of the other parties to this Agreement or the Lease, whether or not contemplated or permitted by this Agreement or the Lease; and (z) any impairment of any rights GKD or A2a or both of them may have against each other or Lessor or any other one or more of the other parties to this Agreement or the Lease, under contract, under law, or otherwise, express or implied, in the nature of subrogation, indemnity, reimbursement, contribution, or setoff.

29.3    *Replacement Agreement.*  However, if GKD is required to pay Lessor the GKD Reimbursement Amount under Section 29.2(a) and on or before the Commitment Expiration Date, GKD and Lessor have entered into a written agreement satisfactory to the two them in their sole discretion ("Replacement Agreement"), whereby GKD has agreed to provide Lessor with the opportunity to finance one or more other Mediamesh installations in the world, crediting Lessor the Reimbursement Amount against the purchase price for the Mediamesh installation that is the subject of the Replacement Agreement, then for so long as the replacement opportunity remains in all respects satisfactory to Lessor (including as to location, lessee, pricing, and all other matters, regardless of materiality), all as may be more particularly provided in the Replacement Agreement, GKD's obligation to pay Lessor the Reimbursement Amount

shall be suspended pending the finalization of such crediting of the Reimbursement Amount under the Replacement Agreement, and upon such final crediting, the Reimbursement Amount to the extent of the amount thereby credited shall be deemed to have been satisfied under this Agreement.

29.4    *Remarketing*. If the Equipment is required or desired to be deinstalled for any reason at any time that Lessor has any right, title, or interest therein, including on termination of the Lease or on termination of any other agreement to which Purchaser, Lessor, and/or any owners and/or rights holders of the facility where the Equipment is to be installed are parties, then on request of Lessor, GKD will upon request by Lessor (and will cause Manufacturer, if required, to):

29.4.1  properly deinstall, pack, and transport the Equipment to a new reinstallation location in the world designated by Lessor (storing the Equipment if necessary on an interim basis until a reinstallation location is determined by Lessor), and provide such design, consultation, and other services as are necessary or as may be reasonably requested by Lessor for a reinstallation of the Equipment at the new location and provide such additional equipment and such construction and other services as may be necessary or otherwise reasonably requested by Lessor to carry out the reinstallation, all of the foregoing to be for such charges as are mutually agreed to (in advance of such performance) by Lessor and GKD or Manufacturer; and

29.4.2  (i) remarket the Equipment for Lessor, using commercially reasonable efforts to find for Lessor other opportunities for the redeployment and sale or lease of the Equipment, for such charges for the services under Section 29.4.1 as are mutually agreed to (in advance of such performance) by Lessor and GKD or Manufacturer (but not any finder's fee, remarketing fee, or other like fee); and (ii) as part of the services under clause (i) above, advise Lessor of any opportunities for the deployment, sale, or lease of equipment for which the Equipment (in whole or in part) would or could reasonably be considered to be appropriate for the opportunity (in whole or in part), giving effect to all relevant factors, including that the Equipment had been previously installed, and the length its remaining useful life.

29.5    *GKD and Lessor Affiliates*. For purposes of Sections 29.3 and 29.4 above, references to GKD and Lessor may include their respective affiliates in any country in which they both do business or have an affiliate doing business similar to the business of this transaction (including, in the case of GKD, Manufacturer).

30.    Wire Transfers. Lessor and Purchaser party may make payments to Contractor by wire transfer in accordance these instructions and in satisfaction of any payment obligations to Contractor (even if the account below identifies another party, and notwithstanding other instructions in any invoice or other purchase documentation) until Lessor and Purchaser receive at least 10 business days prior written notice from Contractor to the contrary. Contractor will be solely liable for all losses and expenses arising from any error or incompleteness in these instructions. Contractor understands that wire transfer payments may also be subject to Lessor's and Purchaser's independent telephonic confirmation of these instructions.

80069926.3

Name of Bank            Bank of America
Address of Bank:            100 Federal Street, Boston Massachusetts 02110
Account Name:            A2a Media, Inc.
ABA No.:            026009593
Account Number:            004600390491

[Signatures continue on the next page.]

80069926.3

**IN WITNESS WHEREOF,** the parties to these presents have hereto set their hands on the dates set forth below.

**A2A**

A2a MEDIA, INC.

By: _____

Andrew Melton / President
Name/Title
October 26th, 2010
Date

**GM**

GARAGE MEDIA, LLC

By: _____

_____
Name/Title

_____
Date

**GKD**

GKD-USA, INC.

By: _____

Tom Powley / President
Name/Title

10/26/2010
_____

Date

**LESSEE**

GARAGE MEDIA NY LLC

By: GARAGE MEDIA, LLC
    Manager

_____
Garett Neff, Member

_____
Date

**LESSOR**

MACQUARIE EQUIPMENT FINANCE, LLC

By: _____

_____
Name/Title

_____
Date

**IN WITNESS WHEREOF,** the parties to these presents have hereto set their hands on the dates set forth below.

**A2A**

A2a MEDIA, INC.

By:_____

_____
Name/Title
_____
Date

**GM**

GARAGE MEDIA, LLC

By: _____

_____
Name/Title
_____
Date

**GKD**

GKD-USA, INC.

By:_____

_____
Name/Title


_____
Date

**LESSEE**

GARAGE MEDIA NY LLC

By: GARAGE MEDIA, LLC
    Manager


_____
Garett Neff, Member

_____
Date

**LESSOR**

MACQUARIE EQUIPMENT FINANCE, LLC

By:_____

_____
Name/Title   Andrew R. Feldstein
       V.P. and Asst. Gen. Counsel
        *10 -26 -10*
_____
Date

**IN WITNESS WHEREOF,** the parties to these presents have hereto set their hands on the dates set forth below.

**A2A**

A2a MEDIA, INC.

By:_____

_____
Name/Title

_____
Date

**GM**

GARAGE MEDIA, LLC

By: _____

_____
Name/Title    Garett Neff / M.P.
        10|26|10
_____
Date

**GKD**

GKD-USA, INC.

By:_____

_____
Name/Title

_____
Date

**LESSEE**

GARAGE MEDIA NY LLC

By: GARAGE MEDIA, LLC
       Manager

_____
Garett Neff, Member

        10|26|10
_____
Date

**LESSOR**

MACQUARIE EQUIPMENT FINANCE, LLC

By:_____

_____
Name/Title

_____
Date

80069926.3

## EXHIBIT "A"

### Equipment

The Media Façade will be two surfaces of equal size comprising a total of 6,010 square feet of Mediamesh, to be installed on the Port Authority Bus Terminal, located at 625 8th Avenue, New York, New York, as shown in EXHIBIT "C". The LED system architecture for this display will be based on a five (5) LED per pixel full color, outdoor design. The LED pixel pitch will be V5cm by H4.25cm, and will feature viewing angles that are deemed most appropriate for this location, by the manufacturer.

In addition to the hardware component, Contractor will design the installation and set up, install and obtain license rights for the life of the equipment and operating/content delivery system interface for the Building.

In addition to the above, the hardware and software components of the Media Façade, as well as the installation of the Media Façade shall comply with the following:

1) LED Display Architecture: The Media Façade LED display component will be enclosed in a stainless steel or aluminum housing. All exterior casings, connection and cabling will be IP65 certified and designed to operate in a range of (-4°F) / (+158°F) degree temperatures. All exterior LED casing and wire-mesh framing will be 6060 (AI Mg Si) rated aluminum or stainless steel products, including all anchor bolts and mounting rails and support struts. In order to centralize signal distribution and terminations, the Media Façade's LED system design will incorporate "single housing technology" and not require exterior support housings located next to or near the display.

2) LED system specifications for Display 1 are as follows:

| | | |
|---|---|---|
| Pixel Configuration; | RGB: | 2-Red, 2-Green, 1-Blue |
| Vertical Resolution | Px: | 214 |
| Horizontal Resolution | Px: | 1,216 |
| Color Processing | Bit: | 48 (3x16) |
| Scanning Speed | HZ: | 240/250 |
| Data Interface | Panellink: | Digital DVI |
| Total Pixels | Px: | 260,309.6 (approx) |
| Total LED's | Pieces: | 1,301,548 (approx) |
| Protection Rating | IP: | 67 |

Indoor Requirements:  Maintenance to all fascia display system electronics will be indoor accessible. Data signal distributors, inter-connecting cabling, power-converters and power supplies shall be service removable. Cover ducts and cabinets require hinged surfaces for easy service access and cover all cable and data/power components from public tampering. All exterior/interior penetrations shall be sealed with a water tight seal.

The GKD Software includes:
- Adnet

80069926.3

The Non-GKD Equipment is lighting to illuminate approximately 25,000 square feet of the exterior wall area of the installation location (as illustrated on Exhibit "C"); design; all necessary control computers and hardware and other system display electronics for the foregoing; delivery to the Equipment Location; and all installation hardware, materials, and labor necessary to complete the full construction, installation, illumination, and operability of all of the foregoing.

The Non-GKD Equipment includes:
- APC UPS
- UPS - APC Smart-UPS X 1500VA Rack/Tower LCD 120V with Network Card (Model #SMX1500RM2UNC)
- UPS Battery - APC Smart-UPS X-Series 48V External Battery Pack Rack/Tower (Model #SMX48RMBP2U)
- Westell Smartjack Box (Model #DTWA528-0212L4)
- Cisco IAD (Model #IAD2430)
- WatchGuard Firewall (Model #WG021000)
- Netgear Ethernet Switch (Model #GS108Tv2)
- Aerva Playback Server(s) (Model# AC-R2X)
- TV One Multi-Window Processor (Model #C2-6104A)
- Steel "X" Truss Lighting
- Cables & Accessories relating to the foregoing

The Non-GKD Software includes:
- Aerva Parent Server software
- Watchguard Firebox

The Equipment and Software also include, the promises and warranties provided to Contractor by its supplier or the manufacturer of any Equipment or Software or any third party in connection therewith, all of which are hereby assigned, to the extent assignable, and to the extent not assignable will be enforced by Contractor, at Purchaser's request and expense.

80069926.3

**EXHIBIT "A-1"**

**Equipment Payment Schedule**

1. The Purchase Price consists of the following:

| Purchase Elements | Purchase Price |
| --- | --- |
| Design | $50,000.00 |
| Façade Mediamesh (6,010 sq. ft.) | 4,160,000.00 |
| Facade Preparation and Product Installation | 1,524,000.00 |
| Licensed System Software and Hardware | Included |
| Air Freight  (1-2 Weeks Delivery) | 78,000.00 |
| Truss Lighting | 125,000.00 |
| Performance Bond Premium * | 89,000.00 |
| Sales Tax | n/a (Resale) |
| TOTAL PURCHASE PRICE | $6,026,000.00 |

> \* Performance Bond expires at the end of the two year GKD Warranty period.

2. The Purchase Price includes HV Electrical Power/Transformer and Cable/Conduit for Cable to Media Facade/Supply Boxes, and Dual strand Single Mode Fiber Optic Cable/FO Conduit to the Media Facade/Supply Boxes. In addition, included are installation costs for Mediamesh brackets from the interior of the building, and additional work necessary on the interior to accommodate the installation.

3. The Purchase Price may only be increased by a written change order executed by all parties following the execution of this Agreement.

4. Subject to the terms hereof, Purchaser shall pay the Purchase Price as follows:

   (a) $50,000, to cover Design Costs, ("Design Services Payment" or "First Payment").  The First Payment was paid by Purchaser on May 21, 2010.

   (b) $1,000,000, to accelerate delivery of the LED's, ("LED Payment" or "Second Payment"). The Second Payment was paid by Purchaser on July 15, 2010.

   (c) $2,015,000, to be paid upon the Effective Date as more particularly provided in Section 23 ("Third Payment").

   (d) $1,000,000, to be paid upon (i) written approval of the Equipment by Purchaser (onsite in Germany), prior to shipment from GKD, Germany, (ii) Lessor's receipt of such evidence as it may reasonably require, including GKD's and Manufacturer's written assurance, that the Media Façade will ship immediately upon payment, and (iii) the issuance to A2a, GM, Lessee and Lessor by Issuer of the Performance Bond ("Fourth Payment").

   (e) $980,500, due not later than 7 days after the date of substantial completion of the installation (all panels can display light) and Contractor's and Purchaser's written acknowledgment thereof, such acknowledgment not to be delayed, conditioned, or withheld for any reason once this condition is satisfied ("Fifth Payment").

   (f) The remaining balance of $980,500, will be paid upon Acceptance ("Final Payment").

5. A one percent (1%) per month finance charge, payable by Purchaser, will be added to all past due amounts.

6. Contractor has the right to issue written notice of non-payment to Purchaser and Lessor if a payment becomes more than fifteen (15) days past due.  Purchaser has up to thirty (30) days to cure said non-payment.  If said past due payment has not been paid after this 30 day notice, Contractor has the right to stop work. Such right is in addition to all other rights and remedies of the Contractor and subject to Section 26.1.2 (and the foregoing notice of non-payment to will also constitute the notice to Lessor under Section 26.1.2 if the notice of non-payment satisfies the requirements of that provision).

80069926.3

## EXHIBIT "B"
## GKD Warranty

Reference is hereby made to that certain Equipment Purchase Agreement dated _____ _____, 2010, by and among Garage Media, LLC ("GM"), Garage Media NY LLC ("Lessee"), A2a Media, Inc. ("A2a"), GKD-USA, Inc. ("GKD"; A2a and GKD, collectively, as Contractor), and Macquarie Equipment Finance, LLC ("Lessor") (the "Agreement"). Capitalized terms not otherwise defined in this GKD Warranty are as defined in the Agreement and Sections 9 through 16 (inclusive) of the Agreement are incorporated into this GKD Warranty as applicable hereto.

As an inducement to GM, Lessee, and Lessor to enter into the Agreement, GKD hereby warrants to Lessor which warranty shall be assigned by Lessor to Lessee under the Lease) all of the GKD Equipment and GKD Software and installation services to conform to the Agreement and all applicable specifications (including the applicable functionality specifications), and be and remain free of defects in workmanship and materials, and to continue (except in the event of misuse or casualty or other damage) to be operable in full accordance with all applicable specifications (including the applicable functionality specification), for a period of two (2) years from the Acceptance Date. By this warranty, GKD agrees, within the warranty period, to promptly repair or replace any Equipment and Software or installation services that are noncompliant with the aforementioned warranty, and/or supply any additional materials and services (including labor) so as to maintain such functionality and operability of the Equipment in accordance with the aforementioned warranty, all at its own cost and expense, and without any expense whatsoever to Purchaser or Lessor or their respective successors and assigns.

If any part of the system (GKD Equipment or GKD Software) is inoperable, GKD's phone service response time shall be within twenty-four (24) hours, irrespective of weekends or holidays. With regard to warranty obligations, GKD agrees to make repairs within two (2) business days when possible, weather and Port Authority Bus Terminal scheduling (if necessary) permitting. All other repairs shall be made within a reasonable time period, to be mutually agreed to at the time of the incident. GKD may, at its sole discretion and cost, retain the services of a local vendor as its agent to provide repairs and service with regard to its warranty obligations. All work and subcontracting will be performed in accordance with Port Authority requirements, as applicable, and applicable laws and regulations, and in a good and workmanlike manner.

### Extended Warranty

GKD shall offer an Extended Warranty for this Media Facade on the same terms and conditions as the original Warranty set forth above, for a maximum of three (3) additional years. The annual cost of the Extended Warranty shall be $134,800. Purchaser shall, at its option, by notice given to GKD at any time, elect the Extended Warranty to commence immediately after the end of the Warranty term of two (2) years. The annual cost of the Extended Warranty shall be payable by Purchaser as follows: In advance for each Extended Warranty year on or before the applicable anniversary of the Acceptance Date.

At the end of Year 5 after the Acceptance Date, Purchaser will have the option of entering into a Maintenance Contract with GKD, for a maximum of three (3) additional years, for a price to be mutually agreed at that time. This Maintenance Contract would cover labor costs only. However, parts would be available at an additional cost.

## Collateral Assignment

GKD understands and expressly acknowledges that all rights under this GKD Warranty (including the right to elect any Extended Warranty and enter into any Maintenance Contract) have been assigned to Lessor, but all of Purchaser's obligations hereunder (including the annual cost or other cost of any Extended Warranty or Maintenance Contract) remain with Lessee, and Lessee acknowledges that it remains liable for all of its obligations under this GKD Warranty. GKD and Lessee acknowledge and agree:

(a) Lessor may terminate its assignment of this GKD Warranty to Lessee and assume the rights and obligations of Lessee under this GKD Warranty upon the occurrence of the events described in Section 8 of the Agreement (insofar as such provision applies) or any other Lessee breach or default thereunder or under the Lease. GKD shall not exercise any termination rights or other remedies (available under this GKD Warranty or at law or in equity) against Lessee, nor shall any termination of this GKD Warranty occur, unless GKD shall have provided Lessor with at least 30 days' prior written notice of its intent to exercise any remedy or terminate, and within such period Lessor shall not have cured the breach or default or other event in question by assuming the rights and obligations of Lessee under this GKD Warranty and curing any performance defaults reasonably capable of cure within such period (and GKD shall accept any such assumption and, without limiting Lessor's obligation to continue to cure all defaults, any such cure of any such defaults). In the event Lessor shall not have so cured such breach or default, GKD may thereafter exercise its termination rights or other remedies.

(b) Neither of GKD nor Lessee shall make any change or modification to this GKD Warranty without Lessor's prior written consent. This GKD Warranty constitutes the entire agreement of the parties relating to its subject matter and there are no other agreements with respect thereto, written or oral or otherwise established.

(c) GKD and Lessee will send directly to Lessor, at its address for notice under the Agreement, copies of all notices given by it in connection with this GKD Warranty.

GKD USA, INC.                                  GARAGE MEDIA NY LLC

By: _____                    By: GARAGE MEDIA, LLC
Name/Title: _____            Name/Title: Manager

                                                   By:_____

Acknowledged:                                  Name/Title:  Garett Neff, Member
MACQUARIE EQUIPMENT FINANCE, LLC

By: _____
80069926.3

Name/Title: _____

80069926.3

## EXHIBIT "C"



6,010sf Mediamesh Display
(shown in red)

80069926.3

## EXHIBIT "D"

### Non-Compete

Reference is hereby made to that certain Equipment Purchase Agreement ("Agreement") dated _____, 2010, by and among Garage-Media, LLC as Purchaser, Garage Media NY LLC, as Lessee, and A2a Media, Inc. and GKD-USA, Inc., collectively as Contractor. Capitalized terms not otherwise defined herein, are as defined in the Agreement.

Contractor hereby agrees that they will not sell any new or replacement Media Façade Equipment, directly to the Port Authority of New York and New Jersey ("Port Authority") or CBS Outdoor, or to any third party, with the intent of installing said Equipment on the Port Authority Bus Terminal, located at 625 8th Avenue, New York, NY (the "Facility"), for a period ending December 31, 2018, with the following exceptions:

a.     If during the period ending December 31, 2018, Purchaser or its assigns dissolve or cease conducting business, are bankrupt or insolvent or are in material breach of the Agreement, or if Purchaser's financing company is no longer involved with this Equipment by means of assignment, then this Non-Compete shall be null and void.

b.     If during the period ending December 31, 2018, the Port Authority severs its relationship with Purchaser or its assigns, or indicates an intention to sever its relationship with Purchaser or its assigns, then this Non-Compete shall be null and void.

GKD-USA, Inc.

By: _____

A2a MEDIA, Inc.

By: _____