# EXHIBIT 10

## PLEDGE AGREEMENT

PLEDGE AGREEMENT (this agreement, as the same may be amended, restated, modified or supplemented, and in effect from time to time in accordance with the terms hereof. this "Agreement"), dated as of October 26, 2010, between GARETT ALAN NEFF, a/k/a Gary Neff, of 22 Mountaincrest Drive, Cheshire, CT 06410, JOHN MARK SCHMID, of 243 Chestnut Hill Rd., Litchfield, CT 06759, DAVID KARL SCHMID, 4 Old Orchard Way, Tolland CT 06084 (individually and collectively, the "Debtor"), and MACQUARIE EQUIPMENT FINANCE, LLC, a Delaware limited liability company (the " Secured Party").

### WITNESSETH:

WHEREAS, pursuant to various agreements, instruments, documents, or other arrangements, now or hereinafter arising, or from time to time in effect, by Debtor in favor of Secured Party or which Secured Party may be entitled to the benefit of, including such as are executed, entered into, or made by Debtor directly with or to Secured Party, or of which Secured Party is a third-party beneficiary, or which may be assigned or collaterally assigned, in whole or in part, to Secured Party, including any promissory notes, any personal property leases, and also including any collateral agreements or other agreements entered into in connection with or in furtherance of this Agreement or otherwise providing for additional collateral or security to Secured Party (collectively, "Furthering Agreements"), in connection with a loan, lease, or other financial accommodation made by Secured Party, or in connection with any other transaction to which Debtor is a party or otherwise bound, Debtor may become obligated to Secured Party (all of the foregoing, whether written or oral or electronic or otherwise established, together with this Agreement, are all of them, collectively, the "Obligations"); and

WHEREAS, the Obligations include a certain Guaranty dated October 26, 2010 made by Debtor to Secured Party providing for Debtor's guaranty of and all obligations of Garage Media, LLC, a Connecticut limited liability company ("Subsidiary") to Secured Party and of all obligations of Garage Media NY LLC, a New York limited liability company to Secured Party; and

WHEREAS, it is or may be a condition precedent to the availability of any loan, lease, or other transaction that may be entered into by Secured Party under which any Obligations may arise or exist that the Debtor shall have granted the security interests contemplated by this Agreement in order to secure the payment and performance of the Obligations;

NOW, THEREFORE, in consideration of the foregoing, and in order to induce the Secured Party to enter into any loan, lease or other transaction that may be entered into by Secured Party under which any Obligations may arise or exist, the Debtor hereby agrees with the Secured Party as follows:

Section 1.  Definitions.

1.1  The following terms, as used herein, have the meanings set forth below:

"Collateral" has the meaning assigned to that term in Section 2.

"Event of Default" means, collectively, any of the following:

(a)  "Default" or "Event of Default" or any similar event, as either of such terms or any comparable term is defined in the Obligations, or any breach, violation or default by any party other than Secured Party under the Obligations (in each case, after the giving of notice

provided for in the Obligations and the expiration of any grace or cure period provided for in the Obligations (or grace periods expressly provided for therein);

(b) Debtor's failure to pay any amount due under the Obligations continues for 10 days after notice (or such longer period as may be expressly provided in the Obligations);

(c) Debtor's failure to observe any provision of the Obligations (other than the a payment provision) continues for 30 days after notice or, if the failure of a nature that it cannot be cured within such period, Debtor fails diligently to pursue a cure and actually cure the failure within 60 days after such notice, or, in either case, such longer period as may be expressly provided in the Obligations;

(d) A representation or warranty or statement made by Debtor in this Agreement or in the other Obligations is incorrect in any material respect when made;

(e) The Collateral is levied against, seized, or attached;

(f) Any administrator, examiner, administrative receiver, compulsory manager, trustee, or liquidator of Debtor (or any similar person contemplated by the laws of the United States of America or other applicable laws) is appointed, elected, nominated, or otherwise instituted with respect to Debtor or its assets, or Debtor makes or seeks an assignment for the benefit of creditors or any arrangement or composition with its creditors, or becomes insolvent, or commits any act of bankruptcy, or is the subject of a petition or proceeding under any bankruptcy, reorganization, arrangement of debts, insolvency, or receivership law, or Debtor seeks to effectuate a bulk sale of its inventory, equipment, or assets, or any action is taken with a view to Debtor's termination or the termination of its business, and, if any of the foregoing events is involuntary, it continues for 60 days; and

(g) Debtor or any guarantor of any Obligations dies or is the subject of an event of the types listed in clause (f) or breaches or defaults under or violates the guaranty.

"Security Interests" means the security interests granted or provided for pursuant to Section 2 hereof, as well as all other security interests created, assigned or provided as additional security for the Obligations pursuant to the provisions of this Agreement or any Further Agreements.

"UCC" means the Uniform Commercial Code as from time to time enacted and in effect in New York or any other applicable jurisdiction.

1.2   Other Definition Provisions. References to "Sections" shall be to Sections of this Agreement unless otherwise specifically provided. For purposes hereof, "including" is not limiting and "or" is not exclusive and the term "lien" includes every sort of claim or encumbrance. All capitalized terms defined in the UCC and not otherwise defined herein shall have the respective meanings provided for by the UCC. Any of the terms defined in Section 1.1 may, unless the context otherwise requires, be used in the singular or the plural depending on the reference. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.

Section 2.   Grant of Security Interests.   To secure the payment and performance of the Obligations, the Debtor hereby grants to the Secured Party, a lien on, security interest in and right of set-off against any and all right, title and interest in and to any and all property and interests in property of the Debtor, whether now owned or existing or hereafter created, acquired or arising, that are (all being collectively referred to herein as the "Collateral"):

(a) all of the stock, shares, membership interests, partnership interests and other equity ownership interests in Subsidiary now or hereafter held by Debtor (collectively, the "Ownership Interests") and all of Debtor's rights to participate in the management of Subsidiary, all rights, privileges, authority and powers of Debtor as owner or holder of its Ownership Interests in Subsidiary, including, but not limited to, all contract rights, general intangibles, accounts and payment intangibles related thereto, all rights, privileges, authority and powers relating to the economic interests of Debtor as owner or holder or its Ownership Interests in Subsidiary, including, without limitation, all investment property, contract rights, general intangibles, accounts and payment intangibles related thereto, all options and warrants of Debtor for the purchase of any Ownership Interest in Subsidiary, all documents and certificates representing or evidencing the Debtor's Ownership Interests in Subsidiary, all of Debtor's right, title and interest to receive payments of principal and interest on any loans and/or other extensions of credit made by Debtor to Subsidiary, and any other right, title, interest, privilege, authority and power of Debtor in or relating to Subsidiary, all whether existing or hereafter arising, and whether arising under any operating agreement, shareholders' agreement, partnership agreement or other agreement, or any bylaws, certificate of formation, articles of organization or other organization or governing documents of Subsidiary (as the same may be amended, modified or restated from time to time) or otherwise, or at law or in equity and all books and records of Debtor pertaining to any of the foregoing and all options, warrants, distributions, investment property, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such interests, and Debtor shall promptly thereafter deliver to Secured Party a certificate duly executed by Debtor describing such percentage interests, options or warrants and certifying that the same have been duly pledged hereunder;

(b) all rights to receive cash distributions, profits, losses and capital distributions (including, but not limited to, distributions in kind and liquidating dividends and distributions) and any other rights and property interests related to the Ownership Interests; and

(c) all other securities, instruments or property (including cash) paid or distributed in respect of or in exchange for the Ownership Interests, whether or not as part of or by way of spin-off, merger, consolidation, dissolution, reclassification, combination or exchange of stock (or other Ownership Interests), asset sales, or similar rearrangement or reorganization or otherwise;

(d) All Proceeds and products of the foregoing.

Section 3. Representations and Warranties. The Debtor represents and warrants to the Secured Party as follows:

3.1 Binding Obligation; Perfection. This Agreement constitutes a valid and binding obligation of the Debtor, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, or similar laws relating to the enforcement of creditors' rights generally and by general equitable principles. The Secured Party has a valid and perfected first priority security interest in the Collateral, securing the payment of the Obligations, and such Security Interests are entitled to all of the rights, priorities and benefits afforded by the UCC or other applicable law as enacted in any relevant jurisdiction which relates to perfected security interests.

3.2 Existing Liens. Debtor owns the Collateral, and will own all after-acquired Collateral, free and clear of any lien. No effective financing statement or other form of lien notice covering all or any part of the Collateral is on file in any recording office, except for those in favor of

Secured Party. Debtor has not heretofore transferred, pledged, assigned or otherwise encumbered any of its rights in or to the Collateral.

3.3     Governmental Authorizations; Consents.  No authorization, approval or other action by, and no notice to or filing with, any domestic or foreign governmental authority or regulatory body or consent of any other Person is required for (i) the grant by the Debtor of the Security Interests granted hereby or for the execution, delivery or performance of this Agreement by the Debtor; or (ii) the exercise by the Secured Party of its rights and remedies hereunder (except as may have been accomplished by or at the direction the Debtor or the Secured Party).  Except for the filing of UCC financing statements with the Secretary of State of the Debtor's residence, no authorization, approval or other action by, and no notice to or filing with, any domestic or foreign governmental authority or regulatory body or consent of any other Person is required for the perfection of the Security Interests granted hereby and pursuant to any other Obligations.

3.4     Accurate Information.  All information heretofore, herein or hereafter supplied to the Secured Party by or on behalf of the Debtor with respect to the Collateral or Debtor's financial position is and will be accurate and complete in all material respects.

3.5     Subsidiary.  Subsidiary is wholly owned by Debtor.  None of the Ownership Interests are in certificated form. Debtor is not prohibited under any agreement with any other person or entity, or under any judgment or decree, from the execution and delivery of this Agreement or the performance or discharge of the obligations, duties, covenants, agreements, and liabilities contained in this Agreement and Debtor has provided Secured Party with a true, complete, and current copy of such agreement(s).  As of the date hereof, the operating agreement or limited liability agreement of the Subsidiary has been amended to include the provisions set forth in EXHIBIT A hereto regarding certain rights of Secured Party in respect of this Agreement (or the substantial equivalent thereof as is acceptable to Security Party in its sole discretion) and Debtor has provided Secured Party with a true, complete, and current copy of such agreement(s).

3.6     Name and Address.     Each Debtor's legal name, as set forth on his birth certificate and as set forth on his driver's license issued by the state of his residence, is as set forth above in the first paragraph of this Agreement.  Each Debtor's address set forth above in the first paragraph of this Agreement is his sole residence address.

3.7     Survival of Representations and Warranties.  All representations and warranties of the Debtor contained in this Agreement shall survive the execution and delivery of this Agreement.

Section 4.     Covenants and Further Assurances.

4.1     Investment Property.  The Debtor shall take any and all actions as may be necessary or desirable, or that the Secured Party may request from time to time, to (i) cause the Secured Party to obtain exclusive Control of any Collateral in a manner acceptable to the Secured Party and (ii) obtain from any issuers of any Collateral and such other Persons, for the benefit of the Secured Party, written confirmation of the Secured Party's Control over such Collateral upon terms and conditions acceptable to the Secured Party.

4.2     General Intangibles.  The Debtor shall use commercially reasonable efforts to obtain any consents, waivers or agreements necessary to enable the Secured Party to exercise remedies hereunder and under the other Obligations with respect to any of the Debtor's rights under any General Intangibles.

Page 4 of 14

4.3 <u>Taxes and Claims</u>. The Debtor shall pay when due all property and other taxes, assessments and governmental charges imposed upon, and all claims against, the Collateral; provided that no such tax, assessment or charge need be paid to the extent the same is being contested in good faith, after written notice to Secured Party, if Debtor is permitted to contest accordance with applicable law and the requirements of any of the Obligations other than this Agreement) and, in all events, without risk of loss or forfeiture or material impairment of the Collateral or the use thereof.

4.4 <u>Collateral Generally</u>.

(a) The Debtor hereby authorizes the Secured Party to file one or more financing or continuation statements, and amendments thereto (or similar documents required by any laws of any applicable jurisdiction), relating to all or any part of the Collateral without the signature of the Debtor (or with or without being signed by Secured Party as Debtor's attorney-in-fact to the extent Debtor's signature is required under the laws of any applicable jurisdiction), which financing statements may describe the Collateral as "all assets" or "all personal property" or words of like import.

(b) The Debtor will furnish to the Secured Party, from time to time upon request, statements and schedules further identifying, updating, and describing the Collateral and such other information, reports and evidence concerning the Collateral as the Secured Party may reasonably request, all in reasonable detail.

(c) The Debtor shall not use or permit any Collateral to be used unlawfully or in violation of any provision of applicable law or agreement, including or any policy of insurance covering any of the Collateral.

(d) The Debtor shall give the Secured Party not less than thirty (30) days' written notice of any change in the Debtor's name or residence address.

(e) Except as otherwise expressly permitted under the other Obligations besides this Agreement, the Debtor shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral; or (ii) create or suffer to exist any lien upon or with respect to any of the Collateral to secure indebtedness of the Debtor or any other Person.

(f) Beyond the safe custody thereof, the Debtor agrees that the Secured Party shall have no duties concerning the custody and preservation of any Collateral in its possession (or in the possession of any agent or bailee) or with respect to any income thereon or the preservation of rights against prior parties or any other rights pertaining thereto. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property. The Secured Party shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehouseman, carrier, forwarding agency, consignee or other agent or bailee selected by the Secured Party in good faith.

(g) The Debtor shall do nothing to impair the rights of the Secured Party in the Collateral. The Debtor assumes all liability and responsibility in connection with the Collateral acquired by it, and the liability of the Debtor to pay the Obligations shall in no way be

affected or diminished by reason of the fact that such Collateral may be lost, stolen, damaged, or for any reason whatsoever unavailable to the Debtor.

(h) The Secured Party agrees that upon satisfaction in full of all Obligations and all commitments of Secured Party which may result in further Obligations, the Security Interests shall terminate and all rights to the Collateral shall revert to the Debtor. The Secured Party further agrees that upon such termination of the Security Interests or release of any Collateral, Secured Party shall, at the expense of the Debtor, execute and deliver to the Debtor such documents as the Debtor shall reasonably request to evidence the termination of the Security Interests or the release of such Collateral, as the case may be.

4.5 Debtor Remains Liable. Anything herein to the contrary notwithstanding: (i) the Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein and shall perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed; (ii) the exercise by the Secured Party of any of the rights hereunder shall not release the Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral; (iii) the Secured Party shall have no obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement, nor shall the Secured Party be obligated to perform any of the obligations or duties of the Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder; and (iv) the Secured Party shall have no liability in contract or tort for the Debtor's acts or omissions.

4.6 Other Documents and Actions. The Debtor shall, from time to time, at its expense, promptly execute and deliver all further instruments, documents and notices and take all further action that may be necessary or desirable, or that the Secured Party may request, in order to create, perfect and protect any Security Interests, or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other Obligations with respect to any Collateral. Without limiting the generality of the foregoing, the Debtor shall: (i) at any reasonable time, upon demand by the Secured Party, exhibit the Collateral to allow inspection of the Collateral by the Secured Party or Persons designated by the Secured Party and to examine and make copies of the records of the Debtor related thereto, and to discuss the Collateral and the records of the Debtor with respect thereto with, and to be advised as to the same by, the Debtor's officers and employees and, after the occurrence and during the continuance of an Event of Default, with any other Person which is or may be obligated with respect to any Collateral; and (ii) upon the Secured Party's request, appear in and defend any action or proceeding that may affect the Debtor's title to or the Secured Party's security interest in the Collateral.

4.7 Registration of Pledge in Books of Subsidiary; Application of Proceeds. Debtor hereby authorizes and directs Subsidiary to register Debtor's pledge to Secured Party of the Collateral on the books of Subsidiary and, following written notice to do so by Secured Party after the occurrence of an Event of Default, to make direct payment to Secured Party of any amounts due or to become due to Debtor with respect to the Collateral. Any moneys received by Secured Party shall be applied to the Obligations in such order and manner of application as Secured Party may from time to time determine in its sole discretion.

4.8 Rights of Debtor in the Collateral. Debtor may not take any action which would require the approval of any holder of the Ownership Interests without first obtaining the approval of Secured Party. Until any Event of Default occurs, Debtor shall be entitled to exercise all voting rights (except as set forth in the prior sentence) and to receive all dividends and other distributions that may be paid on any Collateral and that are not otherwise prohibited under the Obligations. Any cash dividend or distribution payable in respect of the Collateral that is, in whole or in part, a return of capital or that is made in violation of this Agreement or the obligations shall be received by Debtor in trust for Secured

Page 6 of 14

Y:\nmk\ag\80068935.DOC
80068935.2

Party, shall be paid immediately to Secured Party and shall be retained by Secured Party as part of the Collateral. Upon the occurrence and during the continuation of an Event of Default, Debtor shall, at the written direction of Secured Party, immediately send a written notice to Subsidiary instructing Subsidiary, and shall cause Subsidiary, to remit all cash and other distributions payable with respect to the Ownership Interests (until such time as Secured Party notifies Debtor that such Event of Default has ceased to exist) directly to Secured Party. Nothing contained in this paragraph shall be deemed to permit the payment of any sum or the making of any distribution which is prohibited under the Obligations.

    4.9  <u>Debtor further covenants and agrees as follows:</u>

    (a)  To deliver immediately to Secured Party, any certificates that may be issued following the date of this Agreement representing the Ownership Interests or other Collateral, and to execute and deliver to Secured Party one or more transfer powers substantially in the form of EXHIBIT B attached hereto or otherwise in form and content satisfactory to Secured Party, pursuant to which Debtor assigns, in blank, all Ownership Interests and other Collateral (the "Transfer Powers"), which such Transfer Powers shall be held by Secured Party as part of the Collateral;

    (b)  Not to receive any dividend or distribution or other benefit with respect to Subsidiary, and not to vote, consent, waive or ratify any action taken, that would violate or be inconsistent with any of the terms and provisions of this Agreement, or the Obligations or that would materially impair the position or interest of Secured Party in the Collateral or dilute the Ownership Interests pledged to Secured Party under this Agreement;

    (c)  That Debtor consents to the admission of Secured Party (and its assigns or designee) as a member, partner or stockholder of Subsidiary upon Secured Party's acquisition of any of the Ownership Interests; and

    (d)  Debtor shall not take any action to cause any equity interest of the Collateral to be or become a "security" within the meaning of, or to be governed by, Article 8 (Investment Securities) of the UCC, and shall not cause the Subsidiary to "opt in" or to take any other action seeking to establish any equity interest of the Collateral as a "security" or to become certificated.

Section 5.  <u>Remedial Provisions.</u>

    (a)  Upon the occurrence and during the continuance of an Event of Default, the Secured Party or its attorneys shall have the right without notice or demand or legal process (unless the same shall be required by applicable law), personally, or by an agent, to exercise all voting and management rights of Debtor as to Subsidiary or otherwise pertaining to the Collateral, and Debtor, forthwith upon the request of Secured Party, shall use its best efforts to secure, and cooperate with the efforts of Secured Party to secure (if not already secured by Secured Party), all the benefits of such voting and management rights.

    (b)  If any Event of Default shall have occurred and be continuing, the Secured Party may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of the Secured Party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may: (i) require the Debtor to, and the Debtor hereby agrees that it will, at its expense and upon request of the Secured Party forthwith, assemble all or part of the Collateral as directed by the Secured Party and make it available to the Secured Party at any place or places

designated by the Secured Party which is reasonably convenient to the Secured Party in which event the Debtor shall at its own expense (A) forthwith cause the same to be moved to the place or places so designated by the Secured Party, (B) store and keep any Collateral so delivered to the Secured Party at such place or places pending further action by the Secured Party, and (C) while Collateral shall be so stored and kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain the Collateral in good condition; and (ii) without notice except as specified below, sell, lease, license or otherwise dispose of the Collateral or any part thereof by one or more contracts, in one or more parcels at public or private sale, and without the necessity of gathering at the place of sale of the property to be sold, at any of the Secured Party's offices or elsewhere, at such time or times, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Secured Party may deem commercially reasonable.

(c) The Debtor agrees that, to the extent notice of sale shall be required by law, a reasonable authenticated notification of disposition shall be a notification given at least 10 days prior to any such sale and such notice shall (i) describe the Secured Party and the Debtor, (ii) describe the Collateral that is the subject of the intended disposition, (iii) state the method of intended disposition, (iv) state that the Debtor is entitled to an accounting of the Obligations and state the charge, if any, for an accounting, and (v) state the time and place of any public disposition or the time after which any private sale is to be made. At any sale of the Collateral, if permitted by law, the Secured Party may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness) for the purchase, lease, license or other disposition of the Collateral or any portion thereof for the account of the Secured Party. The Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Secured Party may disclaim any warranties that might arise in connection with the sale, lease, license or other disposition of the Collateral and has no obligation to provide any warranties at such time. The Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. To the extent permitted by law, the Debtor hereby specifically waives all rights of redemption, stay or appraisal, which it has or may have under any law now existing or hereafter enacted.

(d) If an Event of Default has occurred and is continuing, the Debtor hereby irrevocably authorizes and empowers the Secured Party, without limiting any other authorizations or empowerments contained in any of the other Obligations, to assert, either directly or on behalf of the Debtor, any claims the Debtor may have, from time to time, against any other party to any of the agreements to which the Debtor is a party or to otherwise exercise any right or remedy of the Debtor under any such agreements (including, without limitation, the right to enforce directly against any party to any such agreement all of the Debtor's rights thereunder, to make all demands and give all notices and to make all requests required or permitted to be made by the Debtor thereunder).

(e) If an Event of Default has occurred and is continuing, the proceeds of any collection, enforcement, sale or other disposition of, or other realization upon, all or any part of the Collateral and any cash held in any Deposit Account shall be applied in accordance with the applicable provisions of the Obligations.

(f) The Debtor acknowledges and agrees that a breach of any of the covenants contained in Section 4, Section 5 or Section 6 hereof will cause irreparable injury to the Secured Party and that the Secured Party has no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of the Secured Party to seek and obtain

specific performance of other obligations of the Debtor contained in this Agreement, that the covenants of the Debtor contained in the Sections referred to in this Section shall be specifically enforceable against the Debtor.

(g) Debtor recognizes that Secured Party may be unable to effect a public sale of the Collateral by reason of certain provisions contained in the federal Securities Act of 1933, as amended, and applicable state securities laws and, under the circumstances then existing, may reasonably resort to a private sale to a restricted group of purchasers who will be obliged to agree, among other things, to acquire the Collateral for their own account for investment and not with a view to the distribution or resale of the Collateral. Debtor agrees that a private sale so made may be at a price and on other terms less favorable to the seller than if the Collateral were sold at public sale and that Secured Party has no obligation to delay sale of the Collateral for the period of time necessary to permit Debtor, even if Debtor would agree to register or qualify the Collateral for public sale under the Securities Act of 1933, as amended, and applicable state securities laws. Debtor agrees that a private sale made under the foregoing circumstances and otherwise in a commercially reasonable manner shall be deemed to have been made in a commercially reasonable manner under the UCC.

(h) No failure or delay on the part of the Secured Party in the exercise of any power, right or privilege hereunder shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or any other right, power or privilege. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available, including any rights or remedies provided for elsewhere in the Obligations or at law or in equity.

Section 6. Attorney-in-Fact. The Debtor hereby irrevocably appoints the Secured Party, its nominee, and any other Person whom the Secured Party may designate, as the Debtor's attorney-in-fact, with full power during the existence of any Event of Default to sign the Debtor's name on and/or to fill in blanks in the Transfer Power to cause a transfer of the Ownership Interests and other Collateral pursuant to a sale of the Collateral and to do all things necessary to carry out the terms and provisions of this Agreement. The Debtor hereby ratifies and approves all acts of any such attorney and agrees that neither the Secured Party nor any such attorney will be liable for any acts or omissions nor for any error of judgment or mistake of fact or law other than, and to the extent of, such Person's gross negligence or willful misconduct. The foregoing powers of attorney, being coupled with an interest, are irrevocable until the Obligations have been fully paid and satisfied and the Security Interests shall have terminated in accordance with the terms hereof.

Section 7. Expenses. Without limiting the Debtor's obligations under the this Agreement or the other Obligations, the Debtor hereby agrees to promptly pay all fees, costs and expenses (including reasonable attorneys' fees and expenses) incurred in connection with (i) protecting, storing, warehousing, appraising, insuring, handling, maintaining and shipping the Collateral, (ii) creating, perfecting, maintaining and enforcing the Secured Party's liens and (iii) collecting, enforcing, retaking, holding, preparing for disposition, processing and disposing of the Collateral.

If the Debtor fails to promptly pay any portion of the above costs, fees and expenses when due or to perform any other obligation of the Debtor under this Agreement, the Secured Party may, at its option, but shall not be required to, pay or perform the same and charge the Debtor's account for all fees, costs and expenses incurred therefor, and the Debtor agrees to reimburse the Secured Party therefor on demand. All sums so paid or incurred by the Secured Party for any of the foregoing, any and all other sums for which the Debtor may become liable hereunder and all fees, costs and expenses (including attorneys'

fees, legal expenses and court costs) incurred by the Secured Party in enforcing or protecting the Security Interests or any of their rights or remedies under this Agreement shall be payable on demand, shall constitute Obligations, shall bear interest until paid at the highest rate provided in the Obligations and shall be secured by the Collateral.

Section 8.  Notices. All notices, approvals, requests, demands and other communications hereunder to be delivered to the Debtor and all notices, approvals, requests, demands and other communications hereunder shall be given in accordance with the notice provision of the applicable Obligations.

Section 9.  Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns except that the Debtor may not assign its rights or obligations hereunder without the prior written consent of the Secured Party. No sales of participations, other sales, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner impair the lien granted to the Secured Party hereunder.

Section 10.  Changes in Writing. No amendment, modification, termination or waiver of any provision of this Agreement shall be effective unless the same shall be in writing signed by the Secured Party.

Section 11.  GOVERNING LAW; SUBMISSION TO JURISDICTION. THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES. THE DEBTOR HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE COUNTY OF NEW YORK, STATE OF NEW YORK AND IRREVOCABLY AGREES THAT, SUBJECT TO THE SECURED PARTY'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS. THE DEBTOR EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. THE DEBTOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON THE DEBTOR BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO THE DEBTOR IN ACCORDANCE WITH THE PROVISIONS OF SECTION 8 HEREOF AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

Section 12.  WAIVER OF JURY TRIAL. THE DEBTOR AND THE SECURED PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

Section 13.  Counterparts; Integration. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement constitutes the entire agreement and understanding among the parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

Section 14.  <u>Headings</u>.  Headings and captions used in this Agreement are included for convenience of reference and shall not be given any substantive effect.

Section 15.  <u>Scanned Documents</u>.  In any proceeding relating to the Obligations, Secured Party or Debtor may produce an electronically scanned copy of a document rather than the original and such copy will have the same force as the original.  Each party acknowledges that it has received and reviewed all of the pages of this Agreement and that none of its provisions are missing or illegible.

**[Signature Page Follows]**


    Witness the due execution hereof by the respective duly authorized officers of the undersigned as of the date first written above.

DEBTOR:

_____
GARETT ALAN NEFF

_____
JOHN MARK SCHMID

_____
DAVID KARL SCHMID

SECURED PARTY:

MACQUARIE EQUIPMENT FINANCE, LLC

By:_____
   Name:_____
   Title:_____

Witness the due execution hereof by the respective duly authorized officers of the undersigned as of the date first written above.

DEBTOR:

_____
GARETT ALAN NEFF

_____
JOHN MARK SCHMID

_____
DAVID KARL SCHMID

SECURED PARTY:

MACQUARIE EQUIPMENT FINANCE, LLC

By: _____
Name: ____Andrew R. Feldstein_____
Title: ____V.P. and Asst. Gen. Counsel___

Y:\nmk\ag\80068935.DOC
80068935.2

# EXHIBIT A

## OPERATING AGREEMENT AMENDMENT PROVISIONS

### ARTICLE [__]
### RIGHTS OF SECURED PARTY

Section [__]   No Board of Managers or any Manager may take any action which would require the approval of any holder of the Ownership Interests (as defined in the Pledge Agreement) without first obtaining the approval of Secured Party. In the event that Macquarie Equipment Finance, LLC (together with any successor and/or assign thereto, "Secured Party") exercises its rights and remedies (the "Pledge Rights") under and in accordance with that certain Security and Pledge Agreement between Secured Party and Garage Media, LLC, a Connecticut limited liability company (the "Pledge Agreement"), delivered in connection with the Obligations (as defined therein), notwithstanding anything contained in this Agreement to the contrary:  (a) Secured Party shall be entitled to remove any or all of the Managers and appoint any representatives of Secured Party or any other person or entity, as Secured Party elects, to be the Manager(s) in order to fill the vacancy created by such removal and the Members shall not have the right to remove the Managers so appointed by Secured Party or to elect any new or additional Managers, and (b) any limitations contained in this Agreement inconsistent with the provisions of the Pledge Agreement or this Article shall thereupon be deemed waived, void and of no further force and effect until all of the Obligations (as defined in the Pledge Agreement) of the Subsidiary (as defined in the Pledge Agreement) to Secured Party have been fully and finally paid, including, without limitation (i) any provision that requires approval of actions by a "Majority in Interest", and (ii) provisions requiring the approval of the "Board of Managers" for certain actions, it being agreed that the Board of Managers may be replaced by a sole Manager at Secured Party's option. Following the full and final payment to Secured Party of the Obligations under the Credit Agreement, all such provisions shall be deemed to be reinstated and in full force and effect.

Section [__]   Notwithstanding anything contained in this Agreement to the contrary, all restrictions on transfer and assignability of any Member's interests in the Company shall be inapplicable, and of no force and effect, as to any transfer of any interests in the Company to Secured Party (or any nominee affiliate, successor, assignee or transferee thereof) in accordance with the Pledge Agreement.

Section [__]   Neither the Members nor Managers will amend this Agreement to provide that any limited liability company interests in the Company are securities governed by Article 8 of the Uniform Commercial Code or otherwise "opt in" of Article 8 of the Uniform Commercial Code.

Section [__]   No petition, action, proceeding, or other undertaking in respect of the insolvency, bankruptcy, receivership, or the like, will be made without the prior written consent of Secured Party.

Section [__]   The provisions of this Article shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and any future Members or Managers and their respective successors and assigns.

Section [__]   None of the provisions of this Agreement may be amended in any way without the prior written consent of Secured Party to the amendment, including, without limitation, in any way which alters, limits, restricts or adversely affects Secured Party's ability to exercise its Pledge Rights, other rights under the Pledge Agreement or the intended result thereof.

## EXHIBIT B

## EQUITY POWER

**FOR VALUE RECEIVED**, the undersigned, _____ ("**Pledgor**"), does hereby sell, assign and transfer to _____* all of its Equity Interests (as hereinafter defined) in Garage Media, LLC, a Connecticut limited liability company ("**Issuer**"), standing in the name of Pledgor on the books of said Issuer. Pledgor does hereby irrevocably constitute and appoint _____*, as attorney, to transfer the Equity Interest in said Issuer with full power of substitution in the premises. The term "**Equity Interest**" means any security, share, unit, partnership interest, membership interest, ownership interest, equity interest, option, warrant, participation, "equity security" (as such term is defined in Rule 3(a)11 1 of the General Rules and Regulations of the Securities Exchange Act of 1934, as amended, or any similar statute then in effect, promulgated by the Securities and Exchange Commission and any successor thereto) or analogous interest (regardless of how designated) of or in a corporation, partnership, limited partnership, limited liability company, limited liability partnership, business trust or other entity, of whatever nature, type, series or class, whether voting or nonvoting, certificated or uncertificated, common or preferred, and all rights and privileges incident thereto.

Dated:_____* **PLEDGOR:**

_____
Name:

Issuer acknowledges the foregoing assignment and that it has been recorded and effected.
Issuer acknowledges the foregoing assignment and that it has been recorded and effected.

**GARAGE MEDIA NY, LLC**

**By: GARAGE MEDIA, LLC**
   **Manager**

By: _____
Name: <u>Garett Neff</u>
Its: <u>Member</u>

*To Remain Blank - Not Completed at Closing

Page 14 of 14