# EXHIBIT 16

```
 1                    UNITED STATES DISTRICT COURT

 2                       DISTRICT OF CONNECTICUT

 3                                           )
      HUNTINGTON TECHNOLOGY
 4    FINANCE, INC., f/k/a                   )
      Macquarie EQUIPMENT FINANCE,
 5    INC., f/k/a Macquarie                  )
      EQUIPMENT FINANCE, LLC
 6                   Plaintiff,              )

 7    vs                                     )  Case No. 3:18CV01708(VLB)

 8    GARRETT ALAN NEFF, a/k/a               )
      GARY NEFF, JOHN MARK SCHMID,
 9    and DAVID KARL SCHMID,                 )
                     Defendants.
10

11

12
              DEPOSITION OF:   EDWARD J. KITCHEN
13            DATE:            May 9, 2019
              HELD AT:         Carmody Torrance Sandak & Hennessey LLP
14                             195 Church Street
                               New Haven, Connecticut 06510
15

16

17

18

19

20

21

22

23
              Reporter:  THEA FINKELSTEIN, RMR, CRC, LSR 126
24                          Cassian Reporting, LLC
                                21 Oak Street
25                         Hartford, Connecticut 06106
                                860-595-7462
```

```
 1
       APPEARANCES:
 2

 3        Representing the Plaintiff:

 4             METZ LEWIS BRODMAN MUST O'KEEFE
               535 Smithfield Street
 5             Suite 800
               Pittsburgh, PA 15222
 6             412-918-1133
               jokeefe@metzlewis.com
 7             JOHN R. O'KEEFE, JR., ESQ.

 8
          Representing the Defendants:
 9
               ZEISLER & ZEISLER, P.C.
10             10 Middle Street
               15th Floor
11             Bridgeport, CT 06604
               203-368-5465
12             cblau@zeislaw.com
               By:   CHRISTOPHER H. BLAU, ESQ.
13

14        Also Present:

15             ROB MACE, SENIOR VICE-PRESIDENT and
               SPECIAL ASSETS SENIOR DIRECTOR
16             THE HUNTINGTON NATIONAL BANK
               7 Easton Oval
17             EA4W67
               Columbus, OH 43219
18             614-480-1537
               Robert.Mace@Huntington.com
19

20

21

22

23

24

25
```

```
 1   understand sales management to mean?
 2              MR. O'KEEFE:  If you did.
 3        Q.    If you did.
 4        A.    I didn't.
 5        Q.    So you didn't know what Mr. Maurer was referring to?
 6        A.    No.
 7        Q.    What did you take equipment performance to mean?
 8        A.    I didn't.  I don't recall.
 9              Defendant's Exhibit 5 for identification was marked
10   by the reporter.)
11        Q.    Showing you what's been marked Defendant's 5, please
12   take a second to review, and look up at me when you're done.
13              Who is Michael DiCecco?
14        A.    He's the president of Huntington Equipment Finance.
15        Q.    Who's Gregg Goldstein?
16        A.    I don't know.
17        Q.    Do you know why Mr. Zimmeth forwarded this email to the
18   president of --
19        A.    No.
20        Q.    Who's Norman Solomon?
21        A.    A fellow colleague in my department.
22        Q.    And who's John Glodich?
23        A.    He's with Huntington Technology -- he's with
24   Macquarie, with Huntington Technology.
25        Q.    What was his role, if you recall?
```

```
 1      A.    I don't recall.
 2      Q.    May be a question for Mr. Maurer, but do you know what
 3   he meant by duo in the email at 3:24 p.m.?
 4            MR. O'KEEFE:   Object to form.
 5      A.    No.
 6      Q.    Why did Mr. Solomon forward this email to you, if you
 7   know?
 8      A.    I don't.
 9      Q.    Do you know why he said FYI, just in case?
10      A.    No.
11      Q.    You don't know what he was referring to?
12      A.    No.
13      Q.    So you don't know what prompted that email?
14      A.    I don't recall, I'm sorry.
15            Defendant's Exhibit 6 for identification was marked
16   by the reporter.)
17      Q.    Showing you what's been marked Defendant's 6, please
18   review and let me know when you're done.
19            Other than this email from January 12, 2018, did you
20   ever communicate directly with individuals associated with the
21   Port Authority?
22      A.    No.
23      Q.    Did you ever, other than this email, communicate with
24   individuals associated with the Port Authority without cc'ing
25   Gary Neff or the Schmids?
```

1            MR. O'KEEFE:  Object to form.
2       A.   No.
3       Q.   What did you mean by see you soon?
4       A.   Looking at the timing of the email, I was just getting
5  involved in this credit and basically acquainting myself with
6  the individuals involved.  So after I realized it, this fellow
7  wasn't one of our guarantors, even reading, there was nothing
8  for me to talk to him about.  There was no need to talk to
9  him.
10           My concern, once I realized who the players were,
11 guarantors, if you will, that's who I met with.  I didn't seek
12 to reach out to him or talk to him.  Didn't need to.
13      Q.   So you never met with Del Tufo in person?
14      A.   No.
15      Q.   I think I asked, but you never met with anyone else at
16 the Port Authority in person?
17      A.   No.
18           (Defendant's Exhibit 7 for identification was marked
19 by the reporter.)
20      Q.   Showing you what's been marked Defendant's 7, please
21 take a look, and look up at me when you're done.
22           What's a CARS amount?
23      A.   First of all, CARS, Credit Asset Report, and those are
24 generated with regards to delinquent accounts, deficiency
25 accounts.  So the leasing system generates, they populate, if

```
 1   you will.  But I don't have access to the leasing system to
 2   get numbers and dollar amounts, so it's provided by the
 3   leasing department.
 4           So as I read that, I needed to get an understanding
 5   of what the CARS amount was in there, because I have no access
 6   re vision into their systems.
 7      Q.   Okay.  So you're looking for a report from another
 8   department for that figure?
 9      A.   That's correct.
10      Q.   What's the significance of the CARS amount?
11      A.   What's actually owed.
12      Q.   So it's the sum total of what's actually owed?
13      A.   It would include real estate -- real estate -- taxes,
14   things of that nature.  It wouldn't just be the lease amount.
15   If -- if -- and I say if -- it populates it correctly.  So
16   again, why I'm asking them what's in there, so apparently I
17   must be questioning something in there.  I don't recall, but I
18   wanted to verify what the numbers were.
19      Q.   Okay.
20      A.   Because again, I don't have revision into their
21   systems.
22      Q.   Okay.  Is the CARS amount, as you understand it, on
23   this page somewhere?
24      A.   I don't know if that was the actual CARS amount or if
25   that's what it was at that time.  I don't recall if there was
```

1   subsequent questions after the fact to get some accuracy or
2   confirming it. So I don't know if that was -- if that would
3   be the final number. I don't know.
4       Q.   By that, are you referring to the approximately $3.8
5   million figure?
6       A.   Yes.
7       Q.   Just to clarify, your email of January 17, 2018, is
8   trying to, to use your term, get vision into what resulted in
9   this $3.8 million figure, is that fair to say?
10          MR. O'KEEFE: Object to form.
11      A.   Yes. As I stated, if that was the final number, I
12  don't know.
13      Q.   Okay. And what is meant by exposure?
14      A.   What's owed.
15      Q.   So Huntington's exposure?
16          MR. O'KEEFE: Object to form.
17      A.   Well, also the guarantors' and payers obligated to pay
18  the debt. That's their exposure, too, along with Huntington.
19      Q.   So the guarantors' only exposure was the $3.8 million
20  amount?
21      A.   No.
22      Q.   And as you sit here, do you know if accrued interest is
23  reflected in this number?
24      A.   No, I do not.
25          (Defendant's Exhibit 8 for identification was marked

1   by the reporter.)

2        Q.   Showing you what's been marked as Defendant's 8.
3   Please take a second to review.

4             What did you mean by tax liability for Garage Media?

5        A.   There's, as I recall, there was some issue -- again,
6   we have no vision into the leasing system -- so there must
7   have been a dollar amount, advised there was a tax bill due
8   and we were trying to determine what that exact number is, and
9   that's what we were trying to get to.  And again, we have no
10  vision so we were getting someone from the leasing department
11  to get on it and try to explain it to us.

12       Q.   There was a tax bill due by Huntington?

13       A.   I don't recall.  I don't know if it was -- I don't
14  recall.  I don't recall.

15       Q.   Do you recall the significance of this tax liability
16  issue?

17            MR. O'KEEFE:  Object to form.

18       A.   For us to be trying to figure it out, it must have
19  been a large amount.  That's the only thing I can estimate.

20       Q.   But you don't recall, as you sit here today, what that
21  amount was?

22       A.   No.  No.

23       Q.   Do you know how this tax liability issue was resolved,
24  if it was resolved?

25       A.   I don't know.

```
 1      Q.    Do you remember anything else about this tax liability
 2   issue?
 3      A.    No.
 4      Q.    Besides Mr. Mace and it looks like Mr. Maurer, was
 5   there anyone who joined this conversation?
 6            MR. O'KEEFE:  Object to form.
 7      A.    I don't recall.
 8      Q.    What did you mean by this is incredible?
 9      A.    Again trying to figure out a number.  We have no
10   vision into the system, and whatever we were discussing, I
11   can't get in there to see it, if it's right or wrong.  So I
12   don't know.
13            (Defendant's Exhibit 9 for identification was marked
14   by the reporter.)
15      Q.    Showing you what's been marked as Exhibit 9, please
16   take a second to review.
17            Who is Adel Wahab?
18            MR. O'KEEFE:  Right here.
19      A.    I don't know.
20      Q.    You don't recognize the name?
21      A.    No.
22      Q.    Did you ever request this information from Mr. Zimmeth?
23      A.    If I recall, this was following up on our meeting with
24   the Schmids and Gary in January, and whereby we were putting
25   together a forbearance agreement and talking about a timeline
```

1  as to when they would resolve, retire, the outstanding
2  obligation and I believe -- I believe -- because again, we
3  don't have vision into the system, I was looking to confirm
4  the dollar amount and I believe -- I could be -- there was a
5  discussion.
6        Gary mentioned that there was a number said and he
7  wanted it confirmed.  There was a dollar amount he hinted to
8  at the meeting, if I recall, and again I was looking for it to
9  put a number into which would be to settle it and retire the
10 debt on July 1st with a forbearance agreement, was due to
11 expire which he did not sign.  I'd have to look at the
12 forbearance agreement but I don't recall if that was the
13 number we put in there.
14     Q.   Referring to Mr. Zimmeth's email at 4:58 p.m.
15 $7,041,000 figure, do you know if that included sales tax?
16     A.   I'm -- I don't know.  And to indicate, to be honest,
17 what's before me, it was relative.  Give me a number of what
18 we're trying to do when we were trying to put together a
19 forbearance agreement.
20     Q.   Referring to the fourth line of Mr. Zimmeth's email, do
21 you know what is meant by Net Investment?
22     A.   I believe he's referring to the book, the book
23 balance, without taxes or interest.  Whatever else was
24 outstanding to finalize the number.
25     Q.   And what is IRR?

```
 1                              JURAT
 2
 3       I, EDWARD J. KITCHEN, do hereby certify that the
 4   foregoing testimony taken on May 9, 2019, is true and accurate,
 5   including any corrections noted on the corrections page, to the
 6   best of my knowledge and belief.
 7
 8
 9                                          EDWARD J. KITCHEN
10
11
12   COMMONWEALTH OF PENNSYLVANIA
13   COUNTY OF ALLEGHENY
                        (EST)
14       At 3:36 pm      in said County of ALLEGHENY       ,
15   this 20th day of JUNE       , 2019, personally appeared
16   EDWARD J. KITCHEN, and he made oath to the truth of the
17   foregoing corrections by her subscribed.
18
19   Before me, ANDREA L. QUATTRONE          , Notary Public
20   [signature: Andrea L. Quattrone]
21   My commission expires: 10/13/21
22
23
24
25
```

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Andrea L. Quattrone, Notary Public
Forward Twp., Allegheny County
My Commission Expires Oct. 13, 2021
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

```
 1                        TRANSCRIPT CORRECTIONS
 2
     REPORTER:        THEA FINKELSTEIN
 3
 4   CASE:   HUNTINGTON TECHNOLOGY FINANCE INC. versus GARRETT NEFF,
             JOHN SCHMID, and DAVID SCHMID
 5
 6   PAGE    LINE   CORRECTION                    REASON
 7    4       3     15219                 INSTEAD OF 15299
 8   16      13     ONE                   INSTEAD OF TWO
 9   37-6          VISION                 INSTEAD OF RE-VISION
10   37-20         VISION                 INSTEAD OF REVISION
11   44-8          SETTING                INSTEAD OF SETTING
12
...
22                                  NAME: [signature]
23                                  DATE: June 20, 2019
```

```
 1                    CERTIFICATE OF REPORTER
 2        I, THEA FINKELSTEIN, a Registered Merit Reporter/Notary
 3   Public within and for the State of Connecticut, do hereby
 4   certify there came before me, on the 9th day of May, 2019, the
 5   following named person, to wit:  EDWARD J. KITCHEN, who was by
 6   me duly sworn/affirmed to testify to the truth and nothing but
 7   the truth; that he was thereupon carefully examined upon his
 8   oath and his examination reduced to writing under my
 9   supervision; that this deposition is a true record of the
10   testimony given by the witness.
11        I further certify that I am neither counsel for, related to
12   nor employed by any of the parties to the action in which this
13   deposition is taken; and further, that I am not a relative or
14   employee of any attorney or counsel employed by the parties
15   hereto, nor financially or otherwise interested in the outcome
16   of the action.
17                    WITNESS my hand and affixed my seal this
18   May 22, 2019.
19
20
21                              [signature: Thea Finkelstein]
22
23                              _____
                                THEA FINKELSTEIN, RMR, CT CSR 126
24
25   My commission expires:  March 31, 2020
```