IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **HUNTINGTON TECHNOLOGY FINANCE, INC. f/k/a MACQUARIE EQUIPMENT FINANCE, INC. f/k/a MACQUARIE EQUIPMENT FINANCE, LLC**<br><br>    Plaintiff,<br><br>    vs.<br><br>**GARETT ALAN NEFF a/k/a GARY NEFF, JOHN MARK SCHMID, and DAVID KARL SCHMID**<br><br>    Defendants. | Case No. 3:18-cv-01708-VLB<br><br>HONORABLE VANESSA L. BRYANT |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Huntington Technology Finance, Inc. f/k/a Macquarie Equipment Finance, Inc. f/k/a Macquarie Equipment Finance, LLC ("Huntington"), by its attorneys, files the within Statement of Undisputed Material Facts in in Support of its Motion for Summary Judgment:

I.      **The Lease Agreement and Related Obligations**

1.      Huntington and Garage Media NY LLC ("GMNY") are parties to that certain Lease No. 001 dated October 26, 2010 (as amended, the "Lease Agreement"), pursuant to which GMNY leases from Huntington a 6,010 square foot Mediamesh digital signage installation at the Port Authority Bus Terminal in

New York, New York (the "Sign"), as more fully described therein. Lease Agreement (Exhibit B) at p.1.[1]

2. By the terms of that certain Guaranty dated October 26, 2010 (the "Guaranty"), Garett Alan Neff a/k/a Gary Neff, John Mark Schmid, and David Karl Schmid (collectively "Guarantors") absolutely and unconditionally guaranteed the full and prompt payment, observance, and performance when due of all obligations of GMNY under the Lease Agreement. Guaranty (Exhibit C) at § 2.

3. The terms of the Lease Agreement were modified pursuant to Amendment No. 1 dated June 13, 2010 ("Amendment 1"), Amendment No. 2 dated July 28, 2011 ("Amendment 2"), Amendment No. 3 dated September 1, 2012 ("Amendment 3"), and Amendment No. 4 contained in an Amendment dated as of March 31, 2013 ("Amendment 4"). Amendment 1 (Exhibit D); Amendment 2 (Exhibit E); Amendment 3 (Exhibit F); Amendment 4 (Exhibit G).

4. Rent is due to Huntington in the amount of $135,500.00 per month. Lease Agreement (Exhibit B) at § 5; Amendment 4 (Exhibit G) at § II.

5. In addition, GMNY is responsible for the payment of all taxes associated with the Sign in the amount of $12,025.63 per month based on a tax rate of 8.875-percent (8.875%) as applicable in New York. Lease Agreement (Exhibit B) at § 7; Affidavit of John Zimmeth ("Zimmeth Affidavit") at ¶ 14.

6. Thus, the total monthly payment due from GMNY to Huntington is $147,525.63. Agreement (Exhibit B) at § 5; Amendment 4 (Exhibit G) at § II; Lease Agreement (Exhibit B) at § 7; Zimmeth Affidavit at ¶ 15.

---

[1] Each of the exhibits cited to herein are included in the Appendix to Huntington's Motion for Summary Judgment filed contemporaneously herewith.

7.      On or about December 11, 2015, Huntington issued that certain Irrevocable Standby Letter of Credit No. OSB 009044 dated December 11, 2015 in the amount of $600,000.00 for the benefit of Outfront Media Group, LLC ("<u>Outfront</u>"), as successor in interest to CBS Outdoor Group, Inc. (the "<u>Letter of Credit</u>"). Letter of Credit (Exhibit I) at p.1.

II.     <u>Default under the Lease Agreement and the Guaranty</u>

8.      GMNY is in default of its obligations under the Lease Agreement for failure to make payment of rent, taxes, and other amounts due under the Lease Agreement in accordance with the terms thereof. Zimmeth Affidavit (Exhibit A) at ¶ 10. Similarly, Guarantors are in default under the terms of the Guaranty for failure to make payment to Huntington when due. <u>Id</u>.

9.      By letters sent on various dates from time to time, most recently by letter dated October 2, 2018 (the "<u>Notice</u>"), Huntington furnished the Lessee and Guarantors notice of past due payments under the terms of the Lease Agreement and the Guaranty and demanded payment of all amounts due under the Lease Agreement. Notice (Exhibit H) at p.1.

10.     The Guarantors admit that payments required under the Lease Agreement have not been made to Huntington. Answer (Doc. 24) at ¶ 13; Deposition Transcript of Garrett Alan Neff ("<u>Neff Tr.</u>") (Exhibit K) at 88:9-17. Deposition Transcript of John Mark Schmid ("<u>J. Schmid Tr.</u>") (Exhibit L) at 69:22-25; 85:1-5; Deposition Transcript of David Karl Schmid ("<u>D. Schmid Tr.</u>") (Exhibit M) at 41:21-23.

3

11. As of July 17, 2019, the principal amount due by GMNY to Huntington under the Lease Agreement is $8,962,074.79 (the "<u>Amount Due</u>"). Zimmeth Affidavit (Exhibit A) at ¶ 12.

12. Huntington has not received any payment whatsoever from GMNY of rent or taxes in accordance with the terms of the Lease Agreement since a partial payment applied to the amount due on March 1, 2015. <u>Id</u>. at ¶ 16.

13. The total amount of past due rent and taxes owed is $6,568,663.35. <u>Id</u>. at ¶ 17.

14. Past due amounts under the Lease Agreement accrue interest at the rate of 12-percent (12%) per annum. Lease Agreement (Exhibit B) at § 25.

15. As such, the total amount of interest on past due rent and taxes currently owed is $2,083,161.24. Zimmeth Affidavit (Exhibit A) at ¶ 17.

16. In addition, Huntington is permitted to collect a Lessor's Return from GMNY which, pursuant to the agreed-upon formula set forth in the Lease Agreement, is equal to $283,075.00. Lease Agreement (Exhibit B) at §§ 18(d), 19.

17. The unpaid Lessor's Return accrues interest at the rate of 12-percent (12%) per annum, and as of July 17, 2019, the total amount of interest on the Lessor's Return currently owed is $27,175.20. Lease Agreement (Exhibit B) at § 25; Zimmeth Affidavit (Exhibit A) at ¶ 19.

18. In pertinent part, Section 2 of the Guaranty provides as follows:

> As Guarantor will derive commercial benefit from the provisions of this Guaranty, and in order to induce Macquarie to enter into the Agreements, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor unconditionally guarantees to [Huntington] the full and prompt payment, observance and performance when due of all

4

obligations of [GMNY] arising under the Agreements. This Guaranty is absolute, continuing, unlimited, and independent, and shall not be affected, diminished or released for any reason whatsoever . . .

Guaranty (Exhibit C) at § 2.

19. The guaranteed "Agreements" are defined as:

"any and all of the various agreements, instruments, documents, or other arrangements . . . by [GMNY] in favor of [Huntington] or which [Huntington] may be entitled to the benefit of . . . including any personal property leases, and also including any security agreements, collateral agreements, or other agreements entered into in connection with any of the foregoing . . in connection with a loan, lease, or other financial accommodation made by [Huntington] to or for [GMNY], or in connection with any other transition to which [GMNY] is a party or otherwise bound . . .

Id. at § 1.

20. By letter correspondence dated December 5, 2018 and provided to Huntington on or about December 17, 2018, Huntington was advised by Outfront that GMNY failed to make payment when due to Outfront under the terms of a Display Agreement by and between those parties. Outfront letter correspondence (Exhibit J) at p.1.

21. As a result of GMNY's default, Outfront drew on the entire principal balance of the Letter of Credit in the amount of $600,000.00 in or about December 2018. Id.

22. Huntington made demand for reimbursement of all amounts drawn under the Letter of Credit. Letter of Credit Demand dated January 2019 (Exhibit S) at p.1.

23.     GMNY's past due reimbursement obligation for the Letter of Credit accrues interest at the rate of 12-percent (12%) per annum. Lease Agreement (Exhibit B) at § 25.

24.     The Lease Agreement is a guaranteed "Agreement" under the Guaranty because it is a personal property lease executed in favor of Huntington pursuant to which Huntington is entitled to the benefit of payment. Guaranty (Exhibit C) at § 2.

25.     Similarly, the Letter of Credit falls within the ambit of the Guaranty because it was issued in connection with the Lease Agreement and is otherwise a financial accommodation made by Huntington for the benefit of GMNY. Id.

26.     The Guarantors admit that they executed the Guaranty and that a true and correct copy thereof was appended to the Complaint. Neff Tr. (Exhibit K) at 37:3-21; J. Schmid Tr. (Exhibit L) at 23:14-22, 24:1; D. Schmid Tr. (Exhibit M) at 24:22-25; Answer (Doc 24) at ¶ 11.

27.     By executing the Guaranty, the Guarantors "unconditionally" guaranteed the full and prompt payment of all amounts due from GMNY to Huntington. Guaranty (Exhibit B) at § 2. Guarantors' obligations to Huntington are "absolute, continuing, unlimited, and independent, and shall not be affected, diminished, or released for any reason whatsoever . . ." Id. Furthermore, Guarantors waived "demand, protest or notice of any default or nonperformance by [GMNY], [and] all affirmative defenses, offsets and counterclaims against [Huntington] . . ." Id. at § 3.

28. Moreover, Guarantors agreed to pay all costs and expenses, including all court costs and legal fees and expenses, incurred by Huntington in connection with the enforcement of the Guaranty. Id. at ¶ § 7.

29. Huntington has incurred legal fees and costs of $92,283.32. Affidavit of Edward Kitchen ("Kitchen Affidavit") (Exhibit N) at ¶ 9. This amount includes sums billed by Huntington's counsel from inception of the matter to and including July 2019, with additional amounts to accrue thereafter. Id. at ¶ 5.

III. Issues Concerning Marketing and Operation of the Sign

30. The Sign is an electronic billboard that displays advertisements for various companies, including Netflix, Facebook, and Twitter. Neff Tr. at 168:2-10.

31. At or near the inception of the Lease Agreement, GMNY retained A2a Media, Inc. ("A2a") as its sales agent in connection with the Sign. Answer (Doc. 24) at ¶ 36.

32. A2a consistently failed to reach its sales projections. Neff Tr. at 124:3-15.

33. By way of example, for the sales period July 1, 2011 to December 31, 2011, the minimum sales goal was $1,710,000, but actual sales totaled only $1,456,000. Letter correspondence from GMNY to A2a dated January 10, 2012 (Exhibit P) at p.1.

34. GMNY was understandably dissatisfied with A2a's sales efforts, and urged A2a to institute corrective measures. Id.

35. When A2a failed to meaningfully increase sales figures, GMNY elected to convert A2a to a non-exclusive sales agent. Letter correspondence from GMNY to A2a dated June 26, 2012 (Exhibit Q) at p1.

36. In late-2013, GMNY retained Field Activate to evaluate the current marketing strategy for the Sign, including A2a's performance as sales agent. Neff Tr. (Exhibit K) at 143:1-25, 144:1-23; Field Activate Brand Research Immersion Program report (the "Field Activate Report") (Exhibit O) at p.2.

37. Among other things, Field Activate concluded that A2a had very little visibility in the New York, New York market and that its sales efforts were deficient. Field Activate Report (Exhibit O) at p.13. As a result, Field Activate recommended that GMNY terminate its relationship with A2a. Id. at p.29.

38. Field Activate further advised GMNY that it should develop an RFP process to help select potential firms to act as sales agent. Id. GMNY agreed with this recommendation and proceeded to create an RFP document. Neff Tr. (Exhibit K) at 150:3-14.

39. After the RPF process began, GMNY received proposals from various ad agencies, including Clear Channel, A2a, Big Outdoor, and Radiant Outdoor. Id. at 152:9-15.

40. Ultimately, Clear Channel and A2a were invited to make presentations to GMNY. Id. at 157:7-15. The decision to invite Clear Channel and A2a to present was made by GMNY with advice from Field Activate; Huntington was not involved. Id.

41. The final decision to terminate A2a and retain Clear Channel was made by GMNY's principals, and them alone. Id. at 159:6-12.

42. On or about March 23, 2014, GMNY terminated its agreement with A2a. Letter correspondence from GMNY to A2a dated March 23, 2014 (Exhibit R) at p.1.

43. A2a was terminated because A2a had "failed to build the sales team or achieve the annual sales objectives both projected by [A2a] and required to support [the] project." Id.

44. Thereafter, GMNY proceeded to formalize its new partnership with Clear Channel. Huntington did not participate in the negotiation of GMNY's agreement with Clear Channel. Neff Tr. at 160:3-9.

45. The Sign was purchased from and installed by GKD-USA, Inc. ("GKD"). Answer (Doc. 24) at ¶ 28.

46. In July, 2011, the first of a series of system failures with the Sign occurred, and all told, the Sign has experienced dozens of significant technical problems. Id. at ¶ 35. GKD performed service on the Sign, but never fully remedied the technical issues. Id.

47. Notwithstanding these ongoing technical issues, GMNY never considered filing a lawsuit against GKD. Neff Tr. at 70:6-8, 22-23.


**[This space left intentionally blank.]**

Respectfully Submitted,

Date: July 26, 2019

METZ LEWIS BRODMAN MUST
O'KEEFE LLC

By: */s/ Justin M. Tuskan*
John R. O'Keefe, Jr. (phv00948)
Justin M. Tuskan (phv00926)
535 Smithfield Street, Suite 800
Pittsburgh, PA 15222
Phone: (412) 918-1100
Fax: (412) 918-1199
jokeefe@metzlewis.com
jtuskan@metzlewis.com
*Attorneys for Plaintiff
Huntington Technology Finance,
Inc.*

- and -

Thomas J. Sansone (ct00617)
**CARMODY TORRANCE SANDAK
& HENNESSEY, LLP**
195 Church Street, 18th floor
New Haven, CT 06509
Phone (203) 777-5501
Fax: (203) 784-3199
tsansone@carmodylaw.com
*Attorneys for Plaintiff
Huntington Technology Finance,
Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing Statement of Undisputed Material Facts in Support of Plaintiff's Motion to for Summary Judgment was served upon the following counsel of record this 26th day of July, 2019 via the Court's Electronic Filing System:

Eric A. Henzy
Christopher H. Blau
Zeisler & Zeisler, P.C
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com
cblau@zeislaw.com
**Attorneys for Defendants**

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**

*/s/ Justin M. Tuskan*
John R. O'Keefe, Jr.
Justin M. Tuskan