## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

HUNTINGTON TECHNOLOGY
FINANCE, INC. f/k/a  MACQUARIE
EQUIPMENT FINANCE, INC.
f/k/a MACQUARIE EQUIPMENT
FINANCE, LLC

       Plaintiff,

    vs.

GARETT ALAN NEFF a/k/a
GARY NEFF, JOHN MARK SCHMID,
and DAVID KARL SCHMID

       Defendants.

Case No. 3:18-cv-01708-VLB

HONORABLE VANESSA L. BRYANT

---

### APPENDIX TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – PART 1

Affidavit of John Zimmeth………………………….....…………….…………….Exhibit A

Lease No. 001 dated October 26, 2010……………………….……………Exhibit B

Guaranty dated October 26, 2010…………………….…………….……Exhibit C

Amendment No. 1 dated June 13, 2010……………..……….…………Exhibit D

Amendment No. 2 dated July 28, 2011…………….………….……….Exhibit E

Amendment No. 3 dated September 1, 2012…………….…………….Exhibit F

Amendment No. 4 dated March 31, 2013……………….………….…Exhibit G

Notice of Default dated October 2, 2018…………….………….….Exhibit H

Irrevocable Standby Letter of Credit No. OSB 009044…………..…………Exhibit I

Outfront letter correspondence dated December 5, 2018…………..……….Exhibit J

Deposition Transcript of Garett Alan Neff…………….………….……….Exhibit K

**EXHIBIT  A**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

HUNTINGTON TECHNOLOGY
FINANCE, INC. f/k/a  MACQUARIE
EQUIPMENT FINANCE, INC.
f/k/a MACQUARIE EQUIPMENT
FINANCE, LLC

        Plaintiff,

vs.

GARETT ALAN NEFF a/k/a
GARY NEFF, JOHN MARK SCHMID,
and DAVID KARL SCHMID

        Defendants.

Case No. 3:18-cv-01708-VLB

HONORABLE VANESSA L. BRYANT

## AFFIDAVIT OF JOHN ZIMMETH

STATE OF MICHIGAN          )
                               )
COUNTY OF OAKLAND      )

      I, John Zimmeth, sworn according to law, states of my own personal knowledge that:

      1.      My name is John Zimmeth, and I am over 21 years of age. I am a Senior Vice President, Portfolio Management at Huntington Technology Finance, Inc. ("Huntington") resident in Huntington's Bloomfield Hills, MI office, and I make this affidavit in that capacity.

      2.      The facts and information contained in this affidavit are true and correct, and are based on personal knowledge and upon my review of the business records of Huntington, which records were made by, or from information transmitted by, a person with knowledge of the events described therein, at or near the time of the event described, and kept in the ordinary course of business. It is the regular business practice of Huntington to make such records, and the aforementioned records are kept under my custody and control.

3.      Huntington Bancshares acquired all the outstanding shares of stock of Macquarie Equipment Finance, Inc. in a transaction closing on or about March 31, 2015. Thereafter, Macquarie Equipment Finance, Inc. changed its name to Huntington Technology Finance, Inc.

4.      Prior to my current role at Huntington, I held a similar position at Macquarie Equipment Finance, Inc. f/k/a Macquarie Equipment Finance, LLC.

5.      Huntington and Garage Media NY LLC ("GMNY") are parties to that certain Lease No. 001 dated October 26, 2010 (the "Lease Agreement"), pursuant to which GMNY leases from Huntington a 6,010 square foot Mediamesh digital signage installation at the Port Authority Bus Terminal in New York, New York (the "Sign"), as more fully described therein.

6.      The terms and conditions of the Lease Agreement were modified pursuant to Amendment No. 1 dated June 13, 2010 ("Amendment 1"), Amendment No. 2 dated July 28, 2011 ("Amendment 2"), Amendment No. 3 dated September 1, 2012 ("Amendment 3"), and Amendment No. 4 contained in an Amendment dated as of March 31, 2013 ("Amendment 4").

7.      The Lease Agreement, Amendment 1, Amendment 2, Amendment 3, and Amendment 4 are referred to hereinafter collectively as the "Lease Documents".

8.      By the terms of that certain Guaranty dated October 26, 2010 (the "Guaranty"), Garett Alan Neff a/k/a Gary Neff, John Mark Schmid, and David Karl Schmid (collectively "Guarantors") absolutely and unconditionally guaranteed the full and prompt payment, observance, and performance when due of all obligations of GMNY under the Lease Documents.

9.      True and correct copies of the Lease Documents and the Guaranty are appended to Huntington's Motion for Summary Judgment as Exhibits B-G.

10.     As more fully described below, GMNY is in default of its obligations under the Lease Documents for failure to make payment of rent, taxes, and other amounts due under the

Lease Documents in accordance with the terms thereof. Similarly, Guarantors are in default under the terms of the Guaranty for failure to make payment to Huntington when due and owing.

11.     The last payment made to Huntington by GMNY was in February of 2015. By letters sent on various dates from time to time, most recently by letter dated October 2, 2018 (the "Notice"), Huntington furnished the Lessee and Guarantors notice of past due payments under the terms of the Lease Documents and the Guaranty and demanded payment of all amounts past due under the Lease Documents. A true and correct copy of the Notice is attached to Huntington's Motion for Summary Judgment as Exhibit H.

12.     As of July 17, 2019, the amount due and owing by GMNY to Huntington under the Lease Documents is $8,962,074.79 (the "Amount Due"). A breakdown of the Amount Due is attached hereto marked as **Exhibit A-1** and is incorporated herein by reference. The Amount Due is comprised of rent, taxes, interest, and a Lessor's Return.

13.     Pursuant to Section 5 of the Lease Agreement and Section II of Amendment 4, rent is due to Huntington in the amount of $135,500.00 per month.

14.     In addition, under Section 7 of the Lease Agreement, GMNY is responsible for the payment of all taxes associated with the Sign in the amount of $12,025.63 per month based on a tax rate of 8.875-percent (8.875%) as applicable in the State of New York.

15.     Thus, the total monthly payment due to Huntington is $147,525.63.

16.     As illustrated on Exhibit A-1, Huntington has not received any payment whatsoever from GMNY of rent or taxes in accordance with the terms of the Lease Documents since the partial payment applied to the amount due March 1, 2015 to and including the date of this Affidavit. The total amount of past due rent and taxes currently owed is $6,568,663.35.

3

17.     In accordance with the provisions of Section 25 of the Lease Agreement, past due rent accrues interest at the rate of 12-percent (12%) per annum. As such, as of July 17, 2019 the total amount of interest on past due rent and taxes currently owed is $2,083,161.24.

18.     In addition to the foregoing amounts, Sections 18(d) and 19 of the Lease Agreement permit Huntington to collect a Lessor's Return which, pursuant to the agreed-upon formula set forth in Section 19 of the Lease Agreement, as amended, is equal to $283,075.00, and was demanded by Huntington from GMNY in the Notice.

19.     In accordance with Section 25 of the Lease Agreement, past due Lessor's Return accrues interest at the rate of 12-percent (12%) per annum. As such, as of July 17, 2019, the total amount of interest on the past due Lessor's Return currently owed is $27,175.20.

20.     Section 2 of the Guaranty provides that Guarantors unconditionally agree to pay all obligations of GMNY to Huntington arising under or related to the Lease Agreement, which includes payment in full of the Amount Due.

21.     Under Section 7 of the Guaranty, Guarantors agreed to pay all costs and expenses, including all court costs and legal fees and expenses, incurred by Huntington in connection with the enforcement of the Guaranty.

22.     Finally, on or about December 11, 2015, Huntington issued that certain Irrevocable Standby Letter of Credit No. OSB 009044 dated December 11, 2015 for the benefit of Outfront Media Group, LLC ("Outfront"), as successor in interest to CBS Outdoor Group, Inc. (the "Letter of Credit"). A true and correct copy of the Letter of Credit is attached to Huntington's Motion for Summary Judgment as Exhibit I.

23.     By letter correspondence dated December 5, 2018 and provided to Huntington on or about December 17, 2018, Huntington was advised by Outfront that GMNY failed to make

payment when due to Outfront under the terms of a Display Agreement by and between those parties. A true and correct copy of the aforementioned letter correspondence is attached to Huntington's Motion for Summary Judgment as Exhibit J.

24.     As a result of GMNY's default, Outfront drew on the entire principal balance of the Letter of Credit in the amount of $600,000.00 in or about December 2018.

25.     In accordance with the provisions of Sections 25 of the Lease Agreement, GMNY's past due reimbursement obligation for the Letter of Credit accrues interest at the rate of 12-percent (12%) per annum. As such, as of July 17, 2019, the total amount of interest on the past due Letter of Credit reimbursement obligation since January 1, 2019 is $39,400.00.

26.     As of the date of this Affidavit, Huntington has not received payment from any party in connection with the Letter of Credit.

27.     Pursuant to Section 2 of the Guaranty, Guarantors are responsible for payment to Huntington of the balance of the Letter of Credit and interest in the amount of $639,400.00.

FURTHER AFFIANT SAYETH NOT

Date: July _17_, 2019

John Zimmeth, Senior Vice President
Huntington Technology Finance, Inc.

SWORN TO and subscribed before me
this _17_ day of July, 2019

Patricia L Sheldon
Notary Public

PATRICIA L. SHELDON
Notary Public, State of Michigan
County of Oakland
My Commission Expires Apr. 15, 2023
Acting in the County of _Oakland_

5



**Customer: Garage Media NY LLC**
*Calculation Date:* 7/17/2019

| | Schedule No. 001 | Notes/ Due Date | Days Late | Late Interest | Tax on late interest | Total Invoice Outstanding | Rental Period # |
|---|---|---|---|---|---|---|---|
| **LEASE TERMS:** | | | | | | | |
| Late Rate: | 12.000% | (per annum) | | | | | |
| Tax Rate: | 8.875% | NY/NY/NY | | | | | |
| Late interest taxable: | No | Nonreturns only | | | | | |
| Rental Payment, per period for Rental Period #28+ (per Lease Amd #4): | $135,500.00 | | | | | | |
| Rental Periods per year | 12 | | | | | | |
| Due Dates: | Advance | | | | | | |
| # Base Term Rental Payment Due Dates *after* Lessor's Return Due | 2 | Lessor's Return demanded in Notice dated October 2, 2018 | | | | | |
| **LESSOR'S RETURN AMOUNTS:** | | | | | | | |
| Lessor's Return (remaining months ÷ 9 × $1,170,000) | $260,000.00 | | | | | | |
| Tax on Base Lessor's Return | $23,075.00 | | | | | | |
| Total Lessor's Return + taxes | $283,075.00 | 10/2/2018 | | | | | |
| Accrued late interest on Lessor's Return | $27,175.20 | | 288 | | | | |
| Tax on accrued late interest | $0.00 | | | | | | |
| Total Lessor's Return Amounts (line g + line h + line i): | $310,250.20 | | | | | | |
| **PAST DUE AMOUNTS:** | | | | | | | |
| Rent ($135,500.00) plus taxes ($12,025.63) - After partial payment | $77,525.63 | 2/1/2015 | 1,627 | $42,044.73 | $0.00 | $119,570.36 | 44 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 3/1/2015 | 1,599 | $78,631.16 | $0.00 | $226,156.79 | 45 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 4/1/2015 | 1,568 | $77,106.73 | $0.00 | $224,632.36 | 46 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 5/1/2015 | 1,538 | $75,631.47 | $0.00 | $223,157.10 | 47 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 6/1/2015 | 1,507 | $74,107.04 | $0.00 | $221,632.67 | 48 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 7/1/2015 | 1,477 | $72,631.79 | $0.00 | $220,157.42 | 49 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 8/1/2015 | 1,446 | $71,107.35 | $0.00 | $218,632.98 | 50 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 9/1/2015 | 1,415 | $69,582.92 | $0.00 | $217,108.55 | 51 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 10/1/2015 | 1,385 | $68,107.67 | $0.00 | $215,633.30 | 52 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 11/1/2015 | 1,354 | $66,583.23 | $0.00 | $214,108.86 | 53 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 12/1/2015 | 1,324 | $65,107.98 | $0.00 | $212,633.61 | 54 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 1/1/2016 | 1,293 | $63,583.55 | $0.00 | $211,109.18 | 55 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 2/1/2016 | 1,262 | $62,059.12 | $0.00 | $209,584.75 | 56 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 3/1/2016 | 1,233 | $60,633.03 | $0.00 | $208,158.66 | 57 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 4/1/2016 | 1,202 | $59,108.60 | $0.00 | $206,634.23 | 58 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 5/1/2016 | 1,172 | $57,633.35 | $0.00 | $205,158.98 | 59 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 6/1/2016 | 1,141 | $56,108.91 | $0.00 | $203,634.54 | 60 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 7/1/2016 | 1,111 | $54,633.66 | $0.00 | $202,159.29 | 61 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 8/1/2016 | 1,080 | $53,109.23 | $0.00 | $200,634.86 | 62 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 9/1/2016 | 1,049 | $51,584.80 | $0.00 | $199,110.43 | 63 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 10/1/2016 | 1,019 | $50,109.54 | $0.00 | $197,635.17 | 64 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 11/1/2016 | 988 | $48,585.11 | $0.00 | $196,110.74 | 65 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 12/1/2016 | 958 | $47,109.85 | $0.00 | $194,635.48 | 66 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 1/1/2017 | 927 | $45,585.42 | $0.00 | $193,111.05 | 67 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 2/1/2017 | 896 | $44,060.99 | $0.00 | $191,586.62 | 68 |

EXHIBIT A-1

| Description | Amount | Date | No. | Amount | Amount | Amount | No. |
|---|---|---|---|---|---|---|---|
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 3/1/2017 | 868 | $42,684.08 | $0.00 | $190,209.71 | 69 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 4/1/2017 | 837 | $41,159.65 | $0.00 | $188,685.28 | 70 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 5/1/2017 | 807 | $39,684.39 | $0.00 | $187,210.02 | 71 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 6/1/2017 | 776 | $38,159.96 | $0.00 | $185,685.59 | 72 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 7/1/2017 | 746 | $36,684.71 | $0.00 | $184,210.34 | 73 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 8/1/2017 | 715 | $35,160.28 | $0.00 | $182,685.91 | 74 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 9/1/2017 | 684 | $33,635.84 | $0.00 | $181,161.47 | 75 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 10/1/2017 | 654 | $32,160.59 | $0.00 | $179,686.22 | 76 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 11/1/2017 | 623 | $30,636.16 | $0.00 | $178,161.79 | 77 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 12/1/2017 | 593 | $29,160.90 | $0.00 | $176,686.53 | 78 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 1/1/2018 | 562 | $27,636.47 | $0.00 | $175,162.10 | 79 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 2/1/2018 | 531 | $26,112.04 | $0.00 | $173,637.67 | 80 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 3/1/2018 | 503 | $24,735.13 | $0.00 | $172,260.76 | 81 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 4/1/2018 | 472 | $23,210.70 | $0.00 | $170,736.33 | 82 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 5/1/2018 | 442 | $21,735.44 | $0.00 | $169,261.07 | 83 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,525.63 | 6/1/2018 | 411 | $20,211.01 | $0.00 | $167,736.64 | 84 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,526.63 | 7/1/2018 | 381 | $18,735.88 | $0.00 | $166,262.51 | 85 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,527.63 | 8/1/2018 | 350 | $17,211.56 | $0.00 | $164,739.19 | 86 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,528.63 | 9/1/2018 | 319 | $15,687.21 | $0.00 | $163,215.84 | 87 |
| Rent ($135,500.00) plus taxes ($12,025.63) | $147,529.63 | 10/1/2018 | 289 | $14,212.02 | $0.00 | $161,741.65 | 88 |
| **Total Past Due Amounts:** | $6,568,663.35 | | | $2,083,161.24 | $0.00 | $8,651,824.59 | |
| **Total Lessor's Return Amounts and Past Due Amounts:** | $8,962,074.79 | | | | | | |

# EXHIBIT  B

ORIGINAL



MACQUARIE

**Lease No. 001**
**dated October 26, 2010**

| Lessee: | Garage Media NY LLC<br>1 Union Place<br>Hartford, CT 06103 | | Lessor: | Macquarie Equipment Finance, LLC<br>2285 Franklin Road, Suite 100<br>Bloomfield Hills, MI 48302 | |

| Item | Seller | Description | Lessor's Basis |
|---|---|---|---|
| 01 | A2a Media Inc. ("*A2a*") and GKD USA, Inc. ("*GKD US*") | The Equipment is a 6,010 square foot Mediamesh installation manufactured by GKD – Gebr. Kufferath AG of Metallweberstraße 46, D-52353 Düren, Germany ("*Manufacturer*") comprising two approximately 3,000 square foot panels, five LED per pixel, full color, outdoor design and including: stainless steel or aluminum housing; cover ducts and cabinets with hinged surfaces for easy service access and covering all cable and data/power components from public tampering; lighting to illuminate approximately 25,000 square feet of the exterior wall area of the Equipment Location; media and license(s) for Interactive Media Pool Platform (IMPP) software; design; all necessary control computers and hardware and other system display electronics; delivery to the Equipment Location; and all installation hardware, materials, and labor necessary to complete the full construction, installation, illumination, and operability of all of the foregoing. | $ 6,026,000 |
| 02 | Lessee | Working capital for Lessee | 275,000 |
| 03 | Johnsen and Fretty | Commission due by Lessee | 150,000 |
| 04 | Various | Permitting and legal fees incurred by Lessee with Seller | 70,000 (estimate) |
| 05 | Various | Inspection fees and costs incurred by Lessee with Seller | 79,000 (estimate) |
| | | Total: | $ 6,600,000 |

*Equipment Location*:   The two exposed façades adjoining the northeast corner of the Port Authority Bus Terminal located near Times Square at 625 8th Avenue, New York, NY 10036.

*Base Term*: 60 months.

*Base Term Commencement Date*: The first day of the first whole Rental Period occurring on or after the Final Acceptance Date.

*Final Expiration Date*: December 31, 2018.

*Rental Period*: Each calendar month during the Term.

| *Rental Payments*: | *Rental Period* | *Rental Payment* |
|---|---|---|
| | 1 – 4 | $0 |
| | 5 – 12 | $140,000 |
| | 13 – 24 | $150,000 |
| | 25 – 36 | $160,000 |
| | 37 – 60 | $125,000 |

*Reference Rate*:   1.65% (Applicable Rate in effect on August 23, 2010).

*Outside Date*:   March 31, 2011.

1.   **Lease.** Lessor agrees to lease to Lessee the Equipment described in this Lease and finance for Lessee the costs of those software, services, consumables, and other nonhardware items described in this Lease ("*Soft Cost Items*") and included in the Lessor's Basis (which is Lessor's agreed-upon cost basis to be paid to Seller under this Lease). The Lessor's Basis will not exceed the amounts stated in this Lease for any item of Equipment or Soft Cost Item. If any of the provisions of this Lease preceding this section are inconsistent with the rest of this Lease, the provisions preceding this section shall control.

2.   **Purchase and Delivery of Equipment; Security; Other.** Lessee is responsible for delivery and installation of the Equipment at the Equipment Location. Lessor will purchase the Equipment from, and pay for Soft Cost Items to, Seller and lease the Equipment to Lessee on the following terms, each of the following conditions to be satisfied in a manner acceptable to Lessor as determined by Lessor in its sole discretion, including: all documents referred to being in such form and of such substance as is so acceptable; all conditions specified therein having been similarly satisfied; for each payment, if required by Lessor, Lessor's receipt of Seller's correct and complete invoice for the payment to be made and, if payment is not to be made directly to Seller, evidence of payment to Seller by the person being reimbursed); Lessor receiving such other documents or agreements as it may reasonably request, including such as it may consider necessary to implement the Mediamesh Lease

Transaction Proposal dated September 10, 2010 between Lessor and GM (which will nonetheless remain nonbinding and not be a part of this Lease); no Putative Default by Lessee under this Lease or Lessee or any other party under any of the other agreements or document referred to is continuing; and all of the foregoing and following conditions are satisfied on or before the Outside Date or such later date as Lessor in its sole discretion may determine:

(a)   THIRD PAYMENT.   A TOTAL OF $2,075,000 as follows:

- • $2,015,000 to the Equipment's Seller, and
- • up to $75,000 to the Seller of the Soft Cost Items, when:

(i)   *Lease.*   Lessee and Lessor enter into this Lease;

(ii)   *GM Agreements.*   Garage Media, LLC ("*GM*") guarantees Lessee's obligations to Lessor ("*GM Guaranty*"); and GM and Lessor enter into a security agreement ("*GM Security Agreement*");

(iii)   *GM Principal Agreements.*   Garett (Gary) Alan Neff, 22 Mountaincrest Drive, Cheshire, CT 06410, John Mark Schmid, 243 Chestnut Hill Rd., Litchfield, CT 06759, and David Karl Schmid, 4 Old Orchard Way, Tolland CT 06084 ("*GM Principals*") guarantee Lessee's and GM's obligations to Lessor ("*GM Principal Guaranty*"); and GM Principals and Lessor,

Y \nmk\ag\80069656.DOC

80069656.2

enter into a security agreement (**"GM Principal Security Agreement"**);

(iv) *Equipment Agreement.* GM, A2a, GKD US, and Lessee enter into (and Lessor Acknowledges) an Equipment Purchase in such form and substance as Lessor may require, including: as to the purchase of the Equipment by GM, GM's payments to A2a under for the Equipment totaling $1,050,000 (**"Initial Deposit"**) (referred to therein as a "First Payment" of $50,000 and a "Second Payment" of $1,000,000); GM's assigning the purchase rights and right to the Initial Deposit to Lessor; and GM's contributing Lessee's (third party beneficiary) rights and any remaining rights it may have in connection with the purchase of the Equipment or the Equipment itself to Lessee (**"Equipment Agreement"**);

(v) *Services Agreement.* Lessee and A2a enter into a Services Purchase Agreement in such form and substance as Lessor may require, including: as to the services to be rendered in connection with the Equipment; and Lessee's collaterally assigning the Services Agreement to Lessor (**"Services Agreement"**);

(vi) *Maintenance Agreement/GKD Warranty.* GKD US and Lessee enter into the Maintenance Agreement required under Section 8(e), in such form and of such substance as Lessor may require, including Lessee's collaterally assigning the Maintenance Agreement to Lessor;

(vii) *Permit.* CBS Outdoor Group, Inc. (f/k/a Viacom Outdoor Group, Inc. f/k/a Transportation Displays, Incorporated) (**"CBS"**) and The Port Authority of New York and New Jersey (**"Port Authority"**) enter into Supplemental Agreement No. 2 to the Agreement dated May 20, 1996, referred to as Permit No. P-BT-168, between them, as previously amended by Supplemental Agreement No. 1 dated May 4, 2004 (collectively, the **"Permit"**);

(viii) *Display Agreement/Subpermit.* Lessee and CBS enter into a Display Agreement (subcontracting the Permit) that is acknowledged and agreed to by the Port Authority (collectively with the Permit, as applicable thereto, **"Display Agreement"**);

(ix) *Acknowledgment.* Lessor, Lessee, CBS, and the Port Authority enter into an acknowledgment and agreement (**"Acknowledgment"**);

(x) *Performance Bond In Process.* That an insurance company reasonably acceptable to Lessor has been requested to issue and is processing for issuance, as a matter included within the price (and Lessor's Basis) to be paid to the Seller of the Equipment, to A2a, GM, Lessee, and Lessor a performance bond in at least the amount of the Lessor's Basis of the Equipment, the terms and conditions of the Performance Bond to be in all respects satisfactory to Lessee and Lessor, including that first proceeds shall belong and be paid to Lessor to the extent of the Reimbursement Amount (as defined in Section 3), and all other proceeds to belong and be paid to Lessee and/or A2a as they may determine (**"Performance Bond"**);

(xi) *GKD Authorization.* Lessor receives a certificate as to the names, titles, signatures, and authority of those individuals executing the Equipment Agreement for GKD;

(b) *FOURTH PAYMENT.* A total of $1,100,000 as follows:
 • $1,000,000 to the Equipment's Seller, and
 • up to $100,000 to the Seller of the Soft Cost Items, plus any unused portion of the cost of the Soft Cost Items that were permitted to be included in the payments under subsection (a) above, when:
  (i) *Bring-Down.* All of the foregoing conditions are (and continue to be) satisfied;

(ii) *Insurance.* Lessor has received evidence of the Insurance required under Section 11;

(iii) *A2a Agreements.* A2a, Lessee, and Lessor enter into a security agreement (**"A2a Security Agreement"**); A2a establishes a segregated account for funds relating to the Services Agreement (**"A2a Account"**); and A2a, A2a's bank, and Lessor enter into a deposit account control agreement for the A2a Account (**"A2a DACA"**);

(iv) *Onsite Inspection.* Onsite (in Germany) management inspection/approval of the Equipment, as confirmed in writing to Lessor by Lessee;

(v) *Shipment.* The Equipment ships, or immediately upon Seller's receipt of this payment it will ship, from Germany as confirmed to Lessor by GKD US in writing;

(vi) *Lessee Security Agreement.* Lessee and Lessor enter into a security agreement (**"Lessee Security Agreement"**); Lessee establishes the Lessee Account as provided in Section 22(b); and Lessee, Lessee's bank, and Lessor enter into the Lessee DACA (as defined in Section 22(b) below);

(vii) *Performance Bond.* The Issuer issues the Performance Bond;

(viii) *Opinions.* Lessor receives opinions of counsel to Lessee, GM, GM Principals, and A2a as to such matters as it shall request;

(ix) *CBS and Port Authority Authorization.* Lessor receives certificates as to the names, titles, signatures, and authority of those individuals executing the Permit, Display Agreement, and Acknowledgment on CBS's and Port Authority's behalf, and the due execution and enforceability thereof;

(x) *Marketing and Sharing.* GM, Lessee, and Lessor enter into a marketing and sharing Agreement(s) on such terms as they may determine (individually and collectively, **"Marketing and Sharing Arrangement"**) (the rights and obligations of the parties to the Marketing and Sharing Arrangement shall be in addition to their respective rights and obligations under this Lease and, except as express reference to the Marketing and Sharing Arrangement is made in this Lease, or express reference to this Lease is made in the Marketing and Sharing Arrangement, this Lease and the Marketing and Sharing Arrangement shall be independent and either of them will not affect, limit, or condition the rights and obligations of the parties to the other of them);

(c) *FIFTH PAYMENT.* A total of $1,175,000 as follows:
 • $980,500 to the Equipment's Seller, and
 • up to $194,500 to the Seller of the Soft Cost Items, plus any unused portion of the cost of the Soft Cost Items that were permitted to be included in the payments under subsections (a) and (b) above, when:
  (a) *Bring-Down.* All of the foregoing conditions are (and continue to be) satisfied;
  (b) *Substantial Completion.* Acceptance testing is substantially complete as agreed to in writing by Lessee, GKD US or Manufacturer, CBS, PA, and their and Lessor's engineers;

(d) *FINAL PAYMENT.* A total of $1,200,000 as follows:
 • $980,500 to the Equipment's Seller,
 • $1,050,000 to GM (reimbursing GM for the Initial Deposit, provided, however, this amount shall be paid by Lessor's crediting GM with this amount as the funding of a security deposit to be made by GM and held by Lessor as collateral under the GM Security Agreement) (**"Security Deposit"**), and
 • up to $219,500 to the Seller of the Soft Cost Items, plus any unused portion of the cost of the Soft Cost Items that were permitted to be included in the payments under subsections (a), (b), and (c) above, when:
  (i) *Bring-Down.* All of the foregoing conditions are (and continue to be) satisfied;

80069656.2                                                                                          Y:\nnk\ag\80069656.DOC

(ii) *Final Sign-Off.* Final completion of the delivery, construction, installation, and testing of the Equipment at the Equipment Location is complete and is (A) approved in writing by CBS and the Port Authority in a manner satisfactory to Lessor; (B) unequivocally and irrevocably approved and accepted under this Lease by Lessee, including as to all matters such as Seller's compliance with the Equipment Agreement, the Equipment and its installation meeting all specifications, zoning, permitting, and other legal requirements that may be applicable; and (C) Lessor is satisfied with all of the foregoing approvals and events; and

(iii) *Final Acceptance Certificate.* Lessee provides Lessor with an acceptance certificate satisfactory to Lessor under this Lease (*"Final Acceptance Certificate"*).

For the avoidance of doubt, any payment made by Lessor without any one or more of the conditions to that payment having been satisfied as provided in this section shall be considered a waiver only of that condition as applicable to that payment, and not of that condition as applicable to any other payment to be made at the same time or any subsequent payments. The satisfaction (or Lessor's written waiver) of all of the foregoing conditions set forth in this section is the *"Final Acceptance Date."*

**3.   Progress Payments.**   The payments referred to in Sections 2(a), (b), and (c) are referred to as *"Progress Payments."*

If Lessee rejects any Equipment or Soft Cost Items before the Final Acceptance Date in accordance with the terms of the Equipment Agreement then this Lease shall terminate. Or, if the Final Acceptance Date for all of the Equipment and Soft Cost Items does not occur for any reason on or before the Outside Date, or if Lessor does not for any reason receive the Final Acceptance Certificate for all of the Equipment and Soft Cost Items by that date, then Lessor shall have the right in its sole discretion to terminate this Lease by written notice to Lessee at any time before it pays Seller in full for the Equipment and Soft Cost Items.

If this Lease terminates for any reason before Lessor pays Seller in full for the Equipment and Soft Cost Items, Lessee shall thereupon reimburse Lessor for any and all Progress Payments and other amounts paid by Lessor to Seller in connection with the Equipment and Soft Cost Items, plus interest on all such amounts at the rate of 12% per annum from the time any such payment was remitted by Lessor until all such payments and interest have been paid in full to Lessor, plus applicable Taxes Lessor may reasonably determine to be imposed by an applicable taxing authority in connection with a transfer of the Equipment to Lessee upon the payment of the foregoing amounts (determined on and as of the date of the transfer) as provided in the next sentence (collectively, *"Reimbursement Amount"*). Upon such payments Lessor will transfer the Equipment to Lessee, and all of Lessor's rights against Seller in respect of the Equipment and Soft Cost Items, **As-Is, Where-Is**, and without warranty of title or other warranty, other than Lessor warrant the Equipment to be free and clear of any liens arising by, through, or under Lessor.

Without limiting the generality of any provisions of this Lease regarding the absolute and unconditional nature of payments to be made and regarding risk of loss, and notwithstanding any such provisions, Lessee specifically shall at all times bear all risk of (a) loss or taking of or damage to or nondelivery or nonprovision of the Equipment and Soft Cost Items, including, without limitation, as a result of the inability of the Seller, or the Manufacturer of the Equipment, or any of Seller's, to deliver or provide any Equipment and Soft Cost Items due to financial inability, lack of creditworthiness or credit availability, bankruptcy, receivership, improper management, inability to obtain sufficient labor, *force majeure*, legal inability or prohibition, war or act of war (whether or not war is declared), insurrection, riot, civil disturbance or commotion, labor dispute or shortage, strike, act of public enemy, accident, fire, flood or other act of God, act of any governmental authority or other third party, judicial action, short or reduced supply of energy, fuel, raw materials, or components,

technical failure, or for any other reason whatsoever, whether nor not within the control of any person, and whether or not similar to the matters herein enumerated, (b) nonconformance of the Equipment and Soft Cost Items with specifications or requirements or applicable laws, (c) the lack of fitness of the Equipment and Soft Cost Items for any particular or intended use by Lessee, (d) the Equipment and Soft Cost Items not being merchantable or provided in a good or workmanlike manner, or (e) in general, the Equipment and Soft Cost Items being in any way or for any reason unavailable or unacceptable to Lessee so as to prevent Lessee from accepting the Equipment and Soft Cost Items and executing an Acceptance Certificate with respect thereto. Accordingly, without limiting the effect of any provisions of this Lease regarding the absolute and unconditional nature of payments to be made or any other provision of this Lease, any reimbursements or other payments to be made by Lessee under this section shall be made unconditionally and without abatement, reduction, offset, recoupment, cross-claim, counterclaim, or any other defense whatsoever, arising under this Lease or otherwise, or against Lessor, Assignee, Seller, Manufacturer, or any other person.

**4.   Term.**   The initial term of this Lease (*"Initial Term"*) begins on the Final Acceptance Date and continues through the Base Term Commencement Date and then for the Base Term. Any renewal term (*"Renewal Term"*) begins at the end of, as applicable, the Initial Term or any preceding Renewal Term (the Initial Term and all Renewal Terms currently in effect, previously in effect, or that are to come into effect as provided in this Lease or by other written agreement of the parties, collectively, *"Term"*).

**5.   Rent and Payments.**   The Rental Payments originally stated in this Lease for the Base Term (with Rental Period #1 beginning on the Base Term Commencement Date) and the Rental Payments specified in Section 6 are based on the Applicable Rate (as defined below) being the Reference Rate. The rate for all Rental Periods during the Base Term having a nonzero Rental Payment and the Rental Payments specified in Section 6 will be adjusted by Lessor as of the Final Acceptance Date to preserve its yield (including as necessary to account for the actual timing of Progress Payments), if: the Final Acceptance Date occurs after the Outside Date (and Lessor nonetheless determines to continue with the transaction); the Applicable Rate increases over the Reference Rate; the final costs of the Equipment and Soft Cost Items change from the amounts stated in this Lease (and in such a case, the Lessor's Basis will likewise change by the same amount). In making any such adjustment of Rental Payments, Lessor will use the same methodology, spreads, and assumptions originally used by it in establishing the pricing originally stated herein. Lessor will notify Lessee of any change in the Rental Payments (and Lessor's Basis) and Lessee agrees to execute such documents as may be required to reflect any such change. However, the failure of Lessee and Lessor to enter into any such documents will not in any way affect Lessee's obligations under this Lease which will be based on the Rental Payments determined by Lessor (and final Lessor's Basis) in accordance with the foregoing. The "Applicable Rate" is the rate of 5-year interest rate swaps as described in Federal Reserve Statistical Release H.15–Selected Interest Rates, or any successor publication of the US Federal Reserve System for the most recently reported business day occurring on or before the date of determination. If Lessee does not agree with Lessor's determination of the Rental Payments (or the final Lessor's Basis) as provided in this paragraph, it will nonetheless make payments based solely on Lessor's determination until the correct amounts are finally determined, at which time the parties will make an adjusting payment as appropriate. Once any adjustment of the Rental Payments pursuant to this paragraph is final, Rental Payments will be fixed for the Initial Term.

Lessee will pay the Rental Payments, plus all applicable Taxes, for the Term, at such address as Lessor may specify in writing (including in any invoice), in advance on the first day of each Rental Period. Lessor

will invoice Lessee for Rental Payments, with the sole remedy for any failure to invoice being that no late interest shall accrue under Section 25 on any Rental Payment until payment has been demanded in writing (including in any invoice) for at least 30 days. This Lease is a net lease and is noncancelable during its Term (except as expressly provided in this Lease). **Lessee's obligation to pay Rental Payments and other amounts under this Lease shall be, except to the limited extent provided for in Section 23, absolute and unconditional and not subject to abatement, reduction, offset, recoupment, compensation, crossclaim, counterclaim, notice or demand, or any other defense whatsoever, arising under this Lease or otherwise, or against Lessor, Assignee, Seller, Manufacturer, any Location Rights Holder, or any other person.** However, the foregoing does not limit Lessee's enforcement of rights against Lessor in a separate action at law for damages.

### 6. End of Term.

(a) At the end of the Base Term, Lessee may exercise one (only) of the following options, but only if Lessee gives irrevocable notice to Lessor unequivocally electing one of these options (*"Exercise Notice"*) and the Exercise Notice is received by Lessor at least 180 days before the end of the Term:

(i) *Return.* Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term.

(ii) *1-Year Renewal.* Lessee may renew the Term for a 1-year Renewal Term, with a Rental Payment of $99,850 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 1-year Renewal Term, Lessee may exercise one (only) of the following options, but only if Lessee gives a further irrevocable Exercise Notice unequivocally electing one of these options, and the Exercise Notice is received by Lessor at least 180 days before the end of this 1-year Renewal Term: (i) Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term; or (ii) Lessee may purchase all of the Equipment for the Purchase Amount.

(iii) *2-Year Renewal.* Lessee may renew the Term for a 2-year Renewal Term, with a Rental Payment of $74,250 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 2-year Renewal Term, Lessee may exercise one (only) of the following options, but only if Lessee gives a further irrevocable Exercise Notice unequivocally electing one of these options, and the Exercise Notice is received by Lessor at least 180 days before the end of this 2-year Renewal Term: (i) Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term; or (ii) Lessee may purchase all of the Equipment for the Purchase Amount.

(iv) *3-Year Renewal With End-Of-Term Purchase.* Lessee may renew the Term for a 3-year Renewal Term, with a Rental Payment of $65,017 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply. At the end of this 3-year Renewal Term, Lessee shall unconditionally purchase the Equipment for the Purchase Amount.

(v) *3-Year Renewal With End-Of-Term Ownership.* Lessee may renew the Term for a 3-year Renewal Term, with a Rental Payment of $71,987 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section),

and with all other provisions of this Lease continuing to apply. At the end of this 3-year Renewal Term, if Lessee has made all payments then due under this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee for $1.

If one of the foregoing options is not exercised, or if Lessee having elected a return or purchase fails to comply with the terms of the option so elected, the Term will automatically extend from its previous expiration date for successive 1-month Renewal Terms, with a Rental Payment of $133,650 (as such amount may be adjusted under the first paragraph of Section 5), and with all other provisions of this Lease continuing to apply. At the end of any such 1-month automatic Renewal Term, Lessee may exercise one (only) of the options set forth above in the preceding clauses of this subsection, but only if Lessee gives an irrevocable Exercise Notice (or further irrevocable Exercise Notice) unequivocally electing the option and the Exercise Notice is received by Lessor at least 180 days before the end of such 1-month automatic Renewal Term (and the option selected will be effective at the end of the 1-month automatic Renewal Term whose expiration date is to occur on or after 180 days from Lessor's receipt of the Exercise Notice).

(b) Where a purchase option or purchase obligation applies at the end of a Renewal Term, as provided above, Lessee will make all payments required for the rest of the Term (including after it has given any Exercise Notice) and on the last day of the Term Lessee will pay Lessor the following (*"Purchase Amount"*): (i) the sum total of the Rental Payments which would have been due and payable for the full 3-year Renewal Term provided for in subsection (a)(v) above had Lessee properly elected that option at the end of the Base Term, minus (ii) the sum total of all Rental Payments scheduled for all Renewal Terms (up to the amount specified in the preceding clause), plus (iii) all applicable Taxes; and on payment of all such amounts and any other outstanding amounts under this Lease as required by this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee.

(c) Any renewal option available to Lessee at the end of the then scheduled Term (whether it be the end of the Initial Term or a Renewal Term in effect or to come into effect under the terms of this Lease, as the case may be, *"Applicable Term"*), would result in the Term extending beyond the Final Expiration Date for any reason (e.g., if the Base Term Commencement Date occurs after January 1, 2011 or if any intervening 1-month automatic Renewal Terms occur), then the Rental Payment for the Renewal Term for each of the renewal options available to Lessee at the end of the Applicable Term will, instead of the amount originally stated in subsections (a)(ii) through (v) above, as applicable, be determined as (i) the Rental Payment so stated, (ii) multiplied by the number of months in the Renewal Term for which such Rental Payment was to have been applicable (i.e., 12, 24, or 36, as applicable), and (iii) divided by the number of months actually remaining following the Applicable Term to (and including) the Final Expiration Date.

7. **Taxes.** Lessee will pay Lessor (or pay directly to the applicable taxing authority if instructed in writing by Lessor) all taxes, fees, and assessments that may be imposed by any governmental entity or taxing authority on the Rental Payments or the Equipment or Soft Cost Items, or their purchase (by Lessee or Lessor), ownership, delivery, return, possession, operation, sale (by Lessor to Lessee), or rental, whether imposed on Lessor or Lessee or any of their affiliates or the Equipment, any Soft Cost Item, or any portion of this Lease or any related document (*"Taxes"*). Taxes include all license and registration fees, electronic waste, recycling, and other environmental fees, and all sales, use, personal property, business transfer, value added, goods and services, and other taxes, and governmental and transaction charges, together with any penalties, fines and interest thereon (except to the extent resulting from

Lessor's negligence or willful misconduct), that may be imposed during the Term or Possession Period or after the Term or Possession Period and relating to events or conditions occurring or existing during the Term or Possession Period. Lessee will not be liable for: Taxes imposed on or measured by Lessor's net income or tax preference items; overall business taxes that are in lieu of net income taxes; or Lessor's corporate franchise or net worth taxes. If Lessee is required by law or administrative practice to make any report or return with respect to Taxes, Lessee will promptly give Lessor notice and cooperate with Lessor to ensure that such action is properly made and Lessor's interests accurately reflected. Lessor has no obligation to contest or preserve any right to contest Taxes. However, Lessee may contest Taxes in its own name and at its own expense so long as, in Lessor's opinion, the contest will not result in an encumbrance on any Equipment or otherwise jeopardize Lessor's rights or interests in any Equipment.

**8. Covenants.** Lessee will during the Term and Possession Period:

(a) Maintain the Equipment in good working order and condition, in accordance with the Manufacturer's recommended engineering and maintenance standards, and at the Manufacturer's current engineering change level.

(b) Use the Equipment only in connection with its business operations and for the purposes for which it was designed and in compliance with all applicable Manufacturer operating standards and all insurance requirements.

(c) Keep the Equipment at the Equipment Location.

(d) Affix to the Equipment any labels Lessor may supply stating the Equipment is owned by Lessor.

(e) Establish and keep in effect a maintenance contract for the Equipment with the Manufacturer (or with GKD US with the guaranty of the Manufacturer) on such terms as are satisfactory to Lessor, including the GKD Warranty and such provisions as may supplement, amend, or replace the GKD Warranty (as referred to in the Equipment Agreement) (*"Maintenance Agreement"*).

(f) Make all alterations or additions to the Equipment that may be required (or supplied at no cost or under the Maintenance Agreement) by the Manufacturer or which are otherwise required to comply with subsection (b) above or subsection (h) below.

(g) Make no other alterations or additions to the Equipment except additions that: do not impair the value or performance of the Equipment, are readily removable without damage to the Equipment, and do not result in an encumbrance on the Equipment.

(h) Comply with all laws and regulations applicable to or affecting this Lease, the Equipment, or Lessee, including maintaining all required insurance and obtaining all governmental permissions necessary for it to so comply or that may be required of Lessor in so complying, and including laws in any way relating to occupational safety, employment, hazardous materials, or the environment, and also including any licenses for Lessee's business operations or possession or operation of the Equipment.

(i) Furnish Lessor with (i) Lessee's certified or audited financial statements, annually, as soon as they are available after the end of each of Lessee's fiscal years, but in no event more than 120 days after any such year-end, (ii) Lessee's quarterly financial statements, as soon as they are available after the end of each quarter, but in no event more than 30 days after any such quarter-end, and (iii) such other financial or business or operations information of Lessee (or of A2a that is applicable to Lessee, and Lessee shall cause the same to be provided by A2a) readily available to Lessee (or A2a) as Lessee may from time to time request, promptly, but in no event more than 10 days after Lessor's request (and Lessee represents and warrants that: all such financial statements and all other financial information previously, or at any time provided to Lessor has been, and will be, prepared in accordance with generally accepted accounting principles

and accurately present Lessee's financial position as of the dates given; and all such financial or business or operations information of Lessee previously or at any time provided to Lessor, whether or not requested was or shall be, at the time provided, true and complete).

(j) Furnish Lessor with resolutions, opinions, certifications of the names, titles, signatures, and authority of those persons executing Lease documents on Lessee's behalf, information (including verification of identity, location, legal status, and formation) as may required for Lessor's voluntary or necessary compliance with the US Patriot Act and other law, and such other information and documents as Lessor may reasonably request.

(k) Not permit the Equipment to become a fixture (as defined in the Uniform Commercial Code) or an accession to or otherwise a part of real or immoveable property.

(l) Permit Lessor to inspect the Equipment and Lessee's applicable Maintenance Agreements and records at any reasonable time (subject to Lessor giving reasonably prior notice to Lessee and to Lessee's usual, reasonable security procedures),

(m) Promptly notify Lessor of: any change in Lessee's name, any change in the location of Lessee's chief executive or registered office, any transfer by Lessee, authorized or not, of any interest in or benefit from the Equipment, and any change, authorized or not, in the location of any Equipment.

(n) Ensure that neither Lessee nor its successors or assigns is a tax-exempt entity (as described in the Internal Revenue Code) at any time during the Term or the five years preceding the Term.

**9. Title to Equipment.** The Equipment will remain personal or moveable property even if physically attached to real or immoveable property. Lessee will keep the Equipment free and clear of encumbrances (other than this Lease or encumbrances created by Lessor or Assignee). Lessee has no right or interest in the Equipment except that set forth in this Lease.

**10. Possession Period; Risk of Loss.** From the delivery of the Equipment to Lessee until the Equipment is returned to and received by Lessor (*"Possession Period"*), Lessee bears the entire risk of whole or partial loss, theft, destruction or damage to the Equipment from any cause whatsoever, or requisition of the Equipment by any governmental entity, or expropriation or the taking of the Equipment by eminent domain or otherwise (collectively, *"Loss"*). Lessee will give Lessor prompt notice of any Loss. Except as provided in this section, no Loss will condition, reduce, or relieve Lessee's Lease obligations, including its obligation to pay Rental Payments in full. If any Equipment is damaged but can be economically repaired, Lessee will promptly place the Equipment in good working order and condition. Upon the occurrence of any other kind of Loss, or if Lessee does not place the Equipment in good working order and condition within 30 days of any economically repairable damage, Lessee will upon Lessor's demand pay Lessor the Lessor's Return, calculated by Lessor as of the date of demand; and upon Lessor's receipt thereof, plus all other outstanding amounts under this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee.

**11. Insurance.** Lessee will at its expense during the Possession Period maintain the following insurance and any additional insurance that may be reasonably requested by Lessor or that may be reasonably determined by Lessee to be necessary to protect the Equipment or Lessee's enterprise or stakeholders and that is reasonably acceptable to Lessor in all respects, including as to terms and conditions, premiums, and the purpose of the insurance (collectively, *"Insurance"*): (a) insurance against all risks to the Equipment, including risks of loss, theft, damage, or destruction for any and all causes whatsoever (including acts of war (whether or not war is declared), insurrection, riot, civil disturbance or commotion, labor dispute or shortage or strike, act of public enemy, accident, fire, flood or other act of God, *force majeure*, and other events beyond the control of Lessee or any . person), for the costs of the Equipment's full replacement, reconstruction, and reinstallation by Manufacturer, naming Lessor as sole

80069656.2

Y:\nmk\ag\80069656.DOC

loss payee; and (b) public liability and third party property damage insurance in the amount of $5,000,000, per occurrence, naming Lessor as an additional insured. Such insurance shall be reasonably satisfactory to Lessor; shall contain the insurer's agreement to give Lessor 30 days' written notice before any cancellation or material change; shall be payable to Lessor regardless of any act, omission or breach by Lessee; and shall provide for commercially reasonable deductibles satisfactory to Lessor. Lessee will provide Lessor with certificates of all such insurance from time to time upon request. Any insurance proceeds of such insurance received by Lessor or Assignee in respect of events with respect to which Lessee has concurrent Lease obligations (including obligations under Sections 10 or 15) will be applied by Lessor to those obligations. Lessee has no right to the benefit of any insurance maintained by Lessor.

12. **Assignment of Warranties.** Lessee is entitled under the Uniform Commercial Code—Leases (Article 2A) to the promises and warranties provided to Lessor by Seller or any third party in connection with the Equipment. Lessor assigns to Lessee, during the Term, and upon any transfer of the Equipment to Lessee hereunder, any assignable representations, warranties, and promises made by Seller or Manufacturer or any other third party in connection with the Equipment, but any claims arising therefrom may only be pursued by Lessee in its own name. Lessor will reasonably cooperate with Lessee, at Lessee's request and expense, in pursuing any such claims and obtaining for Lessee the benefit of all such rights (whether or not assignable). Lessee may communicate with Seller or any third party and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations thereon or on any remedies.

13. **Disclaimers and Limitations.** As to Lessor, Lessee leases the Equipment and finances the Soft Cost Items **As-Is, Where-Is, and on a nonrecourse basis.** Any transfer of the Equipment to Lessee by Lessor is **As-Is, Where-Is and without warranty** except that Lessor will warrant good title to any transfer Equipment to be free and clear of any encumbrances and provide Lessee with Lessor's standard bill of sale on request. **Lessor disclaims any other representation or warranty, including with respect to the design, compliance with specifications, durability, quality, operation, or condition (whether discoverable or not) of the Equipment or Soft Cost Items, title, the merchantability of the Equipment or Soft Cost Items, the fitness of the Equipment or Soft Cost Items for particular purposes, status of this Lease for tax or accounting classification purposes, or issues regarding the design or operation of the Equipment or infringement of industrial or intellectual property rights of any person or any patent, trademark, or copyright infringement, or the like.** Lessor does not make any statement, representation, warranty, or promise made by Seller or any Location Rights Holder, and neither Seller and any Location Rights Holders (on the one hand) nor Lessor (on the other hand) are agents of one another (even if Lessor has or does participate in Lessee's negotiations with any of them). Lessor will have no liability to Lessee, or its customers, or any other persons, for damages or specific performance arising out of this Lease or concerning any Equipment or Soft Cost Items, including direct, indirect, special, or consequential damages, or damages based on strict or absolute tort liability, and also as to any programs or data residing on any Equipment at any time, including upon return to or repossession by Lessor. However, Lessor shall remain liable to Lessee, in a separate action at law, for direct damages resulting from Lessor's negligence, willful misconduct, or breach of Lease. This Lease is intended to be governed solely by its terms and be (and shall by this agreement be) a finance lease as that term defined in the Uniform Commercial Code—Leases (Article 2A) (but the parties do not by this provision any agreement as to the status of this Lease as a "finance lease," "true lease," "capital lease," or "operating lease" for tax classification or accounting purposes). **This Lease, the parties' performance of this Lease, and their other actions relating to this Lease are to be considered so as to give the**

**fullest possible effect to such intent.** This section does not affect Lessee's rights against persons other than Lessor, including Seller and Manufacturer and any Location Rights Holders.

14. **Lessee Warranties.** Lessee represents and warrants when it executes this Lease and whenever Lessor is required to or does make any payment to Seller hereunder:

(a) Lessee is duly organized and in good standing under applicable law in the jurisdictions of its organization and domicile and in which Equipment may be located with full power and authority to enter into this Lease.

(b) This Lease is enforceable against Lessee in accordance with its terms, subject to laws of general application affecting creditors' rights generally, and does not breach or create a default under any document or agreement binding on Lessee.

(c) No proceedings exist before any court or administrative agency that would have a material adverse effect on Lessee, this Lease, or the Equipment, nor has Lessee been threatened with any such proceedings.

(d) The financial statements and other financial information made available by Lessee have been prepared in accordance with generally accepted accounting principles and accurately present Lessee's financial position as of the dates given.

(e) Lessee's chief executive and registered office is located at its address specified in this Lease.

(f) Lessee has selected the Equipment, Soft Cost Items, and Seller, and it knows the Seller's identity.

(g) Lessee's right in respect of the Equipment being located, delivered, constructed, installed, possessed, operated, and deinstalled at the Equipment Location is pursuant agreements by the owners and other holders of any and all necessary rights in respect thereof (*"Location Rights Holders"*). The only Location Rights Holders are the Port Authority and CBS.

15. **Indemnity.** Lessee will indemnify Lessor against and hold Lessor harmless from all liabilities, damages, Taxes, losses, penalties, expenses (including reasonable legal fees and disbursements and costs), claims, actions, and suits, whether based on a theory of strict liability or statutory or regulatory liability of Lessor or otherwise (collectively, *"Claims"*), relating to the operation, construction, installation, selection, manufacture, purchase (by Lessee or Lessor), ownership (for strict liability in tort or for statutory or regulatory liability), leasing, possession, maintenance, delivery, return, or sale (by Lessor to Lessee) of the Equipment, or the selection, licensing, provision, return or relinquishment, obtaining, use, creation, or ownership of Soft Cost Items, including Claims relating to: (a) the condition of any Equipment arising or existing during the Possession Period, including undiscoverable defects; (b) infringement by Lessee or the Equipment or Soft Cost Items of any patent, trademark, copyright, or industrial or other intellectual property rights of any person; and (c) Lessee's contest of Taxes or Lessor's contest of Taxes at Lessee's behest. However, Lessee will not be liable: (y) after the time Lessor is required to purchase the Equipment and pay for the Soft Cost Items, for the net price of the Equipment or Soft Cost Items included in the Lessor's Basis and due to Seller; or (z) to a person for Claims resulting from the person's negligence, willful misconduct, or breach of this Lease.

16. **Surrender of Equipment.** Whenever Lessee is required or permitted to return Equipment, Lessee will have the Manufacturer deinstall, inspect, and properly pack the Equipment, and return the Equipment to Lessor at such location in the world as Lessor shall determine. The Equipment is not be deinstalled or taken out of operation more than one month before it is required to be returned, and then only if at that time Lessee had previously given notice of return under the Lease or the Final Expiration Date is to occur within the month. When received by Lessor, the Equipment shall be: in good working order; clean and cosmetically good; in the same condition as when originally installed, reasonable wear and

80069656.2

Y:\mk\ag\80069656.DOC

tear excepted, and in such condition as may be required by the Manufacturer for deployment and installation at another facility without the need for Lessor to incur any repair or rehabilitation or replacement expense. Lessee shall be to Lessor liable for the cost to Lessor of placing the Equipment in the condition required by the Lease. Any return of Equipment accepted by Lessor releases Lessee of its leasehold rights and possessory interest in the Equipment, but will not otherwise constitute a termination of the Term or this Lease or Lessee's related obligations. Any additions to the Equipment not removed before return shall become Lessor's exclusive property (lien free) or, at Lessor's option and Lessee's expense, removed and returned to Lessee or sold, destroyed, or otherwise disposed of, and the Equipment restored to its original condition, all without any liability on the part of Lessor or any other person to Lessee or any other person. Before returning any Equipment to Lessor hereunder, Lessee shall remove all password protection.

17. **Default.** It is an *"Event of Default"* by Lessee under this Lease if:

(a) PAYMENT. Lessee's failure to pay any Rental Payment or other amount under this Lease when due continues for 10 days after notice.

(b) PERFORMANCE. Lessee's failure to observe any provision of this Lease continues for 30 days after notice or, if the failure of a nature that it cannot be cured within such period, Lessee fails diligently to pursue a cure and actually cure the failure within 60 days after such notice.

(c) MISREPRESENTATION. A representation or warranty or statement made by Lessee in this Lease or in any other document provided by Lessee is incorrect in any material respect when made.

(d) ASSIGNMENT; RELOCATION. Lessee fails to comply with Section 8(c) or Section 21.

(e) LESSOR PRIORITY. The Equipment is levied against, seized, or attached or Lessor shall not have a first priority, continuing security interest in all of Lessee's assets and property of any kind or nature (other than any lien for taxes not yet due or that Lessee is with Lessor's prior approval diligently contesting).

(f) INSOLVENCY, ETC. Any administrator, examiner, administrative receiver, compulsory manager, trustee, or liquidator of Lessee (or any similar person contemplated by the laws of the United States of America or other applicable laws) is appointed, elected, nominated, or otherwise instituted with respect to Lessee or its assets, or Lessee makes or seeks an assignment for the benefit of creditors or any arrangement or composition with its creditors, or becomes insolvent, or commits any act of bankruptcy, or is the subject of a petition or proceeding under any bankruptcy, reorganization, arrangement of debts, insolvency, or receivership law, or Lessee seeks to effectuate a bulk sale of its inventory, equipment, or assets, or any action is taken with a view to Lessee's termination or the termination of its business, and, if any of the foregoing events is involuntary, it continues for 60 days.

(g) OTHER LESSEE AGREEMENTS. Lessee is the subject of a Default under the Lessee Security Agreement, the Lessee DACA, the Maintenance Agreement, the Display Agreement, the Acknowledgment, the Equipment Agreement, the Services Agreement, the Marketing and Sharing Arrangement, any of the contracts contemplated by Sections 22(b)(vi) through (b)(ix), or any other agreements approved by Lessor as contemplated in Section 22(e), or any agreement that, in Lessor's sole opinion, is material to Lessee or any of its businesses or operations or this Lease or the Equipment or any of its assets (individually or collectively).

(h) GM AGREEMENTS. GM is the subject of a Default under the GM Guaranty, the GM Security Agreement, the Equipment Agreement, or any agreement that, or any agreement that, in Lessor's sole opinion, is material to Lessee or GM or any of their businesses or operations or this Lease or the Equipment or any of their assets.

(i) GM PRINCIPAL AGREEMENTS. At any time before Lessor agrees to the termination of the GM Principal Guaranty as contemplated in Section 22(g), a GM Principal is the subject of a Default under the GM Principal Guaranty, the GM Principal Security Agreement, or any agreement that, in Lessor's sole opinion, is material to the GM Principal or GM or Lessee or any of their businesses or operations or this Lease or the Equipment or any of their assets.

(j) A2A. A2a is the subject of a Default under the Equipment Agreement, the Services Agreement, the A2a Security Agreement, the A2a DACA, or any agreement with GM and/or Lessee, or any agreement that, in Lessor's sole opinion, is material to any portion of A2a's business relating to the Equipment or to this Lease or the Equipment or the Services Agreement or is material to A2a's business or operatins as a whole.

(k) MAINTENANCE AGREEMENT. The Maintenance Agreement shall cease to be in full force and effect.

*"Default"* means, with respect to a person and an agreement to which that person is a party, that: (w) such person dies or is the subject of an event of the types listed in subsection (f); (x) such person breaches or defaults under or otherwise fails to comply with any of the terms of such agreement or any related agreement (y) a "default" occurs on the part of such person under such agreement (as such term or a similar term may be defined therein); or (z) such agreement terminates for any reason resulting from such person's actions or inactions (including a failure to meet performance standards or targets), and any of the foregoing events continues after the giving of any required notices and the expiration of any required cure periods provided for in such agreement.

*"Putative Default"* means, with respect to a person and an agreement to which that person is a party, an event occurs that is, or with any required or permitted notices and/or the expiration of any cure periods and/or other lapse of time (or any combination of the foregoing) would be, a Default on the part of such person.

18. **Remedies.** If an Event of Default is continuing, or if at any time during the continuance of an Event of Default under this Lease or any other lease entered into between Lessor and Lessee Lessor notifies Lessee of the occurrence of an Event of Default, Lessor may in its absolute discretion and with notice to Lessee exercise any one or more of these remedies:

(a) Terminate this Lease.

(b) Take control or possession of, or render unusable, any Equipment wherever located (without liability for damages occasioned by such action other than direct damages for Lessor's negligence or willful misconduct (and such actions will not constitute a termination of Lessee's obligations under this Lease), all as though Lessee had failed to surrender the Equipment when required to do so.

(c) Require Lessee to return the Equipment to a location designated by Lessor in accordance with Section 16 and there surrender control of the Equipment to Lessor pursuant to Section 16 as though the Term had expired (and such actions will not constitute a termination of Lessee's obligations under this Lease).

(d) Require Lessee to pay the Lessor's Return, calculated by Lessor as of the date of Lessor's demand, and upon Lessor's full receipt of the Lessor's Return as a result of Lessor's demand under this section, plus all other amounts outstanding under this Lease, this Lease will terminate and Lessor will transfer to Lessee any Equipment still in Lessee's possession).

(e) Proceed by court action to enforce performance by Lessee of this Lease and/or to recover all damages and expenses suffered by Lessor as a result of any Event of Default.

Lessee will also reimburse Lessor for all expenses (including reasonable legal fees and disbursements) incurred by Lessor in enforcing this Lease. Lessor's sole obligation to mitigate its damages is that if it repossesses any Equipment pursuant to this section Lessor will lease, sell, or otherwise

80069656.2

Y:\unk\ag\80069656.DOC

dispose of the Equipment in a commercially reasonable manner, with or without notice, and at public or private sale, and apply the net proceeds (after deducting all expenses of disposition), if any, to the amounts owed to Lessor; but Lessee will remain liable to Lessor for any deficiency that remains after any such disposition. With respect to any notice of sale required by law, 10 days' notice is reasonable notice. The remedies provided in this Lease are in addition to all other rights or remedies now or hereafter existing under this Lease, or at law or in equity, and may be enforced concurrently therewith, and from time to time.

**19. Lessor's Return.** Lessor may become entitled to the Lessor's Return, which shall be Lessor's anticipated benefit of its bargain and profit from this Lease transaction (to which it will specifically be entitled). The Lessor's Return, as stipulated to herein, includes amounts attributed by the parties to (and a loss to Lessor upon a Loss or Event of Default is dependent in part upon) unpaid Rental Payments to become due, the original cost of the Equipment and Soft Cost Items to Lessor, the unrealized anticipated value of the Equipment to Lessor, the future observance by Lessee of its nonrental Lease obligations for the benefit of Lessor. In addition, the calculation of the Lessor's Return provided for in this Lease is intended to recompense Lessor, as liquidated and not as a penalty, for additional costs Lessor may incur in documenting, negotiating, and performing this Agreement, including such amounts as the costs of outside counsel, commissions, overhead allocable to this transaction, and the like. Accordingly, the parties agree that the Lessor's Return shall be calculated as the unamortized portion of 122.7% of the Lessor's Basis calculated on a straight-line amortization basis for eight (8) years beginning on the Base Term Commencement Date; provided, however, that if the Lessor's Return is determined as of a date before the Base Term Commencement Date, the Lessor's Return shall be the total of such percentage of the Lessor's Basis determined without amortization. Such unamortized portion will be determined by multiplying such percentage of Lessor's Basis by a fraction, the numerator of which shall be 96 minus the number of whole calendar months elapsing since the Base Term Commencement Date, and the denominator of which shall be 96. The Lessor's Return as defined in this section is inclusive of New York sales Taxes imposed on sales of personal property occurring at the Equipment Location of up to 8.875% of the sale price (but, for the avoidance of doubt, exclusive of any other Taxes, including New York sales or use Taxes on Rental Payments or other amounts previously due and thus not included in the calculation of Lessor's Return).

**20. Assignment By Lessor.** Lessor may assign this Lease or any Equipment, in whole or in part, including granting or assigning any encumbrance or other interest in this Lease or any Equipment, without notice to Lessee, to any person (*"Assignee"*). No assignment will relieve Lessor of its Lease obligations. **Lessee and Lessor acknowledge that any such assignment will not materially change Lessee's or Lessor's obligations under this Lease.** If notified of an assignment, Lessee will: (a) unless otherwise directed, unconditionally pay all amounts due under this Lease to Assignee without abatement, reduction, offset, recoupment, compensation, crossclaim, counterclaim, notice or demand, or any other defense whatsoever it may have against Lessor, Assignee, Seller, Manufacturer, or any other person; (b) not permit this Lease to be amended or any of its terms waived without the Assignee's written consent; (c) not require Assignee to perform any of Lessor's obligations other than the warranty of quiet enjoyment provided for in Section 23 and any other obligations expressly assumed by the Assignee in writing; and (d) execute such acknowledgments of assignment as may be reasonably requested by Lessor or Assignee. Assignee will have all of Lessor's rights, powers, and privileges under this Lease to the extent of the assignment, including the right to make further assignments.

**21. Assignment By Lessee.** Without the prior written consent of the Lessor (not to be unreasonably withheld) Lessee cannot assign any interest in this Lease or assign or sublet any interest in Equipment (including in

connection with a sale of all or some of Lessee's assets) to any person not in control of or under common control with Lessee, or undergo a change in control, e.g., by merger, amalgamation, or other event whereby those in control of Lessee immediately before the event are not in control of Lessee or its successor immediately after the event (with control being established by the direct and indirect holding of more than ½ of the equity and voting power of the controlled entity and any intervening entities), or issue any voting or equity or other securities. No assignment or sublease by Lessee will discharge or diminish Lessee's obligations, and Lessee will continue to be primarily, absolutely, unconditionally, and independently liable for the full and prompt observance of all of its obligations under this Lease.

**22. Lessee Security and Additional Covenants.**

(a) SECURITY. Lessee hereby grants Lessor a first priority continuing security interest in all of its assets and property of any kind or nature whatsoever as security for all of its obligations under this Lease, all as more particularly provided in the Lessee Security Agreement.

(b) LESSEE ACCOUNT. Lessee will maintain all cash, funds, or other monies received by it or held on hand by it, in a single deposit account with a bank acceptable to Lessor (*"Lessee Account"*), and effect all inflows and outflows of such cash, funds, or other monies only through the Lessee Account. The Lessee Account shall be under the control of Lessor under a deposit account control agreement among Lessee, Lessor, and Lessee's bank (*"Lessee DACA"*). Without Lessor's consent, which may be given or withheld in Lessor's sole discretion, Lessee will not pay out any amounts from the Lessee Account, or permit any amounts to be removed from the Lessee Account—and in general and in all events no assets of Lessee shall in any manner or by any method be transferred directly or indirectly away from Lessee (or encumbered)—except Lessee may pay out of Lessee Account the following:

   (i) *Lease.* Amounts due Lessor under this Lease and the minimum amounts that this Lease requires Lessee to pay to third parties (which shall be made only under any usual and customary contract reasonable in the circumstances),

   (ii) *Display Agreement.* Amounts due by Lessee under the Display Agreement;

   (iii) *Maintenance Agreement.* Amounts due under the Maintenance Agreement;

   (iv) *Insurance.* Premiums for Insurance;

   (v) *Services Agreement.* Management fees due A2a under the Services Agreement;

   (vi) *Utility.* Amounts due the Port Authority (or a public utility) for electricity to operate the Equipment under any usual and customary contract reasonable in the circumstances;

   (vii) *Back Office.* Payments to GM or ProPark for documented back office functions not to exceed $50,000 in the aggregate during any calendar year under any usual and customary contract reasonable in the circumstances;

   (viii) *Promotion and Operating.* Documented promotion and operating expenses not to exceed $50,000 in the aggregate during any calendar year under any usual and customary contract reasonable in the circumstances;

   (ix) *Salary.* Reasonable and customary documented salary for the administration and management of the Lessee not to exceed $250,000 in the aggregate during any calendar year under any usual and customary contract reasonable in the circumstances;

   (x) *Income Tax Distributions.* Provided no Event of Default is continuing, on or before April 15 of each year (as may be extended in accordance with the Internal Revenue Code), distributions to Garage Media or each of Garage Media's Principals limited to Garage Media's Principals' respective federal and state tax liability with respect to the income of the

Lessee only (assuming the applicability of the maximum federal and state tax bracket), for the year ending on the prior December 31, which is based on supporting documentation delivered to and approved by Lessor at least 10 business days prior to any such distribution; and

(xi) *Other Distributions.* As of the last day of any calendar quarter, beginning with the next calendar quarter ending 18 months following the Base Term Commencement Date (the end of each such calendar quarter a *"Test Date"*), funds may be transferred to Garage Media 15 business days after the Test Date, if and to the extent Lessor agrees in writing (not to be unreasonably withheld) that:

  A. Lessee is not the subject of a Putative Default under this Lease and A2a is not the subject of a Putative Default under the Equipment Agreement, the Services Agreement, the A2a Security Agreement, the A2a DACA, or any agreement with GM and/or Lessee, or any agreement that, in Lessor's sole opinion, is material to A2a's businesses or operations taken as a whole or this Lease or the Equipment.

  B. Lessee has a cash balance in the Account, less Lessee's current liabilities, of no less than $500,000.

  C. As of the Test Date, projected advertising revenue annualizes to $5,500,000 under executed contracts with an average remaining term of not less than 60 days, as determined by Lessor, provided, however, upon the request of Lessee, Lessor will consider whether to include contracts of a shorter duration, using its reasonable discretion and considering, without limitation, such factors as the financial performance of the Lessee to the Test Date;

  D. As of the Test Date, Lessee's ad revenues for the immediately ended consecutive 12-month period total at least $5,500,000.

  E. No material adverse change shall have occurred after the date of this Lease in the business, financial condition, or prospects of Lessee, GM, or, at any time before Lessor agrees to the termination of the GM Principal Guaranty as provided in Section 22(g), a GM Principal, in any such case, as determined by Lessor; and

  F. Lessor has received a certification from Lessee within 5 business days following the Test Date, certifying the foregoing together with documentation verifying the same, in each case in form satisfactory to Lessor.

(c) SUBSIDIARY STATUS. Lessee shall remain a directly- and wholly-owned subsidiary of GM. Lessee shall issue no further voting or equity securities to anyone except GM, and then only with the prior written approval of Lessor. Lessee shall not engage in any business other than that relating to the Equipment as contemplated by this Lease and the agreements and arrangements referred to in this Lease.

(d) INDEBTEDNESS. Lessee shall not issue, undertake, incur, or suffer to exist any indebtedness, payment obligations, or nonmonetary performance obligations of any kind except those obligations existing under any of the following: this Lease, the Lessee Security Agreement, the Maintenance Agreement, the Display Agreement, the Acknowledgment, the Equipment Agreement, the Services Agreement, and the contracts contemplated by subsections (b)(vi) through (b)(ix), any amendments or supplements to any of the foregoing approved by Lessor in its sole discretion, and any other agreements that Lessor may in its sole discretion approve (including as to terms, amounts, kind) if Lessee's obligations under such other agreements are subject and subordinate to Lessee's obligations to Lessor in such manner as may be determined by Lessor in its sole discretion.

(e) GUARANTIES. The GM Guaranty and the GM Principal Guaranty shall be unlimited and unconditional and remain in full force and effect at all times the Lessee (or GM in the case of the GM Principal Guaranty) may have obligations to Lessor. However, the GM Principal Guaranty will terminate when Lessor agrees in writing (not to be unreasonably withheld) that all of the following have occurred:

  (i) Lessee's ad revenues for any consecutive 12-month period total at least $5,500,000;

  (ii) Lessee's projected advertising revenue annualizes to $5,500,000 under executed contracts with an average remaining term of not less than 60 days, as determined by Lessor, provided, however, upon the request of Lessee, Lessor will consider whether to include contracts of a shorter duration, using its reasonable discretion and considering, without limitation, such factors as the financial performance of the Lessee and the project to date;

  (iii) Lessee has a cash balance in the Account, less Lessee's current liabilities, of no less than $500,000;

  (iv) no material adverse change shall have occurred after the date of this Lease in the business, financial condition, or prospects of Lessee, as determined by Lessor;

  (v) no Putative Default shall be continuing on the part of any GM Principal under the GM Principal Guaranty (including as a result of a Putative Default on the part of either of GM or Lessee of

  (vi) any of their obligations which are the subject of the GM Principal Guaranty).

(a) SECURITY AGREEMENTS. Immediately upon the Final Acceptance Date, if there is no Putative Default on the part of Lessee, GM, or the GM Principals under this Lease, the Lessee Security Agreement, the GM Guaranty, the GM Security Agreement, the GM Principal Guaranty, or the GM Principal Security Agreement, Lessor will in writing agree to: (y) terminate the GM Principal Security Agreement, including any financing statements filed for the collateral thereunder; and (z) amend the GM Security Agreement in a manner mutually acceptable to GM and Lessor, to exclude from the collateral thereunder any right, title and interest of GM that is not (and does not relate to) GM's ownership of Lessee, the Security Deposit, this Lease, the Equipment, and the sale or display of advertising or other content on the Equipment or at the Equipment Location.

23. **Counterparts; Financing Statements.** This Lease may be executed in one or more counterparts. If there is only one such counterpart, it will be the *"Original,"* otherwise, one such counterpart will be marked as and be the *"Original"* and any other counterparts will be marked as and be *"Duplicates."* No transfer or security interest in this Lease may be created except through the transfer or possession of the Original, and Lessee agrees to deliver any Original to Lessor. Unless Lessee has the right to acquire Lessor's interest in the Equipment at the end of the Term for nominal or no additional consideration, the parties intend this Lease to be a true lease and not one intended merely for security. Lessor is authorized to file financing statements to give public notice of Lessor's interest in any items it may lease to Lessee or its affiliates under this Agreement.

24. **Quiet Enjoyment.** So long as no Event of Default is continuing, Lessor will not interfere with Lessee's quiet enjoyment of the Equipment. If a failure by Lessor to materially observe the foregoing warranty of quiet enjoyment continues for 10 days after notice, Lessee may in its absolute discretion exercise any one or more of the following remedies (which shall be its exclusive remedies for such failure): (a) by notice terminate this Lease (including its obligation to pay Rental Payments) as it relates to such Equipment; and/or (b) proceed in a separate action at law to recover all direct damages suffered by Lessee resulting from such failure.

25. **Late Performance; Interest Limitations.** Amounts due under this Lease that are not paid within 30 days of their due date will bear interest, payable upon demand, at the rate of 12% per year, or such lesser rate as

Y:\nmk\ag\80069656.DOC

may be the maximum legal rate, from their due dates. If any payment required to be made under this Lease would otherwise be considered the collection of interest in excess of the maximum amount permitted by applicable law; Lessee will not be obligated to pay the excess; any excess which may have been collected will be credited to Lessee's other obligations to Lessor or refunded; and this Lease will be considered to have been amended so as to eliminate Lessee's obligation to pay such excess.

**26. Prorations.** Rental Payments for Rental Periods not consisting of a whole month or a whole quarter or another whole period, as applicable, will be prorated on the basis of a 360-day year comprised of four 90-day quarters and twelve 30-day months.

**27. Further Assurances.** Lessee will promptly execute such documents and take such further action as Lessor may from time to time reasonably request in order to carry out the intent of this Lease or protect or perfect Lessor's rights, interests, and remedies reasonably intended to be created thereunder.

**28. Notices.** Notices under this Lease shall be in writing and received when delivered to the receiving party's address set forth in this Lease, or at such other address for notice as it may previously have notified the other party of. A party may give notices in the ordinary course (including under Sections 6, 8, or 10, but not including under Sections 17 or 18 or formal notices such as notices of default, demands for performance, or notices of termination) by conventional email, or by a PDF attachment to conventional email. Emailed notice shall be received on the business day that the receiving party's employee having regular duties relating to this Lease actually reviews the email at the receiving party's physical address for notice. A party giving notice by email bears all risk of nonreceipt of notice (including as a result of email being blocked by the sender's, receiver's, or any intermediary's software monitoring or controlling outgoing or incoming communications or presuming a communication to be spam or to contain inappropriate content).

**29. Interpretation.** Terms of inclusion mean inclusion without limitation. Time is of the essence. The provisions of this Lease will survive its termination, and any return or sale of Equipment, and remain in full force and effect with respect to events or conditions occurring or existing during (or fairly attributable to) the Term or Possession Period. Any waiver or failure of a party to require strict observance of this Lease, will not constitute a waiver of any other breach of the same or any other provision of the same Lease or any other lease. This Lease will not be binding upon a party until executed by the party. This Lease cannot be amended except in a document executed by both parties. This Lease binds and benefits the parties' successors and permitted assigns. The parties hereby acknowledge that they have required this contract, and other agreements and notices required or permitted to be entered into or given pursuant hereto, to be drawn up in the English language only. If any such document or communication is prepared in or contains both the English language and another language, only the English language provisions shall have import and the versions in any other language shall not be binding upon the parties thereto and shall have no effect whatsoever on the interpretation or construction of the English language version. The page numbering of this Lease may be exclusive of exhibits, if any. The terms "signed," "executed," "entered into," and the like require that a document be manually signed, even if it is permitted to be transmitted as an electronically scanned copy. A party having executed a document need not be advised by the other party of the other party's acceptance of the document. Headings of the sections, subsections, and other provisions of this Lease are not a part of or to affect the interpretation of this Lease.

**30. Soft Cost Items.** The Equipment may contain software in which the parties have no ownership or other proprietary rights. Where required by a software owner or manufacturer or the Seller of other Soft Cost Items, Lessee will enter into a license or other agreement for the use of the software and the provision of the Soft Cost Items. Any such agreement will be separate and distinct from this Lease, and Lessor will have no rights or obligations thereunder unless otherwise agreed by it in writing. For the avoidance of doubt, upon Lessee's execution of the Final Acceptance Certificate, Lessee will pay rent attributable to Lessor's financing of Soft Cost Items as provided in Section 5 and regardless of Lessee's dissatisfaction with, or the failure or quality of, or Seller's failure to provide for any reason, any software, services, or other Soft Cost Items). Lessee acknowledges that all Soft Cost Items are provided directly to Lessee by Seller, and not by Lessor, regardless of anything to the contrary in this Lease or in any purchase documents with Seller (and any documentation entered into by Lessor in relation to Soft Cost Items shall be solely for Lessee's benefit), and, in general, regardless of any characterization by the parties of Soft Cost Items as equipment, machines, goods, or the like.

**31. Scanned Documents.** In any proceeding relating to this Lease, a party may produce an electronically scanned copy or photocopy of a document rather than the original and such copy will have the same force as the original. Each party acknowledges that it has received and reviewed all of the pages of this Lease and that none of its provisions are missing or illegible.

**33. Invalidity.** A provision of this Lease that is or becomes invalid will be ineffective only to the extent of the invalidity, without affecting the rest of such provision or this Lease.

**34. Applicable Law.** This Lease is governed by New York law without regard to conflicts of law principles. The parties consent and submit to the jurisdiction of the local, state, and federal courts located within that state. The parties waive any objection relating to improper venue or *forum non conveniens* to the conduct of any proceeding in any such courts. To the extent permitted by law, the parties irrevocably waive all right to trial by jury in any proceeding between them relating to this Lease or the Equipment.

Lessee acknowledges receipt of a true copy of this Lease. This Lease constitutes the entire agreement of the parties relating to the leasing of the Equipment.

80069656.2

Y:\mmk\ag\80069656.DOC

**Garage Media NY LLC (Lessee)**

By: Garage Media, LLC

Manager

By: _____

Name/Title: Garret Neff, Member

Date: _____10 | 26 | 10_____

**Macquarie Equipment Finance, LLC (Lessor)**

By: _____

Name/Title: _Andrew R. Feldstein_
_V.P. and Asst. Gen. Counsel_

Date: _____10-26-10_____

# ORIGINAL

Y \n\nk\ag\80069656.DOC

80069656.2

# EXHIBIT  C

**Guaranty**
**October 26, 2010**

| | | |
|---|---|---|
| **Obligor:** | **Macquarie:** | **Guarantor:** |
| Garage Media NY LLC and Garage Media, LLC, and either or both of them<br>1 Union Place<br>Hartford, CT 06103 | Macquarie Equipment Finance, LLC<br>2285 Franklin Road, Suite 100<br>Bloomfield Hills, MI 48302 | Garett Alan Neff<br>a/k/a Gary Neff<br>DOB 03-31-1965<br>22 Mountaincrest Drive<br>Cheshire, CT  06410 |
| | | John Mark Schmid<br>DOB 07-07-1958<br>243 Chestnut Hill Rd<br>Litchfield, CT  06759 |
| | | David Karl Schmid<br>DOB 10-28-1969<br>4 Old Orchard Way<br>Tolland CT  06084 |

1. **Agreements.** The "Agreements" are any and all of the various agreements, instruments, documents, or other arrangements, now or hereinafter arising, or from time to time in effect, by Obligor in favor of Macquarie or which Macquarie may be entitled to the benefit of, including such as are executed, entered into, or made by Obligor directly with or to Macquarie, or of which Macquarie is a third-party beneficiary, or which may be assigned or collaterally assigned, in whole or in part, to Macquarie, including any promissory notes, any personal property leases, and also including any security agreements, collateral agreements, or other agreements entered into in connection with or in furtherance of any of the foregoing or otherwise providing for additional collateral or security to Macquarie, in connection with a loan, lease, or other financial accommodation made by Macquarie to or for Obligor, or in connection with any other transaction to which Obligor is a party or otherwise bound, whether any of the foregoing are written or oral or electronic or otherwise established.  Guarantor represents and warrants that his legal name, as set forth on his birth certificate and his driver's license in the state of his residence, is as set forth above and that his address set forth above is his sole residence address.  Guarantor will give Secured Party notice of any change in his name or address within 30 days of the change.  The obligations of Guarantor under this Guaranty are joint and several, but as a matter with respect to which Macquarie shall have no obligation or concern and which will not condition, limit, or affect the obligations of Guarantor under this Guaranty, the persons who are the Guarantor under this Guaranty may allocate their obligations solely as among themselves in a separate written agreement.

2. **Guaranty.** As Guarantor will derive commercial benefit from the provisions of this Guaranty, and in order to induce Macquarie to enter into the Agreements, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor unconditionally guarantees to Macquarie the full and prompt payment, observance and performance when due of all obligations of Obligor arising under the Agreements (collectively, the "Guaranteed Obligations"). This Guaranty is absolute, continuing, unlimited, and independent, and shall not be affected, diminished or released for any reason whatsoever, including the following: (a) any invalidity or lack of enforceability of any of the Guaranteed Obligations; or (b) the absence of any attempt by Macquarie to collect any of the Guaranteed Obligations from Obligor or any other guarantor of the Guaranteed Obligations, or the absence of any other action to enforce the same; or (c) the renewal, extension, acceleration or any other change in the time for payment of, or other terms relating to the Guaranteed Obligations; or (d) any modification, amendment, waiver, or other change of the terms of the Agreements, including any such modification, amendment, waiver, or change which expands or increases Guarantor's obligations under this Guaranty; or (e) the failure by Macquarie to take any steps to perfect and maintain any security interest in, or to preserve its rights to, any security or collateral relating to the Guaranteed Obligations; or (f) any action affecting Obligor or any other guarantor of the Guaranteed Obligations; or (g) any judicial or governmental action affecting Obligor or the Guaranteed Obligations, including

Obligor's release from the Guaranteed Obligations or the rejection or disaffirmance of the Agreements or other agreement or any of the terms thereof; or (h) any disability, defense or cessation of the liability of Obligor; or (i) any assignment or transfer of any rights relating to the Guaranteed Obligations; or (j) any other circumstance which might otherwise constitute a defense or a discharge of Obligor, Guarantor or any other guarantor of the Guaranteed Obligations, including the disallowance of all or any portion of Macquarie's claims for payment or performance of the Guaranteed Obligations under Section 502 of Title 11 of the United States Code.

    **3.    Waivers; Subordination.**    Guarantor waives demand, protest or notice of any default or nonperformance by Obligor, all affirmative defenses, offsets and counterclaims against Macquarie, any right to the benefit of any security, and any requirement that Macquarie proceed first against Obligor, any other guarantor of the Guaranteed Obligations, or any collateral security.  So long as any Guaranteed Obligations remain outstanding, Guarantor hereby unconditionally and irrevocably waives and releases any and all claims against Obligor now or hereafter arising out of or related directly or indirectly to any of the obligations of Guarantor under this Guaranty or any liabilities of Obligor to Macquarie, including any and all such claims arising from rights of subrogation, indemnity, reimbursement, contribution or setoff of Guarantor against Obligor, whether arising by contract or otherwise.

    Guarantor hereby unconditionally and irrevocably subordinates any and all claims and rights it has or may have against Obligor now or hereafter however arising, including such as arise out of or relate directly or indirectly to any of the obligations of Guarantor under any other guaranty of Obligor's obligations to any other person, whether as a result of subrogation, indemnity, reimbursement, contribution or setoff, and whether arising by contract or otherwise.

    **4.  Payments.**  Guarantor agrees that all payments made or required to be made or otherwise payable by Obligor or Guarantor to Macquarie on any of the Guaranteed Obligations will, when made, be final.  Guarantor agrees that if any Payment is recovered from or repaid by Macquarie, in whole or in part, in any bankruptcy, insolvency or other proceeding instituted by or against Obligor or Guarantor or any other guarantor of the Guaranteed Obligations, or any creditor of any of theirs, this Guaranty shall continue to be fully applicable to the Guaranteed Obligations to the same extent as though the payment so recovered or repaid had never been originally made.

    **5.  Continuing Guaranty.**  This is a continuing Guaranty and shall not be revoked or terminated by Guarantor so long as any amount owed to Macquarie under the Agreements remains unpaid. Accordingly, this Guaranty shall not be satisfied by any intermediate payment of any Guaranteed Obligation, but shall remain in full force and effect until all Guaranteed Obligations which may at any time or from time to time be outstanding have been satisfied in full.

    **6.  Assignment.**  This Guaranty may not be assigned by Guarantor without Macquarie's prior written consent.  Macquarie shall have the unqualified right to assign this Guaranty  or any portion hereof or any benefits hereunder to any party, without the consent of Guarantor or Obligor.  Macquarie's Assignee shall have all of the rights, privileges and powers granted hereunder to Macquarie and shall have the right to rely upon this Guaranty. This Guaranty shall be binding upon, and inure to the benefit of, Guarantor and Macquarie and their respective successors and assigns (including any personal representatives).

    **7.  Costs.**  Guarantor agrees to pay all costs and expenses, including all court costs and legal fees and expenses incurred by Macquarie in connection with the enforcement of this Guaranty (on an indemnity basis).

    **8.  Interpretation.**  This document contains the entire agreement of the parties concerning the guaranty of the Guaranteed Obligations by Guarantor, and may not be amended or modified except by a writing signed by Guarantor and Macquarie.  The section headings and captions contained herein are for purposes of reference and convenience only and shall not in any way affect the meaning or interpretation of this Guaranty. This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  None of the waivers, limitations, agreements, or other terms made or agreed to by Guarantor in the various provisions of this Guaranty shall limit or affect the extent of the waivers,

limitations, agreements, or other terms made or agreed to by Guarantor elsewhere in this Guaranty.  The performance of any obligation required of Guarantor hereunder may be waived only by a written waiver signed by Macquarie, and such waiver shall be effective only with respect to the specific obligation described.  The waiver by Macquarie of a breach of any provision of this Guaranty by Guarantor shall not operate or be construed as a waiver of any subsequent breach of the same provision or another provision of this Guaranty.  As to each Guaranteed Obligation, this Guaranty shall become effective automatically and without further action (and, for the avoidance of doubt, without notice thereof to Guarantor or notice of the acceptance by Macquarie of this Guaranty).  In this Guaranty: the singular shall include the plural, and *vice versa*; the use of any gender shall be applicable to all genders; and terms of inclusion are without limitation. The English language shall be the language used for the interpretation of and the giving of all notices under this Guaranty.

**9.  Choice of Law**.  This Guaranty shall be governed by the internal laws (as opposed to conflicts of law provisions) of the State of New York, USA provided that nothing contained herein shall prevent Macquarie from proceeding at its election against Guarantor in the courts of any other jurisdiction. If any provision of this Guaranty shall be prohibited by or invalid under that law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.  Guarantor hereby unconditionally and irrevocably consents to the jurisdiction of any courts of record having jurisdiction within the State of New York, USA and waives any objection relating to improper venue or *forum non conveniens* to the conduct of any proceeding in any such court.  **The parties hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding brought to enforce or defend this Guaranty.**

Garett Alan Neff

Date: _____ 10|26|10

John Mark Schmid

Date: _____ 10/26/10

David Karl Schmid

Date: _____ 10/26/2010

# EXHIBIT  D

**Amendment No. 1**
**dated June 13, 2010**
**to Lease No. 001 dated October 26, 2010**



| Lessee: | Garage Media NY LLC<br>1 Union Place<br>Hartford, CT 06103 | Lessor: | Macquarie Equipment Finance, LLC<br>2285 Franklin Road, Suite 100<br>Bloomfield Hills, MI 48302 |
|---|---|---|---|

Lessor and Lessee amend the above-referenced lease ("Lease") between them as provided herein. Capitalized terms used herein without definition are as defined in the Lease. Except as provided in this Amendment, the Lease remains the same.

A. The description and Lessor's Basis table of the Lease is amended to read as follows:

| Item | Seller | Description | Lessor's Basis |
|---|---|---|---|
| 01 | A2a Media Inc. ("*A2a*") and GKD USA, Inc. ("*GKD US*") | The Equipment is a 6,010 square foot Mediamesh installation manufactured by GKD – Gebr. Kufferath AG of Metallweberstraße 46, D-52353 Düren, Germany ("*Manufacturer*") comprising two approximately 3,000 square foot panels, five LED per pixel, full color, outdoor design and including: stainless steel or aluminum housing; cover ducts and cabinets with hinged surfaces for easy service access and covering all cable and data/power components from public tampering; lighting to illuminate approximately 25,000 square feet of the exterior wall area of the Equipment Location; media and license(s) for Interactive Media Pool Platform (IMPP) software; design; all necessary control computers and hardware and other system display electronics; delivery to the Equipment Location; and all installation hardware, materials, and labor necessary to complete the full construction, installation, illumination, and operability of all of the foregoing. | $ 6,026,000 |
| 02 | Lessee | Working capital for Lessee. | 140,023 |
| 03 | Johnsen and Fretty | Commission due by Lessee. | 150,000 |
| 04 | Various | Permitting and legal fees incurred by Lessee with Seller. | 70,000 |
| 05 | - | Deleted. | 0 |
| 06 | A2a and GKD US | Additional Equipment cost per change order to Equipment Agreement. | 213,977 |
| | | Total: | $ 6,600,000 |

B. The Final Expiration Date shall be:

The occurrence of the "Expiration Date" of the Permit (as provided in Section 2(a) thereof) and the Display Agreement (as provided in Section 3 thereof) as they may be supplemented or amended from time to time (with the consent of the Lessor as contemplated by Section 1(g) of the Acknowledgment).

C. The Outside Date shall be July 31, 2011.

D. The Reference Rate shall be 1.87% (Applicable Rate in effect on June 6, 2011).

E. The Rental Payments shall be:

| ***Rental Payments:*** | *Rental Period* | *Rental Payment* |
|---|---|---|
| | 1 – 7 | $0 |
| | 8 | $50,044 |
| | 9 – 12 | $154,249 |
| | 13 – 24 | $165,267 |
| | 25 – 36 | $176,284 |
| | 37 – 60 | $137,722 |

F. In Section 2 of the Lease:

* In subsection (a), the total amount of the third payment is corrected to be $2,090,000 (all of which has been paid).

* In subsection (b), the total amount of the fourth payment remains $1,100,000 (all of which has been paid).

* In subsection (c): total amount of the fifth payment shall be $1,379,500; the amount to be paid to the Equipment's Seller shall be $1,194,477 (comprising $980,500 of the cost identified in Item No. 01 plus the $213,977 cost identified in Item No. 06); and the amount that may be paid to the Seller of the Soft Cost Items shall be $185,023.

* In subsection (d): the total amount of the final payment shall be $2,030,500 ; the amount to be paid to the Equipment's Seller shall remain $980,500; • the amount to be paid to GM (and credited to the Security Deposit) shall remain $1,050,000; and the amount that may be paid to the Seller of the Soft Cost Items shall be $0.

Macintosh HD:Users:garyneff:Library:Mail Downloads:Lease Amd1 v1.doc

G.  In Section 5 of the Lease, second sentence, after the last semicolon, insert "or."

H.  Replace Section 6 of the Agreement with:

**6.  End of Term.**

(a)  At the end of the Base Term, Lessee may exercise one (only) of the following options, but only if Lessee gives irrevocable notice to Lessor unequivocally electing one of these options (***"Exercise Notice"***) and the Exercise Notice is received by Lessor at least 180 days before the end of the Term:

  (i)  *Return.*  Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term.

  (ii)  *1-Year Renewal.*  Lessee may renew the Term for a 1-year Renewal Term, with a Rental Payment of $104,992 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply.  At the end of this 1-year Renewal Term, Lessee may exercise one (only) of the following options, but only if Lessee gives a further irrevocable Exercise Notice unequivocally electing one of these options, and the Exercise Notice is received by Lessor at least 180 days before the end of this 1-year Renewal Term:  (i) Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term; or (ii) Lessee may purchase all of the Equipment for the Purchase Amount.

  (iii)  *2-Year Renewal.*  Lessee may renew the Term for a 2-year Renewal Term, with a Rental Payment of $79,095 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply.  At the end of this 2-year Renewal Term, Lessee may exercise one (only) of the following options, but only if Lessee gives a further irrevocable Exercise Notice unequivocally electing one of these options, and the Exercise Notice is received by Lessor at least 180 days before the end of this 2-year Renewal Term:  (i) Lessee may return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Term; or (ii) Lessee may purchase all of the Equipment for the Purchase Amount.

  (iv)  *2½-Year Renewal.*  Lessee may renew the Term for a 2½-year (30-month) Renewal Term, with a Rental Payment of $83,705 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply.  At the end of this 2½-year Renewal Term, Lessee shall unconditionally purchase the Equipment for its fair market value, defined as the price that would be obtained at arm's length between informed and willing parties, neither under compulsion to contract, for the sale or lease of Equipment assuming the Equipment is: in installed, continued, and uninterrupted use by the buyer; in the condition required by this Lease and certified by Manufacturer or GKD US as eligible for a maintenance agreement in favor of the buyer on substantially the same terms as the Maintenance Agreement but at the Manufacturer's then usual rates; and being sold with the software necessary for its use.  Such fair market value will be determined by Lessor, but if Lessee objects in writing to Lessor's determination within 10 days after Lessor communicates its determination to Lessee's representative in writing or by email, then such fair market value will at Lessee's expense be determined by an independent appraiser selected by Lessor and reasonably satisfactory to Lessee.

  (v)  *2½-Year Renewal With End-Of-Term Ownership.*  Lessee may renew the Term for a 2½-year (30-month) Renewal Term, with a Rental Payment of $92,825 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply.  At the end of this 2½-year Renewal Term, if Lessee has made all payments then due under this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee for $1.

  (vi)  *3½-Year Renewal With End-of-Term Purchase.*  If the Final Expiration Date at the time of Lessee's exercise of this option is December 31, 2019 or later, Lessee may renew the Term for a 3½-year (42-month) Renewal Term, with a Rental Payment of $71,670 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply.  At the end of this 3½-year Renewal Term, Lessee shall unconditionally purchase the Equipment for the Purchase Amount.

  (vii)  *3½-Year Renewal With End-Of-Term Ownership.*  If the Final Expiration Date at the time of Lessee's exercise of this option is December 31, 2019 or later, Lessee may renew the Term for a 3½-year (42-month) Renewal Term, with a Rental Payment of $75,878 (as such amount may be adjusted under the first paragraph of Section 5 and subsection (b) of this section), and with all other provisions of this Lease continuing to apply.  At the end of this 3½-year Renewal Term, if Lessee has made all payments then due under this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee for $1.

  If one of the foregoing options is not exercised, or if Lessee having elected a return or purchase fails to comply with the terms of the option so elected, the Term will automatically extend from its previous expiration date for successive 1-month Renewal Terms, with a Rental Payment of $141,451(as such amount may be adjusted under the first paragraph of Section 5), and with all other provisions of this Lease continuing to apply.  At the end of any such 1-month automatic Renewal Term, Lessee may exercise one (only) of the options set forth above in the preceding clauses of this subsection, but only if Lessee gives an irrevocable Exercise Notice (or further irrevocable Exercise Notice) unequivocally electing the option and the Exercise Notice is received by Lessor at least 180 days before the end of such 1-month automatic Renewal Term (and the option selected will be effective at the end of the 1-month automatic Renewal Term whose expiration date is to occur on or after 180 days from Lessor's receipt of the Exercise Notice).

(b)  Where a purchase option or purchase obligation applies at the end of a Renewal Term for a price equal to the Purchase Amount, as provided above, Lessee will make all payments required for the rest of the Term (including after it has given any Exercise Notice) and on the last day of the Term Lessee will pay Lessor the following (***"Purchase***

*Amount"*): (i) (A) in the case of an option under subsections (a)(ii) or (iii) above, the sum total of the Rental Payments which would have been due and payable for the full 2½-year Renewal Term provided for in subsection (a)(v) above had Lessee properly elected that option at the end of the Base Term, or (B) in the case of an option under subsection (a)(vi) above, the sum total of the Rental Payments which would have been due and payable for the full 3½-year Renewal Term provided for in subsection (a)(vii) had Lessee properly elected that option at the end of the Base Term, minus (ii) the sum total of all Rental Payments scheduled for all Renewal Terms (up to the amount specified in the preceding clause (A) or (B), as applicable), plus (iii) all applicable Taxes; and on payment of all such amounts and any other outstanding amounts under this Lease as required by this Lease, this Lease will terminate and Lessor will transfer the Equipment to Lessee.

(c) Any renewal option available to Lessee at the end of the then scheduled Term (whether it be the end of the Initial Term or a Renewal Term in effect or to come into effect under the terms of this Lease, as the case may be, *"Applicable Term"*), would result in the Term extending beyond the Final Expiration Date for any reason (e.g., if the Base Term Commencement Date occurs after July 1, 2011 or if any intervening 1-month automatic Renewal Terms occur), then the Rental Payment for the Renewal Term for each of the renewal options available to Lessee at the end of the Applicable Term will, instead of the amount originally stated in subsections (a)(ii) through (vii) above, as applicable, be determined as (i) the Rental Payment so stated, (ii) multiplied by the number of months in the Renewal Term for which such Rental Payment was to have been applicable (i.e., 12, 24, 30, or 42, as applicable), and (iii) divided by the number of months actually remaining following the Applicable Term to (and including) December 31, 2018 (in the case of a renewal under subsections (a)(ii) through (v) or December 31, 2019 (in the case of a renewal under subsections (a)(vi) and (vii)).

I.   Add a new Section 35 to the Lease:

**35.   Right to Perform For Lessee; Insurance.** If Lessee fails to procure or maintain (or pay any premium due for) the insurance required under this Lease or otherwise perform or observe the provisions of this Lease, including in respect of the insurance required under Section 11, Lessor in its own name or in the name of Lessee as Lessee's attorney-in-fact may obtain such insurance (or pay any such premium), and Lessee shall reimburse the costs thereof to Lessor on demand. Lessee hereby irrevocably appoints Lessor, as Lessee's attorney-in-fact to file, settle or adjust, and receive payment of claims under any such insurance policy and to endorse Lessee's name on any checks, drafts or other instruments on payment of such claims (and Lessee will immediately and unconditionally deliver over to Lessor any such checks, drafts, or other instruments).

**Garage Media NY LLC (Lessee)**                    **Macquarie Equipment Finance, LLC (Lessor)**

By: _____              By: _____

Name/Title:   Garett Neff                          Name/Title:   Andrew R. Feldstein
                                                               V.P. and Asst. Gen. Counsel
Date:   _____ 6/21/2011 _____             Date:   _____ 6·23·11 _____





**Amendment No. 2**
**dated July 28, 2011**
**to Lease No. 001 dated October 26, 2010**

| | | | |
|---|---|---|---|
| **Lessee:** | Garage Media NY LLC<br>1 Union Place<br>Hartford, CT 06103 | **Lessor:** | Macquarie Equipment Finance, LLC<br>2285 Franklin Road, Suite 100<br>Bloomfield Hills, MI 48302 |

Lessor and Lessee amend the above-referenced lease (as previously amended, *"Lease"*) between them as provided herein. Capitalized terms used herein without definition are as defined in the Lease. Except as provided in this Amendment, the Lease remains the same.

A. From Item 01 of the Equipment, remove "lighting to illuminate approximately 25,000 square feet of the exterior wall area of the Equipment Location," and the delivery, installation hardware, materials, and labor necessary to complete the full construction, installation, illumination, and operability thereof (collectively, the *"Architectural Lighting"*). The Lessor's Basis of Item 01 is reduced by the sum of $125,000, the cost of the Architectural Lighting. The Lessor's Basis of Item 02 of the Equipment (working capital) is increased by the sum of $566,952 (*"Additional Financing"*). As a result of the foregoing, the total Lessor's Basis of all of the Equipment is $7,041,952 (i.e., $6,600,000 - $125,000 + $566,952).

B. Lessee hereby affirms its certification that on June 30, 2011 (which, as described in Acceptance Certificate No. 4, is the Acceptance Date of Item 01 of the Equipment, the Acceptance Date of the rest of the Equipment being as described in the other Acceptance Certificates), all of the Equipment was delivered to the Equipment Location, fully constructed, installed, inspected, and tested and approved and accepted by Lessee for all purposes of the Lease, the Equipment Agreement, the Services Agreement, the Permit, and the Display Agreement, and all related documents. In addition, Lessee certifies that: (a) on and as of June 30, 2011 (which shall be the Acceptance Date for the Additional Financing portion of the Soft Cost Items) Lessee accepted such costs as Soft Cost Items for all purposes; and (b) no Event of Default or event that with notice or the lapse of time would constitute an Event of Default is continuing. For the avoidance of doubt, this section is the Final Acceptance Certificate under the Lease.

C. As a result of the removal of the Architectural Lighting as Equipment under the Lease, and the foregoing acceptance of the Additional Financing portion of the Soft Cost Items, all of the Equipment has been accepted. The Base Term Commencement Date is July 1, 2011.

D. The Rental Payments shall be:

| ***Rental Payments:*** | *Rental Period* | *Rental Payment* |
|---|---|---|
| | 1 – 4 | $0 |
| | 5 – 12 | $151,559 |
| | 13 – 24 | $162,385 |
| | 25 – 36 | $173,209 |
| | 37 – 60 | $135,320 |

E. In Section 2 of the Lease:

* In subsection (a), the total amount of the third payment remains $2,090,000 (all of which has been paid).

* In subsection (b), the total amount of the fourth payment remains $1,100,000 (all of which has been paid).

* In subsection (c): total amount of the fifth payment remains $1,379,500 (all of which has been paid).

* In subsection (d): the total amount of the final payment shall be $2,597,452; the amount to be paid to the Equipment's Seller shall be $855,500 (all of which has been paid); the amount to be paid to GM (and credited to the Security Deposit) shall remain $1,050,000 (which amount is hereby paid to GM by crediting it to the Security Deposit to be held by Lessor as collateral under the GM Security Agreement); and the amount to be paid to the Lessee as Seller of the Additional Financing portion of the Cost Items shall be $566,952 (to be paid to Lessee upon satisfaction of any of the conditions to payment remaining outstanding).

F. In Section 6(a) of the Lease:

* In clause (ii), replace "$104,992" with "$103,161."

* In clause (iii), replace "$79,095" with "$77,715."

* In clause (iv), replace "$83,705" with "$82,245."

* In clause (v), replace "$92,825" with "$91,206."

* In clause (vi), replace "$71,670" with "$70,420."

* In clause (vii), replace "$75,878" with "$74,555."

Macintosh HD:Users:garyneff1:Library:Mail Downloads:Lease Amd2 v1.doc

- In the sentence following clause (vii), replace "$141,451" with "$138,984."

G. This Amendment is conditioned upon the execution by the parties of Lease No. 002 providing for a lease of the Architectural Lighting (the *"Lighting Lease"*). The Lease shall be coterminous with the Lighting Lease. No notice by Lessee exercising any of its options or rights of termination, extension, renewal, purchase, or return shall be effective for either the Lease or the Lighting Lease unless similar and corresponding notice is given under both the Lease and the Sign Lease.

**Garage Media NY LLC** (Lessee)

By: _____

Name/Title: ___Gary H Neff___ / M. P.

Date: _____7 | 28 | 11_____

**Macquarie Equipment Finance, LLC** (Lessor)

By: _____

Name/Title: _____Andrew R. Feldstein_____
V.P. and Asst. Gen. Counsel

Date: _____7 - 29 - 11_____

**EXHIBIT  F**



**Amendment No. 3**
**dated as of September 1, 2012**
**to Lease No. 001 dated October 26, 2010**

| Lessee: | Garage Media NY LLC<br>1 Union Place<br>Hartford, CT 06103 | Lessor: | Macquarie Equipment Finance, LLC<br>2285 Franklin Road, Suite 100<br>Bloomfield Hills, MI 48302 |
|---|---|---|---|

Lessor and Lessee amend the above-referenced lease (as previously amended, *"Lease"*) between them as provided herein.  Capitalized terms used herein without definition are as defined in the Lease. Except as provided in this Amendment, the Lease remains the same.

The Rental Payments shall be:

| Rental Period | Rental Payment | Number of Payments |
|---|---|---|
| 1 – 4 | $0 | 4 ✓ |
| 5 – 12 | $151,559 | 8 ✓ |
| 13 – 14 | $162,385 | 2 ✓ |
| 15 – 17 | $50,000 | 3 ✓ |
| 18 – 24 | $162,385 | 7 ✓ |
| 25 – 36 | $173,210 | 12 ✓ |
| 37 – 48 | $156,203 | 12 |
| 49 – 60 | $156,203 | 12 |

This Amendment will when executed be effective as of the date first stated above.

**Garage Media NY LLC (Lessee)**

By: _____

Name/Title: ____Pa. I m_____

Date: ____10|2a|12____

**Macquarie Equipment Finance, LLC (Lessor)**

By: _____

Name/Title: ___Andrew R. Feldstein___
V.P. and Asst. Gen. Counsel

Date: ____10-30-12____

# EXHIBIT  G

**Amendment**
**dated as of March 31, 2013**

**I. In General**

The parties to this Amendment are Macquarie Equipment Finance, Inc. (f/k/a Macquarie Equipment Finance, LLC) (*"Macquarie"*), Garage Media NY LLC (*"GMNY"*), Garage Media LLC (*"GM"*). Macquarie and GMNY amend Lease No. 001 dated October 26, 2011 between them (as previously amended, the *"Lease"*) as provided in Articles I and II of this Amendment; Macquarie and GM amend the Pledge and Security Agreement dated October 26, 2011 between them (*"GM Security Agreement"*) as provided in Articles I and III of this Amendment; and Macquarie and GMNY amend the Security Agreement dated October 26, 2011 between them (*"GMNY Security Agreement"*) as provided in Article I and IV of this Amendment.

Capitalized terms used in this Amendment without definition are as defined in the Lease, the GM Security Agreement, or the GMNY Security Agreement, as applicable. Each of the parties to this Amendment acknowledge and agree to all of the provisions of this Amendment. Except as provided in this Amendment, the Lease GM Security Agreement, and GMNY Security Agreement remain the same and any or all interest, rights, and obligations of Macquarie, GMNY, and GM are not changed. Each of the provisions of this Amendment will be effective only when this Amendment is executed by Macquarie, GM, and GMNY. When effective, this Amendment will be effective on and as of the date first stated above.

For clarity, Macquarie's rights in respect of the Security Deposit provided for in the Lease and GM Security Agreement (as hereby amended) are independent of and cumulative with its rights in respect of the Lessee Security Deposit provided for in the GMNY Security Agreement (as hereby amended).

**II. Amendment No. 4 to Lease No. 001**

The Base Term of the Lease is amended to be 81 months.

The Rental Payments of the Lease are amended to be:

| Rental Period | Rental Payment | Number of Payments | Dates |
|---|---|---|---|
| 1 – 4 | $ 0.00 | 4 | 07/01/11 – 10/31/11 |
| 5 – 12 | 151,559.00 | 8 | 11/01/11 – 06/30/12 |
| 13 – 14 | 162,385.00 | 2 | 07/01/12 – 08/31/12 |
| 15 – 17 | 50,000.00 | 3 | 09/01/12 – 11/30/12 |
| 18 – 20 | 162,385.00 | 3 | 12/01/12 – 02/28/13 |
| 21 | 505,166.48 | 1 | 03/01/13 – 03/31/13 |
| 22 – 27 | 100,000.00 | 6 | 04/01/13 – 09/30/13 |
| 28 – 81 | 135,500.00 | 54 | 10/01/13 – 03/31/18 |

Section 6 of the Lease is amended to be:

**6.** **End of Term.** At the end of the Base Term, Lessee may exercise one (only) of the following options, but only if Lessee gives irrevocable notice to Lessor unequivocally electing one of these options (*"Exercise Notice"*) and the Exercise Notice is received by Lessor at least 180 days before the end of the Base Term:
(a) *Return.* Lessee may elect to return all of the Equipment, in which case Lessee will return the Equipment to Lessor in accordance with Section 16 within 10 days of the last day of the Base Term.
(b) *Renewal With End-Of-Term Ownership.* Lessee may elect to renew the Base Term for a 9-month Renewal Term (i.e., through the Final Expiration Date), in which case: the Rental Payment for each Rental Period of the Renewal Term will be $135,500 plus all applicable Taxes; all other provisions of this Lease will continue to apply; and, at the end of the Renewal Term, this Lease will terminate and Lessor will be entitled to Lessor's interest in the Equipment for $1.
(c) *Purchase Option.* Lessee may elect to purchase all of the Equipment on the last day of the Base Term, in which case: Lessee will make all payments required during the remainder of the Base Term; on or before the last day of the Base Term Lessee will pay Lessor a purchase price for the Equipment equal to $1,170,000 (*"End-of-Term Purchase Option Price"*), plus all applicable Taxes; and, on the last day of the Base Term, if Lessee has paid such amounts and all other payments then due under this Lease, this Lease will terminate and Lessee will be entitled to Lessor's interest in the Equipment.
If one of the foregoing options is not exercised, or if having elected a return or purchase option Lessee fails to comply with the terms of the elected option, Lessee will automatically be deemed to have elected the renewal option provided in subsection (b) above.

The last three sentences of Section 19 of the Lease are replaced with:

> Accordingly, the parties agree that the Lessor's Return shall be (a) when determined for a date that is on or before the last day of the Base Term (i.e., on or before March 31, 2018), the sum of the present value of the Rental Payments to become due for the remainder of the Base Term, discounted from their respective due dates to the date of determination at 7.5% per annum, plus the present value of End-of-Term Purchase Option Price discounted from the last day of the Base Term to the date of determination at the same rate; and (b) when determined for a date that is after the last day of the Base Term, the product of one-ninth of the End-of-Term Purchase Option Price, multiplied by the number of whole calendar months remaining in the Term. For clarity, the Lessor's Return does not include, and Lessee shall be additionally liable for amounts due under this Lease on or before the date for which Lessor's Return is being determined and other amounts that may become due under this Lease after such date, including Taxes and other indemnity obligations.

### III. Amendment No. 1 to GM Security Agreement

The GM Security Agreement is amended to reduce the amount of the Security Deposit from $1,050,000 to $500,000. GMNY hereby presently and absolutely pays to Lessor the entirety of the funds held by Macquarie representing the $550,000 reduction in the Security Deposit to be applied toward payment of GMNY's outstanding obligation under the Lease (and GM's Obligation under the GM Security Agreement and its Guaranty of GMNY's obligation), including the obligation to pay Lessor $550,000 for the Rental Payment plus all applicable Taxes due under the Lease (as hereby amended) on March 1, 2013.

### IV. Amendment No. 1 to GMNY Security Agreement

Section 1.1 of the GMNY Security Agreement is amended to add the following paragraph:

> "Lessee Security Deposit" means, initially, $0. When in a calendar year Debtor's gross annual sales revenue earned from the Mediamesh equipment that is the subject of the Lease (the "Sign") exceeds $4,250,000, the amount of the Lessee Security Deposit shall be increased, up to $550,000 in the aggregate, by the amount of the excess less up to 15% of the excess that is sales commissions actually payable or to become payable on the excess ("Excess Net Revenues"). Debtor shall unconditionally pay any such increase in the amount of the Lessee Security Deposit to Secured Party within 45 days of the end of the calendar year in which any Excess Net Revenues are earned, and Secured Party shall hold the Lessee Security Deposit as Collateral under this Agreement. The Lessee Security Deposit shall bear no interest and need not be segregated from Lessor's general assets. The Lessee Security Deposit shall not be considered an advance payment of rental or other Obligations or a measure of Lessor's damages in case of default under the Obligations or this Agreement or as conditioning, limiting, or affecting any other Collateral. Secured Party may from time to time, without prejudice to any other remedy, use the Lessee Security Deposit to the extent necessary to make good any payment arrearages or to satisfy any other covenant or obligation of Secured Party hereunder and following any such application of Lessee Security Deposit, Debtor shall pay to Secured Party on demand the amount so applied in order to restore the Lessee Security Deposit to the amount that would have been in the possession of Secured Party had no such application been made. If Secured Party transfers its interest in the Obligations to an assignee who assumes Secured Party's obligations under this Agreement, Secured Party may assign the Lessee Security Deposit to the transferee and thereafter shall have no further liability for the return of the Lessee Security Deposit. Upon satisfaction in full of all Obligations and all commitments of Secured Party which may result in further Obligations, Secured Party shall pay over to Debtor, on demand, the Lessee Security Deposit to the extent not applied.

| Macquarie Equipment Finance, Inc. | Garage Media NY LLC | Garage Media, LLC |
|---|---|---|
| By: _Andrew R. Feldstein_ | By: _____ | By: _____ |
| Name/Title: V.P. and Asst. Gen. Counsel | Name/Title: Gary Neff / MP | Name/Title: Gary Neff / MP |
| Date: 3-18-13 | Date: March 17, 2013 | Date: March 17, 2013 |

**EXHIBIT  H**

## METZ LEWIS BRODMAN MUST O'KEEFE LLC

535 Smithfield Street  Suite 800  Pittsburgh, Pennsylvania 15222
T: 412.918.1100  F: 412.918.1199  www.metzlewis.com

October 2, 2018



**METZ**
**LEWIS**
**BRODMAN**
**MUST**
**O'KEEFE**

ATTORNEYS AT LAW

JOHN R. O'KEEFE, JR.

Garage Media NY LLC                    Garage Media, LLC, Guarantor
1 Union Place                          1 Union Place
Hartford, CT  06103                    Hartford, CT  06103
Attention:      Garett A. Neff

Garett A. Neff, Guarantor              John M. Schmid, Guarantor
22 Mountaincrest Drive                 167 Fern Avenue
Cheshire, CT  06410                    Litchfield, CT  06759

David K. Schmid, Guarantor
4 Old Orchard Way
Tolland, CT  06084

**Re:    Notice of Past Due Payments -**
**October 26, 2010 Lease Agreement, as amended**

Gentlemen:

Reference is made to that certain Lease Agreement dated October 26, 2010 between Garage Media NY LLC (the "Lessee") and Huntington Technology Finance, Inc. (formerly known as Macquarie Equipment Finance, Inc. and formerly known as Macquarie Equipment Finance, LLC) (the "Lessor") (as amended, the "Lease Agreement").  Payment and performance of all obligations of Lessee under the Lease Agreement were unconditionally guaranteed by Garage Media, LLC, Garett Alan Neff, John Mark Schmid and David Karl Schmid (each a "Guarantor" and together, the "Guarantors").

According to Lessor's records, rental payments, taxes and other amounts due under the Lease Agreement have not been paid since on or about May 8, 2015. As of October 1, 2018, the amount past due to the Lessor was computed as follows:

|                   |              |
|-------------------|--------------|
| Past Due Payments | $6,568,663.35 |
| Late Interest     | 1,450,380.00 |
| **TOTAL:**        | **$8,019,043.35** |

These amounts, as adjusted from day to day, are overdue and must be paid immediately.  You should contact Edward Kitchen to determine the exact amount due on the date you anticipate making payment.  The contact information for Edward Kitchen is as follows:

Direct Dial: 412.918.1133          e-mail: jokeefe@metzlewis.com          Cellular: 412.848.4356

Page 2 of 2
October 2, 2018

Edward Kitchen, Senior Vice President
The Huntington National Bank
310 Grant Street
Grant Building, 2nd Floor
Pittsburgh, PA 15219
Telephone: (412) 667-6527

In the meantime, the Lessor expressly reserves all rights and remedies available to it by agreement, at law or in equity because due to the past due rental payments, taxes and other amounts due under the Lease Agreement. No delay of the Lessor to take any action with respect to the same shall be construed to constitute a waiver of Lessor's rights under the Lease Agreement, at law or in equity or impair or otherwise prejudice the later exercise of any such rights or remedies.  Nothing contained in this letter, in any prior or subsequent communication among or between the Lessor, its counsel, the Lessee, the Guarantors and/or their counsel, or any action by the Lessor or any failure by it to act, shall be construed to constitute or shall be deemed as: (i) a course of dealing obligating the Lessor to take or not take any action at any time, (ii) a commitment or an agreement to make a commitment with regard to any possible restructure of the Lease Agreement, or (iii) an agreement to forbear from exercising any rights or remedies.

Very truly yours,

John R. O'Keefe, Jr.

JRO/sal

cc:     Christopher Blau, Esquire        cblau@zeislaw.com
        Edward J. Kitchen, Senior Vice President  edward.kitchen@huntington.com

# EXHIBIT  I

**The Huntington National Bank**
International Services - EA2E85
7 Easton Oval
Columbus, OH 43219
SWIFT: HUNTUS33
614-480-INTL (4685) - Customer Service
International@Huntington.com



Irrevocable Standby Letter of Credit
OSB.009044
Issued: 12/11/15

BENEFICIARY:

OUTFRONT Media Group LLC,
a Delaware limited liability company
405 Lexington Avenue
New York, NY 10174

Attn: General Counsel
Irrevocable Standby Letter of Credit No. OSB.009044
Issuance Date: December 11 , 2015
Expiration Date: December 31, 2016

Ladies and Gentlemen:

We hereby establish our Irrevocable Standby Letter of Credit No. OSB.009044 in
your favor for the account of Garage Media NY LLC, a New York Limited Liability
Company ("Garage Media"), 1 Union Place, Hartford, CT 06103, available for
drawings for up to an aggregate amount of USD 600,000.00 (US Dollars Six Hundred
Thousand and 00/100) (the "Amount Available").

We have been informed the purpose of this Letter of Credit is to secure the
obligations of Garage Media pursuant to the Display Agreement dated as of
October 26, 2010, by and among Garage Media, OUTFRONT Media Group LLC (f/k/a CBS
Outdoor Group LLC, f/k/a CBS Outdoor Group Inc.) and the Port Authority of New
York and New Jersey (the "Display Agreement").

This Letter of Credit is available for payment upon receipt of your draft(s) at
sight drawn on us accompanied by the Beneficiary's dated statement on letterhead
purportedly signed by one of its authorized representatives reading:

A)    "This drawing in the amount of _____USD ($_____) under The
Huntington Bank Irrevocable Standby Letter of Credit No. OSB.009044 represents
funds due and owing to us as Garage Media, is in the judgment of OUTFRONT Media
Group LLC, in default and has failed to cure such default pursuant to the terms
of the Display Agreement."
OR

B)    "The amount of this drawing of _____ USD ($_____) under The
Huntington Bank Irrevocable Standby Letter of Credit No. OSB.009044 represents
funds due to us as we received notice from The Huntington Bank of their decision
not to automatically extend Letter of Credit No. OSB.009044, Garage Media has
failed to provide a replacement letter of credit in a form acceptable to us, and
the underlying obligation remains outstanding."

**The Huntington National Bank**
International Services - EA2E85
7 Easton Oval
Columbus, OH 43219
SWIFT: HUNTUS33
614-480-INTL (4685) - Customer Service
International@Huntington.com



Draft(s) must be marked "Drawn under The Huntington National Bank Standby Letter of Credit No. OSB.009044 dated 12/11/2015."

This Letter of Credit shall expire on December 31, 2016, but such expiration date shall be automatically extended for a period of one (1) year from the expiration date set forth above, or any future expiration date, unless at least sixty (60) days before the current expiration date we notify you by overnight courier that this Letter of Credit is not extended beyond the current expiration date. This Letter of Credit shall finally expire on December 31, 2018, if it has not previously expired in accordance with the preceding sentence.

We give our undertaking to the Beneficiary that sums drawn under and in compliance with the terms of this Letter of Credit will be duly honored by us on presentation of Original drawing documents in accordance with the terms of this Letter of Credit presented to our office via courier at The Huntington National Bank, International Services EA2E85, 7 Easton Oval, Columbus, Ohio 43219 to the attention of Letter of Credit Services.

The amount of each draft presented and paid hereunder will automatically decrease the total amount of this Letter of Credit.

The original of this Letter of Credit must be presented together with the above documents in order to endorse the amount of each drawing on the reverse side and will be returned to the Beneficiary unless it is fully utilized. If cancellation of this Letter of Credit is required by the Beneficiary before the current expiration date, the Original of this Letter of Credit and any amendment(s), must be returned to us accompanied by a letter signed by the Beneficiary requesting its cancellation.

This Letter of Credit sets forth in full the terms of our undertaking, and such undertaking shall not in any way be modified, amended, amplified, or limited by any document, instrument, or agreement referred to herein, or in which this Letter of Credit is referred to, or to which this Letter of Credit relates; and no such reference shall be deemed to incorporate herein by reference any such document, instrument, or agreement.

This Letter of Credit is subject to the Uniform Customs and Practice for Documentary Credits (2007 Revision) ICC Publication No. 600, to the extent not inconsistent herewith, and the law of the State of New York, including Article 5 of the New York Uniform Commercial Code, and engages us to the terms herein.

All presentations and communications to us with respect to this Letter of Credit must be addressed to our office located at The Huntington National Bank, International Services EA2E85, 7 Easton Oval, Columbus, Ohio  43219.

Very Truly Yours,

*Gayla Strickler*

The Huntington National Bank

2

**EXHIBIT  J**



December 17, 2018

HUNTINGTON NATIONAL BANK,
International Services – EA2E85
7 Easton Oval
Columbus, OH 43219
Attn. Letter of Credit Services

Re:   Irrevocable Nontransferable Standby Letter of Credit
      Reference Number: OSB.009044

The undersigned Jonathan D. Karabas, a duly authorized officer of Outfront Media Group LLC (the "Beneficiary"), hereby certifies to Huntington National Bank (the "Bank"), with reference to Irrevocable Standby Letter of Credit No. OSB.009044, dated December 11, 2015 (the "Letter of Credit"), issued by the Bank in favor of the Beneficiary, as follows as of the date hereof:

This drawing under the amount of Six Hundred Thousand USD ($ 600,000.00) under The Huntington Bank Irrevocable Standby Letter of Credit No. OSB.009044 represents funds due and owing to us as Garage Media, is in the judgement of OUTFRONT Media Group LLC, in default and has failed to cure such default pursuant to the terms of the Display Agreement.

Funds paid pursuant to the provisions of the Letter of Credit shall be wire transferred to the Beneficiary in accordance with the following instructions:

| | |
|---|---|
| Bank Name: | JPMorgan Chase Bank |
| Address: | 1 Chase Manhattan Plaza |
| | New York, N.Y. 10005 |
| ABA: | 021-000-021 |
| SWIFT Code: | CHASUS33 |
| Account Name: | OUTFRONT Media |
| | 185 US Highway 46 |
| | Fairfield, NJ 07004 |
| Account No.: | 323-662021 |

Unless otherwise provided herein, capitalized terms which are used and not defined herein shall have the meaning given each such term in the Letter of Credit.

IN WITNESS WHEREOF, this Certificate has been duly executed and delivered on behalf of the Beneficiary by its authorized representative as of this __17th__ day of December, 2018.

Beneficiary: Outfront Media Group LLC

By: _____

Name: __JONATHAN D. KARABAS__

Title: __TREASURER__

(Authorized Officer)

FORM OF SIGHT DRAFT

DATE:  DECEMBER 17, 2018

U.S. $ 600,000.00

DRAWN UNDER HUNTINGTON BANK IRREVOCABLE STANDBY LETTER OF CREDIT NO. OSB. 009044

AT SIGHT PAY TO THE ORDER OF OUTFRONT MEDIA GROUP LLC, U.S. DOLLARS SIX HUNDRED THOUSAND VIA FED WIRE TRANSFER.

| | |
|---|---|
| TO: | JPMORGAN CHASE BANK |
| | 1 CHASE MANHATTAN PLAZA |
| | NEW YORK, NY 10005 |
| ABA: | 021-000-021 |
| BENEFICIARY: | OUTFRONT MEDIA |
| ACCOUNT: | 323-662021 |
| | |
| REFERENCE: | IRREVOCABLE STANDBY LETTER OF CREDIT NO. OSB. 009044 |

OUTFRONT MEDIA GROUP LLC

BY:

NAME: JONATHAN D. KARABAS
TITLE: TREASURER
DATE:  DECEMBER 17, 2018

THIS SIGHT DRAFT IS DRAWN UNDER HUNTINGTON BANK LETTER OF CREDIT NUMBER OSB. 009044 ISSUED ON DECEMBER 11, 2015 AND IS ACCOMPANIED BY THE ORIGINAL LETTER FOR PROPER ENDORSEMENT.

SWORN TO AND SUBSCRIBED BEFORE
THIS DAY OF DECEMBER 17, 2018

NOTARY PUBLIC  Exp 03|02|2020

**The Huntington National Bank**
**International Services** - EA2E85
7 Easton Oval
Columbus, OH 43219
SWIFT: HUNTUS33
614-480-INTL (4685) · Customer Service
International@Huntington.com



Irrevocable Standby Letter of Credit
OSB.009044
Issued: 12/11/15

BENEFICIARY:

OUTFRONT Media Group LLC,
a Delaware limited liability company
405 Lexington Avenue
New York, NY 10174

Attn: General Counsel
Irrevocable Standby Letter of Credit No. OSB.009044
Issuance Date: December 11 , 2015
Expiration Date: December 31, 2016


Ladies and Gentlemen:

We hereby establish our Irrevocable Standby Letter of Credit No. OSB.009044 in
your favor for the account of Garage Media NY LLC, a New York Limited Liability
Company ("Garage Media"), 1 Union Place, Hartford, CT 06103, available for
drawings for up to an aggregate amount of USD 600,000.00 (US Dollars Six Hundred
Thousand and 00/100) (the "Amount Available").

We have been informed the purpose of this Letter of Credit is to secure the
obligations of Garage Media pursuant to the Display Agreement dated as of
October 26, 2010, by and among Garage Media, OUTFRONT Media Group LLC (f/k/a CBS
Outdoor Group LLC, f/k/a CBS Outdoor Group Inc.) and the Port Authority of New
York and New Jersey (the "Display Agreement").

This Letter of Credit is available for payment upon receipt of your draft(s) at
sight drawn on us accompanied by the Beneficiary's dated statement on letterhead
purportedly signed by one of its authorized representatives reading:

A)    "This drawing in the amount of _____USD ($_____) under The
Huntington Bank Irrevocable Standby Letter of Credit No. OSB.009044 represents
funds due and owing to us as Garage Media, is in the judgment of OUTFRONT Media
Group LLC, in default and has failed to cure such default pursuant to the terms
of the Display Agreement."
OR

B)    "The amount of this drawing of _____ USD ($_____) under The
Huntington Bank Irrevocable Standby Letter of Credit No. OSB.009044 represents
funds due to us as we received notice from The Huntington Bank of their decision
not to automatically extend Letter of Credit No. OSB.009044, Garage Media has
failed to provide a replacement letter of credit in a form acceptable to us, and
the underlying obligation remains outstanding."

1

**The Huntington National Bank**
**International Services** - EA2E85
7 Easton Oval
Columbus, OH 43219
SWIFT: HUNTUS33
614-480-INTL (4685) - Customer Service
International@Huntington.com



Draft(s) must be marked "Drawn under The Huntington National Bank Standby Letter of Credit No. OSB.009044 dated 12/11/2015."

This Letter of Credit shall expire on December 31, 2016, but such expiration date shall be automatically extended for a period of one (1) year from the expiration date set forth above, or any future expiration date, unless at least sixty (60) days before the current expiration date we notify you by overnight courier that this Letter of Credit is not extended beyond the current expiration date. This Letter of Credit shall finally expire on December 31, 2018, if it has not previously expired in accordance with the preceding sentence.

We give our undertaking to the Beneficiary that sums drawn under and in compliance with the terms of this Letter of Credit will be duly honored by us on presentation of Original drawing documents in accordance with the terms of this Letter of Credit presented to our office via courier at The Huntington National Bank, International Services EA2E85, 7 Easton Oval, Columbus, Ohio 43219 to the attention of Letter of Credit Services.

The amount of each draft presented and paid hereunder will automatically decrease the total amount of this Letter of Credit.

The original of this Letter of Credit must be presented together with the above documents in order to endorse the amount of each drawing on the reverse side and will be returned to the Beneficiary unless it is fully utilized. If cancellation of this Letter of Credit is required by the Beneficiary before the current expiration date, the Original of this Letter of Credit and any amendment(s), must be returned to us accompanied by a letter signed by the Beneficiary requesting its cancellation.

This Letter of Credit sets forth in full the terms of our undertaking, and such undertaking shall not in any way be modified, amended, amplified, or limited by any document, instrument, or agreement referred to herein, or in which this Letter of Credit is referred to, or to which this Letter of Credit relates; and no such reference shall be deemed to incorporate herein by reference any such document, instrument, or agreement.

This Letter of Credit is subject to the Uniform Customs and Practice for Documentary Credits (2007 Revision) ICC Publication No. 600, to the extent not inconsistent herewith, and the law of the State of New York, including Article 5 of the New York Uniform Commercial Code, and engages us to the terms herein.

All presentations and communications to us with respect to this Letter of Credit must be addressed to our office located at The Huntington National Bank, International Services EA2E85, 7 Easton Oval, Columbus, Ohio  43219.

Very Truly Yours,

The Huntington National Bank

2



December 5, 2018

Garage Media NY LLC
One Union Place
Hartford, CT 06103
Attn: Gary Neff

Re:     Notice of Default

Dear Mr. Neff:

This letter is to provide written notice of a default occurring with respect to your obligations under the Display Agreement (the "Agreement") dated as of October 26, 2010, by and among CBS Outdoor Group Inc. (n/k/a OUTFRONT Media Group Inc.) ("Outfront") and Garage Media NY LLC ("Garage Media"), as agreed to and acknowledged by THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY. Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Agreement.

Section 4 of the Agreement obligates Garage Media to pay to Outfront a guaranteed revenue fee in monthly installments (the "Fee"). Garage Media is currently in default of this Fee obligation and has an unpaid balance in respect of this Fee obligation of $652,166.59. Per Section 19 of the Agreement, Garage Media's "failure to pay when due all or any portion of the Fee, which failure to pay is not cured within five (5) business days of receipt of notice of the payment being delinquent" constitutes an Event of Default. Outfront hereby notifies you of your delinquency in paying the Fee and requests payment of all outstanding amounts within five (5) business days of your receipt of this letter.

Section 19 of the Agreement provides that, upon any Event of Default, Outfront shall have the right, in its sole and reasonable discretion, to take either or both of the following actions: (i) to terminate the Agreement and require G-M to remove the Sign and the Equipment from the Facility and restore the Facility, including the restoration of the existing advertising display, to its original condition within sixty (60) days of the date of the termination of this Agreement; and (ii) to make one or more draws upon the letter of credit serving as Security in an amount or amounts in the aggregate equal to the amount of any past due Fee or Bonus Revenue and any and all other losses or damages (including, without limitation attorneys fees) suffered by Outfront as a result of such Event of Default.

Should Garage Media be unable to remedy its current default, Outfront reserves the right under Section 19 of the Agreement to call an Event of Default and pursue any of the remedies available to it, including terminating the Agreement and/or drawing upon the existing letter of credit. Outfront reserves all other rights.

**EXHIBIT  K**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


| | | |
|---|---|---|
| HUNTINGTON TECHNOLOGY | : | |
| FINANCE, INC., F/K/A MACQUARIE | : | CASE NO. |
| EQUIPMENT FINANCE, INC, | : | |
| F/K/A MACQUARIE EQUIPMENT | : | 3:18-CV-01708-VLB |
| FINANCE, LLC | : | |
| VS. | : | |
| | : | |
| GARETT ALAN NEFF A/K/A | : | |
| GARY NEFF, JOHN MARK SCHMID, | : | |
| and DAVID KARL SCHMID, | : | |
| Defendants. | : | |


DEPOSITION OF:  GARETT ALAN NEFF

DATE:  MAY 08, 2019

TIME:  10:00 A.M.

HELD AT:  CARMODY TORRANCE SANDAK & HENNESSEY, LLP

195 CHURCH STREET, 18TH FLOOR

NEW HAVEN, CONNECTICUT


Reporter:  Margaret A. Bull, LSR 00023


CASSIAN REPORTING, LLC
21 OAK STREET, SUITE 307
HARTFORD, CT  06106
860-595-7462

```
 1                    A P P E A R A N C E S

 2

 3

 4

 5    FOR THE PLAINTIFF

 6    METZ LEWIS BRODMAN MUST O'KEEFE LLC

 7    535 SMITHFIELD STREET, SUITE 800

 8    PITTSBURGH, PA  15222

 9    ATTORNEY:  JOHN R. O'KEEFE, JR., ESQ

10    EMAIL: jokeefe@metzlewis.com

11

12    FOR THE DEFENDANT

13    ZEISLER & ZEISLER, P.C.

14    10 MIDDLE STREET, 15TH FLOOR

15    BRIDGEPORT, CT  06604

16    ATTORNEY:  ERIC A. HENZY, ESQ

17    EMAIL: ehenzy@zeislaw.com

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2                                           PAGE

 3    APPEARANCE. . . . . . . . . . . . . . . 02
      STIPULATIONS. . . . . . . . . . . . . . 04
 4    CERTIFICATE . . . . . . . . . . . . . . .196

 5

 6    WITNESS:  GARETT ALAN NEFF                   PAGE

 7

 8    DIRECT EXAMINATION BY MR. O'KEEFE . . . . . .  05

 9

10    PLAINTIFF'S EXHIBIT

11    Exhibit 7, January 25 and 26, 2017 e-mail chain,.........102
      Exhibit 8, April 25, 2017, e-mail.......................105
12    Exhibit 10, May 26, 2011 letter, 1048-1050..............111
      Exhibit 12, PABT sales 2011, 987........................119
13    Exhibit 15, July 5, 2012 e-mail.........................123
      Exhibit 16, July 15, 2012 letter, 1179-1190.............126
14    Exhibit 17, August 9, 2012 e-mail chain.................129
      Exhibit 18, March 23, 2014, letter......................133
15    Exhibit 20, December 17, 2013 Clear Channel presentation.
                  1214-1222.................................152
16    Exhibit 22, January 18, 2014 e-mail.....................159
      Exhibit 23, Management agreement, 1 of 16...............161
17    Exhibit 25, March 22, 2014 e-mail.......................171
      Exhibit 27,  August 6, 2015 e-mail......................174
18    Exhibit 28, February 19, 2016 e-mail....................177
      Exhibit 29, March 29, 2017 e-mail.......................170
19    Exhibit 31, Subpoena.................................... 07
      Exhibit 32, January 18, 2013 e-mail chain, 1098-1099..... 91
20

21

22    (Note:  All exhibits marked during the deposition have been

23    retained by counsel)

24

25
```

```
1              S T I P U L A T I O N S

2

3

4        It is stipulated by the Attorneys for the Plaintiff

5   and the Defendant that all objections are reserved until the

6   time of trial, except those objections as are directed to the

7   form of the question.

8

9        It is stipulated and agreed between counsel for the

10  parties that the proof of the authority of the Commissioner

11  before whom this deposition is taken is waived.

12

13         It is further stipulated and agreed that any

14  defects in the notice are waived.

15

16       It is further stipulated that the reading and signing

17  of the deposition transcript by the witness is not waived.

18

19

20

21

22

23

24

25
```

Page 5

1      (Deposition commences at 10:00 a.m.)

2

3      GARETT ALAN NEFF, having first been duly sworn, was

4   examined and testified as follows:

5

6   DIRECT EXAMINATION BY MR. O'KEEFE:

7

8      Q   Kindly state your name for the record.

9      A   Yep. Garret Alan Neff.

10     Q   How do you spell your last name?

11     A   N-E-F-F.

12     Q   Mr. Neff, my name is John O'Keefe. I represent

13  Huntington Technician Financing in a civil action that has

14  been brought against you and Misters John and David Schmid in

15  the United States District Court in the District of

16  Connecticut. Are you aware of that lawsuit?

17     A   Yes, I am.

18     Q   Okay. Have you ever been deposed before?

19     A   I have not.

20     Q   Okay. I'm sure that Mr. Henzy has probably explained

21  to you the basic rules of a deposition. Just so that the

22  record is clear, as you can see there is a court reporter who

23  is transcribing what we say here today.

24      A deposition is not a conversation. It's in the

25  form of a question and answer. Those questions and answers

Page 6

1   may have objections by counsel interposed, and sometimes an

2   exchange among counsel. But I will be asking questions, and

3   it's your job to answer questions, the questions that I ask.

4       If I ask a question that is uncertain to you or

5   unclear or any portion of it is uncertain or unclear, I want

6   you to let me know that so that I can clarify that in order

7   for you to answer a question that you understand and intend

8   to answer.

9       Since the court reporter is taking down the words we

10  say, we need to use words. You can't use head shakes or

11  colloquial expressions like un-huh, which she will probably

12  get but we prefer not to have to transcribe.

13     A   Understood.

14     Q   Try to use words. Please wait until I finish with

15  my question before you answer, and I will try to wait until

16  you've finished your answer before I ask the next question.

17  If at any time you want to take a break to either stretch

18  your legs, go to the restroom, or talk to your counsel, I'm

19  happy to accommodate any such request. If there's a question

20  on the table when you ask for the break, I would prefer that

21  you answer that question, unless your lawyer instructs you

22  otherwise; and then we will deal with that on the record.

23     A   Understood.

24     Q   Are those rules acceptable to you?

25     A   They are.

Page 7

1      Q   Okay. Are you aware of anything which would impede

2   your ability to listen, to understand, and to respond to

3   questions which I may ask today? Such as medical condition?

4   Medications? Anything like that?

5      A   Nope.

6      Q   I'm going to show you a document, which I

7   will ask the court reporter to mark Plaintiff's Neff 31.

8   Then we will -- you don't have it.

9      MR. HENZY: Okay.

10     MR. O'KEEFE: Off the record.

11     (Off-the-record discussion is held)

12     (Plaintiff's Exhibit 31 is marked for identification)

13  BY MR. O'KEEFE:

14     Q   Tell me after you had an opportunity to look at that

15  document.

16     A   I have.

17     Q   Do you recognize that document?

18     A   I do.

19     Q   What do you understand that document to be?

20     A   It's a document to initiate a deposition.

21     Q   Okay. Specifically this is a subpoena to

22  Garage-Media New York requesting that it identify a

23  representative for the entity to answer questions for the

24  entity on the topics which are identified in the attached

25  notice to the subpoena. Do you agree with that?

Page 8

1      A   I do.

2      Q   And are you the designee to testify on behalf of

3   Garage-Media New York on the topics which are identified in

4   the notice portion of the exhibit?

5      A   I am.

6      Q   And do you understand that you are also here to

7   testify in your individual capacity as a witness called by

8   Huntington?

9      A   I do.

10     Q   Okay. What is your address?

11     A   My home address?

12     Q   Yes, sir.

13     A   22 Mountain Crest Drive, Cheshire, Connecticut,

14  06410.

15     Q   Could you tell me your educational history, starting

16  with when you graduated from high school?

17     A   Graduated from high school in 1983 from North Haven

18  High School here in Connecticut. I attended three years of

19  schooling at Northeastern University, majoring in business

20  management. I left prior to completing.

21     Q   Did you ever obtain a college degree?

22     A   I did not.

23     Q   So would you have left there in approximately

24  1986?

25     A   Approximately 1986.

Page 9

1  Q   Did you begin to work in 1986?
2  A   I did.
3  Q   Can you tell me where you worked in 1986?
4  A   A family business called ITS, the name of the
5  company.  It was based in Wallingford, Connecticut; and it
6  was a parking technology company.
7  Q   What does that mean?
8  A   It sells parking equipment to parking garages,
9  revenue control systems.
10 Q   Are those the machines that you put tickets in and
11 pay?
12 A   Correct, exactly.
13 Q   What was the scope of that business?  Was it within
14 the locale?  Was it within the state?  Was it broader?
15 A   It was initially in Connecticut alone, and then
16 Boston, and eventually expanded to New Jersey, Pittsburgh,
17 and Washington DC.
18 Q   Is that company still in business?
19 A   It is.
20 Q   And are you still involved in that business?
21 A   I am not.  We sold the company.
22 Q   For how long were you involved in the business?
23 A   From 1987 until 1995.
24 Q   Is that when the business was sold?
25 A   No, that's when I left.

Page 10

1  Q   And where did you go from there?
2  A   I went to a software company called McGann,
3  M-C-G-A-N-N, Software out of Minneapolis, Minnesota.
4  Q   Is that where you worked?
5  A   I did.
6  Q   What was your position there?
7  A   Vice President of Sales.
8  Q   What did you sell?
9  A   Software for parking revenue control systems.
10 Q   Was that patented technology?
11 A   It was not.
12 Q   Was it the same parking control system software as
13 was used in ITS?
14 A   Correct.
15 Q   Did you sell it?  License it?
16 A   We sold it.  We would sell a perpetual software
17 license.
18 Q   Did you have an ownership interest in ITS?
19 A   I did not.
20 Q   Okay.  How long were you with McGann Software?
21 A   From 1995 until 2011.
22 Q   And where did you go from there?
23 A   Involved with a start-up joint venture called Park
24 Now, P-A-R-K Now, which is a joint venture with BMW, what
25 they call I-ventures.  The Investment group of BMW, the car

Page 11

1  company.
2  Q   Where was that located?
3  A   New York City.
4  Q   And what was your position there?
5  A   CEO.
6  Q   Did you have an ownership interest in Park Now?
7  A   I did.  Not in Park Now itself, but in a group that
8  invested into it.  So the partnership was with a company
9  called Urban Mobility, which was our company.
10 Q   And Urban Mobility was an investor in the joint
11 venture?
12 A   That's correct.
13 Q   And were you a minority owner in that joint
14 venture?
15 A   Yes.
16 Q   Strike that -- minority owner in Urban Mobility?
17 A   I was a minority owner.
18 Q   How long were you with that company?
19 A   We sold that in 2014.
20 Q   What was the job description of the CEO of Park
21 Now?
22 A   It was creating -- well, creating a platform for
23 reselling parking spaces through apps, and initiating our
24 first rollout in the City of San Francisco.
25 Q   And about how many such projects followed?

Page 12

1  A   We had eighty or so parking garages using the system
2  when we sold it to a competitor.
3  Q   So just to understand, what was the nature of what
4  you sold?
5  A   We sold them our client base, our technology, and
6  the platform.  All the ideas around it.
7  Q   And what was the purpose for those things?  Managing
8  the parking lot revenue?
9  A   No.  It was to bring customers through an app to
10 those parking garages.  It allowed the parking client patron
11 to secure and buy parking at better-than-market rates through
12 an app.
13 Q   And would it be one-off, I'm going to visit
14 somewhere that I can use it for that purpose; or was it long-
15 term?
16 A   It was one-off, single visits.
17 Q   So, essentially, you could reserve a parking spot
18 through the app?
19 A   You can buy a parking space in advance and use the
20 app to access it.  You had basically a secured spot at a
21 better than normal rate waiting for you when you arrived.
22 Q   And who bought that?
23 A   Company called Park Mobile.
24 Q   And did you have any ownership interest in Park
25 Mobile?

Page 13

1   A  No, I do not.
2   Q  And where did you go from there?
3   A  I became the CEO of Park Assist, P-A-R-K, Assist,
4   A-S-S-I-S-T.  Also based in New York City.
5   Q  And what was the nature of that business?
6   A  We sell -- we sell camera technology in parking
7   garages to help consumers find the best available parking
8   spaces.
9   Q  Is that also on an app?
10  A  There's apps associated with it, but it's
11  predominately a hardware system that's installed inside
12  parking garages.  Red and green lights to help the customer
13  find a parking space so it guides them through the garage to
14  the best spaces, to the available spaces.
15  Q  So it's a green-red-light system?
16  A  That's right.
17  Q  First to show there is availability, --
18  A  For each space --
19  Q  -- and where in the garage the availability is?
20  A  That's correct.
21  Q  Did you have an ownership interest in that
22  company?
23  A  I do not.
24  Q  Did you?
25  A  I did not.

Page 14

1   Q  For how long were you there?
2   A  I'm there currently.  So September 2014 through
3   today.
4   Q  And are you still CEO?
5   A  I am.
6   Q  Okay.  Somewhere along the way an entity by the name
7   of Garage-Media New York came into existence.  Can you tell
8   me what you understand about how it came into existence, and
9   your role in that?
10  A  Yep.  The opportunity was brought to us by a company
11  called A2aMedia.  They introduced a concept of putting a
12  display on the Port Authority bus terminal in New York City.
13  They had sought an arrangement to help facilitate that.
14      They introduced it to my partners, John and Dave,
15  through their company called Pro Park.  At that point when
16  they liked the concept, they had approached me to take on the
17  venture.
18  Q  So your first knowledge of the prospect or
19  possibility of that business opportunity came from one or
20  both of the Schmid brothers?
21  A  Correct.
22  Q  Do you recall which?
23  A  Likely John, but the conversations had been with
24  both.
25  Q  And what relationship, if any, had you had with

Page 15

1   them?
2   A  They were a client of mine in my past business at
3   Amano McGann, A-M-A-N-O, McGann, which is McGann Software
4   after it was sold prior to my leaving.  McGann Software
5   became -- was sold in 2007 and became what is now known as
6   Amano, A-M-A-N-O, McGann.
7   Q  When it changed -- "it" being McGann Software by the
8   sale to Amano McGann.
9   A  Yep.
10  Q  Says the Irishman.  Did your position remain the
11  same, VP of sales?
12  A  I became Senior Vice President of Sales.
13  Q  How, if at all, did that change your job
14  responsibilities?
15  A  None.
16  Q  Okay.  And it existed as Amano McGann when you left
17  to Park Now in 2011?
18  A  Correct.
19  Q  Okay.  So you had had some dealings with one or both
20  of the Schmid brothers when you worked with Amano McGann,
21  which would have been between '07 and 2011?
22  A  Both.  I dealt with the John and Dave Schmid from
23  2000 -- from 1995 through 2011.
24  Q  And how had you interacted with them during that
25  time frame?

Page 16

1   A  They were a client.
2   Q  Always a client?
3   A  Always a client.
4   Q  And a client in what respect?
5   A  Their business, Pro Park, would buy -- purchase our
6   products for use in their parking facilities.
7   Q  So whichever among the technology programs that you
8   talked about that you were involved with during the time
9   period from '95 to '11, you marketed those to Pro Park and
10  specifically to the Schmids?
11  A  That's correct.
12  Q  Okay.  So it's your understanding that the Schmids
13  learned about the prospect of the signage on the Port
14  Authority bus terminal from A2aMedia?
15  A  That's correct.
16  Q  Can you tell me who was involved at A2aMedia?
17  A  Yep.  The interactions were with their president,
18  Andy or Andrew Melton, M-E-L-T-O-N, and Brian Schuvart.
19  Q  How do you spell that last name?
20  A  I'm going to guess, S-C-H-U-V-A-R-T.
21  Q  Schuvart?
22  A  Yep.
23  Q  Were they the only two people involved with
24  A2aMedia?
25  A  No.  There was additional -- there were additional

Page 17

1 people, but that's who I interacted with.
2    Q   Do you know how many people at any one time or from
3 time to time worked at A2aMedia?
4    A   My best guess would be six.
5    Q   Including Andrew and Brian?
6    A   That's correct.
7    Q   And where were they based out of?
8    A   In Boston.
9    Q   And do you know how those folks knew the Schmids?
10   A   I don't.
11   Q   So you don't know how that introduction was made?
12   A   I don't know.
13   Q   Is it your recollection, the introduction was made
14 specifically with reference to the opportunity to put signage
15 on the Port Authority bus terminal in New York?
16   A   Not initially. It was to put signage on parking
17 garages under their management.
18   Q   And do you know whether there ever was an
19 application where signage was put on a Pro Park parking
20 garage?
21   A   It was not.
22   Q   Do you know why?
23   A   I would assume an opportunity didn't present
24 itself.
25   Q   Okay. Do you know how it came to pass that the Port

Page 18

1 Authority bus terminal became a prospect for that signage?
2    A   I do.
3    Q   How is that?
4    A   Prior to 2007 there was a development project with a
5 company called Fernando.
6       MR. HENZY: Fernando, it's a big real estate company
7 in New York.
8       THE WITNESS: They were intending to build an office
9 tower on top of the Port Authority, and they presented a
10 number of design concepts that included media on the outside
11 of the building and mesh technology specifically designed to
12 allow ventilation to go through the terminal. They had been
13 working with A2a on that project.
14      When the project was canceled as a result of the
15 2007 recession, the Port Authority desired to continue on
16 with that concept and had been in touch with A2a looking for
17 a facilitator of the project.
18 BY MR. O'KEEFE:
19   Q   So A2aMedia was asked by the Port Authority, based
20 upon your understanding, to find a party that may be willing
21 to pursue --
22   A   Correct.
23   Q   -- the mesh sign concept on the parking garage?
24   A   Correct.
25   Q   And do you know who all A2aMedia talked to about

Page 19

1 that?
2    A   John or David.
3    Q   Do you know if they talked to anyone other than the
4 Schmids?
5    A   I don't know.
6    Q   So how did that evolve after the Schmids got in
7 touch with you? How did that concept or project evolve?
8    A   We had meetings. Meetings with the Port Authority.
9 We reviewed the opportunity, and we eventually engaged an
10 investment banker to help find funding for it.
11   Q   And who was that?
12   A   A company called Johnson and Fretty, F-R-E-T-T-Y.
13   Q   We learned that one a couple of days ago.
14   A   Okay.
15   Q   Thank you.
16   A   My contact was Steve Fretty.
17   Q   So you are the one that brought Johnson and Fretty
18 to the table for the purpose of looking for investment monies
19 for the project?
20   A   That's correct.
21   Q   And can you tell me whether or not investment monies
22 were found?
23   A   They were through Macquarie Equipment Finance.
24   Q   So Macquarie participated as a lessor in the
25 project; is that correct?

Page 20

1       MR. HENZY: Object to form. You can answer the
2 question.
3       THE WITNESS: They provided the funding for it.
4 BY MR. O'KEEFE:
5    Q   So I'm looking to find out if anyone put capital
6 dollars into the project versus a loan or a lease?
7    A   Yes, individually myself. John and Dave made
8 capital contributions.
9    Q   Do you remember how much they were collectively, the
10 upfront capital contributions?
11   A   Well, it was not upfront. Some of the funds were
12 upfront, and many of them were throughout the project.
13   Q   Okay. How about upfront?
14   A   Upfront, I would -- my estimate would be in the
15 $300,000 range.
16   Q   Did anyone else put capital dollars into the project
17 at the inception of the project?
18   A   No.
19   Q   So it was substantially funded by the dollars which
20 came through the transaction with Macquarie?
21   A   There was not -- to clarify that: There was not
22 equity brought in; but we went out and raised money through
23 friends and family loans. So there were loans to us to help
24 fund the deposit and some of the requirements of the project,
25 which totaled approximately two million dollars outside of

Page 21

1  our own equity.
2      Q   So you have the funding in whatever form it came
3  from Macquarie, you have the capital investment that you and
4  the Schmid brothers made, which was 300,000 approximately,
5  and loans from family, friends, and associates of roughly two
6  million dollars; is that correct?
7      A   Correct, yep.
8      Q   Let's go back for a minute.  You are now in the
9  process of considering the opportunity.  What did you know,
10 if anything, about the signage?
11     A   Well, the technology -- the technology itself?
12     Q   Yes, sir.
13     A   It appeared to meet the requirements, and then later
14 was proven to meet the requirements of the Port Authority's
15 ventilation requirements.
16     Q   Did the Port Authority require you, in the pursuit
17 of that business opportunity, to use the MediaMesh sign?
18     A   They required us to use a technology that met the
19 criteria that MediaMesh met.  Not specifically that sign,
20 that technology.  Although, because of GKD's patents and the
21 limitation of technology, it was the only product that was
22 identified that would meet the requirement by the Port
23 Authority.
24     Q   The requirement by the Port Authority essentially
25 was that the signage had to breath.  There had to be a

Page 22

1  ventilation aspect to it which the mesh product provided?
2      A   And turned out to be the only product that would do
3  that, and that had been revalidated several times throughout
4  the life of this project.
5      Q   What do you mean by that?
6      A   The Port Authority had done several reviews at
7  different times to see if it was still the right technology.
8  Still the only technology that could be utilized on that
9  building.
10     Q   And their conclusion?
11     A   It was the only technology that's proper.
12     Q   And the only technology was a mesh technology, not
13 necessarily GKD; is that correct?
14     A   Yes.  But GKD's unique technology allowed it to
15 occur, which other technologies would not have, being what is
16 called a woven mesh which brings the LED into the display.
17 When other products are sticks on the outside of the building
18 to create -- gap to create ventilation, and this was the only
19 product that met that criteria.
20     Q   And was that true throughout the lifetime of the
21 permit with the Port Authority through December 31, 2018?
22     A   Yep.  It was revalidated in 2014 and revalidated
23 again in 2017, both separately by the Port Authority.
24     Q   And was the conclusion that GKD's product was the
25 only acceptable product?

Page 23

1      A   Correct.
2      Q   All right.  How did you learn of or get to GKD?
3      A   Through A2a.  They sold us the sign.
4      Q   And so it would be fair to say that your
5  introduction to A2a was not by Macquarie; is that correct?
6      A   That's correct.
7      Q   And it would also be fair to say that your
8  introduction to GKD was not through Macquarie?
9      A   That's correct.
10     Q   How did you get to Macquarie?
11     A   The investment banker.
12     Q   Mr. Fretty?
13     A   Yep.
14     Q   And do you recall how it is that he came to
15 recommend Macquarie?
16     A   Yes.  Macquarie was an organization that was already
17 comfortable with the technology as a result of funding a
18 previous project for A2a at the Miami Heat in Miami,
19 Florida.
20     Q   So A2a and GKD had done --
21     A   A different deal not tied to us, but had installed a
22 similar technology.  Exact same system but a similar
23 application for the Miami Heat in Florida.
24     Q   And that had been financed through some type of
25 arrangement with Macquarie?

Page 24

1      A   That's my understanding.
2      Q   And Mr. Fretty is the one that brought you to
3  Macquarie?
4      A   That's correct.
5      Q   Did he have something to do with the Miami Heat
6  project?
7      A   Not to my knowledge.
8      Q   And the Miami Heat project is the American --
9          MR. HENZY:  American Airlines Arena, yeah.
10         THE WITNESS:  That's correct.
11 BY MR. O'KEEFE:
12     Q   Thank you.  Do you know if they are still using that
13 system?
14     A   They are.
15     Q   And it's still working?
16     A   Not well; but yes, it's still working.
17     Q   So to whom were you introduced at Macquarie?
18     A   Patty Magrin.
19     Q   And where did you meet her?
20     A   My introduction was through Johnson and Fretty.  I
21 don't recall where the first meeting was.  Likely in
22 Hartford, Connecticut.
23     Q   And what was the process that you went through in
24 order to procure financing from Macquarie, from the
25 introduction to Patty Magrin to when it was approved?

Page 25

1   A   We filled out forms, explained the opportunity, had
2   done projects, vetted out all the terms associated with it,
3   and supplied all of that information to Macquarie. Who then
4   at some point provided a proposal, and then we moved forward
5   with that proposal.
6       Q   And when the proposal was presented, was it
7   presented to you by Patty Magrin?
8       A   Correct.
9       Q   Had you dealt with others in the process of
10  procuring the proposal at Macquarie?
11      A   No.
12      Q   So when you were providing information such as the
13  projections that you talked about, financial information,
14  that was going to Patty and from her to somebody that you
15  didn't know?
16      A   That's correct.
17      Q   And when the proposal came to you from Macquarie, it
18  came from Patty Magrin; and you don't know where it came from
19  before that?
20      A   That's correct.
21      Q   Okay. Before you communicated with Macquarie, did
22  you do any research on the signage that you ultimately
23  selected?
24      A   We reviewed the literature associated with it. I
25  did visit one site in Milan, Italy, that was a temporary

Page 26

1   installation of a smaller sign. Simply to check the box that
2   I had seen something working elsewhere.
3       Q   Did you visit the Miami Heat installation?
4       A   We did. However, I don't recall if it was active or
5   not at that time.
6       Q   And by, "active", you mean operating?
7       A   Illuminated. I actually think it was illuminated by
8   then. In fact, yes, it was because we had a tour. Myself
9   and John Schmid had a tour of the facilities of how it was
10  installed and everything related to that installation.
11      Q   Did you meet with representatives of GKD either in
12  the United States and/or in Germany?
13      A   Both.
14      Q   And what was the purpose for those meetings?
15      A   Simply to establish a relationship with this
16  critical vendor for us.
17      Q   And when you had these meetings, did a
18  representative of A2a attend with you? When I say,
19  "meetings", I'm talking about GKD meetings.
20      A   A2a did attend meetings with GKD in the U.S. and New
21  York or in Boston and/or I don't recall how many meetings we
22  had. There was several of them leading up to the final
23  agreement to move forward.
24      Q   And did they attend the meetings in Germany with
25  you?

Page 27

1   A   No.
2   Q   Did they attend the visit to Milan --
3   A   No. I simply saw that on vacation. So I was there,
4   and I stopped by.
5       Q   Did they attend the meetings in Miami?
6       A   They did not.
7       Q   Did you ultimately obtain a proposal from Macquarie
8   that was acceptable to Garage-Media?
9       A   We went through variations. We went through -- we
10  were -- actually, we accepted the proposal as it was. We
11  received a proposal from Patty, and then we acted on that
12  proposal.
13      Q   And in that process, were you represented by
14  counsel? "You" meaning Garage-Media New York.
15      A   At that stage, we were. Mark Garrity from Davidoff.
16  I don't remember the full name of the company, out of New
17  York City.
18      Q   And did Mark represent the company? The company and
19  the individuals?
20      A   He represented the company, and his primary role was
21  negotiating the terms with the Port Authority.
22      Q   But you would agree that he represented Garage-Media
23  New York in connection with the transaction to include the
24  financing?
25      A   That's correct.

Page 28

1   Q   Did he represent you and the Schmids individually as
2   well?
3       MR. HENZY:  Object to form.
4       THE WITNESS:  It was -- it was a collective
5   arrangement.
6   BY MR. O'KEEFE:
7       Q   Does that mean yes?
8       MR. HENZY:  Well, object to form.
9       THE WITNESS:  The assumption is that he was
10  representing all of us. We had no other counsel.
11  BY MR. O'KEEFE:
12      Q   Okay. You're aware that in connection with that
13  transaction you and the Schmid brothers were all asked to
14  guarantee the obligation of GM New York to Macquarie?
15      A   Yes, I am.
16      Q   And that's something that you agreed to do?
17      A   I did.
18      Q   As did the Schmid brothers?
19      A   They did.
20      Q   Okay. I'm going to show you a document which is
21  marked as Plaintiff's Schmid 1, and ask you if you'll take a
22  look at that and tell me when you are finished.
23      A   (Witness complies)  Yes, I'm familiar with this.
24      Q   Can you identify that document?
25      A   This is our first lease from October 26, 2010.

Page 29

1    Q   And when you say, "first lease," you mean the lease
2  that was originally executed with Macquarie?
3    A   That's correct.
4    Q   Okay.  And it may have been amended or modified
5  after that?
6    A   It was.
7    Q   Okay.  Do you see on the first page that there's a
8  reference to, 04, permitting and legal fees incurred by the
9  lessee with the seller, $70,000?
10       MR. HENZY:  Where are you?
11       MR. O'KEEFE:  On the first page.
12       THE WITNESS:  In the middle number four.
13       MR. HENZY:  Yep.
14  BY MR. O'KEEFE:
15    Q   Do you recall that your counsel was paid a portion
16  of the proceeds from the financing transaction with
17  Macquarie?
18    A   I don't recall, but I know we incurred cost and had
19  to reimburse certain costs associated with the transaction.
20    Q   And you would agree the total for the project being
21  financed of $6,600,000 set forth at the top of page one of
22  Exhibit 1, later increased.  Do you recall that?
23    A   No.
24    Q   Okay.
25    A   I don't recall that.  I also -- my understanding is

Page 30

1  that the 6.6 million includes our deposit that we put in
2  escrow of 1,050,000.
3    Q   Okay.
4    A   So that the amount they financed was 1,050,000 less
5  than this amount.
6    Q   If your understanding and recollection are
7  correct?
8    A   That's correct.
9    Q   If you turn to paragraph seventeen.
10    A   (Witness complies)
11    Q   You'd agree that the document provides that it would
12  be a default under subparagraph A for the lessees failure to
13  pay a rental payment or any amount under this lease when due
14  continuous for ten days after notice?
15       MR. HENZY:  I'm going to -- objection to form.
16       THE WITNESS:  That's right.
17       MR. O'KEEFE:  Maybe I did not read it exactly?
18       MR. HENZY:  No.  I think -- does he agree that that
19  is what it says?  Then I would have no objection.
20       MR. O'KEEFE:  All right.
21       MR. HENZY:  We are good.
22  BY MR. O'KEEFE:
23    Q   All right.  Did you understand, number one, that
24  this was a lease agreement?
25       MR. HENZY:  Object to form.

Page 31

1       THE WITNESS:  I understood it to be a financing
2  agreement.
3  BY MR. O'KEEFE:
4    Q   Do you see on the front of the page it says lease,
5  leasee/lessor?
6    A   Yes.
7    Q   Did you at any time challenge somebody at Macquarie
8  to say it was a financing transaction versus a lease?
9       MR. HENZY:  Object to form.
10       THE WITNESS:  I questioned several aspects
11  associated with it.  Specifically when there was a request
12  for additional compensation if we had success.  The original
13  proposal included verbiage that had a requirement of a second
14  agreement.  That if we had success in the venture, they would
15  receive additional funds beyond these payments.
16  BY MR. O'KEEFE:
17    Q   Okay.  And did that agreement come to fruition?
18    A   It did not.
19    Q   When you said earlier that you took the original
20  proposal from Macquarie, that was not true?
21    A   We accepted the agreement at that time as it was,
22  and then we had later conversation that we disagreed on that
23  piece of it or questioned it.  They ended up not bringing it
24  forth.  While we were prepared for it, we expressed -- I
25  expressed concern about it and questioned the motives

Page 32

1  associated with it.  They then never completed the agreement.
2  They never brought that next piece forward.
3    Q   Okay.  So the original proposal was not accepted as
4  proposed?
5    A   It was accepted.  They just didn't deliver the
6  second piece.
7    Q   When you had on-going dialog about that, with whom
8  did you speak?
9    A   Patty Magrin.
10    Q   No one else at Macquarie?
11    A   Not to my recollection.
12    Q   Okay.  When this document was presented to you, did
13  you understand that it was a lease?
14       MR. HENZY:  Object to form.
15       THE WITNESS:  I understand it's -- I understand it
16  was a financing agreement.  I understand the words say lease.
17  BY MR. O'KEEFE:
18    Q   And do you understand that Garage-Media was
19  identified as the lessee and Macquarie the lessor?
20    A   Yes.
21    Q   And do you understand that this document has within
22  its body a residual value for the equipment?
23       MR. HENZY:  Object to form.
24       THE WITNESS:  I understand that's in this agreement.
25  BY MR. O'KEEFE:

Page 33

1   Q   Do you understand -- strike that.

2     What was your understanding of the manner in which

3 the sales taxes on this transaction would be paid to New

4 York?

5   A   That the sales tax would be paid on a monthly basis,

6 and it was structured that way in order to not put additional

7 capital out upfront and then finance it. They said that --

8 they said that this process would allow it to be paid on a

9 monthly basis.

10   Q   And did you understand that if the tax -- if this

11 were a financing transaction, that you would be required to

12 pay all of the sales taxes on the amount funded upfront?

13   A   I did not understand that, but I'm not a financial

14 person.

15   Q   I just want to make sure that no one at Macquarie

16 ever had a conversation with you at the time that this

17 document was prepared and executed by Garage-Media that

18 explained if it were a financing transaction, you would be

19 required to pay the sales taxes upfront?

20   A   No conversations ever occurred at my level. I don't

21 think -- I can't say that for the investment banker.

22   Q   Turning back to the same page. I want you to look

23 at paragraph eighteen for a minute.

24   A   Yep.

25   Q   The event of the default, just continuing. Do you

Page 34

1 see Subparagraph D?

2   A   I do.

3   Q   "The lessor had the right to require the lessee to

4 pay the lessor's return, calculated by lessor as of the date

5 of the lessor's demand, and upon lessor's full receipt of the

6 lessor's return as a result of the lessor's demand under this

7 action, plus all other amounts outstanding under this lease,

8 this lease will terminate and lessee will transfer to lessee

9 any equipment still in lessee's possession." Do you see that

10 paragraph?

11   A   I do see that.

12   Q   Do you agree that's a provision contained in Exhibit

13 1?

14   A   I do.

15   Q   Further beneath "C" it says, "Lessee will also

16 reimburse lessor --

17     MR. HENZY: What page are you on, John?

18     MR. O'KEEFE: Right under "C" -- I'm sorry -- under

19 "E". I better put my glasses on.

20 BY MR. O'KEEFE:

21   Q   Under "E" it says, lessee will also reimburse lessor

22 for all expenses, including reasonable legal fees and

23 disbursements incurred by lessee in enforcing this lease."

24 Do you see that provision?

25   A   I do.

Page 35

1   Q   And do you agree that is found in paragraph eighteen

2 of Exhibit 1?

3   A   I do.

4   Q   Does your signature appear or a copy of your

5 signature appear in this document?

6   A   Yes, it does.

7   Q   Let me direct your attention the paragraph

8 twenty-four for a minute, quiet enjoyment. "So long as no

9 event of default is continuing, lessor will not interfere

10 with lessee's quiet enjoyment of the equipment. If a failure

11 by lessor to materially observe the foregoing warrantee of

12 quiet enjoyment continues for ten days after notice. Lessee

13 may, in its absolute discretion, exercise any one or more of

14 the following remedies..." which are then listed.

15     Do you agree that that language appears in paragraph

16 twenty-four of Exhibit 1?

17   A   I do.

18   Q   Did you, on behalf of Garage-Media or anyone else,

19 ever provide written notice to Macquarie of your belief that

20 it was in any way interfering with your quiet enjoyment in

21 writing?

22   A   I did not.

23   Q   And do you know of anyone else who, on behalf of

24 Garage-Media, may have done so or did?

25   A   I don't believe anyone has.

Page 36

1   Q   Okay. Did you at some point begin to deal with

2 somebody other than -- strike that. I will get back to that.

3     Did you at any point -- at some point after --

4 strike that.

5     Do you recall the circumstances under which you

6 executed Exhibit 1?

7   A   This entire document is Exhibit 1?

8   Q   Yes, sir.

9   A   Do I recall signing it, is that the question?

10   Q   Did you sign it -- I want to know where you were,

11 who was with you, and was there any representative from

12 Macquarie present for the execution?

13   A   I don't believe anyone was present.

14   Q   Do you know whether Mr. Feldstein's signature on the

15 document was on it when you signed or at some later time?

16   A   I don't recall the motion.

17   Q   Do you recall having gotten this in the mail and

18 signed it and sent it back? Do you remember the -- that's

19 what I am asking: How did you sign it? Who, if anyone, was

20 with you when you signed it?

21   A   I believe it was by fax. I likely signed it in my

22 office and submitted it back.

23   Q   Okay.

24   A   I don't recall.

25   Q   But at the time that you signed it, there was no one

Page 37

1  present from Macquarie Finance that you recall?
2    A  I don't recall anybody present.
3    Q  Okay. I'm going to show you a document which has
4  been marked as Plaintiff's Schmid 2. Ask you if you will
5  take a look at it, and tell me when you are done.
6    A  (Witness complies) Yes, I'm familiar with this.
7    Q  Can you identify that document for the record?
8    A  Yep. It's the guarantee from October 26, 2010.
9    Q  And when you say, "guarantee," can you identify who
10 the guarantors were?
11   A  Myself, John Schmid, and David Schmid.
12   Q  And does your signature appear on page three of that
13 document?
14   A  It does.
15   Q  And did you understand that to be a document by
16 which you were guaranteeing repayment of indebtedness due to
17 Macquarie under the lease by Garage-Media New York?
18   A  For --
19       MR. HENZY: Object to form.
20       THE WITNESS: Yes. With the caveat that there was
21 opportunity for it to go away.
22 BY MR. O'KEEFE:
23   Q  What -- go ahead.
24   A  Based on sales within the project, revenue within
25 the project.

Page 38

1    Q  Okay. Tell me a little bit more about that.
2    A  In the other financing document, it establishes a
3  threshold, I believe, 5.5 million in sales for a consecutive
4  period of time, so many months in a row, that would allow the
5  guarantees to be removed.
6    Q  And the financing document which you referred is the
7  lease -- the lease dated October 26, 2010, marked Exhibit
8  1?
9    A  That's correct.
10   Q  So it's your understanding that there's language
11 within that which would allow the guarantee, in whole or in
12 part, to erode based upon some sales performance?
13   A  Stabilization, that's correct.
14   Q  And were the numbers that would permit that ever
15 achieved?
16   A  They were not.
17   Q  Okay. Directing your attention to paragraph two of
18 the guarantee. The second sentence, "Guarantor
19 unconditionally guarantees to Macquarie the full and prompt
20 payment, performance, and performance when due of all
21 obligations of obligor rising under the agreements,
22 collectively the guaranteed obligations." Do you agree it
23 says that?
24   A  I do.
25   Q  It goes on the say, "The guarantee is absolute,

Page 39

1  continuing, unlimited and independent, and shall not be
2  affected, diminished, or released for any reason whatsoever,
3  including the following..." and then it goes on with a list.
4  You agree that it says that?
5    A  I do.
6    Q  And you were aware of that when you executed this
7  document?
8    A  I was.
9    Q  At some point -- strike that.
10       Did you execute this at or about the same time that
11 you executed Exhibit 1?
12   A  It was part of our closing package, yes.
13   Q  And so your recollection would be the same, you
14 think you may have executed it and faxed it back?
15   A  I do.
16   Q  You don't recall there having been anyone from
17 Macquarie present at the time that you executed Exhibit 2?
18   A  I don't. I don't recall.
19   Q  At some point after dealing with Patty Magrin and
20 executing these documents, did you come to be involved with a
21 different person or people at Macquarie?
22   A  I did.
23   Q  Do you recall about when that was?
24   A  Shortly after the project was started. It was a
25 financial analyst whose first name is Adele, an Australian.

Page 40

1  He was working in their Michigan office and asking for
2  information.
3    Q  And did he identify himself as a representative of
4  Macquarie?
5    A  He did.
6    Q  And was that before or after Exhibits 1 and 2 were
7  executed?
8    A  It was after.
9    Q  So you don't recall having any dealings with him
10 gathering financial information before Exhibits 1 and 2 were
11 executed?
12   A  Not directly with me.
13   Q  Do you know if they dealt with anyone else?
14   A  They had many conversations with our financial
15 bankers from Johnson and Fretty.
16   Q  And that would have been Steve Fretty or somebody
17 else?
18   A  Well, Steve Fretty and his team. He had -- the
19 organization has more than him and his folks. His team had
20 done work on this project.
21   Q  When you say, "done work," do you mean done work on
22 negotiations of the documents?
23   A  Preparing pro formas, estimates, helping evaluate
24 other funding offers, understanding the scope associated with
25 it.

Page 41

1    Q   So on behalf of Garage-Media New York,
2  representatives of Mr. Fretty's organization were dealing
3  with folks at Macquarie, other than Patty Magrin, to provide
4  financial information, projections before the Exhibits 1 and
5  2 were prepared and executed?
6    A   That's my understanding.
7    Q   And they were dealing with them at your direction;
8  is that correct?
9    A   That's correct.
10   Q   And they were doing so to provide the necessary
11 fiscal information with which Macquarie can consider whether
12 or not to propose a lease transaction or other financing
13 transaction to Garage-Media?
14   A   That's correct.
15   Q   And your recollection is they dealt with Adele.  Do
16 you know if they dealt with anyone else?
17   A   I don't know.
18   Q   And do you recall who on Mr. Fretty's team may have
19 been in contact with the folks at Macquarie during that
20 process?
21   A   The only other person that I think was active is a
22 gentleman whose first name is Taylor.  I could look up his
23 last name.
24   Q   No, that's okay.
25   A   I don't know his last name.

Page 42

1    Q   Was there anyone else on behalf of Garage-Media who
2  was interacting with Adele or anyone else at Macquarie during
3  the process in which you were soliciting a proposal for lease
4  or other financing?
5    A   No.
6    Q   You had a CFO at the time, did you not, at
7  Garage-Media?
8    A   No.  We have -- we had a person from Pro Park, who
9  was the CFO of Pro Park that provided support for us on
10 occasion.  He handled our accounting after the fact, after
11 the project was initiated.
12   Q   Okay.  But not during the process in which you were
13 soliciting financing or the lease transaction?
14   A   That's correct.
15   Q   Okay.  Who, other than Adele, did you interact with
16 at Macquarie sometime after the Exhibits 1 and 2 were
17 executed?
18   A   John Zimmeth.
19   Q   And do you recall your first experience or
20 introduction or work with John Zimmeth?
21   A   I believe it was -- there was at one point, myself
22 and Dave Schmid went to their offices; and I don't -- I don't
23 recall if it was before or after.  I believe we met him at
24 least in passing, just a hello.
25   Q   Did you ever make a presentation to Macquarie?

Page 43

1    A   I don't recall.  I don't recall making a
2  presentation directly to them.
3    Q   I'm going to show you a document marked Exhibit 4,
4  Plaintiff Schmid 4.  Ask you to take a look at that, and tell
5  me when you are finished.
6    A   (Witness complies)
7    Q   Have you had a chance to look at Exhibit 4?
8    A   I have.
9    Q   Do you recognize that document?
10   A   No, I do not.
11   Q   Do you have any idea who prepared that document?
12   A   Probably Johnson and Fretty.
13   Q   Do you recall ever having presented that document or
14 that information that is reflected in it to Macquarie before
15 you obtained the financing or lease proposal from them?
16   A   I don't recall.  There was many, many conversations,
17 many dialog nine years ago on this; and Johnson and Fretty
18 represented our interest and was soliciting the various
19 bankers to come into the project -- various funding
20 opportunities.
21   Q   But as you sit here today, you don't recall ever
22 either having participated in the preparation of what is
23 marked as Exhibit 4 and in its presentation, if it was, to
24 Macquarie?
25   A   I don't recall.  I just don't remember.  I can't

Page 44

1  think of a time that we did.
2    Q   Thumbing through the pages a bit, on the second page
3  of the document you'll see that there's Garage-Media alliance
4  with Pro Park America and A2aMedia.  Would you agree that
5  that was a correct statement at that time?
6        MR. HENZY:  Object to form.
7        THE WITNESS:  Correct, I do agree.
8  BY MR. O'KEEFE:
9    Q   And on the next page, the third page.  Titled
10 Garage-Media Partners, one is identified as GKD USA, a German
11 based manufacturer that patented MediaMesh technology.  Would
12 you agree with the representation in this presentation that
13 they were a partner of Garage-Media at the time it was
14 presented?
15       MR. HENZY:  Object to form.
16       THE WITNESS:  They were a vendor.
17 BY MR. O'KEEFE:
18   Q   Okay.
19   A   I don't see where it says partner.
20   Q   At the top of the page.
21   A   It's a loose terms.  They were a vendor.  They were
22 a supplier of the technology, an important part of the
23 overall project.
24   Q   Would the same be true of Pro Park America, that
25 they were not a Garage-Media partner as suggested or stated

5/8/2019                  Alan Neff/Garage Media            Page: 15 (45 - 48)

Page 45

1  in the document?
2      MR. HENZY: Objection to form.
3      THE WITNESS: I think the term "partners" is a loose
4  term. It represents people that we're aligned with; not
5  necessarily ownership interest. So I think I need to clarify
6  that, Pro Park provided services to Garage-Media that were
7  valuable to us. Again, similar to that of a vendor,
8  including accounting services. Mostly just accounting
9  services.
10 BY MR. O'KEEFE:
11     Q   Okay. Turning to the page on the bottom right that
12 bears the numbers 1153. Under the page title of Garage-Media
13 partners, A2aMedia is listed again. Would you agree with the
14 statement or the representation in this presentation made to
15 Macquarie, that A2aMedia was a Garage-Media partner?
16     MR. HENZY: Object to form.
17     THE WITNESS: Again, they were a vendor.
18 BY MR. O'KEEFE:
19     Q   Okay. Did you know -- strike that.
20     Do you see the second to last bullet, "A2a has
21 secured the exclusive license to distribute the MediaMesh
22 product of GKD." Did you understand that to be a fact at the
23 time that this presentation was prepared and/or made to
24 Macquarie?
25     MR. HENZY: Object to form.

Page 46

1      THE WITNESS: I do; that's my understanding.
2  BY MR. O'KEEFE:
3      Q   Turning to the page which at the bottom has the
4  number 1156. Fourth bullet from the bottom, "Advertising
5  display space will be pre-sold to tear-one advertisers prior
6  to asset deployment." Do you see that statement?
7      A   I do.
8      Q   Do you recall whether, in fact, A2aMedia pre-sold
9  any space prior to the sign going live?
10     A   It did.
11     Q   Do you recall on a percentage basis, what percentage
12 was pre-sold?
13     A   It was a respectable amount, and they were to
14 specific clients. Most importantly to Fox TV and Fidelity
15 Investments.
16     Q   Second to last bullet, "With the financing secured,
17 anticipating live date of November 15, 2010." Do you see
18 that?
19     A   I do.
20     Q   Do you recall when the sign went live?
21     A   Yep. In June 2011.
22     Q   Which was later than expected; is that correct?
23     A   That's correct. And as a result of funding --
24 financing not being secured until 26th of October. So the
25 timing associated with the project was pushed out in the

Page 47

1  similar amount of time it took us to have a financial
2  organization fund the sign.
3      Q   Do you know if it was pushed out for any other
4  reason?
5      A   That was the primary reason.
6      Q   Do you know if it was pushed out --
7      A   There were other delays associated with permitting
8  but not unreasonable delays.
9      Q   Okay. Turning to the page 1157, titled MediaMesh
10 Technology. The second bullet, "Garage-Media's partner, A2a,
11 holds the exclusive distrubution rights to MediaMesh." Do
12 you agree with the conclusion or the statement that A2a had
13 the distribution rights?
14     A   That's how both A2a and GKD presented it to us.
15     Q   And the use of the expression, Garage-Media partner,
16 you've already testify --
17     A   It's a vendor.
18     Q   -- they were a vender.
19     A   It's a loose term. They're aligned in the
20 project.
21     Q   In the third to the last bullet the last point
22 italicized and bolded, "Can be utilized at locations that are
23 unsuitable for traditional digital displays." That's what
24 you are were talking about in that situation such as a garage
25 which requires ventilation; is that correct?

Page 48

1      A   That's correct.
2      Q   The last bullet says, "Limited, albeit successful
3  deployment and utilization history." Do you know what they
4  are referring to there?
5      A   There hasn't been very many installations; and the
6  ones that have been installed, were working appropriately.
7      Q   And that would be, to your knowledge at that time,
8  the situation in Milan that you described and the Miami Heat
9  or American Airline Facility?
10     A   That's correct.
11     Q   Were you aware of any other facility anywhere in the
12 world where that technology had been deployed prior to your
13 involvement?
14     A   Yes.
15     Q   Many?
16     A   No. A few; a handful.
17     Q   And were they, other than the Miami Heat
18 application, all out of the country?
19     A   No. There was one in California for the university;
20 but it was not a -- it was not an advertising. It was a
21 artistic display.
22     Q   And do you recall what university that was?
23     A   One of the ones in California.
24     MR. HENZY: I think it was Davis.
25 BY MR. O'KEEFE:

5/8/2019                  Alan Neff/Garage Media              Page: 16 (49 - 52)

Page 49

1   Q  I'm going to show you a document which has been
2   marked Plaintiff's Schmid 5.  If you will take a look at
3   that, and tell me when you are finished.
4   A  I'm aware of this.
5   Q  Can you identify that document for the record?
6   A  It's our sales brochure for Garage-Media.
7   Q  When you say, "our sales brochure," who prepared
8   that document, if you recall?
9   A  A local marketing consultant.
10  Q  Do you see on the front of that document the words
11  in the middle of the page, Partnered with A2a-Media, GKD
12  Metal Fabrics?
13  A  I do.
14  Q  Do you agree with that presentation?
15     MR. HENZY:  Objection to form.
16     THE WITNESS:  Again, it's a loose term.  Partnered
17  means we are aligned.  It does not mean there is equity or
18  have any kind of ownership positions.
19  BY MR. O'KEEFE:
20  Q  Would it be better to call them a strategic partner?
21     MR. HENZY:  Object to form.
22     THE WITNESS:  Potentially.
23  BY MR. O'KEEFE:
24  Q  Do you see on the second page where you call them
25  strategic partner?

Page 50

1   A  I do.
2   Q  What was the purpose for the preparation of this
3   document?
4   A  To seek other opportunities.
5   Q  What do you mean by that?
6   A  To find other properties that hopefully we can
7   replicate the Port Authority bus terminal project.
8   Q  And do you know when in relation to the Port
9   Authority project this document was prepared?
10  A  I don't.  Although, I would -- my best guess is in
11  the 2011 range.
12  Q  Do you know if it was prepared after the sign went
13  live?
14  A  I don't recall.
15  Q  Do you see on the second page, cover photo is
16  identified New York Port Authority bus terminal.  Then on the
17  first page there appears to be a picture with an operational
18  sign.  Do you know if that was a rendering?
19  A  That was a rendering.  We never sold an ad to
20  Rolex.
21  Q  I'm going to show you a document which has been
22  marked as Plaintiff Schmid 3.  Ask you if you will take a
23  look at that, and tell me when you are finished.
24  A  (Witness complies) I'm familiar with this.
25  Q  This is, would you agree, a series of four

Page 51

1   documents?
2   A  Several, yes.
3   Q  Would you identify these as the amendments to the
4   lease agreement marked Plaintiff's Schmid 1?
5   A  Yes.
6   Q  Okay.  Let's look first at amendment number one,
7   which is the first three pages of Exhibit 3.  Do you
8   recall -- well, do you recall the purpose for the first
9   amendment?
10  A  To address the ramp-up period associated with the
11  display coming to life.
12  Q  So would you agree that there was a change in, among
13  other things, the payment terms and the payment schedule to
14  accommodate a greater amount of time for the sign to go
15  live?
16  A  That was one purpose of it.
17  Q  Do you recall what the other purposes, if any,
18  were?
19  A  To capture the specific costs associated with the
20  costs of the investment banker, provide working capital, and
21  to basically clarify the associated cost with change orders
22  for the project as it -- after it was completed.
23  Q  What was the last point?
24  A  After it was completed.  In other words, the project
25  had additional costs throughout the process.  The intention

Page 52

1   of the amendment was to make sure we captured all of those
2   costs and paid all of our bills associated with it through
3   this mechanism.
4   Q  Okay.  Let me direct your attention to amendment
5   number two, which is two pages behind that.  Two pages behind
6   that.  Do you recall the purpose for this amendment, which is
7   in July of 2011?  So it would be the fourth page of the
8   exhibit.
9   A  Okay.
10  Q  Does that appear to address the cost overruns for
11  the project?
12  A  As well as removing a portion of the approved
13  process and Item Number C.  We removed scope that was
14  originally planned and approved and decided not to proceed
15  with that.
16  Q  So all in the pricing where the original project
17  changed, there was something that went down, something that
18  went up.  The net basis went up; is that correct?  Do you see
19  the seven million dollar figure at the bottom of "A"?
20  A  Yes.
21  Q  Which is now the lessor's basis versus the 6.6
22  million dollar figure on amendment one and on the lease?
23  A  I do.
24  Q  Turning to amendment three, which is a few pages
25  behind that.  Would you agree that this is an amendment dated

Page 53

1  September 1, 2012, to the lease number one, dated October 26,
2  2010?
3      A   I do.
4      Q   Do you recall the basis for this amendment?
5      A   Providing some relief associated with a stretch of
6  time when sales were under-performing.
7      Q   And so this was an accommodation by Macquarie to
8  give payment relief because of under-performing sales; is
9  that correct?
10     A   That's correct.
11     Q   Is that something that you requested of and obtained
12  from Macquarie?
13     A   Something they offered as a result of our tardy
14  payments.
15     Q   So they were trying to help you spread payments
16  which you could not otherwise make because of the under-
17  performance of the sign?
18     A   That's correct.
19         MR. HENZY:  Object.
20  BY MR. O'KEEFE:
21     Q   And the last amendment dated as of March 31, 2013,
22  which in the middle of the page also says Amendment Number
23  four to lease number one.  Do you see that?
24     A   Yes.
25     Q   Okay. Do you recall the purpose for this?

Page 54

1      A   Similarly to align the payment schedule with the
2  payments; and I believe also extract $500,000 from our
3  deposit and reapply it towards payments.
4      Q   Would it be fair to say that what this did was to
5  reduce the security deposit from a million fifty down to five
6  hundred and to take the five-fifty to make up for some missed
7  payments and the sales taxes associated with them, among
8  other things?
9      A   I'm not clear on the numbers.  I'm not sure of the
10  five-fifty.  I see five-owe-five.
11     Q   Plus the sales tax.
12     A   Okay.
13     Q   You don't recall that?
14     A   I do recall.  I'm curious -- I'm just looking for
15  the language making sure I understand it.
16         MR. HENZY:  Are you pointing to a specific language,
17  John?
18  BY MR. O'KEEFE:
19     Q   Are you on the second page under Roman III?
20     A   Yeah.  I'm under section 1.1.
21     Q   Of the GM security agreement?
22     A   Increased --
23         MR. HENZY:  Can you ask a question?  We got lost.
24  BY MR. O'KEEFE:
25     Q   So directing your attention to Roman Numeral III on

Page 55

1  page two of the amendment that you are looking at:  Does that
2  refresh your recollection of what was, in part, being
3  accomplished by this amendment to the lease agreement?
4      A   Yes.
5      Q   Did it cause the security deposit to be reduced from
6  one million fifty to five hundred and the five-fifty to be
7  applied to the missed payments, plus the sales tax?
8      A   Yes.
9      Q   Is that something you requested of Macquarie?  "You"
10  being Garage-Media.
11     A   I don't recall requesting it, as much as they had
12  offered it to try to keep the loan conforming.
13     Q   Did you understand or view that to be an
14  accommodation to Garage-Media?
15     A   Yes, I do.
16     Q   And on the same document, there's also an amendment
17  to the end of term.  Do you see that section six, bottom of
18  first page?
19     A   I do see it.
20     Q   Would you agree that that continued to permit one of
21  three options at the end of the term, return, renewal with
22  term ownership, and purchase option?
23     A   I do see it.
24     Q   And as of this amendment, there was a purchase
25  option at the end of term for a million one seventy; is that

Page 56

1  correct?
2      A   I do see it.
3      Q   And at the very bottom under "C" it says, "Lease
4  will terminate -- I'm sorry.  Strike that.
5         "If one of the foregoing options is not exercised,
6  or if having elected a return or purchase option, lessee
7  fails to comply with the terms of the elected option, lessee
8  will automatically be deemed to have elected the renewal
9  option, provided in Subsection B above."  Does that language
10  appear at the bottom of the first page of the exhibit under
11  the amendment to section six?
12         MR. HENZY:  Is the question:  Is that what the words
13  say?
14         THE WITNESS:  I do see the words.  I do agree it
15  says that.
16  BY MR. O'KEEFE:
17     Q   Do you recall that being part of this document?
18     A   I don't.
19     Q   Okay.  In connection with the Port Authority bus
20  terminal project, did you execute some documents with the
21  Port Authority?
22     A   I did.
23     Q   Among those, did you execute a display agreement?
24     A   Yes.
25     Q   I'm going to show you a document marked Plaintiff's

Page 57

1  Schmid 6. I ask you to take a look at that, and tell me when
2  you are done.
3      A  (Witness complies)  Yes, I am familiar with it.
4      Q  Did you execute that document on behalf of
5  Garage-Media New York?
6      A  I did.
7      Q  Directing your attention to HTF 76, which is page
8  seventeen of that document, Exhibit C.  Do you see that that
9  identifies the un-amortized capital investment to be paid to
10  GM if required under this agreement.  They list the cost
11  basis of $9,795,000.  Do you see that?
12     A  I do.
13     Q  Do you know where that came from?
14     A  I created that number.
15     Q  And what do you mean, you created that number?
16     A  I put in -- I would negotiate in the contract,
17  agreed to ask for more than the sign would cost us to take
18  down in order to discourage them from taking the sign back
19  and us not being fairly compensated for our losses.
20     Q  And this was an exhibit used in conjunction with the
21  obligation by the Port Authority if they terminated the
22  permit early?
23     A  Premature, correct.
24     Q  So that's a made up number?
25     A  It had a basis, but it also included our potential

Page 58

1  profit.
2      Q  Okay.
3      A  Based on projections of October 2010.
4      Q  Contemporaneous in time to the execution of this
5  display?
6      A  Correct.
7      Q  On the first page of that document, there is a
8  whereas clause.  GM and --
9      MR. HENZY:  Okay.  Are you back to the first page of
10  the display agreement?
11     MR. O'KEEFE:  Of the exhibit, which is the display
12  agreement.
13  BY MR. O'KEEFE:
14     Q  "Whereas GM and CBS desire to enter into an
15  agreement, whereby GM would license the CBS rights and
16  install the MediaMesh digital display, the sign, and other
17  ancillary equipment associated therewith, collectively, the
18  equipment, at the facility in order to advertise digital
19  signage, GM work."
20     Is that an accurate description of what it was that
21  you sought to do under this display agreement under then CBS
22  Outdoor Group and the Port Authority?
23     A  That is correct.
24     Q  So this display agreement provided that you were
25  going to put the MediaMesh display on the property?

Page 59

1      A  Correct.
2      Q  And I believe you testified earlier that that was
3  required by the Port Authority in order to enter into an
4  agreement; is that correct?
5      A  The selection of technology was pre-approved, which
6  drove the project.  Let me clarify, we would not have agreed
7  to enter into this agreement if the Port Authority had not
8  previously approved the technology, and we had deemed it as
9  the technology the was required to satisfy.  We also felt it
10  would successfully work.
11     Q  So would it be fair to say that this provision of
12  the display agreement confirmed your recommendation for the
13  proposal to put the MediaMesh sign there, and the Port
14  Authority agreeing that that would be the sign that you would
15  put there?
16     A  That's correct.
17     Q  Turning to page three of the document under section
18  seven, paragraph seven, whichever you prefer.
19     A  Um-hum.
20     Q  In the second full paragraph, the last sentence
21  reads, "It is hereby agreed that the mounting of the light
22  fixtures and the painting of the steel trusses by PA --
23     A  I'm sorry.  Which paragraph?  Seven?  Okay second
24  paragraph.
25     MR. HENZY:  You got it, the last sentence of --

Page 60

1      THE WITNESS:  Yeah.
2  BY MR. O'KEEFE:
3      Q  "It is hereby agreed that the mounting of the light
4  fixtures and the painting of the steel trusses by PA will be
5  coordinated between PA and A2aMedia, Inc., subject to GM's
6  prior approval of the cost incurred"  Do you see that?
7      A  I do.
8      Q  So was it your understanding that A2a not only was
9  looking to obtain sales revenue, but they participated in the
10  installation of the signage?
11     A  We purchased the entire project from A2a, which
12  included the sign, the implementation, and the
13  coordination.
14     Q  Was GKD a seller to you in that process?
15     A  They were --
16     MR. HENZY:  Objection to form.
17     THE WITNESS:  They were a seller to A2a.
18  BY MR. O'KEEFE:
19     Q  Do you know whether, in connection with that
20  purchase, purchase from A2a, that you obtained a warrantee
21  from GKD?
22     A  We did.
23     Q  And did that warrantee last for the life of the
24  permit?
25     A  No, it did not.

Page 61

1    Q   Do you recall how long the warrantee was?
2    A   I believe two years.
3    Q   Did you have any type of a maintenance agreement
4  with either GKD or A2aMedia or anybody else?
5    A   We did not.
6    Q   Okay.  So after two years, you would be on your own
7  for maintenance of the sign?
8    A   That's correct.
9    Q   Did you deal with John Zimmeth in connection with
10  the amendments to the agreement that we just talked about?
11    MR. HENZY:  Sorry.  Which amendments?  All the
12  amendments?
13  BY MR. O'KEEFE:
14    Q   Exhibit 3 was a collection of four amendments to the
15  agreement.  Did you deal with John Zimmeth in connection with
16  all four of those amendments?
17    A   I don't recall all four.  I do recall at a minimum,
18  the last two.
19    Q   Okay.  Did he, at some point, become your principal
20  point of contact at Macquarie?
21    A   He did.
22    Q   Do you know when that occurred?
23    A   Approximately 2012.
24    Q   So you closed on this transaction in October of
25  2010.  Then you said that the sign went live in June of 2011;

Page 62

1  is that correct?
2    A   Um-hum.
3    Q   In that time span between closing on the transaction
4  and the sign going live, I think we have one amendment which
5  extends the payment terms.  Do you recall who at Macquarie
6  you dealt with in amendment number one?
7    A   Patty Magrin.
8    Q   And do you know whether or not or how these terms
9  came to be?  Did she have to talk to someone else at
10  Macquarie?
11    A   She did.
12    Q   What was your understanding of that process?
13    A   She -- well, I believe amendment one is capturing
14  all the costs associated with the project.
15    Q   That's what you testified to.
16    A   So it was a clarification of those, and she would
17  have presented that to us for our understanding, our review,
18  and our acceptance.
19    Q   And did it also change the payment schedule?
20    MR. HENZY:  Object to form.
21    THE WITNESS:  I assume so.
22  BY MR. O'KEEFE:
23    Q   My apologies.  I'm just trying to figure out how
24  that amendment came to pass.  Did you call someone at
25  Macquarie and say --

Page 63

1    A   No.  It was processed as a result of in June --
2  mid-June we finished the project, we had all of our costs,
3  and they were reorganizing the costs associated with the
4  values that were originally estimated to be final.
5    Q   Is that something you asked them to do or --
6    A   No.
7    Q   -- did they determine to do?
8    A   It was something that was just part of the process.
9  It wasn't a request.  It was a requirement and always an
10  understanding that the estimated values would be put into the
11  final document to represent the actual expenditures.
12    Q   So it's your testimony that you didn't ask that
13  amendment number one be prepared, but the Macquarie
14  determined to prepare it?
15    A   That's correct, amendment number one.
16    Q   Okay.  And it's your belief that that is something
17  that you came to understand through Patty Magrin at
18  Macquarie?
19    A   That's correct.
20    Q   And then number two is the one with the cost
21  overruns, among other things.  Do you recall the
22  circumstances under which that came about?
23    A   This was predominantly to remove parts of the lease
24  that were not going to do the lighting.  That was one
25  aspect.

Page 64

1    Q   And the cost --
2    A   So it was in conjunction with both of these.
3    Q   So the second one was dated July 28, 2011.
4    A   Yep.
5    Q   Just asking if you recall with whom, if anyone, at
6  Macquarie you dealt with?
7    A   I believe it was with Patty Magrin at that point.
8    Q   And, again, how did that happen?  Did you go to her
9  and say, look, we're going to eliminate something.  We have
10  cost overruns.  We've got to change the schedule?
11    A   We had continuous conversation, so the conversation
12  was frequent.  It was really just to be aligned with the
13  realities of the project.  So it was a combination of both,
14  but it was -- I don't recall who initiated the conversation.
15  I can only share that we had dialog associated with it to
16  make sure we capture all of our costs, which is why these
17  dates are one month apart from each other.
18    Q   And you would agree that this is, amendment number
19  two is also within a month of when the sign went live?
20    A   That's correct.
21    MR. HENZY:  I stipulate that the date on the top of
22  amendment number one is a typo.  It actually confused me when
23  I first started looking --
24    THE WITNESS:  It's 2011.
25    MR. HENZY:  That's not what it said.

Page 65

1    MR. O'KEEFE:  Amendment one or two?

2    MR. HENZY:  No, at the top of amendment one.

3    MR. O'KEEFE:  One is wrong.

4    MR. HENZY:  It's dated June 13, 2010.

5  BY MR. O'KEEFE:

6    Q   Just to be clear on your testimony, we are up to

7  amendment three.  I need to go back to this.  Amendment three

8  is dated March 31, 2013.  Is it your recollection that --

9  strike that.

10    Do you have a recollection of who you dealt with at

11  Macquarie in connection with amendment number three or the

12  amendment dated as of -- strike that.  Starting over.

13    The document that I just put in front of you,

14  amendment number three, dated September 1, 2012, to the lease

15  number 001, dated October 26, 2010, do you have a

16  recollection of who, if anyone, at Macquarie you dealt with

17  in connection with that amendment?

18    A   John Zimmeth.

19    Q   And is that around when you first started dealing

20  with him?  I can't recall what you said before.

21    A   We were communicating actively approximately a year

22  after the project had been started, where Patty was no longer

23  a communicating -- no longer sharing conversation, and John

24  was calling me direct.

25    Q   And that would have been about June 2012, is that

Page 66

1  your recollection?

2    A   Roughly a year after the project started.

3    Q   How did you first hear from or contact John Zimmeth,

4  if you recall?

5    A   I believe he either called me or asked me to call

6  him.

7    Q   And do you recall why?

8    A   Patty was just simply recommunicating messages.  She

9  would call me, What's going on?  I'd tell her, and she'd tell

10  John.  At one point John just said, let's talk.

11    Q   And so how did that go?

12    A   It was good.  John was trying to understand the

13  project and the challenges associated with it.

14    Q   Patty testified yesterday that she would meet you

15  for coffee periodically in Cheshire.

16    A   That's correct.

17    Q   She also lived there.

18    A   She lived there, and I traveled full time for my

19  job.  So my weeks at that time were mostly in Germany and San

20  Francisco working for BMW.  So I would meet her -- I would

21  meet her for coffee at a local coffee shop.  We just happened

22  to live in the same town, and it was convenient.

23    Q   Based upon your earlier testimony, is it true that

24  throughout the time that you were the man in charge of

25  Garage-Media, you also had other employment?

Page 67

1    A   That's correct.  I always had other employment.

2    Q   And I called you the man in charge.  Were you the

3  CEO --

4    A   Managing partner.

5    Q   Patty Magrin testified yesterday that in some of

6  those conversations with you, she would find out how the

7  project was going.  That was just small-talk conversation

8  with you.  Would you agree with that?

9    A   Yeah, for the most part.

10    Q   Did you understand that she was managing the account

11  after it closed?

12    A   No.  I understood that she was helping and really

13  ideally pursuing more business.  I mean, her goal was really

14  the next project.  She stayed close with us through that

15  process.

16    Q   She testified that more than once you told her that

17  John Zimmeth was the perfect partner.  That he was patient

18  with you throughout the project, is that a correct

19  recollection of something you told her?

20    A   I would never use the word, "perfect partner;" but I

21  would say that John Zimmeth was easy to work with or easy to

22  communicate with.

23    Q   Okay.  Did you have a feeling throughout the project

24  that he was working to try to accommodate Garage-Media and

25  its needs?

Page 68

1    A   No.  I would say that he was working hard to protect

2  Macquarie's situation, and that he -- the pathway through

3  that was to try to work with us through it.

4    Q   So whether directly or indirectly, his first goal

5  was to get paid?

6    A   Absolutely.

7    Q   And his second goal, in order to accomplish that,

8  was to endeavor to accommodate Garage-Media's needs?

9    MR. HENZY:  Object to form.

10    THE WITNESS:  I wouldn't say -- many of the -- you

11  opened the question:  Many, many conversations he would ask

12  what he can do; and I'd give him things he wasn't capable of

13  doing, which would be lower the interest rate, buy some

14  advertising, doing other things that weren't in his ability

15  to do.

16  BY MR. O'KEEFE:

17    Q   Did you implore his assistance in trying to

18  accomplish certain of the things that you thought could be

19  done?  For example, in obtaining an extension of the Port

20  Authority permit?

21    A   No, I didn't ask for his assistance in any of it.  I

22  had a requirement to keep him abreast of what was going on.

23  He had very constant communication with me.  Mostly verbal,

24  but he would call me on my cell phone often and ask for the

25  status.  Often with some deadline within a day or two that he

Page 69

1  had me report the status of the project.

2     Q   So you never asked him to participate either in a

3  phone call or meeting with anyone to help Garage-Media obtain

4  something that they needed in order to succeed?

5     A   I never asked for his assistance. I allowed him to

6  participate in those meetings because those were things that

7  were important to him. Our ability of having his support was

8  critical.

9     Q   So did you invite him to meetings?

10     A   He would -- I would share with him when I was having

11  meeting, and he would identify which ones he wanted to come

12  to. Most of them were out of convenience when he was already

13  in New York. He would indicate, I'm going to be in New York

14  this coming week; but there were several meetings that were

15  arranged per his direction that I would not have had he not

16  insisted upon those meetings.

17     Q   Such as?

18     A   With GKD, who I met with many times at their

19  facilities or separately; but he insisted on a meeting. We

20  called the president of GKD to the meeting. It was myself,

21  John Zimmeth, and Tom Polly were there. He made it really,

22  really clear that, you know, that this is a lemon product.

23  He felt strongly that he should be suing them for defective

24  product. He insisted that he owned the sign, which was still

25  unclear to me. He talked about suing GKD if they didn't

Page 70

1  resolve the technical issues because it's impacting

2  everything in the project.

3     Q   And it's your testimony that you never encouraged

4  him to threaten suit in order to obtain results from GKD?

5     A   Absolutely not.

6     Q   Were you at the time -- "you", GM New York --

7  considerin a lawsuit against GKD?

8     A   Never considered it.

9     Q   Why not?

10     A   The several times that we felt -- we had hoped that

11  the project would be resolved through their efforts, GKD had

12  spent hundreds of thousands of dollars supporting the project

13  trying to reposition it. The LEDs that had failed were not,

14  while sold through GKD, were from another company that had

15  since been liquidated. Had gone out of business.

16     Q   Leurocom?

17     MR. HENZY: Leurocom.

18     THE WITNESS: Leurocom.

19     MR. HENZY: L-E-U-R-O-C-O-M.

20     THE WITNESS: That's correct.

21  BY MR. O'KEEFE:

22     Q   So Garage-Media never considered suit against GKD?

23     A   We had not.

24     Q   And it was because you were trying to work with them

25  to solve the problem?

Page 71

1     A   That's correct.

2     Q   And you thought they were trying to work with you to

3  solve the problem?

4     A   They were putting extensive effort in at a huge

5  expense to accomplish that. Many times we thought we had the

6  answers understood, only to find out that it wouldn't work.

7  You have to understand, a lot of this is weather related. We

8  would fix it in the spring. It would work well for a period

9  of time; and then as soon as the weather turned, getting

10  moisture or cold into the LEDs caused our issues, so it

11  magnified the situation. There were long gaps in time.

12     Q   What was the outcome of the meeting which you just

13  described where Mr. --

14     A   Polly.

15     Q   -- Zimmeth talked about the prospect of bringing a

16  suit against GKD?

17     A   He played the heavy. He was strong in his position

18  to Tom Polly that he would have to resolve this problem,

19  otherwise we are going to come after you. He made it really

20  clear the size of Macquarie, the strength, the legal

21  presence. You don't want us suing you. He was absolutely

22  adamant that Macquarie had the ability to make things

23  miserable for them. By selling them -- even though the

24  product was out of warrantee, and the product was, you know,

25  challenged, they must resolve it. Tom Polly committed --

Page 72

1  recommitted his position that he's doing everything he can do

2  to resolve it. He continued to do that throughout the

3  different phases of the project.

4     Q   Did he react in that fashion, to continue his

5  commitment to try to fix the project?

6     A   It never deviated.

7     Q   Okay. And did you view those words by Mr. Zimmeth

8  to be an effort to try to assist Garage-Media in procuring a

9  positive outcome with GKD?

10     A   Although it had benefit to us, I agreed that, you

11  know, it was startling. I also interpreted it as a strong

12  threat to us as well, but it was startling. The result

13  didn't deviate the actions. It just was -- we -- our dialog

14  with GKD became a bit strained at that point because now

15  there's an overlying presence. So their actions went from

16  cooperative, you know, communicative in the process to more

17  guarded. So it changed -- that meeting changed the dynamic

18  of our relationship to be a more stressed relationship, which

19  had some impact on us going forward.

20     Q   How did you view it to be threatening to

21  Garage-Media?

22     A   Just the tone of John with the legal aspects

23  associated with it, that it also can transcend into even our

24  actions. Should we have, you know, challenges, that they

25  would take those same actions with us.

Page 73

1     Again, in a similar position, they had -- Macquarie
2  had, I believe, signed the purchase agreements associated the
3  sign; and we were also bound to the same, similar documents.
4  My personal -- speaking on my own personal position, that I
5  viewed it to be just a clear message, if you don't cooperate
6  or you don't accomplish something, we are going to get really
7  strong on the legal side.  You will regret that because
8  Macquarie is such a massive organization and has the
9  resources to really make a little guy challenged.
10     Q   And did you understand that under the lease
11  documents which were executed that upon default, Macquarie
12  had certain rights against not only Garage-Media but against
13  the guarantors?
14     A   I did.
15     Q   And did you sense that notwithstanding that, that
16  for years, years, Mr. Zimmeth worked with Garage-Media and
17  the guarantors in a direction other than exercising rights
18  upon default?
19     MR. HENZY:  Objection to form.  Let him finish the
20  question.
21     MR. O'KEEFE:  I did.
22     MR. HENZY:  Okay.  Objection to form.
23     THE WITNESS:  There were times that I even asked
24  them to take it over.  The conversation with John was, take
25  it over.  He said, there's no value to take it over because

Page 74

1  right now we're gaining zero by managing it; and he's got us
2  on the hook for it.  So even I suggested, when he threatened
3  that he was going to take it over or that -- he mostly
4  threatened that the corporate office in Sydney was going to
5  put pressure and it was going to be out of his control and it
6  would be taken over; and I said several times in dialog with
7  John, this is something we should discuss.  Does that make
8  sense?  He said, it makes no sense for them.
9  BY MR. O'KEEFE:
10     Q   So for them and for you, the better answer would be
11  to try to work out or accommodate something which would allow
12  Garage-Media to succeed with a sign.  Would you agree with
13  that?
14     A   I do.
15     Q   And would you agree however he got to that point,
16  that was the motivation, other than getting paid by John
17  Zimmeth?
18     A   The first was to be paid; and secondly, the
19  facility, the best chance of getting paid was for us to get
20  an extension and sell the project.
21     Q   And was that something you determined as a business
22  plan or --
23     A   We did.  We started on it one year after we got into
24  the project with several companies, including Thayer Group
25  and then Beekman.  So we did determine that this was not

Page 75

1  going to -- this was going to be a challenging project and
2  outside of our ability the manage it and costly.  We sought
3  opportunities to find other partners to take it over.
4     Q   When you say, "we", did you employ Johnson and
5  Fretty to assist you in that process?
6     A   We did.
7     Q   And was that more or less from within a year of when
8  the sign went live or there about that you were looking for
9  either an investment partner or someone to buy the company?
10     A   It was -- the first organization was Thayer Group
11  and the second was Beekman.  I believe Thayer, we got
12  involved with them, if I recall correctly, 2012 or maybe
13  2013.  It was in that range of time.
14     Q   So what happened with that opportunity?
15     A   Thayer backed out.  Thayer had given us an intent,
16  and they backed out of it after they got to know the
17  technology aspects of it.
18     Q   Do you know why?
19     A   Because it was just -- it was problematic, and they
20  became uncomfortable with it.  They had a lot of communication
21  with other people in the space, so it was -- it was becoming
22  known that there was, you know, technical challenges.  It's
23  also very visible when you have a sign on the outside of a
24  building, it's easy to see what's working and what is not
25  working.

Page 76

1     Q   What about Beekman?
2     A   Beekman was -- they wanted a quantity of projects.
3  They wanted more than just simply the sign.  They accepted
4  the fact that the sign would have to be replaced.  They were
5  seeking that opportunity but they wanted additional projects.
6  They wanted many additional projects as part of the
7  portfolio.  They didn't want to do a sign project.  They
8  wanted to buy a media company and more agreements to build
9  more signs.
10     Q   Was that not the original plan for Garage-Media?
11     A   It was.
12     Q   And that never happened?
13     A   We couldn't get past this project.
14     Q   Anyone other than Beekman looking to buy?  What
15  about Clear Channel?
16     A   Clear Channel came in later.  Clear Channel came in
17  after we had signed them for the agreement to resell the
18  advertising.  That was not -- that was post -- that was a
19  second conversation after we had already signed them to be
20  our sales channel.
21     Q   So they expressed an interest and/or you requested
22  it and they responded positively that they may have an
23  interest in buying after they were retained for the sales
24  agency?
25     A   That's correct.

Page 77

1    Q   And what happened to those discussions, specifically
2  the acquisition?
3    A   Yep.  According to Harry Coghlan, who is the
4  president, he was moving it forward.  He said his funding was
5  taken away, and he had no ability financially to manage it.
6  He thought -- and he also expressed that the price and the
7  buyout was too high.  So it was the economics and the funding
8  combined.
9    Q   Do you recall him having -- "him" being Clear
10 Channel Outdoor -- having made offers that were -- that you
11 considered were low-ball offers?
12   A   No.  They never responded with a counteroffer.  We
13 made offers to them.
14   Q   What about Park It, did Park It ever express an
15 interest in buying?
16   A   No.  But Park It was a -- they had dialog, but I
17 would never consider that serious.
18   Q   Okay.  You, at one point, testified and we moved off
19 the path, that John Zimmeth insisted upon attending meetings
20 from time to time.  The one you identified was GKD.  Are
21 there others you can think of?
22   A   Sure.  The Port Authority.
23   Q   Okay.  What was that?
24   A   There's several of them.  Meeting with the Port
25 Authority in New York at their offices, as well as with Clear

Page 78

1  Channel.
2    Q   And those were meetings that he was not invited to
3  but invited himself?
4    A   Meetings that he said he wanted to attend, either
5  attend or he wanted us to arrange.
6    Q   And do you recall what the purpose was for the
7  meetings, starting with the Port Authority?
8    A   Mostly information gathering.  The intent was to
9  understand where this is.
10   Q   So he insisted to meet with the Port Authority to
11 find out where the deal was?
12   A   Where the next -- where the -- he only got involved
13 with the Port Authority when we were chasing the extension,
14 which we started chasing the extension in 2014.
15   Q   Are you sure you didn't do it in 2011?
16   A   The extension in 2011?
17   Q   Did you --
18   A   No.
19   Q   Do you recall having corresponded with the Port
20 Authority when the sign went live to ask for an extension and
21 payment relief immediately?
22   A   Sure, we asked for it.  I asked -- payment relief
23 for sure.
24   Q   And an extension for the six-month delay?  I'm just
25 asking.

Page 79

1    A   That's -- that's two different extensions.  One is
2  an extension of time for the gap between the time we started
3  making payments to the Port Authority, which was the first of
4  January, 2011, and we had five-and-a-half months of no
5  revenue that we were paying rent that we thought was unfair.
6  So I asked, that was one extension.
7        The extension that was commercially interesting was
8  a ten-year extension which was then tradable.  That was the
9  goal with Clear Channel, which was 2015, 2016.
10   Q   So the later extension, which you're referring, was
11 one which would enable you to either get an investment
12 partner or sell the business?
13   A   That's correct.
14   Q   Okay.  And when you say, it was interesting and
15 meaningful to Clear Channel, did you mean in conjunction with
16 offers that Clear Channel made to either be an investment
17 partner or to buy Garage-Media?
18   A   The conversation was one of those forms.  It was
19 either to bring them in as a partner, whether they become the
20 majority partner of the project or buy us out entirely.
21   Q   So the information gathering with the Port
22 Authority, I'm still trying to understand, who called for the
23 meeting?  I thought you said John Zimmeth insisted upon
24 scheduling the meeting?
25   A   I would be sharing with him the status of my

Page 80

1  conversations with the Port Authority.  Each time he called,
2  he would ask where things are.  He would ask questions
3  specific to my conversations.  Then he would share, I'm going
4  to be in New York.  I would like to meet with them while I'm
5  in New York.  Let's arrange a meeting.  He would attend --
6  he's only attended a few of them, but he would attend a
7  meeting at the Port Authority.
8    Q   And what occurred in those meetings?
9    A   A couple of them were just information.  Just simply
10 here's the status of the project.  It was comfortable dialog.
11 I mean, John was gathering.  He was always -- the
12 conversations were always about reporting up to his bosses
13 the status of the project.  So it was mostly information
14 gathering.
15   Q   So you scheduled a meeting with the Port Authority.
16 What did they believe was the purpose for that meeting?
17   A   I would have periodic meetings with them.  We were a
18 tenant paying hundreds of thousands of dollars a year for
19 space.  We had different challenges from time to time,
20 whether it be electricity, whether it be technical, whether
21 it be operational, whether it be access to the facility for
22 support.  So I would meet with them on a regular basis.
23       John had asked to attend different meetings when he
24 was in town.  In the beginning and later on when it was
25 identified that the extension was vital to us, he would

Page 81

1  participate; and he would be more interested in that because
2  it seemed like a pathway for both of us to get out of the
3  problem we were in.
4  **Q   And how, if at all, did he participate in those**
5  **meetings?**
6  A   He joined as Macquarie and then as Huntington Bank
7  as a representative.  As the financial, you know, backer of
8  the sign.
9  **Q   And was he, in those meetings, supportive of**
10 **Garage-Media and its plans?**
11 A   Yes, he was.
12 **Q   Were there occasions in those meetings when Port**
13 **Authority wanted to know what your -- the fiscal picture of**
14 **Garage-Media?**
15 A   No, never.
16 **Q   Did they ever ask about whether or not sales**
17 **revenues were meeting targets?**
18 A   No.  They had quarterly reports already.
19 **Q   Did they ever ask about performance of your**
20 **obligations to Macquarie?**
21 A   Never; never once.
22 **Q   And is that information that you have any**
23 **understanding that John Zimmeth shared with them?**
24 A   He did.
25 **Q   What did he share with them?**

Page 82

1  A   He shared with them at one meeting with Jerry Del
2  Tufo, to my surprise he made it clear that Macquarie -- the
3  comment actually came around -- I will be specific with it:
4  The comment came around where Jerry said, I'm trying to get
5  you this extension.  You guys have been a good tenant.  I
6  know you've had challenges.  I know you have asked for help
7  many times, and we haven't been able to help.  You've made
8  all your payments.  Our payments were going through CBS, and
9  CBS was then paying the Port.  You've made all of your
10 payments to us and you're a good tenant.
11     That's when John expressed that Macquarie has not
12 been paid, is not being paid.  That Macquarie has not been
13 paid and this extension is vital to Macquarie getting paid
14 and closing out this project.
15 **Q   And that's not information that you had asked John**
16 **to share --**
17 A   Absolutely not.
18 **Q   -- with the Port Authority?**
19 A   It was extremity detrimental.
20 **Q   How was it detrimental?**
21 A   It created a whole cast of doubt.  The cast of doubt
22 within the Port Authority, within this one person who then
23 communicated a cast of doubt of our ability to do another
24 project.
25 **Q   Am I correct that at one point in time the Port**

Page 83

1  **Authority agreed to a ten-year extension?**
2  A   No.  They never agreed to it.  We had a lot of
3  conversations about it.  We attempted to get them to agree.
4  We had verbal conversations, we've had agreements that were
5  put forth but never a final approval.
6  **Q   So am I correct that the Port Authority proposed an**
7  **extension agreement, to which you made comments, and it still**
8  **sits in their office?**
9  A   That's correct.
10 **Q   And is there any reason why that hasn't been**
11 **pursued?**
12 A   Well, it has been pursued by us; but it has not been
13 executed.
14 **Q   Is it because you do not have backing or funding?**
15 A   No.  They assume we have backing.  We've presented
16 continuously that we have funding partners that would step
17 in, which originally at one point was Clear Channel.
18 **Q   So why is it sitting with the Port Authority?**
19 A   Right now the entire relationship has been taken
20 out, and we have -- the sign is shut down now.
21 **Q   Understood, but you said there wasn't a deal.  Then**
22 **you agreed that they proposed a deal; and you made comments**
23 **to that.**
24 A   There was an agreement that had been going back and
25 forth.  Jerry Del Tufo created an agreement.

Page 84

1  **Q   When was that?**
2  A   2016-2017 in that range.  There was an RFP process
3  that we submitted on.  There was a formal RFP process that we
4  submitted twice on.
5  **Q   So even after the discussions with John Zimmeth, the**
6  **Port Authority did come forward with a proposal to extend the**
7  **permit?**
8  A   The Port Authority had a -- the person in the media
9  group was trying to bridge these gaps.  There was no
10 approval.  There was no acceptance.  There was no proposal
11 accepted to go forward.
12 **Q   If they made -- sent you an agreement and you**
13 **accepted that agreement --**
14 A   They --
15 **Q   Let me finish the question.**
16 A   Okay.
17 **Q   If they sent you an agreement and you accepted that**
18 **agreement, you're saying there would be no deal?**
19     MR. HENZY:  Object to form.
20     THE WITNESS:  That's correct.  It required board
21 approval, which the board was not in a position to approve.
22 The agreement was simply a modification of the existing
23 agreement that he was trying to get prepared.  Jerry Del Tufo
24 was attempting to get it prepared so that we can move it
25 forward.  We could never get past the finance committee.  The

Page 85

1  finance committee had blocked the project; and still, as of
2  conversations a month ago, still blocking it.
3      Q   And so you're having on-going dialog; but for now
4  years they have been sitting with a response that you gave to
5  a proposed agreement which they provided to you?
6      A   The agreement was only worked on in the last --
7  within the last couple of years. The bid process and the
8  request has been going on for close to four years.
9      Q   And that still stands. Can you tell me how long it
10 has been -- when did they propose an agreement to you?
11     MR. HENZY:  Object to form.
12     THE WITNESS:  Jerry gave me a draft agreement before
13 he left, which was in 2017. Yeah, 2017 I believe.
14 BY MR. O'KEEFE:
15     Q   And then you responded in the same time frame?
16     A   Yep, yep. Macquarie also responded. They had to
17 edit it and review it and provide language, which was
18 inclusive of that.
19     Q   Do you know who at Macquarie did that?
20     A   Yeah, Andy Feldstein. At John's request, but Andy,
21 the attorney, provided commentary on it.
22     Q   And do you know when the comments from Garage-Media
23 and Macquarie were provided to the Port Authority?
24     A   I don't recall the date.
25     Q   But it was in 2017?

Page 86

1      A   I believe so. If I saw the documents, I would be
2  able to validate.
3      Q   Anything else that Mr. Zimmeth shared with Port
4  Authority or any discussion that he had with the Port
5  Authority in the meeting to whom you referred?
6      A   In my meetings when John -- the meetings I attended
7  with John were really informational gathering. And that one
8  bit of information that he shared was -- was the most
9  alarming piece of the communication. He had separate
10 conversations with them. He would inquire on his own to them
11 and Clear Channel, and I'm not privy to those conversations.
12     Q   Okay. You also said that he invited himself to a
13 meeting with Clear Channel?
14     A   That's correct.
15     Q   Can you tell me about when that was?
16     A   There was more than one meeting with Clear Channel.
17 Again, it would be 2015, '16, '17; in those ranges.
18     Q   So that would have been after Clear Channel had
19 been --
20     A   After they were already selected.
21     Q   -- selected as the sales agent?
22     A   That's right.
23     Q   Okay. And why did you request a meeting?
24     A   He would ask -- he would say, I'm going to be in New
25 York. You know, what's the latest? I tell him what is going

Page 87

1  on. He would say, I'd like to hear it from them directly.
2  He was not -- I felt that he wanted more than simply my
3  verbal communication of what I'm relaying to him.
4      Q   And what was that?  What was it that you were
5  relaying to him that he wanted confirmation on?
6      A   Status of the project from time to time.
7      Q   What do you mean, status of the project?
8      A   The topics ranged from, what's the sales activity?
9  What are the challenges?  What ads are we winning?  What ads
10 are we losing?  Why are we losing them? He would ask
11 questions about the operational aspects associated with it.
12 The questions were really of the business as a whole; but it
13 was mostly about two things, revenue and the opportunity to
14 potentially do a bigger deal with Clear Channel.
15     Q   And were those topics consistent with the interest
16 of Garage-Media?
17     MR. HENZY:  Object to form.
18     THE WITNESS:  If we succeeded, it was -- if we
19 succeeded in making that move, that would have been in our
20 best interest.
21 BY MR. O'KEEFE:
22     Q   So we know that he wanted to get paid always; is
23 that true?
24     A   That's correct, yep.
25     Q   And you would, from time to time, get notices of

Page 88

1  default for either missing a payment or payments being
2  late?
3      A   I don't recall ever seeing a default notice.
4      Q   Do you remember Andy Feldstein sending the company a
5  letter with copies to the guarantors that you missed a
6  payment?  If you do, you do.  If you don't, you don't.
7      A   I recall our default notice in late 2018, that's the
8  only one I recall.
9      Q   Okay. You would agree that from time to time
10 payments were missed; is that correct?
11     MR. HENZY:  Object to form.
12     THE WITNESS:  That's correct.
13 BY MR. O'KEEFE:
14     Q   Often payments were late; is that correct?
15     A   Um-hum.
16     Q   At some point you stopped paying; is that correct?
17     A   Yep.
18     Q   And throughout that time, you believe that
19 Macquarie's goal, and specifically John Zimmeth's goal, was
20 to get paid?
21     A   Correct.
22     Q   Do you believe that in these meetings with, for
23 example, Clear Channel, he was soliciting information about a
24 pathway by which Garage-Media could succeed and Macquarie
25 could get paid?

Page 89

1    A   That's correct.  What also --
2        MR. HENZY:  There's no question pending.
3    BY MR. O'KEEFE:
4    Q   Feel free if there is something more.
5    A   Well, I feel this is a relevant point to that
6    dialog.  There was one point in the conversation that John
7    had with Harry Coghlan about selling his way out of the sign
8    for the three-and-a-half million dollar range.  So he had
9    made an offer.
10   Q   How do you know that?
11   A   Because he was in the meeting I was attending.
12   Q   So in your presence?
13   A   In my presence he made an offer.  He talked about
14   what it would cost to buy the sign out.
15   Q   And by that he meant, the financial obligation --
16   A   Just the financial obligation.  Not Garage-Media the
17   company, just the financial obligation of the bank.
18   Q   Let me finish the question.  Did you understand him
19   to be inviting Clear Channel to purchase the lease
20   obligation?
21   A   Yes, in conjunction with Garage-Media.
22   Q   The point being, that the lease goes away either if
23   it's paid off at an acceptable mount, or they buy it at an
24   acceptable amount and then they are the owner of the lease?
25   A   That's correct.

Page 90

1    Q   And that was in your presence?
2    A   That was in my presence.
3    Q   Okay.  Did you think he had a right to do that?
4        MR. HENZY:  Object to form.  Who is he?
5    BY MR. O'KEEFE:
6    Q   John Zimmeth.
7    A   I was -- I didn't feel he had the right to do it.
8    However -- well, it was more troubling the number itself
9    because it was not what we had discussed.
10   Q   Did you believe the number was too low or too
11   high?
12   A   I just believe it should be consistent with the
13   number that it would cost us to buy it out.
14   Q   Did you offer to buy it out?
15   A   We had no means to buy it out.  John had often
16   talked about what the buyout number was when we were dealing
17   with Beekman and when we were dealing with Thayer because
18   those conversations were relevant when the acquisitions were
19   discussed.
20   Q   And those numbers were consistently somewhere in the
21   three million five hundred plus range?
22   A   Yeah.  John just said that this is the range.  He
23   didn't give an exact number.  He said this is approximately
24   what it would take to close it out.
25   Q   Did you believe at the time those numbers were being

Page 91

1    shared, that Garage-Media owed a lot more money under the
2    lease to Macquarie?
3        MR. HENZY:  Object to form.
4        THE WITNESS:  I believed at that time those were the
5    numbers that it would cost to buyout the lease.
6    BY MR. O'KEEFE:
7    Q   Did you ever do a calculation of the lessor's
8    return?
9    A   No.  I don't even understand what that means.
10   Q   I'm going to show you a document which I will ask
11   the court reporter to mark Plaintiff's Neff 32.
12     (Plaintiff's Exhibit 32 is marked for identification)
13   BY MR. O'KEEFE:
14   Q   Ask you if you will take a look at that and tell me
15   when you are finished.  So it's your testimony in the record,
16   before you look at the document, that you don't know what the
17   lessor's return is?
18   A   I said I didn't understand -- I don't understand
19   exactly what that means.
20   Q   And that you wouldn't know how to calculate it?
21   A   That's correct.  I don't know what the definition
22   is, so how can I calculate it?
23   Q   Do you know that the lessor's return is set forth in
24   the lease, the definition?
25   A   Nope, I did not know that.

Page 92

1    Q   Tell me when you are finished.
2    A   Okay.
3    Q   Do you recognize that document?
4    A   I do.
5    Q   Is that an e-mail chain which starts with one from
6    you to Mr. Salemi, S-A-L-E-M-I?
7    A   Yep.
8    Q   On January 18, 2013, and ends with one from you to
9    him on the same date at a different time?
10   A   Yep.
11   Q   Do you know whose handwriting appears on that
12   document?
13   A   Looks like mine.
14   Q   And would you agree that the body of the last e-mail
15   in that exchange was you sharing lessor's return calculations
16   with Mr. Salemi?
17   A   I understand the calculations.  I still don't
18   understand what the lessor's return means.
19   Q   Okay.
20   A   Is that simply a mathematical process, or are there
21   other costs associated with it?  I don't know that.
22   Q   Well, we can look at Exhibit 1, if you wish.
23   A   This is also -- this is also not definitive.  This
24   is their opinions.  It says, note my read at the end of
25   section, so it talks about that.

Page 93

1  Q  So if you look at -- referenced in the e-mail --
2  section nineteen is how lessor's return is calculated, and
3  some portion of that is recited in the e-mail.
4  A  Okay.
5  Q  So my question to you is:  Did you perceive or
6  believe that there was a much greater amount of money due to
7  Huntington than 3.5 million dollars at any time?
8  A  Those conversations were four years difference.  So
9  this was in 2013, and the conversations with Clear Channel
10 was in 2017 after millions of dollars were paid.  So to
11 answer your question clearly, I don't understand this.  I've
12 seen both of the documents, and I don't understand the
13 relevance of the question.
14 Q  Okay.  These are your efforts, I suppose -- and
15 correct me if I am wrong --
16 A  We're looking to trade the company --
17     MR. HENZY:  Let him ask the question.
18 BY MR. O'KEEFE:
19 Q  It looks to me like you were trying to figure out
20 how much, in addition to the amount that's reflected in the
21 e-mail that was prepared per Taylor Woodson, would be due for
22 sales taxes.  Do you see that in the corner?
23     MR. HENZY:  Object to the question.
24 BY MR. O'KEEFE:
25 Q  I'm asking the question:  Is that correct?

Page 94

1  A  Sure, that's the tax rate.
2  Q  And so if Taylor Woodson's calculations are correct
3  in 2013, the amount due dealing with the lessor's return as
4  she referenced it there, plus sales taxes, would be roughly
5  7.447 million dollars; is that correct?
6     MR. HENZY:  Object to the form.
7     THE WITNESS:  Whatever it says on there.  I
8  understand this document from 2013 related to a trade of the
9  company in trying to understand what the ask would be from
10 Macquarie to sell it out.
11 BY MR. O'KEEFE:
12 Q  All rgiht.  Say we're in 2017, 2016, did you ever
13 calculate what the lessor's return was yourself?
14 A  No.
15 Q  Did you ever calculate the amounts outstanding for
16 payments not made under the lease?
17 A  No.
18 Q  Did you ever add to them default interest which may
19 have been permitted under the lease?
20 A  I did not.
21 Q  Did you ever add to it sales taxes not paid that
22 were due under the lease?
23     MR. HENZY:  Objection to form.
24     THE WITNESS:  I did not.
25 BY MR. O'KEEFE:

Page 95

1  Q  So you had a perception or belief when the 3.5
2  million dollar number was shared that that was accurate?  Did
3  you have a perception?
4     MR. HENZY:  Objection to form.
5  BY MR. O'KEEFE:
6  Q  You said you were surprised at the number.
7  A  Yeah.  I was surprised that he shared the number.
8  As we're negotiating an extension, to share that number when
9  he's not privy to our negotiations with Clear Channel on
10 selling the company and what it would cost them to acquire
11 it, was -- I found it to be inconsistent with the objectives
12 of Garage-Media.
13 Q  And was it inconsistent because the number was too
14 high or too low?
15     MR. HENZY:  Objection to form.
16     THE WITNESS:  It was not his place to share it.
17 BY MR. O'KEEFE:
18 Q  So if you were looking to do a transaction with
19 Clear Channel by which it would acquire Garage-Media, would
20 you not need an amount that Macquarie would accept in
21 satisfaction of its debt?
22 A  I would.
23 Q  And so you thought it was inappropriate for him to
24 share that number?
25 A  With the buyer.

Page 96

1  Q  And was it shared in the context of a buyout or --
2  strike that.
3     Was it shared in the context of a pay off or to
4  purchase the lease?
5  A  To pay off the lease to get Macquarie out of it.
6  Q  So you didn't think --
7  A  And it wasn't Macquarie.  It was Huntington at the
8  time.
9  Q  You didn't think he was trying to do you a favor?
10 A  Protecting himself.
11 Q  You thought that he was tipping the apple cart?
12 A  I thought he was looking to accomplish the
13 objectives of helping get this thing done.  When the question
14 was asked:  What would it take to buy out the lease?  John
15 gave a number range and said about three-and-a-half
16 million.
17 Q  And that question was put to him by Mr. Coghlan?
18 A  Harry Coghlan.
19 Q  At a meeting at which you were discussing the
20 prospect or possibility of them buying you?
21 A  Combination of that and the status of the project as
22 a whole.  The conversation was predominantly around, What is
23 the status of the project?  Is there an opportunity to make
24 it where Clear Channel would buy us out?
25 Q  Did Mr. Coghlan respond or react to that number?

Page 97

1    A    No.

2    Q    Were there other meetings that Mr. Zimmeth invited

3  himself to, aside from GKD, the Port Authority, and Clear

4  Channel, that you can recall?

5    A    No.  Those were the only parties that we had

6  meetings with.  Aside from John and I meeting privately from

7  time to time.  When he was in the city, he would come to my

8  office and we'd meet, or we'd meet someplace and have a

9  coffee.  We had dialog.  So when he was in New York, he would

10  come by the office and we would meet.

11   Q    And what were the purposes for those meetings?

12   A    Looking for information, status.

13   Q    Would it be fair to say that his discussions and

14  meetings with you were typically for the purpose of getting

15  updates regarding the sales, ad sales status, payment status,

16  and the prospect of extending the permit with the Port

17  Authority and/or selling the business?

18   A    All of those were all topics of conversation.

19   Q    Did he participate in a meeting with you with the

20  Beekman folks?

21   A    I believe he did.  I do know that Patty did.  I

22  believe John did as well, at least once.

23   Q    And do you recall how he participated?

24   A    Represent -- he was -- I don't remember any

25  challenges with the meeting.  It was really around the

Page 98

1  concept of selling Garage-Media to them and funding other

2  projects.  There was conversation about possibly Macquarie

3  being a financier of other signs under the Beekman program.

4    Q    So at the time of the meeting with Clear Channel

5  when Mr. Zimmeth shared either the pay off necessary or the

6  amount that might be required to buy the lease, you don't

7  have any knowledge of what amount was actually due and owing

8  by Garage-Media to Macquarie?

9    A    At that point in time, I'm sure we did some reviews;

10  but I don't recall the specifics.

11   Q    And as you sit here today, have you ever actually

12  sat down and tried to calculate what amount may remain

13  outstanding under the lease?

14   A    No.  Because I would ask John, and he gave us -- he

15  gave me different numbers from time to time.

16   Q    But you haven't, nor have you had anyone on your

17  behalf, actually calculate the amount due under the lease?

18       MR. HENZY:  Object to the form.

19       THE WITNESS:  Well, we may have.  My partner also

20  had a role in some of that, so we may have done that from

21  time to time.

22  BY MR. O'KEEFE:

23   Q    Have you ever done it?

24   A    I have not done it.

25   Q    Have you ever asked someone to do it for you, other

Page 99

1  than John Zimmeth?

2    A    Sure, Taylor Woodson.  You just showed me the

3  e-mail.

4    Q    Okay.  Other than Taylor Woodson?

5    A    I don't recall.  Possible -- actually, likely when

6  we were looking at different transactions, you know, that

7  would be a step in the process to understand it; or at least

8  have a conversation with someone from Macquarie to understand

9  what it was.

10   Q    Do you recall having obtained from either John

11  Zimmeth or somebody else at Macquarie or Huntington at any

12  time or more than one time pay-off information?

13   A    I believe we -- I mean, I believe we've had

14  information for sure verbally, and I would imagine -- I don't

15  recall seeing the written correspondence, but it wouldn't be

16  unlikely that it exists.  I just don't recall seeing it.

17   Q    You understand there's a difference between a pay

18  off amount and an amount that one might be willing to accept

19  in order to pay off --

20   A    Sure.

21   Q    -- an obligation, correct?

22   A    I do.

23   Q    Did you have both of those types of conversations

24  with either John Zimmeth or anyone at Macquarie or

25  Huntington?

Page 100

1    A    About the pay offs?  About what it would take to get

2  them out of it?

3    Q    Well, if I ask a lender how much do I have to pay

4  you to get out of this, that is one concept.  If I ask a

5  lender, what is your pay off, that's another concept.

6    A    Yep.

7    Q    Did you have either or both of those conversations

8  with anyone from Macquarie or Huntington?

9    A    The first part, What would it cost to get out of

10  this?

11   Q    So you don't recall, as you sit here today, ever

12  asking them to give you a calculation of the actual pay off

13  at any time?

14   A    I don't recall requesting that.  However, it's

15  likely that I would have if I'm in a transaction with Thayer

16  or Macquarie -- I'm sorry, Thayer or Beekman because that's

17  relevant data.  It was a data gathering exercise on both

18  projects.

19   Q    And in both of those circumstances and at the time

20  of those circumstances, you were looking for the actual pay

21  off amount?

22   A    Sure.

23   Q    Okay. Do you happen to recall what they were at the

24  time?

25   A    I don't recall.  I've heard various numbers, and

Page 101

1  they varied because each -- these are years apart, and the
2  amounts that we had paid and the amounts we owed were
3  different each year, so the numbers varied from time to
4  time.
5      Q   Understood.  But you understand that the contract
6  identifies what the payments are and the manner in which the
7  pay off -- the manner in which the obligation due can be
8  calculated.
9          MR. HENZY:  Object to the form.
10 BY MR. O'KEEFE:
11     Q   Do you agree with that?
12     A   I understand that's in there.  John Zimmeth made it
13 abundantly clear that Macquarie wanted out of the deal; and
14 they would take a lesser amount to get out.  The would take
15 their hard cost to get out, if they could just get out.  So
16 the conversation was often not tied to a specific
17 calculation, but it was what would it take for Macquarie to
18 be satisfied and move on.
19     Q   Such as the amount which he shared with Mr. Coghlan
20 in the meeting to which you referred; is that correct?
21     A   That's correct.
22     Q   You did, from time to time, ask for them to give
23 you -- somebody, John Zimmeth in particular, to give you a
24 number in which they would accept to get out of the
25 transaction?

Page 102

1      A   That's correct.
2      Q   And you believe that you may have also requested
3  from John Zimmeth or someone else the actual pay off which
4  was due under the lease agreement?
5      A   That's correct.  For Beekman and Thayer, specific to
6  either one of those transactions.
7      Q   Okay.  Directing your attention to Exhibit 7.
8          MR. HENZY:  Was this marked?
9          MR. O'KEEFE:  This will be Plaintiff's Neff 7.
10         (Plaintiff's Exhibit 7 is marked for identification)
11 BY MR. O'KEEFE:
12     Q   Tell me when you are finished looking at that.
13     A   (Witness complies) Do you know what this word is?  I
14 don't know what that is.  (Pointing)
15     Q   It says, Thank you.
16     A   The next one down.  Within pricing to replace the
17 something within GKD.
18     Q   I don't.  I will have to find a better copy.  I'm
19 not going to ask you about that second paragraph.
20     A   Okay.
21     Q   So at the bottom of the first page there's an e-mail
22 from you to Mr. Coghlan.
23     A   Yep.
24     Q   Would you agree that an important piece of that was
25 that you were reminding Clear Channel that the Port Authority

Page 103

1  -- the agreement with the Port Authority is based on the
2  verification that MediaMesh is the only product that would
3  work on the facility to meet ventilation requirements and
4  they would not permit anything other than MediaMesh?
5      A   That's correct.
6      Q   And it appears, correct me if I'm wrong, that they
7  were looking to substitute some portion of the system and
8  that you had concerns that it would violate your agreement
9  with the Port, and reminding him that the Port would only
10 approve the MediaMesh product that you had obtained from GKD;
11 is that correct?
12     A   That's correct.
13     Q   So no matter how well or poorly the GKD product
14 performed, you were required with your agreement with the
15 Port Authority to keep it and either improve it or fix it; is
16 that correct?
17     A   That was for a replacement.
18     Q   Right.
19     A   This was for the next contract.
20     Q   But the point is, that under the then existing
21 permit, you could not replace it with a product that was not
22 MediaMesh or didn't satisfy the ventilation requirements?
23     A   That's not correct.  It has nothing to do with the
24 permit.  It has to do with the requirements of the Port
25 Authority, the technical requirements of a sign.  It's not

Page 104

1  specific to the permit.  It's specific to what is acceptable
2  by the Port Authority to be on the outside of the building.
3      Q   Right.  Maybe I'm misstated my question.  You were
4  advising Mr. Coghlan that they had accepted the MediaMesh
5  sign because it satisfied the ventilation requirements.
6      A   That's correct.
7      Q   And you were uncertain whether what he was proposing
8  as a replacement sign would work or not, except that it had
9  not yet been approved by the Port Authority?
10     A   That's correct.  And further to that, I had heard a
11 rumor that they were talking to the Daktronics about this and
12 looking at other products.  I was simply trying to get ahead
13 of that rumor to make sure that there was no additional
14 conversation or dialog outside of what we were already --
15 what we had already worked through.
16     Q   And that Mr. Coghlan should not move forward with
17 any change in plans unless and until that was discussed with
18 the Port Authority by you?
19     A   Should not be moving forward with anything without
20 our involvement in it because the other piece of this is a
21 remainder of our exclusivity.
22     Q   But as late as January 2017, you were reminding
23 Clear Channel that the MediaMesh signage was the only signage
24 that had been approved as of that time for the Port
25 Authority?

Page 105

1    A   That's correct.

2    Q   Directing your attention to what I will ask the

3   court reporter to mark as Plaintiff Neff 8.

4       (Plaintiff's Exhibit 8 is marked for identification)

5   BY MR. O'KEEFE:

6    Q   Okay.

7    A   I'm familiar with this.

8    Q   Would you agree that this appears -- this is an

9   April 24, 2017, e-mail form you to Mr. Coghlan, which you

10  then forwarded to Mr. Zimmeth?

11   A   Mr. Zimmeth, that's correct.

12   Q   And would you agree in the body of your e-mail to

13  Mr. Coghlan -- by the way, he's from Clear Channel?

14   A   He's the president of Clear Channel New York.

15   Q   And would this have been in connection with your

16  efforts to negotiate a future transaction if you were able to

17  obtain an extension of the Port Authority permit?

18   A   That's correct.

19   Q   You state in this that Garage-Media has a non-

20  compete for this site for the MediaMesh with GKD.

21   A   Correct.

22   Q   What does that mean?

23   A   We have a non-compete agreement that they would not

24  go around us.  They would not sell the product to anybody

25  else for the Port Authority except through us.

Page 106

1    Q   Was A2aMedia still in business at this time, if you

2   know?

3    A   They are still in business today.

4    Q   Do you still have an ownership interest in A2 --

5   strike that.

6       Do you have an ownership interest in A2aMedia?

7    A   I do.

8    Q   For how long have you had that?

9    A   Since 2012.

10   Q   On a percentage basis of ownership, are you minority

11  owner?

12   A   Very minority.

13   Q   Since 2012?

14   A   Yes.

15   Q   Do they still operate out of Boston?

16   A   Yes, they do.

17   Q   And they're still in the ads sales business?

18   A   They are.

19   Q   If Mr. Schmid said they are out of business, he was

20  wrong?

21   A   Yeah, that's incorrect.  He may not know.  We

22  haven't interacted with them since 2014.

23   Q   Okay.  But they had the exclusive for the MediaMesh

24  with GKD; is that correct?

25   A   At that time.

Page 107

1    Q   And you had a contract with them which bound you to

2   that exclusivity?

3    A   That's correct.

4    Q   You also had the Port -- "The Port has verified that

5   the MediaMesh produced by GKD and protected under US patents

6   is the only product that can be installed on the outside of

7   the building and meet the ventilation requirements."  Is that

8   consistent with your earlier testimony regarding their

9   periodic testing?

10   A   That's correct.  On three different occasions they

11  vetted that out.

12   Q   And this says that's the only application; is that

13  correct?

14   A   That's the only application -- that is the case, and

15  that remains -- that remains our understanding as a result of

16  the combination of the ventilation requirements and the

17  technologies that we're aware of in the market.

18   Q   Okay.  And on the second page of this e-mail you

19  state, "Garage-Media is willing to sell the company and pay

20  off all debts with the proceeds, including Huntington Bank,

21  with the new ten-year additional lease term in place, and the

22  balance of the current lease which ends on December 31,

23  2018."

24       You were both endeavoring to have Clear Channel

25  participate as an investor and also giving them the

Page 108

1   opportunity to buy the business; is that correct?

2    A   That's correct.

3    Q   And as of this time, had you received the proposed

4   lease extension or permit extension from the Port

5   Authority?

6    A   We had been in dialog with the Port Authority from

7   2014 to 2018 for the lease extension.  I've had many

8   conversations, so there was some activity associated with

9   it.

10   Q   Do you know how, if at all, Mr. Coghlan responded

11  and Clear Channel responded to this e-mail proposal?

12   A   At that time he felt it was something that he could

13  work with.  He felt that the -- if a new sign was put on,

14  they would be able to -- they would be able to make a fair

15  profit off of the project.  At the time the expression was,

16  of interest.

17   Q   In the middle of the first page you state, "We also

18  agree that the LED portion of the product installed was

19  flawed as the manufacturer has confirmed, who tried to

20  rectify and later went out of business."

21   A   That's correct.

22   Q   Are you talking about --

23   A   Leurocom.

24   Q   Thank you.  Who is it that confirmed that that was

25  flawed, Leurocom or GKD or someone else?

Page 109

1   A   It's apparent, as well as all of those parties.
2   Q   So as of this date, you're reiterating a conclusion
3   that the LED portion was flawed. For how long had you had
4   that opinion?
5   A   Since -- within a couple of weeks after we first
6   installed it. So since the conception of the -- since the
7   illumination of the project.
8   Q   Did you ever try to get GKD to replace that aspect
9   of the project while it was under warrantee?
10   A   They did.
11   Q   How did they do that?
12   A   They replaced all the rods. They took all defective
13   product throughout the warrantee period, and two years beyond
14   that, and they constantly replaced them. So they would swap
15   out, at their expense, all the LEDs that had failed and put
16   new ones in.
17   Q   And was there any way for them to replace the system
18   itself while it was under warrantee with something that might
19   work?
20   A   The --
21   Q   Was that explored?
22   A   No, because that wasn't the problem. The problem
23   was the LEDs, the LED rods were flawed. They
24   will -- they allowed moisture to get into them; and then when
25   the weather changed, it would take the rods and basically

Page 110

1   cutoff the communications so that the rods were only powering
2   on. They were only white, instead of with any LEDs on.
3   Q   Was there any way to fix that with a new system that
4   still satisfied the ventilation requirement?
5   A   Not a different system. Their attempt and
6   Leurocom's attempt was to reseal every rod on the sign. So
7   they spent hundreds of thousands of dollars after the
8   warrantee had ended to try to seal them by inserting silicon
9   into every rod on the outside of the display, which took
10   weeks and weeks for them to accomplish. Leurocom did that at
11   their expense.
12   Q   Did you ever threaten to sue Leurocom?
13   A   No.
14   Q   And did you ever make any claim against GKD short of
15   a lawsuit?
16   A   No.
17   Q   Did you ever demand that GKD completely replace the
18   system while under warrantee because it was flawed?
19   A   No.
20   Q   Why not?
21   A   First of all, my understanding is that the sign
22   itself was owned by Macquarie; or at least that's how it was
23   presented many times by John. He also communicated directly
24   with Macquarie -- I'm sorry -- directly with GKD the position
25   associated with it. It didn't appear to be in our best

Page 111

1   interest to draw that line in the sand versus trying to work
2   with them to repair it and rectify it. The efforts to
3   rectify it seemed to be a better path from a business and
4   commercial aspect than to take legal action.
5   Q   So not taking legal action, but did you ever at any
6   time demand that they replace the system because it wasn't
7   working?
8   A   We demanded that they replace the failed components,
9   which they did continuously throughout the project.
10   Q   And do you understand under the documents that were
11   executed in connection with the lease, that you had rights
12   against GKD and Macquarie had separate rights against GKD?
13       MR. HENZY: Object to form.
14       THE WITNESS: I don't understand that.
15   BY MR. O'KEEFE:
16   Q   Okay. I'm going to show the document which I will
17   ask the court reporter to mark.
18   A   Do you want this one back?
19   Q   Please. I'm going to go to ten, by the way.
20       MR. HENZY: You are skipping nine?
21       MR. O'KEEFE: I'm skipping nine. Trying to speed it
22   up.
23   (Plaintiff's Exhibit 10 is marked for identification)
24   BY MR. O'KEEFE:
25   Q   I will ask the court reporter to mark this as Neff

Page 112

1   ten. Have you read the document?
2   A   I have.
3   Q   Can you identify the document for the record?
4   A   Sure. It was a position in the document to try to
5   get some benefit out of the Port Authority prior it to going
6   live with the sign.
7   Q   So this letter is a letter from you on behalf of
8   Garage-Media to Mr. Roy Bickley, B I-C-K-L-E-Y, of the Port
9   Authority, dated May 26, 2011; is that right?
10   A   That's correct.
11   Q   Is it a letter that you actually sent to
12   Mr. Bickley?
13   A   I did. I hand-delivered it.
14   Q   And on the third page of that, is that a rendering
15   of the sign with an extension on both sides?
16   A   That's correct.
17   Q   Was the purpose of this letter to request that the
18   Port Authority give you some relief because it took longer to
19   get the sign up and running?
20   A   That's correct.
21   Q   And specifically an extension of the -- strike that.
22   Go ahead.
23   A   Let me clarify, it didn't take longer to get the
24   sign up and running than expected from the time we started.
25   The challenge was the language from -- CBS insisted that we

Page 113

1  started paying rent on the first of January, which was our
2  term; even though the agreements were signed later. It was
3  an oversight by our legal counsel and myself to allow
4  ourselves to be paying rent for five-and-a-half months
5  without any sign in operation.
6      Q  Okay. But nevertheless, requesting an extension of
7  the permit term for the time that it did take to get --
8      A  That's correct.
9      Q  -- anticipated time that it would take to get the
10 sign live?
11     A  That's correct.
12     Q  Okay. In the middle paragraph, you talk about
13 everyone being aware of challenges regarding the construction
14 approval process. What do you mean by that?
15     A  Just took -- it took a long time for the Port
16 Authority to approve it. Much longer than they verbally
17 expressed it would take to get our permits approved for the
18 construction on the outside of the building.
19     Q  And in the next paragraph you talk about
20 Garage-Media having incurred one million in cost overrun. Do
21 you see that?
22     A  That's a positioning statement. That's not
23 factual.
24     Q  And what was the true fact?
25     A  It was undetermined at that point. We had overruns,

Page 114

1  but we were not able to sell advertising from the first of
2  January until the sign went live, which was five-and-a-half
3  months; and the Port Authority did take longer to deliver
4  permits.
5      Our objective here was to -- we had zero revenue at
6  this point because the sign had not gone live. It was
7  intended to try to negotiate some kind of relief.
8      Q  But you're referencing a million in cost overruns
9  and two million in lost revenue; is that correct?
10     A  Yes.
11     Q  And those were approximations?
12     A  No. It was undetermined at this point.
13     Q  So where did you come up with the numbers?
14     A  I made them up. This was a letter to a group I'm
15 trying to negotiate with.
16     Q  Okay.
17     A  We had no idea what the revenue was going to be
18 until the revenue started. We thought it would be four
19 million a year. So if we lost six months of activity in
20 paying rent, it would be two million dollars in revenue.
21     Q  In the last paragraph of the first page, there's a
22 reference to a small part of $150,000 increase to year in
23 operating expenses, do you know what that was?
24     A  I don't. I don't recall.
25     Q  Okay. On the next page, is it correct that you were

Page 115

1  seeking a one-year extension with an option for a second year
2  with terms to be agreed on?
3      A  Yes.
4      Q  And you are also requesting in the next paragraph a
5  rent adjustment; is that correct?
6      A  That's correct.
7      Q  And then finally, you're also requesting an
8  expansion of the sign by 2,000 square feet on each side of
9  8th Avenue 42nd Street; is that correct?
10     A  That's correct.
11     Q  Is it fair to say that before the sign went live,
12 you were looking for these extensions for project success?
13     A  Assuming project success, yes, that is correct.
14     Q  Did the Port Authority respond to this letter?
15     A  They did.
16     Q  How?
17     A  Verbally.
18     Q  And what did they say?
19     A  No.
20     Q  Did they said no unequivocally or unconditionally?
21     A  The Port Authority never says no with a definitive
22 answer. They said they will continue considering it.
23     Q  Did you advise Macquarie that they said they wanted
24 to see some performance before they would consider extending
25 the permit?

Page 116

1      A  No.
2      Q  You have to say it verbally.
3      A  Yeah, no. I don't recall them ever doing that. I
4  don't recall the Port Authority ever doing that.
5      Q  I'm asking whether you ever recall having told
6  Mr. Zimmeth that?
7      A  I don't recall that. It wouldn't make sense for
8  that to happen, the sign wasn't even live by that point. All
9  we were trying to do was use the term that we had paid for.
10     Q  Maybe I didn't -- you didn't understand my question;
11 maybe you did. Did you ever tell Mr. Zimmeth that the Port
12 Authority advised you that they would not consider extension
13 of the permit unless/until there was some performance under
14 the sign being live?
15     A  No. That makes no sense to me. There's no logical
16 aspect of that.
17     Q  They wouldn't want to see you succeed before
18 extending the time?
19     A  No, because the time -- the time we were asking for
20 was the time that was lost.
21     Q  Understood.
22     A  So we were receiving zero revenue prior to that, so
23 that has no -- I don't see any logic in that.
24     Q  I'm going to show you a document marked Plaintiff's
25 Schmid 11. Take a look at that.

Page 117

1  A  (Witness complies)  Okay.
2  Q  Do you recognize that document?
3  A  I do not.
4  Q  Do you know who prepared that document?
5  A  I assume A2a.
6  Q  Was A2aMedia asked to seek investors for the
7  Garage-Media/Port Authority bus terminal display?
8  A  No, not at all.
9  Q  I'm asking you to look at the page marked 746 at the
10 bottom.
11 A  Yep.
12 Q  There's a bullet point that says, "Significant
13 penetration of MediaMesh and A2aMedia brands."  Do you know
14 whether A2aMedia had installations other than Miami Heat at
15 the time when they were putting together the deal together
16 with Garage-Media?
17 A  I don't know.  I have no idea.  I don't believe so.
18 I believe the only installations they had at the time were
19 Miami Heat and the Port Authority was the second one.
20 Q  Okay.  The next bullet it says, Financing partners,
21 and identifies Garage-Media, 10 million raised; twenty to
22 thirty more committed.  Did Garage-Media invest ten million
23 dollars in A2a projects?
24 A  Absolutely not.  I invested 250,000.
25 Q  And do you know whether Garage-Media either

Page 118

1  committed or invested an additional twenty to thirty
2  million?
3  A  No, we did not commit.  We indicated that if we had
4  sold additional projects, we would be doing additional deals.
5  Q  The next outstanding bullet called strategic
6  partners second bullet within that says, Garage-Media, Garage
7  Network.  What is Garage Network?
8  A  I have no idea.
9  Q  Turning to page 753, which is near the end or nearer
10 to the end.
11 A  Yep.
12 Q  Do you see that there's a reference to top
13 prospects, and identifies the Port Authority with annual
14 gross ad revenues of 6.2 million dollars?
15 A  I do.
16 Q  Is that a number that was ever discussed with
17 Garage-Media?
18 A  It was not.  Let me just -- never.  The estimates
19 were always anywhere from four to five million.  That was the
20 bandwidth for ad revenues.
21 Q  And do you know what the highest annual ad revenues
22 were that were generated --
23 A  2.6 million.
24 Q  -- by A2aMedia?
25 A  I'm sorry.

Page 119

1  Q  Now you can answer.
2  A  2.6 million.
3  Q  Do you know what the lowest twelve-month revenues
4  that were generated by A2a?
5  A  It would be the first year, and I believe it was 1.9
6  million.
7  Q  Directing your attention to what I will ask the
8  court reporter to mark as Plaintiff Neff 12.
9  (Plaintiff's Exhibit 12 is marked for identification)
10 BY MR. O'KEEFE:
11 Q  Let me know when you finished with it.
12 A  (Witness complies) Yep.
13 Q  Do you recognize that document?
14 A  I do.
15 Q  What is that?
16 A  It's a summary of some sales internal from A2a.
17 Q  And what time period is set forth in that
18 document?
19 A  The first six months, July 2011 to December 2011.
20 Q  And during that time period, is it correct that this
21 document states that A2a was a 1,787,000 and change under
22 budget for ad revenue?
23 A  No -- I see that.  I don't know what the date of
24 this is.  Do you have the date of this document?
25 Q  I don't.

Page 120

1  A  Because I don't know if this is sales at -- is this
2  sales in July?  Is this sales as of October?  I don't know
3  when this document was created.
4  Q  Did you prepare this document?
5  A  I don't -- that would be coming from A2a, likely.
6  Q  Directing your attention what I will ask the court
7  reporter to mark as Plaintiff Neff -- I'm sorry.  It has
8  already been marked as Plaintiff Schmid 13.
9  A  Okay.
10 Q  Are you familiar with that document?
11 A  I am.
12 Q  Can you identify that document?
13 A  Yeah.  It was a document to Andy Melton on January
14 10, 2012.
15 Q  It appears to be a letter from Garage-Media to
16 A2aMedia, dated January 10, 2012.
17 MR. HENZY:  I think you attached --
18 MR. O'KEEFE:  Put that one there.  I'm sorry.  Thank
19 you.
20 BY MR. O'KEEFE:
21 Q  Is that letter signed by you?
22 A  No.
23 Q  Do you know whether or not you sent that letter?
24 A  I likely did because the result of it was their
25 termination.

Page 121

1   Q   When you say "termination" in the introductory --
2   A   Of exclusivity.
3   Q   Okay.  In the first paragraph of the letter you're
4   reminding Mr. Melton of A2a that Garage-Media has an option
5   to terminate exclusivity of sales if they fall short for a
6   six-month period beginning July 1, 2011; is that correct?
7   A   That's correct.
8   Q   And in the second paragraph, is it correct that you
9   are advising A2a that in the first six months of its
10  performance as exclusive sales agent, that they fell short of
11  the goal or projection that was required for exclusivity?
12  A   That's correct.
13  Q   And it looks to me like it's less than $300,000
14  short; is that correct?
15  A   That's correct.
16  Q   Did you also, with this letter, give them an
17  opportunity to cure the deficiency before you terminated
18  exclusivity?
19      MR. HENZY:  Objection to form.
20      THE WITNESS:  Yes.
21  BY MR. O'KEEFE:
22  Q   Do you know whether or not they accepted your offer
23  for the new measurement for the next six-month period?
24  A   I believe they did.
25  Q   Okay.  Do you, in this letter, state that you are

Page 122

1   expressing your dissatisfaction with the sales of the period
2   ending December 31, 2011, and urging them to take appropriate
3   measures to improve sales?
4   A   Absolutely.
5   Q   And is that a fact at that time that they were under
6   performing and that you apprised them of that?
7   A   Yes.
8       MR. HENZY:  Object to form.
9   BY MR. O'KEEFE:
10  Q   Is this a letter which you were instructed to
11  prepare by Macquarie?
12  A   No.
13  Q   Is this a letter which you prepared on your own
14  based upon the performance of A2aMedia?
15  A   That's correct.
16  Q   Directing your attention to Plaintiff's Schmid 14,
17  asking you to take a look at that and tell me when you are
18  finished.
19  A   (Witness complies)  Yes.
20  Q   Would you agree that the under-performance by
21  A2aMedia, which you identified in Exhibit 13, continued
22  throughout the remaining relationship with A2aMedia, with
23  limited exception?
24  A   That's correct.
25  Q   Can you identify Exhibit 14?

Page 123

1   A   Yep.  We moved forward to eliminate the exclusivity
2   agreement and bring a secondary sales team in.
3   Q   This is not counter-signed by A2aMedia.  Do you know
4   whether or not they did?
5   A   I believe it was.
6   Q   Is it correct that Exhibit 14 is a June 26, 2012,
7   letter from Garage-Media to A2aMedia in which, among other
8   things, you identify that A2aMedia has significantly under-
9   performed the ad sales goals?
10  A   That's correct.
11  Q   And do you not further in the letter exercise your
12  right to convert them to a non-exclusive sales agent for the
13  project?
14  A   That's correct.
15  Q   And is this a letter in which Macquarie instructed
16  or directed you to prepare and send to A2aMedia?
17  A   No.
18  Q   This is something which you, on behalf of
19  Garage-Media, undertook and believed to be appropriate?
20  A   That's correct.
21  Q   Directing your attention to a document which I will
22  ask the court reporter to mark Plaintiff Neff 15.
23      (Plaintiff's Exhibit 15 is marked for identification)
24  BY MR. O'KEEFE:
25  Q   Ask you to take a look at that and tell me when you

Page 124

1   are finished.
2   A   (Witness complies)  Okay.
3   Q   Is this an e-mail from you to John Zimmeth and Patty
4   Magrin, dated July 5, 2012?
5   A   That's correct.
6   Q   And in it do you state that A2aMedia has fallen down
7   in both the fulfillment of their commitments, as well as
8   their overall sales to great disappointment, and we are
9   preparing to replace them?
10  A   That's correct.
11  Q   What were the commitments that they were falling
12  down on?
13  A   The only thing we cared about was the top line
14  number and compared to their forecasted sales, which the
15  project was designed around.
16  Q   So it goes on as well, Their overall sales were a
17  great disappointment.  That's all their efforts to meet sales
18  ad goals?
19  A   Simply revenue, that's all we cared about.
20  Q   You go on to state, On June 26th, we put them on
21  notice of our intent to add additional salesperson personnel
22  per the rights of the service agreement, Exhibit B.
23  A   That's right.
24  Q   Is this a strategy or a plan that you were
25  instructed to undertake by Macquarie?

Page 125

1  A   Not to add a second salesperson.  That was a choice
2  of ours.
3  Q   Okay.  And what was the timing, and did you obtain
4  additional sales ad effort?
5  A   We did.  We added a company called Liquid Outdoor,
6  and they generated additional sales on top of A2a's sales.
7  Q   And when did you add them?
8  A   I don't recall the date.  I'm sure you have the
9  agreement.
10 Q   I'm just asking if you recall.  Was it near in time
11 to when you went non-exclusive with A2a?
12 A   Yeah.  I was going non-exclusive in order to add a
13 second sales team.
14 Q   How did you chose Liquid Outdoor?
15 A   They came recommended from Johnson and Fretty, from
16 an investment banker who specializes in media projects.
17 Q   And had you asked them for a recommendation because
18 of the circumstance with A2a under-performing?
19 A   I asked them for a proposal to add sales for them to
20 cover certain accounts in order to generate more revenue.
21 Q   And did they send a request for proposal out to
22 perspective candidates, or did they just simply identify
23 Liquid Outdoor for you to consider?
24 A   They identified Liquid Outdoor as a candidate.
25 Q   And were you ultimately pleased with the performance

Page 126

1  of Liquid Outdoor?
2  A   I was.  Again, their objective was to supplement
3  A2a.  At the same time, similarly, at this time -- around
4  this time, I had also put $250,000 personally into A2a to
5  help them strengthen their sales team.
6  Q   How many people work at A2a?
7  A   I believe they had -- as I testified before, I don't
8  remember the exact count; but I believe approximately six.
9  Q   So I did understand that you did say that.  I
10 thought that was at the inception of the relationship.  Did
11 that continue?
12 A   That continued.
13 Q   Directing your attention to what I will ask the
14 court reporter to mark Plaintiff Neff 16.
15 (Plaintiff's Exhibit 16 is marked for identification)
16 MR. HENZY:  I had this as Schmid 16 already.
17 MR. O'KEEFE:  I don't have a Schmid 16.
18 (Off-the record discussion is held)
19 BY MR. O'KEEFE:
20 Q   Okay.
21 A   I'm familiar with this.
22 Q   Can you identify that for the record?
23 A   Sure.  This is an agreement that was drafted to
24 separate responsibilities and assign accounts within the A2a
25 organization.

Page 127

1  Q   And is this agreement in the form of a letter dated
2  July 15, 2015, from you, on behalf of Garage-Media, to Mr.
3  Melton on behalf of A2aMedia?
4  A   No, it's 2012.
5  Q   I thought I said that.
6  A   You said '15.
7  Q   Is this --
8  MR. HENZY:  July 15, 2012, I think we all agree that
9  is what it says.
10 THE WITNESS:  That's what it says.
11 BY MR. O'KEEFE:
12 Q   A letter dated July 15, 2012, from you on behalf of
13 Garage-Media to Mr. Melton on behalf of A2aMedia, which sets
14 forth the agreement that you broadly described?
15 A   That's correct.
16 Q   And is this a document by which you formally
17 terminated exclusivity, which you had advised them of in
18 Exhibit 14?
19 A   That's right.  In preparation with Macquarie, their
20 awareness of it.
21 Q   And what do you mean by that?
22 A   It required -- it required an amendment to the
23 agreement that Macquarie had with us.  So if you look at page
24 eight, there was a signed version by Macquarie as well.
25 Q   So, in other words, Macquarie had to approve --

Page 128

1  A   That's right.
2  Q   -- this action under the documents that were
3  executed in connection with the lease transaction?
4  A   That's correct because it's an amendment to a
5  services purchase agreement that A2a was bound to at that
6  time and part of our closing package with Macquarie.
7  Q   Okay.  And in the second paragraph you identify, as
8  a result of A2a's failure to achieve certain sales
9  performance target; is that correct?
10 A   That's correct.  We added a second sales team.
11 Q   And is this a document which you prepared or you had
12 prepared to outline in terms of the non-exclusivity for A2a
13 going forward?
14 A   No, I did not prepare it.  I don't recall whether it
15 was Macquarie that prepared it or our attorney.  I don't
16 recall.
17 Q   So I asked the question:  Did you prepare it, or did
18 you have someone prepare it?  You are not sure who prepared
19 it?
20 A   I'm not sure who prepared it.  Although, yes, I
21 drove the preparation of it.
22 Q   And would it also be true that you drove the terms
23 which are set forth in the letter?
24 A   That's correct.
25 Q   Is this a document which Macquarie instructed you to

Page 129

1  prepare?
2      A   It was a requirement of our agreement from
3  Macquarie.  Macquarie advised us that in order to make the
4  change, they had to be part of the agreement.
5      Q   So someone at Macquarie reminded you that in
6  connection with the original documents executed with the
7  lease transaction because of rights that they had to the
8  service agreement with A2a agency, you had to obtain their
9  consent to a change in the terms, material terms with
10  A2aMedia; is that correct?
11      A   That is correct.
12      Q   But this is a document which you prepared on behalf
13  of -- had prepared on behalf of Garage-Media because it was
14  the effort and the intent of Garage-Media to go forward and
15  to terminate the exclusivity of A2aMedia?
16      A   That's correct.
17      Q   And it was based upon their poor performance; is
18  that correct?
19      A   Under-performing their expectations.
20      Q   Okay.  I'm going to show you a document which I will
21  ask the court reporter to mark Plaintiff's Exhibit Neff 17.
22      (Plaintiff's Exhibit 17 is marked for identification)
23  BY MR. O'KEEFE:
24      Q   Do you recognize the e-mail on top and the
25  attachment?

Page 130

1      A   I don't recognize it, but I agree that I transmitted
2  it.
3      Q   Does this appear to be a true and correct copy of
4  your August 9, 2012, e-mail to Patty Magrin with
5  attachments?
6      A   That's correct.  The attachment is an A2a
7  attachment.  The document, I circulated.
8      Q   Okay.  In the body of the e-mail you state, Here is
9  the latest sales number from A2a; is that correct?
10      A   That's correct.
11      Q   Very disappointing; is that correct?
12      A   That's correct.
13      Q   I'm waiting for Andy to sign the A2a agreement
14  allowing us to sign another group; is that correct?
15      A   That's correct.
16      Q   And the Andy to which you refer is Andy Melton from
17  A2aMedia?
18      A   No, Andy Feldstein.
19      Q   He was going to sign the A2a agreement?
20      A   Yeah.  If you look at the back of it, Macquarie is
21  required to sign it.
22      Q   That's -- all right.
23      A   You know, I should state --
24      Q   Do you know which it is?
25      A   I'm not sure now that you point that out.

Page 131

1      Q   Off the record -- never mind.  It's unclear to you
2  whether the Andy to which you are referring to is Andy Melton
3  from A2aMedia or Andy Feldstein on behalf of Macquarie; is
4  that correct?
5      A   That's correct because we had two Andys signing the
6  same document.
7      Q   But someone on behalf of A2aMedia had to sign the
8  letter the way you crafted it?
9      A   That's correct.
10      Q   And you needed someone from Macquarie to sign it?
11      A   That's correct.
12      Q   It goes on to state, "In fact, although they are
13  unofficially working on projects, I can't sign them on until
14  we have MEF's sign off."  Would that be your reference to
15  Macquarie's execution of the letter confirming that you were
16  authorized to take the action that you were taking?
17      A   That's correct.
18      Q   Looking at the attachment, do I read it correctly to
19  state that for the calendar year 2012, A2aMedia had under-
20  performed by almost 2.5 million dollars?
21      A   No, that's not correct.
22      Q   $2,456,000?
23      A   No.  This is a snapshot of sales booked as of July
24  23, 2012, showing the entire year.  Six months of sales
25  efforts still were to be undertaken.  This is where they were

Page 132

1  at that moment in time.
2      Q   So this would have been by mid-year or at or around
3  the same time that you wrote the letter terminating
4  non-exclusivity?
5      A   That's correct.
6      Q   Okay.  And so it took projections out to the end of
7  the year but without performance for the second half of the
8  year?
9      A   That's correct.
10      Q   Or the last five months of the year?
11      A   That's correct.
12      Q   But it does show under/over, under 2,456,000 as of
13  that time of the year?
14      A   At that point.
15      Q   Okay.
16      A   What is relevant is just the first --
17      Q   Six months?
18      A   -- five months, where were we in the months that
19  concluded?
20      Q   It was July 23rd, so you wouldn't include June in
21  that?
22      A   It would include June, so six months.  You're
23  correct.
24      Q   All right.  Suffice it to say, they appear to have
25  been under every month of that year, up to and including June

Page 133

1  of 2012.
2      A   Against the objectives we established, which were
3  4.7 million.  However, the target and the pro forma was based
4  on a three million dollar sales number.  Again, it's really
5  important to understand that numbers communicated with
6  vendors and expectations compared to internal numbers do
7  vary.  Our expectation and our business plan was a three
8  million dollar number.
9      Q   But apparently A2a's minimum revenue goal was
10  higher?
11      A   Absolutely.  As with every salesperson I've ever
12  managed, they always have a higher number than I expected.
13      Q   Both with respect to their expectation and your
14  goal, they were under?
15      A   That's correct.
16      Q   Showing you a document which I will ask the court
17  reporter to mark Plaintiff's Neff 18.
18      (Plaintiff's Exhibit 18 is marked for identification)
19  BY MR. O'KEEFE:
20      Q   Okay.
21      A   I am familiar with this.
22      Q   Can you identify that?
23      A   It's the termination of A2a after we hired Clear
24  Channel Outdoor being our sales agent going forward.
25      Q   Is it a true and correct copy of your March 23,

Page 134

1  2014, letter on behalf of Garage-Media to A2aMedia, Inc.?
2      A   That's correct.
3      Q   And in the letter you state, "Nearly three years
4  into PABT project, A2aMedia has failed to build the sales
5  team or achieve the annual sales objective, both projected by
6  A2aMedia and required to support this project."
7      A   That's correct.
8      Q   We haven't talked about it, but did they have an
9  obligation to build a sales team?
10      A   They had a commitment.
11      Q   And so there was no change in the sales team during
12  the period of time which they performed up to this time?
13      A   There was.  I put $250,000 into the company to build
14  the sale team.  They hired salespeople, that then failed; and
15  they did not keep them.  They were not able to move the
16  numbers appropriately.
17      Q   As a result of the RFP process -- in the next
18  paragraph, "As a result of the RFP process, which A2aMedia
19  participated in last quarter, Clear Channel Outdoor has been
20  selected as our exclusive sales agent."  Do you see that?
21      A   I do.
22      Q   "Effective Monday, March 24, 2014, Clear Channel
23  Outdoor will become the lead sales and program manager for
24  the PABT MediaMesh.  As a result, all A2aMedia accounts have
25  been shifted to CCO."  Does this mean that A2aMedia was

Page 135

1  completely finished with its obligations to Garage-Media as
2  of the close of business March 23, 2014?
3      A   There was a transitional period of which they had a
4  period of time to close certain deals.  So they were not
5  finished on that day, but they were not allowed to issue any
6  more new proposals and had a period of time to close the
7  proposals they had outstanding.
8      Q   You also reference that you would continue to pay
9  until June 30, 2016, 6,000 per month for content management
10  services.  What was that?
11      A   From the onset, there was a $6,000 per month fee
12  associated with managing and delivering the content to the
13  project.  So in their computer room in Boston, they would
14  receive the ads, modify the ads to fit the display, and push
15  it down to the display and run it and manage it.  They would
16  send back affidavits to the customers of what was -- what ads
17  were placed on the display and when they ran, and
18  demonstrating that they met all the time frames that the ad
19  contracts required.
20      Q   You also put in here, "Garage-Media will purchase
21  the camera on a CBSO Cube..."
22      A   Yep.
23      Q   What is that?
24      A   Across the street from the display there is a
25  competitive display.  We made a deal where we put a camera on

Page 136

1  the outside of that looking at our display to allow us to see
2  what's happening from a maintenance perspective.
3      Q   And it was on a competitor's sign?
4      A   It was on CBS's who we were paying the sign, and
5  they have one on ours looking at their's.
6      Q   Okay.  Is this a letter which you were instructed to
7  prepare by Macquarie?
8      A   That is.
9      Q   How is that?
10      A   When the -- at the -- the process of which we ended
11  up to make a change and fire A2a, was one that driven heavily
12  by Macquarie to move us in that direction.
13      Q   So when you say it was driven heavily by Macquarie,
14  what do you mean by that?
15      A   It was made very clear by John Zimmeth that if we
16  didn't change sales teams and show something significant,
17  that we would be issued a default letter and that things were
18  out of his hands.  It was essential that we made some change.
19  The only change that he felt was appropriate was a new sales
20  team.
21      Q   And did you think he was wrong in that suggestion or
22  recommendation?
23      A   Didn't really know at the time.  It was of great
24  harm to me personally.  I lost money there, and set us back
25  substantially from a media plan, our overall plan, which was

Page 137

1  to work in cooperation with A2a across the platform and build
2  more displays.  It was a setback.
3       It also exposed what I considered to be our number
4  one risk we had going into the project, which is doing
5  business with someone that is much, much bigger than us and
6  doesn't have our interest in mind, which Clear Channel, CBS,
7  and these other companies would not have our interest in
8  mind.  Versus A2a who needed to sell our content in order to
9  survive.  It was a questionable action, but it was made
10 extremely clear that if we did not satisfy -- didn't
11 demonstrate change, that we would lose control of the project
12 all together.
13      Q   What do you mean by that, lose control of the
14 project?
15      A   I assume default, take over the project.  Keep in
16 mind, until this point we were paying most of our bills.  So
17 our revenue was in the two-and-a-half million dollar range.
18 We are short-paying, but we are paying.
19      Q   What do you mean, short-paying?
20      A   Not always able to pay on time or pay the full
21 amount each month, but we're paying something every month.
22 We were making progress towards the bills, which cumulatively
23 we paid well over five million dollars to Macquarie for this
24 loan, which came as a result of the revenue with A2a.
25      Q   Did you ever look back at the payment history --

Page 138

1       A   I did.
2       Q   -- to find out, in fact, how current or not current
3  you were?
4       A   Yeah.
5       Q   And you believe and you alleged that you were
6  current between 2013 --
7       A   I didn't say we were current.
8       Q   -- to 2014?
9       A   I said we were short-paying.  I didn't say we were
10 current.  I said we were paying our bills to the best of our
11 ability.  We had revenue to pay bills.
12      Q   I will show you later but in your answer to one of
13 the paragraphs you says, "Beginning or around April 2013 and
14 continuing through April of 2014, notwithstanding that GMNY
15 had paid all amounts due under the lease."  Is that a
16 statement with which you agree?
17      A   I don't recall.
18      Q   Did you ever go back and look at your payment
19 history to find out what payments applied to what obligations
20 to determine if you were ever current and the latest point in
21 time when you were current?  I'm just asking you that.  You
22 made a statement here, and I just want to know if you ever
23 checked it.
24      A   Yes.  And many of the -- several of the amendments
25 is exactly, we reorganized it to create that situation in

Page 139

1  some cases.
2       Q   But you think that as of March 2014, you were
3  current?
4       A   No.  I said we were making payments towards the
5  leases.
6       Q   Okay.
7       A   And after we made this change, we were not able
8  to.
9       Q   And notwithstanding your letters to Garage-Media six
10 months out telling them that they were at risk of losing
11 their exclusivity, another month later advising Macquarie
12 that you were greatly disappointed with their performance and
13 considering replacing them, in your July 2012 letter where
14 you told them that they did not achieve, and you were
15 terminating their exclusivity, that this letter in March of
16 2014 was not driven by Garage-Media but was driven my
17 Macquarie?
18      MR. HENZY:  Object to form.  You actually --
19      MR. O'KEEFE:  I misstated it.
20      MR. HENZY:  Misstated letters to Garage-Media.
21      THE WITNESS:  It's to A2a.
22 BY MR. O'KEEFE:
23      Q   If you understood my question.
24      A   I understand your question.
25      Q   Thank you.

Page 140

1       A   And the decision to eliminate A2a entirely was a
2  decision that was pushed on us by Macquarie.  The
3  conversations which are mostly through John Zimmeth through
4  verbal communications, not in letter form -- very, very
5  carefully communicated -- was we need to make a change
6  whole-heartedly, and the addition of a sales team only
7  incrementally brought the revenue up.
8       We either have to do something significant to
9  satisfy some person -- I don't know her last name, but
10 references Helen all the time -- we had to satisfy Helen in
11 Sydney, that we make some change.  Otherwise, this project is
12 out of my control, quote/unquote.
13      Q   Do you believe that while he was being cleaver at
14 that time, as you've described it, that that was not in any
15 way being driven by a default circumstance by Garage-Media?
16      A   We were doing our best to avoid default.
17      Q   Do you know whether or not you were in default at
18 that time?
19      A   I think that I would ask what the legal definition
20 of default is.
21      Q   Do you know whether or not you were not in
22 compliance with the payment obligations and the schedule
23 under the lease agreement?
24      A   I don't know where we were at the each point in
25 time.  We'd have to look specifically and figure that out,

Page 141

1  but I can't say that I know.
2      Q   You said that by not putting his comments in
3  writing, that Mr. Zimmeth was cleaver.  What do you mean by
4  that?
5      A   All conversations were verbal.  It was a text to me
6  or reaching out to me verbally asking for verbal updates.  I
7  would write back, you know, asking something or having
8  communication verbally, so it was a tremendous amount of
9  verbal conversation.
10     Q   Were you ever instructed in writing by Macquarie to
11 take action as set forth in this March 23, 2014, letter?
12     A   I don't believe so.
13     Q   Any e-mail?  Any e-mail that instructed you to take
14 this action?
15     A   That would be in writing, no.
16     Q   What about a text?  I think you said a text.
17     A   He would text me and ask to call me.  The
18 conversations were either in person or by telephone because
19 he would often visit us in New York.  It was about, we've got
20 to do something different because this is not working.
21     Q   It's your testimony that Garage-Media did not of its
22 own volition terminate A2aMedia's services?
23     A   That's correct.
24     Q   Okay.  Did you -- meaning Garage-Media -- undertake
25 some type of a study --

Page 142

1      A   It was --
2      Q   -- with Field Activate?
3      A   Yes.
4      Q   And can you tell me the circumstances under which
5  that came to pass?
6      A   We were -- once we accepted the fact that we have to
7  make this change, we decided to engage an outside firm to
8  help us evaluate the outside -- the other contenders, the
9  marketplace, and we went out to bid.
10         I asked -- I asked to do a study, and I hired them
11 to do a study not only about a potential sales team that
12 would sell it, but also about the circumstances of our
13 position, our market as a whole.
14     Q   So you said a lot there.  When a determination was
15 made, and however it was made, by Garage-Media to replace
16 A2aMedia --
17     A   No.  The decision was not to replace A2aMedia.  The
18 decision was to evaluate the market.  While there was
19 pressure to replace A2aMedia -- there was pressure to replace
20 A2aMedia and do something significant, the effort to hire
21 Field Activate was to identify the market, identify the
22 risks, identify the potential candidates, and understand how
23 can we better the situation.
24     Q   So I misstated that.  In considering whatever
25 pressure you perceived you were under to replace A2aMedia,

Page 143

1  did Garage-Media undertake to have a study of its business
2  and the marketing opportunities by A2aMedia and others for
3  purposes of moving forward, either with the same marketing
4  company or some other marketing company?
5      A   That's correct.
6      Q   All right.  Who made the decision to have a study
7  done?
8      A   I did.
9      Q   And who identified Field Activate as the party that
10 would do that study?
11     A   I did.
12     Q   And neither of those were required or directed or
13 recommended by Macquarie?
14     A   That's correct.
15     Q   That's correct.
16     A   Yes.
17     Q   All right.  I'm going to show you a document marked
18 Plaintiff Schmid 19.  Ask if you will take a look at it, and
19 tell me when you are finished.
20     A   (Witness complies) Yep.
21     Q   Can you identify that document?
22     A   Yep.  That's the initial phase of reviewing our
23 position within the ad community, the sign, and the market
24 opportunities to help determine the best way forward.
25     Q   Did you tell Mark at Field Activate how to undertake

Page 144

1  the effort in which they did?
2      A   Yes.  We identified the pathway for them to do that.
3  We asked them to interview clients, make recommendations, and
4  they followed that.
5      Q   So they considered your position in the market; is
6  that correct?
7      A   That's correct.
8      Q   They considered the efforts which had been
9  undertaken up to that point by A2aMedia and Liquid Outdoor;
10 is that correct?
11     A   That's correct.
12     Q   They looked at the market generally for ad space in
13 New York City, and particularly Time Square and bus terminal
14 area; is that correct?
15     A   That's correct, yep.
16     Q   And all of those things you asked them to do to make
17 recommendations?
18     A   I did.
19     Q   Okay.  Did they interview any of your customers?
20     A   They did.
21     Q   Did they interview any of your competitors?
22     A   I believe so.  I believe it's in the report.
23     Q   I'm just asking if you remember.
24     A   Yeah.  We asked them -- not our competitors, but
25 potential candidates.  So the groups that they interviewed

Page 145

1 were people that we had short-listed that we wanted to have a
2 conversation with.
3   Q   So you identified the potential prospects for a new
4 ad sales agent?
5   A   That's correct.
6   Q   All right.
7   A   Which is easy to do because there's only half a
8 dozen in the city.
9   Q   I'm going to ask you to look at the second page of
10 the document itself.  In the middle it says, They engaged in
11 in-depth discussions were completed with both Garage-Media
12 sales partners, A2aMedia, and they identify Brian Shuvart --
13 by the ways, it's S-H-U-V-A-R-T.  I believe you got it right
14 before -- and Liquid Outdoor, Pat Sherry and Paul DuCharme.
15   A   DuCharme, yep.
16   Q   A total of twenty interviews were completed.  So
17 they did talk to your then existing ad sales agents; is that
18 correct?
19   A   That's correct.
20   Q   Turning to the fifth page, major findings.  You
21 would agree that they concluded that your board was no longer
22 the preeminent board in the high profile --
23        MR. HENZY:  Sorry, John.  Where are you?
24        MR. O'KEEFE:  The fifth page of the document.
25        MR. HENZY:  Is it the fifth numbered page?

Page 146

1        MR. O'KEEFE:  Fifth numbered page and it's got 1026
2 in the corner.
3        MR. HENZY:  Okay.
4 BY MR. O'KEEFE:
5   Q   "Viewed as a spectacular product, however, no longer
6 the preeminent board in the high profile 42nd Street and 8th
7 Avenue location."  Do you see that?
8   A   Yep, that's correct.
9   Q   And in the next bullet they talk about it being
10 washed out in the daylight.  Is that something that you
11 experienced?
12   A   Yep.
13   Q   Okay.  And in the next paragraph they say, the
14 Garage-Media board pales in comparison from a technology
15 standpoint.  In that paragraph in the bullet point, they were
16 comparing it to the cube?
17   A   Yep.
18   Q   When did the cube start to operate, if you know?
19   A   One year after we installed our display.
20   Q   Do you know the differences --
21   A   I'm sorry.  It had always been there.  It was
22 upgraded one year later.
23   Q   It was upgraded to a much brighter --
24   A   From a statistic display to a digital display.
25   Q   Okay.  And then the last bullet, they conclude it is

Page 147

1 a true outlier.  Do you see that?
2   A   Um-hum.
3   Q   So they were critical of the board, would you agree
4 with that?
5   A   They were.
6   Q   Were they also critical of the fact that it was not
7 perceived as Time Square being on the Port Authority parking
8 garage?
9   A   Um-hum.
10   Q   Turning to the thirteenth page of that, which has
11 HTF ending 1034, so it's many pages forward.  It's titled,
12 Sales dynamic, A2aMedia.
13   A   Um-hum.
14   Q   Do you agree that they concluded that A2a -- it says
15 very little visibility.  It says A2 who?  In the first
16 bullet.
17   A   I see the words.  We didn't agree with that.
18   Q   Okay.  It says, "No presence in NYC.  Few contacts
19 or relationships in place.  Seen at times as being needy or
20 hounding media buyers when they get connected."  Do you see
21 that?
22   A   Yeah.  We didn't agree with that.
23   Q   Next is, "Pervasive opinion exists the need to be
24 physically located in the city.  Boston is not New York."  Do
25 you see that?

Page 148

1   A   I do.  Did not agree with it.
2   Q   The last bullet shows that, "Sales executives felt
3 that assigning the selling right to A2aMedia doomed
4 Garage-Media from the start."  Do you see that?
5   A   Completely disagree with that.
6   Q   On the next page, "Sales dynamic, Liquid Outdoor,
7 which was the other non-exclusive ad."  Second bullet, "Some
8 confusion exists as to who is selling what, and to whom
9 between A2a and Liquid Outdoor."  Do you see that?
10   A   I do.
11   Q   Did you agree with that?
12   A   No -- no, I should clarify.  What is really important
13 is the amount of time.  From the time that we added them to
14 this point was a very short period of time, and it was in a
15 transition phase.
16   Q   Next bullet, "Buyers and sellers both question
17 whether Liquid Outdoor can overcome many of the issues and
18 lack of sales velocity based on A2a's involvement."  Do you
19 see that?
20   A   Yes.
21   Q   Do you agree with that?
22   A   It's someone else's opinion, so I have no
23 argument.
24   Q   Okay.  Did they recommend whomever took over the
25 sales effort should direct their sales efforts at a

Page 149

1  particular market niche which had not been pursued by
2  A2aMedia?
3      MR. HENZY: If you recall.
4  BY MR. O'KEEFE:
5      Q   If you are recall.
6      A   Don't -- I don't recall. I don't.
7      Q   Directing your attention to what is marked thirty,
8  page thirty in that. I will come back, but that's 1051 on
9  the Bates stamp.
10     A   Yep.
11     Q   Do you see in number two, "Develop a
12  category/industry/brand target account program." Then they
13  list a number of things. Sports entertainment, were they new
14  concepts for you at the time?
15     A   No. If you look at our current ad sales, they were
16  most of these groups already.
17     Q   Page before that on page twenty-nine -- actually,
18  the page before that, twenty-eight, says recommendation,
19  right?
20     A   Sure.
21     Q   So on page twenty-nine, number one, "Terminate the
22  relationships with A2a and Liquid Outdoor." Do you see
23  that?
24     A   I do.
25     Q   Did you agree with that?

Page 150

1      A   No. I agreed in the end to do that, but I didn't
2  agree that it was in our best interest.
3      Q   Okay. And number three says, "Develop a well
4  thought-out RFP." Did you agree with that?
5      A   We did.
6      Q   Did you agree with it or --
7      A   We did it. We took action. We actually did that.
8      Q   Tell me about that. How did you do that?
9      A   With Field Activate we created an RFP document of
10  all the requirements and submitted to these -- several of
11  these companies; not all of them. We would not have done it
12  with CBS Outdoor, who is our main competitor. We did it with
13  Clear Channel, we did it with Van Wagner, we did it with City
14  Outdoor, and we did it with A2a as well.
15     Q   And those are the entities that were listed in and
16  recommended by Field Activate, paragraph three on page
17  twenty-nine?
18     A   They're also the only organizations in New York.
19     Q   CBS Outdoor was also your permit holder; is that
20  correct?
21     A   Exactly and our major competitor and our enemy by
22  all sense, except for the fact that they were getting paid
23  every month by us.
24     Q   Did Field Activate put the RFP together?
25     A   They did.

Page 151

1      Q   And did they do it with information that was
2  provided by you?
3      A   Yes.
4      Q   Did Macquarie direct or participate in the
5  preparation of the RFP?
6      A   It reviewed it.
7      Q   Okay. And was that because you provided it to them
8  for informational purposes?
9      A   Because we shared where we were, and they said they
10  would like to see it.
11     Q   Did that seem like an unusual request to you?
12     A   No. We were sharing information all the way
13  through.
14     Q   Would you agree that throughout the relationship
15  with Macquarie and then Huntington, whenever you were called
16  upon to share information or provide documents, that you did
17  that?
18     A   Yes, absolutely.
19     Q   And you in particular did that?
20     A   I personally did that on every action, every
21  activity.
22     MR. HENZY: Do you need a break?
23     MR. O'KEEFE: I would like a recess.
24     (Recess: 1:25 p.m. to 1:30 p.m.)
25  BY MR. O'KEEFE:

Page 152

1      Q   Mr. Neff, you indicated that not all of the parties
2  identified in the recommendations by Field Activate to
3  receive RFPs, received RFPs. Do you recall who did receive
4  an RFP?
5      A   Clear Channel, Van Wagner, City Outdoor, a company
6  called Big Outdoor, and A2a.
7      Q   Was City Outdoor on that list? I don't recall.
8      A   Yes, they were on the list.
9      Q   Do you recall who all you received proposals from?
10     A   A2a, may have been another company Radiant Outdoor
11  may have come in, and Clear Channel. Van Wagner did not bid
12  it, but they merged with CBS right at the same time. So I
13  believe three: Big Outdoor, Radiant and Clear Channel.
14     Q   And A2a?
15     A   And A2a.
16     Q   Did A2a submit it with Liquid Outdoor?
17     A   No. They submitted it with Big Outdoor. Another
18  company was trying to get assembled in New York.
19     Q   I'm going to show you a document, and I will ask the
20  court reporter to mark it as Plaintiff Neff 20.
21     (Plaintiff Exhibit 20 is marked for identification)
22  BY MR. O'KEEFE:
23     Q   Can you identify that for the record?
24     A   It is the financial proposal response from Clear
25  Channel on December 17, 2013.

## Page 153

1  Q   And to whom were the responses to the request for
2  proposal submitted?  Were they submitted to you?  Field
3  Activate?
4  A   Field Activate.
5  Q   And who at Field Activate was the contact person, if
6  you recall?
7  A   I don't remember his name.  Bill -- I don't remember
8  his last name.  Maybe Field, Bill Field.
9  Q   And they were the party with whom or with which you
10 contracted to do the study, and also to assist you in
11 preparing a request for the proposal --
12 A   That's correct.
13 Q   -- upon the conclusion of their study?
14 A   Yes, that's correct.
15 Q   Did you react or respond in any way to this proposal
16 from Clear Channel?
17 A   We collectively considered it, and they presented to
18 us, my partners, as well as Macquarie.  John Zimmeth
19 participated in the interview process.
20 Q   So I will come back to that.  This came from
21 Mr. Coghlan?
22 A   That's correct.
23 Q   Did you, upon receipt of this, have an opportunity
24 to explore any further information from them, other than the
25 presentation which they made at some point in time?

## Page 154

1  A   I had a chance to meet their technical people, as
2  well as their salespeople.
3  Q   And is that true of each of the participants that
4  submitted proposals?
5  A   As well as A2a and Big Outdoor and Radiant as
6  well.
7  Q   I'm going to show you a document which I will ask
8  the court reporter to mark -- sorry.  The court reporter has
9  marked Plaintiff's Schmid 20.  Take a look at that and tell
10 me when you are finished.
11 A   (Witness complies)
12     MR. HENZY:  Is that Plaintiff's 20 or 21?
13     MR. O'KEEFE:  It should be 21.
14 BY MR. O'KEEFE:
15 Q   Do you recognize this document which has been placed
16 before you marked Schmid 21?
17 A   I don't.
18 Q   Okay.  Does this document in any way refresh your
19 recollection of who actually did make bids or give proposals
20 in response to the request for proposal?
21 A   I don't believe this is accurate.  I don't believe
22 Van Wagner made a submission.  I believe Radiant Outdoor did,
23 and A2a was teamed up with a company called Big Outdoor.  I
24 don't know who prepared this document.
25 Q   There's a reference at the top of the document to

## Page 155

1  financial meeting 12/10.  Do you recall there having been a
2  financial meeting on 12/10 or thereabouts?
3  A   I don't.
4      MR. HENZY:  Object to the form of the question.
5      THE WITNESS:  I don't know what this document is.
6  BY MR. O'KEEFE:
7  Q   Okay.  So it's your recollection that A2a with Big
8  Outdoor, Clear Channel, and Radiant made proposals; and you
9  don't remember any others?
10 A   Van Wagner did not because it was -- we questioned
11 why they wouldn't make a submission, and we learned that they
12 merged after.  I went and met with them.  Clear Channel and
13 A2a were the two organizations that were mostly considered or
14 evaluated.
15 Q   And you said that these proposals were furnished
16 directly to Field Activate?
17 A   That's correct.
18 Q   And you think it was Bill Field that received
19 them?
20 A   That's correct.
21 Q   And he would have furnished them to you, and you
22 furnished them to Macquarie?
23 A   Yep.
24 Q   Did you have a meeting or meetings with each of the
25 candidates that had submitted proposals?

## Page 156

1  A   We had video presentations.
2  Q   Like a Skype --
3  A   It was --
4  Q   -- or was it an actual media presentation?
5  A   It was actual presentations over -- on-line like a
6  PowerPoint presentation.
7  Q   So it was taped in a can and sent to you?
8  A   No.  It was like a web cast.
9      MR. HENZY:  You're not going to understand it any
10 more than I am.  All right.
11     THE WITNESS:  Get on-line and they present to us.
12 Like a conference call with video.
13 BY MR. O'KEEFE:
14 Q   So you could talk to them, and they could talk to
15 you?
16 A   Yes.  We could see their presentation.
17 Q   So they weren't in person, but on some type of
18 technology?
19 A   Yeah.  Both A2a --
20 Q   And who participated on those presentations on
21 behalf of Garage-Media?
22 A   Myself, John Schmid and Dave Schmid.
23 Q   And who else would have participated exclusive of
24 the party that was presenting their proposals?
25 A   In the case of Clear Channel, John Zimmeth

Page 157

1 participated. In the presentation of A2a, nobody from
2 Macquarie. John just participated in Clear Channel.
3    Q   Not the Radiant one?
4    A   No. I don't think we went that far. I don't think
5 they qualified further. We got down to these two companies,
6 Clear Channel and A2a.
7    Q   So did you get to a point where you determined that
8 the two, A2a and Clear Channel, would make a presentation?
9    A   Yes.
10    Q   And who is it that narrowed it down to those two?
11    A   We did.
12    Q   Who is "we"?
13    A   Garage-Media.
14    Q   With Field Activate's participation?
15    A   Yeah, absolutely.
16    Q   And did Bill Field or someone on behalf of Field
17 Activate give any assessment of the proposals that had been
18 made? Did they favor one over the other?
19    A   Yeah. They favored Clear Channel for the objectives
20 that we had set.
21    Q   And was it Clear Channel's New York office that was
22 making the proposal?
23    A   Yeah, just the New York office.
24    Q   So it's narrowed down to A2a and Clear Channel. How
25 is it that Mr. Zimmeth was able or not able to participate in

Page 158

1 either or both of those?
2    A   He asked to participate in Clear Channel.
3    Q   He wanted to hear what they had to say?
4    A   Yeah. And he very specifically said, I don't want to
5 waste my time with A2a.
6    Q   Did anyone from Park It tell you that you had to
7 chose -- strike that.
8       Did John Schmid ever tell you that you had to choose
9 or should choose Clear Channel because of its relationship
10 with Park It?
11    A   I don't recall that. I don't think that would have
12 been relevant. My understanding is that Park It had a
13 relationship with a different company called Robbins up in
14 the Northwest. They had experience in the media place, but
15 they weren't a serious -- I didn't believe they were a
16 serious contender at the time.
17    Q   So neither John Schmid nor a representative of Park
18 It encouraged you to choose Clear Channel?
19    A   No.
20    Q   Okay.
21    A   No.
22       MR. HENZY: John Schmid?
23       MR. O'KEEFE: Did I say John Schmid? I thought I
24 did.
25 BY MR. O'KEEFE:

Page 159

1    Q   Neither John Schmid -- strike that.
2       No one from Park It recommended to you that you
3 should choose Clear Channel?
4    A   No. I don't know why -- they had no involvement
5 with our process.
6    Q   Okay. And among the representatives of Garage-Media,
7 did each of you choose to pick Clear Channel?
8    A   Given the -- the answer is, yes; and we got on the
9 bandwagon of the program. I mean, we understood we had to
10 make a change. Of those options, we felt Clear Channel was
11 the best option of the competitive set if we are going to
12 leave A2a behind.
13    Q   Directing your attention to what I will ask the
14 court reporter to mark as Plaintiff's Neff 22.
15      (Plaintiff's Exhibit 22 marked for identification)
16 BY MR. O'KEEFE:
17    Q   Do you recognize that?
18    A   Yes. These are our businesses terms that we
19 discussed.
20    Q   Is that a true and correct copy of a January 18,
21 2014, e-mail from you to Patty Magrin and John Zimmeth, with
22 attached terms for PABT Media Project with Clear Channel?
23    A   That's correct.
24    Q   And you would agree that your e-mail reads, "Here is
25 the summary of business terms we agreed to with Clear

Page 160

1 Channel, which will be in the final agreement."
2    A   That's correct.
3    Q   And that's what is appended to this document. Are
4 those terms which were negotiated between you and Clear
5 Channel? Meaning Garage-Media and Clear Channel.
6    A   Yes.
7    Q   And did Macquarie participate in the negotiation of
8 those terms?
9    A   They did not participate in the negotiations of the
10 terms.
11    Q   And if Macquarie were to say that this e-mail is the
12 first that they knew of the determination that had been made
13 to pick Clear Channel, you would say that would be
14 incorrect?
15    A   I'm saying that's false.
16    Q   Do you know when they would have known you picked
17 Clear Channel?
18    A   Shortly after -- shortly after the interview process
19 was concluded, which was back in December. No, I don't know
20 the date. I shouldn't say the date. I don't -- shortly
21 after the interview process was concluded, which may have
22 been after the first of the year. Now that I --
23    Q   So sometime between when the proposals were made?
24 We know from Exhibit 20, that Clear Channel's was December
25 17th.

5/8/2019        Alan Neff/Garage Media        Page: 44 (161 - 164)

Page 161

1   A   In between. Likely in the beginning of January, but
2   conversation -- there were many conversations between the
3   proposal, presentation, and the terms being negotiated.
4   **Q   But, again, to reiterate the terms set forth on the**
5   **attachment, dated January 10, 2014, were negotiated between**
6   **you and Clear Channel?**
7   A   That's correct, and coming out of -- coming out of a
8   proposal that they submitted.
9   **Q   Okay. Directing your attention to what I will ask**
10   **the court reporter the mark as Plaintiff Neff 23.**
11   (Plaintiff's Exhibit 23 is marked for identification)
12   BY MR. O'KEEFE:
13   **Q   Tell me after you had an opportunity to look at**
14   **that.**
15   A   (Witness complies) Yes, I'm familiar with this.
16   **Q   Can you identify the document for the record?**
17   A   It's the management agreement between Garage-Media,
18   Clear Channel, and with the approval from Macquarie.
19   **Q   So when you say, approval from Macquarie, you're**
20   **indicating that the lessor consented to you entering into the**
21   **agreement under one of the paragraphs set forth in the**
22   **agreement?**
23   A   Yes. And also reviewed it to ensure that it met the
24   criteria associated with -- consistent with the A2a agreement
25   that we previously had.

Page 162

1   **Q   And you did sign this agreement?**
2   A   I did and so did Macquarie.
3   **Q   And did Clear Channel sign?**
4   A   They did. The signature pages are on the back.
5   **Q   Directing your attention -- strike that. Off the**
6   **record.**
7   (Off-the-record discussion is held)
8   BY MR. O'KEEFE:
9   **Q   There is an unsigned or a blank signature page on**
10   **page fourteen, which appears in the succession of pages as**
11   **page fourteen; is that correct?**
12   A   That's correct. This is that page.
13   **Q   Directing your attention to page three of the**
14   **management agreement, marked as Exhibit 23. Was there, in**
15   **this agreement, a minimum performance threshold --**
16   A   There is.
17   **Q   -- for semi-annual performance for gross revenue for**
18   **CCO?**
19   A   That's correct.
20   **Q   If I say CCO, do you understand that to mean Clear**
21   **Channel Outdoor?**
22   A   That's correct.
23   **Q   And directing your attention to Exhibit B, nearer**
24   **the back of the document, does that set forth the semi-annual**
25   **minimum special levels?**

Page 163

1   A   It does.
2   **Q   Did Clear Channel ever meet those specials?**
3   A   No, they did not.
4   **Q   Did you ever put them on notice that they were in**
5   **default of the management agreement?**
6   A   We chose not to.
7   **Q   Why?**
8   A   We were negotiating or having conversations about
9   them taking over the entire project, so the dialog shifted to
10   acquiring the entire project.
11   **Q   Or investing in the project if you got an extension;**
12   **is that correct?**
13   A   Yeah. Either way it was always tied to an
14   extension, but for them to come in and take it over.
15   **Q   And so for that reason, Garage-Media elected not to**
16   **either replace them or to advise them of a default in the**
17   **minimum performance threshold levels?**
18   A   That's correct.
19   **Q   Is that something that Macquarie directed or**
20   **instructed you to do?**
21   A   We had collaboration on it.
22   **Q   Meaning that they were aware of your decision not to**
23   **declare them in default or to get rid of them?**
24   A   It was a collective decision.
25   **Q   So Macquarie told you not to fire or to put CCO on**

Page 164

1   notice of their default?
2   A   No, but we collaborated and had discussion and
3   agreed together not to do that.
4   **Q   I'm still trying to understand what you are saying.**
5   **Did you determine it was a good business strategy not to do**
6   **that?**
7   A   I did.
8   **Q   And Macquarie agreed with that?**
9   A   They also concluded the same thing.
10   **Q   So either --**
11   A   We --
12   **Q   -- agreeing with you or independently, you both**
13   **thought that it was a good idea not to put CCO on notice of**
14   **default or to be replaced?**
15   A   That's correct. We sat in the same room, had a
16   conversation, and agreed together that our best answer is to
17   woo them into buying our display.
18   **Q   Or invest?**
19   A   And running them away from the project was not going
20   to better our position because there were no other parties
21   left to work with that was in the competitive market.
22   **Q   And that would be a business strategy to enhance or**
23   **improve Garage-Media's ability to succeed to the point where**
24   **it could obtain an investor, a buyer, and either case pay**
25   **Macquarie?**

Page 165

1   MR. HENZY: Object to form.
2   THE WITNESS: That's right; that's correct.
3   BY MR. O'KEEFE:
4   Q   And to be clear, Macquarie would have had the
5   opportunity to review the document marked Exhibit 23 but did
6   not prepare it?
7   A   I believe it was prepared by Clear Channel, and they
8   reviewed it and provided commentary on some of the terms and
9   then approval. My best recollection is that this is a Clear
10  Channel agreement.
11  Q   And when you say, their approval again, you mean the
12  lessor's consent which is reflected on the signature page?
13  A   They also put language in, in reference to some of
14  the protections. So it was on -- it was insurance and
15  there's a few other things that they had wanted to make sure
16  we had in place because they were -- it was replacing the A2a
17  agreement.
18  Q   And it was changes made to protect their rights
19  consistent with the same provisions in the A2a agreement; am
20  I correct?
21  A   That's correct.
22  Q   I'm going to show you a document that has been
23  marked as Plaintiff's Schmid 24, and ask you to take a look
24  at that and tell me when you've finished.
25  A   (Witness complies) Yes.

Page 166

1   Q   Would you agree it appears to be an e-mail exchange
2   which began on May 17, 2017, from Harry Coghlan to you and
3   ended with an e-mail from you to John Schmid and John Zimmeth
4   on May 23, 2017?
5   A   I do.
6   Q   Does it start with a non-binding proposal from Clear
7   Channel to Garage-Media?
8   A   It does; but to clarify, it is not the scope that we
9   were submitting the proposal for. This is for additional
10  billboards that are not part of our agreement with the Port
11  Authority.
12  Q   Okay. This would have been a broader plan for the
13  future?
14  A   This included an entire side of the Port Authority
15  bus terminal that does not have any media, and it was a
16  requirement. Their offer was contingent on obtaining
17  approval for the entire exterior of the building; not just
18  the corner.
19  Q   Okay. Does it start with you being congratulated on
20  obtaining extension from the Port Authority for the MediaMesh
21  on the bus terminal through 2028?
22  A   That's correct. Because we put into the marketplace
23  that we had an extension because we found after people had
24  heard that we were having challenges, a number of our
25  competitors started going to the Port Authority trying to get

Page 167

1   in between us and our lease and were creating conflict for
2   us. So we spread the message out there that we had an
3   agreement in place with the Port Authority in order to
4   discourage competitors from doing additional harm to us while
5   we were negotiating.
6   Q   But, in fact, as of that time, according to your
7   prior testimony, you had obtained a proposed agreement from
8   the Port Authority?
9   A   We received a draft agreement for review.
10  Q   Which had not been finally approved?
11  A   Was not approved by the board, and was consistent
12  with only one -- replacing the existing display. This here
13  is -- this here is an attempt to replace our current display
14  and receive a whole other area of the Port Authority that
15  currently the Port Authority had no interest in allowing us
16  to expand to.
17  Q   In the middle of the second paragraph, at the
18  beginning of the non-binding proposal, Mr. Coghlan comments
19  that you paid him the ultimate compliment when you stated
20  that he worked as partners with you as opposed to media
21  representatives and he echoed that statement to you. Do you
22  see that?
23  A   Yep, that's correct.
24  Q   Is that something you shared with him, that you were
25  a partner?

Page 168

1   A   I do that with everybody I work with.
2   Q   In the next paragraph they comment upon the
3   challenges that they faced but taking pride in certain of
4   their successes, aka, growing Netflix, adding WIX, New York
5   Mets, Facebook, Twitter, and key campaigns for Title and
6   Clear. Are those all things that you are familiar with?
7   A   I am.
8   Q   And, in fact, they had retained those advances?
9   A   Those are ad contracts that they had sold on the
10  display.
11  Q   And does this particular non-binding proposals,
12  carrying over onto the second page, conclude with an offer to
13  buy Garage-Media?
14  A   As conditioned on receiving all rights to the
15  exterior of the Port Authority for two displays.
16  Q   Did you -- strike that.
17      You then have an exchange with him where it looks
18  like there's information being shared about ad revenue
19  sharing; is that correct?
20  A   Do I have that?
21  Q   Yes.
22  A   Yes, okay.
23  Q   Would it be fair to say that this is part of the
24  on-going dialog for a broader relationship or any
25  relationship in the future that would have depended upon a

Page 169

1 extension of the permit and possibly an extension of the ad

2 space?

3    A   That's correct.  They're forecasting if we doubled

4 the space, they would sell 3.4 million in revenue on the

5 combined spaces.  These are not -- this is not based on

6 existing.

7    Q   But it would also indicate the share that you might

8 get out of that in a relationship with them going forward?

9    A   That's correct.

10    Q   Did you ultimately share this with Mr. Schmid and

11 Mr. Zimmeth, commenting that you were going to get together

12 with Mr. Schmid and counter?

13    A   Yep.  We also had a meeting following that with John

14 Zimmeth and Harry Coghlan at a later point as well.

15    Q   And before we get to that, you did also tell them

16 that you spoke with Jerry --

17    A   From the Port Authority.

18    Q   And that you were going to get back to him on that

19 -- or them, Mr. Schmid and Mr. Zimmeth.

20    A   Yeah.

21    Q   Did you ultimately move forward in discussions with

22 respect to this --

23    A   We did.

24    Q   -- non-binding proposal?

25    A   Until it was retracted in September.

Page 170

1    Q   Of 2017?

2    A   2017.

3    Q   And do you know why it was?

4    A   Lack of funding within Clear Channel.  They said

5 they did not have approval for it and were concerned about

6 the technology in general.

7    Q   Do you know whether the plan that was referenced in

8 this e-mail would have depended upon changing the signage?

9    A   It was.  It was essential that the sign was to be

10 replaced because the sign was failed, but it was to install

11 signs on both -- replace the sign and add a new sign on the

12 other side of the building.

13    Q   And this is different than the prior discussion that

14 you had with the Port Authority of extending the sign.  This

15 is a sign on the other side of the building?

16    A   They were looking for a completely different side of

17 the building.  Our sign is on 42nd and 8th, and they wanted

18 it on 40th Street and 8 Avenue, two blocks south.

19    Q   Okay.  And so that died later that year and has not

20 been resurrected since?

21    A   Harry got fired shortly after that, and nothing

22 happened after that with Clear Channel.

23    Q   Did something happen with somebody else?

24    A   No.

25    Q   Were they, in the more recent years, the exclusive

Page 171

1 party with which you were dealing, either for a future

2 investment and/or acquisition?

3    A   They were, until 2017 when they pulled out.

4    Q   Okay.  Directing your attention to what I will ask

5 the court reporter to mark Plaintiff Neff 25.

6    (Plaintiff's Exhibit 25 is marked for identification)

7 BY MR. O'KEEFE:

8    Q   Is that a true and correct copy of an e-mail that

9 you sent to John Zimmeth, Adele Wahab, W-A-H-A-B, and Patty

10 Magrin, dated March 22, 2014?

11    A   It is.

12    Q   And in it, am I correct, that you reference the fact

13 that you have signed your agreement with Clear Channel?

14    A   That's correct.

15    Q   And you also comment that Clear Channel is a strong

16 sales plan in place, and I believe they will perform

17 effectively?

18    A   I did.

19    Q   And that's something you believed at the time you

20 wrote that?

21    A   I did.

22    Q   You also identify technical issues, and go on about

23 specific problem, on-going problems with the board.  These

24 are part of the problems that had been on-going more or less

25 since the sign went live; is that correct?

Page 172

1    A   That's correct.

2    Q   Was there a period of time when it was worse than

3 others?

4    A   Yeah.  Year number two was our most difficult

5 year.

6    Q   Was that 2013?

7    A   It was like --

8    Q   '12 to '13?

9    A   Yeah, in that range.  It was the wintertime that was

10 the most distributing time.  That's when we had most of the

11 failures when the weather changed.

12    Q   And in this you state, "This information is very

13 troubling as our failure rate is high and the manufacturer

14 agrees at this time that its their product; but quick to

15 point out that it's out of warrantee.  I do expect GKD to

16 step up and provide some relief.  However, at this time no

17 commitments have been offered."  Do you see that?

18    A   I do.

19    Q   And then you go on to state that the cost to replace

20 is outside of your ability to support the upgrade; is that

21 correct?

22    A   That's correct.

23    Q   So at that time you were reporting to Macquarie both

24 your confidence in Clear Channel and the continued problems

25 with the board and GKD, did you request Macquarie to

Page 173

1  participate in helping you to obtain any relief or assistance
2  from GKD at this time?
3     A   No.  They -- the meetings we had with Tom Polly was
4  before this.
5     Q   Just asking about this time.
6     A   Yep.
7     Q   When were those meetings that you were talking
8  about?
9     A   I believe they were in 2013.  It was after the
10 warrantee had ended, before Leurocom went out of business.
11    Q   Okay.  I'm going to show you a document which has
12 been marked Plaintiff's Schmid 26.  Ask you to take a look at
13 that and tell me when you have finished.
14    A   (Witness complies)  Yep.
15    Q   Can you identify that?
16    A   This is a proposal to exchange out the segments of
17 the display.
18    Q   Is either of the options -- would you agree there
19 are two options identified?
20    A   I do.
21    Q   It's a March 18, 2014, letter or other writing from
22 GKD Metal Fabrics to you; is that correct?
23    A   That's correct.
24    Q   Did either of the options identified here involve
25 replacing the entire system or both?

Page 174

1     A   The second one was to replace the entire system with
2  what's called a fifty millimeter horizontal pitch, which
3  would not work for us.  It's even a lesser quality product.
4  We were on a forty-two millimeters.  So this option two to
5  replace the entire thing which would not look good and would
6  actually degrade the system even further.  The first one was
7  to what they call restick it, put new LEDs in place.  Both
8  options were considered only from getting a price so we can
9  have conversation with investors going forward.
10    Q   So this gave you an opportunity to consider future
11 investments and/or buyout.  Would this have been contingent
12 upon getting an extension from the Port Authority?
13    A   It would have been.  It made no sense to put a new
14 display on something that we are only going to operate for a
15 couple of years.
16    Q   And even with that extension, you would either
17 require capital investment, some type of lending, and/or a
18 buyout?
19    A   That's correct.
20    Q   Did either of those go forward, those options?
21    A   No.
22    Q   I'm going to show you a document which I will ask
23 the court reporter to mark as Plaintiff Neff 27.
24    (Plaintiff Exhibit 27 is marked for identification)
25 BY MR. O'KEEFE:

Page 175

1     Q   I ask you to take a look at that, and tell me when
2  you're done.
3     A   (Witness complies)
4     Q   Do you recognize that document?
5     A   I do.
6     Q   Would you agree that it appears to be a series of
7  e-mails originating August 6, 2015, from Joel Orgel,
8  O-R-G-E-L, Clear Channel to David Miller and ending with one
9  from you to John Zimmeth?
10    A   That's correct.
11    Q   Okay.  The very first e-mail says, "David, this
12 campaign is now on life support."
13    A   That's right.
14    Q   Do you know what that meant?
15    A   It's an ad they bought that they were paying $45,000
16 for an ad for twenty days for three weeks, eight minutes per
17 hour, and that's the campaign and the content.
18    Q   Do you know what is meant or intended by the
19 reference, this campaign is now on life support?
20    A   Sure.  What they are saying is that the ad plate,
21 the ad buyer has seen the display and is dissatisfied with
22 the display and about ready to pull it.
23    Q   Okay.  On the next page there is a lengthier e-mail
24 from David Miller to Jessie London, both of Clear Channel.
25 It appears to be complaining of technical issues, and the

Page 176

1  fact that Netflix is considering -- currently running now and
2  in the panels are still out.  They know this and won't
3  confirm this October business until they see that the screen
4  is fixed.  This business is very much in jeopardy going
5  forward.  Not just for this deal but for the future.  Do you
6  see that?
7     A   I do.
8     Q   And that was brought to your attention at some
9  point; is that correct?
10    A   Um-hum.
11    Q   In fact, Mr. London sent you an e-mail, "Guys, this
12 is a good advertiser.  A lot on the line here.  Can it be
13 solved?"
14        Who was responsible for maintaining that board?
15    A   GKD through me.
16    Q   And so did -- I asked you before, you did not have a
17 service contract but you would contact them to fix things?
18    A   We didn't have a preset, prepaid maintenance
19 contract.  We had an on-call service arrangement, so they
20 came on every service call.  This issue was resolved shortly
21 after, and Netflix had advertised all the way up to the
22 display ended.
23    Q   Okay.  Was this characteristic of problems that were
24 experienced with the board from time to time?
25    A   Yes.

Page 177

1    Q   And did you receive complaints from other ad parties
2  such as Netflix because of similar problems?
3    A   We did.
4    Q   I'm going to show you a document which I will ask
5  the court reporter to mark Plaintiff Neff 28.
6    (Plaintiff's Exhibit 28 is marked for identification)
7  BY MR. O'KEEFE:
8    Q   Do you recognize that document?
9    A   I do.
10   Q   Is that a true and correct copy of an e-mail chain
11  starting with a February 18, 2016, e-mail from you to Roy
12  Bickley at the Port Authority and ending with an e-mail from
13  you to John Zimmeth on the next day, February 19, 2016?
14   A   Yes.
15   Q   The e-mail to Mr. Bickley was to let him know you
16  hadn't heard from anyone in procurement.  Did that relate to
17  obtaining a proposed extension for the permit?
18   A   I don't recall.
19   Q   And above that, you reach out to John Zimmeth by
20  e-mail.  John maybe you call him also.  Thanks.  That was a
21  common practice for you to ask Mr. Zimmeth to contact
22  relationships of Garage-Media on your behalf?
23   A   Absolutely not, but I'm also not sure who I'm
24  referring to.  I would not have asked John to contact
25  procurement.  You don't give John Zimmeth -- you give him

Page 178

1  direction -- you give him a phone number, a name, or
2  something more.  I have no idea who I'm even referring to or
3  the conversation is in between these.
4    Q   So you don't know what you meant by this?
5    A   I have no idea.  Maybe you can call him.  I don't
6  know who "him" is also.
7    Q   But you acknowledge that by e-mail on that date, you
8  did ask John Zimmeth to reach out to somebody --
9    A   Somebody, sure.
10   Q   -- from the Port Authority?
11   A   No.  I don't know if it was from the Port
12  Authority.
13   Q   Okay.
14   A   Often John would call me, leave me a message.  I try
15  to call him back.  I send him a note.  We had a lot of
16  confusing conversation, confusing in the sense that they
17  weren't linked together.  So I would e-mail John, he would
18  then call me back, leave me a voice mail, send me a text, or
19  something along those lines.  I don't know who this is
20  referring to.
21   Q   But this is on top of an e-mail --
22   A   I see that.
23   Q   -- under which you're reaching out to the Port
24  Authority; is that correct?
25   A   Roy is with the Port Authority.

Page 179

1    Q   But it's correct that it's two e-mails, one from you
2  to Roy Bickley.
3    A   Yep.
4    Q   And the other one to John Zimmeth asking him
5  specifically, maybe you can call him also.  Thanks; is that
6  correct?
7    A   It says that.  I don't know what it means.
8    Q   You were asking him to call somebody?
9    A   Yes, but I don't know who I'm asking him to call.
10   Q   And if you don't know who it is that you are asking
11  him to call, you also don't know why you wanted him to call
12  whomever it was?
13   A   Yeah.  There would have been a lot of -- would have
14  been a lot of verbal conversation around that.
15   Q   I'm going to show you a document which I will ask
16  the court reporter to mark Plaintiff Neff 29.
17   (Plaintiff's Exhibit 29 is marked for identification)
18  BY MR. O'KEEFE:
19   Q   Ask you to take a look at it, and tell me when you
20  are finished.
21   A   (Witness complies)  Okay.  I'm familiar with this.
22   Q   Does that appear to be a number of e-mails starting
23  with one from the March 21, 2017, from Scan Documents and
24  parkassist.com to Nicole Ardolino, A-R-D-O-L-I-N-O, at
25  parkassist.com.  That was date March 21, 2017, and ending

Page 180

1  with one from to you John Zimmeth dated March 29, 2017.
2    A   Um-hum.
3    Q   Have you had a chance to review the e-mail exchange
4  or sequence?  There's reference to documents having been
5  picked up from Clear Channel.  Do you know what they were in
6  2017?
7    A   It would have been a draft of the contract with the
8  Port Authority, and their comments associated with it.
9    Q   And at the one at the top of the second page, not in
10  the format I was expecting.  Can I ask for Andy's general
11  comments of their requests.  Would that have been Andy
12  Feldstein, in-house counsel at Macquarie then, I think it was
13  Huntington?
14   A   That's correct.
15   Q   Okay.  And in the next e-mail from John Zimmeth,
16  there's three question marks and he tells you that Andy is
17  not available.
18   A   Yep.
19   Q   Is that correct?
20   A   That's correct.
21   Q   And then you tell him at Mark Garrity's office -- we
22  had a page-turn yesterday with Mark Garrity's office
23  yesterday, and I'm writing comments and revising the offer
24  tomorrow.  Sending to the Port tomorrow, correct?
25   A   That's correct.

Page 181

1   Q   So as of March 2017, you were still in the process
2   of endeavoring to obtain an extension with the Port Authority
3   and exchanging documents, which would have been proposed for
4   that purpose?
5   A   That's correct.
6   Q   And, in fact, they would have been proposed to you;
7   is that correct?
8       MR. HENZY:  Object to the form.
9   BY MR. O'KEEFE:
10  Q   They would have been provided to you by the Port
11  Authority, and you were providing comments back?
12  A   That's correct.
13  Q   Do you know why you picked them up from Clear
14  Channel, as referenced in the top of the second page?
15  A   Yeah.  I believe, if I recall correctly, they were
16  handed to me by Jerry Del Tufo, confidentially.  He came to
17  my office.  Jerry was the Port Authority exec at the time.  He
18  came to my office and said, here's where I am with the draft
19  agreement.  He handed it to me.
20      I brought it over to Clear Channel and let them
21  review it.  They -- I picked it up from them, whose office
22  happens to be right around the corner from my office.  Jerry
23  had shared certain things with me off the record because this
24  was not an approved project, but he was trying to get the
25  paperwork in order for the agreement at one point.

Page 182

1   Q   And on the very bottom where the scan documents from
2   Park Assist to Nancy Ardolino and then from Nancy Ardolino to
3   you, would that have been the origin of the documents --
4   A   Yeah.
5   Q   -- that were being exchanged in the sequence of
6   e-mail?
7   A   Yes.  She's my assistant, so I would have taken the
8   hard copy and had her scan it so I can share it.
9       MR. HENZY:  This doesn't have an ID on it.  I don't
10  know if you want to put one on.
11      (Off-the-record discussion is held)
12      MR. O'KEEFE:  Can we take break for a minute?  I
13  have one last little round, and then I will be done.
14  Actually I found it, so we don't have to take a break.
15  BY MR. O'KEEFE:
16  Q   Mr. Neff, up until December 31, 2018, the board
17  operated in some fashion or another; is that correct?
18  A   That's correct.
19  Q   And from the time that Clear Channel was retained as
20  the ad -- marketing or ad agent, they continued to work for
21  Garage-Media through that time; is that correct?
22  A   That is correct.
23  Q   I'm going to show you a document which has been
24  marked as Schmid 30.  Ask you to take a look at that, and I
25  will direct your attention to a portion --

Page 183

1   A   Yes, I'm familiar with this.
2   Q   Directing your attention to paragraph thirty-six.
3   In the middle of that paragraph, Macquarie pressured GMNY to
4   replace its then sales agent, A2aMedia, Inc.  It's talking
5   about the period from April '13 to April '14.
6       Is there any portion of your recollection of events
7   that you have not shared with us today on that topic that you
8   haven't already testified to?
9   A   We didn't get into the specifics associated with the
10  requirements of John Zimmeth, and the conversations that were
11  very specific to either do something or they are going to do
12  something.
13  Q   We did or did not get into that?
14  A   I didn't feel we covered that as -- that's an area
15  that I just want to emphasize.  I've answered all the
16  questions.
17  Q   So to the extent that you don't think we've
18  adequately covered that, what other information about those
19  either conversations or discussions --
20  A   Just that --
21      MR. HENZY:  Just hold on.
22  BY MR. O'KEEFE:
23  Q   -- would you like to offer?
24      MR. HENZY:  Object to form.
25      THE WITNESS:  Just very specifically it was made

Page 184

1   absolutely clear, adamantly clear that a change is necessary
2   from A2a to anything else and that we have to show progress,
3   otherwise we lose control.  The "we lose control" was phrased
4   multiple times, we collectively John Zimmeth and Garage-Media
5   lose control of this project and it rolls up to the team in
6   Sydney.  Their actions and their aggressiveness will be much
7   more -- it would be better for us to resolve the issues than
8   it would be to let it get to that point.
9   BY MR. O'KEEFE:
10  Q   And did you understand that Zimmeth was
11  communicating that to you because he believed that Garage-
12  Media was then in default of its obligations under the lease
13  agreement?
14  A   I do.
15  Q   And that in the event there was not some action
16  taken, in this case the replacement of A2aMedia, that others
17  at Macquarie would require action to be taken against
18  Garage-Media.  His ability to control or help you to control
19  the project or assist you with keeping the project going
20  forward would be finished?
21      MR. HENZY:  Object to form.
22      THE WITNESS:  That's correct.
23  BY MR. O'KEEFE:
24  Q   They would or may declare default and terminate the
25  project or take over the project and make certain demands on

Page 185

1   the Garage-Media and its guarantors?
2       A   That's correct.
3       Q   Did he tell you why he or someone at Macquarie
4   believed A2aMedia had to go and be replaced?
5       A   Purely the numbers.  That's all he cared about; and
6   rightfully so, I'd say.  Because the numbers were underneath
7   the amount of funds to allow us to stay afloat.  We were
8   slightly below.  We reorganized the debt a number of times,
9   the payment schedule; but they were under-performing.
10      On the other side of it, we had talked a number of
11  times with other advisors, including Johnson and Fretty who
12  were actually suggesting that we needed time to build this
13  display because it's a new business.  It wasn't coming out of
14  the ground as expected, but sales were increasing.  They just
15  weren't getting go that minimum threshold we were needing to
16  be -- to remain alive, which is why we went back and asked
17  the Port Authority for relief.  Why we tried to reshape it a
18  number of different times to close the gap.
19      Q   Did you ever tell John Zimmeth when he made a
20  suggestion or recommendation to you, no?
21      A   Sure.
22      Q   Okay.
23      A   Yeah.
24      Q   Do you believe that he conscientiously engaged in
25  dialog with you about where you were and what options

Page 186

1   Garage-Media might have at any given time?
2       MR. HENZY:  Objection to form.
3       THE WITNESS:  I believe he was doing -- I believe he
4   was doing the right thing for Macquarie.  I think he was
5   trying his best to maneuver the situation, and he was
6   sincerely looking at our interest as well.
7   BY MR. O'KEEFE:
8       Q   If you fast forward to today, do you think that he
9   was able to extend the time within which Garage-Media had an
10  opportunity to fix the financial situation, longer than you
11  expected Macquarie or Huntington to wait?
12      A   I do, to our detriment.
13      Q   And that's your comment earlier, you could have
14  pulled the plug much earlier?
15      A   Absolutely.  Turned it over to them, turned it over
16  to CBS, walked away from all the responsibilities three or
17  four years ago.
18      Q   And do you have any perception of what that might
19  have meant in terms of dollars and cents and any claim that
20  Macquarie might have had under the guarantee?
21      A   Yeah.  It would have been far, far less than what is
22  being asked for today.
23      Q   You say that why?
24      A   Because had CBS taken over the display, they would
25  have been making those rent payments; and at that -- at those

Page 187

1   points in time, we had far less responsibility.
2       Q   So your thought is that if someone orchestrated a
3   transaction by which somebody else assumed the obligations
4   for the sign, that the ultimate obligations for Garage-Media
5   and its guarantors would be less?
6       A   I do.  Considering that it would have rolled over to
7   CBS.
8       Q   But it assumes that someone else assumes the
9   obligation for the sign?
10      A   That's correct.
11      Q   Okay.  In paragraph thirty-seven.
12      A   Yep.
13      Q   "In 2014, GMNY considered suing GKD due to the
14  repeated failure of the sign."  You said earlier that you
15  never considered that; is that correct?
16      A   I would say -- I would say the discussions were --
17  we had discussions around suing or taking action, and we
18  choose not to do.  We did not take it as a formal position.
19      Q   So whether it was threatened by Macquarie or not
20  didn't affect your ability, if you so choose, to go forward
21  with a suit or claim against GKD?
22      A   It was -- the position from John Zimmeth
23  repetitively was he owns the sign, Macquarie owns the sign.
24  That's the exact position he gave Tom Polly.  He's the owner
25  of the sign.  This is a lemon and we have these options

Page 188

1   associated with it.
2       Q   I'm sorry.
3       A   That's all.
4       Q   You realize the lessor and the lessee under a lease
5   both have rights with respect to the equipment?
6       MR. HENZY:  Objection to form.
7       THE WITNESS:  I do.
8   BY MR. O'KEEFE:
9       Q   And each has a different claim, at it were, against
10  the manufacturer of the equipment?
11      MR. HENZY:  Objection to form.
12  BY MR. O'KEEFE:
13      Q   You have to answer verbally.
14      A   Yes.
15      Q   But, again, ultimately GMNY elected not to sue GKD
16  for business purposes?
17      MR. HENZY:  Object to the form.
18      THE WITNESS:  That's correct.
19  BY MR. O'KEEFE:
20      Q   Okay.  Paragraph thirty-nine on the next page.
21  "Notwithstanding the Macquarie promised GMNY would have quiet
22  enjoyment of its property and business, Macquarie exercised a
23  high-degree of control over GMNY's day-to-day operations."
24  Do you agree with that statement?
25      A   I do.

Page 189

1    Q   How and who exercised control on a day-to-day
2  basis?
3    A   Specifically John Zimmeth.
4    Q   And how did he do that?
5    A   As he -- in the manner in which he steered us, the
6  manner in which we ended up with A2a being taken out of the
7  project, and also the interference associated with sharing
8  confidential information with both the Port Authority and
9  Clear Channel, which we're in the midst of discussing and
10  negotiating more definitive arrangements.
11    Q   What confidential information did he share with
12  Clear Channel?
13    A   He shared the cost associated with buying out the
14  lease.
15    Q   And you don't think that he had a legal right to
16  sell the least if he choose to?
17    A   Yes, he did have a right to sell the lease.  To sell
18  it to the company we are negotiating a sale with is
19  inappropriate.  Selling it to another bank, confidential
20  discussions fine.  Having those when we have an offer on
21  the table, we're talking about a nine million dollar sale and
22  he's saying it's only worth three-and-a-half million to get
23  out of it.
24    Q   So you were upset -- and I asked you about this
25  before but I didn't understand that to be the answer -- that

Page 190

1  he was giving too low of a number.
2    A   I was upset with two factors.  One, that he shared a
3  number which was inconsistent with our offers to sell the
4  company and what it would cost Clear Channel to buy us out.
5  And, two, that the number was so much different than the
6  number he communicated to us to buy ourselves out.
7    Q   So we talked about it before, there's a difference
8  between the pay off and how much you will take to give it up.
9    A   Yeah, so there's three numbers.  There's the pay off
10  number based on the calculations.  There was the number that
11  we were told, which was several million dollars less that
12  Macquarie or Huntington would take to get out of it.
13    Q   Several million dollars less than 3.5 million?
14    A   No.  It was six or seven million, the calculated
15  value.
16    Q   Okay.
17    A   We were told in the four-and-a-half to five million
18  dollar number is what it would cost Garage-Media to buy it
19  out, and three-and-a-half million dollars for Clear Channel
20  to buy it out all at the same time.
21    Q   And what about that is inappropriate in your mind?
22    A   What's inappropriate is to share the
23  three-and-a-half million dollar number in the room with the
24  company we are negotiating with to buy our business, sharing
25  what the buyout value is.

Page 191

1    Q   So what that would mean is if you got your buyout
2  that you wanted from Clear Channel, and Huntington or
3  Macquarie were willing to accept a lower number than what you
4  were reporting to Clear Channel, you would make a profit on a
5  deal by which you were saved millions of dollars; is that
6  what you were upset about?
7    A   I would have had an opportunity to recover the
8  millions of dollars we lost.
9    Q   But you would have actually recovered money instead
10  of owing money because of an accommodation by Macquarie,
11  correct?
12    A   In the end --
13        MR. HENZY:  Object to the form of the question.
14        THE WITNESS:  Yeah.  I mean, if you are selling --
15  if I am selling my company, I'm going to try to sell it for
16  as much value as I can get out of it.  I don't need my bank
17  to under-value that sale.
18  BY MR. O'KEEFE:
19    Q   They're under-valuing it by reducing substantially
20  the amount which you owe?
21    A   That's between me and the bank.
22    Q   Okay.  But --
23    A   That's not -- you don't share that with the buyer.
24    Q   I understand.  I just want to make sure I understand
25  that the delta that you are talking about is money that was

Page 192

1  owed to the bank, but would be lost by you because it's a
2  lower number for your buyer?
3        MR. HENZY:  Object to the form of the question.
4        THE WITNESS:  That's correct.  I'm disappointed -- I
5  was disappointed that information that should have been
6  between us was shared with a buyer of a business in the midst
7  of negotiations or discussions.
8  BY MR. O'KEEFE:
9    Q   So we have the discussion that you talked about with
10  the Port Authority and now Clear Channel, which you talked
11  about before and again now.  Any other communications that
12  you are talking about?
13    A   No.
14    Q   Any other ways that you can describe, aside from
15  your testimony concerning A2aMedia, that Macquarie or
16  Huntington exercised a high-degree of control over Garage-
17  Media's day-to-day operations?
18    A   Yeah.  We would not have pulled the plug from A2a.
19    Q   I know that.  I'm saying aside from that, the
20  communications with the Port Authority that you testified to,
21  and the communications with Clear Channel that you testified
22  to, are there any other ways you can identify to illustrate
23  Macquarie exercising a high-degree of control over
24  Garage-Media's day-to-day operations?
25    A   No.

Page 193

1    MR. O'KEEFE:  I have nothing further.
2    MR. HENZY:  No questions.
3    MR. O'KEEFE:  Same order as previous days.  Original
4  and e-tran, attach exhibits.
5    MR. HENZY:  E-tran and attach exhibits.
6    (Deposition concludes at 2:35 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 194

1                    JURAT
2
3        I, Garett Alan Neff, do hereby certify that the
4  foregoing testimony given by me on May 08, 2019, is true and
5  accurate, including any corrections noted on the corrections
6  page, to the best of my knowledge and behalf.
7
8
9
10                    _____
11              Garett Alan Neff
12
13
14
15    Subscribed to and sworn before me on this _____
16  day of _____ 2019.
17
18
19  My Notary Expires: _____
20
21
22
23
24
25

Page 195

1                    CORRECTION SHEET
2
3        I, Garett Alan Neff, do hereby certify that the
4  following corrections and additions are true and accurate to
5  the best of my knowledge and belief.
6
7  CORRECTION        PAGE     LINE     REASON
8  -----------------------------------------------------------
9  -----------------------------------------------------------
10  -----------------------------------------------------------
11  -----------------------------------------------------------
12  -----------------------------------------------------------
13  -----------------------------------------------------------
14  -----------------------------------------------------------
15  -----------------------------------------------------------
16    DATE: _____
17  At _____ in said County of _____,
18  this _____ day of _____, 2019, personally appeared
19  Garett Alan Neff, and he made oath to the truth of the
20  foregoing corrections by him subscribed.
21
22  Before me, _____, Notary Public.
23
24  My Notary Expires: _____
25

Page 196

1  STATE OF CONNECTICUT   :
2  COUNTY OF HARTFORD     :
3
4        I, MARGARET A. BULL, a Commissioner duly commissioned
   and qualified in and for the State of Connecticut, do hereby
5  certify that pursuant to notice there came before me on the
   08th day of May, 2019, the following-named person, to wit:
6  Garett Alan Neff, who was by me duly sworn to testify to the
   truth and nothing but the truth; that he was thereupon
7  carefully examined upon his oath and his examination was
   reduced to writing under my supervision; that this deposition
8  is a true record of the testimony given by the witness.
9
10        I further certify that I am neither attorney nor
   counsel for nor related to nor employed by any of the parties
11  to the action in which this deposition is taken;  and
   further, that I am not a relative or employee of any attorney
12  or counsel employed by the parties hereto or financially
   interested in this action.
13
14        IN WITNESS THEREOF, I have hereunto set my hand and
   affixed my seal this 21st day of May, 2019.
15
16
17
18
19
20
21              MARGARET A. BULL, Commissioner
22
23  My Commission Expires: November 30, 2021
24
25

## WORD INDEX

**< $ >**
**$150,000** 114:*22*
**$2,456,000** 131:*22*
**$250,000** 126:*4*
134:*13*
**$300,000** 20:*15*
121:*13*
**$45,000** 175:*15*
**$500,000** 54:*2*
**$6,000** 135:*11*
**$6,600,000** 29:*21*
**$70,000** 29:*9*
**$9,795,000** 57:*11*

**< 0 >**
**00023** 1:*1*
**001** 65:*15*
**02** 3:*3*
**04** 3:*3* 29:*8*
**05** 3:*8*
**06106** 1:*1*
**06410** 8:*14*
**06604** 2:*15*
**07** 3:*19* 15:*21*
**08** 1:*1* 194:*4*
**08th** 196:*5*

**< 1 >**
**1** 3:*16* 28:*21*
29:*22* 34:*13* 35:*2,*
*16* 36:*6, 7* 38:*8*
39:*11* 40:*6, 10*
41:*4* 42:*16* 51:*4*
53:*1* 65:*14* 92:*22*
121:*6*
**1,050,000** 30:*2, 4*
**1,787,000** 119:*21*
**1.1** 54:*20*
**1.9** 119:*5*
**1:25** 151:*24*
**1:30** 151:*24*
**10** 2:*14* 3:*12*
111:*23* 117:*21*
120:*14, 16* 155:*1, 2*
161:*5*
**10:00** 1:*1* 5:*1*
**1026** 146:*1*
**1034** 147:*11*

**1048-1050111** 3:*12*
**1051** 149:*8*
**1098-1099** 3:*19*
**11** 16:*9* 116:*25*
**1153** 45:*12*
**1156** 46:*4*
**1157** 47:*9*
**1179-1190126** 3:*13*
**12** 3:*12* 119:*8, 9*
155:*1, 2* 172:*8*
**1214-1222152** 3:*15*
**13** 65:*4* 120:*8*
122:*21* 172:*8*
183:*5*
**14** 122:*16, 25*
123:*6* 127:*18*
183:*5*
**15** 3:*13, 13* 46:*17*
123:*22, 23* 127:*2, 6,*
*8, 12*
**15222** 2:*8*
**15TH** 2:*14*
**16** 3:*13* 86:*17*
126:*14, 15, 16, 17*
**16.161** 3:*16*
**17** 3:*14, 15* 86:*17*
129:*21, 22* 152:*25*
166:*2*
**17th** 160:*25*
**18** 3:*14, 16, 19*
92:*8* 133:*17, 18*
159:*20* 173:*21*
177:*11*
**18TH** 1:*1*
**19** 3:*18* 143:*18*
177:*13*
**195** 1:*1*
**196** 3:*4*
**1983** 8:*17*
**1986** 8:*24, 25* 9:*1,*
*3*
**1987** 9:*23*
**1995** 9:*23* 10:*21*
15:*23*

**< 2 >**
**2** 37:*4* 39:*17* 40:*6,*
*10* 41:*5* 42:*16*
**2,000** 115:*8*
**2,456,000** 132:*12*

**2.5** 131:*20*
**2.6** 118:*23* 119:*2*
**2:35** 193:*6*
**20** 3:*15* 152:*20, 21*
154:*9, 12* 160:*24*
**2000** 15:*23*
**2007** 15:*5* 18:*4, 15*
**2010** 28:*25* 37:*8*
38:*7* 46:*17* 53:*2*
58:*3* 61:*25* 65:*4,*
*15*
**2011** 3:*12, 12*
10:*21* 15:*17, 21, 23*
46:*21* 50:*11* 52:*7*
61:*25* 64:*3, 24*
78:*15, 16* 79:*4*
112:*9* 119:*19, 19*
121:*6* 122:*2*
**2012** 3:*13, 13, 14*
53:*1* 61:*23* 65:*14,*
*25* 75:*12* 106:*9, 13*
120:*14, 16* 123:*6*
124:*4* 127:*4, 8, 12*
130:*4* 131:*19, 24*
133:*1* 139:*13*
**2013** 3:*15, 19*
53:*21* 65:*8* 75:*13*
92:*8* 93:*9* 94:*3, 8*
138:*6, 13* 152:*25*
172:*6* 173:*9*
**2014** 3:*14, 16, 17*
11:*19* 14:*2* 22:*22*
78:*14* 106:*22*
108:*7* 134:*1, 22*
135:*2* 138:*8, 14*
139:*2, 16* 141:*11*
159:*21* 161:*5*
171:*10* 173:*21*
187:*13*
**2015** 3:*17* 79:*9*
86:*17* 127:*2* 175:*7*
**2016** 3:*18* 79:*9*
94:*12* 135:*9*
177:*11, 13*
**2016-2017** 84:*2*
**2017** 3:*11, 11, 18*
22:*23* 85:*13, 13, 25*
93:*10* 94:*12*
104:*22* 105:*9*
166:*2, 4* 170:*1, 2*

**2.5** 131:*20*
**171:**3 179:*23, 25*
180:*1, 6* 181:*1*
**2018** 22:*21* 88:*7*
107:*23* 108:*7*
182:*16*
**2019** 1:*1* 194:*4, 16*
195:*18* 196:*5, 14*
**2021** 196:*21*
**2028** 166:*21*
**21** 1:*1* 154:*12, 13,*
*16* 179:*23, 25*
**21st** 196:*14*
**22** 3:*16, 17* 8:*13*
159:*14, 15* 171:*10*
**23** 3:*14, 16* 131:*24*
133:*25* 135:*2*
141:*11* 161:*10, 11*
162:*14* 165:*5*
166:*4*
**23rd** 132:*20*
**24** 105:*9* 134:*22*
165:*23*
**25** 3:*11, 11, 17*
171:*5, 6*
**250,000** 117:*24*
**26** 3:*11, 12* 28:*25*
37:*8* 38:*7* 53:*1*
65:*15* 112:*9* 123:*6*
173:*12*
**26th** 46:*24* 124:*20*
**27** 3:*17* 174:*23, 24*
**28** 3:*18* 64:*3*
177:*5, 6*
**29** 3:*18, 18* 179:*16,*
*17* 180:*1*

**< 3 >**
**3** 50:*22* 51:*7*
61:*14*
**3.4** 169:*4*
**3.5** 93:*7* 95:*1*
190:*13*

**3:18-CV-01708-VLB**
1:*1*
**30** 135:*9* 182:*24*
196:*21*
**300,000** 21:*4*
**307** 1:*1*
**31** 3:*19* 7:*7, 12*
22:*21* 53:*21* 65:*8*

107:*22*  122:*2*
182:*16*
**32**  3:*19*  91:*11, 12*

**< 4 >**
**4**  43:*3, 4, 7, 23*
**4.7**  133:*3*
**40th**  170:*18*
**42nd**  115:*9*  146:*6*
170:*17*

**< 5 >**
**5**  3:*13*  49:*2*  124:*4*
**5.5**  38:*3*
**535**  2:*7*

**< 6 >**
**6**  3:*17*  57:*1*  175:*7*
**6,000**  135:*9*
**6.2**  118:*14*
**6.6**  30:*1*  52:*21*

**< 7 >**
**7**  3:*11*  102:*7, 9, 10*
**7.447**  94:*5*
**746**  117:*9*
**753**  118:*9*
**76**  57:*7*

**< 8 >**
**8**  3:*11*  105:*3, 4*
170:*18*
**800**  2:*7*
**860-595-7462**  1:*1*
**8th**  115:*9*  146:*6*
170:*17*

**< 9 >**
**9**  3:*14*  130:*4*
**91**  3:*19*
**95**  16:*9*
**987.119**  3:*12*

**< A >**
**A.M**  1:*1*  5:*1*
**A2**  106:*4*  147:*15*
**A2a**  18:*13, 16*
23:*3, 5, 18, 20*
26:*18, 20*  45:*20*
47:*10, 12, 14*  60:*8,*
*11, 17, 20*  117:*5, 23*

119:*4, 16, 21*  120:*5*
121:*4, 9*  125:*11, 18*
126:*3, 4, 6, 24*
128:*5, 12*  129:*8*
130:*6, 9, 13, 19*
133:*23*  136:*11*
137:*1, 8, 24*  139:*21*
140:*1*  147:*14*
148:*9*  149:*22*
150:*14*  152:*6, 10,*
*14, 15, 16*  154:*5, 23*
155:*7, 13*  156:*19*
157:*1, 6, 8, 24*
158:*5*  159:*12*
161:*24*  165:*16, 19*
184:*2*  189:*6*
192:*18*
**A2aMedia**  14:*11*
16:*14, 16, 24*  17:*3*
18:*19, 25*  44:*4*
45:*13, 15*  46:*8*
60:*5*  61:*4*  106:*1, 6*
117:*6, 13, 14*
118:*24*  120:*16*
122:*14, 21, 22*
123:*3, 7, 8, 16*
124:*6*  127:*3, 13*
129:*10, 15*  130:*17*
131:*3, 7, 19*  134:*1,*
*4, 6, 18, 24, 25*
142:*16, 17, 19, 20,*
*25*  143:*2*  144:*9*
145:*12*  147:*12*
148:*3*  149:*2*  183:*4*
184:*16*  185:*4*
192:*15*
**A2a-Media**  49:*11*
**A2aMedia's**  141:*22*
**A2a's**  125:*6*  128:*8*
133:*9*  148:*18*
**ability**  7:*2*  68:*14*
69:*7*  71:*22*  75:*2*
77:*5*  82:*23*  138:*11*
164:*23*  172:*20*
184:*18*  187:*20*
**able**  82:*7*  86:*2*
105:*16*  108:*14, 14*
114:*1*  134:*15*
137:*20*  139:*7*
157:*25, 25*  186:*9*
**abreast**  68:*22*

**absolute**  35:*13*
38:*25*
**Absolutely**  68:*6*
70:*5*  71:*21*  82:*17*
117:*24*  122:*4*
133:*11*  151:*18*
157:*15*  177:*23*
184:*1*  186:*15*
**abundantly**  101:*13*
**accept**  95:*20*
99:*18*  101:*24*
191:*3*
**acceptable**  6:*24*
22:*25*  27:*8*  89:*23,*
*24*  104:*1*
**acceptance**  62:*18*
84:*10*
**accepted**  27:*10*
31:*21*  32:*3, 5*  76:*3*
84:*11, 13, 17*  104:*4*
121:*22*  142:*6*
**access**  12:*20*  80:*21*
**accommodate**  6:*19*
51:*14*  67:*24*  68:*8*
74:*11*
**accommodation**
53:*7*  55:*14*  191:*10*
**accomplish**  68:*7,*
*18*  71:*5*  73:*6*
96:*12*  110:*10*
**accomplished**  55:*3*
**account**  67:*10*
149:*12*
**accounting**  42:*10*
45:*8, 8*
**accounts**  125:*20*
126:*24*  134:*24*
**accurate**  58:*20*
95:*2*  154:*21*  194:*5*
195:*4*
**achieve**  128:*8*
134:*5*  139:*14*
**achieved**  38:*15*
**acknowledge**  178:*7*
**acquire**  95:*10, 19*
**acquiring**  163:*10*
**acquisition**  77:*2*
171:*2*
**acquisitions**  90:*18*
**acted**  27:*11*

**action**  5:*13*  34:*7*
111:*4, 5*  128:*2*
131:*16*  137:*9*
141:*11, 14*  150:*7*
151:*20*  184:*15, 17*
187:*17*  196:*11, 12*
**actions**  72:*13, 15,*
*24, 25*  184:*6*
**Activate**  142:*2, 21*
143:*9, 25*  150:*9, 16,*
*24*  152:*2*  153:*3, 4,*
*5*  155:*16*  157:*17*
**Activate's**  157:*14*
**active**  26:*4, 6*
41:*21*
**actively**  65:*21*
**activity**  87:*8*
108:*8*  114:*19*
151:*21*
**actual**  63:*11*
100:*12, 20*  102:*3*
156:*4, 5*
**ad**  50:*19*  97:*15*
118:*14, 20, 21*
119:*22*  123:*9*
124:*18*  125:*4*
135:*18*  143:*23*
144:*12*  145:*4, 17*
148:*7*  149:*15*
168:*9, 18*  169:*1*
175:*15, 16, 20, 21*
177:*1*  182:*20, 20*
**adamant**  71:*22*
**adamantly**  184:*1*
**add**  94:*18, 21*
124:*21*  125:*1, 7, 12,*
*19*  170:*11*
**added**  125:*5*
128:*10*  148:*13*
**adding**  168:*4*
**addition**  93:*20*
140:*6*
**additional**  16:*25,*
*25*  31:*12, 15*  33:*6*
51:*25*  76:*5, 6*
104:*13*  107:*21*
118:*1, 4, 4*  124:*21*
125:*4, 6*  166:*9*
167:*4*
**additions**  195:*4*

address 8:10, 11
51:10 52:10
Adele 39:25 41:15
42:2, 15 171:9
adequately 183:18
adjustment 115:5
ads 87:9, 9 106:17
135:14, 14, 16
advance 12:19
advances 168:8
advertise 58:18
advertised 176:21
advertiser 176:12
advertisers 46:5
Advertising 46:4
48:20 68:14 76:18
114:1
advise 115:23
163:16
advised 116:12
127:17 129:3
advising 104:4
121:9 139:11
advisors 185:11
affect 187:20
affidavits 135:16
affixed 196:14
afloat 185:7
agency 76:24
129:8
agent 86:21
121:10 123:12
133:24 134:20
145:4 182:20
183:4
agents 145:17
aggressiveness
184:6
ago 19:13 43:17
85:2 186:17
agree 7:25 27:22
29:20 30:11, 18
34:12 35:1, 15
38:22 39:4 44:4, 7,
12 45:13 47:12
49:14 50:25 51:12
52:25 55:20 56:14
64:18 67:8 74:12,
15 83:3 88:9
92:14 101:11
102:24 105:8, 12

108:18 122:20
127:8 130:1
138:16 145:21
147:3, 14, 17, 22
148:1, 11, 21
149:25 150:2, 4, 6
151:14 159:24
166:1 173:18
175:6 188:24
agreed 4:9, 13
28:16 57:17 59:6,
21 60:3 72:10
83:1, 2, 22 115:2
150:1 159:25
164:3, 8, 16
agreeing 59:14
164:12
agreement 3:16
26:23 30:24 31:2,
14, 17, 21 32:1, 16,
24 51:4 54:21
55:3 56:23 57:10
58:10, 12, 15, 21, 24
59:4, 7, 12 61:3, 10,
15 76:17 83:7, 24,
25 84:12, 13, 17, 18,
22, 23 85:5, 6, 10,
12 102:4 103:1, 8,
14 105:23 123:2
124:22 125:9
126:23 127:1, 14,
23 128:5 129:2, 4,
8 130:13, 19
140:23 160:1
161:17, 21, 22, 24
162:1, 14, 15 163:5
165:10, 17, 19
166:10 167:3, 7, 9
171:13 181:19, 25
184:13
agreements 38:21
73:2 76:8 83:4
113:2
agrees 172:14
ahead 37:23
104:12 112:22
Airline 48:9
Airlines 24:9
aka 168:4

ALAN 1:1, 1 3:6
5:3, 9 194:3, 11
195:3, 19 196:6
alarming 86:9
albeit 48:2
align 54:1
aligned 45:4
47:19 49:17 64:12
alive 185:16
alleged 138:5
alliance 44:3
allow 18:12 33:8
38:4, 11 74:11
113:3 136:1 185:7
allowed 12:10
22:14 69:5 109:24
135:5
allowing 130:14
167:15
Amano 15:3, 6, 8,
16, 20
A-M-A-N-O 15:3, 6
amended 29:4
amendment 51:6, 9
52:1, 4, 6, 22, 24, 25
53:4, 21, 22 55:1, 3,
16, 24 56:11 62:4,
6, 13, 24 63:13, 15
64:18, 22 65:1, 2, 7,
7, 11, 12, 14, 17
127:22 128:4
amendments 51:3
61:10, 11, 12, 14, 16
138:24
America 44:4, 24
American 24:8, 9
48:9
amount 30:4, 5, 13
33:12 46:13 47:1
51:14 89:24 93:6,
20 94:3 95:20
98:6, 7, 12, 17
99:18, 18 100:21
101:14, 19 137:21
141:8 148:13
185:7 191:20
amounts 34:7
94:15 101:2, 2
138:15
analyst 39:25
ancillary 58:17

Andrew 16:18
17:5
Andy 16:18 85:20,
20 88:4 120:13
130:13, 16, 16, 18
131:2, 2, 3 180:11,
16
Andys 131:5
Andy's 180:10
annual 118:13, 21
134:5
answer 5:25 6:3, 7,
8, 15, 16, 21 7:23
20:1 74:10 93:11
115:22 119:1
138:12 159:8
164:16 188:13
189:25
answered 183:15
answers 5:25 71:6
anticipated 113:9
anticipating 46:17
anybody 37:2
61:4 105:24
apart 64:17 101:1
apologies 62:23
app 12:9, 12, 18, 20
13:9
apparent 109:1
apparently 133:9
appear 35:4, 5
37:12 52:10 56:10
110:25 130:3
132:24 179:22
APPEARANCE 3:3
appeared 21:13
195:18
appears 35:15
50:17 92:11 103:6
105:8 120:15
162:10 166:1
175:6, 25
appended 160:3
apple 96:11
application 17:19
23:23 48:18
107:12, 14
applied 55:7
138:19
apprised 122:6
approached 14:16

**appropriate** 122:2
123:19 136:19
**appropriately** 48:6
134:16
**approval** 60:6
83:5 84:10, 21
113:14 161:18, 19
165:9, 11 166:17
170:5
**approve** 84:21
103:10 113:16
127:25
**approved** 24:25
52:12, 14 59:8
104:9, 24 113:17
167:10, 11 181:24
**approximately**
8:23, 25 20:25
21:4 61:23 65:21
90:23 126:8
**approximations**
114:11
**apps** 11:23 13:10
**April** 3:11 105:9
138:13, 14 183:5, 5
**Ardolino** 179:24
182:2, 2
**A-R-D-O-L-I-N-O**
179:24
**area** 144:14
167:14 183:14
**Arena** 24:9
**argument** 148:23
**arrange** 78:5 80:5
**arranged** 69:15
**arrangement** 14:13
23:25 28:5 176:19
**arrangements**
189:10
**arrived** 12:21
**artistic** 48:21
**aside** 97:3, 6
192:14, 19
**asked** 18:19 28:13
63:5 66:5 69:2, 5
73:23 78:22, 22
79:6 80:23 82:6,
15 96:14 98:25
117:6 125:17, 19
128:17 142:10, 10
144:3, 16, 24 158:2

176:16 177:24
185:16 186:22
189:24
**asking** 6:2 36:19
40:1 64:5 78:25
93:25 100:12
116:5, 19 117:9
122:17 125:10
138:21 141:6, 7
144:23 173:5
179:4, 8, 9, 10
**aspect** 22:1 63:25
109:8 111:4
116:16
**aspects** 31:10
72:22 75:17 87:11
**assembled** 152:18
**assessment** 157:17
**asset** 46:6
**assign** 126:24
**assigning** 148:3
**Assist** 13:3, 3 72:8
75:5 153:10 182:2
184:19
**A-S-S-I-S-T** 13:4
**assistance** 68:17,
21 69:5 173:1
**assistant** 182:7
**associated** 13:10
25:2, 24 29:19
31:11 32:1 40:24
46:25 47:7 51:10,
19, 21 52:2 53:5
54:7 58:17 62:14
63:3 64:15 66:13
72:23 73:2 87:11
92:21 108:8
110:25 135:12
161:24 180:8
183:9 188:1 189:7,
13
**associates** 21:5
**assume** 17:23
62:21 83:15 117:5
137:15
**assumed** 187:3
**assumes** 187:8, 8
**Assuming** 115:13
**assumption** 28:9
**attach** 193:4, 5

**attached** 7:24
120:17 159:22
**attachment** 129:25
130:6, 7 131:18
161:5
**attachments** 130:5
**attempt** 110:5, 6
167:13
**attempted** 83:3
**attempting** 84:24
**attend** 26:18, 20,
24 27:2, 5 78:4, 5
80:5, 6, 23
**attended** 8:18
80:6 86:6
**attending** 77:19
89:11
**attention** 35:7
38:17 52:4 54:25
57:7 102:7 105:2
119:7 120:6
122:16 123:21
126:13 149:7
159:13 161:9
162:5, 13, 23 171:4
176:8 182:25
183:2
**ATTORNEY** 2:9,
16 85:21 128:15
196:10, 11
**Attorneys** 4:4
**August** 3:14, 17
130:4 175:7
**Australian** 39:25
**authority** 4:10
14:12 16:14 17:15
18:1, 9, 15, 19 19:8
21:16, 23, 24 22:6,
21, 23 27:21 50:7,
9, 16 56:19, 21
57:21 58:22 59:3,
7, 14 68:20 77:22,
25 78:7, 10, 13, 20
79:3, 22 80:1, 7, 15
81:13 82:18, 22
83:1, 6, 18 84:6, 8
85:23 86:4, 5 97:3,
17 102:25 103:1,
15, 25 104:2, 9, 18,
25 105:17, 25
108:5, 6 112:5, 9,

18 113:16 114:3
115:14, 21 116:4,
12 117:7, 19
118:13 147:7
166:11, 14, 20, 25
167:3, 8, 14, 15
168:15 169:17
170:14 174:12
177:12 178:10, 12,
24, 25 180:8 181:2,
11, 17 185:17
189:8 192:10, 20
**Authority's** 21:14
**authorized** 131:16
**automatically** 56:8
**availability** 13:17,
19
**available** 13:7, 14
180:17
**Avenue** 115:9
146:7 170:18
**avoid** 140:16
**aware** 5:16 7:1
28:12 39:6 48:11
49:4 107:17
113:13 163:22
**awareness** 127:20

**< B >**
**back** 21:8 33:22
36:2, 18, 22 39:14
57:18 58:9 65:7
83:24 111:18
130:20 135:16
136:24 137:25
138:18 141:7
149:8 153:20
160:19 162:4, 24
169:18 178:15, 18
181:11 185:16
**backed** 75:15, 16
**backer** 81:7
**backing** 83:14, 15
**balance** 107:22
**bandwagon** 159:9
**bandwidth** 118:20
**Bank** 81:6 89:17
107:20 189:19
191:16, 21 192:1

banker 19:10
23:11 33:21 51:20
125:16
bankers 40:15
43:19
base 12:5
based 9:5 13:4
17:7 18:19 37:24
38:12 44:11 58:3
66:23 103:1
122:14 129:17
133:3 148:18
169:5 190:10
basic 5:21
basically 12:20
51:21 109:25
basis 33:5, 9
46:11 52:18, 21
53:4 57:11, 25
80:22 106:10
189:2
Bates 149:9
bears 45:12
becoming 75:21
Beekman 74:25
75:11 76:1, 2, 14
90:17 97:20 98:3
100:16 102:5
began 166:2
beginning 80:24
121:6 138:13
161:1 167:18
behalf 8:2 35:18,
23 41:1 42:1 57:4
98:17 112:7
123:18 127:2, 3, 12,
13 129:12, 13
131:3, 7 134:1
156:21 157:16
177:22 194:6
belief 35:19 63:16
95:1 195:5
believe 35:25
36:13, 21 38:3
42:21, 23 54:2
59:2 61:2 62:13
64:7 66:5 73:2
75:11 80:5 85:13
86:1 88:18, 22
90:10, 12, 25 93:6
97:21, 22 99:13, 13

102:2 117:17, 18
119:5 121:24
123:5 126:7, 8
138:5 140:13
141:12 144:22, 22
145:13 152:13
154:21, 21, 22
158:15 165:7
171:16 173:9
181:15 185:24
186:3, 3
believed 91:4
123:19 171:19
184:11 185:4
beneath 34:15
benefit 72:10
112:5
best 13:7, 14 17:4
50:10 74:19 87:20
110:25 138:10
140:16 143:24
150:2 159:11
164:16 165:9
186:5 194:6 195:5
better 12:21 34:19
49:20 74:10
102:18 111:3
142:23 164:20
184:7
better-than-market
12:11
beyond 31:15
109:13
Bickley 112:8, 12
177:12, 15 179:2
bid 85:7 142:9
152:11
bids 154:19
big 18:6 152:6, 13,
17 154:5, 23 155:7
bigger 87:14 137:5
Bill 153:7, 8
155:18 157:16
billboards 166:10
bills 52:2 137:16,
22 138:10, 11
bit 38:1 44:2
72:14 86:8
blank 162:9
blocked 85:1

blocking 85:2
blocks 170:18
BMW 10:24, 25
66:20
board 84:20, 21
145:21, 22 146:6,
14 147:3 167:11
171:23 172:25
176:14, 24 182:16
body 32:22 92:14
105:12 130:8
bolded 47:22
booked 131:23
bosses 80:12
Boston 9:16 17:8
26:7 106:15
135:13 147:24
bottom 45:11 46:3,
4 52:19 55:17
56:3, 10 102:21
117:10 182:1
bought 12:22
175:15
bound 73:3 107:1
128:5
box 26:1
brand 149:12
brands 117:13
break 6:17, 20
151:22 182:12, 14
breath 21:25
Brian 16:18 17:5
145:12
bridge 84:9
BRIDGEPORT
2:15
brighter 146:23
bring 12:9 79:19
123:2
bringing 31:23
71:15
brings 22:16
broader 9:14
166:12 168:24
broadly 127:14
brochure 49:6
brochure, 49:7
BRODMAN 2:6
brothers 14:20
15:20 21:4 28:13,
18

brought 5:14
14:10 19:17 20:22
24:2 32:2 140:7
176:8 181:20
budget 119:22
build 18:8 76:8
134:4, 9, 13 137:1
185:12
building 18:11
22:9, 17 75:24
104:2 107:7
113:18 166:17
170:12, 15, 17
Bull 1:1 196:4, 21
bullet 45:20 46:4,
16 47:10, 21 48:2
117:12, 20 118:5, 6
146:9, 15, 25
147:16 148:2, 7, 16
bus 14:12 16:14
17:15 18:1 50:7,
16 56:19 117:7
144:13 166:15, 21
business 8:19 9:4,
13, 18, 20, 22, 24
13:5 14:19 15:2
16:5 21:17 67:13
70:15 74:21 79:12
87:12 97:17 106:1,
3, 17, 19 108:1, 20
111:3 133:7 135:2
137:5 143:1
159:25 164:5, 22
173:10 176:3, 4
185:13 188:16, 22
190:24 192:6
businesses 159:18
buy 12:11, 19
16:5 68:13 75:9
76:8, 14 79:17, 20
89:14, 23 90:13, 14,
15 96:14, 24 98:6
108:1 168:13
190:4, 6, 18, 20, 24
buyer 95:25
164:24 175:21
191:23 192:2, 6
buyers 147:20
148:16

buying 76:23
77:15 96:20
164:17 189:13
buyout 77:7 90:16
91:5 96:1 174:11,
18 190:25 191:1

< C >
calculate 91:20, 22
94:13, 15 98:12, 17
calculated 34:4
93:2 101:8 190:14
calculation 91:7
100:12 101:17
calculations 92:15,
17 94:2 190:10
calendar 131:19
California 48:19,
23
call 10:25 49:20,
24 62:24 66:5, 9
68:24 69:3 141:17
156:12 174:7
176:20 177:20
178:5, 14, 15, 18
179:5, 8, 9, 11, 11
called 8:7 9:4
10:2, 23 11:9
12:23 14:11, 15
18:5 19:12 22:16
66:5 67:2 69:20
79:22 80:1 118:5
125:5 151:15
152:6 154:23
158:13 174:2
calling 65:24
camera 13:6
135:21, 25
campaign 175:12,
17, 19
campaigns 168:5
canceled 18:14
candidate 125:24
candidates 125:22
142:22 144:25
155:25
capable 68:12
capacity 8:7
capital 20:5, 8, 10,
16 21:3 33:7
51:20 57:9 174:17

capture 51:19
64:16
captured 52:1
capturing 62:13
car 10:25
cared 124:13, 19
185:5
carefully 140:5
196:7
CARMODY 1:1
carrying 168:12
cart 96:11
CASE 1:1 107:14
156:25 164:24
184:16
cases 139:1
CASSIAN 1:1
cast 82:21, 21, 23
156:8
category 149:12
cause 55:5
caused 71:10
caveat 37:20
CBS 58:14, 15, 21
82:8, 9 112:25
137:6 150:12, 19
152:12 186:16, 24
187:7
CBSO 135:21
CBS's 136:4
CCO 134:25
162:18, 20 163:25
164:13
cell 68:24
cents 186:19
CEO 11:5, 20
13:3 14:4 67:3
certain 29:19
68:18 73:12
125:20 128:8
135:4 168:5
181:23 184:25
CERTIFICATE
3:4
certify 194:3
195:3 196:5, 10
CFO 42:6, 9
chain 3:19 92:5
177:10
chain,102 3:11
chain129 3:14

challenge 31:7
112:25
challenged 71:25
73:9
challenges 66:13
72:24 75:22 80:19
82:6 87:9 97:25
113:13 166:24
168:3
challenging 75:1
chance 43:7 74:19
154:1 180:3
change 15:13
51:12, 21 62:19
64:10 104:17
119:21 129:4, 9
134:11 136:11, 16,
18, 19 137:11
139:7 140:5, 11
142:7 159:10
184:1
changed 15:7
52:17 72:17, 17
109:25 172:11
changes 165:18
changing 170:8
Channel 3:15
76:15, 16, 16, 20
77:10 78:1 79:9,
15, 16 83:17 86:11,
13, 16, 18 87:14
88:23 89:19 93:9
95:9, 19 96:24
97:4 98:4 102:25
104:23 105:13, 14
107:24 108:11
133:24 134:19, 22
137:6 150:13
152:5, 11, 13, 25
153:16 155:8, 12
156:25 157:2, 6, 8,
19, 24 158:2, 9, 18
159:3, 7, 10, 22
160:1, 5, 5, 13, 17
161:6, 18 162:3, 21
163:2 165:7, 10
166:7 170:4, 22
171:13, 15 172:24
175:8, 24 180:5
181:14, 20 182:19

189:9, 12 190:4, 19
191:2, 4 192:10, 21
Channel's 157:21
160:24
characteristic
176:23
charge 66:24 67:2
chasing 78:13, 14
check 26:1
checked 138:23
Cheshire 8:13
66:15
choice 125:1
choose 158:8, 9, 18
159:3, 7 187:18, 20
189:16
chose 125:14
158:7 163:6
CHURCH 1:1
circulated 130:7
circumstance
125:18 140:15
circumstances 36:5
63:22 100:19, 20
142:4, 12
City 11:3, 24 13:4
14:12 27:17 97:7
144:13 145:8
147:24 150:13
152:5, 7
civil 5:13
claim 110:14
186:19 187:21
188:9
clarification 62:16
clarify 6:6 20:21
45:5 51:21 59:6
112:23 148:12
166:8
clause 58:8
Clear 3:15 5:22
54:9 65:6 69:22
71:20 73:5 76:15,
16, 16 77:9, 25
79:9, 15, 16 82:2
83:17 86:11, 13, 16,
18 87:14 88:23
89:19 93:9 95:9,
19 96:24 97:3
98:4 101:13
102:25 104:23

105:*13, 14*  107:*24*
108:*11*  133:*23*
134:*19, 22*  136:*15*
137:*6, 10*  150:*13*
152:*5, 11, 13, 24*
153:*16*  155:*8, 12*
156:*25*  157:*2, 6, 8,*
*19, 21, 24*  158:*2, 9,*
*18*  159:*3, 7, 10, 22,*
*25*  160:*4, 5, 13, 17,*
*24*  161:*6, 18*  162:*3,*
*20*  163:*2*  165:*4, 7,*
*9*  166:*6*  168:*6*
170:*4, 22*  171:*13,*
*15*  172:*24*  175:*8,*
*24*  180:*5*  181:*13,*
*20*  182:*19*  184:*1, 1*
189:*9, 12*  190:*4, 19*
191:*2, 4*  192:*10, 21*
**clearly**  93:*11*
**cleaver**  140:*13*
141:*3*
**client**  12:*5, 10*
15:*2*  16:*1, 2, 3, 4*
**clients**  46:*14*  144:*3*
**close**  67:*14*  85:*8*
90:*24*  135:*2, 4, 6*
185:*18*
**closed**  61:*24*  67:*11*
**closing**  39:*12*  62:*3*
82:*14*  128:*6*
**coffee**  66:*15, 21, 21*
97:*9*
**Coghlan**  77:*3*
89:*7*  96:*17, 18, 25*
101:*19*  102:*22*
104:*4, 16*  105:*9, 13*
108:*10*  153:*21*
166:*2*  167:*18*
169:*14*
**cold**  71:*10*
**collaborated**  164:*2*
**collaboration**
163:*21*
**collection**  61:*14*
**collective**  28:*4*
163:*24*
**collectively**  20:*9*
38:*22*  58:*17*
153:*17*  184:*4*

**college**  8:*21*
**colloquial**  6:*11*
**combination**  64:*13*
96:*21*  107:*16*
**combined**  77:*8*
169:*5*
**come**  31:*17*  39:*20*
43:*19*  69:*11*  71:*19*
84:*6*  97:*7, 10*
114:*13*  149:*8*
152:*11*  153:*20*
163:*14*
**comfortable**  23:*17*
80:*10*
**coming**  51:*11*
69:*14*  120:*5*  161:*7,*
*7*  185:*13*
**commences**  5:*1*
**comment**  82:*3, 4*
168:*2*  171:*15*
186:*13*
**commentary**  85:*21*
165:*8*
**commenting**  169:*11*
**comments**  83:*7, 22*
85:*22*  141:*2*
167:*18*  180:*8, 11,*
*23*  181:*11*
**commercial**  111:*4*
**commercially**  79:*7*
**Commission**  196:*21*
**commissioned**
196:*4*
**Commissioner**
4:*10*  196:*4, 21*
**commit**  118:*3*
**commitment**  72:*5*
134:*10*
**commitments**
124:*7, 11*  172:*17*
**committed**  71:*25*
117:*22*  118:*1*
**committee**  84:*25*
85:*1*
**common**  177:*21*
**communicate**  67:*22*
**communicated**
25:*21*  82:*23*
110:*23*  133:*5*
140:*5*  190:*6*

**communicating**
65:*21, 23*  184:*11*
**communication**
68:*23*  75:*20*  86:*9*
87:*3*  141:*8*
**communications**
110:*1*  140:*4*
192:*11, 20, 21*
**communicative**
72:*16*
**community**  143:*23*
**companies**  74:*24*
137:*7*  150:*11*
157:*5*
**company**  9:*5, 6, 18,*
*21*  10:*2*  11:*1, 8, 9,*
*18*  12:*23*  13:*22*
14:*10, 15*  18:*5, 6*
19:*12*  27:*16, 18, 18,*
*20*  70:*14*  75:*9*
76:*8*  88:*4*  89:*17*
93:*16*  94:*9*  95:*10*
107:*19*  125:*5*
134:*13*  143:*4, 4*
152:*5, 10, 18*
154:*23*  158:*13*
189:*18*  190:*4, 24*
191:*15*
**compared**  124:*14*
133:*6*
**comparing**  146:*16*
**comparison**  146:*14*
**compensated**  57:*19*
**compensation**
31:*12*
**compete**  105:*20*
**competitive**  135:*25*
159:*11*  164:*21*
**competitor**  12:*2*
150:*12, 21*
**competitors**  144:*21,*
*24*  166:*25*  167:*4*
**competitor's**  136:*3*
**complaining**  175:*25*
**complaints**  177:*1*
**completed**  32:*1*
51:*22, 24*  145:*11,*
*16*
**completely**  110:*17*
135:*1*  148:*5*

170:*16*
**completing**  8:*20*
**compliance**  140:*22*
**complies**  28:*23*
30:*10*  37:*6*  43:*6*
50:*24*  57:*3*  102:*13*
117:*1*  119:*12*
122:*19*  124:*2*
143:*20*  154:*11*
161:*15*  165:*25*
173:*14*  175:*3*
179:*21*
**compliment**  167:*19*
**comply**  56:*7*
**components**  111:*8*
**computer**  135:*13*
**concept**  14:*11, 16*
18:*16, 23*  19:*7*
98:*1*  100:*4, 5*
**conception**  109:*6*
**concepts**  18:*10*
149:*14*
**concern**  31:*25*
**concerned**  170:*5*
**concerning**  192:*15*
**concerns**  103:*8*
**conclude**  146:*25*
168:*12*
**concluded**  132:*19*
145:*21*  147:*14*
160:*19, 21*  164:*9*
**concludes**  193:*6*
**conclusion**  22:*10,*
*24*  47:*12*  109:*2*
153:*13*
**condition**  7:*3*
**conditioned**  168:*14*
**conference**  156:*12*
**confidence**  172:*24*
**confidential**  189:*8,*
*11, 19*
**confidentially**
181:*16*
**confirm**  176:*3*
**confirmation**  87:*5*
**confirmed**  59:*12*
108:*19, 24*
**confirming**  131:*15*
**conflict**  167:*1*
**conforming**  55:*12*
**confused**  64:*22*

confusing 178:16, 16
confusion 148:8
congratulated 166:19
conjunction 57:20 64:2 79:15 89:21
connected 147:20
CONNECTICUT 1:1, 1 5:16 8:13, 18 9:5, 15 24:22 196:1, 4
connection 27:23 28:12 56:19 60:19 61:9, 15 65:11, 17 105:15 111:11 128:3 129:6
conscientiously 185:24
consecutive 38:3
consent 129:9 165:12
consented 161:20
consider 41:11 77:17 115:24 116:12 125:23 174:10
considered 70:8, 22 77:11 137:3 144:5, 8 153:17 155:13 174:8 187:13, 15
considering 21:9 115:22 139:13 142:24 176:1 187:6
considerinv 70:7
consistent 87:15 90:12 107:8 161:24 165:19 167:11
consistently 90:20
constant 68:23
constantly 109:14
construction 113:13, 18
consultant 49:9
consumers 13:7
contact 19:16 41:19 61:20 66:3 153:5 176:17

177:21, 24
contacts 147:18
contained 34:12
Contemporaneous 58:4
contender 158:16
contenders 142:8
content 135:9, 12 137:8 175:17
context 96:1, 3
contingent 166:16 174:11
continue 18:15 72:4 115:22 126:11 135:8
continued 55:20 72:2 122:21 126:12 172:24 182:20
continues 35:12
continuing 33:25 35:9 39:1 138:14
continuous 30:14 64:11
continuously 83:16 111:9
contract 57:16 101:5 103:19 107:1 176:17, 19 180:7
contracted 153:10
contracts 135:19 168:9
contributions 20:8, 10
control 9:9 10:9, 12 74:5 137:11, 13 140:12 184:3, 3, 5, 18, 18 188:23 189:1 192:16, 23
convenience 69:12
convenient 66:22
conversation 5:24 31:22 33:16 64:11, 11, 14 65:23 67:7 73:24 76:19 79:18 89:6 96:22 97:18 98:2 99:8 101:16 104:14 141:9 145:2 161:2

164:16 174:9 178:3, 16 179:14
conversations 14:23 33:20 40:14 43:16 67:6 68:11 80:1, 3, 12 83:3, 4 85:2 86:10, 11 90:18 93:8, 9 99:23 100:7 108:8 140:3 141:5, 18 161:2 163:8 183:10, 19
convert 123:12
cooperate 73:5
cooperation 137:1
cooperative 72:16
coordinated 60:5
coordination 60:13
copies 88:5
copy 35:4 102:18 130:3 133:25 159:20 171:8 177:10 182:8
corner 93:22 146:2 166:18 181:22
corporate 74:4
Correct 9:12 10:14 11:12 13:20 14:21 15:18 16:11, 15 17:6 18:22, 24 19:20, 25 21:6, 7 22:13 23:1, 5, 6, 9 24:4, 10 25:8, 16, 20 27:25 29:3 30:7, 8 38:9, 13 41:8, 9, 14 42:14 44:5, 7 46:22, 23 47:25 48:1, 10 52:18 53:9, 10, 18 56:1 57:23 58:6, 23 59:1, 4, 16 61:8 62:1 63:15, 19 64:20 66:16 67:1, 18 70:20 71:1 76:25 79:13 82:25 83:6, 9 84:20 86:14 87:24 88:10, 12, 14, 16, 21 89:1, 25 91:21 93:15, 25 94:2, 5 99:21

101:20, 21 102:1, 5 103:5, 6, 11, 12, 16, 23 104:6, 10 105:1, 11, 18, 21 106:24 107:3, 10, 13 108:1, 2, 21 112:10, 16, 20 113:8, 11 114:9, 25 115:5, 6, 9, 10, 13 119:20 121:6, 7, 8, 12, 14, 15 122:15, 24 123:6, 10, 14, 20 124:5, 10 127:15 128:4, 9, 10, 24 129:10, 11, 16, 18 130:3, 6, 9, 10, 11, 12, 14, 15 131:4, 5, 9, 11, 17, 21 132:5, 9, 11, 23 133:15, 25 134:2, 7 141:23 143:5, 14, 15 144:6, 7, 10, 11, 14, 15 145:5, 18, 19 146:8 150:20 153:12, 14, 22 155:17, 20 159:20, 23 160:2 161:7 162:11, 12, 19, 22 163:12, 18 164:15 165:2, 20, 21 166:22 167:23 168:19 169:3, 9 171:8, 12, 14, 25 172:1, 21, 22 173:22, 23 174:19 175:10 176:9 177:10 178:24 179:1, 6 180:14, 19, 20, 24, 25 181:5, 7, 12 182:17, 18, 21, 22 184:22 185:2 187:10, 15 188:18 191:11 192:4
CORRECTION 195:1, 7
corrections 194:5, 5 195:4, 20
correctly 75:12 131:18 181:15
corresponded 78:19
correspondence 99:15

cost 29:*18* 51:*21*
52:10 57:10, *17*
60:6 63:20 64:*1,*
*10* 89:14 90:*13*
91:5 95:10 100:9
101:*15* 113:20
114:*8* 172:*19*
189:*13* 190:*4, 18*
costly 75:2
costs 29:*19* 51:*19,*
20, 25 52:2 62:*14*
63:2, 3 64:*16*
92:21
counsel 3:*23* 4:9
6:*1, 2, 18* 27:*14*
28:10 29:*15* 113:3
180:12 196:10, *12*
count 126:*8*
counter 169:*12*
counteroffer 77:*12*
counter-signed
123:3
country 48:*18*
County 195:*17*
196:2
couple 19:*13* 80:9
85:7 109:5 174:*15*
COURT 1:*1* 5:*15,*
22 6:9 7:7 91:*11*
105:3 111:*17, 25*
119:8 120:6
123:22 126:*14*
129:*21* 133:*16*
152:20 154:8, 8
159:*14* 161:*10*
171:5 174:*23*
177:5 179:*16*
cover 50:*15* 125:*20*
covered 183:*14, 18*
crafted 131:8
create 22:*18, 18*
138:*25*
created 57:*14, 15*
82:*21* 83:*25* 120:3
150:9
creating 11:*22, 22*
167:*1*
Crest 8:*13*
criteria 21:*19*
22:*19* 161:*24*

critical 26:*16* 69:8
147:3, 6
CT 1:*1* 2:*15*
Cube 135:*21*
146:*16, 18*
cumulatively
137:22
cure 121:*17*
curious 54:*14*
current 107:*22*
138:2, 2, 6, 7, 10, 20,
21 139:3 149:*15*
167:*13*
currently 14:2
167:*15* 176:*1*
customer 13:*12*
customers 12:9
135:*16* 144:*19*
cutoff 110:*1*

< D >
Daktronics 104:*11*
data 100:*17, 17*
DATE 1:*1* 34:4
46:17 64:*21* 85:*24*
92:9 109:2 119:*23,*
24 125:8 160:*20,*
20 178:7 179:*25*
195:*16*
dated 38:7 52:*25*
53:*1, 21* 64:3 65:*4,*
8, 12, 14, 15 112:9
120:*16* 124:4
127:*1, 12* 161:5
171:*10* 180:*1*
dates 64:*17*
Dave 14:*14* 15:*22*
20:7 42:22 156:*22*
DAVID 1:*1* 5:*14*
19:2 37:*11* 175:8,
11, 24
Davidoff 27:*15*
Davis 48:*24*
day 68:*25* 135:5
177:*13* 194:*16*
195:*18* 196:5, *14*
daylight 146:*10*
days 19:*13* 30:*14*
35:*12* 175:*16*
193:3

day-to-day 188:*23*
189:*1* 192:*17, 24*
DC 9:*17*
deadline 68:*25*
deal 6:22 23:*21*
36:*1* 61:9, *15*
78:*11* 83:*21, 22*
84:*18* 87:*14*
101:*13* 117:*15*
135:*25* 176:5
191:5
dealing 39:*19*
41:2, 7 65:*19*
90:*16, 17* 94:3
171:*1*
dealings 15:*19*
40:9
deals 118:*4* 135:4
dealt 15:*22* 25:9
40:*13* 41:*15, 16*
62:6 64:6 65:*10,*
16
debt 95:*21* 185:8
debts 107:*20*
December 3:*15*
22:*21* 107:*22*
119:*19* 122:2
152:*25* 160:*19, 24*
182:*16*
decided 52:*14*
142:7
decision 140:*1, 2*
142:*17, 18* 143:6
163:22, 24
declare 163:*23*
184:24
deemed 56:8 59:8
default 30:*12*
33:*25* 35:9 73:*11,*
18 88:*1, 3, 7* 94:*18*
136:*17* 137:*15*
140:*15, 16, 17, 20*
163:5, *16, 23* 164:*1,*
14 184:*12, 24*
defective 69:*23*
109:*12*
defects 4:*14*
DEFENDANT
2:*12* 4:5
Defendants 1:*1*
deficiency 121:*17*

definition 91:*21, 24*
140:*19*
definitive 92:*23*
115:*21* 189:*10*
degrade 174:6
degree 8:*21*
Del 82:*1* 83:*25*
84:*23* 181:*16*
delay 78:*24*
delays 47:7, 8
deliver 32:5 114:3
delivering 135:*12*
delta 191:*25*
demand 34:5, 6
110:*17* 111:6
demanded 111:8
demands 184:*25*
demonstrate 137:*11*
demonstrating
135:*18*
depended 168:*25*
170:8
deployed 48:*12*
deployment 46:6
48:3
deposed 5:*18*
deposit 20:*24* 30:*1*
54:3, 5 55:5
DEPOSITION 1:*1*
3:*22* 4:*11, 17* 5:*1,*
21, 24 7:*20* 193:6
196:7, *11*
describe 192:*14*
described 48:*8*
71:*13* 127:*14*
140:*14*
description 11:*20*
58:20
design 18:*10*
designed 18:*11*
124:*15*
designee 8:2
desire 58:*14*
desired 18:*15*
determination
142:*14* 160:*12*
determine 63:7
74:25 138:*20*
143:*24* 164:5
determined 63:*14*

74:21  157:7
**detriment** 186:12
**detrimental** 82:19, 20
**Develop** 149:11 150:3
**development** 18:4
**deviate** 72:13
**deviated** 72:6
**dialog** 32:7  43:17 64:15  72:13  74:6 77:16  80:10  85:3 89:6  97:9  104:14 108:6  163:9 168:24  185:25
**died** 170:19
**difference** 93:8 99:17  190:7
**differences** 146:20
**different** 22:7 23:21  39:21  72:3 79:1  80:19, 23 92:9  98:15  99:6 101:3  107:10 110:5  141:20 158:13  170:13, 16 185:18  188:9 190:5
**difficult** 172:4
**digital** 47:23 58:16, 18  146:24
**diminished** 39:2
**DIRECT** 3:8  5:6 35:7  52:4  65:24 148:25  151:4 182:25
**directed** 4:6 123:16  143:12 163:19
**Directing** 38:17 54:25  57:7  102:7 105:2  119:7  120:6 122:16  123:21 126:13  149:7 159:13  161:9 162:5, 13, 23  171:4 183:2
**direction** 41:7 69:15  73:17 136:12  178:1

**directly** 40:12 43:2  68:4  87:1 110:23, 24  155:16
**disagree** 148:5
**disagreed** 31:22
**disappointed** 139:12  192:4, 5
**disappointing** 130:11
**disappointment** 124:8, 17
**disbursements** 34:23
**discourage** 57:18 167:4
**discretion** 35:13
**discuss** 74:7
**discussed** 90:9, 19 104:17  118:16 159:19
**discussing** 96:19 189:9
**discussion** 7:11 86:4  126:18  162:7 164:2  170:13 182:11  192:9
**discussions** 77:1 84:5  97:13  145:11 169:21  183:19 187:16, 17  189:20 192:7
**display** 14:12 22:16  46:5  48:21 51:11  56:23  58:5, 10, 11, 16, 21, 24, 25 59:12  110:9  117:7 135:14, 15, 17, 24, 25  136:1  146:19, 24, 24  164:17 167:12, 13  168:10 173:17  174:14 175:21, 22  176:22 185:13  186:24
**displays** 47:23 137:2  168:15
**dissatisfaction** 122:1
**dissatisfied** 175:21
**distribute** 45:21
**distributing** 172:10
**distribution** 47:13

**DISTRICT** 1:1, 1 5:15, 15
**distrubution** 47:11
**document** 7:6, 15, 17, 19, 20  28:20, 24 30:11  32:12, 21 33:17  35:5  36:7, 15  37:3, 7, 13, 15 38:2, 6  39:7  43:3, 9, 11, 13  44:3  45:1 49:1, 5, 8, 10  50:3, 9, 21  55:16  56:17, 25  57:4, 8  58:7 59:17  63:11  65:13 91:10, 16  92:3, 12 94:8  111:16  112:1, 3, 4  116:24  117:2, 4  119:13, 18, 21, 24 120:3, 4, 10, 12, 13 123:21  127:16 128:11, 25  129:12, 20  130:7  131:6 133:16  143:17, 21 145:10, 24  150:9 152:19  154:7, 15, 18, 24, 25  155:5 160:3  161:16 162:24  165:5, 22 173:11  174:22 175:4  177:4, 8 179:15  182:23
**documents** 39:20 40:22  51:1  56:20 73:3, 11  86:1 93:12  111:10 128:2  129:6 151:16  179:23 180:4  181:3  182:1, 3
**doing** 41:10  68:13, 14  72:1  116:3, 4 118:4  137:4 140:16  167:4 186:3, 4
**dollar** 52:19, 22 89:8  95:2  133:4, 8 137:17  189:21 190:18, 23
**dollars** 20:6, 16, 19, 25  21:6  70:12 80:18  93:7, 10

94:5  110:7  114:20 117:23  118:14 131:20  131:23 186:19  190:11, 13, 19  191:5, 8
**doomed** 148:3
**doubled** 169:3
**doubt** 82:21, 21, 23
**dozen** 145:8
**draft** 85:12  167:9 180:7  181:18
**drafted** 126:23
**draw** 111:1
**Drive** 8:13
**driven** 136:11, 13 139:16, 16  140:15
**drove** 59:6  128:21, 22
**DuCharme** 145:14, 15
**due** 30:13  37:16 38:20  93:6, 21 94:3, 22  98:7, 17 101:7  102:4 138:15  187:13
**duly** 5:3  196:4, 6
**dynamic** 72:17 147:12  148:6

**< E >**
**earlier** 31:19  59:2 66:23  107:8 186:13, 14  187:14
**early** 57:22
**easy** 67:21, 21 75:24  145:7
**echoed** 167:21
**economics** 77:7
**edit** 85:17
**educational** 8:15
**Effective** 134:22
**effectively** 171:17
**effort** 71:4  72:8 125:4  129:14 142:20  144:1 148:25
**efforts** 70:11 93:14  105:16 111:2  124:17 131:25  144:8 148:25

ehenzy@zeislaw.com 2:17
eight 127:24 175:16
eighteen 33:23 35:1
eighty 12:1
either 6:17 26:11 43:22 61:4 66:5 69:2 75:9 78:4 79:11, 16, 19 88:1 89:22 98:5 99:10, 24 100:7 102:6 103:15 117:25 140:8 141:18 143:3 158:1 163:13, 16 164:10, 24 171:1 173:18, 24 174:16, 20 183:11, 19
elected 56:6, 7, 8 163:15 188:15
electricity 80:20
eliminate 64:9 123:1 140:1
else's 148:22
EMAIL 2:10, 17
e-mail 3:11, 14, 19 92:5, 14 93:1, 3, 21 99:3 102:21 105:9, 12 107:18 108:11 124:3 129:24 130:4, 8 141:13, 13 159:21, 24 160:11 166:1, 3 170:8 171:8 175:11, 23 176:11 177:10, 11, 12, 15, 20 178:7, 17, 21 180:3, 15 182:6
e-mail.159 3:16
e-mail105 3:11
e-mail123 3:13
e-mail170 3:18
e-mail171 3:17
e-mail174 3:17
e-mail177 3:18
e-mails 175:7 179:1, 22
emphasize 183:15
employ 75:4

employed 196:10, 12
employee 196:11
employment 66:25 67:1
enable 79:11
encouraged 70:3 158:18
endeavor 68:8
endeavoring 107:24 181:2
ended 31:23 110:8 136:10 166:3 173:10 176:22 189:6
ends 92:8 107:22
enemy 150:21
enforcing 34:23
engage 142:7
engaged 19:9 145:10 185:24
enhance 164:22
enjoyment 35:8, 10, 12, 20 188:22
ensure 161:23
enter 58:14 59:3, 7
entering 161:20
entertainment 149:13
entire 36:7 60:11 83:19 131:24 163:9, 10 166:14, 17 173:25 174:1, 5
entirely 79:20 140:1
entities 150:15
entity 7:23, 24 14:6
EQUIPMENT 1:1, 1 9:8 19:23 32:22 34:9 35:10 58:17, 18 188:5, 10
equity 20:22 21:1 49:17
ERIC 2:16
erode 38:12
escrow 30:2
ESQ 2:9, 16
essential 136:18 170:9

essentially 12:17 21:24
establish 26:15
established 133:2
establishes 38:2
estate 18:6
estimate 20:14
estimated 63:4, 10
estimates 40:23 118:18
e-tran 193:4, 5
evaluate 40:23 142:8, 18
evaluated 155:14
event 33:25 35:9 184:15
events 183:6
eventually 9:16 19:9
everybody 168:1
evolve 19:6, 7
Exact 23:22 90:23 126:8 187:24
exactly 9:12 30:17 91:19 138:25 150:21
EXAMINATION 3:8 5:6 196:7
examined 5:4 196:7
example 68:19 88:23
exception 122:23
exchange 6:2 92:15 166:1 168:17 173:16 180:3
exchanged 182:5
exchanging 181:3
exclusive 45:21 47:11 106:23 121:10 134:20 156:23 170:25
exclusivity 104:21 107:2 121:2, 5, 11, 18 123:1 127:17 129:15 139:11, 15
exec 181:17
execute 39:10 56:20, 23 57:4

executed 29:2 33:17 36:6 39:6, 11, 14, 17 40:7, 11 41:5 42:17 73:11 83:13 111:11 128:3 129:6
executing 39:20
execution 36:12 58:4 131:15
executives 148:2
exercise 35:13 100:17 123:11
exercised 56:5 188:22 189:1 192:16
exercising 73:17 192:23
EXHIBIT 3:10, 11, 11, 12, 12, 13, 13, 14, 14, 15, 16, 16, 17, 17, 18, 18, 19, 19 7:12 8:4 29:22 34:12 35:2, 16 36:6, 7 38:7 39:11, 17 43:3, 7, 23 51:7 52:8 56:10 57:8, 20 58:11 61:14 91:12 92:22 102:7, 10 105:4 111:23 119:9 122:21, 25 123:6, 23 124:22 126:15 127:18 129:21, 22 133:18 152:21 159:15 160:24 161:11 162:14, 23 165:5 171:6 174:24 177:6 179:17
exhibits 3:22 40:6, 10 41:4 42:16 193:4, 5
existed 15:16
existence 14:7, 8
existing 84:22 103:20 145:17 167:12 169:6
exists 99:16 147:23 148:8
expand 167:16
expanded 9:16

expansion 115:8
expect 172:15
expectation 133:7, 13
expectations 129:19 133:6
expected 46:22 112:24 133:12 185:14 186:11
expecting 180:10
expenditures 63:11
expense 71:5 109:15 110:11
expenses 34:22 114:23
experience 42:19 158:14
experienced 146:11 176:24
Expires 194:19 195:24 196:21
explained 5:20 25:1 33:18
explore 153:24
explored 109:21
exposed 137:3
express 77:14
expressed 31:24, 25 76:21 77:6 82:11 113:17
expressing 122:1
expression 47:15 108:15
expressions 6:11
extend 84:6 186:9
extending 97:16 115:24 116:18 170:14
extends 62:5
extension 68:19 74:20 78:13, 14, 16, 20, 24 79:2, 6, 7, 8, 10 80:25 82:5, 13 83:1, 7 95:8 105:17 108:4, 4, 7 112:15, 21 113:6 115:1 116:12 163:11, 14 166:20, 23 169:1, 1 174:12, 16 177:17 181:2

extensions 79:1 115:12
extensive 71:4
extent 183:17
exterior 166:17 168:15
extract 54:2
extremely 137:10
extremity 82:19

< F >
Fabrics 49:12 173:22
Facebook 168:5
faced 168:3
facilitate 14:13
facilitator 18:17
facilities 16:6 26:9 69:19
Facility 48:9, 11 58:18 74:19 80:21 103:3
fact 26:8 42:10 45:22 46:8 76:4 113:24 122:5 131:12 138:2 142:6 147:6 150:22 167:6 168:8 171:12 176:1, 11 181:6
factors 190:2
factual 113:23
failed 70:13 109:15 111:8 134:4, 14 170:10
fails 56:7
failure 30:12 35:10 128:8 172:13 187:14
failures 172:11
fair 23:4, 7 54:4 59:11 97:13 108:14 115:11 168:23
fairly 57:19
fall 121:5
fallen 124:6
falling 124:11
false 160:15
familiar 28:23 37:6 50:24 57:3

105:7 120:10 126:21 133:21 161:15 168:6 179:21 183:1
family 9:4 20:23 21:5
far 157:4 186:21, 21 187:1
fashion 72:4 182:17
fast 186:8
favor 96:9 157:18
favored 157:19
fax 36:21
faxed 39:14
February 3:18 177:11, 13
fee 135:11
Feel 89:4, 5 90:7 183:14
feeling 67:23
fees 29:8 34:22
feet 115:8
Feldstein 85:20 88:4 130:18 131:3 180:12
Feldstein's 36:14
fell 121:10
felt 59:9 69:23 70:10 87:2 108:12, 13 136:19 148:2 159:10
Fernando 18:5, 6
Fidelity 46:14
Field 142:2, 21 143:9, 25 150:9, 16, 24 152:2 153:2, 4, 5, 8, 8 155:16, 18 157:14, 16, 16
fifth 145:20, 24, 25 146:1
fifty 54:5 55:6 174:2
figure 52:19, 22 62:23 93:19 140:25
filled 25:1
final 26:22 63:4, 11 83:5 160:1
finally 115:7 167:10

FINANCE 1:1, 1, 1 19:23 33:7 37:1 84:25 85:1
financed 23:24 29:21 30:4
financial 25:13 33:13 39:25 40:10, 14 41:4 47:1 81:7 89:15, 16, 17 152:24 155:1, 2 186:10
financially 77:5 196:12
financier 98:3
Financing 5:13 24:24 27:24 29:16 31:1, 8 32:16 33:11, 18 38:2, 6 41:12 42:4, 13 43:15 46:16, 24 117:20
find 13:7, 13 18:20 19:10 20:5 50:6 67:6 71:6 75:3 78:11 102:18 138:2, 19
findings 145:20
fine 189:20
finish 6:14 73:19 84:15 89:18
finished 6:16 28:22 43:5 49:3 50:23 63:2 91:15 92:1 102:12 119:11 122:18 124:1 135:1, 5 143:19 154:10 165:24 173:13 179:20 184:20
fire 136:11 163:25
fired 170:21
firm 142:7
first 5:3 11:24 13:17 14:18 24:21 28:25 29:1, 7, 11 39:25 41:22 42:19 50:17 51:6, 7, 8 55:18 56:10 58:7, 9 64:23 65:19 66:3 68:4 74:18 75:10 79:3 100:9

102:*21*  108:*17*
109:*5*  110:*21*
113:*1*  114:*1, 21*
119:*5, 19*  121:*3, 9*
132:*16*  147:*15*
160:*12, 22*  174:*6*
175:*11*
fiscal  41:*11*  81:*13*
fit  135:*14*
five  54:*5*  55:*6*
90:*21*  118:*19*
132:*10, 18*  137:*23*
190:*17*
five-and-a-half
79:*4*  113:*4*  114:*2*
five-fifty  54:*6, 10*
55:*6*
five-owe-five  54:*10*
fix  71:*8*  72:*5*
103:*15*  110:*3*
176:*17*  186:*10*
fixed  176:*4*
fixtures  59:*22*  60:*4*
flawed  108:*19, 25*
109:*3, 23*  110:*18*
FLOOR  1:*1*  2:*14*
Florida  23:*19, 23*
folks  17:*9*  40:*19*
41:*3, 19*  97:*20*
followed  11:*25*
144:*4*
following  35:*14*
39:*3*  169:*13*  195:*4*
following-named
196:*5*
follows  5:*4*
forecasted  124:*14*
forecasting  169:*3*
foregoing  35:*11*
56:*5*  194:*4*  195:*20*
form  4:*7*  5:*25*
20:*1*  21:*2*  28:*3, 8*
30:*15, 25*  31:*9*
32:*14, 23*  37:*19*
44:*6, 15*  45:*2, 16,*
*25*  49:*15, 21*  60:*16*
62:*20*  68:*9*  73:*19,*
*22*  84:*19*  85:*11*
87:*17*  88:*11*  90:*4*
91:*3*  94:*6, 23*  95:*4,*
*15*  98:*18*  101:*9*

105:*9*  111:*13*
121:*19*  122:*8*
127:*1*  139:*18*
140:*4*  155:*4*  165:*1*
181:*8*  183:*24*
184:*21*  186:*2*
188:*6, 11, 17*
191:*13*  192:*3*
forma  133:*3*
formal  84:*3*
187:*18*
formally  127:*16*
formas  40:*23*
format  180:*10*
forms  25:*1*  79:*18*
forth  29:*21*  31:*24*
83:*5, 25*  91:*23*
119:*17*  127:*14*
128:*23*  141:*11*
161:*4, 21*  162:*24*
forty-two  174:*4*
forward  25:*4*
26:*23*  32:*2*  72:*19*
77:*4*  84:*6, 11, 25*
104:*16, 19*  123:*1*
128:*13*  129:*14*
133:*24*  143:*3, 24*
147:*11*  169:*8, 21*
174:*9, 20*  176:*5*
184:*20*  186:*8*
187:*20*
forwarded  105:*10*
found  19:*22*  35:*1*
95:*11*  166:*23*
182:*14*
four  29:*12*  50:*25*
53:*23*  61:*14, 16, 17*
85:*8*  93:*8*  114:*18*
118:*19*  186:*17*
four-and-a-half
190:*17*
fourteen  162:*10, 11*
Fourth  46:*4*  52:*7*
Fox  46:*14*
frame  15:*25*  85:*15*
frames  135:*18*
Francisco  11:*24*
66:*20*
free  89:*4*
frequent  64:*12*

Fretty  19:*12, 16,*
*17*  23:*12*  24:*2, 20*
40:*15, 16, 18*  43:*12,*
*17*  75:*5*  125:*15*
185:*11*
F-R-E-T-T-Y  19:*12*
Fretty's  41:*2, 18*
friends  20:*23*  21:*5*
front  31:*4*  49:*10*
65:*13*
fruition  31:*17*
fulfillment  124:*7*
full  27:*16*  34:*5*
38:*19*  59:*20*  66:*18*
137:*20*
fund  20:*24*  47:*2*
funded  20:*19*
33:*12*
funding  19:*10*
20:*3*  21:*2*  23:*17*
40:*24*  43:*19*  46:*23*
77:*4, 7*  83:*14, 16*
98:*1*  170:*4*
funds  20:*11*  31:*15*
185:*7*
furnished  155:*15,*
*21, 22*
further  4:*13, 16*
34:*15*  104:*10*
123:*11*  153:*24*
157:*5*  174:*6*  193:*1*
196:*10, 11*
future  105:*16*
166:*13*  168:*25*
171:*1*  174:*10*
176:*5*

< G >
gaining  74:*1*
gap  22:*18*  79:*2*
185:*18*
gaps  71:*11*  84:*9*
garage  13:*13, 19*
17:*20*  18:*23*  47:*24*
118:*6, 7*  147:*8*
184:*11*  192:*16*
Garage-Media
7:*22*  8:*3*  14:*7*
27:*8, 14, 22*  32:*18*
33:*17*  35:*18, 24*
37:*17*  41:*1, 13*

42:*1, 7*  44:*3, 10, 13,*
*25*  45:*6, 12, 15*
47:*15*  49:*6*  55:*10,*
*14*  57:*5*  66:*25*
67:*24*  69:*3*  70:*22*
72:*8, 21*  73:*12, 16*
74:*12*  76:*10*  79:*17*
81:*10, 14*  85:*22*
87:*16*  88:*24*  89:*16,*
*21*  91:*1*  95:*12, 19*
98:*1, 8*  105:*19*
107:*19*  112:*8*
113:*20*  117:*7, 16,*
*21, 22, 25*  118:*6, 17*
120:*15*  121:*4*
123:*7, 19*  127:*2, 13*
129:*13, 14*  134:*1*
135:*1, 20*  139:*9, 16,*
*20*  140:*15*  141:*21,*
*24*  142:*15*  143:*1*
145:*11*  146:*14*
148:*4*  156:*21*
157:*13*  159:*6*
160:*5*  161:*17*
163:*15*  166:*7*
168:*13*  177:*22*
182:*21*  184:*4, 18*
185:*1*  186:*1, 9*
187:*4*  190:*18*
Garage-Media's
47:*10*  68:*8*  164:*23*
192:*24*
garages  9:*8*  12:*1,*
*10*  13:*7, 12*  17:*17*
GARETT  1:*1, 1*
3:*6*  5:*3*  194:*3, 11*
195:*3, 19*  196:*6*
Garret  5:*9*
Garrity  27:*15*
Garrity's  180:*21,*
*22*
GARY  1:*1*
gathering  40:*10*
78:*8*  79:*21*  80:*11,*
*14*  86:*7*  100:*17*
general  170:*6*
180:*10*
generally  144:*12*
generate  125:*20*
generated  118:*22*

119:4  125:6
**gentleman**  41:22
**German**  44:10
**Germany**  26:12, 24
66:19
**getting**  71:9  74:16,
19  82:13  97:14
150:22  174:8, 12
185:15
**give**  53:8  68:12
90:23  100:12
101:22, 23  112:18
121:16  154:19
157:17  177:25, 25
178:1  190:8
**given**  75:15  159:8
186:1  194:4  196:8
**giving**  107:25
190:1
**GKD**  22:13  23:2,
8, 20  26:11, 19, 20
44:10  45:22  47:14
49:11  60:14, 21
61:4  69:18, 20, 25
70:4, 7, 11, 14, 22
71:16  72:9, 14
77:20  97:3  102:17
103:10, 13  105:20
106:24  107:5
108:25  109:8
110:14, 17, 24
111:12, 12  172:15,
25  173:2, 22
176:15  187:13, 21
188:15
**GKD's**  21:20
22:14, 24
**glasses**  34:19
**GM**  28:14  54:21
57:10  58:8, 14, 15,
19  70:6
**GMNY**  138:14
183:3  187:13
188:15, 21
**GMNY's**  188:23
**GM's**  60:5
**go**  6:18  10:1, 22
13:2  18:12  21:8
37:21, 23  51:14
64:8  65:7  66:11
84:11  105:24

111:19  112:22
124:20  129:14
138:18  171:22
172:19  174:20
185:4, 15  187:20
**goal**  67:13  68:4, 7
79:9  88:19, 19
121:11  133:9, 14
**goals**  123:9  124:18
**goes**  38:25  39:3
89:22  124:16
131:12
**going**  7:6  12:13
16:20  25:14  28:20
30:15  37:3  43:3
46:9  49:1  50:21
56:25  58:25  62:4
63:24  64:9  66:9
67:7  68:22  69:13
71:19  72:19  73:6
74:3, 4, 5  75:1, 1
80:3  82:8  83:24
85:8  86:24, 25
91:10  102:19
111:16, 19  112:5
114:17  116:24
125:12  128:13
129:20  130:19
133:24  137:4
143:17  145:9
152:19  154:7
156:9  159:11
164:19  165:22
166:25  169:8, 11,
18  173:11  174:9,
14, 22  176:4  177:4
179:15  182:23
183:11  184:19
191:15
**good**  30:21  66:12
82:5, 10  164:5, 13
174:5  176:12
**gotten**  36:17
**graduated**  8:16, 17
**great**  124:8, 17
136:23
**greater**  51:14  93:6
**greatly**  139:12
**green**  13:12
**green-red-light**
13:15

**gross**  118:14
162:17
**ground**  185:14
**group**  10:25  11:7
58:22  74:24  75:10
84:9  114:14
130:14
**groups**  144:25
149:16
**growing**  168:4
**guarantee**  28:14
37:8  38:11, 18, 25
186:20
**guarantee,**  37:9
**guaranteed**  38:22
**guaranteeing**  37:16
**guarantees**  38:5, 19
**Guarantor**  38:18
**guarantors**  37:10
73:13, 17  88:5
185:1  187:5
**guarded**  72:17
**guess**  16:20  17:4
50:10
**guides**  13:13
**guy**  73:9
**guys**  82:5  176:11

**< H >**
**half**  132:7  145:7
**hand**  196:14
**hand-delivered**
112:13
**handed**  181:16, 19
**handful**  48:16
**handled**  42:10
**hands**  136:18
**handwriting**  92:11
**happen**  64:8
100:23  116:8
170:23
**happened**  66:21
75:14  76:12  77:1
170:22
**happening**  136:2
**happens**  181:22
**happy**  6:19
**hard**  68:1  101:15
182:8
**hardware**  13:11
**harm**  136:24  167:4

**Harry**  77:3  89:7
96:18  166:2
169:14  170:21
**HARTFORD**  1:1
24:22  196:2
**HAVEN**  1:1  8:17
**head**  6:10
**hear**  66:3  87:1
158:3
**heard**  100:25
104:10  166:24
177:16
**Heat**  23:18, 23
24:5, 8  26:3  48:8,
17  117:14, 19
**heavily**  136:11, 13
**heavy**  71:17
**HELD**  1:1  7:11
126:18  162:7
182:11
**Helen**  140:10, 10
**hello**  42:24
**help**  13:7, 12
14:13  19:10  20:23
53:15  69:3  82:6, 7
126:5  142:8
143:24  184:18
**helping**  40:23
67:12  96:13  173:1
**HENNESSEY**  1:1
**HENZY**  2:16  5:20
7:9  18:6  20:1
24:9  28:3, 8  29:10,
13  30:15, 18, 21, 3
31:9  32:14, 23
34:17  37:19  44:6,
15  45:2, 16, 25
48:24  49:15, 21
53:19  54:16, 23
56:12  58:9  59:25
60:16  61:11  62:20
64:21, 25  65:2, 4
68:9  70:17, 19
73:19, 22  84:19
85:11  87:17  88:11
89:2  90:4  91:3
93:17, 23  94:6, 23
95:4, 15  98:18
101:9  102:8
111:13, 20  120:17
121:19  122:8

126:*16*  127:*8*
139:*18, 20*  145:*23,*
*25*  146:*3*  149:*3*
151:*22*  154:*12*
155:*4*  156:*9*
158:*22*  165:*1*
181:*8*  182:*9*
183:*21, 24*  184:*21*
186:*2*  188:*6, 11, 17*
191:*13*  192:*3*
193:*2, 5*
**hereto**  196:*12*
**hereunto**  196:*14*
**high**  8:*16, 17, 18*
77:*7*  90:*11*  95:*14*
145:*22*  146:*6*
172:*13*
**high-degree**  188:*23*
192:*16, 23*
**higher**  133:*10, 12*
**highest**  118:*21*
**hire**  142:*20*
**hired**  133:*23*
134:*14*  142:*10*
**history**  8:*15*  48:*3*
137:*25*  138:*19*
**hold**  183:*21*
**holder**  150:*19*
**holds**  47:*11*
**home**  8:*11*
**hook**  74:*2*
**hoped**  70:*10*
**hopefully**  50:*6*
**horizontal**  174:*2*
**hounding**  147:*20*
**hour**  175:*17*
**HTF**  57:*7*  147:*11*
**huge**  71:*4*
**hundred**  54:*6*
55:*6*  90:*21*
**hundreds**  70:*12*
80:*18*  110:*7*
**HUNTINGTON**
1:*1*  5:*13*  8:*8*  81:*6*
93:*7*  96:*7*  99:*11,*
*25*  100:*8*  107:*20*
151:*15*  180:*13*
186:*11*  190:*12*
191:*2*  192:*16*

**< I >**
**I-C-K-L-E-Y**  112:*8*
**ID**  182:*9*
**idea**  43:*11*  114:*17*
117:*17*  118:*8*
164:*13*  178:*2, 5*
**ideally**  67:*13*
**ideas**  12:*6*
**identification**  7:*12*
91:*12*  102:*10*
105:*4*  111:*23*
119:*9*  123:*23*
126:*15*  129:*22*
133:*18*  152:*21*
159:*15*  161:*11*
171:*6*  174:*24*
177:*6*  179:*17*
**identified**  7:*24*  8:*3*
21:*22*  32:*19*  44:*10*
50:*16*  77:*20*  80:*25*
122:*21*  125:*24*
143:*9*  144:*2*  145:*3*
152:*2*  173:*19, 24*
**identifies**  57:*9*
101:*6*  117:*21*
118:*13*
**identify**  7:*22*
28:*24*  37:*7, 9*  40:*3*
49:*5*  51:*3*  69:*11*
112:*3*  120:*12*
122:*25*  123:*8*
125:*22*  126:*22*
128:*7*  133:*22*
142:*21, 21, 22*
143:*21*  145:*12*
152:*23*  161:*16*
171:*22*  173:*15*
192:*22*
**III**  54:*19, 25*
**illuminated**  26:*7, 7*
**illumination**  109:*7*
**illustrate**  192:*22*
**imagine**  99:*14*
**immediately**  78:*21*
**impact**  72:*19*
**impacting**  70:*1*
**impede**  7:*1*
**implementation**
60:*12*
**implore**  68:*17*

**important**  44:*22*
69:*7*  102:*24*  133:*5*
148:*12*
**importantly**  46:*14*
**improve**  103:*15*
122:*3*  164:*23*
**inappropriate**
95:*23*  189:*19*
190:*21, 22*
**Inc.**  134:*1*
**inception**  20:*17*
126:*10*
**include**  27:*23*
132:*20, 22*
**included**  18:*10*
31:*13*  57:*25*  60:*12*
166:*14*
**includes**  30:*1*
**Including**  17:*5*
34:*22*  39:*3*  45:*8*
74:*24*  107:*20*
132:*25*  185:*11*
194:*5*
**inclusive**  85:*18*
**inconsistent**  95:*11,*
*13*  190:*3*
**incorrect**  106:*21*
160:*14*
**increase**  114:*22*
**increased**  29:*22*
54:*22*
**increasing**  185:*14*
**incrementally**  140:*7*
**incurred**  29:*8, 18*
34:*23*  60:*6*  113:*20*
**indebtedness**  37:*16*
**independent**  39:*1*
**independently**
164:*12*
**in-depth**  145:*11*
**INDEX**  3:*1*
**indicate**  69:*13*
169:*7*
**indicated**  118:*3*
152:*1*
**indicating**  161:*20*
**indirectly**  68:*4*
**individual**  8:*7*
**individually**  20:*7*
28:*1*

**individuals**  27:*19*
**industry**  149:*12*
**information**  25:*3,*
*12, 13*  40:*2, 10*
41:*4, 11*  43:*14*
78:*8*  79:*21*  80:*9,*
*13*  81:*22*  82:*15*
86:*8*  88:*23*  97:*12*
99:*12, 14*  151:*1, 12,*
*16*  153:*24*  168:*18*
172:*12*  183:*18*
189:*8, 11*  192:*5*
**informational**  86:*7*
151:*8*
**in-house**  180:*12*
**initial**  143:*22*
**initially**  9:*15*  17:*16*
**initiate**  7:*20*
**initiated**  42:*11*
64:*14*
**initiating**  11:*23*
**inquire**  86:*10*
**inserting**  110:*8*
**inside**  13:*11*
**insisted**  69:*16, 19,*
*24*  77:*19*  78:*10*
79:*23*  112:*25*
**install**  58:*16*
170:*10*
**installation**  26:*1, 3,*
*10*  60:*10*
**installations**  48:*5*
117:*14, 18*
**installed**  13:*11*
23:*21*  26:*10*  48:*6*
107:*6*  108:*18*
109:*6*  146:*19*
**instructed**  122:*10*
123:*15*  124:*25*
128:*25*  136:*6*
141:*10, 13*  163:*20*
**instructs**  6:*21*
**insurance**  165:*14*
**intend**  6:*7*
**intended**  114:*7*
175:*18*
**intending**  18:*8*
**intent**  75:*15*  78:*8*
124:*21*  129:*14*
**intention**  51:*25*
**interact**  42:*15*

interacted  15:24
17:1  106:22
interacting  42:2
interactions  16:17
interest  10:18
11:6  12:24  13:21
43:18  45:5  68:13
76:21, 23  77:15
87:15, 20  94:18
106:4, 6  108:16
111:1  137:6, 7
150:2  167:15
186:6
interested  81:1
196:12
interesting  79:7, 14
interfere  35:9
interference  189:7
interfering  35:20
internal  119:16
133:6
interposed  6:1
interpreted  72:11
interview  144:3, 19,
21  153:19  160:18,
21
interviewed  144:25
interviews  145:16
introduced  14:11,
14  24:17
introduction  17:11,
13  23:5, 8  24:20,
25  42:20
introductory  121:1
invest  117:22
164:18
invested  11:8
117:24  118:1
investing  163:11
Investment  10:25
19:10, 18, 21  21:3
23:11  33:21  51:20
57:9  75:9  79:11,
16  125:16  171:2
174:17
Investments  46:15
174:11
investor  11:10
107:25  164:24
investors  117:6

174:9
invite  69:9
invited  78:2, 3
86:12  97:2
inviting  89:19
involve  173:24
involved  9:20, 22
10:23  16:8, 16, 23
39:20  75:12  78:12
involvement  48:13
104:20  148:18
159:4
Irishman  15:10
issue  135:5  176:20
issued  136:17
issues  70:1  71:10
148:17  171:22
175:25  184:7
italicized  47:22
Italy  25:25
Item  52:13
ITS  9:4  10:13, 18
32:22  35:13  43:23
67:25  81:10  95:21
121:9  135:1
141:21  143:1
158:9  172:14
183:4  184:12
185:1  187:5
188:22
I-ventures  10:25

< J >
January  3:11, 16,
19  79:4  92:8
104:22  113:1
114:2  120:13, 16
159:20  161:1, 5
jeopardy  176:4
Jerry  82:1, 4
83:25  84:23  85:12
169:16  181:16, 17,
22
Jersey  9:16
Jessie  175:24
job  6:3  11:20
15:13  66:19
Joel  175:7
JOHN  1:1  2:9
5:12, 14  14:14, 23
15:22  19:2  20:7

26:9  34:17  37:11
42:18, 20  54:17
61:9, 15  65:18, 23
66:3, 10, 10, 12
67:17, 21  69:21
72:22  73:24  74:7,
16  77:19  79:23
80:11, 23  81:23
82:11, 15  84:5
86:6, 7  88:19  89:6
90:6, 15, 22  96:14
97:6, 22  98:14
99:1, 10, 24  101:12,
23  102:3  110:23
124:3  136:15
140:3  145:23
153:18  156:22, 25
157:2  158:8, 17, 22,
23  159:1, 21  166:3,
3  169:13  171:9
175:9  177:13, 19,
20, 24, 25  178:8, 14,
17  179:4  180:1, 15
183:10  184:4
185:19  187:22
189:3
John's  85:20
Johnson  19:12, 17
24:20  40:15  43:12,
17  75:4  125:15
185:11
joined  81:6
joint  10:23, 24
11:10, 13
jokeefe@metzlewis.c
om  2:10
JR  2:9
July  3:13, 13  52:7
64:3  119:19  120:2
121:6  124:4  127:2,
8, 12  131:23
132:20  139:13
June  46:21  61:25
63:1  65:4, 25
123:6  124:20
132:20, 22, 25
135:9
JURAT  194:1

< K >
KARL  1:1

keep  55:12  68:22
103:15  134:15
137:15
keeping  184:19
key  168:5
kind  49:18  114:7
Kindly  5:8
knew  17:9  160:12
know  6:6  17:2, 9,
11, 12, 18, 22, 25
18:25  19:3, 5  21:9
24:12  25:15, 18
29:18  35:23  36:10,
14  40:13  41:16, 17,
25  45:19  47:3, 6
48:3  50:8, 12, 18
57:13  60:19  61:22
62:8  69:22  71:24
72:11, 16, 24  75:16,
18, 22  81:7, 13
82:6, 6  85:19, 22
86:25  87:22  89:10
91:16, 20, 21, 23, 25
92:11, 21  97:21
99:6  102:13, 14
106:2, 21  108:10
114:23  117:4, 13,
17, 25  118:21
119:3, 11, 23  120:1,
2, 23  121:22  123:3
130:23, 24  136:23
138:22  140:9, 17,
21, 24  141:1, 7
146:18, 20  154:24
155:5  159:4
160:16, 19, 24
170:3, 7  175:14, 18
176:2  177:15
178:4, 6, 11, 19
179:7, 9, 10, 11
180:5  181:13
182:10  192:19
knowledge  14:18
24:7  48:7  98:7
194:6  195:5
known  15:5  75:22
160:16

< L >
lack  148:18  170:4

**language** 35:*15*
38:*10* 54:*15, 16*
56:*9* 85:*17* 112:*25*
165:*13*
**late** 88:*2, 7, 14*
104:*22*
**latest** 86:*25* 130:*9*
138:*20*
**lawsuit** 5:*16* 70:*7*
110:*15*
**lawyer** 6:*21*
**lead** 134:*23*
**leading** 26:*22*
**learn** 23:*2*
**learned** 16:*13*
19:*13* 155:*11*
**lease** 20:*6* 28:*25*
29:*1* 30:*13, 24*
31:*4, 8* 32:*13, 16*
34:*7, 8, 23* 37:*17*
38:*7, 7* 41:*12* 42:*3,*
*13* 43:*15* 51:*4*
52:*22* 53:*1, 23*
55:*3* 56:*3* 63:*23*
65:*14* 73:*10* 89:*19,*
*22, 24* 91:*2, 5, 24*
94:*16, 19, 22* 96:*4,*
*5, 14* 98:*6, 13, 17*
102:*4* 107:*21, 22*
108:*4, 7* 111:*11*
128:*3* 129:*7*
138:*15* 140:*23*
167:*1* 184:*12*
188:*4* 189:*14, 17*
**lease,** 29:*1*
**leasee** 31:*5*
**leases** 139:*5*
**leave** 159:*12*
178:*14, 18*
**leaving** 15:*4*
**LED** 22:*16* 108:*18*
109:*3, 23*
**LEDs** 70:*13* 71:*10*
109:*15, 23* 110:*2*
174:*7*
**left** 8:*20, 23* 9:*25*
15:*16* 85:*13*
164:*21*
**legal** 29:*8* 34:*22*
71:*20* 72:*22* 73:*7*

111:*4, 5* 113:*3*
140:*19* 189:*15*
**legs** 6:*18*
**lemon** 69:*22*
187:*25*
**lender** 100:*3, 5*
**lending** 174:*17*
**lengthier** 175:*23*
**lessee** 29:*9* 32:*19*
34:*3, 8, 8, 15, 21, 23*
35:*12* 56:*6, 7*
188:*4*
**lessees** 30:*12*
**lessee's** 34:*9* 35:*10*
**lesser** 101:*14*
174:*3*
**lessor** 19:*24* 31:*5*
32:*19* 34:*3, 4, 16,*
*21* 35:*9, 11* 161:*20*
188:*4*
**lessor's** 34:*4, 5, 5, 6,*
*6* 52:*21* 91:*7, 17,*
*23* 92:*15, 18* 93:*2*
94:*3, 13* 165:*12*
**letter** 3:*12, 13*
88:*5* 112:*7, 7, 11,*
*17* 114:*14* 115:*14*
120:*15, 21, 23*
121:*3, 16, 25*
122:*10, 13* 123:*7,*
*11, 15* 127:*1, 12*
128:*23* 131:*8, 15*
132:*3* 134:*1, 3*
136:*6, 17* 139:*13,*
*15* 140:*4* 141:*11*
173:*21*
**letter133** 3:*14*
**letters** 139:*9, 20*
**Leurocom** 70:*16,*
*17, 18* 108:*23, 25*
110:*10, 12* 173:*10*
**L-E-U-R-O-C-O-M**
70:*19*
**Leurocom's** 110:*6*
**level** 33:*20*
**levels** 162:*25*
163:*17*
**LEWIS** 2:*6*
**License** 10:*15, 17*
45:*21* 58:*15*

**life** 22:*4* 51:*11*
60:*23* 175:*12, 19*
**lifetime** 22:*20*
**light** 59:*21* 60:*3*
**lighting** 63:*24*
**lights** 13:*12*
**liked** 14:*16*
**limitation** 21:*21*
**Limited** 48:*2*
122:*23*
**line** 111:*1* 124:*13*
176:*12* 195:*7*
**lines** 178:*19*
**linked** 178:*17*
**Liquid** 125:*5, 14,*
*23, 24* 126:*1* 144:*9*
145:*14* 148:*6, 9, 17*
149:*22* 152:*16*
**liquidated** 70:*15*
**list** 39:*3* 57:*10*
149:*13* 152:*7, 8*
**listed** 35:*14* 45:*13*
150:*15*
**listen** 7:*2*
**literature** 25:*24*
**little** 38:*1* 73:*9*
147:*15* 182:*13*
**live** 46:*9, 17, 20*
50:*13* 51:*15* 61:*25*
62:*4* 64:*19* 66:*22*
75:*8* 78:*20* 112:*6*
113:*10* 114:*2, 6*
115:*11* 116:*8, 14*
171:*25*
**lived** 66:*17, 18*
**LLC** 1:*1, 1* 2:*6*
**LLP** 1:*1*
**loan** 20:*6* 55:*12*
137:*24*
**loans** 20:*23, 23*
21:*5*
**local** 49:*9* 66:*21*
**locale** 9:*14*
**located** 11:*2*
147:*24*
**location** 146:*7*
**locations** 47:*22*
**logic** 116:*23*
**logical** 116:*15*
**London** 175:*24*
176:*11*

**long** 9:*22* 10:*20*
11:*18* 12:*14* 14:*1*
35:*8* 61:*1* 71:*11*
85:*9* 106:*8* 109:*3*
113:*15*
**longer** 65:*22, 23*
112:*18, 23* 113:*16*
114:*3* 145:*21*
146:*5* 186:*10*
**look** 7:*14* 28:*22*
33:*22* 37:*5* 41:*22*
43:*4, 7* 49:*2* 50:*23*
51:*6* 57:*1* 64:*9*
91:*14, 16* 92:*22*
93:*1* 116:*25* 117:*9*
122:*17* 123:*25*
127:*23* 130:*20*
137:*25* 138:*18*
140:*25* 143:*18*
145:*9* 149:*15*
154:*9* 161:*13*
165:*23* 173:*12*
174:*5* 175:*1*
179:*19* 182:*24*
**looked** 144:*12*
**looking** 18:*16*
19:*18* 20:*5* 54:*14*
55:*1* 60:*9* 64:*23*
75:*8* 76:*14* 93:*16*
95:*18* 96:*12* 97:*12*
99:*6* 100:*20*
102:*12* 103:*7*
104:*12* 115:*12*
131:*18* 136:*1, 5*
170:*16* 186:*6*
**Looks** 92:*13*
93:*19* 121:*13*
168:*17*
**loose** 44:*21* 45:*3*
47:*19* 49:*16*
**lose** 137:*11, 13*
184:*3, 3, 5*
**losing** 87:*10, 10*
139:*10*
**losses** 57:*19*
**lost** 54:*23* 114:*9,*
*19* 116:*20* 136:*24*
191:*8* 192:*1*
**lot** 12:*8* 71:*7*
75:*20* 83:*2* 91:*1*

142:*14* 176:*12*
178:*15* 179:*13, 14*
low 90:*10* 95:*14*
190:*1*
low-ball 77:*11*
lower 68:*13* 191:*3*
192:*2*
lowest 119:*3*
LSR 1:*1*

< M >
machines 9:*10*
MACQUARIE 1:*1,*
*1* 19:*23, 24* 20:*20*
21:*3* 23:*5, 8, 10, 15,*
*16, 25* 24:*3, 17, 24*
25:*3, 10, 17, 21*
27:*7* 28:*14* 29:*2,*
*17* 31:*7, 20* 32:*10,*
*19* 33:*15* 35:*19*
36:*12* 37:*1, 17*
38:*19* 39:*17, 21*
40:*4* 41:*3, 11, 19*
42:*2, 16, 25* 43:*14,*
*24* 45:*15, 24* 53:*7,*
*12* 55:*9* 61:*20*
62:*5, 10, 25* 63:*13,*
*18* 64:*6* 65:*11, 16*
71:*20, 22* 73:*1, 8,*
*11* 81:*6, 20* 82:*2,*
*11, 12, 13* 85:*16, 19,*
*23* 88:*24* 91:*2*
94:*10* 95:*20* 96:*5,*
*7* 98:*2, 8* 99:*8, 11,*
*24* 100:*8, 16*
101:*13, 17* 110:*22,*
*24* 111:*12* 115:*23*
122:*11* 123:*15*
124:*25* 127:*19, 23,*
*24, 25* 128:*6, 15, 25*
129:*3, 3, 5* 130:*20*
131:*3, 10* 136:*7, 12,*
*13* 137:*23* 139:*11,*
*17* 140:*2* 141:*10*
143:*13* 151:*4, 15*
153:*18* 155:*22*
157:*2* 160:*7, 11*
161:*18, 19* 162:*2*
163:*19, 25* 164:*8,*
*25* 165:*4* 172:*23,*
*25* 180:*12* 183:*3*

184:*17* 185:*3*
186:*4, 11, 20*
187:*19, 23* 188:*21,*
*22* 190:*12* 191:*3,*
*10* 192:*15, 23*
Macquarie's 68:*2*
88:*19* 131:*15*
magnified 71:*11*
Magrin 24:*18, 25*
25:*7, 18* 32:*9*
39:*19* 41:*3* 62:*7*
63:*17* 64:*7* 67:*5*
124:*4* 130:*4*
159:*21* 171:*10*
mail 36:*17* 178:*18*
main 150:*12*
maintaining 176:*14*
maintenance 61:*3,*
*7* 136:*2* 176:*18*
major 145:*20*
150:*21*
majoring 8:*19*
majority 79:*20*
making 43:*1*
54:*15* 79:*3* 87:*19*
137:*22* 139:*4*
157:*22* 186:*25*
man 66:*24* 67:*2*
manage 75:*2* 77:*5*
135:*15*
managed 133:*12*
Management 3:*16*
8:*20* 17:*17* 135:*9*
161:*17* 162:*14*
163:*5*
manager 134:*23*
Managing 12:*7*
67:*4, 10* 74:*1*
135:*12*
maneuver 186:*5*
manner 33:*2*
101:*6, 7* 189:*5, 6*
manufacturer
44:*11* 108:*19*
172:*13* 188:*10*
March 3:*14, 17, 18*
53:*21* 65:*8* 133:*25*
134:*22* 135:*2*
139:*2, 15* 141:*11*
171:*10* 173:*21*

179:*23, 25* 180:*1*
181:*1*
Margaret 1:*1*
196:*4, 21*
MARK 1:*1* 7:*7*
27:*15, 18* 91:*11*
105:*3* 111:*17, 25*
119:*8* 120:*7*
123:*22* 126:*14*
129:*21* 133:*17*
143:*25* 152:*20*
154:*8* 159:*14*
161:*10* 171:*5*
174:*23* 177:*5*
179:*16* 180:*21, 22*
marked 3:*22* 7:*12*
28:*21* 37:*4* 38:*7*
43:*3, 23* 49:*2*
50:*22* 51:*4* 56:*25*
91:*12* 102:*8, 10*
105:*4* 111:*23*
116:*24* 117:*9*
119:*9* 120:*8*
123:*23* 126:*15*
129:*22* 133:*18*
143:*17* 149:*7*
152:*21* 154:*9, 16*
159:*15* 161:*11*
162:*14* 165:*5, 23*
171:*6* 173:*12*
174:*24* 177:*6*
179:*17* 182:*24*
market 107:*17*
142:*13, 18, 21*
143:*23* 144:*5, 12*
149:*1* 164:*21*
marketed 16:*9*
marketing 49:*9*
143:*2, 3, 4* 182:*20*
marketplace 142:*9*
166:*22*
marks 180:*16*
massive 73:*8*
material 129:*9*
materially 35:*11*
mathematical 92:*20*
matter 103:*13*
McGann 10:*2, 20*
15:*3, 3, 3, 4, 6, 7, 8,*
*16, 20*
M-C-G-A-N-N 10:*3*

mean 9:*7* 22:*5*
26:*6* 28:*7* 29:*1*
40:*21* 49:*17* 50:*5*
57:*15* 67:*13* 79:*15*
80:*11* 87:*7* 99:*13*
105:*22* 113:*14*
127:*21* 134:*25*
136:*14* 137:*13, 19*
141:*3* 159:*9*
162:*20* 165:*11*
191:*1, 14*
meaning 27:*14*
141:*24* 160:*5*
163:*22*
meaningful 79:*15*
means 49:*17*
90:*15* 91:*9, 19*
92:*18* 179:*7*
meant 89:*15*
175:*14, 18* 178:*4*
186:*19*
measurement
121:*23*
measures 122:*3*
mechanism 52:*3*
media 18:*10* 76:*8*
84:*8* 125:*16*
136:*25* 147:*20*
156:*4* 158:*14*
159:*22* 166:*15*
167:*20* 184:*12*
MediaMesh 21:*17,*
*19* 44:*11* 45:*21*
47:*9, 11* 58:*16, 25*
59:*13* 103:*2, 4, 10,*
*22* 104:*4, 23*
105:*20* 106:*23*
107:*5* 117:*13*
134:*24* 166:*20*
Media's 192:*17*
medical 7:*3*
Medications 7:*4*
meet 21:*13, 14, 22*
24:*19* 26:*11* 66:*14,*
*20, 21* 78:*10* 80:*4,*
*22* 97:*8, 8, 10*
103:*3* 107:*7*
124:*17* 154:*1*
163:*2*
meeting 24:*21*
69:*3, 11, 19, 20*

71:*12*  72:*17*  77:*24*
79:*23, 24*  80:*5, 7,*
*15, 16*  81:*17*  82:*1*
86:*5, 13, 16, 23*
89:*11*  96:*19*  97:*6,*
*19, 25*  98:*4*  101:*20*
155:*1, 2, 24*  169:*13*
**meetings**  19:*8, 8*
26:*14, 17, 19, 19, 20,*
*21, 24*  27:*5*  69:*6, 9,*
*14, 16*  77:*19*  78:*2,*
*4, 7*  80:*8, 17, 23*
81:*5, 9, 12*  86:*6, 6*
88:*22*  97:*2, 6, 11,*
*14*  155:*24*  173:*3, 7*
**MEF's**  131:*14*
**Melton**  16:*18*
120:*13*  121:*4*
127:*3, 13*  130:*16*
131:*2*
**M-E-L-T-O-N**
16:*18*
**merged**  152:*12*
155:*12*
**mesh**  18:*11, 23*
22:*1, 12, 16*
**message**  73:*5*
167:*2*  178:*14*
**messages**  66:*8*
**met**  21:*18, 19*
22:*19*  42:*23*  69:*18*
135:*18*  155:*12*
161:*23*
**Metal**  49:*12*
173:*22*
**Mets**  168:*5*
**METZ**  2:*6*
**Miami**  23:*18, 18,*
*23*  24:*5, 8*  26:*3*
27:*5*  48:*8, 17*
117:*14, 19*
**Michigan**  40:*1*
**MIDDLE**  2:*14*
29:*12*  49:*11*  53:*22*
108:*17*  113:*12*
145:*10*  167:*17*
183:*3*
**mid-June**  63:*2*
**midst**  189:*9*  192:*6*
**mid-year**  132:*2*

**Milan**  25:*25*  27:*2*
48:*8*
**Miller**  175:*8, 24*
**millimeter**  174:*2*
**millimeters**  174:*4*
**million**  20:*25*  21:*6*
30:*1*  38:*3*  52:*19,*
*22*  54:*5*  55:*6, 25*
89:*8*  90:*21*  93:*7*
94:*5*  95:*2*  96:*16*
113:*20*  114:*8, 9, 19,*
*20*  117:*21, 22*
118:*2, 14, 19, 23*
119:*2, 6*  131:*20*
133:*3, 4, 8*  137:*17,*
*23*  169:*4*  189:*21,*
*22*  190:*11, 13, 13,*
*14, 17, 19, 23*
**millions**  93:*10*
191:*5, 8*
**mind**  131:*1*  137:*6,*
*8, 16*  190:*21*
**mine**  15:*2*  92:*13*
**minimum**  61:*17*
133:*9*  162:*15, 25*
163:*17*  185:*15*
**Minneapolis**  10:*3*
**Minnesota**  10:*3*
**minority**  11:*13, 16,*
*17*  106:*10, 12*
**minute**  21:*8*  33:*23*
35:*8*  182:*12*
**minutes**  175:*16*
**miserable**  71:*23*
**missed**  54:*6*  55:*7*
88:*5, 10*
**missing**  88:*1*
**misstated**  104:*3*
139:*19, 20*  142:*24*
**Misters**  5:*14*
**Mobile**  12:*23, 25*
**Mobility**  11:*9, 10,*
*16*
**modification**  84:*22*
**modified**  29:*4*
**modify**  135:*14*
**moisture**  71:*10*
109:*24*
**moment**  132:*1*
**Monday**  134:*22*

**money**  20:*22*  91:*1*
93:*6*  136:*24*  191:*9,*
*10, 25*
**monies**  19:*18, 21*
**month**  64:*17, 19*
85:*2*  132:*25*  135:*9,*
*11*  137:*21, 21*
139:*11*  150:*23*
**monthly**  33:*5, 9*
**months**  38:*4*  79:*4*
113:*4*  114:*3, 19*
119:*19*  121:*9*
131:*24*  132:*10, 17,*
*18, 18, 22*  139:*10*
**motivation**  74:*16*
**motives**  31:*25*
**mount**  89:*23*
**Mountain**  8:*13*
**mounting**  59:*21*
60:*3*
**move**  26:*23*  84:*24*
87:*19*  101:*18*
104:*16*  134:*15*
136:*12*  169:*21*
**moved**  25:*4*  77:*18*
123:*1*
**moving**  77:*4*
104:*19*  143:*3*
**multiple**  184:*4*

**< N >**

**name**  5:*8, 10, 12*
9:*4*  14:*6*  16:*19*
27:*16*  39:*25*  41:*22,*
*23, 25*  140:*9*  153:*7,*
*8*  178:*1*
**Nancy**  182:*2, 2*
**narrowed**  157:*10,*
*24*
**nature**  12:*3*  13:*5*
**near**  118:*9*  125:*10*
**nearer**  118:*9*
162:*23*
**Nearly**  134:*3*
**necessarily**  22:*13*
45:*5*
**necessary**  41:*10*
98:*5*  184:*1*
**need**  6:*10*  45:*5*
65:*7*  95:*20*  140:*5*

147:*23*  151:*22*
191:*16*
**needed**  69:*4*
131:*10*  137:*8*
185:*12*
**needing**  185:*15*
**needs**  67:*25*  68:*8*
**needy**  147:*19*
**NEFF**  1:*1, 1, 1*
3:*6*  5:*3, 9, 12*  7:*7*
91:*11*  102:*9*  105:*3*
111:*25*  119:*8*
120:*7*  123:*22*
126:*14*  129:*21*
133:*17*  152:*1, 20*
159:*14*  161:*10*
171:*5*  174:*23*
177:*5*  179:*16*
182:*16*  194:*3, 11*
195:*3, 19*  196:*6*
**N-E-F-F**  5:*11*
**negotiate**  57:*16*
105:*16*  114:*7, 15*
**negotiated**  160:*4*
161:*3, 5*
**negotiating**  27:*21*
95:*8*  163:*8*  167:*5*
189:*10, 18*  190:*24*
**negotiation**  160:*7*
**negotiations**  40:*22*
95:*9*  160:*9*  192:*7*
**neither**  143:*12*
158:*17*  159:*1*
196:*10*
**net**  52:*18*
**Netflix**  168:*4*
176:*1, 21*  177:*2*
**Network**  118:*7, 7*
**never**  32:*1, 2*
50:*19*  67:*20*  69:*2,*
*5*  70:*3, 8, 22*  72:*6*
76:*12*  77:*12, 17*
81:*15, 21, 21*  83:*2,*
*5*  84:*25*  115:*21*
118:*18*  131:*1*
187:*15*
**nevertheless**  113:*6*
**NEW**  1:*1*  7:*22*
8:*3*  9:*16*  11:*3*
13:*4*  14:*7, 12*
17:*15*  18:*7*  26:*20*

27:*14*, *16*, *23*  28:*14*
33:*3*  37:*17*  41:*1*
50:*16*  57:*5*  69:*13*,
*13*  70:*6*  77:*25*
80:*4, 5*  86:*24*  97:*9*
105:*14*  107:*21*
108:*13*  109:*16*
110:*3*  121:*23*
135:*6*  136:*19*
141:*19*  144:*13*
145:*3*  147:*24*
149:*13*  150:*18*
152:*18*  157:*21, 23*
168:*4*  170:*11*
174:*7, 13*  185:*13*
**niche**  149:*1*
**Nicole**  179:*24*
**nine**  43:*17*  111:*20,*
*21*  189:*21*
**nineteen**  93:*2*
**non**  105:*19*
**non-binding**  166:*6*
167:*18*  168:*11*
169:*24*
**non-compete**
105:*23*
**non-exclusive**
123:*12*  125:*11, 12*
148:*7*
**non-exclusivity**
128:*12*  132:*4*
**Nope**  7:*5*  91:*25*
**normal**  12:*21*
**North**  8:*17*
**Northeastern**  8:*19*
**Northwest**  158:*14*
**Notary**  194:*19*
195:*22, 24*
**Note**  3:*22*  92:*24*
178:*15*
**noted**  194:*5*
**notice**  4:*14*  7:*25*
8:*4*  30:*14*  35:*12,*
*19*  88:*3, 7*  124:*21*
163:*4*  164:*1, 13*
196:*5*
**notices**  87:*25*
**notwithstanding**
73:*15*  138:*14*
139:*9*  188:*21*

**November**  46:*17*
196:*21*
**number**  18:*10*
29:*12*  30:*23*  46:*4*
51:*6*  52:*5, 13*  53:*1,*
*22, 23*  57:*14, 15, 24*
62:*6*  63:*13, 15, 20*
64:*18, 22*  65:*11, 14,*
*15*  90:*8, 10, 13, 16,*
*23*  95:*2, 6, 7, 8, 13,*
*24*  96:*15, 25*
101:*24*  118:*16*
124:*14*  130:*9*
133:*4, 8, 12*  137:*3*
149:*11, 13, 21*
150:*3*  166:*24*
172:*4*  178:*1*
179:*22*  185:*8, 10,*
*18*  190:*1, 3, 5, 6, 10,*
*10, 18, 23*  191:*3*
192:*2*
**numbered**  145:*25*
146:*1*
**numbers**  38:*14*
45:*12*  54:*9*  90:*20,*
*25*  91:*5*  98:*15*
100:*25*  101:*3*
114:*13*  133:*5, 6*
134:*16*  185:*5, 6*
190:*9*
**Numeral**  54:*25*
**NYC**  147:*18*

**< O >**
**OAK**  1:*1*
**oath**  195:*19*  196:*7*
**Object**  20:*1*  28:*3,*
*8*  30:*25*  31:*9*
32:*14, 23*  37:*19*
44:*6, 15*  45:*16, 25*
49:*21*  53:*19*  62:*20*
68:*9*  84:*19*  85:*11*
87:*17*  88:*11*  90:*4*
91:*3*  93:*23*  94:*6*
98:*18*  101:*9*
111:*13*  122:*8*
139:*18*  155:*4*
165:*1*  181:*8*
183:*24*  184:*21*
188:*17*  191:*13*
192:*3*

**objection**  30:*15, 19*
45:*2*  49:*15*  60:*16*
73:*19, 22*  94:*23*
95:*4, 15*  121:*19*
186:*2*  188:*6, 11*
**objections**  4:*5, 6*
6:*1*
**objective**  114:*5*
126:*2*  134:*5*
**objectives**  95:*11*
96:*13*  133:*2*
157:*19*
**obligation**  28:*14*
57:*21*  89:*15, 16, 17,*
*20*  99:*21*  101:*7*
134:*9*  187:*9*
**obligations**  38:*21,*
*22*  81:*20*  135:*1*
138:*19*  140:*22*
184:*12*  187:*3, 4*
**obligor**  38:*21*
**observance**  38:*20*
**observe**  35:*11*
**obtain**  8:*21*  27:*7*
60:*9*  69:*3*  70:*4*
105:*17*  125:*3*
129:*8*  164:*24*
173:*1*  181:*2*
**obtained**  43:*15*
53:*11*  60:*20*  99:*10*
103:*10*  167:*7*
**obtaining**  68:*19*
166:*16, 20*  177:*17*
**occasion**  42:*10*
**occasions**  81:*12*
107:*10*
**occur**  22:*15*
**occurred**  33:*20*
61:*22*  80:*8*
**October**  28:*25*
37:*8*  38:*7*  46:*24*
53:*1*  58:*3*  61:*24*
65:*15*  120:*2*  176:*3*
**offer**  89:*9, 13*
90:*14*  121:*22*
166:*16*  168:*12*
180:*23*  183:*23*
189:*20*
**offered**  53:*13*
55:*12*  172:*17*

**offers**  40:*24*  77:*10,*
*11, 13*  79:*16*  190:*3*
**office**  18:*8*  36:*22*
40:*1*  74:*4*  83:*8*
97:*8, 10*  157:*21, 23*
180:*21, 22*  181:*17,*
*18, 21, 22*
**offices**  42:*22*  77:*25*
**offs**  100:*1*
**Off-the**  126:*18*
**Off-the-record**
7:*11*  162:*7*  182:*11*
**Okay**  5:*18, 20*  7:*1,*
*6, 9, 21*  8:*10*  10:*20*
14:*6*  15:*16, 19*
16:*12*  17:*25*  19:*14*
20:*13*  25:*21*  28:*12,*
*20*  29:*4, 7, 24*  30:*3*
31:*17*  32:*3, 12*
36:*1, 23*  37:*3*  38:*1,*
*17*  41:*24*  42:*12, 15*
44:*18*  45:*11, 19*
47:*9*  51:*6*  52:*4, 9*
53:*25*  54:*12*  56:*19*
58:*2, 9*  59:*23*  61:*6,*
*19*  63:*16*  67:*23*
72:*7*  73:*22*  77:*18,*
*23*  79:*14*  84:*16*
86:*12, 23*  88:*9*
90:*3*  92:*2, 19*  93:*4,*
*14*  99:*4*  100:*23*
102:*7, 20*  105:*6*
106:*23*  107:*18*
111:*16*  113:*6, 12*
114:*16, 25*  117:*1,*
*20*  120:*9*  121:*3, 25*
124:*2*  125:*3*
126:*20*  128:*7*
129:*20*  130:*8*
132:*6, 15*  133:*20*
136:*6*  139:*6*
141:*24*  144:*19*
146:*3, 13, 25*
147:*18*  148:*24*
150:*3*  151:*7*
154:*18*  155:*7*
158:*20*  159:*6*
161:*9*  166:*12, 19*
168:*22*  170:*19*
171:*4*  173:*11*
175:*11, 23*  176:*23*

178:*13*  179:*21*
180:*15*  185:*22*
187:*11*  188:*20*
190:*16*  191:*22*
**O'KEEFE**  2:*6, 9*
3:*8*  5:*6, 12*  7:*10,*
*13*  18:*18*  20:*4*
24:*11*  28:*6, 11*
29:*11, 14*  30:*17, 20,*
*22*  31:*3, 16*  32:*17,*
*25*  34:*18, 20*  37:*22*
44:*8, 17*  45:*10, 18*
46:*2*  48:*25*  49:*19,*
*23*  53:*20*  54:*18, 24*
56:*16*  58:*11, 13*
60:*2, 18*  61:*13*
62:*22*  65:*1, 3, 5*
68:*16*  70:*21*  73:*21*
74:*9*  85:*14*  87:*21*
88:*13*  89:*3*  90:*5*
91:*6, 13*  93:*18, 24*
94:*11, 25*  95:*5, 17*
98:*22*  101:*10*
102:*9, 11*  105:*5*
111:*15, 21, 24*
119:*10*  120:*18, 20*
121:*21*  122:*9*
123:*24*  126:*17, 19*
127:*11*  129:*23*
133:*19*  139:*19, 22*
145:*24*  146:*1, 4*
149:*4*  151:*23, 25*
152:*22*  154:*13, 14*
155:*6*  156:*13*
158:*23, 25*  159:*16*
161:*12*  162:*8*
165:*3*  171:*7*
174:*25*  177:*7*
179:*18*  181:*9*
182:*12, 15*  183:*22*
184:*9, 23*  186:*7*
188:*8, 12, 19*
191:*18*  192:*8*
193:*1, 3*
**on-call**  176:*19*
**once**  67:*16*  81:*21*
97:*22*  142:*6*
**one-off**  12:*13, 16*
**ones**  48:*6, 23*
69:*11*  109:*16*
**one-year**  115:*1*

**on-going**  32:*7*
85:*3*  168:*24*
171:*23, 24*
**on-line**  156:*5, 11*
**onset**  135:*11*
**opened**  68:*11*
**operate**  106:*15*
146:*18*  174:*14*
**operated**  182:*17*
**operating**  26:*6*
114:*23*
**operation**  113:*5*
**operational**  50:*17*
80:*21*  87:*11*
**operations**  188:*23*
192:*17, 24*
**opinion**  109:*4*
147:*23*  148:*22*
**opinions**  92:*24*
**opportunities**
43:*20*  50:*4*  75:*3*
143:*2, 24*
**opportunity**  7:*14*
14:*10, 19*  17:*14, 23*
19:*9*  21:*9, 17*  25:*1*
37:*21*  75:*14*  76:*5*
87:*13*  96:*23*  108:*1*
121:*17*  153:*23*
161:*13*  165:*5*
174:*10*  186:*10*
191:*7*
**opposed**  167:*20*
**option**  55:*22, 25*
56:*6, 7, 9*  115:*1*
121:*4*  159:*11*
174:*4*
**options**  55:*21*
56:*5*  159:*10*
173:*18, 19, 24*
174:*8, 20*  185:*25*
187:*25*
**orchestrated**  187:*2*
**order**  6:*6*  24:*24*
33:*6*  36:*16*  57:*18*
58:*18*  59:*3*  68:*7*
69:*4*  70:*4*  99:*19*
125:*12, 20*  129:*3*
137:*8*  167:*3*
181:*25*  193:*3*
**orders**  51:*21*

**organization**  23:*16*
40:*19*  41:*2*  47:*2*
73:*8*  75:*10*  126:*25*
**organizations**
150:*18*  155:*13*
**Orgel**  175:*7*
**O-R-G-E-L**  175:*8*
**origin**  182:*3*
**original**  31:*12, 19*
32:*3*  52:*16*  76:*10*
129:*6*  193:*3*
**originally**  29:*2*
52:*14*  63:*4*  83:*17*
**originating**  175:*7*
**outcome**  71:*12*
72:*9*
**Outdoor**  58:*22*
77:*10*  125:*5, 14, 23,*
*24*  126:*1*  133:*24*
134:*19, 23*  144:*9*
145:*14*  148:*6, 9, 17*
149:*22*  150:*12, 14,*
*19*  152:*5, 6, 7, 10,*
*13, 16, 17*  154:*5, 22,*
*23*  155:*8*  162:*21*
**outlier**  147:*1*
**outline**  128:*12*
**outside**  18:*10*
20:*25*  22:*17*  75:*2,*
*23*  104:*2, 14*  107:*6*
110:*9*  113:*18*
136:*1*  142:*7, 8*
172:*20*
**outstanding**  34:*7*
94:*15*  98:*13*  118:*5*
135:*7*
**overall**  44:*23*
124:*8, 16*  136:*25*
**overcome**  148:*17*
**overlying**  72:*15*
**overrun**  113:*20*
**overruns**  52:*10*
63:*21*  64:*10*
113:*25*  114:*8*
**oversight**  113:*3*
**owe**  191:*20*
**owed**  91:*1*  101:*2*
192:*1*
**owing**  98:*7*  191:*10*
**owned**  69:*24*
110:*22*

**owner**  11:*13, 16,*
*17*  89:*24*  106:*11*
187:*24*
**ownership**  10:*18*
11:*6*  12:*24*  13:*21*
45:*5*  49:*18*  55:*22*
106:*4, 6, 10*
**owns**  187:*23, 23*

**< P >**
**P.C**  2:*13*
**p.m**  151:*24, 24*
193:*6*
**PA**  2:*8*  59:*22*
60:*4, 5*
**PABT**  3:*12*  134:*4,*
*24*  159:*22*
**package**  39:*12*
128:*6*
**PAGE**  3:*2, 6*  29:*7,*
*11, 21*  31:*4*  33:*22*
34:*17*  37:*12*  44:*2,*
*9, 9, 20*  45:*11, 12*
46:*3*  47:*9*  49:*11,*
*24*  50:*15, 17*  52:*7*
53:*22*  54:*19*  55:*1,*
*18*  56:*10*  57:*7*
58:*7, 9*  59:*17*
102:*21*  107:*18*
108:*17*  112:*14*
114:*21, 25*  117:*9*
118:*9*  127:*23*
145:*9, 20, 24, 25*
146:*1*  147:*10*
148:*6*  149:*8, 17, 17,*
*18, 21*  150:*16*
162:*9, 10, 11, 12, 13*
165:*12*  168:*12*
175:*23*  180:*9*
181:*14*  188:*20*
194:*6*  195:*7*
**pages**  44:*2*  51:*7*
52:*5, 5, 24*  147:*11*
162:*4, 10*
**page-turn**  180:*22*
**paid**  29:*15*  33:*3, 5,*
*8*  52:*2*  57:*9*  68:*5*
74:*16, 18, 19*  82:*12,*
*12, 13, 13*  87:*22*
88:*20, 25*  89:*23*
93:*10*  94:*21*  101:*2*

116:*9*  137:*23*
138:*15*  150:*22*
167:*19*
**painting**  59:*22*
60:*4*
**pales**  146:*14*
**panels**  176:*2*
**paperwork**  181:*25*
**paragraph**  30:*9*
33:*23*  34:*10*  35:*1*,
*7*, *15*  38:*17*  59:*18*,
*20*, *23*, *24*  102:*19*
113:*12*, *19*  114:*21*
115:*4*  121:*3*, *8*
128:*7*  134:*18*
146:*13*, *15*  150:*16*
167:*17*  168:*2*
183:*2*, *3*  187:*11*
188:*20*
**paragraphs**  138:*13*
161:*21*
**Park**  10:*23*  11:*6*,
*7*, *20*  12:*23*, *24*
13:*3*  14:*15*  15:*17*
16:*5*, *9*  17:*19*  42:*8*,
*9*  44:*4*, *24*  45:*6*
77:*14*, *14*, *16*  158:*6*,
*10*, *12*, *17*  159:*2*
182:*2*
**P-A-R-K**  10:*24*
13:*3*
**parkassist.com**
179:*24*, *25*
**parking**  9:*6*, *8*, *8*
10:*9*, *12*  11:*23*
12:*1*, *8*, *10*, *10*, *11*,
*17*, *19*  13:*6*, *7*, *12*,
*13*  16:*6*  17:*16*, *19*
18:*23*  147:*7*
**part**  38:*12*  39:*12*
44:*22*  55:*2*  56:*17*
63:*8*  67:*9*  76:*6*
100:*9*  114:*22*
128:*6*  129:*4*
166:*10*  168:*23*
171:*24*
**participants**  154:*3*
**participate**  69:*2*, *6*
81:*1*, *4*  97:*19*
107:*25*  151:*4*

157:*25*  158:*2*
160:*7*, *9*  173:*1*
**participated**  19:*24*
43:*22*  60:*9*  97:*23*
134:*19*  153:*19*
156:*20*, *23*  157:*1*, *2*
**participation**
157:*14*
**particular**  101:*23*
149:*1*  151:*19*
168:*11*
**particularly**  144:*13*
**parties**  4:*10*  97:*5*
109:*1*  152:*1*
164:*20*  177:*1*
196:*10*, *12*
**partner**  44:*13*, *19*,
*25*  45:*15*  47:*10*, *15*
49:*20*, *25*  67:*4*, *17*,
*20*  75:*9*  79:*12*, *17*,
*19*, *20*  98:*19*
167:*25*
**Partnered**  49:*11*, *16*
**partners**  14:*14*
44:*10*  45:*3*, *13*
75:*3*  83:*16*  117:*20*
118:*6*  145:*12*
153:*18*  167:*20*
**partnership**  11:*8*
**parts**  63:*23*
**party**  18:*20*  143:*9*
153:*9*  156:*24*
171:*1*
**pass**  17:*25*  62:*24*
142:*5*
**passing**  42:*24*
**Pat**  145:*14*
**patented**  10:*10*
44:*11*
**patents**  21:*20*
107:*5*
**path**  77:*19*  111:*3*
**pathway**  68:*2*
81:*2*  88:*24*  144:*2*
**patient**  67:*17*
**patron**  12:*10*
**Patty**  24:*18*, *25*
25:*7*, *14*, *18*  27:*11*
32:*9*  39:*19*  41:*3*
62:*7*  63:*17*  64:*7*
65:*22*  66:*8*, *14*

67:*5*  97:*21*  124:*3*
130:*4*  159:*21*
171:*9*
**Paul**  145:*14*
**pay**  9:*11*  30:*13*
33:*12*, *19*  34:*4*
96:*3*, *5*  98:*5*  99:*17*,
*19*  100:*1*, *3*, *5*, *12*,
*20*  101:*7*  102:*3*
107:*19*  135:*8*
137:*20*, *20*  138:*11*
164:*24*  190:*8*, *9*
**paying**  79:*5*  80:*18*
82:*9*  88:*16*  113:*1*,
*4*  114:*20*  136:*4*
137:*16*, *18*, *21*
138:*10*  175:*15*
**payment**  30:*13*
38:*20*  51:*13*, *13*
53:*8*  54:*1*  62:*5*, *19*
78:*21*, *22*  88:*1*, *6*
97:*15*  137:*25*
138:*18*  140:*22*
185:*9*
**payments**  31:*15*
53:*14*, *15*  54:*2*, *3*, *7*
55:*7*  79:*3*  82:*8*, *8*,
*10*  88:*1*, *10*, *14*
94:*16*  101:*6*
138:*19*  139:*4*
186:*25*
**pay-off**  99:*12*
**pending**  89:*2*
**penetration**  117:*13*
**people**  16:*23*  17:*1*,
*2*  39:*21*  45:*4*
75:*21*  126:*6*  145:*1*
154:*1*  166:*23*
**perceive**  93:*5*
**perceived**  142:*25*
147:*7*
**percentage**  46:*11*,
*11*  106:*10*
**perception**  95:*1*, *3*
186:*18*
**perfect**  67:*17*, *20*
**perform**  171:*16*
**performance**  38:*12*,
*20*  53:*17*  81:*19*
115:*24*  116:*13*
121:*10*  122:*14*

125:*25*  128:*9*
129:*17*  132:*7*
139:*12*  162:*15*, *17*
163:*17*
**performed**  103:*14*
123:*9*  131:*20*
134:*12*
**performing**  122:*6*
**period**  16:*9*  38:*4*
51:*10*  71:*8*  109:*13*
119:*17*, *20*  121:*6*,
*23*  122:*1*  134:*12*
135:*3*, *4*, *6*  148:*14*
172:*2*  183:*5*
**periodic**  80:*17*
107:*9*
**periodically**  66:*15*
**permit**  22:*21*
38:*14*  55:*20*  57:*22*
60:*24*  68:*20*  84:*7*
97:*16*  103:*4*, *21*, *24*
104:*1*  105:*17*
108:*4*  113:*7*
115:*25*  116:*13*
150:*19*  169:*1*
177:*17*
**permits**  113:*17*
114:*4*
**permitted**  94:*19*
**permitting**  29:*8*
47:*7*
**perpetual**  10:*16*
**person**  33:*14*
39:*21*  41:*21*  42:*8*
82:*22*  84:*8*  140:*9*
141:*18*  153:*5*
156:*17*  196:*5*
**personal**  73:*4*, *4*
**personally**  126:*4*
136:*24*  151:*20*
195:*18*
**personnel**  124:*21*
**perspective**  125:*22*
136:*2*
**Pervasive**  147:*23*
**phase**  143:*22*
148:*15*
**phases**  72:*3*
**phone**  68:*24*  69:*3*
178:*1*

**photo** 50:*15*
**phrased** 184:*3*
**physically** 147:*24*
**pick** 159:*7* 160:*13*
**picked** 160:*16*
180:*5* 181:*13, 21*
**picture** 50:*17*
81:*13*
**piece** 31:*23* 32:*2,*
*6* 86:*9* 102:*24*
104:*20*
**pitch** 174:*2*
**PITTSBURGH** 2:*8*
9:*16*
**place** 95:*16*
107:*21* 147:*19*
158:*14* 165:*16*
167:*3* 171:*16*
174:*7*
**placed** 135:*17*
154:*15*
**PLAINTIFF** 2:*5*
4:*4* 43:*4* 50:*22*
105:*3* 119:*8* 120:*7,*
*8* 123:*22* 126:*14*
143:*18* 152:*20, 21*
161:*10* 171:*5*
174:*23, 24* 177:*5*
179:*16*
**PLAINTIFF'S**
3:*10* 7:*7, 12* 28:*21*
37:*4* 49:*2* 51:*4*
56:*25* 91:*11, 12*
102:*9, 10* 105:*4*
111:*23* 116:*24*
119:*9* 122:*16*
123:*23* 126:*15*
129:*21, 22* 133:*17,*
*18* 154:*9, 12*
159:*14, 15* 161:*11*
165:*23* 171:*6*
173:*12* 177:*6*
179:*17*
**plan** 74:*22* 76:*10*
124:*24* 133:*7*
136:*25, 25* 166:*12*
170:*7* 171:*16*
**planned** 52:*14*
**plans** 81:*10* 104:*17*
**plate** 175:*20*

**platform** 11:*22*
12:*6* 137:*1*
**played** 71:*17*
**Please** 6:*14* 111:*19*
**pleased** 125:*25*
**plug** 186:*14*
192:*18*
**plus** 34:*7* 54:*11*
55:*7* 90:*21* 94:*4*
**point** 14:*15* 25:*4*
36:*1, 3, 3* 39:*9, 19*
42:*21* 47:*21* 51:*23*
61:*19, 20* 64:*7*
66:*10* 72:*14* 74:*15*
77:*18* 82:*25* 83:*17*
88:*16* 89:*5, 6, 22*
98:*9* 103:*20*
113:*25* 114:*6, 12*
116:*8* 117:*12*
130:*25* 132:*14*
137:*16* 138:*20*
140:*24* 144:*9*
146:*15* 148:*14*
153:*25* 157:*7*
164:*23* 169:*14*
172:*15* 176:*9*
181:*25* 184:*8*
**pointing** 54:*16*
102:*14*
**points** 187:*1*
**Polly** 69:*21* 71:*14,*
*18, 25* 173:*3*
187:*24*
**poor** 129:*17*
**poorly** 103:*13*
**Port** 14:*12* 16:*13*
17:*15, 25* 18:*9, 15,*
*19* 19:*8* 21:*14, 16,*
*22, 24* 22:*6, 21, 23*
27:*21* 50:*7, 8, 16*
56:*19, 21* 57:*21*
58:*22* 59:*3, 7, 13*
68:*19* 77:*22, 24*
78:*7, 10, 13, 19*
79:*3, 21* 80:*1, 7, 15*
81:*12* 82:*9, 18, 22,*
*25* 83:*6, 18* 84:*6, 8*
85:*23* 86:*3, 4* 97:*3,*
*16* 102:*25* 103:*1, 9,*
*9, 15, 24* 104:*2, 9,*
*18, 24* 105:*17, 25*

107:*4, 4* 108:*4, 6*
112:*5, 8, 18* 113:*15*
114:*3* 115:*14, 21*
116:*4, 11* 117:*7, 19*
118:*13* 147:*7*
166:*10, 14, 20, 25*
167:*3, 8, 14, 15*
168:*15* 169:*17*
170:*14* 174:*12*
177:*12* 178:*10, 11,*
*23, 25* 180:*8, 24*
181:*2, 10, 17*
185:*17* 189:*8*
192:*10, 20*
**portfolio** 76:*7*
**portion** 6:*5* 8:*4*
29:*15* 52:*12* 93:*3*
103:*7* 108:*18*
109:*3* 182:*25*
183:*6*
**position** 10:*6* 11:*4*
15:*10* 71:*17* 72:*1*
73:*1, 4* 84:*21*
110:*24* 112:*4*
142:*13* 143:*23*
144:*5* 164:*20*
187:*18, 22, 24*
**positioning** 113:*22*
**positions** 49:*18*
**positive** 72:*9*
**positively** 76:*22*
**possession** 34:*9*
**possibility** 14:*19*
96:*20*
**Possible** 99:*5*
**possibly** 98:*2*
169:*1*
**post** 76:*18*
**potential** 57:*25*
142:*11, 22* 144:*25*
145:*3*
**Potentially** 49:*22*
87:*14*
**powering** 110:*1*
**PowerPoint** 156:*6*
**practice** 177:*21*
**pre-approved** 59:*5*
**predominantly**
63:*23* 96:*22*
**predominately**
13:*11*

**preeminent** 145:*22*
146:*6*
**prefer** 6:*12, 20*
59:*18*
**Premature** 57:*23*
**prepaid** 176:*18*
**preparation** 43:*22*
50:*2* 127:*19*
128:*21* 151:*5*
**prepare** 63:*14*
120:*4* 122:*11*
123:*16* 128:*14, 17,*
*18* 129:*1* 136:*7*
165:*6*
**prepared** 31:*24*
33:*17* 41:*5* 43:*11*
45:*23* 49:*7* 50:*9,*
*12* 63:*13* 84:*23, 24*
93:*21* 117:*4*
122:*13* 128:*11, 12,*
*15, 18, 20* 129:*12,*
*13* 154:*24* 165:*7*
**Preparing** 40:*23*
124:*9* 153:*11*
**presence** 71:*21*
72:*15* 89:*12, 13*
90:*1, 2* 147:*18*
**present** 17:*23*
36:*12, 13* 37:*1, 2*
39:*17* 156:*11*
**presentation** 3:*15*
42:*25* 43:*2, 23*
44:*12* 45:*14, 23*
49:*14* 153:*25*
156:*4, 6, 16* 157:*1,*
*8* 161:*3*
**presentations**
156:*1, 5, 20*
**presented** 18:*9*
25:*6, 7* 32:*12*
43:*13* 44:*14* 47:*14*
62:*17* 83:*15*
110:*23* 153:*17*
**presenting** 156:*24*
**preset** 176:*18*
**President** 10:*7*
15:*12* 16:*17* 69:*20*
77:*4* 105:*14*
**pre-sold** 46:*5, 8, 12*
**pressure** 74:*5*

142:*19, 19, 25*
**pressured** 183:*3*
**previous** 23:*18*
193:*3*
**previously** 59:*8*
161:*25*
**price** 77:6 174:*8*
**pricing** 52:*16*
102:*16*
**pride** 168:*3*
**primary** 27:*20*
47:*5*
**principal** 61:*19*
**prior** 8:20 15:*4*
18:*4* 46:*5, 9* 48:*12*
60:*6* 112:5 116:*22*
167:7 170:*13*
**privately** 97:*6*
**privy** 86:*11* 95:*9*
**Pro** 14:*15* 16:*5, 9*
17:*19* 40:*23* 42:*8,*
*9* 44:*4, 24* 45:*6*
133:*3*
**probably** 5:*20*
6:*11* 43:*12*
**problem** 70:*25*
71:*3, 18* 81:*3*
109:*22, 22* 171:*23*
**problematic** 75:*19*
**problems** 171:*23,*
*24* 172:*24* 176:*23*
177:*2*
**proceed** 52:*14*
**proceeds** 29:*16*
107:*20*
**process** 21:*9*
24:*23* 25:*9* 27:*13*
33:*8* 41:*20* 42:*3,*
*12* 51:*25* 52:*13*
60:*14* 62:*12* 63:*8*
67:*15* 72:*16* 75:*5*
84:*2, 3* 85:*7* 92:*20*
99:*7* 113:*14*
134:*17, 18* 136:*10*
153:*19* 159:*5*
160:*18, 21* 181:*1*
**processed** 63:*1*
**procure** 24:*24*
**procurement**
177:*16, 25*

**procuring** 25:*10*
72:*8*
**produced** 107:*5*
**product** 21:*21*
22:*1, 2, 19, 24, 25*
45:*22* 69:*22, 24*
71:*24, 24* 103:*2, 10,*
*13, 21* 105:*24*
107:*6* 108:*18*
109:*13* 146:*5*
172:*14* 174:*3*
**products** 16:*6*
22:*17* 104:*12*
**profile** 145:*22*
146:*6*
**profit** 58:*1* 108:*15*
191:*4*
**program** 98:*3*
134:*23* 149:*12*
159:*9*
**programs** 16:*7*
**progress** 137:*22*
184:*2*
**project** 18:*4, 13, 14,*
*17* 19:*7, 19, 25*
20:*6, 12, 16, 17, 24*
22:*4* 23:*18* 24:*6, 8*
29:*20* 37:*24, 25*
39:*24* 40:*20* 42:*11*
43:*19* 44:*23* 46:*25*
47:*20* 50:*7, 9*
51:*22, 24* 52:*11, 16*
56:*20* 59:*6* 60:*11*
62:*14* 63:*2* 64:*13*
65:*22* 66:*2, 13*
67:*7, 14, 18, 23*
69:*1* 70:*2, 11, 12*
72:*3, 5* 74:*20, 24*
75:*1* 76:*7, 13*
79:*20* 80:*10, 13*
82:*14, 24* 85:*1*
87:*6, 7* 96:*21, 23*
108:*15* 109:*7, 9*
111:*9* 115:*12, 13*
123:*13* 124:*15*
134:*4, 6* 135:*13*
137:*4, 11, 14, 15*
140:*11* 159:*22*
163:*9, 10, 11*
164:*19* 181:*24*

**procuring** 184:*5, 19, 19, 25, 25*
189:*7*
**projected** 134:*5*
**projection** 121:*11*
**projections** 25:*13*
41:*4* 58:*3* 132:*6*
**projects** 11:*25*
25:*2* 76:*2, 5, 6*
98:*2* 100:*18*
117:*23* 118:*4*
125:*16* 131:*13*
**promised** 188:*21*
**prompt** 38:*19*
**proof** 4:*10*
**proper** 22:*11*
**properties** 50:*6*
**property** 58:*25*
188:*22*
**proposal** 25:*4, 5, 6,*
*10, 17* 27:*7, 10, 11,*
*12* 31:*13, 20* 32:*3*
42:*3* 43:*15* 59:*13*
84:*6, 10* 108:*11*
125:*19, 21* 152:*24*
153:*2, 11, 15*
154:*20* 157:*22*
161:*3, 8* 166:*6, 9*
167:*18* 169:*24*
173:*16*
**proposals** 135:*6, 7*
152:*9* 154:*4, 19*
155:*8, 15, 25*
156:*24* 157:*17*
160:*23* 168:*11*
**propose** 41:*12*
85:*10*
**proposed** 32:*4*
83:*6, 22* 85:*5*
108:*3* 167:*7*
177:*17* 181:*3, 6*
**proposing** 104:*7*
**prospect** 14:*18*
16:*13* 18:*1* 71:*15*
96:*20* 97:*16*
**prospects** 118:*13*
145:*3*
**protect** 68:*1*
165:*18*
**protected** 107:*5*
**Protecting** 96:*10*

**protections** 165:*14*
**proven** 21:*14*
**provide** 35:*19*
41:*3, 10* 51:*20*
85:*17* 151:*16*
172:*16*
**provided** 20:*3*
22:*1* 25:*4* 42:*9*
45:*6* 56:*9* 58:*24*
85:*5, 21, 23* 151:*2,*
*7* 165:*8* 181:*10*
**provides** 30:*11*
**providing** 25:*12*
53:*5* 181:*11*
**provision** 34:*12, 24*
59:*11*
**provisions** 165:*19*
**Public** 195:*22*
**pull** 175:*22*
**pulled** 171:*3*
186:*14* 192:*18*
**purchase** 16:*5*
55:*22, 24* 56:*6*
60:*20, 20* 73:*2*
89:*19* 96:*4* 128:*5*
135:*20*
**purchased** 60:*11*
**Purely** 185:*5*
**purpose** 12:*7, 14*
19:*18* 26:*14* 50:*2*
51:*8, 16* 52:*6*
53:*25* 78:*6* 80:*16*
97:*14* 112:*17*
181:*4*
**purposes** 51:*17*
97:*11* 143:*3* 151:*8*
188:*16*
**pursuant** 196:*5*
**pursue** 18:*21*
**pursued** 83:*11, 12*
149:*1*
**pursuing** 67:*13*
**pursuit** 21:*16*
**push** 135:*14*
**pushed** 46:*25* 47:*3,*
*6* 140:*2*
**put** 9:*10* 17:*14, 16,*
*19* 20:*5, 16* 30:*1*
33:*6* 34:*19* 57:*16*
58:*25* 59:*13, 15*
63:*10* 65:*13* 74:*5*

83:5  96:17  108:13
109:15  120:18
124:20  126:4
134:13  135:20, 25
150:24  163:4, 25
164:13  165:13
166:22  174:7, 13
182:10
**putting**  14:11
71:4  117:15  141:2

**< Q >**
**qualified**  157:5
196:4
**quality**  174:3
**quantity**  76:2
**quarter**  134:19
**quarterly**  81:18
**question**  4:7  5:25
6:4, 7, 15, 16, 19, 21
20:2  36:9  54:23
56:12  68:11  73:20
84:15  89:2, 18
93:5, 11, 13, 17, 23,
25  96:13, 17  104:3
116:10  128:17
139:23, 24  148:16
155:4  180:16
191:13  192:3
**questionable**  137:9
**questioned**  31:10,
23, 25  155:10
**questions**  5:25  6:2,
3, 3  7:3, 23  80:2
87:11, 12  183:16
193:2
**quick**  172:14
**quiet**  35:8, 10, 12,
20  188:21
**quote**  140:12

**< R >**
**Radiant**  152:10, 13
154:5, 22  155:8
157:3
**raised**  20:22
117:21
**ramp-up**  51:10
**ran**  135:17
**range**  20:15  50:11
75:13  84:2  89:8

90:21, 22  96:15
137:17  172:9
**ranged**  87:8
**ranges**  86:17
**rate**  12:21  68:13
94:1  172:13
**rates**  12:11
**reach**  177:19
178:8
**reaching**  141:6
178:23
**react**  72:4  96:25
153:15
**read**  30:17  92:24
112:1  131:18
**reading**  4:16
**reads**  59:21  159:24
**ready**  175:22
**real**  18:6
**realities**  64:13
**realize**  188:4
**really**  64:12  67:12,
13  69:21, 22  71:19
73:6, 9  86:7  87:12
97:25  133:4
136:23  148:12
**reapply**  54:3
**reason**  39:2  47:4,
5  83:10  163:15
195:7
**reasonable**  34:22
**recall**  14:22  23:14
24:21  26:4, 21
29:15, 18, 22, 25
36:5, 9, 16, 17, 24
37:1, 2  39:16, 18,
23  40:9  41:18
42:19, 23  43:1, 1,
13, 16, 21, 25  46:8,
11, 20  48:22  49:8
50:14  51:8, 8, 17
52:6  53:4, 25
54:13, 14  55:11
56:17  61:1, 17, 17
62:5  63:21  64:5,
14  65:20  66:4, 7
75:12  77:9  78:6,
19  85:24  88:3, 7, 8
97:4, 23  98:10
99:5, 10, 15, 16
100:11, 14, 23, 25

114:24  116:3, 4, 5,
7  125:8, 10  128:14,
16  138:17  149:3, 5,
6  152:3, 7, 9  153:6
155:1  158:11
177:18  181:15
**receipt**  34:5
153:23
**receive**  31:15
135:14  152:3, 3
167:14  177:1
**received**  27:11
108:3  152:3, 9
155:18  167:9
**receiving**  116:22
168:14
**recess**  151:23, 24
**recession**  18:15
**recited**  93:3
**recognize**  7:17
43:9  92:3  117:2
119:13  129:24
130:1  154:15
159:17  175:4
177:8
**recollection**  17:13
30:6  32:11  39:13
41:15  55:2  65:8,
10, 16  66:1  67:19
154:19  155:7
165:9  183:6
**recommend**  23:15
148:24
**recommendation**
59:12  125:17
136:22  149:18
185:20
**recommendations**
144:3, 17  152:2
**recommended**
125:15  143:13
150:16  159:2
**recommitted**  72:1
**recommunicating**
66:8
**record**  5:8, 22
6:22  7:10  37:7
49:5  91:15  112:3
126:18, 22  131:1
152:23  161:16

162:6  181:23
196:8
**recover**  191:7
**recovered**  191:9
**rectify**  108:20
111:2, 3
**Red**  13:12
**reduce**  54:5
**reduced**  55:5
196:7
**reducing**  191:19
**refer**  130:16
**reference**  17:14
29:8  114:22
118:12  131:14
135:8  154:25
165:13  171:12
175:19  180:4
**referenced**  93:1
94:4  170:7  181:14
**references**  140:10
**referencing**  114:8
**referred**  38:6  86:5
101:20
**referring**  48:4
79:10  131:2
177:24  178:2, 20
**reflected**  43:14
93:20  165:12
**refresh**  55:2
154:18
**regarding**  97:15
107:8  113:13
**regret**  73:7
**regular**  80:22
**reimburse**  29:19
34:16, 21
**reiterate**  161:4
**reiterating**  109:2
**relate**  177:16
**related**  26:10  71:7
94:8  196:10
**relation**  50:8
**relationship**  14:25
26:15  72:18, 18
83:19  122:22
126:10  151:14
158:9, 13  168:24,
25  169:8

relationships
147:*19*  149:*22*
177:*22*
relative  196:*11*
relaying  87:*3, 5*
released  39:*2*
relevance  93:*13*
relevant  89:*5*
90:*18*  100:*17*
132:*16*  158:*12*
relief  53:*5, 8*
78:*21, 22*  112:*18*
114:*7*  172:*16*
173:*1*  185:*17*
remain  15:*10*
98:*12*  185:*16*
remainder  104:*21*
remaining  122:*22*
remains  107:*15, 15*
remedies  35:*14*
remember  20:*9*
27:*16*  36:*18*  43:*25*
88:*4*  97:*24*  126:*8*
144:*23*  153:*7, 7*
155:*9*
reminded  129:*5*
reminding  102:*25*
103:*9*  104:*22*
121:*4*
remove  63:*23*
removed  38:*5*
52:*13*
removing  52:*12*
rendering  50:*18,*
*19*  112:*14*
renewal  55:*21*
56:*8*
rent  79:*5*  113:*1, 4*
114:*20*  115:*5*
186:*25*
rental  30:*13*
reorganized  138:*25*
185:*8*
reorganizing  63:*3*
repair  111:*2*
repayment  37:*16*
repeated  187:*14*
repetitively  187:*23*
replace  102:*16*
103:*21*  109:*8, 17*
110:*17*  111:*6, 8*

124:*9*  142:*15, 17,*
*19, 19, 25*  163:*16*
167:*13*  170:*11*
172:*19*  174:*1, 5*
183:*4*
replaced  76:*4*
109:*12, 14*  164:*14*
170:*10*  185:*4*
replacement
103:*17*  104:*8*
184:*16*
replacing  139:*13*
165:*16*  167:*12*
173:*25*
replicate  50:*7*
report  69:*1*  144:*22*
Reporter  1:*1*  5:*22*
6:*9*  7:*7*  91:*11*
105:*3*  111:*17, 25*
119:*8*  120:*7*
123:*22*  126:*14*
129:*21*  133:*17*
152:*20*  154:*8, 8*
159:*14*  161:*10*
171:*5*  174:*23*
177:*5*  179:*16*
REPORTING  1:*1*
80:*12*  172:*23*
191:*4*
reports  81:*18*
reposition  70:*13*
represent  5:*12*
27:*18*  28:*1*  63:*11*
97:*24*
representation
44:*12*  45:*14*
representative  7:*23*
26:*18*  36:*11*  40:*3*
81:*7*  158:*17*
representatives
26:*11*  41:*2*  159:*6*
167:*21*
represented  27:*13,*
*20, 22*  43:*18*
representing  28:*10*
represents  45:*4*
request  6:*19*
31:*11*  63:*9*  85:*8,*
*20*  86:*23*  112:*17*
125:*21*  151:*11*

153:*1, 11*  154:*20*
172:*25*
requested  53:*11*
55:*9*  76:*21*  102:*2*
requesting  7:*22*
55:*11*  100:*14*
113:*6*  115:*4, 7*
requests  180:*11*
require  21:*16*
34:*3*  174:*17*
184:*17*
required  21:*18*
33:*11, 19*  57:*10*
59:*3, 9*  84:*20*  98:*6*
103:*14*  121:*11*
127:*22, 22*  130:*21*
134:*6*  135:*19*
143:*12*
requirement  21:*22,*
*24*  31:*13*  63:*9*
68:*22*  110:*4*  129:*2*
166:*16*
requirements
20:*24*  21:*13, 14, 15*
103:*3, 22, 24, 25*
104:*5*  107:*7, 16*
150:*10*  183:*10*
requires  47:*25*
reseal  110:*6*
research  25:*22*
resell  76:*17*
reselling  11:*23*
reserve  12:*17*
reserved  4:*5*
reshape  185:*17*
residual  32:*22*
resolve  70:*1*  71:*18,*
*25*  72:*2*  184:*7*
resolved  70:*11*
176:*20*
resources  73:*9*
respect  16:*4*
133:*13*  169:*22*
188:*5*
respectable  46:*13*
respond  7:*2*  96:*25*
115:*14*  153:*15*
responded  76:*22*
77:*12*  85:*15, 16*
108:*10, 11*

response  85:*4*
152:*24*  154:*20*
responses  153:*1*
responsibilities
15:*14*  126:*24*
186:*16*
responsibility  187:*1*
responsible  176:*14*
restick  174:*7*
restroom  6:*18*
result  18:*14*  23:*17*
34:*6*  46:*23*  53:*13*
63:*1*  72:*12*  107:*15*
120:*24*  128:*8*
134:*17, 18, 24*
137:*24*
results  70:*4*
resurrected  170:*20*
retained  3:*23*
76:*23*  168:*8*
182:*19*
retracted  169:*25*
return  34:*4, 6*
55:*21*  56:*6*  91:*8,*
*17, 23*  92:*15, 18*
93:*2*  94:*3, 13*
revalidated  22:*3,*
*22, 22*
revenue  9:*9*  10:*9*
12:*8*  37:*24*  60:*9*
79:*5*  87:*13*  114:*5,*
*9, 17, 18, 20*  116:*22*
119:*22*  124:*19*
125:*20*  133:*9*
137:*17, 24*  138:*11*
140:*7*  162:*17*
168:*18*  169:*4*
revenues  81:*17*
118:*14, 20, 21*
119:*3*
review  62:*17*
85:*17*  165:*5*  167:*9*
180:*3*  181:*21*
reviewed  19:*9*
25:*24*  151:*6*
161:*23*  165:*8*
reviewing  143:*22*
reviews  22:*6*  98:*9*
revising  180:*23*

**RFP** 84:2, 3
134:17, 18 150:4, 9,
24 151:5 152:4
**RFPs** 152:3, 3
**rgiht** 94:12
**rid** 163:23
**right** 13:16 22:7
23:2 30:16, 20, 23
34:3, 18 45:11
74:1 83:19 86:22
90:3, 7 103:18
104:3 112:9
123:12 124:23
127:19 128:1
130:22 132:24
143:6, 17 145:6, 13
148:3 149:19
152:12 156:10
165:2 175:13
181:22 186:4
189:15, 17
**rightfully** 185:6
**rights** 47:11, 13
58:15 73:12, 17
111:11, 12 124:22
129:7 165:18
168:14 188:5
**rising** 38:21
**risk** 137:4 139:10
**risks** 142:22
**Robbins** 158:13
**rod** 110:6, 9
**rods** 109:12, 23, 23,
25 110:1
**role** 14:9 27:20
98:20
**Rolex** 50:20
**rolled** 187:6
**rollout** 11:24
**rolls** 184:5
**Roman** 54:19, 25
**room** 135:13
164:15 190:23
**roughly** 21:5 66:2
94:4
**round** 182:13
**row** 38:4
**Roy** 112:8 177:11
178:25 179:2
**rules** 5:21 6:24

**rumor** 104:11, 13
**run** 135:15
**running** 112:19, 24
164:19 176:1

**< S >**
**sale** 15:8 134:14
189:18, 21 191:17
**Salemi** 92:6, 16
**S-A-L-E-M-I** 92:6
**sales** 3:12 10:7
15:11, 12 33:3, 5,
12, 19 37:24 38:3,
12 49:6, 7 53:6, 8
54:7, 11 55:7 60:9
76:20, 23 81:16
86:21 87:8 93:22
94:4, 21 97:15, 15
106:17 119:16
120:1, 2, 2 121:5,
10 122:1, 3 123:2,
9, 12 124:8, 14, 16,
17 125:4, 6, 6, 13,
19 126:5 128:8, 10
130:9 131:23, 24
133:4, 24 134:4, 5,
9, 11, 20, 23 136:16,
19 140:6 142:11
145:4, 12, 17
147:12 148:2, 6, 18,
25, 25 149:15
171:16 183:4
185:14
**salespeople** 134:14
154:2
**salesperson** 124:21
125:1 133:11
**San** 11:24 66:19
**sand** 111:1
**SANDAK** 1:1
**sat** 98:12 164:15
**satisfaction** 95:21
**satisfied** 101:18
104:5 110:4
**satisfy** 59:9
103:22 137:10
140:9, 10
**saved** 191:5
**saw** 27:3 86:1
**saying** 84:18
160:15 164:4

175:20 189:22
192:19
**Says** 15:10 30:19
31:4 34:15, 21
38:23 39:4 44:19
48:2 53:22 56:3,
15 92:24 94:7
102:15 107:12
115:21 117:12, 20
118:6 127:9, 10
138:13 145:10
147:14, 15, 18
149:18 150:3
175:11 179:7
**Scan** 179:23 182:1,
8
**schedule** 51:13
54:1 62:19 64:10
140:22 185:9
**scheduled** 80:15
**scheduling** 79:24
**SCHMID** 1:1, 1
5:14 14:20 15:20,
22 21:4 26:9
28:13, 18, 21 37:4,
11, 11 42:22 43:4
49:2 50:22 51:4
57:1 106:19
116:25 120:8
122:16 126:16, 17
143:18 154:9, 16
156:22, 22 158:8,
17, 22, 23 159:1
165:23 166:3
169:10, 12, 19
173:12 182:24
**Schmids** 16:10, 12
17:9 19:4, 6 28:1
**school** 8:16, 17, 18
**schooling** 8:19
**Schuvart** 16:18, 21
**S-C-H-U-V-A-R-T**
16:20
**scope** 9:12 40:24
52:13 166:8
**screen** 176:3
**seal** 110:8 196:14
**second** 31:13 32:6
38:18 44:2 45:20
46:16 47:10 49:24
50:15 54:19 59:20,

23 64:3 68:7
75:11 76:19
102:19 107:18
115:1 117:19
118:6 121:8 125:1,
13 128:7, 10 132:7
145:9 148:7
167:17 168:12
174:1 180:9
181:14
**secondary** 123:2
**secondly** 74:18
**section** 54:20
55:17 56:11 59:17
92:25 93:2
**secure** 12:11
**secured** 12:20
45:21 46:16, 24
**security** 54:5, 21
55:5
**see** 5:22 22:7
29:7 31:4 34:1, 9,
11, 24 44:3, 19
45:20 46:6, 17
49:10, 24 50:15
52:18 53:23 54:10
55:17, 19, 23 56:2,
14 57:8, 11 60:6
75:24 93:22
113:21 115:24
116:17, 23 118:12
119:23 134:20
136:1 146:7 147:1,
17, 20, 25 148:4, 9,
19 149:11, 22
151:10 156:16
167:22 172:17
176:3, 6 178:22
**seeing** 88:3 99:15,
16
**seek** 50:4 117:6
**seeking** 76:5 115:1
**seen** 26:2 93:12
147:19 175:21
**segments** 173:16
**selected** 25:23
86:20, 21 134:20
**selection** 59:5
**sell** 10:8, 15, 16
13:6, 6 74:20
79:12 94:10

105:*24*   107:*19*
114:*1*   137:*8*
142:*12*   169:*4*
189:*16, 17, 17*
190:*3*   191:*15*
**seller**   29:*9*   60:*14,*
*17*
**sellers**   148:*16*
**selling**   71:*23*   89:*7*
95:*10*   97:*17*   98:*1*
148:*3, 8*   189:*19*
191:*14, 15*
**sells**   9:*8*
**semi-annual**
162:*17, 24*
**send**   123:*16*
125:*21*   135:*16*
178:*15, 18*
**sending**   88:*4*
180:*24*
**Senior**   15:*12*
**sense**   73:*15*   74:*8,*
*8*   116:*7, 15*   150:*22*
174:*13*   178:*16*
**sent**   36:*18*   84:*12,*
*17*   112:*11*   120:*23*
156:*7*   171:*9*
176:*11*
**sentence**   38:*18*
59:*20, 25*
**separate**   86:*9*
111:*12*   126:*24*
**separately**   22:*23*
69:*19*
**September**   14:*2*
53:*1*   65:*14*   169:*25*
**sequence**   180:*4*
182:*5*
**series**   50:*25*   175:*6*
**serious**   77:*17*
158:*15, 16*
**service**   124:*22*
129:*8*   176:*17, 19,*
*20*
**services**   45:*6, 8, 9*
128:*5*   135:*10*
141:*22*
**set**   29:*21*   91:*23*
119:*17*   128:*23*
136:*24*   141:*11*
157:*20*   159:*11*

161:*4, 21*   162:*24*
196:*14*
**setback**   137:*2*
**sets**   127:*13*
**seven**   52:*19*   59:*18,*
*18, 23*   190:*14*
**seventeen**   30:*9*
57:*8*
**seventy**   55:*25*
**shakes**   6:*10*
**share**   64:*15*   69:*10*
80:*3*   81:*25*   82:*16*
95:*8, 16, 24*   151:*16*
169:*7, 10*   182:*8*
189:*11*   190:*22*
191:*23*
**shared**   81:*23*   82:*1*
86:*3, 8*   91:*1*   95:*2,*
*7*   96:*1, 3*   98:*5*
101:*19*   151:*9*
167:*24*   168:*18*
181:*23*   183:*7*
189:*13*   190:*2*
192:*6*
**sharing**   65:*23*
79:*25*   92:*15*
151:*12*   168:*19*
189:*7*   190:*24*
**she'd**   66:*9*
**SHEET**   195:*1*
**Sherry**   145:*14*
**shifted**   134:*25*
163:*9*
**shop**   66:*21*
**short**   110:*14*
121:*5, 10, 14*
148:*14*
**short-listed**   145:*1*
**Shortly**   39:*24*
160:*18, 18, 20*
170:*21*   176:*20*
**short-paying**
137:*18, 19*   138:*9*
**show**   7:*6*   13:*17*
28:*20*   37:*3*   43:*3*
49:*1*   50:*21*   56:*25*
91:*10*   111:*16*
116:*24*   129:*20*
132:*12*   136:*16*
138:*12*   143:*17*
152:*19*   154:*7*

165:*22*   173:*11*
174:*22*   177:*4*
179:*15*   182:*23*
184:*2*
**showed**   99:*2*
**showing**   131:*24*
133:*16*
**shows**   148:*2*
**shut**   83:*20*
**Shuvart**   145:*12*
**S-H-U-V-A-R-T**
145:*13*
**side**   73:*7*   115:*8*
166:*14*   170:*12, 15,*
*16*   185:*10*
**sides**   112:*15*
**sign**   18:*23*   21:*17,*
*19*   23:*3*   26:*1*
36:*10, 19*   46:*9, 20*
47:*2*   50:*12, 18*
51:*14*   53:*17*   57:*17,*
*18*   58:*16*   59:*13, 14*
60:*12*   61:*7, 25*
62:*4*   64:*19*   69:*24*
73:*3*   74:*12*   75:*8,*
*23*   76:*3, 4, 7*   78:*20*
81:*8*   83:*20*   89:*7,*
*14*   103:*25*   104:*5, 8*
108:*13*   110:*6, 21*
112:*6, 15, 19, 24*
113:*5, 10*   114:*2, 6*
115:*8, 11*   116:*8, 14*
130:*13, 14, 19, 21*
131:*7, 10, 13, 14*
136:*3, 4*   143:*23*
162:*1, 3*   170:*9, 10,*
*11, 11, 14, 15, 17*
171:*25*   187:*4, 9, 14,*
*23, 23, 25*
**signage**   16:*13*
17:*14, 16, 19*   18:*1*
21:*10, 25*   25:*22*
58:*19*   60:*10*
104:*23, 23*   170:*8*
**signature**   35:*4, 5*
36:*14*   37:*12*   162:*4,*
*9*   165:*12*
**signed**   36:*15, 18,*
*20, 21, 25*   73:*2*
76:*17, 19*   113:*2*

120:*21*   127:*24*
171:*13*
**Significant**   117:*12*
136:*16*   140:*8*
142:*20*
**significantly**   123:*8*
**signing**   4:*16*   36:*9*
131:*5*
**signs**   76:*9*   98:*3*
170:*11*
**silicon**   110:*8*
**similar**   23:*22, 22*
45:*7*   47:*1*   73:*1, 3*
177:*2*
**Similarly**   54:*1*
126:*3*
**Simply**   26:*1, 15*
27:*3*   66:*8*   76:*3*
80:*9*   84:*22*   87:*2*
92:*20*   104:*12*
124:*19*   125:*22*
**sincerely**   186:*6*
**single**   12:*16*
**sir**   8:*12*   21:*12*
36:*8*
**sit**   43:*21*   98:*11*
100:*11*
**site**   25:*25*   105:*20*
**sits**   83:*8*
**sitting**   83:*18*   85:*4*
**situation**   47:*24*
48:*8*   68:*2*   71:*11*
138:*25*   142:*23*
186:*5, 10*
**six**   17:*4*   55:*17*
56:*11*   114:*19*
119:*19*   121:*9*
126:*8*   131:*24*
132:*17, 22*   139:*9*
190:*14*
**six-month**   78:*24*
121:*6, 23*
**size**   71:*20*
**skipping**   111:*20, 21*
**Skype**   156:*2*
**slightly**   185:*8*
**small**   114:*22*
**smaller**   26:*1*
**small-talk**   67:*7*
**SMITHFIELD**   2:*7*
**snapshot**   131:*23*

software 10:2, 3, 9,
12, 16, 20 15:3, 4, 7
sold 9:21, 24
10:16 11:19 12:2,
4, 5 15:4, 5 23:3
50:19 70:14 118:4
168:9
soliciting 42:3, 13
43:18 88:23
solve 70:25 71:3
solved 176:13
somebody 25:14
31:7 36:2 40:16
99:11 101:23
170:23 178:8, 9
179:8 187:3
someplace 97:8
soon 71:9
sorry 34:18 56:4
59:23 61:11
100:16 110:24
118:25 120:7, 18
145:23 146:21
154:8 188:2
sought 14:13
58:21 75:2
south 170:18
space 12:19 13:13,
18 46:5, 9 75:21
80:19 144:12
169:2, 4
spaces 11:23 13:8,
14, 14 169:5
span 62:3
speak 32:8
speaking 73:4
special 162:25
specializes 125:16
specials 163:2
specific 46:14
51:19 54:16 80:3
82:3 101:16 102:5
104:1, 1 171:23
183:11
Specifically 7:21
16:10 17:14 18:11
21:19 31:11 77:1
88:19 112:21
140:25 158:4
179:5 183:25
189:3

specifics 98:10
183:9
spectacular 146:5
speed 111:21
spell 5:10 16:19
spent 70:12 110:7
spoke 169:16
Sports 149:13
spot 12:17, 20
spread 53:15
167:2
spring 71:8
square 115:8
144:13 147:7
Stabilization 38:13
stage 27:15
stamp 149:9
standpoint 146:15
stands 85:9
start 146:18 148:4
166:6, 19
started 39:24
64:23 65:19, 22
66:2 74:23 78:14
79:2 112:24 113:1
114:18 166:25
starting 8:15
65:12 78:7 177:11
179:22
startling 72:11, 12
starts 92:5
start-up 10:23
state 5:8 9:14
105:19 107:19
108:17 121:25
124:6, 20 130:8, 23
131:12, 19 134:3
172:12, 19 196:1, 4
stated 44:25
167:19
statement 44:5
45:14 46:6 47:12
113:22 138:16, 22
167:21 188:24
STATES 1:1 5:15
26:12 119:21
statistic 146:24
status 68:25 69:1
79:25 80:10, 13
87:6, 7 96:21, 23

97:12, 15, 15
stay 185:7
stayed 67:14
steel 59:22 60:4
steered 189:5
step 83:16 99:7
172:16
Steve 19:16 40:16,
18
sticks 22:17
stipulate 64:21
stipulated 4:4, 9,
13, 16
STIPULATIONS
3:3
stopped 27:4 88:16
strained 72:14
strategic 49:20, 25
118:5
strategy 124:24
164:5, 22
STREET 1:1, 1
2:7, 14 115:9
135:24 146:6
170:18
strength 71:20
strengthen 126:5
stressed 72:18
stretch 6:17 53:5
Strike 11:16 33:1
36:2, 4 39:9 45:19
56:4 65:9, 12 96:2
106:5 112:21
158:7 159:1 162:5
168:16
strong 71:17
72:11 73:7 171:15
strongly 69:23
structured 33:6
study 141:25
142:10, 11 143:1, 6,
10 153:10, 13
subject 60:5
submission 154:22
155:11
submit 152:16
submitted 36:22
84:3, 4 150:10
152:17 153:2, 2
154:4 155:25

161:8
submitting 166:9
subparagraph
30:12 34:1
Subpoena 3:19
7:21, 25
Subscribed 194:15
195:20
Subsection 56:9
substantially 20:19
136:25 191:19
substitute 103:7
succeed 69:4
74:12 88:24
116:17 164:23
succeeded 87:18, 19
success 31:12, 14
115:12, 13
successes 168:4
successful 48:2
successfully 59:10
succession 162:10
sue 110:12 188:15
Suffice 132:24
suggested 44:25
74:2
suggesting 185:12
suggestion 136:21
185:20
suing 69:23, 25
71:21 187:13, 17
suit 70:4, 22 71:16
187:21
SUITE 1:1 2:7
summary 119:16
159:25
supervision 196:7
supplement 126:2
supplied 25:3
supplier 44:22
support 42:9 69:7
80:22 134:6
172:20 175:12, 19
supporting 70:12
supportive 81:9
suppose 93:14
sure 5:20 33:15
52:1 54:9, 15
64:16 77:22 78:15,
22, 23 94:1 98:9
99:2, 14, 20 100:22

104:*13*  112:*4*
125:*8*  126:*23*
128:*18, 20*  130:*25*
149:*20*  165:*15*
175:*20*  177:*23*
178:*9*  185:*21*
191:*24*
**surprise**  82:*2*
**surprised**  95:*6, 7*
**survive**  137:*9*
**swap**  109:*14*
**sworn**  5:*3*  194:*15*
196:*6*
**Sydney**  74:*4*
140:*11*  184:*6*
**system**  10:*12*  12:*1*
13:*11, 15*  23:*22*
24:*13*  103:*7*
109:*17*  110:*3, 5, 18*
111:*6*  173:*25*
174:*1, 6*
**systems**  9:*9*  10:*9*

**< T >**
**table**  6:*20*  19:*18*
189:*21*
**take**  6:*17*  14:*16*
28:*21*  37:*5*  43:*4*
49:*2*  50:*22*  54:*6*
57:*1, 17*  72:*25*
73:*24, 24, 25*  74:*3*
75:*3*  90:*24*  91:*14*
96:*14*  100:*1*
101:*14, 14, 17*
109:*25*  111:*4*
112:*23*  113:*7, 9, 17*
114:*3*  116:*25*
122:*2, 17*  123:*25*
131:*16*  137:*15*
141:*11, 13*  143:*18*
154:*9*  163:*14*
165:*23*  173:*12*
175:*1*  179:*19*
182:*12, 14, 24*
184:*25*  187:*18*
190:*8, 12*
**taken**  4:*11*  74:*6*
77:*5*  83:*19*  182:*7*
184:*16, 17*  186:*24*
189:*6*  196:*11*

**talk**  6:*18*  62:*9*
66:*10*  113:*12, 19*
145:*17*  146:*9*
156:*14, 14*
**talked**  16:*8*  18:*25*
19:*3*  25:*13*  61:*10*
69:*25*  71:*15*  89:*13*
90:*16*  134:*8*
185:*10*  190:*7*
192:*9, 10*
**talking**  26:*19*
47:*24*  104:*11*
108:*22*  173:*7*
183:*4*  189:*21*
191:*25*  192:*12*
**talks**  92:*25*
**taped**  156:*7*
**tardy**  53:*13*
**target**  128:*9*  133:*3*
149:*12*
**targets**  81:*17*
**tax**  33:*5, 10*  54:*11*
55:*7*  94:*1*
**taxes**  33:*3, 12, 19*
54:*7*  93:*22*  94:*4,
21*
**Taylor**  41:*22*
93:*21*  94:*2*  99:*2, 4*
**team**  40:*18, 19*
41:*18*  123:*2*
125:*13*  126:*5*
128:*10*  134:*5, 9, 11,
14*  136:*20*  140:*6*
142:*11*  184:*5*
**teamed**  154:*23*
**teams**  136:*16*
**tear-one**  46:*5*
**technical**  70:*1*
75:*22*  80:*20*
103:*25*  154:*1*
171:*22*  175:*25*
**Technician**  5:*13*
**technologies**  22:*15*
107:*17*
**TECHNOLOGY**
1:*1*  9:*6*  10:*10*
12:*5*  13:*6*  16:*7*
18:*11*  21:*11, 11, 18,
20, 21*  22:*7, 8, 11,
12, 12, 14*  23:*17, 22*
44:*11, 22*  47:*10*

48:*12*  59:*5, 8, 9*
75:*17*  146:*14*
156:*18*  170:*6*
**telephone**  141:*18*
**Tell**  7:*14*  8:*15*
9:*3*  14:*7*  16:*16*
19:*21*  28:*22*  37:*5*
38:*1*  43:*4*  49:*3*
50:*23*  57:*1*  66:*9, 9*
85:*9*  86:*15, 25*
91:*14*  92:*1*  102:*12*
116:*11*  122:*17*
123:*25*  142:*4*
143:*19, 25*  150:*8*
154:*9*  158:*6, 8*
161:*13*  165:*24*
169:*15*  173:*13*
175:*1*  179:*19*
180:*21*  185:*3, 19*
**telling**  139:*10*
**tells**  180:*16*
**temporary**  25:*25*
**ten**  30:*14*  35:*12*
111:*19*  112:*1*
117:*22*
**tenant**  80:*18*  82:*5,
10*
**ten-year**  79:*8*  83:*1*
107:*21*
**term**  12:*15*  45:*3, 4*
47:*19*  49:*16*  55:*17,
21, 22, 25*  107:*21*
113:*2, 7*  116:*9*
**terminal**  14:*12*
16:*14*  17:*15*  18:*1,
12*  50:*7, 16*  56:*20*
117:*7*  144:*13*
166:*15, 21*
**terminate**  34:*8*
56:*4*  121:*5*  129:*15*
141:*22*  149:*21*
184:*24*
**terminated**  57:*21*
121:*17*  127:*17*
**terminating**  132:*3*
139:*15*
**termination**  120:*25*
121:*1*  133:*23*
**terms**  25:*2*  27:*21*
44:*21*  51:*13*  56:*7*
62:*5, 8*  115:*2*

128:*12, 22*  129:*9, 9*
159:*18, 22, 25*
160:*4, 8, 10*  161:*3,
4*  165:*8*  186:*19*
**testified**  5:*4*  59:*2*
62:*15*  66:*14*  67:*5,
16*  77:*18*  126:*7*
183:*8*  192:*20, 21*
**testify**  8:*2, 7*  47:*16*
196:*6*
**testimony**  63:*12*
65:*6*  66:*23*  70:*3*
91:*15*  107:*8*
141:*21*  167:*7*
192:*15*  194:*4*
196:*8*
**testing**  107:*9*
**text**  141:*5, 16, 16,
17*  178:*18*
**Thank**  19:*15*
24:*12*  102:*15*
108:*24*  120:*18*
139:*25*
**Thanks**  177:*20*
179:*5*
**Thayer**  74:*24*
75:*10, 11, 15, 15*
90:*17*  100:*15, 16*
102:*5*
**their's**  136:*5*
**thereabouts**  155:*2*
**THEREOF**  196:*14*
**therewith**  58:*17*
**thing**  96:*13*
124:*13*  164:*9*
174:*5*  186:*4*
**things**  12:*7*  51:*13*
54:*8*  63:*21*  68:*12,
14, 18*  69:*6*  71:*22*
80:*2*  87:*13*  123:*8*
136:*17*  144:*16*
149:*13*  165:*15*
168:*6*  176:*17*
181:*23*
**think**  26:*7*  30:*18*
33:*21*  39:*14*  41:*21*
44:*1*  45:*3, 5*  48:*24*
62:*4*  77:*21*  90:*3*
96:*6, 9*  120:*17*
127:*8*  136:*21*
139:*2*  140:*19*

141:*16*  155:*18*
157:*4, 4*  158:*11*
180:*12*  183:*17*
186:*4, 8*  189:*15*
**third**  44:*9*  47:*21*
112:*14*
**thirteenth**  147:*10*
**thirty**  117:*22*
118:*1*  149:*7, 8*
**thirty-nine**  188:*20*
**thirty-seven**  187:*11*
**thirty-six**  183:*2*
**thought**  68:*18*
71:*2, 5*  77:*6*  79:*5,*
*23*  95:*23*  96:*11, 12*
114:*18*  126:*10*
127:*5*  158:*23*
164:*13*  187:*2*
**thought-out**  150:*4*
**thousands**  70:*12*
80:*18*  110:*7*
**threat**  72:*12*
**threaten**  70:*4*
110:*12*
**threatened**  74:*2, 4*
187:*19*
**threatening**  72:*20*
**three**  8:*18*  37:*12*
51:*7*  52:*24*  55:*21*
59:*17*  65:*7, 7, 11,*
*14*  90:*21*  107:*10*
133:*4, 7*  134:*3*
150:*3, 16*  152:*13*
162:*13*  175:*16*
180:*16*  186:*16*
190:*9*
**three-and-a-half**
89:*8*  96:*15*  189:*22*
190:*19, 23*
**threshold**  38:*3*
162:*15*  163:*17*
185:*15*
**Thumbing**  44:*2*
**tickets**  9:*10*
**tied**  23:*21*  101:*16*
163:*13*
**TIME**  1:*1*  4:*6*
6:*17*  15:*25*  16:*8*
17:*2, 3, 3*  26:*5*
31:*7, 21*  33:*16*
36:*15, 25*  38:*4*

39:*10, 17*  42:*6*
44:*1, 5, 13*  45:*23*
47:*1*  48:*7*  51:*14*
53:*6*  58:*4*  62:*3*
66:*18, 19, 24*  70:*6*
71:*9, 11*  75:*13*
77:*20, 20*  79:*2, 2*
80:*1, 19, 19*  82:*25*
85:*15*  87:*6, 6, 25,*
*25*  88:*9, 9, 18*
90:*25*  91:*4*  92:*9*
93:*7*  96:*8*  97:*7, 7*
98:*4, 9, 15, 15, 21,*
*21*  99:*12, 12*
100:*13, 19, 24*
101:*3, 4, 22, 22*
104:*24*  106:*1, 25*
108:*3, 12, 15*  111:*6*
112:*24*  113:*7, 9, 15*
116:*18, 19, 19, 20*
117:*15, 18*  119:*17,*
*20*  122:*5*  125:*10*
126:*3, 3, 4*  128:*6*
132:*1, 3, 13*  134:*12,*
*12*  135:*4, 6, 18*
136:*23*  137:*20*
138:*21*  140:*10, 14,*
*18, 25*  144:*13*
147:*7*  148:*13, 13,*
*14*  149:*14*  152:*12*
153:*25*  158:*5, 16*
167:*6*  171:*19*
172:*2, 10, 14, 16, 23*
173:*2, 5*  176:*24, 24*
181:*17*  182:*19, 21*
185:*12*  186:*1, 9*
187:*1*  190:*20*
**times**  22:*3, 7*
69:*18*  70:*10*  71:*5*
73:*23*  74:*6*  82:*7*
110:*23*  147:*19*
184:*4*  185:*8, 11, 18*
**timing**  46:*25*  125:*3*
**tipping**  96:*11*
**title**  45:*12*  168:*5*
**Titled**  44:*9*  47:*9*
147:*11*
**today**  5:*23*  7:*3*
14:*3*  43:*21*  98:*11*
100:*11*  106:*3*
183:*7*  186:*8, 22*

**told**  67:*16, 19*
116:*5*  139:*14*
163:*25*  190:*11, 17*
**Tom**  69:*21*  71:*18,*
*25*  173:*3*  187:*24*
**tomorrow**  180:*24,*
*24*
**tone**  72:*22*
**top**  18:*9*  29:*21*
44:*20*  64:*21*  65:*2*
118:*12*  124:*13*
125:*6*  129:*24*
154:*25*  178:*21*
180:*9*  181:*14*
**topic**  183:*7*
**topics**  7:*24*  8:*3*
87:*8, 15*  97:*18*
**TORRANCE**  1:*1*
**total**  29:*20*  145:*16*
**totaled**  20:*25*
**touch**  18:*16*  19:*7*
**tour**  26:*8, 9*
**tower**  18:*9*
**town**  66:*22*  80:*24*
**tradable**  79:*8*
**trade**  93:*16*  94:*8*
**traditional**  47:*23*
**transaction**  20:*20*
27:*23*  28:*13*  29:*16,*
*19*  31:*8*  33:*3, 11,*
*18*  41:*12, 13*  42:*13*
61:*24*  62:*3*  95:*18*
100:*15*  101:*25*
105:*16*  128:*3*
129:*7*  187:*3*
**transactions**  99:*6*
102:*6*
**transcend**  72:*23*
**transcribe**  6:*12*
**transcribing**  5:*23*
**transcript**  4:*17*
**transfer**  34:*8*
**transition**  148:*15*
**transitional**  135:*3*
**transmitted**  130:*1*
**traveled**  66:*18*
**tremendous**  141:*8*
**trial**  4:*6*
**tried**  98:*12*  108:*19*
185:*17*

**troubling**  90:*8*
172:*13*
**true**  22:*20*  31:*20*
44:*24*  66:*23*  87:*23*
113:*24*  128:*22*
130:*3*  133:*25*
147:*1*  154:*3*
159:*20*  171:*8*
177:*10*  194:*4*
195:*4*  196:*8*
**trusses**  59:*22*  60:*4*
**truth**  195:*19*
196:*6, 6*
**Try**  6:*14, 15*
55:*12*  67:*24*  68:*3*
72:*5, 8*  74:*11*
109:*8*  110:*8*  112:*4*
114:*7*  178:*14*
191:*15*
**trying**  53:*15*
62:*23*  66:*12*  68:*17*
70:*13, 24*  71:*2*
79:*22*  82:*4*  84:*9,*
*23*  93:*19*  94:*9*
96:*9*  104:*12*  111:*1,*
*21*  114:*15*  116:*9*
152:*18*  164:*4*
166:*25*  181:*24*
186:*5*
**Tufo**  82:*2*  83:*25*
84:*23*  181:*16*
**turn**  30:*9*
**turned**  22:*2*  71:*9*
186:*15, 15*
**Turning**  33:*22*
45:*11*  46:*3*  47:*9*
52:*24*  59:*17*  118:*9*
145:*20*  147:*10*
**TV**  46:*14*
**twelve-month**  119:*3*
**twenty**  117:*21*
118:*1*  145:*16*
175:*16*
**twenty-eight**  149:*18*
**twenty-four**  35:*8,*
*16*
**twenty-nine**  149:*17,*
*21*  150:*17*
**twice**  84:*4*
**Twitter**  168:*5*

two 16:23 20:25 21:5 38:17 52:5, 5, 5 55:1 61:2, 6, 18 63:20 64:19 65:1 68:25 79:1 87:13 109:13 114:9, 20 131:5 149:11 155:13 157:5, 8, 10 168:15 170:18 172:4 173:19 174:4 179:1 190:2, 5
two-and-a-half 137:17
type 23:24 61:3 141:25 156:17 174:17
types 99:23
typically 97:14
typo 64:22

< U >
U.S 26:20
ultimate 167:19 187:4
ultimately 25:22 27:7 125:25 169:10, 21 188:15
Um-hum 59:19 62:2 88:15 147:2, 9, 13 176:10 180:2
un-amortized 57:9
uncertain 6:4, 5 104:7
unclear 6:5, 5 69:25 131:1
uncomfortable 75:20
unconditionally 38:19 115:20
underneath 185:6
under-performance 122:20
under-performing 53:6, 8 125:18 129:19 185:9
understand 6:7 7:2, 19 8:6 12:3 14:8 30:23 32:13, 15, 15, 16, 18, 21, 24 33:1, 10, 13 37:15

45:22 54:15 55:13 63:17 66:12 67:10 71:7 73:10 78:9 79:22 89:18 91:9, 18, 18 92:17, 18 93:11, 12 94:8, 9 99:7, 8, 17 101:5, 12 111:10, 14 116:10 126:9 133:5 139:24 142:22 156:9 162:20 164:4 184:10 189:25 191:24, 24
understanding 16:12 18:20 24:1 29:25 30:6 33:2 38:10 40:24 41:6 46:1 60:8 62:12, 17 63:10 81:23 107:15 110:21 158:12
Understood 6:13, 23 31:1 67:12 71:6 83:21 101:5 116:21 139:23 159:9
undertake 124:25 141:24 143:1, 25
undertaken 131:25 144:9
undertook 123:19
under-value 191:17
under-valuing 191:19
undetermined 113:25 114:12
unequivocally 115:20
unfair 79:5
un-huh 6:11
unique 22:14
UNITED 1:1 5:15 26:12
University 8:19 48:19, 22
unlimited 39:1
unofficially 131:13
unquote 140:12
unreasonable 47:8

unsigned 162:9
unsuitable 47:23
unusual 151:11
updates 97:15 141:6
upfront 20:10, 11, 12, 13, 14 33:7, 12, 19
upgrade 172:20
upgraded 146:22, 23
upset 189:24 190:2 191:6
Urban 11:9, 10, 16
urging 122:2
USA 44:10
use 6:10, 10, 14 12:14, 19 16:6 21:17, 18 47:15 67:20 116:9
utilization 48:3
utilized 22:8 47:22

< V >
vacation 27:3
validate 86:2
valuable 45:7
value 32:22 73:25 190:15, 25 191:16
values 63:4, 10
Van 150:13 152:5, 11 154:22 155:10
variations 27:9
varied 101:1, 3
various 43:18, 19 100:25
vary 133:7
velocity 148:18
vender 47:18
vendor 26:16 44:16, 21 45:7, 17 47:17
vendors 133:6
ventilation 18:12 21:15 22:1, 18 47:25 103:3, 22 104:5 107:7, 16 110:4
venture 10:23, 24 11:11, 14 14:17 31:14

verbal 68:23 83:4 87:3 140:4 141:5, 6, 9 179:14
verbally 99:14 113:16 115:17 116:2 141:6, 8 188:13
verbiage 31:13
verification 103:2
verified 107:4
version 127:24
versus 20:6 31:8 52:21 111:1 137:8
vetted 25:2 107:11
Vice 10:7 15:12
video 156:1, 12
view 55:13 72:7, 20
viewed 73:5 146:5
violate 103:8
visibility 147:15
visible 75:23
visit 12:13 25:25 26:3 27:2 141:19
visits 12:16
vital 80:25 82:13
voice 178:18
volition 141:22
VP 15:11
VS 1:1

< W >
Wagner 150:13 152:5, 11 154:22 155:10
Wahab 171:9
W-A-H-A-B 171:9
wait 6:14, 15 186:11
waiting 12:21 130:13
waived 4:11, 14, 17
walked 186:16
Wallingford 9:5
want 6:5, 17 33:15, 22 36:10 71:21 76:7 111:18 116:17 138:22 158:4 182:10 183:15 191:24

wanted  69:11
76:2, 3, 5, 6, 8  78:4,
5  81:13  87:2, 5, 22
101:13  115:23
145:1  158:3
165:15  170:17
179:11  191:2
warrantee  35:11
60:20, 23  61:1
71:24  109:9, 13, 18
110:8, 18  172:15
173:10
washed  146:10
Washington  9:17
waste  158:5
way  14:6  33:6
35:20  89:7  105:13
109:17  110:3
111:19  131:8
140:15  143:24
151:12  153:15
154:18  163:13
176:21
ways  145:13
192:14, 22
weather  71:7, 9
109:25  172:11
web  156:8
week  69:14
weeks  66:19  109:5
110:10, 10  175:16
well  11:22  20:11
21:11  24:16  28:2,
8  40:18  51:8
52:12  62:13  71:8
72:12  77:25  83:12
89:5  90:8  92:22
97:22  98:19  100:3
103:13  109:1
124:7, 16  127:24
137:23  150:3, 14
153:18  154:2, 5, 6
169:14  186:6
went  10:2  20:22
24:23  27:9, 9
42:22  46:20  50:12
52:17, 18, 18  61:25
64:19  72:15  75:8
78:20  108:20
114:2  115:11
125:11  142:9

155:12  157:4
171:25  173:10
185:16
we're  45:4  64:9
74:1  93:16  94:12
95:8  107:17
137:21  189:9, 21
We've  64:10  83:4,
15  99:13  141:19
183:17
whatsoever  39:2
whichever  16:7
59:18
white  110:2
whole-heartedly
140:6
willing  18:20
99:18  107:19
191:3
winning  87:9
wintertime  172:9
wish  92:22
wit  196:5
WITNESS  3:6
4:17  8:7  18:8
20:3  24:10  28:4, 9,
23  29:12  30:10, 16
31:1, 10  32:15, 24
37:6, 20  43:6  44:7,
16  45:3, 17  46:1
49:16, 22  50:24
56:14  57:3  60:1,
17  62:21  64:24
68:10  70:18, 20
73:23  84:20  85:12
87:18  88:12  91:4
94:7, 24  95:16
98:19  102:13
111:14  117:1
119:12  121:20
122:19  124:2
127:10  139:21
143:20  154:11
155:5  156:11
161:15  165:2, 25
173:14  175:3
179:21  183:25
184:22  186:3
188:7, 18  191:14
192:4  196:8, 14

WIX  168:4
woo  164:17
Woodson  93:21
99:2, 4
Woodson's  94:2
word  67:20  102:13
words  6:9, 10, 14
32:16  49:10  51:24
56:12, 14  72:7
127:25  147:17
work  9:1  40:20,
21  42:20  58:19
59:10  67:21  68:3
70:24  71:2, 6, 8
74:11  103:3  104:8
108:13  109:19
111:1  126:6  137:1
164:21  168:1
174:3  182:20
work,  40:21
worked  9:3  10:4
15:20  17:3  73:16
85:6  104:15
167:20
working  18:13
24:15, 16  26:2
40:1  48:6  51:20
66:20  67:24  68:1
75:24, 25  111:7
131:13  141:20
world  48:12
worse  172:2
worth  189:22
woven  22:16
write  141:7
writing  35:21
141:3, 10, 15
173:21  180:23
196:7
written  35:19
99:15
wrong  65:3  93:15
103:6  106:20
136:21
wrote  132:3
171:20

< Y >
yeah  24:9  54:20
60:1  67:9  85:13,
20  90:22  95:7

106:21  116:3
120:13  125:12
130:20  138:4
144:24  147:22
156:19  157:15, 19,
23  158:4  163:13
169:20  172:4, 9
179:13  181:15
182:4  185:23
186:21  190:9
191:14  192:18
year  65:21  66:2
74:23  75:7  80:18
101:3  114:19, 22
115:1  119:5
131:19, 24  132:7, 8,
10, 13, 25  146:19,
22  160:22  170:19
172:4, 5
years  8:18  43:17
61:2, 6  73:16, 16
85:4, 7, 8  93:8
101:1  109:13
134:3  170:25
174:15  186:17
Yep  5:9  14:10
15:9  16:17, 22
21:7  22:22  23:13
29:13  33:24  37:8
46:21  64:4  77:3
85:16, 16  87:24
88:17  92:7, 10
100:6  102:23
117:11  118:11
119:12  123:1
135:22  143:20, 22
144:15  145:15
146:8, 12, 17
149:10  155:23
167:23  169:13
173:6, 14  179:3
180:18  187:12
yesterday  66:14
67:5  180:22, 23
York  7:22  8:3
11:3  13:4  14:7, 12
17:15  18:7  26:21
27:14, 17, 23  28:14
33:4  37:17  41:1
50:16  57:5  69:13,
13  70:6  77:25

80:*4, 5*  86:*25*  97:*9*
105:*14*  141:*19*
144:*13*  147:*24*
150:*18*  152:*18*
157:*21, 23*  168:*4*

< Z >
**ZEISLER**  2:*13, 13*
**zero**  74:*1*  114:*5*
116:*22*
**Zimmeth**  42:*18, 20*
61:*9, 15*  65:*18*
66:*3*  67:*17, 21*
69:*21*  71:*15*  72:*7*
73:*16*  74:*17*  77:*19*
79:*23*  81:*23*  84:*5*
86:*3*  90:*6*  97:*2*
98:*5*  99:*1, 11, 24*
101:*12, 23*  102:*3*
105:*10, 11*  116:*6,*
*11*  124:*3*  136:*15*
140:*3*  141:*3*
153:*18*  156:*25*
157:*25*  159:*21*
166:*3*  169:*11, 14,*
*19*  171:*9*  175:*9*
177:*13, 19, 21, 25*
178:*8*  179:*4*  180:*1,*
*15*  183:*10*  184:*4,*
*10*  185:*19*  187:*22*
189:*3*
**Zimmeth's**  88:*19*

```
 1                         CORRECTION SHEET

 2

 3          I, Garett Alan Neff, do hereby certify that the

 4     following corrections and additions are true and accurate to

 5     the best of my knowledge and belief.

 6

 7     CORRECTION                PAGE      LINE      REASON
       Garett, not Garret         5         9        Spelling
 8     --------------------------------------------------------
       Vernado, not Fernado      18         5        Spelling
 9     --------------------------------------------------------
       Projections, not projects 25         2        Spelling
10     --------------------------------------------------------
       Gehrety, not Garrity      27        15        Spelling
11     --------------------------------------------------------
       Powley, not Polly         60        21        Spelling
12     --------------------------------------------------------

13     --------------------------------------------------------

14     --------------------------------------------------------

15     --------------------------------------------------------

16          DATE:  ____June 17, 2019____
            57 W 38TH St.
17     At  NY, NY 10018  in said County of  New York,

18     this   17   day of  June  , 2019, personally appeared

19     Garett Alan Neff, and he made oath to the truth of the

20     foregoing corrections by him subscribed.

21

22     Before me,  _____ , Notary Public.

23
                                    SALLY LOFTIN
24     My Notary Expires: __6/1/2023__   Notary Public, State of New York
                                    Reg. No. 01LO6239999
25                                  Qualified in Bronx County Westchester County
                                    Commission Expires 6/1/23
```

```
 1                              JURAT

 2

 3          I, Garett Alan Neff, do hereby certify that the

 4     foregoing testimony given by me on May 08, 2019, is true and

 5     accurate, including any corrections noted on the corrections

 6     page, to the best of my knowledge and behalf.

 7

 8

 9

10                              _____

11                              Garett Alan Neff

12

13

14

15          Subscribed to and sworn before me on this 7th

16     day of ____JUNE____ 2019.

17

18

19     My Notary Expires: 2/28/23

20

21

22

23

24

25
```