IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

HUNTINGTON TECHNOLOGY
FINANCE, INC. f/k/a  MACQUARIE
EQUIPMENT FINANCE, INC.
f/k/a MACQUARIE EQUIPMENT
FINANCE, LLC

       Plaintiff,

vs.

GARETT ALAN NEFF a/k/a
GARY NEFF, JOHN MARK SCHMID,
and DAVID KARL SCHMID

       Defendants.

Case No. 3:18-cv-01708-VLB

HONORABLE VANESSA L. BRYANT

## <u>APPENDIX TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – PART 2</u>

Deposition Transcript of John Mark Schmid………...………………...………….Exhibit L

Deposition Transcript of David Karl Schmid………………..………...………….Exhibit M

Affidavit of Edward Kitchen…………………………………………....…………Exhibit N

Field Activate Report………...…………………………………………...……….Exhibit O

GMNY January 2012 letter to A2a Media……...……………………...……...…..Exhibit P

GMNY June 2012 letter to A2a Media……...…………………..…......…...……..Exhibit Q

GMNY March 2014 letter to A2a Media……...………………..…......…...……...Exhibit R

Letter of Credit Demand dated January 23, 2019………………….…......………..Exhibit S

**EXHIBIT  L**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


| | |
|---|---|
| HUNTINGTON TECHNOLOGY | : |
| FINANCE, INC., F/K/A MACQUARIE | : CASE NO. |
| EQUIPMENT FINANCE, INC, | : |
| F/K/A MACQUARIE EQUIPMENT | : 3:18-CV-01708-VLB |
| FINANCE, LLC | : |
| VS. | : |
| | : |
| GARETT ALAN NEFF A/K/A | : |
| GARY NEFF, JOHN MARK SCHMID, | : |
| and DAVID KARL SCHMID, | : |
| Defendants. | : |


DEPOSITION OF: JOHN MARK SCHMID

DATE: MAY 07, 2019

TIME: 10:00 A.M.

HELD AT: CARMODY TORRANCE SANDAK & HENNESSEY, LLP

195 CHURCH STREET, 18TH FLOOR

NEW HAVEN, CONNECTICUT


Reporter: Margaret A. Bull, LSR 00023


CASSIAN REPORTING, LLC
21 OAK STREET, SUITE 307
HARTFORD, CT  06106
860-595-7462

```
 1                    A P P E A R A N C E S

 2

 3

 4

 5    FOR THE PLAINTIFF

 6    METZ LEWIS BRODMAN MUST O'KEEFE LLC

 7    535 SMITHFIELD STREET, SUITE 800

 8    PITTSBURGH, PA  15222

 9    ATTORNEY:  JOHN R. O'KEEFE, JR., ESQ

10    EMAIL: jokeefe@metzlewis.com

11

12    FOR THE DEFENDANT

13    ZEISLER & ZEISLER, P.C.

14    10 MIDDLE STREET, 15TH FLOOR

15    BRIDGEPORT, CT  06604

16    ATTORNEY:  ERIC A. HENZY, ESQ

17    EMAIL: ehenzy@zeislaw.com

18

19

20

21

22

23

24

25
```

```
 1                            INDEX

 2                                              PAGE

 3     APPEARANCE. . . . . . . . . . . . . . . 02
       STIPULATIONS. . . . . . . . . . . . . . 04
 4     CERTIFICATE . . . . . . . . . . . . . .104

 5

 6     WITNESS:  JOHN MARK SCHMID               PAGE

 7

 8     DIRECT EXAMINATION BY MR. O'KEEFE . . . . . .  05

 9

10     PLAINTIFF'S EXHIBIT

11     Exhibit 1, Lease no. 001, 233-243 ......................21
       Exhibit 2, Guarantee, 247-251 ........................22
12     Exhibit 3, Amendment 1, 1 of 3 and 257-261..............25
       Exhibit 4, Presentation 8-4-10, 1148-1160..............27
13     Exhibit 5, Garage-Media presentation....................31
       Exhibit 6, Display agreement, 58-88 ...................37
14     Exhibit 11, A2aMedia presentation, 743-760............
       Exhibit 13, January 10, 2012 letter, 1235-1236.........46
15     Exhibit 14, June 26, 2012 letter,......................47
       Exhibit 19, Field Activate report 1022-1052............65
16     Exhibit 21, RFP status update, 12/10, 741-742..........75
       Exhibit 24, E-mail chain, four pages,..................78
17     Exhibit 26, March 18, 2014, letter, 663-665............89
       Exhibit 30, Answer and affirmative defense doc.........91
18

19

20

21     (Note:  All exhibits were kept by reporter and attached to

22     the original.)

23

24

25
```

```
 1                    S T I P U L A T I O N S

 2

 3

 4          It is stipulated by the Attorneys for the Plaintiff

 5     and the Defendant that all objections are reserved until the

 6     time of trial, except those objections as are directed to the

 7     form of the question.

 8

 9          It is stipulated and agreed between counsel for the

10     parties that the proof of the authority of the Commissioner

11     before whom this deposition is taken is waived.

12

13          It is further stipulated and agreed that any

14     defects in the notice are waived.

15

16          It is further stipulated that the reading and signing

17     of the deposition transcript by the witness is not waived.

18

19

20

21

22

23

24

25
```

5/7/2019                              John Mark Schmid                         Page: 5 (5 - 8)

Page 5

1        (Deposition commences at 10:00 a.m.)

2

3        JOHN MARK SCHMID, having first been duly sworn, was

4   examined and testified as follows:

5

6   DIRECT EXAMINATION BY MR. O'KEEFE:

7

8        Q   Can you state your name and spell  your last name

9   for the record?

10       A   John Schmid, S-C-H-M-I-D.

11       Q   Mr. Schmid, my name is John O'Keefe. As you

12  probably know, I'm counsel for the plaintiff in an action

13  brought in the District Court of Connecticut here by

14  Huntington Technology Finances, successor to Macquarie. I

15  don't remember the whole name.

16       In any event, you, your brother, and Mr. Neff are

17  represented by Mr. Henzy. We are here today to take your

18  deposition in connection with knowledge of facts and

19  information relevant to that case. Have you ever had your

20  deposition taken before?

21       A   No, never.

22       Q   So Mr. Henzy has probably already given you the

23  short version, but a deposition is a series of questions and

24  answers. I ask the questions; you give the answers. If you

25  have a question or are concerned with a portion of the whole

Page 6

1   of my question, you don't understand it, you want

2   clarification, you should make that known. We want you to

3   understand and answer the question that has been asked.

4        If your counsel believes that there's something

5   inappropriate or he has a question about my question, he will

6   no doubt voice that on the record and either instruct you to

7   answer the question or request that I modify the question in

8   some form or fashion.

9        You're free at any time to take a break. If you

10  want to speak with your counsel, you have the absolute right

11  to do that at any time. If there is a question pending on

12  the record, we generally prefer to have that answered before

13  you break; but otherwise, you can do it at any time. If you

14  need to go to restroom, stretch your legs, or take a longer

15  view at the scenery behind me, you can take a break to do

16  that at any time.

17       Are those rules acceptable to you?

18       A   Yes.

19       Q   Okay. One of the other things is, the court

20  reporter is transcribing what is said on the record here.

21  When you respond to questions, you need to be audible. You

22  need to use words. You can't shake your need or say un-hum,

23  although she may get that.

24       A   Got it.

25       Q   It's easier if words are spoken. I would ask you to

Page 7

1   wait until I finish with a question before you give the

2   answer. I will try to do the same thing when you give an

3   answer, I will wait until you finish before I move on to the

4   next question. Are those rules acceptable?

5        A   Yes.

6        Q   See how I said I said um-hum, that's a bad thing.

7   Are you aware of anything which would impede your ability to

8   listen, understand, and to answer questions asked today, such

9   as a medical condition or medications or some other reason?

10       A   No.

11       Q   Okay. Would you tell me what your address is?

12       A   Yes. 167 Fern Avenue in Litchfield, Connecticut.

13       Q   And could you briefly recite your educational

14  background?

15       A   Dropped -- high school, dropped out of college

16  second year.

17       Q   Where did you attend?

18       A   Eastern Connecticut State College.

19       Q   And when did you graduate from high school?

20       A   1976.

21       Q   And did you -- strike that.

22       Tell me something about your employment from at or

23  around the time you dropped out of college?

24       A   I went to work for a rent-a-car company, Dollar

25  Rent-a-car. I studied to be a stock broker and became a

Page 8

1   stock broker in Hartford.

2        Q   Did you have to take any special tests or pass any

3   certifications?

4        A   Yes.

5        Q   Did you obtain any certifications?

6        A   My Series seven, Series eleven.

7        Q   And you were able to do that without a college

8   degree?

9        A   I passed.

10       MR. O'KEEFE:  Off the record.

11       (Off-the-record discussion is held)

12  BY MR. O'KEEFE:

13       Q   Series seven and eleven?

14       A   Yeah.

15       Q   And when did you pass those, ballpark?

16       A   '83 maybe.

17       Q   And did you then begin to work as a stockbroker?

18       A   I did.

19       Q   For whom?

20       A   Supervised Financial Services.

21       Q   And what was your capacity at Supervised Financial

22  Services?

23       A   I was an agent that sold stocks, life insurance,

24  that kind of thing.

25       Q   Was that located in Connecticut?

**Page 9**

1  A   In Hartford, yeah.

2  Q   And for how long were you employed at Supervised

3  Financial Services?

4  A   Probably a couple of year; two years maybe.

5  Q   Am I correct you were employed and not an owner of

6  that organization?

7  A   That's correct.

8  Q   Where did you go from there?

9  A   Started my own business.

10 Q   And that was or is?

11 A   It was called The Best of Hartford.  It was a

12 discount, you know, buy-one-get-one-free kind of thing.

13 Q   Like a dollar store?

14 A   I'm sorry.

15 Q   Dollar store type of thing or discount?

16 A   No.  It was like a dining club.

17 Q   So people would buy the opportunity to go eat

18 somewhere and get one free, that type of thing?

19 A   Yeah, yeah.

20 Q   For how long did that business last?

21 A   I believe four or five years.

22 Q   And what happened to it?

23 A   I got into parking.

24 Q   What happened to The Best of Hartford business?

25 A   We just kind of walked away from it.

**Page 10**

1  Q   Folded it up?

2  A   Yeah.

3  Q   And by getting into parking, how do you mean?

4  A   I got a job at night when I was a stock broker in a

5  parking lot and realized there was opportunity.

6  Q   What was the job that you got at night?  Was it

7  parking cars?

8  A   Yeah, I was a parking lot attendant at night.

9  Q   And do you recall for whom it was that you worked?

10 A   Yeah.  Justin Dinino, Union Place Parking.

11 Q   And for how long did you have that job?

12 A   Probably two years.

13 Q   So we are up in the early '90s now?

14 A   No.  This was at the same time I was a stockbroker

15 and doing that other business.  '84, '85.

16 Q   Okay.  And so they ran parallel?

17 A   Yeah.

18 Q   And what was the next job that you had or held?

19 A   I started Professional Parking.

20 Q   And is that now known as Pro Park?

21 A   Yes.

22 Q   Is it legally Professional Parking?

23 A   I think so, yeah.

24 Q   Tell me about what that is -- what was it when you

25 started?

**Page 11**

1  A   We leased parking lots.

2  Q   And who is "we"?

3  A   My partner Joe Capolla.

4  Q   And what was your capacity when that company -- is

5  it a company?

6  A   It is.

7  Q   -- when it started?

8  A   Chief parking lot attendant.

9  Q   So you parked cars?

10 A   I did.

11 Q   On leased lots?

12 A   I did.

13 Q   Who handled the business of Pro Park, if I

14 understand?

15 A   I did.

16 Q   Does that company still exist?

17 A   It does.

18 Q   Can you tell me how, since this is roughly what '86

19 when you started?

20 A   '84 was the official date, yeah.

21 Q   How did that company evolve and change since '84

22 until today?

23      MR. HENZY:  I'm going to object.  I'm fine with

24 asking him about his employment background.  Pro Park is not

25 a party to this lawsuit.

**Page 12**

1      MR. O'KEEFE:  Right.

2      MR. HENZY:  And I don't think it's relevant.  I'm

3  going to object, and hopefully we stay away from questions of

4  Pro Park.

5      MR. O'KEEFE:  Okay.

6      THE WITNESS:  I'LL tell you over a drink.

7  BY MR. O'KEEFE:

8  Q   Let me just rephrase it to say:  How did your

9  position and involvement with Pro Park evolve and change

10 since '84?  I want to get you up-to-date on your employment.

11 A   Yeah.  I'm now the COO of Pro Park.

12 Q   Has Pro Park been your primary form of employment

13 since --

14 A   Yes.

15 Q   -- a date and time?

16 A   Yes.

17 Q   When?

18 A   Since 1986.

19 Q   So were you involved in the business of Pro Park and

20 attending parking lots, and you're now COO.  How has that

21 changed over the years?

22 A   A lot more parking lots.

23 Q   So you're not parking or attending parking lots, are

24 you?

25 A   No, no.

## Page 13

1    MR. HENZY:  Maybe just really busy times.

2  BY MR. O'KEEFE:

3    Q   Would it be fair to say that you as a COO supervise

4  the business of Pro Park?

5    A   Yes.

6    Q   You're familiar with an entity by the name of

7  Garage-Media?

8    A   Garage-Media?

9    Q   Yes.

10   A   Yes.

11   Q   Can you tell me your recollection and understanding

12 of how that came to be?

13   MR. HENZY:  I'm just going to object to the form.

14 There's two Garage-Medias.

15   MR. O'KEEFE:  Correct.

16   MR. HENZY:  So if you know who he's referring to

17 when he says, Garage-Media.

18   THE WITNESS:  Okay.

19 BY MR. O'KEEFE:

20   Q   So there's two Garage-Medias.  There's Garage-Media

21 New York and Garage-Media.  Can you tell me what knowledge

22 you have of how either or both were started?

23   A   Yeah.  We saw this cool technology that goes on the

24 outside of parking garages and allows air and light to go

25 through the garage.  So you can put this billboard up

## Page 14

1  without -- where others -- where you couldn't put other

2  billboards up, so it was pretty cool.

3    Q   And who is "we" when you say we?

4    A   David and Gary.

5    Q   And Gary would be Gary Neff, and David would be

6  David Schmid.  Did I pronounce that correctly?

7    A   Yes, you did.

8    Q   Where did you see this technology?

9    A   Initially I saw it at A2a's office on Boston on a

10 laptop.

11   Q   And how is that you came to go to A2a and learn of

12 that technology?

13   A   I -- a friend of mine introduced me to A2a.

14   Q   And who was that friend?

15   A   Phil Schoenberg.  He passed away.

16   Q   Sorry to hear that.

17   A   Good guy.

18   Q   Do you know why he identified that as something for

19 you to look at?

20   A   Yeah.  I mean, I'm in the sustainability world, and

21 this is a very sustainable billboard that could go on parking

22 garages.

23   Q   And so you would agree that the introduction to A2a

24 was by someone other than a representative of Macquarie

25 Financial?

## Page 15

1    A   Yes.

2    Q   And am I correct that when you went up to meet with

3  representatives of A2a, there was no Garage-Media entity in

4  existence at that time?

5    A   Correct.

6    Q   So can you tell me how after that meeting, and to

7  the extent it had an impact or effect on it, Garage-Media,

8  the entity, and Garage-Media the parent were formed?

9    A   I'm just trying to think back here.  Let's see.  I

10 don't know.  Just one thing lead to another.  Saw the

11 technology, we thought it was a cool, tried to figure out

12 where we could put it.

13   Q   And when you saw the demonstration on the laptop, do

14 you know what it was that was being depicted on the laptop?

15 Was it an actual location where the technology was in place,

16 or was it more of a prototype?

17   A   No.  It showed different installations.  Most

18 notably the Miami Heat location in Miami.

19   Q   But there were others, aside from the Miami Heat

20 installation?

21   A   There was one in Europe somewhere.

22   Q   Just the two?

23   A   That I remember.

24   Q   Were you, Gary, and your brother all present for

25 that demonstration?

## Page 16

1    A   Initially, no.  It was just me.

2    Q   And who did you meet with at A2a, if you recall?

3    A   I don't.  I remember Brian Stuvart, I think; and I

4  forget the name of his partner.

5    Q   But it was through the introduction of Phil

6  Shoenberg, you said?

7    A   Yes.

8    Q   And this was something -- strike that.

9      Was his referral to you to A2a and this technology

10 related to the fact that you were managing parking space?

11   A   Yes.

12   Q   And, perhaps, it would be a supplement to that

13 business?

14   A   Yes.

15   Q   Okay.  Tell me how after the meeting with A2a you,

16 your brother, and Mr. Neff formulated a plan to install

17 signage on the Port Authority bus terminal?

18   A   I'm not sure.  I know it was mostly Gary.  Gary

19 somehow came across the fact that -- I don't how it happened

20 but that the Port Authority was looking to have a display put

21 on the outside of the garage, but I'm not sure.

22   Q   So that would have been something that he was more

23 of a player in --

24   A   Yeah.

25   Q   -- in developing?

5/7/2019                           John Mark Schmid                    Page: 8 (17 - 20)

Page 17

1   A   Yeah. Just to put it in context, I had a bunch of
2   different start-ups going on at the time. I was mostly an
3   investor. I thought this was a cool product, but I was
4   mostly a passive investor in this.
5   Q   You're aware that Garage-Media entered into a permit
6   agreement for use or sub-permit agreement for use of the
7   space on the Port Authority parking garage?
8   A   Yes.
9   Q   Okay. And is that something that you were involved
10  in, agreeing to? Disagreeing with? Discussing?
11  A   I was not involved in negotiations.
12  Q   When Garage-Media was started, did you have an
13  active role in the organization in terms of a position?
14  A   No.
15  Q   Would it be fair to say that you were not, when it
16  started, involved in the day-to-day operations of
17  Garage-Media?
18  A   Yes.
19  Q   When I say, Garage-Media, I'm now talking about the
20  permitee. The one that actually put the sign on, and that
21  Gary seemed to be the day-to-day guy for.
22  A   Yes.
23  Q   Was Gary Neff the day-to-day guy for the business of
24  Garage-Media?
25  A   He was.

Page 18

1   Q   And how about your brother David, what was his
2   role?
3   A   Almost non-existent.
4   Q   So would it be fair to characterize your position
5   and David's at the time, more in the capacity of a passive
6   investor?
7   A   Yes.
8   Q   Did that role for you ever change during the time
9   period up to date?
10  A   It did.
11  Q   How so?
12  A   When it started going sideways, and I started
13  putting a lot of money into it, personal money into it to
14  keep it alive.
15  Q   And do you recall about when that was?
16  A   Yeah. 2013, 2014.
17  Q   And we will come back to that; but broadly speaking,
18  how did you become more involved at that time?
19  A   I was involved in phone calls, I was writing checks,
20  I was concerned. I went to a couple of meetings.
21  Q   Something more than a passive investor?
22  A   At that point, yes.
23  Q   Okay. Do you recall meeting with anyone from
24  Macquarie in connection with a financing or lease transaction
25  for the development of the sign?

Page 19

1   A   In the beginning.
2   Q   Can you tell me who it is, if you recall, that you
3   met with?
4   A   We met with -- I think it was Patty something.
5   Q   Magrin?
6   A   Yes. I think I had maybe one or two meetings with
7   her. I was brought in at the end. I didn't do negotiations
8   or anything. I just did a meet-and-greet with her.
9   Q   Do you remember who at Garage-Media first spoke with
10  anyone from Macquarie regarding the prospect of financing or
11  a lease?
12  A   I believe it was Gary.
13  Q   Do you know how that introduction was made?
14  A   I don't.
15  Q   Did he have the first meeting alone with someone
16  from Macquarie?
17  A   Yes -- I don't know.
18  Q   And then would it be fair to say that he brought you
19  and your brother in to meet with folks from Macquarie?
20  A   It would be fair to say that I met with Patty.
21  Q   Okay. Do you recall ever having met with any other
22  people at the inception of the project and before you entered
23  into the lease?
24  A   No.
25  Q   Do you recall ever having to participate in a

Page 20

1   presentation of your idea or project to Macquarie?
2   A   No, I don't recall.
3   Q   Do you know that that happened?
4   A   I did, yes.
5   Q   Who do you understand participated in that from the
6   Garage-Media side?
7   A   Gary Neff.
8   Q   Do you know if he did that alone, or if he did it
9   with someone, for example, from A2a?
10  A   I don't know.
11  Q   You are aware -- strike that.
12      Did Garage-Media ultimately enter into a lease
13  agreement with Macquarie for the signage?
14  A   Yes.
15  Q   When I say "signage", just so the record is not
16  unclear -- although this may not make it clearer -- I mean
17  the installation, the parts, the construction. So that it
18  went from an idea to actually affixed on the parking garage
19  and ready to operate. Is that a fair --
20  A   Yes.
21  Q   -- way to describe the signage?
22  A   Yes.
23      MR. O'KEEFE: I'm going to show you document. I
24  will ask that the court report mark it as Exhibit 1. Ask if
25  you can take a look at that and tell me when you are

5/7/2019                                          John Mark Schmid                              Page: 9 (21 - 24)

### Page 21

1  finished.

2       (Plaintiff's Exhibit 1 is marked for identification)

3  BY MR. O'KEEFE:

4       Q   Have you had a chance to take a look at that

5  document?

6       A   Yes.

7       Q   I realize you didn't sign that, but do you recognize

8  that document?

9       A   No.

10      Q   Do you recall ever having seen the lease agreement

11  between Garage-Media NY, LLC, and Macquarie Equipment

12  Finance, LLC?

13      A   Vaguely.

14      Q   Okay.  Do you know whether in connection with that

15  transaction, Garage-Media New York was represented by

16  counsel?

17      A   We were.

18      Q   And do you know whether a portion or all of the

19  counsel fees for the negotiations and execution of the lease

20  agreement and related documents, whether counsel fees were

21  paid as a part of that transaction?

22      A   I don't recall.

23      Q   Were you individually represented by counsel in that

24  transaction?

25      A   No.

### Page 22

1       Q   I'm going to show you a document marked Exhibit 2.

2       (Plaintiff's Exhibit 2 is marked for identification)

3  BY MR. O'KEEFE:

4       Q   Do you know whether Garage-Media made all of the

5  payments that were required under the lease agreement to

6  Macquarie and/or its successor Huntington?

7       A   Do I know?  Yes, we did not.

8       Q   Okay.  And you're aware that the lease was -- strike

9  that.

10          You are aware that Macquarie was acquired at some

11  point by Huntington Technology?

12      A   Yes.

13      Q   Okay.  Did you get a chance to look at the document

14  marked Exhibit 2?

15      A   Yes.

16      Q   Do you recognize that document?

17      A   Yes.

18      Q   Let me see that for a second.  I think there's a --

19  there was a mistake made.  This amendment one is attached at

20  both the end of that, and I thought I took it out.  Take

21  the beginning of three so you can dispose of one of those.

22      MR. HENZY:  Just we're going to take amendment one

23  off?

24      MR. O'KEEFE:  Yes.  It was a tabbing issue.  I did

25  not realize, so I had a new one made.

### Page 23

1       MR. HENZY:  I think you have it in tab three.

2       MR. O'KEEFE:  I do.

3       MR. HENZY:  All set.  Those three pages could come

4  off.

5       MR. O'KEEFE:  I took it off.

6       MR. HENZY:  Okay.

7  BY MR. O'KEEFE:

8       Q   Having shown you that document, it is a three-page

9  document; is that correct?

10      A   Yes.

11      Q   And does that bear your signature on the last

12  page?

13      A   It does.

14      Q   All right.  Do you know what that document is?

15      A   Yes.

16      Q   What is it?

17      A   It's a guarantee.

18      Q   And what is the date of that guarantee?

19      A   10/26/10.

20      Q   And would you agree that it is a document by which,

21  among others, you guaranteed indebtedness due to Macquarie

22  Equipment Finance by Garage-Media New York?

23      MR. HENZY:  Objection to form.  You can answer.

24      THE WITNESS:  What is that?

25      MR. HENZY:  You can answer.

### Page 24

1       THE WITNESS:  Yes.

2  BY MR. O'KEEFE:

3       Q   And you see in paragraph two in the middle of that,

4  "Guarantor unconditionally guarantees to Macquarie the full

5  and prompt payment, observance and performance when due of

6  all obligations of Obligor arising under the agreements

7  (collectively, the "Guaranteed Obligations.")  That language

8  appears in there?

9       A   Yes.

10      Q   Followed by, "This guarantee is absolute,

11  continuing, unlimited and independent, and shall not be

12  affected, diminished, or release for any reason whatsoever."

13  It then goes on to list a number of reasons.  Do you see

14  that?

15      A   Um-hum, yes.

16      Q   And that is a true and correct copy of the document

17  that you executed and delivered to Macquarie Equipment

18  Financing; is that correct?

19      A   Yes.

20      Q   Were you represented by legal counsel in the

21  negotiation and execution of this document?

22      A   No, not that I remember.

23      Q   Did you have the opportunity to be individually

24  represented by counsel?

25      A   Did I have --

5/7/2019                     John Mark Schmid                  Page: 10 (25 - 28)

Page 25

1    Q   The opportunity to be individually represented by
2  counsel in connection with that guarantee agreement?
3    MR. HENZY:  Object to form.
4    THE WITNESS:  Yeah, I guess.
5  BY MR. O'KEEFE:
6    Q   But in that transaction, Garage-Media was
7  represented by counsel; is that correct?
8    A   Yes, I believe so.
9    Q   I'm going to show you a collection of documents
10  which will be marked Plaintiff's Schmid 3.  I ask you, if you
11  will take a look at that and tell me when you are finished.
12    (Plaintiff's Exhibit 3 is marked for identification)
13  BY MR. O'KEEFE:
14    Q   Have you had a chance to take a look at those
15  documents?
16    A   I did.
17    Q   Your signature appears on one of those documents; is
18  that correct?  The last title amendment, dated as of March
19  31, 2013.  In it's body -- strike that.
20    Amendment dated as of March 31, 2013.  On the bottom
21  the numbers is HTF, and letters HTF 000216 to 261.  Do you
22  see that?
23    A   No.
24    Q   The last amendment, does your signature appear on
25  the second page of the amendment dated as of March 31,

Page 26

1  2013?
2    A   I don't see it.
3    Q   Okay.  You are right.  You didn't sign these
4  documents?
5    A   I don't know.
6    Q   Are you familiar with these documents?
7    A   I don't remember.
8    Q   Do you recall that there were amendments to the
9  lease agreement between Macquarie and Garage-Media?
10    A   Yes.
11    Q   Do you remember why there were amendments?
12    A   No.
13    Q   Do you recall that the project was not installed in
14  the time that was originally anticipated?
15    A   I don't remember.
16    Q   Do you recall whether there were cost overruns in
17  connection with the project?
18    A   I don't remember.
19    Q   Do you recall whether at any time someone on behalf
20  of Garage-Media sought some type of payment relief for
21  payments that were past due by Garage-Media to Macquarie?
22    A   I don't remember.
23    Q   Do you know whether at some point in time
24  Garage-Media and Macquarie agreed that a portion of the
25  security deposit would be used for past due rent and taxes?

Page 27

1    A   I remember that, yes.
2    Q   Would that have been around the time that you became
3  more involved in --
4    A   I don't remember.
5    Q   -- the day-to-day operation of Garage-Media?
6    A   I don't remember.
7    Q   Okay.  Do you remember -- what, if anything, do you
8  remember about that circumstance that I just described?
9    A   Which circumstance?
10    Q   That a portion of the security deposit was used for
11  past due payments and sale taxes?
12    A   That's what I remember.  I don't have any
13  recollection.
14    Q   Did you have anything to do with the request being
15  made of Garage-Media that it take that action?  I'm sorry,
16  that Macquarie take that action or permit that action?
17    A   I don't think so.
18    Q   Would that have been Mr. Neff?
19    A   Yes, I would imagine.
20    Q   I'm going to show you a document that I will ask to
21  be marked as Plaintiff's Schmid 4.  Ask if you would take a
22  look at it and ask you to take a look at that.
23    (Plaintiff's Exhibit 4 is marked for identification)
24  BY MR. O'KEEFE:
25    Q   Have you seen that document before?

Page 28

1    A   I don't remember.
2    Q   For the record, I will identify Exhibit 4 as a
3  document titled, Presentation to Macquarie Equipment Finance,
4  dated August 4, 2010.  Do you recall having participated in
5  the preparation of that document?
6    A   I do not.
7    Q   Were you aware that a document was being prepared
8  for presentation by Garage-Media to Macquarie with respect to
9  the signage project?
10    A   I don't remember.
11    Q   In this document there's reference to alliances with
12  Pro Park and A2aMedia.  Would you agree that Garage-Media had
13  an alliance with Pro Park and A2aMedia at that time?
14    A   Yes.
15    Q   There's reference to Garage-Media Partners, in
16  addition to Pro Park GKD USA, as identified.  Do you agree
17  that at the time GKD USA was a partner with Garage-Media in
18  the signage project?
19    A   No.
20    MR. HENZY:  Objection to form.
21  BY MR. O'KEEFE:
22    Q   Pardon me?
23    A   No.
24    Q   Why do you say that?
25    A   They weren't a partner.

Page 29

1  Q   So if it says that in this document, it is
2  inaccurate?
3  A   Yes.
4     MR. HENZY:  Object to form, But you can answer.
5  He's asking you:  If it's in the document, is it inaccurate?
6     MR. O'KEEFE:  He answered.
7     MR. HENZY:  Okay.
8  BY MR. O'KEEFE:
9  Q   Are you aware that this presentation included a
10 statement that A2a had the exclusive license to distribute
11 the Mediamesh product from GKD?
12    MR. HENZY:  He asked you:  Are you aware?  He's not
13 asking you to look at the document.
14 BY MR. O'KEEFE:
15 Q   You don't have to look at it.
16 A   Yes, I am.
17 Q   And did you know at the time that the exclusive
18 manufacturer or provider of the Mediamesh product was GKD
19 Products?
20 A   Yes.
21 Q   Okay.  How did GKD come to be the product supplier
22 for Garage-Media for the signage project?
23 A   Through A2a.
24 Q   So you would agree that in connection with the
25 selection of the product from GKD, that Macquarie Financial

Page 30

1  had nothing to do with that choice?
2  A   Yes.
3  Q   Are you aware that in this presentation, the target
4  launch date was November 15, 2010, when presented to
5  Macquarie?
6  A   I don't remember.
7  Q   But you do recall that there were delays in getting
8  the project completed?
9  A   Vaguely.
10 Q   Okay.  Do you know how revenue projections which
11 were presented to Macquarie by Garage-Media in this
12 presentation were calculated?
13 A   No.  I know that we had hired a group Johnson and
14 Fretty, and that they put the projections together.  They're
15 a billboard consulting group.
16 Q   Would that have been in conjunction with discussions
17 with A2aMedia?
18 A   I don't remember.
19 Q   Do you know who Johnson and Fretty would have spoken
20 to in order to compile these projections?
21 A   I don't.
22 Q   Do you know who on behalf of Garage-Media, if
23 anyone, Johnson and Fretty would have spoken to in connection
24 with preparing those projections?
25 A   Gary Neff.

Page 31

1  Q   Thank you.  Do you know that there was a
2  representation in this presentation to Macquarie that at
3  least thirty-five percent of the projected annual revenue
4  would be booked prior to deployment?
5  A   No.
6  Q   Do you know whether or not that happened?
7  A   No.
8  Q   You know -- don't know, or you don't no --
9  A   I don't know.
10 Q   Thank you.
11 A   I don't know what I don't know.
12 Q   I'm going to show you a document, which I will ask
13 that the court reporter mark Plaintiff Schmid 5.  I ask if
14 you will take a look at that, and tell me when you are
15 finished.
16    (Plaintiff's Exhibit 5 is marked for identification)
17 BY MR. O'KEEFE:
18 Q   Have you had a chance to look at that document?
19 A   I did.
20 Q   Do you recognize that document?
21 A   I do.
22 Q   What is that document?
23 A   It's a sale brochure for Garage-Media.
24 Q   And do you know for what purpose that was
25 prepared?

Page 32

1  A   I don't.
2  Q   Do you know to what audience that was to be
3  delivered?
4  A   I don't.
5  Q   Do you know who prepared it?
6  A   I would guess Gary Neff.
7  Q   Do you know if, in fact, it was presented to
8  anyone?
9  A   I don't.
10 Q   Do you know that a copy of this was provided to --
11 whether or not a copy of this was provided to Huntington
12 Technology?
13 A   I don't.
14 Q   Or Macquarie?  I'm sorry.
15 A   I don't know.
16 Q   Do you see on the first page of that where it says,
17 Partnered with A2aMedia and GKD Metal Fabrics?
18 A   Yes, I do.
19 Q   Would you agree that in this presentation
20 Garage-Media was representing that A2aMedia and GKD Metal
21 Fabrics were partners?
22    MR. HENZY:  Object to form.
23    THE WITNESS:  No.
24 BY MR. O'KEEFE:
25 Q   How am I incorrect in stating that?

5/7/2019                        John Mark Schmid                    Page: 12 (33 - 36)

---

Page 33

1    MR. HENZY: Objection to form.
2    THE WITNESS: I'm not -- not aware of that.
3  BY MR. O'KEEFE:
4    Q  Turn to the next page. Would you agree that it
5  says, Garage-Media -- in the third paragraph, "Garage-Media,
6  together with our strategic partners, A2aMedia and GKD, will
7  work with you to understand the opportunity, design the
8  optimum display, and select the best media program at the
9  right cost and return." Do you see that?
10   A  Yes.
11   Q  And it's your testimony that that is incorrect, that
12 A2aMedia and GKD were not strategic partners?
13   MR. HENZY: Objection to form.
14   THE WITNESS: I don't know. Strategic partners,
15 depends on how you define that, right?
16 BY MR. O'KEEFE:
17   Q  You agree it says that?
18   A  It says that, yep.
19   Q  And on the next page it says in middle, the
20 description of, "Mediamesh as the world's leading transparent
21 architectural video display. It transforms buildings into
22 iconic locations, while providing a dynamic vehicle for
23 branding and advertising. Garage-Media and A2aMedia work as
24 a team to sell advertising time, leveraging enormous revenue
25 opportunities which are being presented by the industry's

Page 34

1  major shift to high-impact outdoor marketing and away from
2  traditional television, print, and radio mediums." Do you
3  see that?
4    A  Yes. That's good stuff.
5    Q  Is it your recollection that A2aMedia was a partner
6  of Garage-Media in the signage project?
7    MR. HENZY: Objection to form.
8    THE WITNESS: We were not partners, but we were
9  together.
10 BY MR. O'KEEFE:
11   Q  Working together on the project?
12   A  Yeah.
13   Q  Okay. And A2aMedia was your choice for the marketing
14 aspect of the signage?
15   A  Absolutely. They were motivated because they were
16 -- they had the exclusive rights.
17   Q  And GKD was the Mediamesh sign, was the material
18 that was picked for the media; is that correct?
19   A  Yes.
20   Q  And they were the exclusive -- "they" being A2aMedia
21 -- the exclusive supplier of the GKD signage; is that
22 correct?
23   MR. HENZY: Objection to form.
24   THE WITNESS: That was my understanding.
25   MR. HENZY: I think the question was: A2a was the

Page 35

1  exclusive supplier of the GKD Mediamesh technology?
2    THE WITNESS: I think so, yes.
3  BY MR. O'KEEFE:
4    Q  Okay. Just so the record is clear, I asked you a
5  previous question in connection with a presentation that was
6  made to Macquarie, so I may have mis-stated the last
7  question. They were the -- had the exclusive license to
8  distribute the Mediamesh product for GKD in the United
9  States?
10   A  That was my understanding.
11   Q  Was there anything that was unique about the
12 Mediamesh product that you selected or chose it for that
13 application?
14   A  It was the product that A2a brought to the table.
15 It was represented to us that because it was a third-
16 generation German company that made a lot of architectural
17 mesh, that the precision of this product was what made it
18 different than anything else.
19   Q  And who made that representation, the company?
20   A  Yes, and A2a.
21   Q  Was it a unique application for structures like a
22 parking garage?
23   A  It was. Also for glass, like at the Miami Heat.
24 They had -- they had the A2aMediamesh on -- I don't know if
25 it was A2a, but they had the Mediamesh outside of the Miami

Page 36

1  Heat, American Airlines --
2    MR. HENZY: Did you say glass?
3    THE WITNESS: Yes.
4    MR. HENZY: On glass?
5    THE WITNESS: Yes.
6    MR. HENZY: I didn't know that.
7    THE WITNESS: It was light-weight, and it was a cool
8  product. Macquarie financed the Mediamesh at the Miami Heat
9  which gave us a lot of comfort in the technology.
10 BY MR. O'KEEFE:
11   Q  How did you connect those two? How did you know
12 that?
13   A  I believe A2a told us.
14   Q  And that's how you got to Macquarie --
15   A  I think so, yeah.
16   Q  -- for potential financing?
17   A  I think so. I'm not really sure.
18   Q  And did anyone at Macquarie tell you that this is
19 the technology you have to use for your specific project?
20   A  They told us that they were comfortable with the
21 technology, and they were comfortable with underwriting the
22 technology because they financed it at the Miami Heat.
23   Q  Which was a successful project; am I correct?
24   A  It was. And also the fact that Macquarie was
25 comfortable was, as part of our due diligence, something, we

5/7/2019                          John Mark Schmid                    Page: 13 (37 - 40)

Page 37

1   became more comfortable with the product.
2       Q   What other due diligence did you do in that regard,
3   if you recall?
4       A   We went and visited the GKD plant.
5       Q   In Germany?
6       A   In Germany.  We were on a convention in Europe and
7   took a day and went and looked at it.
8       Q   Anything else?
9       A   Went to Miami to look at it, and we talked to the
10  people that were running it.  I know Gary did other due
11  diligence.
12      Q   Okay.  I'm going to show you a document that I will
13  ask be marked as Plaintiff's Schmid 6.
14          (Plaintiff's Exhibit 6 is marked for identification)
15  BY MR. O'KEEFE:
16      Q   Have you had a chance to look at that document?
17      A   I did.
18      Q   Do you recognize that document?
19      A   I don't.
20      Q   Are you aware that Garage-Media entered into a
21  display agreement with what was then CBS Outdoor Group for
22  placing the sign on the Port Authority bus terminal?
23      A   Yes.
24      Q   And are you aware that in connection with the
25  display agreement, Garage-Media represented to the Port

Page 38

1   Authority that the signage would be the Mediamesh signage?
2       A   I would assume, yes.
3       Q   Were you involved at any discussions with either
4   Outdoor -- CBS Outdoor Group at the time or Port Authority in
5   connection with the display agreement?
6       A   No.
7       Q   Who would have been the person to deal with that?
8       A   I believe Gary Neff.
9       Q   Do you recall there being issues respecting
10  A2aMedia's performance in obtaining the ad revenues right out
11  of the gates?
12      A   No.
13      Q   Do you recall there being a point in time when there
14  was an issue with respect to A2aMedia's performance in
15  generating ad revenues for the sign?
16      A   Yes.
17      Q   Do you recall in your mind about when that would
18  have been?
19      A   I don't remember.
20      Q   Are you aware that six months into the relationship,
21  Gary Neff, on behalf of Garage-Media, corresponded with
22  A2aMedia to inform it they were under in the first six-month
23  period for ad revenues and --
24      A   I don't remember that.
25      Q   Do you recall him giving them an opportunity to cure

Page 39

1   that or threatening to terminate the exclusive relationship
2   for obtaining it?
3       A   I do remember that.
4       Q   Do you remember any response to that?
5       A   I remember that, in my recollection, John was --
6   that they weren't hitting the projected numbers, and that we
7   were concerned.  Once again, there were times when I had to
8   write checks to cover -- to make sure I paid the bank,
9   personal checks.  I know that we -- our intent was to put
10  pressure, as much pressure as we could on A2a to be more
11  successful.
12      Q   Were they -- was their -- strike that.
13          Was A2a retained both to obtain ad revenue and
14  investor investments?
15          MR. HENZY:  Object to form.
16          THE WITNESS:  I don't think so.  I think just ad
17  revenue.
18  BY MR. O'KEEFE:
19      Q   Do you recall Garage-Media reaching out to the Port
20  Authority because of the delay in getting the sign up and
21  running, and requesting that they modify the time of the
22  permit?
23      A   I don't remember that.
24      Q   Do you recall them contacting the Port Authority
25  requesting that they extend the time of the permit?

Page 40

1       A   I don't.
2       Q   Do you recall them contacting the Port Authority to
3   adjust any of the payment obligations under the permit?
4       A   No.
5       Q   Do you know whether Garage-Media has an extension of
6   the permit with Port Authority today?
7       A   If -- I'm sorry.  I didn't hear that.  Can you say
8   that again?
9       Q   Do you know whether or not Garage-Media obtained an
10  extension of the permit beyond December 2018?
11      A   We did not.
12      Q   Okay.  Is the sign out right now?
13      A   It's turned off; it's black.
14      Q   When did that happen?
15      A   December 30, 2018.
16      Q   The end of 2018?
17      A   End of the year, yeah.
18      Q   So far as Garage-Media is concerned, is that now a
19  dead project or dead deal?
20          MR. HENZY:  Object to form.
21          THE WITNESS:  Yes.
22  BY MR. O'KEEFE:
23      Q   To be clear, there are no ongoing discussions
24  between Garage-Media and either the Port Authority or
25  Outfront for either an extension of or a new permit for use

Page 41

1  of the signage?
2     A  I think we are trying to figure that out.
3     Q  Okay.  Who is "we" when you say, we're trying to
4  figure that out?
5     A  Gary Neff.
6     Q  And your help?
7     A  Yes.
8     Q  Okay.  I'm going to show you a document marked as
9  Exhibit Plaintiff Schmid 11.
10    MR. HENZY:  Which in the binder is that?
11    MR. O'KEEFE:  Eleven.
12    MR. HENZY:  Eleven in the binder.
13    (Plaintiff's Exhibit 11 is marked for identification)
14  BY MR. O'KEEFE:
15    Q  Are you finished looking at that document?
16    A  I am.
17    Q  Have you ever seen that document before?
18    A  I don't remember it.
19    Q  Would you agree that it appears to be a document
20  entitled, A2aMedia, Next generation, Urban Digital Media
21  Investor Presentation?
22    A  Yes.
23    Q  In that document A2aMedia make as a statement that
24  they have the exclusive rights agreement?
25    A  Okay.

Page 42

1     Q  Do you know what they're referring to in that?
2     MR. HENZY:  Can you point to where that is?
3     MR. O'KEEFE:  I'm sorry, second page.
4     THE WITNESS:  Second page, yes.
5     MR. HENZY:  I mean, he asked -- he asked, do you
6  know what they're referring to?  He had a pending question:
7  Do you know what they are referring to?
8     THE WITNESS:  Yes.
9  BY MR. O'KEEFE:
10    Q  Is that the Mediamesh?
11    A  It is.
12    Q  Okay.  Is that what represented to you that
13  they identified as a potential marketing opportunity in
14  the United States?
15    A  Yes.
16    Q  And that they had the exclusive rights to bring that
17  to parties that were interested in the United States?
18    A  Yes.
19    Q  The next page -- two pages later they say, Proof of
20  concept U.S., Miami Heat installation.  That's the
21  installation that you examined.  What was the name of the
22  facility?
23    A  American Airlines Arena.
24    Q  In Miami?
25    A  Yes.

Page 43

1     Q  They have a section on that page, financing
2  partners.  Garage Media, ten million raised.  Twenty to
3  thirty million and more committed.  Do you have any knowledge
4  of what they're referring to there?
5     A  No.
6     Q  Did Garage-Media invest ten million dollars in
7  anything connected with A2a?
8     A  No.  Six million dollars.
9     Q  And that would be the transaction, whatever the
10  number is, for the signage on the Port Authority garage?
11    A  Yes.
12    Q  Twenty to thirty million and more committed, did
13  Garage-Media commit to investing additional monies in
14  A2aMedia or its projects?
15    A  No, but we -- Gary Neff did invest in A2aMedia.
16    Q  The entity itself?
17    A  Yes.
18    Q  Did he do that before this transaction?  During this
19  transaction?
20    A  In the -- somewhere in the middle.
21    Q  How do you know that?
22    A  He told me.
23    Q  And when you say, in the middle, when do you mean?
24    A  I would guess in 2012, 2013; but I don't really
25  remember.

Page 44

1     Q  Okay.  They also, in a section titled strategic
2  partner, list Garage-Media, Garage Network.  Was there an
3  entity formed by the name of Garage Network?
4     A  No.
5     Q  Was there a business operated by the name of Garage
6  Network?
7     A  Not to my knowledge.
8     Q  Do you have any knowledge of what A2aMedia is
9  referring to in that identification?
10    A  I would imagine my relationships with garages.
11    Q  A few pages beyond that they talk about Mediamesh, a
12  game changer.  Is that the sustainability concept you were
13  referring to earlier?
14    A  Yes.
15    Q  And the breathability is because you can put it on
16  anything like a parking garage?
17    A  Yes.
18    Q  Were you aware of any other technology at the time
19  that allowed that opportunity?
20    A  No.  I was aware that there was some Chinese
21  products out there in other cities, but I never saw it.  I
22  heard it was inferior.
23    Q  And was it the application Mediamesh to garages
24  which made it attractive to Garage-Media?
25    A  Yes.

Page 45

1    Q   A bunch of pages ahead, but if you look at the
2   bottom it's DEF 753.
3    A   Got it.
4    Q   Do you see where A2aMedia is identifying top
5   prospects?
6    A   Yes.
7    Q   The fourth one down, Port Authority NYC, annual
8   gross ad revenues appears to be 6.2 million dollars.  Am I
9   reading that correctly?
10   A   That's what it says.
11   Q   Is that something which you understood was the
12  projection or target of A2aMedia with the Port Authority
13  signage project?
14   A   I'm not aware.
15   Q   Several pages beyond that, DEF 758.  Again there's a
16  reference to Garage-Media capital available, ten million to
17  invest in Mediamesh.  Twenty to thirty million and more
18  committed.  Your answer to inquiries about those would be the
19  same as they were before, that the most that Garage-Media put
20  in was for the project with the Port Authority.  The rest
21  were ideas and no promise of actual money?
22   A   Yes, I would assume.
23   Q   Aside from the trip that you look to Germany and the
24  due diligence that you described that you undertook, and
25  appreciating that Mr. Neff may have undertaken more due

Page 46

1   diligence, did you go to any other place where there was a
2   installation of a product similar to Mediamesh, i.e., the
3   Chinese installations that you talked about?
4    A   There was one other location, but I'm not sure if I
5   saw it before.  It was on a hotel in time square.  It was
6   small, but I don't really remember.
7    Q   Would it be fair to say that Mediamesh and the GKD
8   product was the one that you set your sights on first, and
9   the one you concluded you would go with?
10   A   Yes.
11   Q   I'm going to show you a document, I will ask to be
12  marked, Plaintiff Schmid 12.  I ask if you will take a look
13  at it.
14      (Plaintiff's Exhibit 13 is marked for identification)
15  BY MR. O'KEEFE:
16   Q   Have you finished looking at that document?
17   A   Yes.
18   Q   Have you ever seen that document before?
19   A   I don't remember it.
20   Q   Does it appear to be a true and correct copy of
21  January 10, 2012, letter, from Garage-Media, specifically
22  Gary Neff, to Andrew Melton of A2aMedia which is unsigned?
23      MR. HENZY:  Objection to the form.
24      THE WITNESS:  Yes.
25  BY MR. O'KEEFE:

Page 47

1    Q   Not having seen the letter, some of the content of
2   the letter goes to questions that I asked before:  Do you
3   have a recollection as you sit here today -- strike that.
4       You said that you didn't recall there being a
5   problem with A2aMedia until the middle of '12 or '13.
6    A   Yes.
7    Q   Does this in any way refresh your recollection as to
8   whether or not there was a problem in the first six months in
9   the relationship after the sign went live?
10   A   No.
11   Q   Okay.  Do you recall ever having been advised by
12  Mr. Neff that he was putting A2aMedia on notice that he was
13  going to withdraw their exclusivity?
14   A   Yes.
15   Q   Do you remember approximately when that would have
16  been?
17   A   No.
18   Q   Is that an action with which you agreed, disagreed,
19  or didn't comment?
20   A   Don't remember.
21   Q   Okay. I'm going to show you a document that I will
22  ask to be marked as Plaintiff Schmid 14.
23      (Plaintiff's Exhibit 14 is marked for identification)
24  BY MR. O'KEEFE:
25   Q   Do you recall -- have you looked at the document?

Page 48

1    A   I don't.
2    Q   Have you looked at the document?
3    A   Yes.
4    Q   Do you recall ever having seen the document?
5    A   No, I don't recall.
6    Q   Do you recall there being a time within a year or so
7   of the sign going live when Mr. Neff, on behalf of
8   Garage-Media, advised A2aMedia that Garage-Media was
9   terminating its exclusive sales agency for the project?
10   A   Yes.
11   Q   Do you recall it being within a year or so of the
12  sign going live?
13   A   No.
14   Q   Do you have a recollection in your mind of when that
15  was?
16   A   I don't.
17   Q   Is that a decision with which you agree, disagree,
18  or didn't comment?
19   A   I wasn't really involved.
20   Q   Okay.  Do you know the name Liquid Outdoor?
21   A   Yes.
22   Q   How do you know that name?
23   A   I know they were selected to help with sales at some
24  point.
25   Q   By whom?

**Page 49**

1    A   By Gary Neff.

2    Q   And do you know the circumstances in which it came

3 to pass that he was looking for another party to help with

4 such efforts?

5    A   I know that he was looking for other parties to help

6 with those efforts, yes.

7    Q   Do you recall when that was?

8    A   I don't.

9    Q   Do you recall whether it was approximate in time to

10 the start of the sign?  A year?  Two years?

11    A   Couple years in.  I don't really remember.

12    Q   Do you know why Liquid Outdoor?

13    A   I don't.

14      (Phone rings)

15      (Off-the-record)

16 BY MR. O'KEEFE:

17    Q   Do you recall a time when Garage-Media and A2aMedia

18 entered into a written letter agreement or otherwise to

19 change the terms of the relationship?

20    A   I don't.

21    Q   Did you participate in any discussions concerning

22 how, if at all, the relationship between Garage-Media and

23 A2aMedia may be amended or modified from the outset?

24    A   I vaguely remember something.  I knew that was

25 happening, but I wasn't really involved.

**Page 50**

1    Q   Did you know that under the agreement with A2aMedia,

2 Garage-Media either had to terminate the exclusivity or

3 A2aMedia had to agree to terminate the exclusivity to bring

4 in Liquid Outdoor?

5    A   No.

6    Q   Do you have a recollection of the manner in which

7 A2aMedia performed under its contract with Garage-Media?

8    A   Yes.

9    Q   What is your recollection?

10    A   My recollection is that they under-performed based

11 on our projections.  I know that -- I remember that one year

12 maybe 2013, we did -- they did about two and a half million

13 dollars of business.  We needed it to be above three and

14 that's about it.

15    Q   Do you recall there coming a time when Garage-Media

16 commissioned Field Activate -- are you familiar with the

17 name, Field Activate?

18    A   Only because I saw it recently.

19    Q   Do you recall there being a point in time when

20 Garage-Media commissioned Field Activate to study the

21 performance and the future prospects for marketing for

22 Garage-Media?

23    A   I remember that John Zimmeth at that time was very

24 unhappy and wanted us to find alternatives.  As part of that,

25 I was aware that we had the study done, but I don't

**Page 51**

1 remember.

2    Q   Do you know whether on a periodic basis Gary Neff

3 corresponded with Mr. Zimmeth and repeatedly advised him of

4 the fact that A2a was under-performing?

5    A   I know that on a regular basis Gary and John had

6 calls.  I was on a couple of them, and John was very

7 aggressive about paying him his money.

8    Q   Not uncharacteristic for a lessor or banker?

9    A   Fair.

10    Q   You mentioned that John Zimmeth -- and I don't want

11 to misstate your testimony -- stated, suggested, or demanded

12 that Garage-Media get rid of A2aMedia, which was it?

13    A   He -- John Zimmeth was very aggressive with us to

14 figure out how to manage the business so that we could pay

15 the bank, yes.

16    Q   Well, manage business, that seems broader than

17 A2aMedia.  What do you mean by that?

18    A   He was -- he was involved in quite a bit, actually,

19 by the time when I got involved.

20    Q   You went from manage business to involved in quite a

21 bit.  I need you to give me some specifics.

22      MR. HENZY:  Objection to form.  Maybe -- is there a

23 question pending?

24 BY MR. O'KEEFE:

25    Q   Yeah.  I would like you to expand upon either manage

**Page 52**

1 business or getting involved.  That doesn't tell me what it

2 was that he was doing.  So the question is:  What was John

3 Zimmeth doing which lead you to conclude that he was

4 aggressive with Garage-Media to manage the business?

5    A   John Zimmeth was present in many different meetings

6 between Garage-Media, Clear Channel.  He had -- he was very

7 involved in day-to-day operation of the business.  He had

8 developed relationships with different people in the media

9 world, including Harry Coghlan, the president of Clear

10 Channel.  He had separate calls with Harry.  He had calls and

11 meetings with the Port Authority.  He had separate calls

12 privately with the Port Authority.  He had meetings with

13 other investment groups that, for instance, Beekman Capital,

14 he had meetings with them.  He had meetings with GKD, and he

15 was very involved on a weekly basis with the management of

16 the business.

17    Q   So, again, you used the word involved on a weekly

18 basis with the management of the business.

19    A   Yes.

20    Q   I haven't heard a particular from you -- unless I'm

21 misunderstanding what you said -- to demonstrate or to

22 illustrate what you are talking about.  What did he do with

23 the business to manage it?

24    A   He was in meetings.  He was telling us to make

25 changes.  He was giving us his opinion about which way we

5/7/2019                     John Mark Schmid                Page: 17 (53 - 56)

---

Page 53

1  should go. He was having conversations with competitors,
2  with our landlord, with investors.
3     Q   And do you know --
4     A   That's pretty involved.
5     Q   Do you know whether the conversations that he had
6  with the landlord, for example, were with Gary Neff or
7  encouraged by Gary Neff?
8     A   I know that Gary Neff was a part of a lot of the
9  meetings. I know that at a certain point that we felt that
10  we were working for John.
11     Q   When was that?
12     A   I think for me -- well, you know, first we had the
13  threatening phone calls which, as you mentioned,
14  understandable. For me it was when we had the meeting with
15  GKD, with the president of GKD that John Zimmeth called.
16     Q   So going back for a minute: Do you know whether or
17  not the meetings with Harry Coghlan were with Gary Neff or at
18  Gary Neff's request?
19     A   I think that John Zimmeth and Gary Neff collaborated
20  with Harry to try to figure it out.
21     Q   And you said that he was having conversations with
22  your competitors. Who were they?
23     A   They would be Clear Channel is a competitor, and I
24  believe other media companies.
25     Q   Why do you say that?

Page 54

1     A   Because that's what I was told.
2     Q   By?
3     A   Gary Neff.
4     Q   So is this whole area of testimony that you just
5  offered based upon what you have been told by Gary Neff?
6     A   No. I was in meetings and on calls.
7     Q   And the meetings and calls were calls in which John
8  Zimmeth was invited to participate?
9     A   John Zimmeth was on the calls.
10     Q   Do you know who scheduled the calls?
11     A   I don't.
12     Q   When you talk about a meeting with GKD, tell me
13  about that.
14     A   Well, it was terrifying. Actually, John Zimmeth,
15  nice guy. He was in the meeting. We were having issues with
16  the technology, and he was basically telling GKD -- oh, I
17  remember exactly what he said. He said, I represent
18  Macquarie Bank, and I can tell you that we are an Australian
19  company. We are not litigious by nature, but we come from a
20  penal island. When we do take you to court or when we do go
21  after you, we go after you really hard. I'm sure that you
22  don't want us to go after you, so you better fix my sign.
23     Q   So he was trying to help get the sign fixed that
24  wasn't working properly?
25     A   He was trying to help with that, yes.

Page 55

1     Q   Do you know whether or not Gary Neff encouraged or
2  specifically asked him to say those exact words to GKD?
3     A   No.
4     Q   You don't know?
5     A   I don't know.
6     Q   Okay. Had Garage-Media threatened GKD at that
7  point?
8     A   I don't know. I know we were thinking of suing them
9  at one point for technology failure. I do know, to go back
10  to the statement when John Zimmeth was going after Tom Polly,
11  that when he finished saying, we're going to go after you and
12  we are going to go hard, he turned and looked at me at the
13  end; and I took it as a distinct threat. I did. I was
14  terrified. He was a big guy. We were worried that we were
15  going to have to give the sign back to him. And I -- I'm
16  sure if you talked to Tom Polly, that he felt very, very,
17  very threatened.
18     Q   Wasn't that the intention of the presentation?
19     A   I would assume, sure.
20     Q   Have you ever threatened to sue somebody before?
21     A   No.
22     Q   Never?
23     A   No.
24     Q   If you did, it would be --
25     A   I wouldn't yell it. I don't know.

Page 56

1     Q   All right. GM thought of a suing, who at GM thought
2  of suing?
3     A   I'm sorry?
4     Q   Garage-Media thought of suing GKD?
5     A   We did.
6     Q   Why didn't you?
7     A   Because at that point, the bank was in charge.
8     Q   And how did you come to that conclusion?
9     A   It was evident that John Zimmeth was calling the
10  shots for us. He was telling us what to do. He handled it
11  very well, but he was telling us what to do.
12     Q   As you sit here today, notwithstanding the fact that
13  you can sue under the documents, you realize you can sue GKD
14  under your contract; is that right?
15      MR. HENZY: Objection to form.
16      THE WITNESS: I don't know.
17  BY MR. O'KEEFE:
18     Q   John Zimmeth --
19     A   I can tell you something, though: When John made
20  that threat, it seemed it was implicit that he was the one
21  that was going to sue them, and that it was his decision to
22  make. That's how I took it.
23     Q   But you realize that they're the lessor of the sign
24  and have rights against GKD. You are lessee of the sign, you
25  have rights against GKD, or maybe you don't.

Page 57

1    A   At that point, I felt that we were following John's
2  lead.  That if we didn't, that he would take the sign back
3  and call the note.
4    Q   So right or wrong, you had an impression at that
5  moment in time that Macquarie was calling the shots; and that
6  if you didn't, they might act upon your default, declare your
7  default, and take the sign back, as they're permitted under
8  the lease agreement?
9        MR. HENZY: Object to form.
10       THE WITNESS: That's how I felt.  That's how we all
11 felt.
12 BY MR. O'KEEFE:
13   Q   But there was no writing or specific communication
14 to you by anyone at Macquarie, including John Zimmeth, that
15 you could not act on your own?
16   A   Nothing in writing, no.  John is too smart.
17   Q   So let's back up for a minute.  First of all, when
18 was the meeting with GKD that you are referring to?
19   A   I don't remember.  It had to be in 2014, I would
20 guess.
21   Q   And had there been problems with GKD before that?
22   A   Yes.
23   Q   When did the problems with GKD, and by that I mean
24 the product and its service of the product, when did they
25 start?

Page 58

1    A   They were problems with the board from the
2  beginning.
3    Q   And did they get worse?  Did they get better?
4    A   There was continuous problems.
5    Q   Were there a number of problems in 2013?
6    A   I'm sure there was, yes.
7    Q   You don't know?
8    A   I know that there were problems throughout the whole
9  time.
10   Q   Was there a particular stretch of time when they
11 were more significant than others?
12   A   There was, but I don't remember.  It was -- it was
13 in -- when we had that really bad winter, probably 2014.
14   Q   Was it before the meeting with Polly or after?
15   A   I would say some time around.  I don't really
16 remember.
17   Q   Was that the first meeting with you had with a
18 representative of GKD US about the problems?
19   A   It was the first time that I had a meeting with
20 them.  Gary had meetings on a regular basis.
21   Q   And the meetings that he had with them on a regular
22 basis, what was the outcome of those meetings?
23   A   GKD would fix the problems.
24   Q   And did they always fix the problems?
25   A   I think they did, yeah.

Page 59

1    Q   Did there come a time when they didn't fix them as
2  quickly or as well?
3    A   I don't recall, but --
4    Q   Do you recall a time when part of the sign didn't
5  work properly, and parts had to be moved around and it
6  compressed the advertising space?
7    A   I was aware that that was the only way that we could
8  get parts for it.  The LED lights inside the metal channels
9  were produced by a different company that went out of
10 business, and so we couldn't get replacements for that.  So
11 we made the sign incrementally smaller, but it wasn't really
12 noticeable in my mind.
13   Q   What was the outcome of the meeting with
14 Mr. Polly?
15   A   I don't genuinely -- I think GKD was working faster
16 to get stuff done after that, but that was about it.
17   Q   And by working faster to get stuff done, did you --
18 do you mean to fix problems with the sign?
19   A   Yes.
20   Q   Including the issue of the bulbs, or was that
21 accomplished simply by compressing the sign?
22   A   Took the one piece out and moved it up.
23   Q   And was there ever a lawsuit filed against GKD?
24   A   No.
25   Q   Neither by Garage-Media nor Macquarie?

Page 60

1    A   No.
2    Q   And did GKD also offer options for upgrading or
3  fixing the sign so that the problems that were then existing
4  would either be less frequent or wouldn't happen at all?
5    A   Replacement of the sign, yes.
6    Q   And did that happen proximate in time to that
7  meetings?
8        MR. HENZY: Object to form.
9  BY MR. O'KEEFE:
10   Q   Proximate in time to the 2014 meeting?
11   A   We got pricing to replace the whole sign at some
12 point.  I don't remember when.
13   Q   Going back to actions that Mr. Zimmeth took that you
14 described, meetings with Beekman.  Were those meetings that
15 he attended alone, or were they with Mr. Neff?
16   A   I believe he was with Mr. Neff for the Beekman
17 meetings, but I know he had private conversations with the
18 Port Authority.
19   Q   And do you know whether or not the private
20 conversations with the Port Authority were at the request or
21 direction of Gary Neff?
22   A   They were not, in my belief.
23   Q   That's your belief?
24   A   I don't know.  But I do know that as a result of one
25 of those calls, Mr. Zimmeth told the Port Authority that we

Page 61

1  weren't making payments to the sign, which caused us harm
2  with our relationship with the Port Authority, which we were
3  always current on.
4      Q     And is that the only conversation in which you have
5  a recollection that he had by himself?
6      A   I believe he spoke with Harry Coghlan also, and I
7  think he had -- my general feeling was that he was very
8  active.
9      Q     And do you know if that activity had to do with
10 trying to assist you in your project, whether it was to try
11 to sell the lease, or what the purpose for those calls and
12 activity were?
13     A   I think he was motivated to try to sell the sign or
14 help us get the extension.
15     Q     And with respect to the extension --
16     A   Yes.
17     Q     -- would that have provided an opportunity for
18 Garage-Media to market to investors either to invest in a
19 long-term and fixed project or to buy?
20     A   Yes.
21     Q     Was that not also the business plan at the time of
22 Garage-Media?
23     A   It was.
24     Q     And so those efforts that he undertook were to
25 assist it with its business plan?

Page 62

1      A   Assist with managing the business, yes.
2      Q     That's not the question. I asked whether it was to
3  assist with the business plan?
4      A   Yeah.
5      Q     The meeting was Beekman, did he not also meet with
6  others that had expressed an interest in buying Garage-Media
7  or investing in fixing the project?
8      A   Yes.
9      Q     And potentially buying it?
10     A   Yes.
11     Q     Was that at the invitation or request of Gary
12 Neff?
13     A   I'm not sure.
14     Q     Do you know who else he met with? You talked about
15 Harry Coghlan at Clear Channel and Beekman.
16     A   And the Port Authority, that's all I know of.
17     Q     The Port Authority, do you know if that was a
18 meeting or phone call?
19     A   I don't.
20     Q     And how do you know about that?
21     A   I know that from Gary Neff that his contact -- I
22 forget what his name was. I never met him -- called Gary and
23 told him that he had conversations with John Zimmeth. He was
24 questioning our financial capabilities because he was told
25 that we weren't making our payments to the bank. The bank

Page 63

1  was calling your landlord.
2      Q     Do you know whether or not Gary Neff asked him to
3  call the landlord and tell him what your physical
4  circumstance was -- let me finish the question.
5      A   Go ahead.
6      Q     -- to encourage them to extend the lease, and that
7  the bank was working with Garage-Media to see it through to a
8  long-term resolution?
9      A   I don't know.
10     Q     Do you know whether or not in that conversation John
11 Zimmeth expressed to the Port Authority that if the lease
12 were extended -- the permit were extended, that it would put
13 the bank in a better position to help Garage-Media?
14     A   I believe that was probably true.
15     Q     Do you know whether or not Gary Neff specifically
16 asked John Zimmeth to call the Port Authority and encourage
17 them to extend the permit?
18     A   I don't know. I can tell you --
19         MR. HENZY: There's no question pending.
20 BY MR. O'KEEFE:
21     Q     Do you know if there came a time when Garage-Media
22 terminated it's relationship with A2aMedia?
23     A   Yes.
24     Q     Can you tell me your understanding of the
25 circumstances under which that occurred?

Page 64

1      A   Yes. We were under great pressure from John Zimmeth
2  and the Macquarie to figure out how to make the project work.
3  We were encouraged to go look at other media companies and
4  try to see -- put an RFP out. We didn't really want to do it
5  because all the other media companies that were out there had
6  competitive billboards, and we thought that we didn't want to
7  get involved with competitors that could then not put content
8  on our sign.
9          I know an RFP went out. I know that John Zimmeth
10 was very involved in the RFP process. I know that -- and
11 with not only putting it out but with what came in.
12     Q     So let me understand this. A2aMedia under-performed
13 more or less from the outset. Would you agree with that?
14     A   Under-performed from the projections, yes.
15     Q     And Gary Neff on Garage-Media's behalf corresponded
16 with them often, first to tell them that they were under-
17 performing and giving them an opportunity to cure. Then
18 taking away their exclusive agency, and ultimately
19 terminating them. That was all done because of John
20 Zimmeth?
21         MR. HENZY: Objection to form.
22         THE WITNESS: No. We -- we were never a hundred
23 percent happy with A2a, but we thought they were the most
24 motivated company out there because if this project didn't
25 work, they would go out of business. Gary was invested in

5/7/2019                          John Mark Schmid                    Page: 20 (65 - 68)

Page 65

1  A2a, wanted them to succeed. We knew that if we pulled the
2  project away from A2a, that they would go out of business.
3  We thought that they were, for a small shop, very effective
4  and missing the mark -- missing the projections by enough but
5  still producing on a regular basis. We were always looking
6  to try to figure it out. We were trying to figure it out.
7  BY MR. O'KEEFE:
8      Q   At some point Garage-Media engaged Field Activate to
9  do a study of the marketing effort. Do you recall that?
10     A   I don't recall that. Well, I recall that we had
11 someone, but I don't recall that part of it.
12     Q   Do you know that Garage-Media engaged a party to
13 conduct a study of the marketing effort by A2a?
14     A   Yes.
15     Q   And the prospect others?
16     A   Yes.
17     Q   Do you know what the results of that study were?
18     A   I don't.
19     Q   I'm going to show you a document marked Exhibit 19,
20 and ask if will you take a look at that. Plaintiff Schmid
21 19?
22     (Plaintiff's Exhibit 19 is marked for identification)
23 BY MR. O'KEEFE:
24     Q   Let me know when you are done. Have you had a
25 chance to glance through that?

Page 66

1      A   I did.
2      Q   Would you agree that it appears to be titled,
3  Garage-Media Brand Research Immersion Program. November 6,
4  2013, presented by Field Activate?
5      A   Yes.
6      Q   Prior to it undertaking this program, did you have
7  any familiarity with Field Activate?
8      A   No.
9      Q   Do you know whether anyone else at Garage-Media
10 did?
11     A   No.
12     Q   Do you know how Garage-Media got to Field
13 Activate?
14     A   No.
15     Q   Do you know that Garage-Media did engage Field
16 Activate to conduct the program which is seemingly summarized
17 in Exhibit 19?
18     A   I don't have recollection of that.
19     Q   Do you recall having heard anything about either of
20 the studies or its conclusions?
21     A   No. I know at that point it was -- Gary was
22 handling that.
23     Q   Do you recall having been advised that Field
24 Activate concluded that A2aMedia should be replaced?
25     A   I don't.

Page 67

1      Q   Do you know whether as a result of this study,
2  Garage-Media determined to put out a request for proposals
3  from other marketing companies?
4      A   I know that there was an RFP put out, yes.
5      Q   Do you know whether Field Activate participated in
6  either the preparation or the follow-up of the requests for
7  proposals?
8      A   I don't.
9      Q   Do you know whether Field Activate recommended that
10 the relationships with A2a and Liquid Outdoor be
11 terminated?
12     A   No.
13     Q   Do you know whether or not Field Activate
14 recommended, in connection with a request for proposal, the
15 specific companies to which that proposal request should be
16 sent?
17     A   No.
18     Q   You don't have to look at that. Do you know whether
19 as a result of the Field Activate study, that Garage-Media
20 did, in fact, prepare a request for proposal assisted by
21 Field Activate, and send it to the specific parties to which
22 Field Activate recommended?
23     A   No. I know there was an RFP put out.
24     Q   Do you know whether the RFP that was put out went to
25 A2aMedia to provide a further opportunity to participate in

Page 68

1  marketing?
2      A   I believe that's true.
3      Q   What's your understanding or recollection of the RFP
4  process?
5      A   I wasn't involved in that. That was more Gary
6  working with John.
7      Q   When you say, Gary working with John, why do you say
8  that?
9      A   Because Gary was working with John to put out the
10 RFP.
11     Q   What specific participation do you recall -- strike
12 that.
13         Do you have specific knowledge of John Zimmeth
14 participating in either the preparation of or the RFP
15 process?
16     A   I know that he and Gary were the ones talking about
17 it, and that Gary was doing it.
18     Q   Do you know whether Gary went to John and said, hey,
19 Field Activate recommended we do an RFP; and John says,
20 sounds like a good idea?
21     A   I'm not aware of that.
22     Q   But you said he was working with John Zimmeth. Do
23 you mean he was keeping him advised of the process?
24     A   He was -- John was -- Gary was keeping John
25 appraised of the situation, yes.

5/7/2019                       John Mark Schmid                    Page: 21 (69 - 72)

| Page 69 | Page 71 |
|---|---|

**Page 69**

1     Q   You keep saying he was working with him, and that

2 John Zimmeth was behind it. I want to know exactly what John

3 Zimmeth had to do with the Request For Proposal, in your

4 recollection?

5     A   In my recollection, my understanding of the whole

6 situation is that we were going out to bid because we wanted

7 to keep John Zimmeth happy. That we, while we weren't a

8 hundred percent happy with A2a, we were invested in them.

9 But we were also worried that John was going to take the

10 board back and call the note. So we were trying to do

11 everything we could to have the project be more successful.

12     Q   So as you sit here today, you don't think that it

13 was a good idea to get rid of A2aMedia, which was under-

14 performing from the outset of the contract?

15     A   Yes, I don't think it was a good idea.

16     Q   Even though as a result of its performance, the

17 company was under water, couldn't pay the lessor, and you had

18 to invest more and more money in the company?

19     A   We invested once in them, but we were worried that a

20 larger competitor would take the board and under-perform for

21 their benefit.

22     Q   And at the same time not paying the lessor?

23     A   Yes.

24     Q   And at one point you stopped paying the lessor?

25     A   That's correct.

**Page 70**

1     Q   During this time period around the RFP and the new

2 contract with Clear Channel, you're aware that ultimately you

3 got rid of A2a and you contracted with Clear Channel; is that

4 correct?

5     A   Yes.

6     Q   Did you become aware of a new media sign in Time

7 Square called the cube?

8     A   I'm aware of it, yes.

9     Q   Tell me something about your perception of impact or

10 the effect the cube had on sign advertising in the Time

11 Square area?

12     A   It had an effect. It was the latest technology, and

13 it was sharper than our board.

14     Q   And cheaper to advertise on it?

15     A   I don't know.

16     Q   Serious competition, if not eclipsing your board

17 from a technology standpoint?

18     A   Yes.

19     Q   And would one of the things that might enable you to

20 compete be to upgrade your board in order to do so?

21     A   Yes.

22     Q   Is that something that was contemplated by

23 Garage-Media?

24     A   Yes.

25     Q   And in order to do that, would you agree that it

**Page 71**

1 would have had to get investors, and it wouldn't have needed

2 an extension of the permit from the Port Authority?

3     MR. HENZY: Object to the form. You can answer.

4     THE WITNESS: We knew we needed an extension in

5 order to get investors.

6 BY MR. O'KEEFE:

7     Q   Who was working on that?

8     A   Gary Neff.

9     Q   So the request for proposal goes out; presumably

10 some submissions come in. What do you understand happened in

11 connection with those submissions?

12     Q   Could you repeat the question?

13     Q   The RFP went out, people responded that were invited

14 to do so. What do you understand happened with those who

15 responded? What was the process?

16     A   At that time Gary was doing all of it. I was

17 involved in other -- I don't remember.

18     Q   Do you know whether or not Gary met with the

19 perspective bidders?

20     A   I think Gary and John met with perspective bidders,

21 yes.

22     Q   Do you know if John participated in those

23 meetings?

24     A   I know John was involved with meetings with Clear

25 Channel and the Port Authority. I'm not sure who else.

**Page 72**

1     Q   And in connection with his meetings with Clear

2 Channel, do you know if it had to do with the request for

3 proposal or something else?

4     A   I think -- I don't know.

5     Q   So you don't know whether John Zimmeth participated

6 in the meetings with the people who returned the proposals in

7 response to the RFP?

8     A   I don't know.

9     Q   And Garage-Media ultimately selected Clear

10 Channel?

11     A   Clear Channel was ultimately selected, yes.

12     Q   By Garage-Media?

13     A   Yes.

14     Q   Do you know whether or not Field Activate

15 participated in the review of the submissions and in the

16 decision to pick a successor or new or even the same

17 marketing party?

18     A   I don't know.

19     Q   Do you know whether or not Field Activate

20 recommended that Garage-Media accept the bid of Clear

21 Channel?

22     A   I don't know.

23     Q   Do you know whether or not it called it a clear --

24 clearly superior offer, --

25     A   I am not aware of that.

5/7/2019                          John Mark Schmid                    Page: 22 (73 - 76)

---

Page 73

1    Q   -- or words to that effect?  Do you know whether as

2 a result of that process that A2a was, in fact, terminated

3 as --

4    A   Yes.

5    Q   -- an agent for Garage-Media?

6    A   Yes.

7    Q   Did they go out of business after that?

8    A   I think they did.

9    Q   As a result of that?

10    A   I think that could be -- that was my impression,

11 yes.

12    Q   Did Gary lose money as a result of that?

13    A   Yes.

14    Q   Did he tell you that?

15    A   Yes.

16    Q   Did Garage-Media enter into a marketing agreement

17 with Clear Channel?

18    A   Yes.

19    Q   Did Garage-Media also ask and obtain financing from

20 Clear Channel?

21    A   I believe so, yes.

22    Q   Did Garage-Media also ask and from time to time

23 receive offers to buy from Garage-Media?

24    A   Yes.

25    Q   And do you know whether or not those are the

---

Page 74

1 meetings and discussions in which Mr. Zimmeth participated?

2    A   Yes.

3    Q   Are they the only ones that you're aware of?

4    A   I don't know.

5    Q   What was Clear Channel's performance under its

6 agreement with Garage-Media?

7    A   From my recollection, we went from two-and-a-half

8 million dollars in 2013 with A2a, to half of that with Clear

9 Channel in 2014 and going onwards.

10    Q   And was the A2a marketing income still derived from

11 any of its accounts after termination?

12      MR. HENZY:  Object to form.

13      THE WITNESS:  I don't know.

14 BY MR. O'KEEFE:

15    Q   Do you know whether or not the difference between

16 the total sold by Clear Channel and the previous total by A2a

17 was in any way made up by tailing advertising that was

18 derived from A2a?

19    A   I don't know.

20    Q   Do you know whether in the separation of

21 Garage-Media and A2aMedia, that A2aMedia preserved accounts

22 which it had brought to the relationship?

23    A   I don't know.

24    Q   And so you don't know if income continued to be

25 derived through advertising placed by A2aMedia even after

---

Page 75

1 termination and for some time after termination?

2    A   I don't know.

3    Q   I'm going to show you a document marked Exhibit

4 Plaintiff Schmid 21.

5      (Plaintiff's Exhibit 21 is marked for identification)

6 BY MR. O'KEEFE:

7    Q   Ask you to take a look at it, and tell me when you

8 are finished.

9    A   (Witness complies)

10    Q   Did you have a chance to look at that document?

11    A   Yes.

12    Q   You would agree that it is a document entitled,

13 Garage-Media RFP status, update-financial meeting, 12/10?

14    A   Yes.

15    Q   Do you know who authored that document?

16    A   I don't.

17    Q   Have you seen that document before?

18    A   I don't remember.

19    Q   Do you see in the RFP overall considerations,

20 there's reference to the receipt of submissions from A2a,

21 Liquid Outdoor, Van Wagner, and Clear Channel?

22    A   Yes.

23    Q   There's reference to the potential receipt of a

24 submission from City Outdoor.  Do you see that?  That's in

25 the second --

---

Page 76

1    A   Yes.

2    Q   Do you know whether or not that was ever received by

3 Garage-Media?

4    A   I don't.

5    Q   Under the A2a and Liquid Outdoor, middle of the

6 page, "Two sales agency incumbents - A2a and Liquid Outdoor

7 have been asked to make a presentation.  Although it is

8 highly unlikely that they'll retain the selling rights, we

9 want to ensure that they continue to aggressively sell and

10 promote the board.  The transition to a potential new selling

11 team needs to be expedient and seamless."  Do you see that?

12    A   Yes.

13    Q   Does that refresh your recollection on whether or

14 not they had continuing opportunities to sell and derive and

15 generate income from Garage-Media after termination?

16    A   No.

17    Q   Okay.  On the next page, "Clear Channel, Brings

18 considerate sales velocity - over 500 people."  Do you know

19 how many people work for A2aMedia?

20    A   I don't.

21    Q   If I told you it was one or two, would that refresh

22 your recollection?

23    A   I would think it was more than that, but they are a

24 small company for sure.

25    Q   Do you know how many people worked at Liquid

---

5/7/2019                          John Mark Schmid                    Page: 23 (77 - 80)

Page 77

1  Outdoor?

2      A   I think there was two.

3      Q   Do you know if either of those were based in New

4  York?

5      A   I don't -- I thought Liquid Outdoor was somewhere in

6  the area. New Jersey or something. I don't know.

7      Q   And A2a was in Boston?

8      A   Yes.

9      Q   Did Clear Channel have a presence in New York?

10     A   Yes.

11     Q   This also says, "Highest level of revenue projection

12  $4.9 million." Clear Channel, did they ever achieve that?

13     A   No.

14     Q   Do you know what the highest level of income they

15  achieved was?

16     A   I don't. I think it was under 1.5 million.

17     Q   And did their timing also coincide with the material

18  problems with the signage that you talked about earlier?

19     A   The material problems with the sign were for the

20  whole time of the sign.

21     Q   I thought there were a point in time when it got

22  progressively worse. Am I wrong about that?

23     A   There was a time where it got worse. I think it was

24  before we made the switch, though.

25     Q   Okay.

Page 78

1      A   That's my recollection, but I'm not sure.

2      Q   And did Garage-Media ever undertake any efforts

3  under its agreement with Clear Channel and the minimum

4  distribution that it promised, to terminate its marketing

5  rights?

6      A   No. I think Clear Channel was also negotiating with

7  Gary to buy the board if we got the extension. That was the

8  plan.

9      Q   So throughout the relationship with Clear Channel,

10  you used them as a marketing agent, they lent you money, they

11  were interested in investing if you got an extension of the

12  permit and/or buying if you got an extension of the permit?

13     A   Yes.

14     Q   And so they stayed on as a marketing partner for --

15     A   They did.

16     Q   -- Garage-Media?

17     A   They did.

18         MR. HENZY: Can we take a break?

19         MR. O'KEEFE: Sure.

20         (Recess: 12:05 p.m. through 12:10 p.m.)

21         MR. O'KEEFE: I'm going to show you a document

22  marked Plaintiff's Schmid 24.

23         (Plaintiff's Exhibit 24 is marked for identification)

24  BY MR. O'KEEFE:

25     Q   I ask you to take a look at it and tell me when you

Page 79

1  are finished.

2      A   Okay.

3      Q   Did you have a chance to look at that document?

4      A   I have.

5      Q   At the very last in the sequence of e-mail, which is

6  the top of the first page, it appears that you are copied on

7  the e-mail from Gary N. along with Mr. Zimmeth; is that

8  correct?

9      A   Yes, I'm on that e-mail.

10     Q   So this appears to have started with an e-mail from

11  Harry Coghlan at Clear Channel to Gary Neff with a

12  non-binding proposal. Do you agree with that?

13     A   Yes.

14     Q   And that proposal appeared to be in the alternative

15  a future relationship in marketing or a buyout?

16     A   Yes.

17     Q   And it appears that in the e-mails which ensue from

18  that, that there's focus on the marketing aspect going

19  forward.

20         MR. HENZY: Objection to form.

21  BY MR. O'KEEFE:

22     Q   Revenue stream.

23         MR. HENZY: I'm not sure of the question. Is there

24  a question?

25  BY MR. O'KEEFE:

Page 80

1      Q   The question is: Would you agree that the next

2  couple of e-mails before it was forwarded to you, appeared to

3  have to do with the clarifying the revenue stream that was

4  set forth in the non-binding proposal?

5      A   Yes.

6      Q   In the proposal itself, in the middle paragraph,

7  this would be the third page of the e-mail from the top.

8         MR. HENZY: Sorry, John. Can you say specifically

9  where you are pointing to?

10         MR. O'KEEFE: Under the beginning of the non-binding

11  proposal on the third page.

12         MR. HENZY: Got it.

13  BY MR. O'KEEFE:

14     Q   In the middle of the paragraph, there's reference to

15  Coghlan interpreting something that Gary Neff said to

16  characterize them as a partner, as opposed to a media

17  representative. Do you see that?

18     A   I do.

19     Q   Is that a sentiment with which you would agree?

20     A   No.

21     Q   Okay.

22     A   I -- it depends on how you use partner.

23     Q   On the first paragraph congratulations are extended

24  to Gary. Mr. Coghlan expresses his pleasure in knowing that

25  the Mediamesh will continue to have its place in Time Square,

John Mark Schmid

Page 81

1  Port Authority area through 2028.  Was he misinformed that
2  there had been an extension of the permit at that time?
3      A   We were being told that there was.  We had the
4  extension, we had the paperwork, we were waiting to get it
5  signed from the Port Authority.  They just never did.
6      Q   Okay.  So it fell on the vine?
7      A   It did.
8      Q   Did you guys stand on them to try to get something
9  back and they refused ultimately?
10     A   They never got back.  They always had an excuse.
11     Q   So is it still outstanding from when it was
12  proposed, or have at they at some point in time said no?
13     A   It's all outstanding.  The --
14     Q   And you actually received a proposed -- strike that.
15         You actually received a writing by which terms for
16  an extension were set forth?
17     A   Yes, and agreed upon.
18     Q   And did Garage-Media respond to that to the Port
19  Authority?
20     A   Yes.
21     Q   And is that what is outstanding?
22     A   Yes.
23     Q   Okay.  So you see in the middle of this Mr. Zimmeth
24  makes inquiry regarding where things stand with Coghlan and
25  where things stand with the Port and Gary --

Page 82

1      MR. HENZY:  Where are you?
2      MR. O'KEEFE:  Top of the first page.
3  BY MR. O'KEEFE:
4      Q   After the exchange of information regarding the
5  revenue stream clarification --
6      A   First page.
7      Q   -- I guess Gary Neff forwarded this to you and to
8  John Zimmeth.  Do you see that in the very middle of the page
9  with no comment whatsoever?  Then John Zimmeth makes inquiry
10  of him, to which Gary Neff responds that you were to counter.
11  You were working through the details, and that you were
12  waiting on an update from the Port Authority.  Do you see
13  that?
14     A   Yes.
15     Q   Are those the type of communications that you were
16  referring to earlier between Mr. Zimmeth and Mr. Neff
17  regarding the business of Garage-Media?
18     MR. HENZY:  Objection to form.
19     THE WITNESS:  Well, it's a communication between
20  Gary and John, yes.
21  BY MR. O'KEEFE:
22     Q   Are those the types of communications which were
23  shared back and forth between the two of them?  Updates
24  regarding things such as Clear Channel and Port Authority?
25     A   Yes.

Page 83

1      Q   Okay.  Do you have any writings like this where John
2  Zimmeth tells you what to do?
3      A   No.
4      Q   Do you have any writings like this where John
5  Zimmeth prohibits you from doing anything?
6      A   No.
7      Q   Do you have any writings like this where he
8  threatens to do something if you don't take certain action?
9      A   No.
10     Q   You would say that he was vigilant in pursuing
11  payment, would you not?
12     A   Yes.
13     Q   Do you know why he was -- did not -- strike that.
14         Would you agree that you guys received default
15  notices for payment on an almost regular basis?
16     MR. HENZY:  Object to form.
17     THE WITNESS:  No.
18  BY MR. O'KEEFE:
19     Q   Do you ever recall having received it?
20     A   No.
21     Q   Okay.
22     A   At the end, yes.  I do remember getting it right
23  sometime towards the end of the year.
24     Q   You don't remember getting notices from Andy
25  Feldstein saying your payment was past due.  Make payment?

Page 84

1      A   I remember getting notices to make payment, yes.
2      Q   Okay.  That's what I'm talking about.  Do you recall
3  that those were frequent notices?
4      MR. HENZY:  Object to form.
5      THE WITNESS:  No, I don't.
6  BY MR. O'KEEFE:
7      Q   Do you remember how many of those you got?
8      A   I don't.
9      Q   Do you remember getting more than ten?
10     A   No.
11     Q   The letter to which you referred, was that a letter
12  to you as a guarantor or a copy to you as a guarantor by
13  which the default and demand for payment was made?
14     A   Yes.
15     Q   For the full amount that was then due?
16     A   Yes.
17     Q   Do you recall if that came from me?
18     A   I think it was Ed Kitchen.
19     Q   Do you know why Mr. Zimmeth never pulled the plug on
20  the sign and took it back and declared you in default and
21  demanded payment?
22     A   I think he wanted to see the project be a success.
23     Q   He was trying to help make it a success rather than
24  putting an end to it?
25     A   Yes.

Page 85

1   Q   That was notwithstanding the fact that you were not
2   making the payments?
3   A   Yes.
4   Q   For years?
5   A   Yes.
6   Q   Do you know Steve Fretty?
7   A   I met Steve.
8   Q   Did you use Steve as some type of a broker when this
9   deal was first done?
10  A   Yes.
11  Q   Did you also commission Mr. Fretty to look for
12  buyers of the project after it got started?
13  A   I believe Gary did, yes.
14  Q   And do you know whether or not there were interested
15  parties along the way?
16  A   There were interested parties along the way.
17  Q   Did you participate in the meetings or discussions
18  with those parties?
19  A   No -- I met do -- I went to lunch with the Beekman
20  guy.  I think that's about it.
21  Q   Does Thayer ring a bell?
22  A   No.
23  Q   Tell me what you know about the prospect of selling
24  to Beekman?
25  A   I know they were very interested in buying it.  It

Page 86

1   was a hedge fund.  There was a guy from, I think, CBS Radio.
2   That was like the president of CBS Radio that was quitting
3   and was going to join a hedge fund.  They wanted to have
4   Digital media, and they were interested.
5   Q   Did they ever make an offer to buy?
6   A   There were negotiations to buy.  I'm not sure if
7   there was ever a formal offer.
8   Q   Do you know why those conversations fell apart or
9   terminated?
10  A   I don't.
11  Q   You don't know of any reason why Beekman walked away
12  from the prospect of trying to do a deal?
13  A   I think they were hedge fund, and they didn't want
14  the risk.  I don't know.
15  Q   What about Clear Channel, were you involved in any
16  discussions or meetings with them with the prospect of them
17  buying the project?
18  A   I wasn't.  It was Gary meeting with Harry and John;
19  and as long as John was happy, I wasn't involved.
20  Q   Was he happy with the Beekman discussions?
21  A   No, but that was -- that was before the Clear
22  Channel discussions.
23  Q   So this would have been later on?
24  A   Yeah.
25  Q   Do you know whether -- strike that.

Page 87

1   Q   Do you know why Clear Channel -- why Garage-Media
2   never negotiated a transaction by which Clear Channel would
3   acquire the project?
4   A   I don't.  I know they were interested.  At the last
5   minute, they had some internal corporate issues; but I'm not
6   sure what those were.
7   Q   Were there any ongoing discussions with Clear
8   Channel regarding the prospect of a relationship going
9   forward in connection with the sign?
10  A   Now?
11  Q   Yes.
12  A   No.
13  Q   In connection with the extension, the effort to
14  extend the permit with the Port Authority, does Garage-Media
15  have a marketing agent?
16  A   No.
17  Q   And it definitely is not Clear Channel?
18  A   Yes.
19  Q   Were they terminated or --
20  A   They just.
21  Q   -- did the agreement expire?
22  A   It expired, yeah.
23  Q   Are you aware of any meetings or discussions with
24  Park Lift regarding the potential acquisition of the
25  project?

Page 88

1   A   Who?
2   Q   Park Lift.
3   A   No.
4   Q   Any others?
5   A   I know that Gary was actively looking diligently
6   trying to find somebody.
7   Q   Do you know weather he had any help from Mr. Fretty
8   in locating the prospective buyers?
9   A   I think he did originally, but then I think Fretty
10  exhausted his contacts.
11  Q   Okay.  Do you recall at any time telling John
12  Zimmeth and Gary that Clear Channel was the absolute best fit
13  for Garage-Media because of your prior dealings with it at
14  Park It?
15  A   No.
16  Q   Is it your testimony that you never told that to
17  Gary Neff or John Zimmeth?
18  A   I don't recall.  I know that John asked me if I had
19  any other people I could go talk to.  We had a relationship
20  or have a relationship with a group out of Canada called Park
21  It.  We ran it up the flag pole with them, and they weren't
22  interested.
23  Q   But I'm talking about Park It had -- do you know
24  whether Park It had a relationship with Clear Channel?
25  A   I don't think they did.

## Page 89

1    Q   Do you recall having been told by somebody at Park

2   It that the best fit for Garage-Media would be Clear

3   Channel?

4    A   I don't recall that.

5    Q   And you don't recall telling either John Zimmeth or

6   Gary Neff specifically that?

7    A   I don't remember.

8    Q   I'm going to show you a document which I will ask

9   the court reporter to mark as Plaintiff Schmid 30 -- I'm

10  sorry -- 26.  Ask if you will take a look at that, and tell

11  me when you are done.

12      (Plaintiff's Exhibit 26 is marked for identification)

13  BY MR. O'KEEFE:

14   Q   Did you have a chance to look at what has been

15  marked as Exhibit 26?

16   A   Yes.

17   Q   Are you familiar with that document?

18   A   No.

19   Q   Do you recall ever having seen that document?

20   A   No.

21   Q   Do you agree it appears to be a letter from GKD

22  Metal Fabrics with Garage-Media setting out a course of

23  options to replace -- well, enhance the sign, if not replace

24  the sign?

25   A   Yes.

## Page 90

1    Q   Do you recall ever having had any discussion with

2   Mr. Neff about these options proposed by GKD?

3    A   I think I recall having conversations, yes.

4    Q   And was any of the work which was recommended or

5   suggested here undertaken by Garage-Media?

6    A   No.

7    Q   Do you know why?

8    A   I think money.

9    Q   Do you know whether or not this information was

10  shared with either Macquarie or Huntington.  I think it was

11  still Macquarie at the time.

12   A   I assume it was.

13   Q   And do you know whether in connection with this

14  proposal, Gary Neff developed a plan to try to extend the

15  permit and locate an investor so that these improvements

16  could be made?

17   A   Yes.

18   Q   And do you know whether he undertook to do that,

19  both of those things?

20   A   Yes, I believe he did.

21   Q   And would it be fair to say that between '14 and the

22  expiration of the permit in December of '18, he was unable to

23  locate an investor to allow this to go forward?

24   A   Yes.  But it was really -- everything hinged on the

25  extension.  Nobody wanted to do it for a two-year return on

## Page 91

1   investment.

2    Q   So Gary did undertake from this point, 2014 forward,

3   with your assistance, with John's assistance, with anyone's

4   assistance to get an extension for the Port Authority permit;

5   is that right?

6    A   Yes.

7    Q   And if that was obtained, the next step would be get

8   an investor or buyer for the company; is that correct?

9    A   Absolutely.

10   Q   And that did not happen until the time we are

11  speaking right now?

12   A   No.

13   Q   But you said there are some ongoing efforts to do

14  that as we speak?

15   A   Well, it's -- yeah, we place a phone call once a

16  month and say, hey, when are you signing that?

17   Q   And who is behind that?  Gary Neff?

18   A   Yes.

19   Q   Is counsel involved in that process?

20   A   We are talking to counsel at this moment.  We

21  haven't engaged.

22   Q   I'm going to ask you to look at what I will mark as

23  Plaintiff Schmid 30.

24      (Plaintiff's Exhibit 30 is marked for identification)

25  BY MR. O'KEEFE:

## Page 92

1    Q   And ask you if can you take a look at that, and tell

2   me when you are finished.

3    A   Okay.

4    Q   Have you had a chance to look at Exhibit 30?

5    A   I have.

6    Q   Do you recognize that document?

7    A   I do.

8    Q   Did you have an opportunity to review that document

9   approximate in time to when it was prepared and filed?

10   A   Yes.

11   Q   I'm going to ask you to turn to paragraph 36, if you

12  would.

13   A   (Witness complies)

14   Q   It's on page seven.

15   A   Okay.

16   Q   I will read -- and tell me if I am reading this

17  incorrectly -- "Beginning in or around April, 2013, and

18  continuing through April, 2014, notwithstanding the GMNY had

19  paid all amounts due under the Lease Agreement and was thus

20  entitled to quiet enjoyment of its property and business,

21  Macquarie pressured GMNY to replace its then sales agent

22  A2aMedia, Inc."

23      How did Macquarie pressure GMNY to replace

24  A2aMedia?

25   A   As I went over before, they came to meetings, they

Page 93

1    told us that we had to do something different, they
2    participated in meetings, they just participated in meetings
3    with Clear Channel, they participated in meetings with Port
4    Authority. John was very clear that we had to do something
5    to make a change.
6        Q   Did Macquarie prepare the letter for Garage-Media to
7    send to A2a, telling them after six months of performance
8    they were under-performing, and that they were on notice that
9    if they didn't cure, their exclusivity would be terminated?
10       MR. HENZY: Objection to form.
11       THE WITNESS: No.
12   BY MR. O'KEEFE:
13       Q   That was Gary Neff and Garage-Media's effort?
14       A   Yes.
15       Q   Did Macquarie send a letter in June of 2012, and
16   hereafter the sign went active, converting the exclusive
17   agency to non-exclusive agency by A2aMedia because of
18   under-performance?
19       MR. HENZY: Objection to form.
20       THE WITNESS: I don't know.
21   BY MR. O'KEEFE:
22       Q   If that letter was sent by Gary Neff, it would have
23   been his letter, correct?
24       MR. HENZY: Objection to form.
25       THE WITNESS: That would be yes.

Page 94

1    BY MR. O'KEEFE:
2        Q   Did Macquarie prepare and send a Garage-Media letter
3    in July of 2012 under the terms of which material terms of
4    the agreement with A2aMedia were amended and waived?
5        MR. HENZY: Objection to form.
6        THE WITNESS: No.
7    BY MR. O'KEEFE:
8        Q   That would have been Garage-Media and Gary Neff,
9    right?
10       A   Yes.
11       Q   Did you participate in any of the discussions or
12   decisions to send those letters?
13       A   I was aware that those letters were going to be
14   sent.
15       Q   And you were aware of those different milestones by
16   which the rights of A2aMedia were changed?
17       A   Yes.
18       Q   Did Macquarie prepare and send the March 2014 letter
19   to A2aMedia under the terms of which the relationship was
20   terminated?
21       MR. HENZY: Object to form.
22       THE WITNESS: No.
23   BY MR. O'KEEFE:
24       Q   That was a letter from Garage-Media and Gary Neff;
25   is that correct?

Page 95

1        A   Yes.
2        Q   "From late 2013 and into 2014..." at the end of
3    that paragraph "...Macquarie participated extensively in the
4    search for a new sales agent, and in April 2014 GMNY
5    terminated A2a and retained Clear Channel as its sales
6    agent."
7            You offered testimony on what you perceived to be
8    John Zimmeth's efforts in connection with replacement of a
9    new sales agent. Is there anything else that supports this
10   allegation that you are aware of?
11       MR. HENZY: Object to form.
12       THE WITNESS: I think if we talked to Clear Channel,
13   they would agree with what we are saying.
14   BY MR. O'KEEFE:
15       Q   Which is what?
16       A   That John Zimmeth participated extensively in that
17   negotiation. When John was in the room, he was leading the
18   meeting, and it was very clear that he considered -- that he
19   was trying to save the board.
20       Q   He was trying to save the board for Garage-Media and
21   so that Macquarie got paid?
22       A   Yes.
23       Q   Okay. Now, you talked only about Clear Channel.
24   They would agree that John Zimmeth participated in, if not
25   lead meetings. Were those meetings that related to the

Page 96

1    agreement that was negotiated with Clear Channel to market
2    after the request for proposal?
3        A   I'm not sure.
4        Q   I'm just trying to understand your knowledge or
5    understanding of John Zimmeth's role in the extensive search
6    for a new -- participated extensively in the search for a new
7    sales agent.
8        A   He was part of it every step of the way.
9        Q   So it's your belief that he participated in the
10   preparation for the request for proposal?
11       A   Absolutely.
12       Q   The actual document that went out to the parties
13   that made the proposals?
14       A   I think he -- I think yes. I think even the bank's
15   attorney was involved somehow.
16       Q   Are you confusing that with Clear Channel having
17   sent a proposed agreement, and Gary Neff sending it to John
18   Zimmeth asking that in-house lawyers look at that
19   agreement?
20       A   I could be on that one, yes.
21       Q   And do you know that in that circumstance, the
22   in-house lawyer did not look at it and Clear Channel -- I'm
23   sorry. Strike that -- that Garage-Media retained outside
24   counsel to review and comment upon the Clear Channel
25   agreement?

Page 97

1    MR. HENZY: Object to form.
2    THE WITNESS: I don't know.
3  BY MR. O'KEEFE:
4    Q  Do you know whether in connection with retention of
5  Clear Channel, the proposed agreement from Clear Channel was
6  reviewed by outside counsel for Garage-Media?
7    A  I don't know. I don't think so.
8    Q  Do you know that Field Activate was the party which
9  received -- strike that.
10    Do you know whether Field Activate or Garage-Media
11  was the party to receive the proposals in response to the
12  RFP?
13    A  I don't know.
14    Q  Do you believe that Huntington or its predecessor, I
15  should say, Macquarie was the party to receive the proposals
16  in response to the RFP?
17    A  I think they got all of the responses, yes.
18    Q  Would that have been provided to them by
19  Garage-Media?
20    A  I don't know. I imagine.
21    Q  Do you know -- you're not saying that the proposals
22  went directly from the RFP and Clear Channel would send it to
23  Macquarie?
24    A  No, no, no. It went to Garage-Media.
25    Q  How else did John Zimmeth or Macquarie participate

Page 98

1  in the search for a new sales agent? You've talked about the
2  Clear Channel meeting. What else?
3    A  I know -- once again, this is something that was
4  Gary Neff and John, I would get it secondhand from Gary. I
5  was just happy that Gary was keeping John Zimmeth happy.
6    Q  Meaning that if John Zimmeth was happy, then there
7  would be the prospect for life of the sign, rather than
8  shutting the business down for default?
9    A  Right, taking the sign away from us.
10    Q  And if that happened, the guarantors also would be
11  subject to potential claims, right?
12    A  Yes, yes; terrifying.
13    Q  Without identifying them, have you guaranteed any
14  other obligations, bank obligations, lease obligations in
15  your life?
16    A  Probably for cars or trucks or something; but
17  probably for real estate, probably for company debt, yeah.
18    Q  And the guarantee itself, is that terrifying?
19    MR. HENZY: Object to form.
20    THE WITNESS: No, because -- no. When things are
21  going sideways, it gets -- I've never had that happen before.
22  BY MR. O'KEEFE:
23    Q  So the terrifying part is the prospect of someone
24  calling upon the guarantee obligation for payment?
25    A  Yes.

Page 99

1    Q  You would agree that Zimmeth's efforts were to
2  assist Garage-Media in propping up the business so that it
3  succeeded and/or be sold?
4    A  Yes.
5    MR. HENZY:  Object to form.
6  BY MR. O'KEEFE:
7    Q  In paragraph 37, second sentence -- well, I'll read
8  it from the beginning.  "In 2014 GMNY considered suing GKD
9  due to the repeated failures with the Sign.  In February,
10  2014, notwithstanding that as of 2014 GMNY had paid all
11  amounts due under the Lease Agreement and was thus entitled
12  to quiet enjoyment of its property and business, Macquarie
13  proceeded as if it owned any claims against GKD and
14  threatened to take legal action against GKD if the problems
15  with the Sign were not remedied.  In light of Macquarie's
16  control position through its security interest and pledges of
17  ownership interests, GMNY felt that it had no choice but to
18  accede to Macquarie's exercise of control over any claims
19  against GKD, and acceded to the decision that no claims would
20  be pursued against GKD."
21    Again, was there any writing by which you were
22  advised not to sue GKD?
23    A  No, there's no writings.
24    Q  Was there any writing by which you were prohibited
25  to sue GKD?

Page 100

1    A  No.
2    Q  Was there any writing by which Macquarie exercised
3  any right it might have had to take the claim and sue GKD?
4    A  No.
5    Q  And is your testimony concerning this aspect, the
6  suit against GKD, is that testimony that you've already
7  offered regarding the meeting at which John Zimmeth
8  threatened a potential claim against GKD?
9    A  Yes. At that point, I felt that John was -- it was
10  John's decision if he would sue or not sue.
11    Q  And is it correct that neither you nor any other
12  representative of Garage-Media said, hey, John, we would like
13  to sue GKD; and we are going to go forward with that?
14    A  I don't know.
15    Q  Did you?
16    A  No.
17    Q  Have you identified in your testimony today all the
18  ways in which you think Macquarie interfered with the
19  day-to-day business of Garage-Media?
20    MR. HENZY: Object to form.
21    THE WITNESS: That's all that I'm aware of to my
22  recollection.
23  BY MR. O'KEEFE:
24    Q  Have you also identified each of the ways in which
25  you believe Macquarie exercised the high degree of control

Page 101

1  over Garage-Media's day-to-day business?
2       MR. HENZY:  Object to form.
3       THE WITNESS:  To the best of my recollection, yes.
4       MR. O'KEEFE:  Let's take a five-minute break.
5       MR. HENZY:  Sure.
6       (Recess:  12:47 p.m. and back on at 12:49 p.m.)
7       MR. O'KEEFE:  I'm finished.  Original and PDF.
8       MR. HENZY:  Same thing as last time.  PDF copy.
9       (Deposition concludes at 12:50 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 102

1                    JURAT
2
3       I, John Mark Schmid, do hereby certify that the
4   foregoing testimony given by me on May 07, 2019, is true and
5   accurate, including any corrections noted on the corrections
6   page, to the best of my knowledge and behalf.
7
8
9
10       _____
11       John Mark Schmid
12
13
14
15       Subscribed to and sworn before me on this _____
16   day of _____ 2019.
17
18
19   My Notary Expires: _____
20
21
22
23
24
25

Page 103

1                CORRECTION SHEET
2
3       I, John Mark Schmid, do hereby certify that the
4   following corrections and additions are true and accurate to
5   the best of my knowledge and belief.
6
7   CORRECTION        PAGE    LINE    REASON
8   -------------------------------------------------
9   -------------------------------------------------
10  -------------------------------------------------
11  -------------------------------------------------
12  -------------------------------------------------
13  -------------------------------------------------
14  -------------------------------------------------
15  -------------------------------------------------
16       DATE: _____
17   At _____ in said County of _____,
18   this _____ day of _____, 2019, personally appeared
19   John Mark Schmid, and he made oath to the truth of the
20   foregoing corrections by him subscribed.
21
22   Before me, _____, Notary Public.
23
24   My Notary Expires: _____
25

Page 104

1   STATE OF CONNECTICUT    :
2   COUNTY OF HARTFORD      :
3
4       I, MARGARET A. BULL, a Commissioner duly commissioned
    and qualified in and for the State of Connecticut, do hereby
5   certify that pursuant to notice there came before me on the
    07th day of May, 2019, the following-named person, to wit:
6   John Mark Schmid, who was by me duly sworn to testify to the
    truth and nothing but the truth; that he was thereupon
7   carefully examined upon his oath and his examination was
    reduced to writing under my supervision; that this deposition
8   is a true record of the testimony given by the witness.
9
10      I further certify that I am neither attorney nor
    counsel for nor related to nor employed by any of the parties
11  to the action in which this deposition is taken; and
    further, that I am not a relative or employee of any attorney
12  or counsel employed by the parties hereto or financially
    interested in this action.
13
14      IN WITNESS THEREOF, I have hereunto set my hand and
    affixed my seal this 16th day of May, 2019.
15
16
17
18
19
20
21           MARGARET A. BULL, Commissioner
22
23   My Commission Expires: November 30, 2021
24
25

**WORD INDEX**

**< $ >**
**$4.9**  77:12

**< 0 >**
**000216**  25:21
**00023**  1:1
**001**  3:11
**02**  3:3
**04**  3:3
**05**  3:8
**06106**  1:1
**06604**  2:15
**07**  1:1  102:4
**07th**  104:5

**< 1 >**
**1**  3:11, 12, 12
20:24  21:2
**1.5**  77:16
**10**  2:14  3:14, 16
23:19, 19  46:21
75:13
**10:00**  1:1  5:1
**1022-1052.65**  3:15
**104**  3:4
**11**  3:14  41:9, 13
**1148-116027**  3:12
**12**  3:16  46:12
47:5  75:13
**12:05**  78:20
**12:10**  78:20
**12:47**  101:6
**12:49**  101:6
**12:50**  101:9
**1235-1236.46**  3:14
**13**  3:14  46:14
47:5
**14**  3:15  47:22, 23
90:21
**15**  30:4
**15222**  2:8
**15TH**  2:14
**167**  7:12
**16th**  104:14
**18**  3:17  90:22
**18TH**  1:1
**19**  3:15  65:19, 21,
22  66:17

**195**  1:1
**1976**  7:20
**1986**  12:18

**< 2 >**
**2**  3:11  22:1, 2, 14
**2010**  28:4  30:4
**2012**  3:14, 15
43:24  46:21  93:15
94:3
**2013**  18:16  25:19,
20  26:1  43:24
50:12  58:5  66:4
74:8  92:17  95:2
**2014**  3:17  18:16
57:19  58:13  60:10
74:9  91:2  92:18
94:18  95:2, 4  99:8,
10, 10
**2018**  40:10, 15, 16
**2019**  1:1  102:4, 16
103:18  104:5, 14
**2021**  104:21
**2028**  81:1
**21**  1:1  3:11, 16
75:4, 5
**22**  3:11
**233-243**  3:11
**24**  3:16  78:22, 23
**247-251**  3:11
**257-26125**  3:12
**26**  3:15, 17  23:19
89:10, 12, 15
**261**  25:21

**< 3 >**
**3**  3:12, 12  25:10,
12

**3:18-CV-01708-VLB**
1:1
**30**  3:17  40:15
89:9  91:23, 24
92:4  104:21
**307**  1:1
**31**  25:19, 20, 25
**36**  92:11
**37**  3:13  99:7

**< 4 >**

**4**  3:12  27:21, 23
28:2, 4

**< 5 >**
**5**  3:13  31:13, 16
**500**  76:18
**535**  2:7
**58-88**  3:13

**< 6 >**
**6**  3:13  37:13, 14
66:3
**6.2**  45:8
**663-665.89**  3:17

**< 7 >**
**741-74275**  3:16
**743-760**  3:14
**753**  45:2
**758**  45:15

**< 8 >**
**800**  2:7
**83**  8:16
**84**  10:15  11:20, 21
12:10
**8-4-10**  3:12
**85**  10:15
**86**  11:18
**860-595-7462**  1:1

**< 9 >**
**90s**  10:13

**< A >**
**A.M**  1:1  5:1
**A2a**  14:11, 13, 23
15:3  16:2, 9, 15
20:9  29:10, 23
34:25  35:14, 20, 25
36:13  39:10, 13
43:7  51:4  64:23
65:1, 2, 13  67:10
69:8  70:3  73:2
74:8, 10, 16, 18
75:20  76:5, 6  77:7
93:7  95:5
**A2aMedia**  3:14
28:12, 13  30:17
32:17, 20  33:6, 12,
23  34:5, 13, 20

**38:22**  41:20, 23
43:14, 15  44:8
45:4, 12  46:22
47:5, 12  48:8
49:17, 23  50:1, 3, 7
51:12, 17  63:22
64:12  66:24  67:25
69:13  74:21, 21, 25
76:19  92:22, 24
93:17  94:4, 16, 19
**A2aMediamesh**
35:24
**A2aMedia's**  38:10,
14
**A2a's**  14:9
**ability**  7:7
**able**  8:7
**absolute**  6:10
24:10  88:12
**Absolutely**  34:15
91:9  96:11
**accede**  99:18
**acceded**  99:19
**accept**  72:20
**acceptable**  6:17
7:4
**accomplished**  59:21
**accounts**  74:11, 21
**accurate**  102:5
103:4
**achieve**  77:12
**achieved**  77:15
**acquire**  87:3
**acquired**  22:10
**acquisition**  87:24
**act**  57:6, 15
**action**  5:12  27:15,
16, 16  47:18  83:8
99:14  104:11, 12
**actions**  60:13
**Activate**  3:15
50:16, 17, 20  65:8
66:4, 7, 13, 16, 24
67:5, 9, 13, 19, 21,
22  68:19  72:14, 19
97:8, 10
**active**  17:13  61:8
93:16
**actively**  88:5
**activity**  61:9, 12

actual 15:15
45:21 96:12
ad 38:10, 15, 23
39:13, 16 45:8
addition 28:16
additional 43:13
additions 103:4
address 7:11
adjust 40:3
advertise 70:14
advertising 33:23,
24 59:6 70:10
74:17, 25
advised 47:11
48:8 51:3 66:23
68:23 99:22
affirmative 3:17
affixed 20:18
104:14
agency 48:9 64:18
76:6 93:17, 17
agent 8:23 73:5
78:10 87:15 92:21
95:4, 6, 9 96:7
98:1
aggressive 51:7, 13
52:4
aggressively 76:9
agree 14:23 23:20
28:12, 16 29:24
32:19 33:4, 17
41:19 48:17 50:3
64:13 66:2 70:25
75:12 79:12 80:1,
19 83:14 89:21
95:13, 24 99:1
agreed 4:9, 13
26:24 47:18 81:17
agreeing 17:10
agreement 3:13
17:6, 6 20:13
21:10, 20 22:5
25:2 26:9 37:21,
25 38:5 41:24
49:18 50:1 57:8
73:16 74:6 78:3
87:21 92:19 94:4
96:1, 17, 19, 25
97:5 99:11
agreements 24:6

ahead 45:1 63:5
air 13:24
Airlines 36:1
42:23
ALAN 1:1
alive 18:14
allegation 95:10
alliance 28:13
alliances 28:11
allow 90:23
allowed 44:19
allows 13:24
alternative 79:14
alternatives 50:24
amended 49:23
94:4
Amendment 3:12
22:19, 22 25:18, 20,
24, 25
amendments 26:8,
11
American 36:1
42:23
amount 84:15
amounts 92:19
99:11
Andrew 46:22
Andy 83:24
annual 31:3 45:7
Answer 3:17 6:3,
7 7:2, 3, 8 23:23,
25 29:4 45:18
71:3
answered 6:12
29:6
answers 5:24, 24
anticipated 26:14
anyone's 91:3
apart 86:8
appear 25:24
46:20
APPEARANCE 3:3
appeared 79:14
80:2 103:18
appears 24:8
25:17 41:19 45:8
66:2 79:6, 10, 17
89:21
application 35:13,
21 44:23

appraised 68:25
appreciating 45:25
approximate 49:9
92:9
approximately
47:15
April 92:17, 18
95:4
architectural 33:21
35:16
area 54:4 70:11
77:6 81:1
Arena 42:23
arising 24:6
aside 15:19 45:23
asked 6:3 7:8
29:12 35:4 42:5, 5
47:2 55:2 62:2
63:2, 16 76:7
88:18
asking 11:24 29:5,
13 96:18
aspect 34:14
79:18 100:5
assist 61:10, 25
62:1, 3 99:2
assistance 91:3, 3, 4
assisted 67:20
assume 38:2
45:22 55:19 90:12
attached 3:21
22:19
attend 7:17
attendant 10:8
11:8
attended 60:15
attending 12:20, 23
ATTORNEY 2:9,
16 96:15 104:10,
11
Attorneys 4:4
attractive 44:24
audible 6:21
audience 32:2
August 28:4
Australian 54:18
authored 75:15
authority 4:10
16:17, 20 17:7
37:22 38:1, 4
39:20, 24 40:2, 6,

24 43:10 45:7, 12,
20 52:11, 12 60:18,
20, 25 61:2 62:16,
17 63:11, 16 71:2,
25 81:1, 5, 19
82:12, 24 87:14
91:4 93:4
available 45:16
Avenue 7:12
aware 7:7 17:5
20:11 22:8, 10
28:7 29:9, 12 30:3
33:2 37:20, 24
38:20 44:18, 20
45:14 50:25 59:7
68:21 70:2, 6, 8
72:25 74:3 87:23
94:13, 15 95:10
100:21

< B >
back 15:9 18:17
53:16 55:9, 15
57:2, 7, 17 60:13
69:10 81:9, 10
82:23 84:20 101:6
background 7:14
11:24
bad 7:6 58:13
ballpark 8:15
bank 39:8 51:15
54:18 56:7 62:25,
25 63:7, 13 98:14
banker 51:8
bank's 96:14
based 50:10 54:5
77:3
basically 54:16
basis 51:2, 5
52:15, 18 58:20, 22
65:5 83:15
bear 23:11
Beekman 52:13
60:14, 16 62:5, 15
85:19, 24 86:11, 20
beginning 19:1
22:21 58:2 80:10
92:17 99:8
behalf 26:19
30:22 38:21 48:7
64:15 102:6

belief  60:22, 23
96:9  103:5
believe  9:21  19:12
25:8  36:13  38:8
53:24  60:16  61:6
63:14  68:2  73:21
85:13  90:20  97:14
100:25
believes  6:4
bell  85:21
benefit  69:21
Best  9:11, 24  33:8
88:12  89:2  101:3
102:6  103:5
better  54:22  58:3
63:13
beyond  40:10
44:11  45:15
bid  69:6  72:20
bidders  71:19, 20
big  55:14
billboard  13:25
14:21  30:15
billboards  14:2
64:6
binder  41:10, 12
bit  51:18, 21
black  40:13
board  58:1  69:10,
20  70:13, 16, 20
76:10  78:7  95:19,
20
body  25:19
booked  31:4
Boston  14:9  77:7
bottom  25:20  45:2
Brand  66:3
branding  33:23
break  6:9, 13, 15
78:18  101:4
breathability  44:15
Brian  16:3
BRIDGEPORT
2:15
briefly  7:13
bring  42:16  50:3
Brings  76:17
broader  51:16
broadly  18:17
brochure  31:23
BRODMAN  2:6

broker  7:25  8:1
10:4  85:8
brother  5:16
15:24  16:16  18:1
19:19
brought  5:13  19:7,
18  35:14  74:22
buildings  33:21
bulbs  59:20
Bull  1:1  104:4, 21
bunch  17:1  45:1
bus  16:17  37:22
business  9:9, 20, 24
10:15  11:13  12:19
13:4  16:13  17:23
44:5  50:13  51:14,
16, 20  52:1, 4, 7, 16,
18, 23  59:10  61:21,
25  62:1, 3  64:25
65:2  73:7  82:17
92:20  98:8  99:2,
12  100:19  101:1
busy  13:1
buy  9:17  61:19
73:23  78:7  86:5, 6
buyer  91:8
buyers  85:12  88:8
buying  62:6, 9
78:12  85:25  86:17

buy-one-get-one-free
9:12
buyout  79:15

< C >
calculated  30:12
call  57:3  62:18
63:3, 16  69:10
91:15
called  9:11  53:15
62:22  70:7  72:23
88:20
calling  56:9  57:5
63:1  98:24
calls  18:19  51:6
52:10, 10, 11  53:13
54:6, 7, 7, 9, 10
60:25  61:11
Canada  88:20
capabilities  62:24

capacity  8:21  11:4
18:5
capital  45:16
52:13
Capolla  11:3
carefully  104:7
CARMODY  1:1
cars  10:7  11:9
98:16
CASE  1:1  5:19
CASSIAN  1:1
caused  61:1
CBS  37:21  38:4
86:1, 2
certain  53:9  83:8
CERTIFICATE
3:4
certifications  8:3, 5
certify  102:3
103:3  104:5, 10
chain  3:16
chance  21:4  22:13
25:14  31:18  37:16
65:25  75:10  79:3
89:14  92:4
change  11:21  12:9
18:8  49:19  93:5
changed  12:21
94:16
changer  44:12
changes  52:25
Channel  52:6, 10
53:23  62:15  70:2,
3  71:25  72:2, 10,
11, 21  73:17, 20
74:9, 16  75:21
76:17  77:9, 12
78:3, 6, 9  79:11
82:24  86:15, 22
87:1, 2, 8, 17  88:12,
24  89:3  93:3  95:5,
12, 23  96:1, 16, 22,
24  97:5, 5, 22  98:2
channels  59:8
Channel's  74:5
characterize  18:4
80:16
charge  56:7
cheaper  70:14
checks  18:19  39:8,

9
Chief  11:8
Chinese  44:20
46:3
choice  30:1  34:13
99:17
chose  35:12
CHURCH  1:1
circumstance  27:8,
9  63:4  96:21
circumstances  49:2
63:25
cities  44:21
City  75:24
claim  100:3, 8
claims  98:11
99:13, 18, 19
clarification  6:2
82:5
clarifying  80:3
clear  35:4  40:23
52:6, 9  53:23
62:15  70:2, 3
71:24  72:1, 9, 11,
20, 23  73:17, 20
74:5, 8, 16  75:21
76:17  77:9, 12
78:3, 6, 9  79:11
82:24  86:15, 21
87:1, 2, 7, 17  88:12,
24  89:2  93:3, 4
95:5, 12, 18, 23
96:1, 16, 22, 24
97:5, 5, 22  98:2
clearer  20:16
clearly  72:24
club  9:16
Coghlan  52:9
53:17  61:6  62:15
79:11  80:15, 24
81:24
coincide  77:17
collaborated  53:19
collection  25:9
collectively  24:7
college  7:15, 18, 23
8:7
come  18:17  23:3
29:21  54:19  56:8
59:1  71:10
comfort  36:9

comfortable 36:*20*, *21*, *25*  37:*1*
coming 50:*15*
commences 5:*1*
comment 47:*19*  48:*18*  82:*9*  96:*24*
commission 85:*11*  104:*21*
commissioned 50:*16*, *20*  104:*4*
Commissioner 4:*10*  104:*4*, *21*
commit 43:*13*
committed 43:*3*, *12*  45:*18*
communication 57:*13*  82:*19*
communications 82:*15*, *22*
companies 53:*24*  64:*3*, *5*  67:*3*, *15*
company 7:*24*  11:*4*, *5*, *16*, *21*  35:*16*, *19*  54:*19*  59:*9*  64:*24*  69:*17*, *18*  76:*24*  91:*8*  98:*17*
compete 70:*20*
competition 70:*16*
competitive 64:*6*
competitor 53:*23*  69:*20*
competitors 53:*1*, *22*  64:*7*
compile 30:*20*
completed 30:*8*
complies 75:*9*  92:*13*
compressed 59:*6*
compressing 59:*21*
concept 42:*20*  44:*12*
concerned 5:*25*  18:*20*  39:*7*  40:*18*
concerning 49:*21*  100:*5*
conclude 52:*3*
concluded 46:*9*  66:*24*
concludes 101:*9*

conclusion 56:*8*
conclusions 66:*20*
condition 7:*9*
conduct 65:*13*  66:*16*
confusing 96:*16*
congratulations 80:*23*
conjunction 30:*16*
connect 36:*11*
connected 43:*7*
CONNECTICUT 1:*1*, *1*  5:*13*  7:*12*, *18*  8:*25*  104:*1*, *4*
connection 5:*18*  18:*24*  21:*14*  25:*2*  26:*17*  29:*24*  30:*23*  35:*5*  37:*24*  38:*5*  67:*14*  71:*11*  72:*1*  87:*9*, *13*  90:*13*  95:*8*  97:*4*
considerate 76:*18*
considerations 75:*19*
considered 95:*18*  99:*8*
construction 20:*17*
consulting 30:*15*
contact 62:*21*
contacting 39:*24*  40:*2*
contacts 88:*10*
contemplated 70:*22*
content 47:*1*  64:*7*
context 17:*1*
continue 76:*9*  80:*25*
continued 74:*24*
continuing 24:*11*  76:*14*  92:*18*
continuous 58:*4*
contract 50:*7*  56:*14*  69:*14*  70:*2*
contracted 70:*3*
control 99:*16*, *18*  100:*25*
convention 37:*6*
conversation 61:*4*  63:*10*

conversations 53:*1*, *5*, *21*  60:*17*, *20*  62:*23*  86:*8*  90:*3*
converting 93:*16*
COO 12:*11*, *20*  13:*3*
cool 13:*23*  14:*2*  15:*11*  17:*3*  36:*7*
copied 79:*6*
copy 24:*16*  32:*10*, *11*  46:*20*  84:*12*  101:*8*
corporate 87:*5*
correct 9:*5*, *7*  13:*15*  15:*2*, *5*  23:*9*  24:*16*, *18*  25:*7*, *18*  34:*18*, *22*  36:*23*  46:*20*  69:*25*  70:*4*  79:*8*  91:*8*  93:*23*  94:*25*  100:*11*
CORRECTION 103:*1*, *7*
corrections 102:*5*, *5*  103:*4*, *20*
correctly 14:*6*  45:*9*
corresponded 38:*21*  51:*3*  64:*15*
cost 26:*16*  33:*9*
counsel 4:*9*  5:*12*  6:*4*, *10*  21:*16*, *19*, *20*, *23*  24:*20*, *24*  25:*2*, *7*  91:*19*, *20*  96:*24*  97:*6*  104:*10*, *12*
counter 82:*10*
County 103:*17*  104:*2*
couple 9:*4*  18:*20*  49:*11*  51:*6*  80:*2*
course 89:*22*
COURT 1:*1*  5:*13*  6:*19*  20:*24*  31:*13*  54:*20*  89:*9*
cover 39:*8*
CT 1:*1*  2:*15*
cube 70:*7*, *10*
cure 38:*25*  64:*17*  93:*9*
current 61:*3*

DATE 1:*1*  11:*20*  12:*15*  18:*9*  23:*18*  30:*4*  103:*16*
dated 25:*18*, *20*, *25*  28:*4*
DAVID 1:*1*  14:*4*, *5*, *6*  18:*1*
David's 18:*5*
day 37:*7*  102:*16*  103:*18*  104:*5*, *14*
day-to-day 17:*16*, *21*, *23*  27:*5*  52:*7*  100:*19*  101:*1*
dead 40:*19*, *19*
deal 38:*7*  40:*19*  85:*9*  86:*12*
dealings 88:*13*
debt 98:*17*
December 40:*10*, *15*  90:*22*
decision 48:*17*  56:*21*  72:*16*  99:*19*  100:*10*
decisions 94:*12*
declare 57:*6*
declared 84:*20*
DEF 45:*2*, *15*
default 57:*6*, *7*  83:*14*  84:*13*, *20*  98:*8*
defects 4:*14*
DEFENDANT 2:*12*  4:*5*
Defendants 1:*1*
defense 3:*17*
define 33:*15*
definitely 87:*17*
degree 8:*8*  100:*25*
delay 39:*20*
delays 30:*7*
delivered 24:*17*  32:*3*
demand 84:*13*
demanded 51:*11*  84:*21*
demonstrate 52:*21*
demonstration 15:*13*, *25*
depends 33:*15*  80:*22*

< D >

depicted 15:14
deployment 31:4
deposit 26:25
27:10
DEPOSITION 1:1
4:11, 17 5:1, 18, 20,
23 101:9 104:7, 11
derive 76:14
derived 74:10, 18,
25
describe 20:21
described 27:8
45:24 60:14
description 33:20
design 33:7
details 82:11
determined 67:2
developed 52:8
90:14
developing 16:25
development 18:25
difference 74:15
different 15:17
17:2 35:18 52:5, 8
59:9 93:1 94:15
Digital 41:20 86:4
diligence 36:25
37:2, 11 45:24
46:1
diligently 88:5
diminished 24:12
dining 9:16
Dinino 10:10
DIRECT 3:8 5:6
directed 4:6
direction 60:21
directly 97:22
disagree 48:17
disagreed 47:18
Disagreeing 17:10
discount 9:12, 15
Discussing 17:10
discussion 8:11
90:1
discussions 30:16
38:3 40:23 49:21
74:1 85:17 86:16,
20, 22 87:7, 23
94:11

Display 3:13
16:20 33:8, 21
37:21, 25 38:5
dispose 22:21
distinct 55:13
distribute 29:10
35:8
distribution 78:4
DISTRICT 1:1, 1
5:13
doc.91 3:17
document 20:23
21:5, 8 22:1, 13, 16
23:8, 9, 14, 20
24:16, 21 27:20, 25
28:3, 5, 7, 11 29:1,
5, 13 31:12, 18, 20,
22 37:12, 16, 18
41:8, 15, 17, 19, 23
46:11, 16, 18 47:21,
25 48:2, 4 65:19
75:3, 10, 12, 15, 17
78:21 79:3 89:8,
17, 19 92:6, 8
96:12
documents 21:20
25:9, 15, 17 26:4, 6
56:13
doing 10:15 52:2,
3 68:17 71:16
83:5
Dollar 7:24 9:13,
15
dollars 43:6, 8
45:8 50:13 74:8
doubt 6:6
drink 12:6
dropped 7:15, 15,
23
due 23:21 24:5
26:21, 25 27:11
36:25 37:2, 10
45:24, 25 83:25
84:15 92:19 99:9,
11
duly 5:3 104:4, 6
dynamic 33:22

< E >
earlier 44:13

77:18 82:16
early 10:13
easier 6:25
Eastern 7:18
eat 9:17
eclipsing 70:16
Ed 84:18
educational 7:13
effect 15:7 70:10,
12 73:1
effective 65:3
effort 65:9, 13
87:13 93:13
efforts 49:4, 6
61:24 78:2 91:13
95:8 99:1
ehenzy@zeislaw.co
m 2:17
either 6:6 13:22
38:3 40:24, 25
50:2 51:25 60:4
61:18 66:19 67:6
68:14 77:3 89:5
90:10
eleven 8:6, 13
41:11, 12
EMAIL 2:10, 17
E-mail 3:16 79:5,
7, 9, 10 80:7
e-mails 79:17 80:2
employed 9:2, 5
104:10, 12
employee 104:11
employment 7:22
11:24 12:10, 12
enable 70:19
encourage 63:6, 16
encouraged 53:7
55:1 64:3
engage 66:15
engaged 65:8, 12
91:21
enhance 89:23
enjoyment 92:20
99:12
enormous 33:24
ensue 79:17
ensure 76:9
enter 20:12 73:16
entered 17:5
19:22 37:20 49:18

entitled 41:20
75:12 92:20 99:11
entity 13:6 15:3, 8
43:16 44:3
EQUIPMENT 1:1,
1 21:11 23:22
24:17 28:3
ERIC 2:16
ESQ 2:9, 16
estate 98:17
Europe 15:21 37:6
event 5:16
evident 56:9
evolve 11:21 12:9
exact 55:2
exactly 54:17 69:2
EXAMINATION
3:8 5:6 104:7
examined 5:4
42:21 104:7
example 20:9 53:6
exchange 82:4
exclusive 29:10, 17
34:16, 20, 21 35:1,
7 39:1 41:24
42:16 48:9 64:18
93:16
exclusivity 47:13
50:2, 3 93:9
excuse 81:10
executed 24:17
execution 21:19
24:21
exercise 99:18
exercised 100:2, 25
exhausted 88:10
EXHIBIT 3:10, 11,
11, 12, 12, 13, 13, 14,
14, 15, 15, 16, 16, 17,
17 20:24 21:2
22:1, 2, 14 25:12
27:23 28:2 31:16
37:14 41:9, 13
46:14 47:23 65:19,
22 66:17 75:3, 5
78:23 89:12, 15
91:24 92:4
exhibits 3:21
exist 11:16
existence 15:4

existing  60:3
expand  51:25
expedient  76:11
expiration  90:22
expire  87:21
expired  87:22
Expires  102:19
103:24  104:21
expressed  62:6
63:11
expresses  80:24
extend  39:25  63:6,
17  87:14  90:14
extended  63:12, 12
80:23
extension  40:5, 10,
25  61:14, 15  71:2,
4  78:7, 11, 12  81:2,
4, 16  87:13  90:25
91:4
extensive  96:5
extensively  95:3,
16  96:6
extent  15:7

< F >
Fabrics  32:17, 21
89:22
facility  42:22
fact  16:10, 19  32:7
36:24  51:4  56:12
67:20  73:2  85:1
facts  5:18
failure  55:9
failures  99:9
fair  13:3  17:15
18:4  19:18, 20
20:19  46:7  51:9
90:21
familiar  13:6  26:6
50:16  89:17
familiarity  66:7
far  40:18
fashion  6:8
faster  59:15, 17
February  99:9
feeling  61:7
fees  21:19, 20
Feldstein  83:25
fell  81:6  86:8

felt  53:9  55:16
57:1, 10, 11  99:17
100:9
Fern  7:12
Field  3:15  50:16,
17, 20  65:8  66:4, 7,
12, 15, 23  67:5, 9,
13, 19, 21, 22  68:19
72:14, 19  97:8, 10
figure  15:11  41:2,
4  51:14  53:20
64:2  65:6, 6
filed  59:23  92:9
FINANCE  1:1, 1, 1
21:12  23:22  28:3
financed  36:8, 22
Finances  5:14
Financial  8:20, 21
9:3  14:25  29:25
62:24
financially  104:12
financing  18:24
19:10  24:18  36:16
43:1  73:19
find  50:24  88:6
fine  11:23
finish  7:1, 3  63:4
finished  21:1
25:11  31:15  41:15
46:16  55:11  75:8
79:1  92:2  101:7
first  5:3  19:9, 15
32:16  38:22  46:8
47:8  53:12  57:17
58:17, 19  64:16
79:6  80:23  82:2, 6
85:9
fit  88:12  89:2
five  9:21
five-minute  101:4
fix  54:22  58:23,
24  59:1, 18
fixed  54:23  61:19
fixing  60:3  62:7
flag  88:21
FLOOR  1:1  2:14
focus  79:18
Folded  10:1
folks  19:19
Followed  24:10

following  57:1
103:4
following-named
104:5
follows  5:4
follow-up  67:6
foregoing  102:4
103:20
forget  16:4  62:22
form  4:7  6:8
12:12  13:13  23:23
25:3  28:20  29:4
32:22  33:1, 13
34:7, 23  39:15
40:20  46:23  51:22
56:15  57:9  60:8
64:21  71:3  74:12
79:20  82:18  83:16
84:4  93:10, 19, 24
94:5, 21  95:11
97:1  98:19  99:5
100:20  101:2
formal  86:7
formed  15:8  44:3
formulated  16:16
forth  80:4  81:16
82:23
forward  79:19
87:9  90:23  91:2
100:13
forwarded  80:2
82:7
four  3:16  9:21
fourth  45:7
free  6:9  9:18
frequent  60:4  84:3
Fretty  30:14, 19,
23  85:6, 11  88:7, 9
friend  14:13, 14
full  24:4  84:15
fund  86:1, 3, 13
further  4:13, 16
67:25  104:10, 11
future  50:21  79:15

< G >
game  44:12
garage  13:25
16:21  17:7  20:18
35:22  43:2, 10
44:2, 3, 5, 16

Garage-Media
3:13  13:7, 8, 17, 20,
21  15:3, 7, 8  17:5,
12, 17, 19, 24  19:9
20:6, 12  21:11, 15
22:4  23:22  25:6
26:9, 20, 21, 24
27:5, 15  28:8, 12,
15, 17  29:22  30:11,
22  31:23  32:20
33:5, 5, 23  34:6
37:20, 25  38:21
39:19  40:5, 9, 18,
24  43:6, 13  44:2,
24  45:16, 19  46:21
48:8, 8  49:17, 22
50:2, 7, 15, 20, 22
51:12  52:4, 6  55:6
56:4  59:25  61:18,
22  62:6  63:7, 13,
21  65:8, 12  66:3, 9,
12, 15  67:2, 19
70:23  72:9, 12, 20
73:5, 16, 19, 22, 23
74:6, 21  75:13
76:3, 15  78:2, 16
81:18  82:17  87:1,
14  88:13  89:2, 22
90:5  93:6  94:2, 8,
24  95:20  96:23
97:6, 10, 19, 24
99:2  100:12, 19
Garage-Medias
13:14, 20
Garage-Media's
64:15  93:13  101:1
garages  13:24
14:22  44:10, 23
GARETT  1:1
GARY  1:1  14:4, 5,
5  15:24  16:18, 18
17:21, 23  19:12
20:7  30:25  32:6
37:10  38:8, 21
41:5  43:15  46:22
49:1  51:2, 5  53:6,
7, 8, 17, 18, 19  54:3,
5  55:1  58:20
60:21  62:11, 21, 22
63:2, 15  64:15, 25
66:21  68:5, 7, 9, 16,

*17, 18, 24* 71:*8, 16,*
*18, 20* 73:*12* 78:*7*
79:*7, 11* 80:*15, 24*
81:*25* 82:*7, 10, 20*
85:*13* 86:*18* 88:*5,*
*12, 17* 89:*6* 90:*14*
91:*2, 17* 93:*13, 22*
94:*8, 24* 96:*17*
98:*4, 4, 5*
**gates** 38:*11*
**general** 61:*7*
**generally** 6:*12*
**generate** 76:*15*
**generating** 38:*15*
**generation** 35:*16*
41:*20*
**genuinely** 59:*15*
**German** 35:*16*
**Germany** 37:*5, 6*
45:*23*
**getting** 10:*3* 30:*7*
39:*20* 52:*1* 83:*22,*
*24* 84:*1, 9*
**give** 5:*24* 7:*1, 2*
51:*21* 55:*15*
**given** 5:*22* 102:*4*
104:*8*
**giving** 38:*25*
52:*25* 64:*17*
**GKD** 28:*16, 17*
29:*11, 18, 21, 25*
32:*17, 20* 33:*6, 12*
34:*17, 21* 35:*1, 8*
37:*4* 46:*7* 52:*14*
53:*15, 15* 54:*12, 16*
55:*2, 6* 56:*4, 13, 24,*
*25* 57:*18, 21, 23*
58:*18, 23* 59:*15, 23*
60:*2* 89:*21* 90:*2*
99:*8, 13, 14, 19, 20,*
*22, 25* 100:*3, 6, 8,*
*13*
**glance** 65:*25*
**glass** 35:*23* 36:*2, 4*
**GM** 56:*1, 1*
**GMNY** 92:*18, 21,*
*23* 95:*4* 99:*8, 10,*
*17*
**go** 6:*14* 9:*8, 17*
13:*24* 14:*11, 21*
46:*1, 9* 53:*1* 54:*20,*

*21, 22* 55:*9, 11, 12*
63:*5* 64:*3, 25* 65:*2*
73:*7* 88:*19* 90:*23*
100:*13*
**goes** 13:*23* 24:*13*
47:*2* 71:*9*
**going** 11:*23* 12:*3*
13:*13* 17:*2* 18:*12*
20:*23* 22:*1, 22*
25:*9* 27:*20* 31:*12*
37:*12* 41:*8* 46:*11*
47:*13, 21* 48:*7, 12*
53:*16* 55:*10, 11, 12,*
*15* 56:*21* 60:*13*
65:*19* 69:*6, 9* 74:*9*
75:*3* 78:*21* 79:*18*
86:*3* 87:*8* 89:*8*
91:*22* 92:*11* 94:*13*
98:*21* 100:*13*
**Good** 14:*17* 34:*4*
68:*20* 69:*13, 15*
**graduate** 7:*19*
**great** 64:*1*
**gross** 45:*8*
**group** 30:*13, 15*
37:*21* 38:*4* 88:*20*
**groups** 52:*13*
**Guarantee** 3:*11*
23:*17, 18* 24:*10*
25:*2* 98:*18, 24*
**guaranteed** 23:*21*
24:*7* 98:*13*
**guarantees** 24:*4*
**Guarantor** 24:*4*
84:*12, 12*
**guarantors** 98:*10*
**guess** 25:*4* 32:*6*
43:*24* 57:*20* 82:*7*
**guy** 14:*17* 17:*21,*
*23* 54:*15* 55:*14*
85:*20* 86:*1*
**guys** 81:*8* 83:*14*

< H >
**half** 50:*12* 74:*8*
**hand** 104:*14*
**handled** 11:*13*
56:*10*
**handling** 66:*22*

**happen** 40:*14*
60:*4, 6* 91:*10*
98:*21*
**happened** 9:*22, 24*
16:*19* 20:*3* 31:*6*
71:*10, 14* 98:*10*
**happening** 49:*25*
**happy** 64:*23* 69:*7,*
*8* 86:*19, 20* 98:*5, 5,*
*6*
**hard** 54:*21* 55:*12*
**harm** 61:*1*
**Harry** 52:*9, 10*
53:*17, 20* 61:*6*
62:*15* 79:*11* 86:*18*
**HARTFORD** 1:*1*
8:*1* 9:*1, 11, 24*
104:*2*
**HAVEN** 1:*1*
**hear** 14:*16* 40:*7*
**heard** 44:*22* 52:*20*
66:*19*
**Heat** 15:*18, 19*
35:*23* 36:*1, 8, 22*
42:*20*
**hedge** 86:*1, 3, 13*
**HELD** 1:*1* 8:*11*
10:*18*
**help** 41:*6* 48:*23*
49:*3, 5* 54:*23, 25*
61:*14* 63:*13* 84:*23*
88:*7*
**HENNESSEY** 1:*1*
**HENZY** 2:*16* 5:*17,*
*22* 11:*23* 12:*2*
13:*1, 13, 16* 22:*22*
23:*1, 3, 6, 23, 25*
25:*3* 28:*20* 29:*4, 7,*
*12* 32:*22* 33:*1, 13*
34:*7, 23, 25* 36:*2, 4,*
*6* 39:*15* 40:*20*
41:*10, 12* 42:*2, 5*
46:*23* 51:*22* 56:*15*
57:*9* 60:*8* 63:*19*
64:*21* 71:*3* 74:*12*
78:*18* 79:*20, 23*
80:*8, 12* 82:*1, 18*
83:*16* 84:*4* 93:*10,*
*19, 24* 94:*5, 21*
95:*11* 97:*1* 98:*19*

99:*5* 100:*20* 101:*2,*
*5, 8*
**hereto** 104:*12*
**hereunto** 104:*14*
**hey** 68:*18* 91:*16*
100:*12*
**high** 7:*15, 19*
100:*25*
**Highest** 77:*11, 14*
**high-impact** 34:*1*
**highly** 76:*8*
**hinged** 90:*24*
**hired** 30:*13*
**hitting** 39:*6*
**hopefully** 12:*3*
**hotel** 46:*5*
**HTF** 25:*21, 21*
**hundred** 64:*22*
69:*8*
**HUNTINGTON**
1:*1* 5:*14* 22:*6, 11*
32:*11* 90:*10* 97:*14*

< I >
**i.e** 46:*2*
**iconic** 33:*22*
**idea** 20:*1, 18*
68:*20* 69:*13, 15*
**ideas** 45:*21*
**identification** 21:*2*
22:*2* 25:*12* 27:*23*
31:*16* 37:*14* 41:*13*
44:*9* 46:*14* 47:*23*
65:*22* 75:*5* 78:*23*
89:*12* 91:*24*
**identified** 14:*18*
28:*16* 42:*13*
100:*17, 24*
**identify** 28:*2*
**identifying** 45:*4*
98:*13*
**illustrate** 52:*22*
**imagine** 27:*19*
44:*10* 97:*20*
**Immersion** 66:*3*
**impact** 15:*7* 70:*9*
**impede** 7:*7*
**implicit** 56:*20*
**impression** 57:*4*
73:*10*

improvements 90:15
inaccurate 29:2, 5
inappropriate 6:5
inception 19:22
included 29:9
including 52:9 57:14 59:20 102:5
income 74:10, 24 76:15 77:14
incorrect 32:25 33:11
incorrectly 92:17
incrementally 59:11
incumbents 76:6
indebtedness 23:21
independent 24:11
INDEX 3:1
individually 21:23 24:23 25:1
industry's 33:25
inferior 44:22
inform 38:22
information 5:19 82:4 90:9
in-house 96:18, 22
Initially 14:9 16:1
inquiries 45:18
inquiry 81:24 82:9
inside 59:8
install 16:16
installation 15:20 20:17 42:20, 21 46:2
installations 15:17 46:3
installed 26:13
instance 52:13
instruct 6:6
insurance 8:23
intent 39:9
intention 55:18
interest 62:6 99:16
interested 42:17 78:11 85:14, 16, 25 86:4 87:4 88:22 104:12
interests 99:17
interfered 100:18
internal 87:5

interpreting 80:15
introduced 14:13
introduction 14:23 16:5 19:13
invest 43:6, 15 45:17 61:18 69:18
invested 64:25 69:8, 19
investing 43:13 62:7 78:11
investment 52:13 91:1
investments 39:14
investor 17:3, 4 18:6, 21 39:14 41:21 90:15, 23 91:8
investors 53:2 61:18 71:1, 5
invitation 62:11
invited 54:8 71:13
involved 12:19 17:9, 11, 16 18:18, 19 27:3 38:3 48:19 49:25 51:18, 19, 20 52:1, 7, 15, 17 53:4 64:7, 10 68:5 71:17, 24 86:15, 19 91:19 96:15
involvement 12:9
island 54:20
issue 22:24 38:14 59:20
issues 38:9 54:15 87:5
its 22:6 43:14 48:9 50:7 57:24 61:25 66:20 69:16 74:5, 11 78:3, 4 80:25 92:20, 21 95:5 97:14 99:12, 16

< J >
January 3:14 46:21
Jersey 77:6
job 10:4, 6, 11, 18
Joe 11:3

JOHN 1:1, 1 2:9 3:6 5:3, 10, 11 39:5 50:23 51:5, 6, 10, 13 52:2, 5 53:10, 15, 19 54:7, 9, 14 55:10 56:9, 18, 19 57:14, 16 62:23 63:10, 16 64:1, 9, 19 68:6, 7, 9, 13, 18, 19, 22, 24, 24 69:2, 2, 7, 9 71:20, 22, 24 72:5 80:8 82:8, 9, 20 83:1, 4 86:18, 19 88:11, 17, 18 89:5 93:4 95:8, 16, 17, 24 96:5, 17 97:25 98:4, 5, 6 100:7, 9, 12 102:3, 11 103:3, 19 104:6
John's 57:1 91:3 100:10
Johnson 30:13, 19, 23
join 86:3
jokeefe@metzlewis.com 2:10
JR 2:9
July 94:3
June 3:15 93:15
JURAT 102:1
Justin 10:10

< K >
KARL 1:1
keep 18:14 69:1, 7
keeping 68:23, 24 98:5
kept 3:21
kind 8:24 9:12, 25
Kitchen 84:18
knew 49:24 65:1 71:4
know 5:12 9:12 13:16 14:18 15:10, 14 16:18 19:13, 17 20:3, 8, 10 21:14, 18 22:4, 7 23:14 26:5, 23 29:17 30:10, 13, 19, 22 31:1, 6, 8, 8, 9, 11,

11, 24 32:2, 5, 7, 10, 15 33:14 35:24 36:6, 11 37:10 39:9 40:5, 9 42:1, 6, 7 43:21 48:20, 22, 23 49:2, 5, 12 50:1, 11 51:2, 5 53:3, 5, 8, 9, 12, 16 54:10 55:1, 4, 5, 8, 8, 9, 25 56:16 58:7, 8 60:17, 19, 24, 24 61:9 62:14, 16, 17, 20, 21 63:2, 9, 10, 15, 18, 21 64:9, 9, 10 65:12, 17, 24 66:9, 12, 15, 21 67:1, 4, 5, 9, 13, 18, 23, 24 68:16, 18 69:2 70:15 71:18, 22, 24 72:2, 4, 5, 8, 14, 18, 19, 22, 23 73:1, 25 74:4, 13, 15, 19, 20, 23, 24 75:2, 15 76:2, 18, 25 77:3, 6, 14 83:13 84:19 85:6, 14, 23, 25 86:8, 11, 14, 25 87:1, 4 88:5, 7, 18, 23 90:7, 9, 13, 18 93:20 96:21 97:2, 4, 7, 8, 10, 13, 20, 21 98:3 100:14
knowing 80:24
knowledge 5:18 13:21 43:3 44:7, 8 68:13 96:4 102:6 103:5
known 6:2 10:20

< L >
landlord 53:2, 6 63:1, 3
language 24:7
laptop 14:10 15:13, 14
larger 69:20
late 95:2
latest 70:12
launch 30:4
lawsuit 11:25

59:23
lawyer 96:22
lawyers 96:18
lead 15:10 52:3
57:2 95:25
leading 33:20
95:17
learn 14:11
Lease 3:11 18:24
19:11, 23 20:12
21:10, 19 22:5, 8
26:9 57:8 61:11
63:6, 11 92:19
98:14 99:11
leased 11:1, 11
LED 59:8
legal 24:20 99:14
legally 10:22
legs 6:14
lent 78:10
lessee 56:24
lessor 51:8 56:23
69:17, 22, 24
letter 3:14, 17
46:21 47:1, 2
49:18 84:11, 11
89:21 93:6, 15, 22,
23 94:2, 18, 24
letter,47 3:15
letters 25:21
94:12, 13
level 77:11, 14
leveraging 33:24
LEWIS 2:6
license 29:10 35:7
life 8:23 98:7, 15
Lift 87:24 88:2
light 13:24 99:15
lights 59:8
light-weight 36:7
LINE 103:7
Liquid 48:20
49:12 50:4 67:10
75:21 76:5, 6, 25
77:5
list 24:13 44:2
listen 7:8
Litchfield 7:12
litigious 54:19
live 47:9 48:7, 12

LLC 1:1, 1 2:6
21:11, 12
LLP 1:1
locate 90:15, 23
located 8:25
locating 88:8
location 15:15, 18
46:4
locations 33:22
long 9:2, 20 10:11
86:19
longer 6:14
long-term 61:19
63:8
look 14:19 20:25
21:4 22:13 25:11,
14 27:22, 22 29:13,
15 31:14, 18 37:9,
16 45:1, 23 46:12
64:3 65:20 67:18
75:7, 10 78:25
79:3 85:11 89:10,
14 91:22 92:1, 4
96:18, 22
looked 37:7 47:25
48:2 55:12
looking 16:20
41:15 46:16 49:3,
5 65:5 88:5
lose 73:12
lot 10:5, 8 11:8
12:22 18:13 35:16
36:9 53:8
lots 11:1, 11 12:20,
22, 23
LSR 1:1
lunch 85:19

< M >
MACQUARIE 1:1,
1 5:14 14:24
18:24 19:10, 16, 19
20:1, 13 21:11
22:6, 10 23:21
24:4, 17 26:9, 21,
24 27:16 28:3, 8
29:25 30:5, 11
31:2 32:14 35:6
36:8, 14, 18, 24
54:18 57:5, 14
59:25 64:2 90:10,

11 92:21, 23 93:6,
15 94:2, 18 95:3,
21 97:15, 23, 25
99:12 100:2, 18, 25
Macquarie's 99:15,
18
Magrin 19:5
major 34:1
making 61:1
62:25 85:2
manage 51:14, 16,
20, 25 52:4, 23
management 52:15,
18
managing 16:10
62:1
manner 50:6
manufacturer
29:18
March 3:17 25:18,
20, 25 94:18
Margaret 1:1
104:4, 21
MARK 1:1, 1 3:6
5:3 20:24 31:13
65:4 89:9 91:22
102:3, 11 103:3, 19
104:6
marked 21:2 22:1,
2, 14 25:10, 12
27:21, 23 31:16
37:13, 14 41:8, 13
46:12, 14 47:22, 23
65:19, 22 75:3, 5
78:22, 23 89:12, 15
91:24
market 61:18 96:1
marketing 34:1, 13
42:13 50:21 65:9,
13 67:3 68:1
72:17 73:16 74:10
78:4, 10, 14 79:15,
18 87:15
material 34:17
77:17, 19 94:3
mean 10:3 14:20
20:16 42:5 43:23
51:17 57:23 59:18
68:23
Meaning 98:6

media 33:8 34:18
41:20 43:2 52:8
53:24 64:3, 5 70:6
80:16 86:4
Mediamesh 29:11,
18 33:20 34:17
35:1, 8, 12, 25 36:8
38:1 42:10 44:11,
23 45:17 46:2, 7
80:25
medical 7:9
medications 7:9
mediums 34:2
meet 15:2 16:2
19:19 62:5
meet-and-greet
19:8
meeting 15:6
16:15 18:23 19:15
53:14 54:12, 15
57:18 58:14, 17, 19
59:13 60:10 62:5,
18 75:13 86:18
95:18 98:2 100:7
meetings 18:20
19:6 52:5, 11, 12,
14, 14, 24 53:9, 17
54:6, 7 58:20, 21,
22 60:7, 14, 14, 17
71:23, 24 72:1, 6
74:1 85:17 86:16
87:23 92:25 93:2,
2, 3 95:25, 25
Melton 46:22
mentioned 51:10
53:13
mesh 35:17
met 19:3, 4, 20, 21
62:14, 22 71:18, 20
85:7, 19
Metal 32:17, 20
59:8 89:22
METZ 2:6
Miami 15:18, 18,
19 35:23, 25 36:8,
22 37:9 42:20, 24
MIDDLE 2:14
24:3 33:19 43:20,
23 47:5 76:5 80:6,
14 81:23 82:8
milestones 94:15

**million** 43:2, *3*, 6, 8, 12  45:8, *16, 17*  50:12  74:8  77:12, *16*
**mind** 38:*17*  48:*14*  59:12
**mine** 14:*13*
**minimum** 78:3
**minute** 53:*16*  57:17  87:5
**misinformed** 81:*1*
**missing** 65:4, *4*
**misstate** 51:*11*
**mis-stated** 35:6
**mistake** 22:*19*
**misunderstanding** 52:21
**modified** 49:*23*
**modify** 6:7  39:*21*
**moment** 57:5  91:*20*
**money** 18:*13, 13*  45:*21*  51:7  69:*18*  73:12  78:*10*  90:8
**monies** 43:*13*
**month** 91:*16*
**months** 38:*20*  47:8  93:7
**motivated** 34:*15*  61:*13*  64:*24*
**move** 7:3
**moved** 59:5, 22

**< N >**
**name** 5:*8*, 8, *11, 15*  13:6  16:*4*  42:*21*  44:*3*, 5  48:20, 22  50:*17*  62:22
**nature** 54:*19*
**need** 6:*14, 21*, 22, 22  51:*21*
**needed** 50:*13*  71:*1, 4*
**needs** 76:*11*
**NEFF** 1:*1*, 1  5:*16*  14:5  16:*16*  17:*23*  20:7  27:*18*  30:*25*  32:6  38:*8, 21*  41:5  43:*15*  45:*25*  46:*22*  47:*12*  48:7  49:*1*  51:*2*  53:*6, 7, 8, 17,*

*19*  54:*3, 5*  55:*1*  60:*15, 16, 21*  62:*12, 21*  63:*2, 15*  64:*15*  71:*8*  79:*11*  80:*15*  82:*7, 10, 16*  88:*17*  89:*6*  90:*2, 14*  91:*17*  93:*13, 22*  94:*8, 24*  96:*17*  98:*4*
**Neff's** 53:*18*
**negotiated** 87:2  96:*1*
**negotiating** 78:*6*
**negotiation** 24:*21*  95:*17*
**negotiations** 17:*11*  19:7  21:*19*  86:6
**Neither** 59:*25*  100:*11*  104:*10*
**Network** 44:2, *3*, 6
**never** 5:*21*  44:*21*  55:*22*  62:*22*  64:*22*  81:*5, 10*  84:*19*  87:*2*  88:*16*  98:*21*
**NEW** 1:*1*  13:*21*  21:*15*  22:*25*  23:*22*  40:*25*  70:*1*, 6  72:*16*  76:*10*  77:*3, 6*, 9  95:*4, 9*  96:*6, 6*  98:*1*
**nice** 54:*15*
**night** 10:*4*, 6, 8
**non-binding** 79:*12*  80:*4, 10*
**non-exclusive** 93:*17*
**non-existent** 18:*3*
**notably** 15:*18*
**Notary** 102:*19*  103:*22, 24*
**Note** 3:*21*  57:3  69:*10*
**noted** 102:*5*
**notice** 4:*14*  47:*12*  93:*8*  104:*5*
**noticeable** 59:*12*
**notices** 83:*15, 24*  84:*1, 3*
**notwithstanding** 56:*12*  85:*1*  92:*18*  99:*10*

**November** 30:*4*  66:3  104:*21*
**number** 24:*13*  43:*10*  58:5
**numbers** 25:*21*  39:6
**NY** 21:*11*
**NYC** 45:7

**< O >**
**OAK** 1:*1*
**oath** 103:*19*  104:7
**object** 11:*23*  12:3  13:*13*  25:3  29:4  32:*22*  39:*15*  40:*20*  57:9  60:*8*  71:3  74:*12*  83:*16*  84:4  94:*21*  95:*11*  97:*1*  98:*19*  99:5  100:*20*  101:2
**Objection** 23:*23*  28:*20*  33:*1, 13*  34:*7, 23*  46:*23*  51:*22*  56:*15*  64:*21*  79:*20*  82:*18*  93:*10, 19, 24*  94:5
**objections** 4:5, *6*
**obligation** 98:*24*
**obligations** 24:6, *7*  40:*3*  98:*14, 14, 14*
**Obligor** 24:6
**observance** 24:*5*
**obtain** 8:5  39:*13*  73:*19*
**obtained** 40:*9*  91:7
**obtaining** 38:*10*  39:*2*
**occurred** 63:*25*
**offer** 60:*2*  72:*24*  86:*5, 7*
**offered** 54:*5*  95:7  100:*7*
**offers** 73:*23*
**office** 14:*9*
**official** 11:*20*
**Off-the-record** 8:*11*  49:*15*
**oh** 54:*16*
**Okay** 6:*19*  7:*11*  10:*16*  12:5  13:*18*  16:*15*  17:9  18:*23*

19:*21*  21:*14*  22:*8, 13*  23:6  26:3  27:7  29:7, *21*  30:*10*  34:*13*  35:*4*  37:*12*  40:*12*  41:3, *8, 25*  42:*12*  44:*1*  47:*11, 21*  48:*20*  55:*6*  76:*17*  77:*25*  79:2  80:*21*  81:*6, 23*  83:*1, 21*  84:*2*  88:*11*  92:3, *15*  95:*23*
**O'KEEFE** 2:*6, 9*  3:*8*  5:*6, 11*  8:*10, 12*  12:*1, 5, 7*  13:2, *15, 19*  20:*23*  21:*3*  22:*3, 24*  23:*2, 5, 7*  24:2  25:*5, 13*  27:*24*  28:*21*  29:*6, 8, 14*  31:*17*  32:*24*  33:*3, 16*  34:*10*  35:*3*  36:*10*  37:*15*  39:*18*  40:*22*  41:*11, 14*  42:*3, 9*  46:*15, 25*  47:*24*  49:*16*  51:*24*  56:*17*  57:*12*  60:*9*  63:*20*  65:*7, 23*  71:*6*  74:*14*  75:*6*  78:*19, 21, 24*  79:*21, 25*  80:*10, 13*  82:*2, 3, 21*  83:*18*  84:*6*  89:*13*  91:*25*  93:*12, 21*  94:*1, 7, 23*  95:*14*  97:*3*  98:*22*  99:*6*  100:*23*  101:*4, 7*
**Once** 39:*7*  69:*19*  91:*15*  98:*3*
**ones** 68:*16*  74:*3*
**ongoing** 40:*23*  87:*7*  91:*13*
**onwards** 74:*9*
**operate** 20:*19*
**operated** 44:*5*
**operation** 27:*5*  52:*7*
**operations** 17:*16*
**opinion** 52:*25*
**opportunities** 33:*25*  76:*14*

opportunity 9:17
10:5 24:23 25:1
33:7 38:25 42:13
44:19 61:17 64:17
67:25 92:8
opposed 80:16
optimum 33:8
options 60:2
89:23 90:2
order 30:20 70:20,
25 71:5
organization 9:6
17:13
original 3:22 101:7
originally 26:14
88:9
outcome 58:22
59:13
outdoor 34:1
37:21 38:4, 4
48:20 49:12 50:4
67:10 75:21, 24
76:5, 6 77:1, 5
Outfront 40:25
outset 49:23 64:13
69:14
outside 13:24
16:21 35:25 96:23
97:6
outstanding 81:11,
13, 21
overall 75:19
overruns 26:16
owned 99:13
owner 9:5
ownership 99:17

< P >
P.C 2:13
p.m 78:20, 20
101:6, 6, 9
PA 2:8
PAGE 3:2, 6
23:12 25:25 32:16
33:4, 19 42:3, 4, 19
43:1 76:6, 17 79:6
80:7, 11 82:2, 6, 8
92:14 102:6 103:7
pages 23:3 42:19
44:11 45:1, 15
pages,.78 3:16

paid 21:21 39:8
92:19 95:21 99:10
paperwork 81:4
paragraph 24:3
33:5 80:6, 14, 23
92:11 95:3 99:7
parallel 10:16
Pardon 28:22
parent 15:8
Park 10:20 11:13,
24 12:4, 9, 11, 12,
19 13:4 28:12, 13,
16 87:24 88:2, 14,
20, 23, 24 89:1
parked 11:9
parking 9:23 10:3,
5, 7, 8, 10, 19, 22
11:1, 8 12:20, 22,
23, 23 13:24 14:21
16:10 17:7 20:18
35:22 44:16
part 21:21 36:25
50:24 53:8 59:4
65:11 96:8 98:23
participate 19:25
49:21 54:8 67:25
85:17 94:11 97:25
participated 20:5
28:4 67:5 71:22
72:5, 15 74:1 93:2,
2, 3 95:3, 16, 24
96:6, 9
participating 68:14
participation 68:11
particular 52:20
58:10
parties 4:10 42:17
49:5 67:21 85:15,
16, 18 96:12
104:10, 12
partner 11:3 16:4
28:17, 25 34:5
44:2 78:14 80:16,
22
Partnered 32:17
Partners 28:15
32:21 33:6, 12, 14
34:8 43:2
parts 20:17 59:5, 8

party 11:25 49:3
65:12 72:17 97:8,
11, 15
pass 8:2, 15 49:3
passed 8:9 14:15
passive 17:4 18:5,
21
Patty 19:4, 20
pay 51:14 69:17
paying 51:7 69:22,
24
payment 24:5
26:20 40:3 83:11,
15, 25, 25 84:1, 13,
21 98:24
payments 22:5
26:21 27:11 61:1
62:25 85:2
PDF 101:7, 8
penal 54:20
pending 6:11 42:6
51:23 63:19
people 9:17 19:22
37:10 52:8 71:13
72:6 76:18, 19, 25
88:19
perceived 95:7
percent 31:3
64:23 69:8
perception 70:9
performance 24:5
38:10, 14 50:21
69:16 74:5 93:7
performed 50:7
performing 64:17
69:14
period 18:9 38:23
70:1
periodic 51:2
permit 17:5 27:16
39:22, 25 40:3, 6,
10, 25 63:12, 17
71:2 78:12, 12
81:2 87:14 90:15,
22 91:4
permitee 17:20
permitted 57:7
person 38:7 104:5
personal 18:13
39:9
personally 103:18

perspective 71:19,
20
Phil 14:15 16:5
phone 18:19
49:14 53:13 62:18
91:15
physical 63:3
pick 72:16
picked 34:18
piece 59:22
PITTSBURGH 2:8
Place 10:10 15:15
46:1 80:25 91:15
placed 74:25
placing 37:22
PLAINTIFF 2:5
4:4 5:12 31:13
41:9 46:12 47:22
65:20 75:4 89:9
91:23
PLAINTIFF'S
3:10 21:2 22:2
25:10, 12 27:21, 23
31:16 37:13, 14
41:13 46:14 47:23
65:22 75:5 78:22,
23 89:12 91:24
plan 16:16 61:21,
25 62:3 78:8
90:14
plant 37:4
player 16:23
pleasure 80:24
pledges 99:16
plug 84:19
point 18:22 22:11
26:23 38:13 42:2
48:24 50:19 53:9
55:7, 9 56:7 57:1
60:12 65:8 66:21
69:24 77:21 81:12
91:2 100:9
pointing 80:9
pole 88:21
Polly 55:10, 16
58:14 59:14
Port 16:17, 20
17:7 37:22, 25
38:4 39:19, 24
40:2, 6, 24 43:10
45:7, 12, 20 52:11,

*12* 60:*18, 20, 25*
61:*2* 62:*16, 17*
63:*11, 16* 71:*2, 25*
81:*1, 5, 18, 25*
82:*12, 24* 87:*14*
91:*4* 93:*3*
**portion** 5:*25*
21:*18* 26:*24* 27:*10*
**position** 12:*9*
17:*13* 18:*4* 63:*13*
99:*16*
**potential** 36:*16*
42:*13* 75:*23* 76:*10*
87:*24* 98:*11* 100:*8*
**potentially** 62:*9*
**precision** 35:*17*
**predecessor** 97:*14*
**prefer** 6:*12*
**preparation** 28:*5*
67:*6* 68:*14* 96:*10*
**prepare** 67:*20*
93:*6* 94:*2, 18*
**prepared** 28:*7*
31:*25* 32:*5* 92:*9*
**preparing** 30:*24*
**presence** 77:*9*
**present** 15:*24* 52:*5*
**Presentation** 3:*12,*
*14* 20:*1* 28:*3, 8*
29:*9* 30:*3, 12* 31:*2*
32:*19* 35:*5* 41:*21*
55:*18* 76:*7*
**presentation31** 3:*13*
**presented** 30:*4, 11*
32:*7* 33:*25* 66:*4*
**preserved** 74:*21*
**president** 52:*9*
53:*15* 86:*2*
**pressure** 39:*10, 10*
64:*1* 92:*23*
**pressured** 92:*21*
**presumably** 71:*9*
**pretty** 14:*2* 53:*4*
**previous** 35:*5*
74:*16*
**pricing** 60:*11*
**primary** 12:*12*
**print** 34:*2*
**prior** 31:*4* 66:*6*
88:*13*

**private** 60:*17, 19*
**privately** 52:*12*
**Pro** 10:*20* 11:*13,*
*24* 12:*4, 9, 11, 12,*
*19* 13:*4* 28:*12, 13,*
*16*
**probably** 5:*12, 22*
9:*4* 10:*12* 58:*13*
63:*14* 98:*16, 17, 17*
**problem** 47:*5, 8*
**problems** 57:*21, 23*
58:*1, 4, 5, 8, 18, 23,*
*24* 59:*18* 60:*3*
77:*18, 19* 99:*14*
**proceeded** 99:*13*
**process** 64:*10*
68:*4, 15, 23* 71:*15*
73:*2* 91:*19*
**produced** 59:*9*
**producing** 65:*5*
**product** 17:*3*
29:*11, 18, 21, 25*
35:*8, 12, 14, 17*
36:*8* 37:*1* 46:*2, 8*
57:*24, 24*
**Products** 29:*19*
44:*21*
**Professional** 10:*19,*
*22*
**program** 33:*8*
66:*3, 6, 16*
**progressively** 77:*22*
**prohibited** 99:*24*
**prohibits** 83:*5*
**project** 19:*22* 20:*1*
26:*13, 17* 28:*9, 18*
29:*22* 30:*8* 34:*6,*
*11* 36:*19, 23* 40:*19*
45:*13, 20* 48:*9*
61:*10, 19* 62:*7*
64:*2, 24* 65:*2*
69:*11* 84:*22* 85:*12*
86:*17* 87:*3, 25*
**projected** 31:*3*
39:*6*
**projection** 45:*12*
77:*11*
**projections** 30:*10,*
*14, 20, 24* 50:*11*
64:*14* 65:*4*

**projects** 43:*14*
**promise** 45:*21*
**promised** 78:*4*
**promote** 76:*10*
**prompt** 24:*5*
**pronounce** 14:*6*
**proof** 4:*10* 42:*19*
**properly** 54:*24*
59:*5*
**property** 92:*20*
99:*12*
**proposal** 67:*14, 15,*
*20* 69:*3* 71:*9* 72:*3*
79:*12, 14* 80:*4, 6,*
*11* 90:*14* 96:*2, 10*
**proposals** 67:*2, 7*
72:*6* 96:*13* 97:*11,*
*15, 21*
**proposed** 81:*12, 14*
90:*2* 96:*17* 97:*5*
**propping** 99:*2*
**prospect** 19:*10*
65:*15* 85:*23* 86:*12,*
*16* 87:*8* 98:*7, 23*
**prospective** 88:*8*
**prospects** 45:*5*
50:*21*
**prototype** 15:*16*
**provide** 67:*25*
**provided** 32:*10, 11*
61:*17* 97:*18*
**provider** 29:*18*
**providing** 33:*22*
**proximate** 60:*6, 10*
**Public** 103:*22*
**pulled** 65:*1* 84:*19*
**purpose** 31:*24*
61:*11*
**pursuant** 104:*5*
**pursued** 99:*20*
**pursuing** 83:*10*
**put** 13:*25* 14:*1*
15:*12* 16:*20* 17:*1,*
*20* 30:*14* 39:*9*
44:*15* 45:*19* 63:*12*
64:*4, 7* 67:*2, 4, 23,*
*24* 68:*9*
**putting** 18:*13*
47:*12* 64:*11* 84:*24*

**< Q >**
**qualified** 104:*4*
**question** 4:*7* 5:*25*
6:*1, 3, 5, 5, 7, 7, 11*
7:*1, 4* 34:*25* 35:*5,*
*7* 42:*6* 51:*23* 52:*2*
62:*2* 63:*4, 19*
71:*12* 79:*23, 24*
80:*1*
**questioning** 62:*24*
**questions** 5:*23, 24*
6:*21* 7:*8* 12:*3*
47:*2*
**quickly** 59:*2*
**quiet** 92:*20* 99:*12*
**quite** 51:*18, 20*
**quitting** 86:*2*

**< R >**
**radio** 34:*2* 86:*1, 2*
**raised** 43:*2*
**ran** 10:*16* 88:*21*
**reaching** 39:*19*
**read** 92:*16* 99:*7*
**reading** 4:*16* 45:*9*
92:*16*
**ready** 20:*19*
**real** 98:*17*
**realize** 21:*7* 22:*25*
56:*13, 23*
**realized** 10:*5*
**really** 13:*1* 36:*17*
43:*24* 46:*6* 48:*19*
49:*11, 25* 54:*21*
58:*13, 15* 59:*11*
64:*4* 90:*24*
**reason** 7:*9* 24:*12*
86:*11* 103:*7*
**reasons** 24:*13*
**recall** 10:*9* 16:*2*
18:*15, 23* 19:*2, 21,*
*25* 20:*2* 21:*10, 22*
26:*8, 13, 16, 19*
28:*4* 30:*7* 37:*3*
38:*9, 13, 17, 25*
39:*19, 24* 40:*2*
47:*4, 11, 25* 48:*4, 5,*
*6, 11* 49:*7, 9, 17*
50:*15, 19* 59:*3, 4*
65:*9, 10, 10, 11*
66:*19, 23* 68:*11*

83:*19*  84:*2, 17*
88:*11, 18*  89:*1, 4, 5,*
*19*  90:*1, 3*
**receipt**  75:*20, 23*
**receive**  73:*23*
97:*11, 15*
**received**  76:*2*
81:*14, 15*  83:*14, 19*
97:*9*
**Recess**  78:*20*  101:*6*
**recite**  7:*13*
**recognize**  21:*7*
22:*16*  31:*20*  37:*18*
92:*6*
**recollection**  13:*11*
27:*13*  34:*5*  39:*5*
47:*3, 7*  48:*14*  50:*6,*
*9, 10*  61:*5*  66:*18*
68:*3*  69:*4, 5*  74:*7*
76:*13, 22*  78:*1*
100:*22*  101:*3*
**recommended**  67:*9,*
*14, 22*  68:*19*  72:*20*
90:*4*
**record**  5:*9*  6:*6, 12,*
*20*  8:*10*  20:*15*
28:*2*  35:*4*  104:*8*
**reduced**  104:*7*
**reference**  28:*11, 15*
45:*16*  75:*20, 23*
80:*14*
**referral**  16:*9*
**referred**  84:*11*
**referring**  13:*16*
42:*1, 6, 7*  43:*4*
44:*9, 13*  57:*18*
82:*16*
**refresh**  47:*7*  76:*13,*
*21*
**refused**  81:*9*
**regard**  37:*2*
**regarding**  19:*10*
81:*24*  82:*4, 17, 24*
87:*8, 24*  100:*7*
**regular**  51:*5*
58:*20, 21*  65:*5*
83:*15*
**related**  16:*10*
21:*20*  95:*25*
104:*10*

**relationship**  38:*20*
39:*1*  47:*9*  49:*19,*
*22*  61:*2*  63:*22*
74:*22*  78:*9*  79:*15*
87:*8*  88:*19, 20, 24*
94:*19*
**relationships**  44:*10*
52:*8*  67:*10*
**relative**  104:*11*
**release**  24:*12*
**relevant**  5:*19*  12:*2*
**relief**  26:*20*
**remedied**  99:*15*
**remember**  5:*15*
15:*23*  16:*3*  19:*9*
24:*22*  26:*7, 11, 15,*
*18, 22*  27:*1, 4, 6, 7,*
*8, 12*  28:*1, 10*  30:*6,*
*18*  38:*19, 24*  39:*3,*
*4, 5, 23*  41:*18*
43:*25*  46:*6, 19*
47:*15, 20*  49:*11, 24*
50:*11, 23*  51:*1*
54:*17*  57:*19*  58:*12,*
*16*  60:*12*  71:*17*
75:*18*  83:*22, 24*
84:*1, 7, 9*  89:*7*
**rent**  26:*25*
**rent-a-car**  7:*24, 25*
**repeat**  71:*12*
**repeated**  99:*9*
**repeatedly**  51:*3*
**rephrase**  12:*8*
**replace**  60:*11*
89:*23, 23*  92:*21, 23*
**replaced**  66:*24*
**Replacement**  60:*5*
95:*8*
**replacements**  59:*10*
**report**  3:*15*  20:*24*
**Reporter**  1:*1*  3:*21*
6:*20*  31:*13*  89:*9*
**REPORTING**  1:*1*
**represent**  54:*17*
**representation**
31:*2*  35:*19*
**representative**
14:*24*  58:*18*  80:*17*
100:*12*
**representatives**
15:*3*

**represented**  5:*17*
21:*15, 23*  24:*20, 24*
25:*1, 7*  35:*15*
37:*25*  42:*12*
**representing**  32:*20*
**request**  6:*7*  27:*14*
53:*18*  60:*20*  62:*11*
67:*2, 14, 15, 20*
69:*3*  71:*9*  72:*2*
96:*2, 10*
**requesting**  39:*21,*
*25*
**requests**  67:*6*
**required**  22:*5*
**Research**  66:*3*
**reserved**  4:*5*
**resolution**  63:*8*
**respect**  28:*8*  38:*14*
61:*15*
**respecting**  38:*9*
**respond**  6:*21*
81:*18*
**responded**  71:*13,*
*15*
**responds**  82:*10*
**response**  39:*4*
72:*7*  97:*11, 16*
**responses**  97:*17*
**rest**  45:*20*
**restroom**  6:*14*
**result**  60:*24*  67:*1,*
*19*  69:*16*  73:*2, 9,*
*12*
**results**  65:*17*
**retain**  76:*8*
**retained**  39:*13*
95:*5*  96:*23*
**retention**  97:*4*
**return**  33:*9*  90:*25*
**returned**  72:*6*
**revenue**  30:*10*
31:*3*  33:*24*  39:*13,*
*17*  77:*11*  79:*22*
80:*3*  82:*5*
**revenues**  38:*10, 15,*
*23*  45:*8*
**review**  72:*15*  92:*8*
96:*24*
**reviewed**  97:*6*
**RFP**  3:*16*  64:*4, 9,*
*10*  67:*4, 23, 24*

68:*3, 10, 14, 19*
70:*1*  71:*13*  72:*7*
75:*13, 19*  97:*12, 16,*
*22*
**rid**  51:*12*  69:*13*
70:*3*
**right**  6:*10*  12:*1*
23:*14*  26:*3*  33:*9,*
*15*  38:*10*  40:*12*
56:*1, 14*  57:*4*
83:*22*  91:*5, 11*
94:*9*  98:*9, 11*
100:*3*
**rights**  34:*16*  41:*24*
42:*16*  56:*24, 25*
76:*8*  78:*5*  94:*16*
**ring**  85:*21*
**rings**  49:*14*
**risk**  86:*14*
**role**  17:*13*  18:*2, 8*
96:*5*
**room**  95:*17*
**roughly**  11:*18*
**rules**  6:*17*  7:*4*
**running**  37:*10*
39:*21*

**< S >**
**sale**  27:*11*  31:*23*
**sales**  48:*9, 23*  76:*6,*
*18*  92:*21*  95:*4, 5, 9*
96:*7*  98:*1*
**SANDAK**  1:*1*
**save**  95:*19, 20*
**saw**  13:*23*  14:*9*
15:*10, 13*  44:*21*
46:*5*  50:*18*
**saying**  55:*11*  69:*1*
83:*25*  95:*13*  97:*21*
**says**  13:*17*  29:*1*
32:*16*  33:*5, 17, 18,*
*19*  45:*10*  68:*19*
77:*11*
**scenery**  6:*15*
**scheduled**  54:*10*
**SCHMID**  1:*1, 1, 1*
3:*6*  5:*3, 10, 11*
14:*6*  25:*10*  27:*21*
31:*13*  37:*13*  41:*9*
46:*12*  47:*22*  65:*20*
75:*4*  78:*22*  89:*9*

91:23  102:3, 11
103:3, 19  104:6
**S-C-H-M-I-D**  5:10
**Schoenberg**  14:15
**school**  7:15, 19
**seal**  104:14
**seamless**  76:11
**search**  95:4  96:5,
6  98:1
**second**  7:16  22:18
25:25  42:3, 4
75:25  99:7
**secondhand**  98:4
**section**  43:1  44:1
**security**  26:25
27:10  99:16
**See**  7:6  14:8  15:9
22:18  24:3, 13
25:22  26:2  32:16
33:9  34:3  45:4
63:7  64:4  75:19,
24  76:11  80:17
81:23  82:8, 12
84:22
**seemingly**  66:16
**seen**  21:10  27:25
41:17  46:18  47:1
48:4  75:17  89:19
**select**  33:8
**selected**  35:12
48:23  72:9, 11
**selection**  29:25
**sell**  33:24  61:11,
13  76:9, 14
**selling**  76:8, 10
85:23
**send**  67:21  93:7,
15  94:2, 12, 18
97:22
**sending**  96:17
**sent**  67:16  93:22
94:14  96:17
**sentence**  99:7
**sentiment**  80:19
**separate**  52:10, 11
**separation**  74:20
**sequence**  79:5
**series**  5:23  8:6, 6,
13
**Serious**  70:16
**service**  57:24

**Services**  8:20, 22
9:3
**set**  23:3  46:8
80:4  81:16  104:14
**setting**  89:22
**seven**  8:6, 13  92:14
**shake**  6:22
**shared**  82:23
90:10
**sharper**  70:13
**SHEET**  103:1
**shift**  34:1
**Shoenberg**  16:6
**shop**  65:3
**short**  5:23
**shots**  56:10  57:5
**show**  20:23  22:1
25:9  27:20  31:12
37:12  41:8  46:11
47:21  65:19  75:3
78:21  89:8
**showed**  15:17
**shown**  23:8
**shutting**  98:8
**side**  20:6
**sideways**  18:12
98:21
**sights**  46:8
**sign**  17:20  18:25
21:7  26:3  34:17
37:22  38:15  39:20
40:12  47:9  48:7,
12  49:10  54:22, 23
55:15  56:23, 24
57:2, 7  59:4, 11, 18,
21  60:3, 5, 11  61:1,
13  64:8  70:6, 10
77:19, 20  84:20
87:9  89:23, 24
93:16  98:7, 9  99:9,
15
**signage**  16:17
20:13, 15, 21  28:9,
18  29:22  34:6, 14,
21  38:1, 1  41:1
43:10  45:13  77:18
**signature**  23:11
25:17, 24
**signed**  81:5
**significant**  58:11

**signing**  4:16  91:16
**similar**  46:2
**simply**  59:21
**sit**  47:3  56:12
69:12
**situation**  68:25
69:6
**six**  38:20  43:8
47:8  93:7
**six-month**  38:22
**small**  46:6  65:3
76:24
**smaller**  59:11
**smart**  57:16
**SMITHFIELD**  2:7
**sold**  8:23  74:16
99:3
**somebody**  55:20
88:6  89:1
**sorry**  9:14  14:16
27:15  32:14  40:7
42:3  56:3  80:8
89:10  96:23
**sought**  26:20
**sounds**  68:20
**space**  16:10  17:7
59:6
**speak**  6:10  91:14
**speaking**  18:17
91:11
**special**  8:2
**specific**  36:19
57:13  67:15, 21
68:11, 13
**specifically**  46:21
55:2  63:15  80:8
89:6
**specifics**  51:21
**spell**  5:8
**spoke**  19:9  61:6
**spoken**  6:25  30:19,
23
**square**  46:5  70:7,
11  80:25
**stand**  81:8, 24, 25
**standpoint**  70:17
**start**  49:10  57:25
**Started**  9:9  10:19,
25  11:7, 19  13:22
17:12, 16  18:12, 12

**79:**10  85:12
**start-ups**  17:2
**state**  5:8  7:18
104:1, 4
**stated**  51:11
**statement**  29:10
41:23  55:10
**STATES**  1:1  35:9
42:14, 17
**stating**  32:25
**status**  3:16  75:13
**stay**  12:3
**stayed**  78:14
**step**  91:7  96:8
**Steve**  85:6, 7, 8
**stipulated**  4:4, 9,
13, 16
**STIPULATIONS**
3:3
**stock**  7:25  8:1
10:4
**stockbroker**  8:17
10:14
**stocks**  8:23
**stopped**  69:24
**store**  9:13, 15
**strategic**  33:6, 12,
14  44:1
**stream**  79:22  80:3
82:5
**STREET**  1:1, 1
2:7, 14
**stretch**  6:14  58:10
**strike**  7:21  16:8
20:11  22:8  25:19
39:12  47:3  68:11
81:14  83:13  86:25
96:23  97:9
**structures**  35:21
**studied**  7:25
**studies**  66:20
**study**  50:20, 25
65:9, 13, 17  67:1,
19
**stuff**  34:4  59:16,
17
**Stuvart**  16:3
**subject**  98:11
**submission**  75:24
**submissions**  71:10,

*11* 72:15  75:20
**sub-permit**  17:6
**Subscribed**  102:*15*
103:*20*
**succeed**  65:*1*
**succeeded**  99:3
**success**  84:22, 23
**successful**  36:23
39:*11*  69:*11*
**successor**  5:*14*
22:6  72:*16*
**sue**  55:20  56:*13*,
*13, 21*  99:22, 25
100:3, *10, 10, 13*
**suggested**  51:*11*
90:5
**suing**  55:8  56:*1, 2,*
*4*  99:8
**suit**  100:6
**SUITE**  1:*1*  2:7
**summarized**  66:*16*
**superior**  72:24
**supervise**  13:3
**Supervised**  8:*20*,
*21*  9:2
**supervision**  104:7
**supplement**  16:*12*
**supplier**  29:*21*
34:*21*  35:*1*
**supports**  95:9
**sure**  16:*18, 21*
36:*17*  39:8  46:4
54:*21*  55:*16, 19*
58:6  62:*13*  71:*25*
76:24  78:*1, 19*
79:23  86:6  87:6
96:3  101:5
**sustainability**
14:*20*  44:*12*
**sustainable**  14:*21*
**switch**  77:24
**sworn**  5:3  102:*15*
104:6

**< T >**
**tab**  23:*1*
**tabbing**  22:24
**table**  35:*14*
**tailing**  74:*17*
**take**  5:*17*  6:9, *14,*
*15*  8:2  20:25  21:4

22:20, 22  25:*11, 14*
27:*15, 16, 21, 22*
31:*14*  46:*12*  54:*20*
57:2, 7  65:20  69:9,
*20*  75:7  78:*18, 25*
83:8  89:*10*  92:*1*
99:*14*  100:3  101:4
**taken**  4:*11*  5:20
104:*11*
**talk**  44:*11*  54:*12*
88:*19*
**talked**  37:9  46:3
55:*16*  62:*14*  77:*18*
95:*12, 23*  98:*1*
**talking**  17:*19*
52:22  68:*16*  84:2
88:*23*  91:20
**target**  30:3  45:*12*
**taxes**  26:25  27:*11*
**team**  33:24  76:*11*
**TECHNOLOGY**
1:*1*  5:*14*  13:23
14:8, *12*  15:*11, 15*
16:9  22:*11*  32:*12*
35:*1*  36:9, *19, 21,*
*22*  44:*18*  54:*16*
55:9  70:*12, 17*
**television**  34:2
**tell**  7:*11, 22*  10:24
11:*18*  12:6  13:*11,*
*21*  15:6  16:*15*
19:2  20:25  25:*11*
31:*14*  36:*18*  52:*1*
54:*12, 18*  56:*19*
63:3, *18, 24*  64:*16*
70:9  73:*14*  75:7
78:25  85:23  89:*10*
92:*1, 16*
**telling**  52:24
54:*16*  56:*10, 11*
88:*11*  89:5  93:7
**tells**  83:2
**ten**  43:2, 6  45:*16*
84:9
**terminal**  16:*17*
37:22
**terminate**  39:*1*
50:2, 3  78:4
**terminated**  63:22
67:*11*  73:2  86:9

87:*19*  93:9  94:*20*
95:5
**terminating**  48:9
64:*19*
**termination**  74:*11*
75:*1, 1*  76:15
**terms**  17:*13*  49:*19*
81:*15*  94:3, *3, 19*
**terrified**  55:*14*
**terrifying**  54:*14*
98:*12, 18, 23*
**testified**  5:4
**testify**  104:6
**testimony**  33:*11*
51:*11*  54:4  88:*16*
95:7  100:5, 6, *17*
102:4  104:8
**tests**  8:2
**Thank**  31:*1, 10*
**Thayer**  85:*21*
**THEREOF**  104:*14*
**thing**  7:2, 6  8:24
9:*12, 15, 18*  15:*10*
101:8
**things**  6:*19*  70:*19*
81:24, 25  82:24
90:*19*  98:20
**think**  10:23  12:2
15:9  16:3  19:4, 6
22:*18*  23:*1*  27:*17*
34:25  35:2  36:*15,*
*17*  39:*16, 16*  41:2
53:*12, 19*  58:25
59:15  61:7, *13*
69:*12, 15*  71:20
72:4  73:8, *10*
76:23  77:2, *16, 23*
78:6  84:*18, 22*
85:20  86:*1, 13*
88:9, *9, 25*  90:3, *8,*
*10*  95:*12*  96:*14, 14,*
*14*  97:7, *17*  100:*18*
**thinking**  55:8
**third**  33:5  35:*15*
80:7, *11*
**thirty**  43:3, *12*
45:*17*
**thirty-five**  31:3
**thought**  15:*11*
*17:3*  22:20  56:*1, 1,*

*4*  64:6, *23*  65:3
77:5, *21*
**threat**  55:*13*  56:*20*
**threatened**  55:6, *17,*
*20*  99:*14*  100:8
**threatening**  39:*1*
53:*13*
**threatens**  83:8
**three**  22:*21*  23:*1,*
*3*  50:*13*
**three-page**  23:8
**TIME**  1:*1*  4:6
6:9, *11, 13, 16*  7:23
10:*14*  12:15  15:4
17:2  18:5, *8, 18*
26:*14, 19, 23*  27:2
28:*13, 17*  29:*17*
33:24  38:4, *13*
39:*21, 25*  44:*18*
46:5  48:6  49:9, *17*
50:*15, 19, 23*  51:*19*
57:5  58:9, *10, 15,*
*19*  59:*1, 4*  60:6, *10*
61:*21*  63:*21*  69:22
70:*1, 6, 10*  71:*16*
73:22, *22*  75:*1*
77:20, *21, 23*  80:25
81:2, *12*  88:*11*
90:*11*  91:*10*  92:9
101:8
**times**  13:*1*  39:7
**timing**  77:*17*
**title**  25:*18*
**titled**  28:3  44:*1*
66:2
**today**  5:*17*  7:8
11:22  40:6  47:3
56:12  69:*12*
100:*17*
**told**  36:*13, 20*
43:22  54:*1, 5*
60:25  62:23, *24*
76:*21*  81:3  88:*16*
89:*1*  93:*1*
**Tom**  55:*10, 16*
**top**  45:4  79:6
80:7  82:2
**TORRANCE**  1:*1*
**total**  74:*16, 16*
**traditional**  34:2

transaction  18:24
21:15, 21, 24  25:6
43:9, 18, 19  87:2
transcribing  6:20
transcript  4:17
transforms  33:21
transition  76:10
transparent  33:20
trial  4:6
tried  15:11
trip  45:23
trucks  98:16
true  24:16  46:20
63:14  68:2  102:4
103:4  104:8
truth  103:19
104:6, 6
try  7:2  53:20
61:10, 13  64:4
65:6  81:8  90:14
trying  15:9  41:2,
3  54:23, 25  61:10
65:6  69:10  84:23
86:12  88:6  95:19,
20  96:4
Turn  33:4  92:11
turned  40:13
55:12
Twenty  43:2, 12
45:17
two  9:4  10:12
13:14, 20  15:22
19:6  24:3  36:11
42:19  49:10  50:12
76:6, 21  77:2
82:23
two-and-a-half  74:7
two-year  90:25
type  9:15, 18
26:20  82:15  85:8
types  82:22

< U >
U.S  42:20
ultimately  20:12
64:18  70:2  72:9,
11  81:9
um-hum  7:6  24:15
unable  90:22
uncharacteristic

51:8
unclear  20:16
unconditionally
24:4
under-perform
69:20
under-performance
93:18
under-performed
50:10  64:12, 14
under-performing
51:4  93:8
understand  6:1, 3
7:8  11:14  20:5
33:7  64:12  71:10,
14  96:4
understandable
53:14
understanding
13:11  34:24  35:10
63:24  68:3  69:5
96:5
understood  45:11
undertake  78:2
91:2
undertaken  45:25
90:5
undertaking  66:6
undertook  45:24
61:24  90:18
underwriting  36:21
unhappy  50:24
un-hum  6:22
Union  10:10
unique  35:11, 21
UNITED  1:1  35:8
42:14, 17
unlimited  24:11
unsigned  46:22
update  3:16  82:12
update-financial
75:13
Updates  82:23
upgrade  70:20
upgrading  60:2
up-to-date  12:10
Urban  41:20
USA  28:16, 17
use  6:22  17:6, 6
36:19  40:25  80:22

85:8

< V >
Vaguely  21:13
30:9  49:24
Van  75:21
vehicle  33:22
velocity  76:18
version  5:23
video  33:21
view  6:15
vigilant  83:10
vine  81:6
visited  37:4
voice  6:6
VS  1:1

< W >
Wagner  75:21
wait  7:1, 3
waiting  81:4  82:12
waived  4:11, 14, 17
94:4
walked  9:25  86:11
want  6:1, 2, 10
12:10  51:10  54:22
64:4, 6  69:2  76:9
86:13
wanted  50:24
65:1  69:6  84:22
86:3  90:25
water  69:17
way  20:21  47:7
52:25  59:7  74:17
85:15, 16  96:8
ways  100:18, 24
weather  88:7
weekly  52:15, 17
Well  51:16  53:12
54:14  56:11  59:2
65:10  82:19  89:23
91:15  99:7
went  7:24  15:2
18:20  20:18  37:4,
7, 9  47:9  51:20
59:9  64:9  67:24
68:18  71:13  74:7
85:19  92:25  93:16
96:12  97:22, 24
we're  22:22  41:3
55:11

whatsoever  24:12
82:9
winter  58:13
wit  104:5
withdraw  47:13
WITNESS  3:6
4:17  12:6  13:18
23:24  24:1  25:4
32:23  33:2, 14
34:8, 24  35:2  36:3,
5, 7  39:16  40:21
42:4, 8  46:24
56:16  57:10  64:22
71:4  74:13  75:9
82:19  83:17  84:5
92:13  93:11, 20, 25
94:6, 22  95:12
97:2  98:20  100:21
101:3  104:8, 14
word  52:17
words  6:22, 25
55:2  73:1
work  7:24  8:17
33:7, 23  59:5  64:2,
25  76:19  90:4
worked  10:9  76:25
Working  34:11
53:10  54:24  59:15,
17  63:7  68:6, 7, 9,
22  69:1  71:7
82:11
world  14:20  52:9
world's  33:20
worried  55:14
69:9, 19
worse  58:3  77:22,
23
write  39:8
writing  18:19
57:13, 16  81:15
99:21, 24  100:2
104:7
writings  83:1, 4, 7
99:23
written  49:18
wrong  57:4  77:22

< Y >
Yeah  8:14  9:1, 19,
19  10:2, 8, 10, 17,
23  11:20  12:11

13:*23*   14:*20*   16:*24*
17:*1*   18:*16*   25:*4*
34:*12*   36:*15*   40:*17*
51:*25*   58:*25*   62:*4*
86:*24*   87:*22*   91:*15*
98:*17*
**year**   7:*16*   9:*4*
  40:*17*   48:*6, 11*
  49:*10*   50:*11*   83:*23*
**years**   9:*4, 21*
  10:*12*   12:*21*   49:*10,*
*11*   85:*4*
**yell**   55:*25*
**yep**   33:*18*
**York**   13:*21*   21:*15*
  23:*22*   77:*4, 9*

**< Z >**
**ZEISLER**   2:*13, 13*
**Zimmeth**   50:*23*
  51:*3, 10, 13*   52:*3, 5*
  53:*15, 19*   54:*8, 9,*
*14*   55:*10*   56:*9, 18*
  57:*14*   60:*13, 25*
  62:*23*   63:*11, 16*
  64:*1, 9, 20*   68:*13,*
*22*   69:*2, 3, 7*   72:*5*
  74:*1*   79:*7*   81:*23*
  82:*8, 9, 16*   83:*2, 5*
  84:*19*   88:*12, 17*
  89:*5*   95:*16, 24*
  96:*18*   97:*25*   98:*5,*
*6*   100:*7*
**Zimmeth's**   95:*8*
  96:*5*   99:*1*

```
 1                               JURAT

 2

 3          I, John Mark Schmid, do hereby certify that the

 4    foregoing testimony given by me on May 07, 2019, is true and

 5    accurate, including any corrections noted on the corrections

 6    page, to the best of my knowledge and behalf.

 7

 8

 9

10

11                          John Mark Schmid

12

13

14

15          Subscribed to and sworn before me on this  27

16    day of   June        2019.   Eileen O'Connor

17

18                    EILEEN M O'CONNOR
                      Notary Public, State of Connecticut
19    My Notary Expires:  My Commission Expires July 31, 2022

20

21

22

23

24

25
```



EXHIBIT  M

```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT
 2

 3

 4   HUNTINGTON TECHNOLOGY              )
     FINANCE, INC. F/K/A MACQUARIE      )   Civil Action No.
 5   EQUIPMENT FINANCE, INC.            )   3:18-cv-01708-VLB
     F/K/A MACQUARIE EQUIPMENT          )
 6   FINANCE, LLC,                      )
              Plaintiff,                )
 7                                      )
                   VS                   )
 8                                      )
                                        )
 9                                      )
     GARETT ALAN NEFF A/K/A             )
10   GARY NEFF, JOHN MARK SCHMID,       )
     AND DAVID KARL SCHMID,             )
11            Defendants.               )

12

13

14
                    DEPOSITION OF:   DAVID KARL SCHMID
15                  DATE:            May 15, 2019
                    HELD AT:         One Union Place
16                                   Hartford, Connecticut

17

18

19

20

21

22

23
               Reporter:  Tina Davis, LSR #00221
24                 Cassian Reporting, LLC
                        21 Oak Street
25             Hartford, Connecticut 06106
                      860-595-7462
```

```
 1                        APPEARANCES:

 2

          Representing the Plaintiff:
 3
              METZ LEWIS BRODMAN MUST O'KEEFE, LLC
 4            535 Smithfield Street
              Suite 800
 5            Pittsburgh, Pennsylvania 15222
              TEL: (412) 918-1100
 6            Fax: (412) 918-1199
              By:  JOHN R. O'KEEFE, JR., ESQ.
 7                 (via speakerphone)
                   jokeefe@metzlewis.com
 8

 9        Representing the Defendants:

10            ZEISLER & ZEISLER, P.C.
              10 Middle Street
11            15th Floor
              Bridgeport, Connecticut 06604
12            By: ERIC HENZY, ESQ.
                  ehenzy@zeislaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                  S T I P U L A T I O N S

2

3            It is stipulated by counsel for the parties

4     that all objections are reserved until the time of

5     trial, except those objections as are directed to the

6     form of the question.

7

8            It is stipulated and agreed between counsel

9     for the parties that the proof of the authority of the

10    Notary Public before whom this deposition is taken is

11    waived, and that any defects in the notice are waived.

12

13           It is further stipulated that the reading and

14    signing of the deposition transcript by the witness

15    may be signed before any Notary Public.

16

17

18

19

20

21

22

23

24

25
```

```
 1                           INDEX

 2
                                                    Page
 3

 4          Appearances   -------------------------    2

 5          Stipulations  -------------------------    3

 6          Certificate   -------------------------   65

 7


 8   WITNESS: DAVID KARL SCHMID

 9
              DIRECT EXAMINATION BY MR. O'KEEFE -----    6
10

11   ---------------------------------------------------------

12

                T R A N S C R I P T   L E G E N D
13

14     (Sic)             - Exactly as said.
       (Phonetic)        - Exact spelling not provided.
       ( -- )            - Break in speech continuity and/or
15                          interrupted sentence.
       (. . .)           - Indicates omission or word[s]
16                          when reading OR trailing off and
                            not finishing a sentence.
17

18

19

20

21

22

23

24

25
```

```
 1                      Index of Exhibits
                    (Marked for identification)
 2

 3      Exhibit No.      Description                      Page

 4
                    (NO EXHIBITS WERE MARKED)
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 6

1  (Deposition commenced at 10:02 a.m.)

2

3      DAVID KARL SCHMID, Deponent, having been

4  first duly sworn by Tina Davis, LSR, a

5  Notary Public in and for the State of

6  Connecticut, was examined and testified as

7  follows:

8      THE COURT REPORTER:  Usual stipulations?

9      MR. HENZY:  Yes.

10     MR. O'KEEFE:  It's Federal.  No stips.

11     MR. HENZY:  We'll read and sign.

12

13         DIRECT EXAMINATION

14  BY MR. O'KEEFE: (via speakerphone)

15     Q  Mr. Schmid, would you state your name for the

16  record, spell your last name?

17     A  David Karl Schmid.  Karl with a K.  Last

18  name, S-c-h-m-i-d.

19     Q  Mr. Schmid, as you may know, my name is

20  John O'Keefe.  I am counsel to

21  Huntington Technology Finance, which is a successor by

22  acquisition, I think, to Macquarie Equipment Finance

23  in a legal action brought in the

24  United States District Court for the

25  District of Connecticut against you, John Schmid, and

Page 7

1  Gary Neff -- or Garrett Neff.

2      We're here today to take your deposition in

3  connection with information you may be able to provide

4  concerning the facts and circumstances that are

5  embodied in that Complaint and your response to that

6  complaint and in the relationship among the parties

7  that is the subject of the complaint.

8      Although by phone -- you might imagine that

9  I'm sitting across the table from you -- I will ask

10  questions.  And if you're lawyer, were it appropriate

11  to interpose any objection, he will do so and then

12  either allow you to answer the question and not.  It

13  is in the form of question and answer, and so,

14  therefore, you must use verbal responses instead of

15  head shakes or colloquial expressions that may be

16  difficult for the court reporter to transcribe.

17      I'll ask that you allow me to finish the

18  question before you answer, and I will endeavor to try

19  to allow you to finish your answer before I ask the

20  next question.

21      If any portion or the whole of a question

22  that I may ask is unclear to you or you want some

23  clarification or some context, you need to let me know

24  that, otherwise we will assume that if a question is

25  asked and answered you understood the question.  Is

Page 8

1  that acceptable to you?

2      A  Yes.

3      Q  If you'd like to take a break at any time to

4  use the restroom, stretch your legs, talk to your

5  counsel, or for whatever other reason, I'm happy to

6  accommodate that.  Just let me know that.  If there's

7  a question on the table that has been asked, I would

8  ask that you respond to it before you take a break.

9  But otherwise we'll accommodate your need to take a

10  break if you voice that need.  Is that acceptable?

11     A  Yes.

12     Q  Are you aware of anything that would affect

13  your ability to listen, understand, and respond to

14  questions which may be asked today, a medical

15  condition, medication, anything like that?

16     A  No.  There's nothing.

17     Q  Did you review any documents in preparation

18  for your deposition today?

19     A  I reviewed the Complaint and our response.

20     Q  Okay.  Did you review the exhibit binder that

21  Mr. Henzy has?

22     A  I did not.

23     Q  Okay.  Did you talk either to your brother or

24  Mr. Neff about their depositions?

25     A  Generally but not specifically.

Page 9

1      Q  Do you recall -- was the discussion about the

2  experience, or were there particular discussions or

3  conversations?

4      MR. HENZY:  I'm going to -- objection.

5  To the extent the conversations involved me,

6      through e-mail communications or otherwise --

7      MR. O'KEEFE:  Yes.

8  BY MR. O'KEEFE:

9      Q  No.  To be clear, I do not want you to tell

10  me anything that you were provided by your counsel or

11  if either of the two folks whom you may have spoken to

12  generally that testified shared with you comments that

13  your counsel made.  This is strictly information, if

14  anything, that they shared with you about being

15  deposed?

16      MR. HENZY:  In communications where I

17  was not involved.

18      MR. O'KEEFE:  That's correct.

19     A  So no, except for how long it went.

20  BY MR. O'KEEFE:

21     Q  Okay.  Without telling me anything that was

22  shared, did you meet with either or both of Mr. Neff

23  or Mr. Schmid and Mr. Henzy or Mr. Blau?

24      MR. HENZY:  Objection to the form.

25      I don't -- I don't understand the

Page 10

1   question.
2   BY MR. O'KEEFE:
3       Q   Did you meet with Mr. Henzy and/or
4   Mr. Blau and either Mr. Neff and/or Mr. Schmid
5   following their depositions?
6           MR. HENZY:  I mean -- you can answer the
7   question.
8       A   Yes.  I work with Mr. Schmid on a daily
9   basis.  And yes, I met with my attorney before this
10  meeting and conversations after the deposition of both
11  Mr. Neff and Mr. Schmid.
12  BY MR. O'KEEFE:
13      Q   Okay.  Directing your attention to what in
14  the binder has been marked as Plaintiff's Exhibit 1.
15  I ask you to take a look at that and tell me when
16  you're finished.
17          (The Witness reviews Exhibit No. 1.)
18      A   Okay.  Yes.  This is part of the Complaint, I
19  believe.
20  BY MR. O'KEEFE:
21      Q   Are you familiar with the document itself?
22      A   I'm familiar with -- I guess I'm familiar
23  with the document in that I read it.
24      Q   Are you aware that, that is a copy of the
25  lease agreement between Garage Media NY and

Page 11

1   Macquarie Equipment Finance --
2       A   Yes.
3       Q   -- dated October 26, 2010?
4       A   Yes.
5       Q   Is that a document that you would have seen
6   near or around the time that it was executed?
7       A   Yes.
8       Q   And do you recall having seen that document
9   in or around the time that it was executed?
10      A   I don't remember specifically the time frame,
11  but I'm assuming that I -- I read it at the time.
12      Q   Do you recall if there was a person among
13  you, Mr. Schmid and/or Mr. Neff that would have been
14  the principal party having discussions concerning the
15  execution of that document?
16      A   Yes.  Mr. Neff.
17      Q   With who?
18      A   Mr. Neff.
19      Q   Okay.  Let me go back for a minute.  What's
20  your address?
21      A   Home --
22      Q   Your home address.
23      A   Home address or business?
24      Q   That would be fine.  Home is fine.
25      A   4 Old Orchard Way, Tolland, Connecticut

Page 12

1   06084.
2       Q   Can you briefly describe your educational
3   background, starting with the year in which and the
4   high school that you graduated from?
5       A   Sure.
6           Cathedral High School in Springfield, Mass,
7   1987, and University of Connecticut, 1992.
8       Q   What was your degree from the
9   University of Connecticut?
10      A   Chemical engineering.
11      Q   Can you tell me your first gainful employment
12  after graduating from University of Connecticut?
13      A   Yes.  I worked for the
14  Better Business Bureau.
15      Q   In what capacity?
16      A   Salesperson.
17      Q   And for how long did you hold that position?
18      A   Six months.
19      Q   Was that from the time that you graduated or
20  was it later than your graduation?
21      A   It was after I graduated.  I don't remember
22  the specific date.
23      Q   What would your next employment have been?
24      A   We're going back in time.  I probably --
25      Q   No.  We're moving forward.  After the better

Page 13

1   business bureau, what was your next job?
2       A   Yeah.  I don't remember specifically.  I
3   believe it was an interim job working with Propark as
4   a parking attendant.
5       Q   Do you recall when that was?
6       A   No, not specifically.
7       Q   Did either you or any family member have an
8   ownership interest in Propark at that time?
9       A   Yes.
10      Q   Who?
11      A   John Schmid.
12      Q   For how long did you have that job?
13      A   I don't remember.  Months.
14      Q   What came after Propark?
15      A   I had a job as a sales representative at
16  Witco.
17      Q   Where was that?
18      A   That was based out of New York.
19      Q   What was the nature of Witco's business?
20      A   Chemicals.
21      Q   So you sold chemicals?
22      A   Chemicals.
23      Q   Did you sell anything other than chemicals in
24  that job?
25      A   No.  It was -- I sold a wide array of

5/15/2019                          David Karl Schmid                    Page: 8 (14 - 17)

Page 14

1  chemicals that they manufactured.
2      Q  For how long did you hold that position?
3      A  Roughly, I want to say, it was about a year.
4      Q  So are we now in the 1994 range, that you can
5  recall?
6      A  We're now -- yes.
7      Q  What employment followed Witco?
8      A  I came back to work with Propark.
9      Q  In what capacity?
10     A  A parking manager.
11     Q  For how long did you hold that position?
12     A  Oh, boy.  Probably a couple three years.
13     Q  What was involved in being a parking manager?
14     A  Scheduling employees, dealing with a client,
15 doing payroll.
16     Q  So we're now up to about 1997; is that fair?
17     A  Yes.
18     Q  And what employment followed parking manager
19 at Propark?
20     A  I've been with Propark ever since then in
21 different capacities.
22     Q  Can you tell me the different capacities in
23 which you have been with Propark?
24     A  Sure.
25        A general manager, a very brief stint as CFO

Page 15

1  in between -- in between CFOs, and then the chief
2  operating officer, and then the chief investment
3  officer.
4      Q  Is that what you are today?
5      A  Yes.
6      Q  For how long have you held that position?
7      A  Since around 2009.
8      Q  During the time that you worked at Propark
9  since '97, have you worked elsewhere at the same time
10 or at any time.
11     A  We have other companies, but my paycheck has
12 always come from Propark.
13     Q  Okay.
14     A  Or a Propark related company.  Right now my
15 paycheck comes from Parking Real Estate, which is a
16 joint venture.  It's a real estate acquisition
17 company.
18     Q  Okay.  Are you familiar with the entity own
19 as Garage Media New York?
20     A  Yes.
21     Q  Can you tell me when you first became
22 familiar with it and under what circumstance?
23     A  Sure.  I don't remember the specific dates.
24 It was something that John and Gary were working on
25 and that Gary was leading.  And I was included as a

Page 16

1  partner.
2      Q  And the John and Gary to whom you refer, when
3  you refer to them as John and Gary, are John Schmid
4  and Gary Neff; is that correct?
5      A  Yes, sir.
6      Q  What was your understanding of the reason for
7  its organization or formation?  What was it to be?
8      A  Digital display on garages.
9      Q  Do you know whose idea that was to pursue
10 that type of business?
11     A  I don't remember whose specific idea it was.
12     Q  Do you know whether Gary came to John or John
13 to Gary with the idea?
14     A  No, I don't.
15     Q  What was your first understanding of what the
16 nature of the business would be?
17     A  To try to monetize the side of garages,
18 digital displays on garages.
19     Q  When that was shared with you, was there a
20 specific garage or were there specific garages that
21 they were pursuing or talking about?
22     A  I don't know what they were talking about.
23 Ultimately, the first and only one was the
24 Port Authority garage.
25     Q  Do you recall participating in either putting

Page 17

1  together a business plan or discussing a business plan
2  for that first installation?
3      A  I was not specifically involved with that.
4      Q  What, if any, involvement did you have in
5  that -- the process leading up to there being a
6  determination that you would pursue the Port Authority
7  for that opportunity?
8      A  Can you repeat the question?  I'm sorry.
9      Q  What participation did you have in the
10 process that included, at a minimum, John and Gary,
11 that ultimately led to them and/or you having
12 discussions with the Port Authority about that
13 opportunity?
14     A  I had very limited involvement.
15     Q  Would it be fair to say that your involvement
16 principally was as a passive either investor or
17 participant?
18     A  I was --
19        MR. HENZY:  Object to form.  You can
20 answer.
21     A  Yes.  I was mostly passive.  I would be
22 included in some conversations around e-mails, but the
23 decisions -- day-to-day decisions were made by,
24 primarily, Gary.

Page 18

BY MR. O'KEEFE:
Q  Do you recall participating in any visits,
either with John or Gary to see the signage in Miami,
for example?
A  I did not go to Miami, no, with them.  No.
Q  Did you go anywhere to see any type of a sign
on a garage or parking structure?
A  I'm in the parking business, so I may have
seen garages with signs on them.  But digital GKD
displays, I did not see any.  No.
Q  Did you participate in a meeting with John or
Gary and GKD in Europe?
A  No.
Q  Did you participate in meeting with John or
Gary and GKD in the United States before the
implementation of the signage on the Port Authority
garage?
A  I don't remember.  I don't believe I did, but
I don't remember.
Q  Do you recall investing money in Garage Media
for the Port Authority project?
A  Yes, I invested money.
Q  Do you recall how much?
A  Not specifically, but somewhere around
700,000 over the course of time.

Page 19

Q  Did you participate in any meetings with John
and/or Gary and A2aMEDIA during the time that the
Port Authority project was being discussed and before
it actually happened?
A  Probably, but I don't remember specifically.
Q  Do you know who the contact was in your group
or contacts in your group with A2aMEDIA?
A  Primarily Gary.
Q  And do you know who brought A2aMEDIA to
Garage Media to work with it in connection with the
Port Authority opportunity?
A  I don't remember.
Q  Do you know whether it was a representative
of Macquarie?
A  I don't remember that either.
Q  Do you recall how, if at all, you were
introduced to A2aMEDIA in connection with the
opportunity?
A  I don't remember.
Q  Do you remember if you were introduced to the
A2aMEDIA folks in connection with the opportunity?
MR. HENZY:  Object to the form.  You can
answer.
A  I don't remember how -- how we -- how we met
them.

Page 20

BY MR. O'KEEFE:
Q  No.  I'm asking do you recall whether you met
with anyone from A2aMEDIA in connection with the
Port Authority opportunity?
A  I believe I answered that before and said I
do -- I do believe I met with them, but I don't
remember the specifics.
Q  Okay.  Did you participate in the decision to
work with A2aMEDIA on the Port Authority opportunity?
A  I don't recall specifically.  I probably was
involved in the conversation, but I was a minority
partner.
Q  Okay.  Do you recall how Garage Media was
introduced to Macquarie in connection with the
Port Authority opportunity?
A  I believe it was through a group in Stamford,
Connecticut that Gary had contact with.
Q  Do you remember the name of the group?
A  I don't.
Q  Was it Johnson Fretty?  Does that ring a
bell?
A  It does ring a bell.
Q  Was that the group?
A  Yes, that was the group.
Q  Do you recall having discussions with

Page 21

Johnson Fretty about the opportunity at that time?
A  I don't remember.  No.
Q  Do you recall ever having been presented with
a business proposal that had been prepared by or for
Garage Media about the Port Authority opportunity?
A  Can you repeat the question one more time?
Q  Do you recall having been presented a
business proposal, whether it was from Gary, your
brother, both of them, someone from Johnson Fretty, or
somebody else a business proposal prepared for
Garage Media, which laid out the opportunity with the
Port Authority?
A  I vaguely remember it, but not specifically.
Q  Would you have participated in the
preparation of such a document?
A  I would not have participated in the
preparation.  I might have reviewed the document.  But
I don't remember.
Q  Do you recall ever meeting with any
representatives of Macquarie regarding financing for
the Port Authority garage?
A  I met with Gary and John and Patty Magrin a
few times.  And I may have met another time in
New York.  But very limited.
Q  Would all of those meetings have occurred in

Page 22

1  New York?
2      A  No.  Patty Magrin meetings could have been in
3  Connecticut.
4      Q  Did you ever travel to Michigan to meet with
5  other representatives of Macquarie?
6      A  I traveled once to Bloomington Hills.  I
7  don't remember if it was before or after the board
8  went up.
9      Q  Do you recall why?
10     A  No.
11     Q  Do you recall who you met with?
12     A  I believe -- not specifically.  I believe
13  John Zimmeth was there.  There was a gentleman from --
14  a younger gentleman from Australia there.  And I
15  believe Patty Magrin was there.  But, again, I don't
16  specifically remember.
17     Q  And you don't recall what the purpose for
18  that meeting was?
19     A  I don't.
20     Q  Were Gary and John participants in that
21  meeting, as well?
22     A  I believe Gary was a participant.  I don't
23  believe John was.  But I don't remember specifically.
24     Q  In connection with the entity known as
25  Garage Media New York and the Port Authority sign

Page 23

1  project, did you have any day-to-day role in
2  Garage Media in connection with that project?
3      A  No.
4      Q  Ever?
5      A  No.
6      Q  How would you know the status of that project
7  from day-to-day?
8      A  Only if I'm copied on e-mails.
9      Q  And who would be the person that would
10  provide that information?
11     A  Whoever sent the e-mail.
12     Q  In terms of the day-to-day operation, was
13  there a person that was in charge for Garage Media?
14     A  Right.  As I previously said, Gary Neff was
15  our day-to-day person.
16     Q  And aside from Mr. Neff, do you recall anyone
17  else keeping you apprised of what was going on with
18  Garage Media from day-to-day?
19     A  From time to time John may have sent me an
20  e-mail if Gary didn't cc me on something.  But
21  typically if I got anything on Garage Media, it was
22  from Gary.
23     Q  All right.  Turning back to Exhibit 1 for a
24  minute.  Do you recall having been involved in either
25  the review or negotiation of that document?

Page 24

1      A  No.
2      Q  And did you guys have counsel -- you guys
3  meaning you, Gary, John, Garage Media New York -- have
4  counsel who participated in the closing of that
5  transaction?
6      A  Yes.
7      Q  And do you know whether that counsel also
8  represented you individually in connection with the
9  transaction?
10     A  No, I don't know.  Or I don't remember.
11     Q  Do you recall having a lawyer represent you
12  individually in connection with that transaction?
13     A  I do not remember that.  No.
14     Q  Okay.  Directing your attention to Exhibit 2
15  for a moment.  Take a look at that and tell me when
16  you're finished.
17     A  Okay.
18        (The Witness reviews Exhibit No. 2.)
19  BY MR. O'KEEFE:
20     Q  Can you -- do you recognize that document?
21     A  I see I signed it, but I don't remember it.
22     Q  Would you agree that it appears to be a true
23  and correct copy of the guarantee dated
24  October 26, 2010?
25     A  It for sure is my signature on the -- on the

Page 25

1  copy of the exhibit.
2      Q  So your signature appears on the third of
3  three pages of that exhibit; is that correct?
4      A  Yes.
5      Q  Directing your attention to paragraph 2 of
6  that on the first page toward the second sentence --
7  I'm sorry.  I need my glasses here.  The middle of the
8  first sentence says, "Guarantor unconditionally
9  guarantees to Macquarie the full and prompt payment
10  observance and performance when due of all obligations
11  of obligor arising under the agreements (collectively
12  the 'guaranteed's obligations')."
13        Does that language appear in the middle of
14  that section?
15     A  Yes.
16     Q  And then it goes on to say, "This guarantee
17  is absolutely continuing, unlimited, and independent
18  and shall not be affected, diminished, or released for
19  any reason whatsoever, including the following," and
20  then it goes on to have a list after that.  Do you
21  agree that language appears in the guarantee?
22     A  Yes.
23     Q  As you sit here today, you don't recall
24  having signed this guarantee back in 2010?
25     A  No.  But that is my signature.

Page 26

1    Q  Okay.  Were you involved in any amendments to
2  the lease in terms of acting as a representative of
3  Garage Media?
4    A  I don't remember being involved, no.
5    Q  Were you aware that there were some
6  amendments to the lease?
7    A  Yes.
8    Q  Do you recall, near in time to the
9  amendments, that you had knowledge of the reason for
10  the amendment?
11    A  I don't specifically recall each amendment
12  and the reason for each amendment.
13    Q  So would it be fair to say that the person
14  who would have dealt with Macquarie in connection with
15  those amendments would have been Mr. Neff?
16    A  Yes.
17    Q  The principal contact; is that fair?
18    A  Yes.
19    Q  I direct your attention to Exhibit 4.  If you
20  could take a look at that and tell me when you're
21  finished.
22      (The Witness reviews Exhibit No. 4.)
23    A  Okay.
24  BY MR. O'KEEFE:
25    Q  Do you recall that document?

Page 27

1    A  Not specifically, no.
2    Q  Do you know whether or not such -- strike
3  that.
4      Do you know if a document like this was
5  prepared by Garage Media or for Garage Media to
6  present to Macquarie?
7    A  I don't.  I don't know.
8    Q  Do you recall having participated in the
9  preparation or review of a document to be presented to
10  Macquarie?
11    A  I don't remember.
12    Q  I believe you already testified that you did
13  not.  But do you recall having gone to Michigan to
14  make a presentation to Macquarie in connection with
15  efforts to obtain financing?
16    A  I definitely made a trip to Michigan.  I
17  don't remember what the trip was for or when it was.
18    Q  And you testified before that you weren't
19  certain that it was before or after the sign went up;
20  is that correct?
21    A  That's correct.
22    Q  Okay.  Looking at the second page of this
23  document, it talks about Garage Media having been
24  founded in 2009 and that you were one of the folks
25  identified in management.  Do you recall that it was

Page 28

1  founded in 2009?
2    A  Yes.  It says it right here.
3    Q  But I'm asking if that's something that you
4  recall --
5    A  I don't remember the specific date it was
6  founded.
7    Q  Okay.  And it talks about an alliance with
8  Propark America and A2aMEDIA.  Do you recall that
9  being the case?
10      MR. HENZY:  Object to the form.
11    A  I see it written here, but I don't understand
12  the question.
13  BY MR. O'KEEFE:
14    Q  Do you have a recollection that Garage Media
15  had an alliance with Propark America and/or an
16  alliance with A2aMEDIA?
17    A  So two of the -- John and I are a part of
18  Propark.  So there were people from Propark involved,
19  but Propark itself wasn't involved, to my
20  recollection.
21    Q  Okay.
22    A  And A2aMEDIA, again, I wasn't involved in
23  those specific discussions with them.
24    Q  Okay.  Next page, which is titled
25  Garage Media partners, again identifies

Page 29

1  Propark America and GKD USA.  Do you recall GKD USA
2  being a partner with Garage Media?
3    A  I mean, they weren't -- they weren't partners
4  in a sense of a financial partner.  They're more like,
5  you know, we say we partner with our attorney.  We're
6  partnering with them.  We're not partners.
7    Q  So it's a business affiliation or relation?
8    A  Right.  Not an investment relation or a
9  membership relation.
10    Q  All right.  Turning two pages ahead on the
11  bottom right.  It's 1153.  Garage Media partners.
12  There's a presentation for A2aMEDIA; do you see that?
13    A  Yes.
14    Q  Do you recall how it was that Garage Media
15  chose GKD as the provider for the signage?
16    A  No.
17    Q  Do you see on this page, the second bullet
18  from the bottom, A2a has security exclusive license to
19  distribute the media mesh project from GKD?  Do you
20  recall that A2a immediate had the exclusive license
21  for the media mesh sign from GKD?
22    A  Not specifically, but vaguely.
23    Q  Do you recall whether or not the
24  Port Authority required the signage to have certain
25  specifications and that the only one that satisfied

5/15/2019                David Karl Schmid                Page: 12 (30 - 33)

Page 30

1  that was GKD media mesh sign?
2     A  That was my understanding.
3     Q  Do you recall that A2aMEDIA worked with the
4  folks in Miami on the signage that was utilized down
5  there?
6     A  I'm sorry.  You mentioned --
7     Q  Did you know that?
8     A  You mentioned that earlier, I believe.
9     Q  I'm asking whether or not you have a
10  recollection that, that was the case.
11     A  I vaguely remember that was the case, yes.
12     Q  And I didn't ask you this.  Do you know how
13  GKD came to be selected as the provider for the
14  signage?
15     A  Not -- not specifically.  I wasn't involved
16  in that whole part of the decision.
17     Q  Okay.  Directing your attention to Exhibit 5.
18  If you'd take a look at that and tell me when you're
19  finished.
20     A  Okay.  I have it open.
21     Q  Pardon me?
22     A  I have it -- I have it open, and I see what's
23  there.
24     Q  Do you recognize that document?
25     A  It looks like a media piece.

Page 31

1     Q  Do you know who prepared that document?
2     A  I don't know specifically, no.
3     Q  Do you recall what it was prepared for?
4     A  No, not specifically.
5     Q  Do you see on the front page partnered with
6  A2aMEDIA, GKD, Metal Fabrics?  Do you recall them
7  being partners -- perhaps not legally, but in the
8  business transaction -- with Garage Media?
9     A  Again, it was an affiliation.  It wasn't a
10  partnership and membership interest situation.
11     Q  Do you know what arrangement Garage Media had
12  with A2aMEDIA in connection with the transaction?
13        MR. HENZY:  Object to the form of the
14  question.
15        You can answer.
16     A  My recollection is that they got commission
17  on sales, but I don't remember what the specific
18  commissions were.
19  BY MR. O'KEEFE:
20     Q  Okay.  Do you recall that they were at one
21  time the exclusive sales agent for Garage Media in
22  connection with the signage?
23     A  Yes.
24     Q  Who would have been the person at
25  Garage Media to interact with A2aMEDIA on a daily

Page 32

1  basis?
2     A  Gary Neff.
3     Q  And that's not something that you
4  participated in on a daily basis; is that correct?
5     A  That is correct.
6     Q  Would the same be true with dealings between
7  Garage Media and GKD?
8     A  The question is what specifically?
9     Q  Would Gary Neff be the principle contact from
10  day-to-day with GKD and you would not have dealings
11  with GKD?
12     A  Yes.
13     Q  I direct your attention to Exhibit 6.  Tell
14  me when you've had a chance to look at that.
15        (The Witness reviews Exhibit No. 6.)
16     A  Okay.
17  BY MR. O'KEEFE:
18     Q  Do you recognize that document?
19     A  No.
20     Q  For the record, would you agree that it's
21  titled Display Agreement Between CBS Outdoor Group,
22  Inc., Garage Media New York, and the Port Authority of
23  New York and New Jersey?
24     A  Yes.
25     Q  Who on behalf of Garage Media, if anyone,

Page 33

1  would have been the principle contact with CBS Outdoor
2  and the Port Authority in connection with this type of
3  document?
4     A  I would assume it was Gary Neff.  It looks
5  like Gary was the signator on this document.
6     Q  Fair to say that you played little or no role
7  in connection with either the negotiation or execution
8  of this document?
9     A  Yes.
10     Q  Do you recall there being some delays in the
11  time it took to get the sign up and running?
12     A  I don't remember that.
13     Q  Do you have any recollection today about when
14  the sign did begin to operate?
15     A  No.  I don't remember the dates.
16     Q  Do you remember Garage Media talking to
17  anyone other than Macquarie for financing of the
18  project?
19     A  I -- I don't remember that.  Johnson Fretty
20  may have.  But I don't remember that.
21     Q  Do you know whether or not Garage Media did
22  talk to anyone other than Macquarie to consider
23  financing for the sign?
24     A  I don't remember.
25     Q  Is that something which you believe was

Page 34

1 entrusted to Johnson Fretty?
2    A  In part, not necessarily in full.  But I
3 don't -- I don't remember.
4    Q  Okay.  Do you know what Johnson Fretty was
5 retained to do in connection with the sign project?
6    A  I don't remember specifically, no.
7    Q  And would the principle person from
8 Garage Media dealing with Johnson Fretty have been
9 Mr. Neff?
10    A  Yes.
11    Q  I'm going to direct your attention for a
12 moment to Exhibit 10.  I'll ask if you take a look at
13 that and tell me when you're finished.
14       (The Witness reviews Exhibit No. 10.)
15 BY MR. O'KEEFE:
16    Q  Okay.  Do you recognize that letter?
17    A  No.
18    Q  Would it have been Mr. Neff's practice, when
19 corresponding with parties related to the sign
20 project, to have copied you on such correspondence?
21    A  Sometimes yes, sometimes no.
22    Q  Do you recall, near in time to the sign going
23 live, Mr. Neff, on behalf of Garage Media, soliciting
24 the Port Authority for an extension of the permit?
25    A  I don't -- I don't remember that.

Page 35

1    Q  Okay.  I direct your attention to Exhibit 11.
2 Tell me when you've had an opportunity to go look at
3 that.
4       (The Witness reviews Exhibit No. 11.)
5    A  Okay.
6 BY MR. O'KEEFE:
7    Q  Do you recognize that document?
8    A  No.
9    Q  Do you recall ever having seen the document?
10    A  I don't recall specifically seeing this
11 document.
12    Q  And you would agree that it appears to be
13 titled A2aMEDIA Next Generation Urban Digital Media
14 Investor Presentation?
15    A  That's the front page, yes.
16    Q  Okay.  Do you see on the second page it says
17 Exclusive Rights Agreement?
18    A  Yes.  I see a sub bullet point.  Yes.
19    Q  And I think I asked you before, and you said
20 you don't recall whether or not they had an exclusive
21 right to distribute the media mesh sign for GKD?
22       MR. HENZY:  Object to the form of the
23    question.
24       You can answer.
25    A  Yeah.  I don't -- I don't remember.

Page 36

1 BY MR. O'KEEFE:
2    Q  Okay.  Turning several pages, on the bottom
3 right it says 746.
4    A  Okay.
5    Q  In the middle of that page it talks about --
6 or there's a heading Financing Partners, and beneath
7 that, "Garage Media, 10 million raised,
8 20 to 30 million more committed."  Do you see that
9 there?
10    A  Yes.
11    Q  Do you recall that being the case?
12       MR. HENZY:  Object to the form.  You can
13    answer.
14    A  I don't remember.
15 BY MR. O'KEEFE:
16    Q  Do you recall Garage Media investing
17 $10 million in a project or projects with A2aMEDIA?
18    A  The only project we ever did was the project
19 at the port, and whatever that amount was would have
20 been the amount.  So I don't -- I mean, no, I don't
21 remember that specifically.  But we only did one
22 project.
23    Q  Okay.  And so the part 20 to 30 million more
24 committed may have been a concept, but it wasn't a
25 fact?

Page 37

1    A  I didn't say that.  I don't know what Gary
2 had necessarily, conversations or who was committing
3 that.  I don't know what that's referring to.
4    Q  Okay.  And the next heading,
5 Strategic Partners, the second bullet,
6 "Garage Media-Garage Network."  Do you know what was
7 meant by Garage Network?
8    A  No.
9    Q  Was there or is there an entity by that name?
10    A  Not that I know of.
11    Q  Okay.  To the best of your knowledge, aside
12 from the Miami Heat application of the same
13 technology, were you aware of any other prior use of
14 the technology before the Port Authority project?
15    A  I believe there was one in Europe, but I
16 don't -- I don't specifically remember where.  I
17 think -- that's all I remember.  But I don't -- there
18 could have been.  I don't know.
19    Q  Okay.  Would it be fair to say that in
20 selecting that technology for application on the
21 Port Authority that you relied upon A2aMEDIA in its --
22 in that choice?
23    A  I don't know if that's true or not.
24    Q  Would that have been somebody else's
25 decision, not yours?

**Page 38**

1    A  It wasn't my decision.  But I don't -- I
2 don't know who made that decision specifically.  It
3 was -- it was the technology that was chosen.  I don't
4 know.
5    Q  Do you have a recollection of how A2aMEDIA
6 performed in connection with its efforts to procure
7 customers for the board?
8        MR. HENZY:  Objection to the form.
9        You can answer.
10    A  They general -- I can generally answer the
11 question.  I know they didn't perform as we all had
12 hoped or expected.
13 BY MR. O'KEEFE:
14    Q  Okay.  Directing your attention for a moment
15 to exhibit 13.  If you'll take a look at that and tell
16 me when you're finished.
17    (The Witness reviews Exhibit No. 13.)
18    A  Okay.
19 BY MR. O'KEEFE:
20    Q  Do you recognize this document?
21    A  Not specifically, no.
22    Q  Do you recall, on behalf of Garage Media,
23 that Mr. Neff corresponded with A2aMEDIA, roughly six
24 months after the sign went live, expressing
25 dissatisfaction with their sales efforts?

**Page 39**

1    A  I don't remember the specific time frame.  I
2 do know that he expressed dissatisfaction.
3    Q  And is that something which he shared with
4 you?  And that is to say within, approximately, six
5 months the sign going live that he was disappointed
6 with the performance of A2aMEDIA?
7    A  I don't remember that conversation within six
8 months.  I don't remember the time frame.
9    Q  Do you remember hearing from him from time to
10 time that he was disappointed with the performance of
11 A2aMEDIA?
12    A  Vaguely, but not specifically.
13    Q  Do you recall having any discussion with him
14 where he expressed his intention to terminate the
15 exclusive agency for A2aMEDIA?
16    A  We were getting -- I do know -- not
17 specifically, I do know we were getting a lot of
18 pressure from Macquarie to change out the sales agent.
19    Q  Tell me more about what you recall of that.
20    A  So I wasn't directly involved in any of those
21 discussions or meetings.  But both Gary and John were,
22 and I would hear from time to time from them about
23 meetings they had or e-mails they had with respect to
24 Macquarie, specifically John Zimmeth focusing on
25 changing out the sales, the sales team.

**Page 40**

1    Q  And fair to say that all of your knowledge on
2 that subject comes either from Gary Neff or
3 from John Schmid and not directly from communications
4 that you may have had, if any, with Macquarie?
5    A  Yes.
6    Q  Do you recall separate and apart from them --
7 either or both of them sharing those thoughts, do you
8 recall either or both of them independently sharing
9 their own view that A2aMEDIA was not performing up to
10 expectations?
11    A  Repeat the question, please.
12    Q  Aside from either Gary or John sharing the
13 thoughts that you describe from somebody at Macquarie,
14 do you remember either Gary or John sharing their own
15 thoughts, independent of Macquarie, that they were
16 disappointed with the performance and/or that A2a was
17 underperforming?
18        MR. HENZY:  Object to the form.
19        THE WITNESS (SCHMID):  Answer?
20        MR. HENZY:  Yes.
21    A  So yeah.  We were all putting money in, so we
22 all were -- and I don't remember the specific time
23 frames of that.  So the board wasn't performing for
24 sure.  And we were getting a lot of pressure to
25 change.  And if we didn't change, there was the threat

**Page 41**

1 of default.  So yes, we had those conversations among
2 ourselves.  But I don't remember them specifically.
3 Just generally that was the sense.
4 BY MR. O'KEEFE:
5    Q  Okay.  When you said that there will be a
6 default, how would there be a default?
7        MR. HENZY:  Object to the form.
8    A  If payments weren't able to be made.  So we
9 made payments, in part, utilizing our own moneys.
10 BY MR. O'KEEFE:
11    Q  So when you used the expression the threat of
12 default, you meant the inability of Garage Media to
13 kindly pay under the lease; is that right?
14    A  Correct.  My understanding was that
15 John Zimmeth was very involved and was getting reports
16 on the board and knew the board wasn't performing.
17 And, you know, there was pressure to make sure we made
18 payments.  And we did.  And we contributed -- John,
19 Gary, and myself contributed moneys to make sure that
20 we didn't end up in that position.
21    Q  At some point do you recall that Garage Media
22 stopped paying?
23    A  At some point.  I don't remember the date.
24    Q  Okay.  But before that happened, you recall
25 there being performance issues with the board you just

**Page 42**

1  described; right?
2      A  Yes.  And they got worse after -- after the
3  change of sales agents from A2a.
4      Q  Okay.  Let's back up a minute, though.
5      Do you have a recollection that A2a did not
6  perform up to either expectations or what was
7  necessary for Garage Media to meet its financial
8  obligations?
9      A  Yes.  Generally.
10     Q  Do you recall, independent of any complaints
11  that Macquarie may have had and that you've
12  articulated, that Gary Neff also expressed
13  dissatisfaction with A2aMEDIA's performance?
14     MR. HENZY:  Objection to the form and
15  also asked and answered.
16     You can answer again.
17     A  Again, we had general conversations.  We were
18  contributing money.  And so to that extent, yes.  I
19  mean, during that time Gary also invested money into
20  A2a so that we could have, you know, more leverage
21  with them to try to get more pressure, to get more
22  sales.  So we -- you know, Gary specifically invested
23  into them.
24     So it wasn't a desire necessarily to change.
25  But we didn't think we had a choice.  It wasn't

**Page 43**

1  performing, and we were getting a lot of pressure.
2  BY MR. O'KEEFE:
3      Q  Do you remember Gary independently writing to
4  A2aMEDIA a number of times, first advising that they
5  were underperforming and that he was considering
6  terminating the nonexclusive agency; do you remember
7  that?
8      A  Not -- not specifically.  I mean, other
9  than -- I'm looking at some -- I don't know if you're
10  referring to Exhibit 13.  But I don't remember
11  specifically.
12     Q  Well, I directed your attention to it just to
13  ask generally if you have a recollection near in time
14  to when the sign went live that A2aMEDIA was
15  underperforming and Mr. Neff, on behalf of
16  Garage Media, so advised them.
17     MR. HENZY:  I'm sorry.  Is that a
18  question?
19     MR. O'KEEFE:  Yes.
20     MR. HENZY:  Object to the form.
21  BY MR. O'KEEFE:
22     Q  Do you recall --
23     MR. O'KEEFE:  I'll reformulate the
24  question.
25     MR. HENZY:  Okay.

**Page 44**

1  BY MR. O'KEEFE:
2      Q  Do you recall, within the first six months
3  after the sign went live, Mr. Neff, on behalf of
4  Garage Media, advising A2aMEDIA of his disappointment
5  with their performance and that he was considering
6  terminating the exclusive agency relationship?
7      MR. HENZY:  Objection to the form and
8  also asked and answered.
9      You can answer.
10     A  No, I don't recall.
11  BY MR. O'KEEFE:
12     Q  Do you recall -- did you have any discussion
13  with Mr. Neff about actually terminating the exclusive
14  agency of A2a?
15     A  I don't specifically remember that.
16     Q  Do you recall whether or not Mr. Neff ever
17  acted on behalf of Garage Media to terminate the
18  exclusive agency of A2aMEDIA?
19     A  I don't specifically remember that.  I know
20  it was done because of pressure from Macquarie.  That
21  was my recollection.
22     Q  Again, that recollection stems from what you
23  were told either by Mr. Neff or your brother?
24     A  Yes.
25     Q  Okay.  Do you recall Garage Media having

**Page 45**

1  terminated the nonexclusive -- I'm sorry, the
2  exclusive agency and hiring Liquid Outdoor?
3      A  No, I don't remember that.
4      Q  Do you have any knowledge whether at any time
5  during its relationship with Garage Media A2aMEDIA met
6  a sales goal?
7      A  I don't remember.
8      Q  Do you recall a time when Garage Media hired
9  Field Activate to do a study regarding A2aMEDIA's
10  performance and Garage Media's experience both with
11  marketing and with the signage?
12     A  Vaguely.  Vaguely remember that now that
13  you're mentioning it.
14     Q  Do you recall the circumstances under which
15  that study was commissioned by Garage Media?
16     A  No.
17     MR. HENZY:  Objection to form.
18     THE WITNESS (SCHMID):  Sorry.
19     MR. HENZY:  That's okay.  That's fine.
20     THE WITNESS (SCHMID):  Sorry.
21     A  No, I don't remember.
22  BY MR. O'KEEFE:
23     Q  Is that something -- a decision in which you
24  participated; do you recall?
25     A  I don't recall.

Page 46

1    Q   Do you remember such a study being
2  undertaken?
3    A   As I mentioned before, vaguely, now that you
4  mentioned it, but I don't remember the specifics of
5  it.
6    Q   And I take it that you, without refreshing
7  your recollection in some way, if at all, don't have
8  any recollection of the outcome of that study, any
9  recommendations that were made as a result of that
10 study?
11   A   No, I don't.
12   Q   Do you recall that it was undertaken by
13 Field Activate?
14   A   No.
15   Q   And do you know whether or not the notion of
16 having that study undertaken was done by Gary Neff of
17 his own volition?
18   A   No.
19   Q   Do you recall Mr. Neff ever telling you that
20 Field Activate recommended that the relationship with
21 A2a be terminated?
22   A   No.
23   Q   Do you recall being advised that
24 Field Activate recommended that Garage Media send out
25 an RFP for sales agents?

Page 47

1    A   No.
2    Q   Do you remember Garage Media putting
3  together, itself or with the assistance of
4  Field Activate, an RFP looking for a new sales agent?
5    A   I don't remember that.
6    Q   Do you recall at some point that A2aMEDIA's
7  agency was terminated?
8    A   Yes, but I don't remember when.
9    Q   Do you remember the circumstances under which
10 it was terminated?
11   A   My understanding was that we were receiving a
12 lot of pressure from Macquarie to make a change, and
13 we were putting money into the board to make payments
14 and there was the threat of potential nonpayment
15 default. So that was my understanding of why we made
16 a change.
17   Q   You made a change because you were fearful of
18 a payment default?
19       MR. HENZY:  Objection to the form of the
20 question.  I think the --
21 BY MR. O'KEEFE:
22   Q   I'm trying to understand the testimony that
23 you just gave.
24   A   Sure.
25       I think it goes back to what I testified

Page 48

1  before, which was we were putting money in to make
2  payments.  We were getting pressure from John Zimmeth
3  to make a change.  And so we made a change because
4  there was the threat of default if -- if we didn't
5  make a change.  And we were worried about that.
6  BY MR. O'KEEFE:
7    Q   So did you have an understanding yourself or
8  through what you were advised by Gary Neff or your
9  brother that, separate and apart from a payment
10 default, Macquarie had the ability to declare a
11 default having to do with A2aMEDIA?
12   A   No.
13       MR. HENZY:  Objection.
14       THE WITNESS (SCHMID):  Sorry.
15 BY MR. O'KEEFE:
16   Q   So if you elected not to replace A2aMEDIA and
17 you paid your bills, you would agree that there would
18 be no default?
19       MR. HENZY:  Objection to the form of the
20 question.
21   A   Yeah.  If bills were paid, there would be no
22 default.
23 BY MR. O'KEEFE:
24   Q   And so I'm trying to understand the
25 connection between A2aMEDIA and a default.

Page 49

1        MR. HENZY:  Objection to the form of the
2  question.
3  BY MR. O'KEEFE:
4    Q   You testified that because of pressure from
5  Macquarie to replace A2aMEDIA you were fearful of a
6  default and so you took action based upon that
7  concern; is that a fair statement?
8        MR. HENZY:  Objection to the form of the
9  question.
10   A   The board wasn't performing.  Macquarie was
11 in the loop that the board wasn't performing,
12 specifically John Zimmeth.  There was pressure to
13 change the sales agent to get to performance.  We made
14 up the difference by putting in money, our own
15 personal money.  And because of that pressure, we made
16 a change.  That was my understanding.
17 BY MR. O'KEEFE:
18   Q   Again, that comes from Gary and/or John, your
19 brother; right?
20   A   Yes.
21   Q   I'm just trying to understand how there is
22 any potential for default by not replacing A2aMEDIA,
23 and I don't -- I don't understand that based upon what
24 you told me.  That's what I'm trying to understand.
25       MR. HENZY:  So --

**Page 50**

1  BY MR. O'KEEFE:
2   Q  Can you explain that?
3    MR. HENZY:  Objection to the form of the
4  question.
5    I think it was asked and answered,
6  John.
7    MR. O'KEEFE:  Well, it actually hasn't
8  been answered.
9    MR. HENZY:  Okay.  Well -- okay.  I
10  mean --
11    MR. O'KEEFE:  I'll ask a different
12  question.
13    MR. HENZY:  I think he's given his
14  answer.  But go ahead.
15  BY MR. O'KEEFE:
16   Q  Is it your belief that a refusal to replace
17  A2aMEDIA would have caused or could have caused a
18  default under the lease?
19    MR. HENZY:  Objection to the form of the
20  question.
21   A  My understanding was that if we didn't change
22  the sales people that Macquarie was going to start to
23  take action.
24  BY MR. O'KEEFE:
25   Q  And was it your understanding that, that

**Page 51**

1  action would be taken as a direct consequence of not
2  replacing A2aMEDIA?
3   A  That is my understanding.
4   Q  Okay.  Do you recall A2aMEDIA having been
5  terminated?
6   A  Yes.  I don't know when.
7   Q  Okay.  Is it your testimony that, that was
8  not a decision that was made by Garage Media for its
9  own benefit?
10    MR. HENZY:  Object to the form.  Of the
11  question.
12   A  Can you repeat the question?
13  BY MR. O'KEEFE:
14   Q  Is it your understanding that the decision to
15  terminate A2aMEDIA's sales agency with Garage Media
16  was not a decision made by Garage Media for its own
17  benefit?
18    MR. HENZY:  Objection to the form of the
19  question.
20   A  Yes.  Yes, that's my understanding.
21  BY MR. O'KEEFE:
22   Q  Do you recall who replaced Garage Media --
23  I'm sorry.  Who replaced A2aMEDIA?
24    MR. HENZY:  Object to the form of the
25  question.

**Page 52**

1  BY MR. O'KEEFE:
2   Q  I'll finish the question.
3    Do you recall who replaced A2aMEDIA as
4  Garage Media's sales agent?
5    MR. HENZY:  Object to the form of the
6  question.
7    You can answer it if you understand.
8   A  If you told me the name, I could confirm it,
9  but I don't remember it off the top of my head.
10  BY MR. O'KEEFE:
11   Q  Did you participate in the consideration of
12  other potential sales agents to be hired by
13  Garage Media upon A2aMEDIA's termination?
14   A  Not directly, no.
15   Q  What degree of participation or how did you
16  participate?
17   A  I probably -- I don't remember specifically.
18  I probably received e-mails.
19   Q  Do you recall actually participating in the
20  selection?
21   A  I don't recall actually participating in the
22  selection.
23   Q  Do you recall someone having made a
24  recommendation to you with which you agreed?
25   A  I don't specifically remember the -- any

**Page 53**

1  recommendation.
2   Q  Does Clear Channel Outdoor ring a bell?
3   A  Yes.
4   Q  Do you recall that Clear Channel Outdoor
5  entered into a management agreement at or about the
6  time that A2aMEDIA was terminated by Garage Media?
7   A  Yes, now that you mention the name.
8   Q  And do you recall whether Garage Media had
9  any other relationship with Clear Channel Outdoor
10  other than as a sales agent for the board?
11    MR. HENZY:  Objection to the form of the
12  question.
13   A  I don't remember that.
14  BY MR. O'KEEFE:
15   Q  Do you remember if Clear Channel Outdoor
16  lent -- ever lent money to Garage Media?
17   A  I don't.  I don't remember that.  No.
18   Q  Do you recall whether or not Garage Media
19  ever entered into discussions with Clear Channel for
20  Clear Channel to buy Garage Media?
21   A  I vaguely remember that we were talking to at
22  least -- at least one group to buy Garage Media, but I
23  don't remember who it was.  I wasn't actively involved
24  in any of those conversations.
25   Q  Okay.

5/15/2019        David Karl Schmid        Page: 18 (54 - 57)

Page 54

1      (An off the record discussion was held.)

2

3      (A recess was taken from

4      11:11 a.m. to 11:18 a.m.)

5

6      DIRECT EXAMINATION (cont.)

7 BY MR. O'KEEFE:

8     Q   Mr. Schmid, are you aware of any writing by

9 anyone at Macquarie directing or instructing

10 Garage Media to terminate A2aMEDIA's sales agency

11 agreement?

12     A   No.

13     Q   Are you aware of any e-mail from Macquarie in

14 which a representative of Macquarie instructed or

15 directed Garage Media to terminate A2aMEDIA's sales

16 agency agreement?

17     A   No.

18     Q   Are you aware of any writing by a

19 representative of Macquarie, whether a letter or an

20 e-mail, in which it advised Garage Media that it would

21 take or not take certain action if Garage Media did

22 not terminate A2aMEDIA's sales agency agreement?

23     A   No.

24     Q   You talked before about problems with the

25 board. When you said that, were you referring to

Page 55

1 performance problems with the actual board itself?

2     A   I was not. I was talking about -- about

3 sales goals.

4     Q   Do you know whether or not the board had

5 technological problems?

6     A   I'm -- I'm told that it had technological

7 problems.

8     Q   Are the technological problems that it had

9 something with which you have familiarity, other than

10 as you may have been told by others?

11     A   No.

12     Q   Independent knowledge.

13     A   No.

14     Q   So any information that you would provide

15 would be something that you were told by somebody

16 else, is that correct, on the topic of the

17 technological performance of the sign?

18     A   Repeat the question.

19     Q   Any problems that you know about regarding

20 the technological performance of the sign would be

21 based upon information provided to you by others; is

22 that correct?

23     A   Yes.

24     Q   Did you ever witness any technological

25 problems with the sign?

Page 56

1     A   Yes. I went to -- when I was in New York on

2 other business, I did stop to see the sign, and I saw

3 some -- what would be referred to as light bars that

4 were out.

5     Q   Do you know what efforts, if any, were

6 undertaken by Garage Media to correct those problems?

7     A   Not directly.

8     Q   Do you recall whether or not Garage Media

9 ever considered suing GKD for problems with the

10 technological performance of the sign?

11       MR. HENZY: Objection to the form of the

12 question.

13     A   It's my understanding that Garage Media

14 wanted to sue GKD.

15 BY MR. O'KEEFE:

16     Q   Where does that understanding come from?

17     A   From both John and Gary.

18     Q   So if I were to tell you that Gary testified

19 that Garage Media never considered suing GKD, that

20 would be a surprise to you?

21       MR. HENZY: Objection to the form of the

22 question. I think it mischaracterizes his

23 testimony. But objection to the form.

24 BY MR. O'KEEFE:

25     Q   You can answer.

Page 57

1     A   I work with John. He's my brother. I know

2 he absolutely wanted to sue GKD.

3     Q   My question is would it surprise you to learn

4 that Gary Neff testified that he did not consider

5 suing GKD?

6       MR. HENZY: Object to the form of the

7 question.

8     A   Yes, it would surprise me.

9 BY MR. O'KEEFE:

10     Q   Do you know why Garage Media didn't sue GKD?

11     A   Not directly, but my understanding is because

12 John Zimmeth didn't want us to.

13     Q   Where did that understanding come from?

14     A   John and Gary.

15     Q   So in connection with any potential action

16 against GKD, your knowledge would come from either

17 Gary or John and not independently; is that correct?

18     A   Yes.

19     Q   Okay. Are you aware that GKD made a proposal

20 to Garage Media to fix and/or replace elements of the

21 sign?

22       MR. HENZY: Object to the form of the

23 question.

24     A   No.

25

Page 58

1   BY MR. O'KEEFE:
2       Q   Would you have been involved in discussions
3   for replacement of the sign if that was considered by
4   Garage Media?
5       A   Not directly.  I may have received e-mails on
6   it.
7       Q   Do you recall ever having participated in
8   such discussions?
9       A   No, I don't recall.
10      Q   Did you participate in discussions with Gary
11  or John regarding the prospect of extending the
12  Port Authority permit?
13      A   Yes.  But I don't remember the details.
14      Q   Do you recall for what period of time and why
15  there was discussion about extending the Garage Media
16  permit with the Port Authority?
17      A   No, I don't remember?
18      Q   Would that have been left up principally to
19  Gary Neff?
20      A   Yes.  With input from John more than likely.
21      Q   And the John you're referring to now is
22  John Schmid?
23      A   Sorry.  Yes.  John Schmid.
24      Q   Did you ever deal directly with any
25  representative of the Port Authority in connection

Page 59

1   with either the existing permit or an extension of the
2   permit?
3       A   No.
4       Q   Do you recall Garage Media having an interest
5   in selling itself, Garage Media?
6           MR. HENZY:  Object to the form of the
7       question.
8       A   I don't --
9   BY MR. O'KEEFE:
10      Q   The business.
11      A   I don't understand the question.
12      Q   Are you aware of any discussions among
13  yourself and Gary and/or John about selling the
14  business?
15      A   Yes.  I vaguely remember that we were open to
16  selling the business.
17      Q   Do you know whether or not Johnson Fretty was
18  retained to look for prospective buyers of the
19  business?
20      A   Not specifically, but they may have been.
21      Q   Did you participate in any meetings or
22  discussion with Thayer in which they expressed an
23  interest in buying the business?
24      A   I don't remember any meeting with Thayer.
25      Q   Did you participate in any discussions or

Page 60

1   meetings with Beatman (phonetic) concerning its
2   interest in buying the business?
3       A   No, I don't remember meeting with Beatman.
4       Q   I think you mentioned that you had a faint
5   recollection that Clear Channel may have had an
6   interest in buying the business.  Did you participate
7   in any discussions or meetings with Clear Channel
8   regarding its interest in offering to buy the
9   business?
10      A   No, I have no memory of meeting with
11  Clear Channel.
12      Q   Do you have any recollection of any meeting
13  or discussion with any outside party that had
14  expressed an interest in buying the business?
15      A   No, I don't.  I don't recall having any
16  meetings with anyone.
17      Q   Do you recall Clear Channel's performance
18  under its management agreement with Garage Media in
19  terms of meeting or not meeting sales goals?
20      A   So not specifically.  I know they didn't
21  perform as well as A2a.
22      Q   And do you recall there being any discussions
23  to terminate the sales agency agreement with or
24  management agreement with Clear Channel?
25      A   I don't remember specifically.

Page 61

1       Q   Do you know why Clear Channel was not
2   replaced by Garage Media?
3       A   I have no specific knowledge of that at all,
4   no.
5           MR. O'KEEFE:  Give me a minute here and
6       I'll -- I think I may be done.  Just give me
7       another minute.  Is that all right?
8           MR. HENZY:  Absolutely.
9           MR. O'KEEFE:  All right.
10          (Off the record.)
11          MR. O'KEEFE:  I have no further
12      questions.
13          MR. HENZY:  Okay.
14          MR. O'KEEFE:  So you're going to read
15      and sign?
16          MR. HENZY:  Yes.
17          MR. O'KEEFE:  Mr. Schmid, I appreciate
18      your accommodating the change in the schedule.
19          THE WITNESS (SCHMID):  My pleasure.
20      Thank you for your time.
21          MR. O'KEEFE:  Thank you.
22          MR. HENZY:  Thanks, John.
23          THE COURT REPORTER:  Mr. Henzy, would
24      you like to order a copy of the transcript?
25          MR. HENZY:  Yes.

5/15/2019                     David Karl Schmid                Page: 20 (62 - 65)

**Page 62**

1  (Deposition concluded at 11:29 a.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 64**

1
2                    TRANSCRIPT CORRECTIONS
3
4  REPORTER:   Tina Davis
5
6  CASE:   HUNTINGTON TECHNOLOGY
        FINANCE, INC. F/K/A MACQUARIE EQUIPMENT
        FINANCE, INC.
        F/K/A MACQUARIE EQUIPMENT
        FINANCE, LLC
        VS
        GARETT ALAN NEFF a/k/a
        GARY NEFF, JOHN MARK SCHMID,
        and DAVID KARL SCHMID
7
8
9  PAGE LINE   CORRECTION          REASON
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

**Page 63**

1              JURAT
2
3      I, DAVID KARL SCHMID, do hereby certify that
4  the foregoing testimony taken on May 15, 2019, is true
5  and accurate, including any corrections noted on the
6  corrections page, to the best of my knowledge and
7  belief.
8
9
10           DAVID KARL SCHMID
11
12
13
14
15    At _____ in said county of _____,
16  this _____ day of _____, 2019, personally
17  appeared DAVID KARL SCHMID, and he made oath to the
18  truth of the foregoing corrections by him subscribed.
19
20
21  Before me,_____, Notary Public
22  My commission expires:
23
24
25

**Page 65**

1
2   NAME: _____
3   DATE: _____
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 66

1          CERTIFICATE OF REPORTER
2      I, Tina Davis, Notary Public, duly commissioned
3  and qualified in and for the State of Connecticut, do
4  hereby certify there came before me, on the 15th day
5  of May, 2019, the following named person, to wit:
6  DAVID KARL SCHMID, who was by me duly sworn to testify
7  to the truth and nothing but the truth; that he was
8  thereupon carefully examined upon his oath and his
9  examination reduced to writing under my supervision;
10 that this deposition is a true record of the testimony
11 given by the witness.
12          I further certify that I am neither
13 counsel for, related to, nor employed by any of the
14 parties to the action in which this deposition is
15 taken; and further, that I am not a relative or
16 employee of any attorney or counsel employed by the
17 parties hereto, nor financially or otherwise
18 interested in the outcome of the action.
19      WITNESS my hand and affixed my seal this 28th day
20 of May, 2019.
21
22
23
24 Tina Davis, LSR
25 My commission expires:  September 30, 2022

## WORD INDEX

**< $ >**
**$10** 36:*17*

**< 0 >**
**00221** 1:*16*
**06084** 12:*1*
**06106** 1:*25*
**06604** 2:*11*

**< 1 >**
**1** 10:*14, 17* 23:*23*
**10** 2:*10* 34:*12, 14*
36:*7*
**10:02** 6:*1*
**11** 35:*1, 4*
**11:11** 54:*4*
**11:18** 54:*4*
**11:29** 62:*1*
**1153** 29:*11*
**13** 38:*15, 17* 43:*10*
**15** 1:*15* 63:*4*
**15222** 2:*5*
**15th** 2:*11* 66:*4*
**1987** 12:*7*
**1992** 12:*7*
**1994** 14:*4*
**1997** 14:*16*

**< 2 >**
**2** 4:*4* 24:*14, 18*
25:*5*
**20** 36:*8, 23*
**2009** 15:*7* 27:*24*
28:*1*
**2010** 11:*3* 24:*24*
25:*24*
**2019** 1:*15* 63:*4, 16*
66:*5, 20*
**2022** 66:*25*
**21** 1:*24*
**26** 11:*3* 24:*24*
**28th** 66:*19*

**< 3 >**
**3** 4:*5*
**3:18-cv-01708-VLB**
1:*5*
**30** 36:*8, 23* 66:*25*

**< 4 >**
**4** 11:*25* 26:*19, 22*
**412** 2:*5, 6*

**< 5 >**
**5** 30:*17*
**535** 2:*4*

**< 6 >**
**6** 4:*8* 32:*13, 15*
**65** 4:*6*

**< 7 >**
**700,000** 18:*25*
**746** 36:*3*

**< 8 >**
**800** 2:*4*
**860-595-7462** 1:*25*

**< 9 >**
**918-1100** 2:*5*
**918-1199** 2:*6*
**97** 15:*9*

**< A >**
**a.m** 6:*1* 54:*4, 4*
62:*1*
**A2a** 29:*18, 20*
40:*16* 42:*3, 5, 20*
44:*14* 46:*21* 60:*21*
**A2aMEDIA** 19:*2,*
*7, 9, 17, 21* 20:*3, 9*
28:*8, 16, 22* 29:*12*
30:*3* 31:*6, 12, 25*
35:*13* 36:*17* 37:*21*
38:*5, 23* 39:*6, 11,*
*15* 40:*9* 43:*4, 14*
44:*4, 18* 45:*5*
48:*11, 16, 25* 49:*5,*
*22* 50:*17* 51:*2, 4,*
*23* 52:*3* 53:*6*
**A2aMEDIA's**
42:*13* 45:*9* 47:*6*
51:*15* 52:*13* 54:*10,*
*15, 22*
**ability** 8:*13* 48:*10*
**able** 7:*3* 41:*8*
**absolutely** 25:*17*

57:*2* 61:*8*
**acceptable** 8:*1, 10*
**accommodate** 8:*6, 9*
**accommodating**
61:*18*
**accurate** 63:*5*
**acquisition** 6:*22*
15:*16*
**acted** 44:*17*
**acting** 26:*2*
**Action** 1:*4* 6:*23*
49:*6* 50:*23* 51:*1*
54:*21* 57:*15* 66:*14,*
*18*
**Activate** 45:*9*
46:*13, 20, 24* 47:*4*
**actively** 53:*23*
**actual** 55:*1*
**address** 11:*20, 22,*
*23*
**advised** 43:*16*
46:*23* 48:*8* 54:*20*
**advising** 43:*4* 44:*4*
**affect** 8:*12*
**affiliation** 29:*7*
31:*9*
**affixed** 66:*19*
**agency** 39:*15* 43:*6*
44:*6, 14, 18* 45:*2*
47:*7* 51:*15* 54:*10,*
*16, 22* 60:*23*
**agent** 31:*21* 39:*18*
47:*4* 49:*13* 52:*4*
53:*10*
**agents** 42:*3* 46:*25*
52:*12*
**agree** 24:*22* 25:*21*
32:*20* 35:*12* 48:*17*
**agreed** 3:*8* 52:*24*
**agreement** 10:*25*
32:*21* 35:*17* 53:*5*
54:*11, 16, 22* 60:*18,*
*23, 24*
**agreements** 25:*11*
**ahead** 29:*10* 50:*14*
**ALAN** 1:*9* 64:*7*
**alliance** 28:*7, 15, 16*
**allow** 7:*12, 17, 19*
**amendment** 26:*10,*
*11, 12*

**amendments** 26:*1,*
*6, 9, 15*
**America** 28:*8, 15*
29:*1*
**amount** 36:*19, 20*
**answer** 7:*12, 13, 18,*
*19* 10:*6* 17:*20*
19:*23* 31:*15* 35:*24*
36:*13* 38:*9, 10*
40:*19* 42:*16* 44:*9*
50:*14* 52:*7* 56:*25*
**answered** 7:*25*
20:*5* 42:*15* 44:*8*
50:*5, 8*
**apart** 40:*6* 48:*9*
**appear** 25:*13*
**APPEARANCES**
2:*1* 4:*4*
**appeared** 63:*17*
**appears** 24:*22*
25:*2, 21* 35:*12*
**application** 37:*12,*
*20*
**appreciate** 61:*17*
**apprised** 23:*17*
**appropriate** 7:*10*
**approximately** 39:*4*
**arising** 25:*11*
**arrangement** 31:*11*
**array** 13:*25*
**articulated** 42:*12*
**aside** 23:*16* 37:*11*
40:*12*
**asked** 7:*25* 8:*7, 14*
35:*19* 42:*15* 44:*8*
50:*5*
**asking** 20:*2* 28:*3*
30:*9*
**assistance** 47:*3*
**assume** 7:*24* 33:*4*
**assuming** 11:*11*
**attendant** 13:*4*
**attention** 10:*13*
24:*14* 25:*5* 26:*19*
30:*17* 32:*13* 34:*11*
35:*1* 38:*14* 43:*12*
**attorney** 10:*9* 29:*5*
66:*16*
**Australia** 22:*14*
**authority** 3:*9*
16:*24* 17:*6, 12*

18:*16, 21*  19:*3, 11*
20:*4, 9, 15*  21:*5, 12,*
*21*  22:*25*  29:*24*
32:*22*  33:*2*  34:*24*
37:*14, 21*  58:*12, 16,*
*25*
aware  8:*12*  10:*24*
26:*5*  37:*13*  54:*8,*
*13, 18*  57:*19*  59:*12*

< B >
back  11:*19*  12:*24*
14:*8*  23:*23*  25:*24*
42:*4*  47:*25*
background  12:*3*
bars  56:*3*
based  13:*18*  49:*6,*
*23*  55:*21*
basis  10:*9*  32:*1, 4*
Beatman  60:*1, 3*
behalf  32:*25*
34:*23*  38:*22*  43:*15*
44:*3, 17*
belief  50:*16*  63:*7*
believe  10:*19*  13:*3*
18:*18*  20:*5, 6, 16*
22:*12, 12, 15, 22, 23*
27:*12*  30:*8*  33:*25*
37:*15*
bell  20:*21, 22*  53:*2*
beneath  36:*6*
benefit  51:*9, 17*
best  37:*11*  63:*6*
Better  12:*14, 25*
bills  48:*17, 21*
binder  8:*20*  10:*14*
Blau  9:*23*  10:*4*
Bloomington  22:*6*
board  22:*7*  38:*7*
40:*23*  41:*16, 16, 25*
47:*13*  49:*10, 11*
53:*10*  54:*25*  55:*1,*
*4*
bottom  29:*11, 18*
36:*2*
boy  14:*12*
Break  4:*14*  8:*3, 8,*
*10*
Bridgeport  2:*11*
brief  14:*25*

briefly  12:*2*
BRODMAN  2:*1*
brother  8:*23*  21:*9*
44:*23*  48:*9*  49:*19*
57:*1*
brought  6:*23*  19:*9*
bullet  29:*17*  35:*18*
37:*5*
Bureau  12:*14*  13:*1*
business  11:*23*
12:*14*  13:*1, 19*
16:*10, 16*  17:*1, 1*
18:*8*  21:*4, 8, 10*
29:*7*  31:*8*  56:*2*
59:*10, 14, 16, 19, 23*
60:*2, 6, 9, 14*
buy  53:*20, 22*  60:*8*
buyers  59:*18*
buying  59:*23*  60:*2,*
*6, 14*

< C >
capacities  14:*21, 22*
capacity  12:*15*
14:*9*
carefully  66:*8*
case  28:*9*  30:*10,*
*11*  36:*11*  64:*4*
Cassian  1:*24*
Cathedral  12:*6*
caused  50:*17, 17*
CBS  32:*21*  33:*1*
cc  23:*20*
certain  27:*19*
29:*24*  54:*21*
Certificate  4:*6*
66:*1*
certify  63:*3*  66:*4,*
*12*
CFO  14:*25*
CFOs  15:*1*
chance  32:*14*
change  39:*18*
40:*25, 25*  42:*3, 24*
47:*12, 16, 17*  48:*3,*
*3, 5*  49:*13, 16*
50:*21*  61:*18*
changing  39:*25*
Channel  53:*2, 4, 9,*
*15, 19, 20*  60:*5, 7,*

*11, 24*  61:*1*
Channel's  60:*17*
charge  23:*13*
Chemical  12:*10*
Chemicals  13:*20,*
*21, 22, 23*  14:*1*
chief  15:*1, 2*
choice  37:*22*  42:*25*
chose  29:*15*
chosen  38:*3*
circumstance  15:*22*
circumstances  7:*4*
45:*14*  47:*9*
Civil  1:*4*
clarification  7:*23*
clear  9:*9*  53:*2, 4, 9,*
*15, 19, 20*  60:*5, 7,*
*11, 17, 24*  61:*1*
client  14:*14*
closing  24:*4*
collectively  25:*11*
colloquial  7:*15*
come  15:*12*  56:*16*
57:*13, 16*
comes  15:*15*  40:*2*
49:*18*
commenced  6:*1*
comments  9:*12*
commission  31:*16*
63:*22*  66:*25*
commissioned
45:*15*  66:*2*
commissions  31:*18*
committed  36:*8, 24*
committing  37:*2*
communications
9:*6, 16*  40:*3*
companies  15:*11*
company  15:*14, 17*
Complaint  7:*5, 6, 7*
8:*19*  10:*18*
complaints  42:*10*
concept  36:*24*
concern  49:*7*
concerning  7:*4*
11:*14*  60:*1*
concluded  62:*1*
condition  8:*15*
confirm  52:*8*
CONNECTICUT
1:*1, 16, 25*  2:*11*

6:*6, 25*  11:*25*  12:*7,*
*9, 12*  20:*17*  22:*3*
66:*3*
connection  7:*3*
19:*10, 17, 21*  20:*3,*
*14*  22:*24*  23:*2*
24:*8, 12*  26:*14*
27:*14*  31:*12, 22*
33:*2, 7*  34:*5*  38:*6*
48:*25*  57:*15*  58:*25*
consequence  51:*1*
consider  33:*22*
57:*4*
consideration  52:*11*
considered  56:*9, 19*
58:*3*
considering  43:*5*
44:*5*
cont  54:*6*
contact  19:*6*  20:*17*
26:*17*  32:*9*  33:*1*
contacts  19:*7*
context  7:*23*
continuing  25:*17*
continuity  4:*14*
contributed  41:*18,*
*19*
contributing  42:*18*
conversation  20:*11*
39:*7*
conversations  9:*3,*
*5*  10:*10*  17:*22*
37:*2*  41:*1*  42:*17*
53:*24*
copied  23:*8*  34:*20*
copy  10:*24*  24:*23*
25:*1*  61:*24*
correct  9:*18*  16:*4*
24:*23*  25:*3*  27:*20,*
*21*  32:*4, 5*  41:*14*
55:*16, 22*  56:*6*
57:*17*
CORRECTION
64:*8*
corrections  63:*5, 6,*
*18*  64:*1*
corresponded  38:*23*
correspondence
34:*20*
corresponding
34:*19*

counsel  3:3, 8
6:20  8:5  9:10, 13
24:2, 4, 7  66:13, 16
county  63:15
couple  14:12
course  18:25
COURT  1:1  6:8,
24  7:16  61:23
customers  38:7

< D >
daily  10:8  31:25
32:4
DATE  1:15  12:22
28:5  41:23  65:3
dated  11:3  24:23
dates  15:23  33:15
DAVID  1:10, 11
4:8  6:3, 17  63:3,
10, 17  64:8  66:6
Davis  1:16  6:4
64:1  66:2, 24
day  63:16  66:4, 19
day-to-day  17:23
23:1, 7, 12, 15, 18
32:10
deal  58:24
dealing  14:14  34:8
dealings  32:6, 10
dealt  26:14
decision  20:8
30:16  37:25  38:1,
2  45:23  51:8, 14,
16
decisions  17:23, 23
declare  48:10
default  41:1, 6, 6,
12  47:15, 18  48:4,
10, 11, 18, 22, 25
49:6, 22  50:18
defects  3:11
Defendants  1:11
2:9
definitely  27:16
degree  12:8  52:15
delays  33:10
Deponent  6:3
deposed  9:15
DEPOSITION
1:11  3:10, 14  6:1

7:2  8:18  10:10
62:1  66:10, 14
depositions  8:24
10:5
describe  12:2
40:13
described  42:1
Description  5:3
desire  42:24
details  58:13
determination  17:6
difference  49:14
different  14:21, 22
50:11
difficult  7:16
Digital  16:8, 18
18:9  35:13
diminished  25:18
DIRECT  4:8  6:13
26:19  32:13  34:11
35:1  51:1  54:6
directed  3:5  43:12
54:15
Directing  10:13
24:14  25:5  30:17
38:14  54:9
directly  39:20
40:3  52:14  56:7
57:11  58:5, 24
disappointed  39:5,
10  40:16
disappointment
44:4
discussed  19:3
discussing  17:1
discussion  9:1
39:13  44:12  54:1
58:15  59:22  60:13
discussions  9:2
11:14  17:12  20:25
28:23  39:21  53:19
58:2, 8, 10  59:12,
25  60:7, 22
display  16:8  32:21
displays  16:18
18:10
dissatisfaction
38:25  39:2  42:13
distribute  29:19
35:21

DISTRICT  1:1, 1
6:24, 25
document  10:21,
23  11:5, 8, 15
21:15, 17  23:25
24:20  26:25  27:4,
9, 23  30:24  31:1
32:18  33:3, 5, 8
35:7, 9, 11  38:20
documents  8:17
doing  14:15
due  25:10
duly  6:4  66:2, 6

< E >
earlier  30:8
educational  12:2
efforts  27:15  38:6,
25  56:5
ehenzy@zeislaw.co
m  2:12
either  7:12  8:23
9:11, 22  10:4  13:7
16:25  17:16  18:3
19:15  23:24  33:7
40:2, 7, 8, 12, 14
42:6  44:23  57:16
59:1
elected  48:16
elements  57:20
else's  37:24
e-mail  9:6  23:11,
20  54:13, 20
e-mails  17:22  23:8
39:23  52:18  58:5
embodied  7:5
employed  66:13, 16
employee  66:16
employees  14:14
employment  12:11,
23  14:7, 18
endeavor  7:18
engineering  12:10
entered  53:5, 19
entity  15:18  22:24
37:9
entrusted  34:1
EQUIPMENT  1:5,
5  6:22  11:1  64:4,
5

ERIC  2:12
ESQ  2:6, 12
Estate  15:15, 16
Europe  18:12
37:15
Exact  4:14
Exactly  4:8
EXAMINATION
4:8  6:13  54:6
66:9
examined  6:6  66:8
example  18:4
exclusive  29:18, 20
31:21  35:17, 20
39:15  44:6, 13, 18
45:2
executed  11:6, 9
execution  11:15
33:7
Exhibit  5:3  8:20
10:14, 17  23:23
24:14, 18  25:1, 3
26:19, 22  30:17
32:13, 15  34:12, 14
35:1, 4  38:15, 17
43:10
Exhibits  5:1, 3
existing  59:1
expectations  40:10
42:6
expected  38:12
experience  9:2
45:10
expires  63:22
66:25
explain  50:2
expressed  39:2, 14
42:12  59:22  60:14
expressing  38:24
expression  41:11
expressions  7:15
extending  58:11, 15
extension  34:24
59:1
extent  9:5  42:18

< F >
Fabrics  31:6
fact  36:25
facts  7:4
faint  60:4

fair  14:*16*  17:*15*
26:*13, 17*  33:*6*
37:*19*  40:*1*  49:*7*
familiar  10:*21, 22,*
*22*  15:*18, 22*
familiarity  55:*9*
family  13:*7*
Fax  2:*6*
fearful  47:*17*  49:*5*
Federal  6:*10*
Field  45:*9*  46:*13,*
*20, 24*  47:*4*
FINANCE  1:*4, 5, 6*
*6:21, 22*  11:*1*  64:*4,*
*5, 6*
financial  29:*4*  42:*7*
financially  66:*17*
financing  21:*20*
27:*15*  33:*17, 23*
36:*6*
fine  11:*24, 24*
45:*19*
finish  7:*17, 19*
52:*2*
finished  10:*16*
24:*16*  26:*21*  30:*19*
34:*13*  38:*16*
finishing  4:*16*
first  6:*4*  12:*11*
15:*21*  16:*15, 23*
17:*2*  25:*6, 8*  43:*4*
44:*2*
fix  57:*20*
Floor  2:*11*
focusing  39:*24*
folks  9:*11*  19:*21*
27:*24*  30:*4*
followed  14:*7, 18*
following  10:*5*
66:*5*
following,  25:*19*
follows  6:*7*
foregoing  63:*4, 18*
form  3:*6*  7:*13*
*9:24*  17:*19*  19:*22*
28:*10*  31:*13*  35:*22*
36:*12*  38:*8*  40:*18*
41:*7*  42:*14*  43:*20*
44:*7*  45:*17*  47:*19*
48:*19*  49:*1, 8*  50:*3,*
*19*  51:*10, 18, 24*

52:*5*  53:*11*  56:*11,*
*21, 23*  57:*6, 22*
59:*6*
formation  16:*7*
forward  12:*25*
founded  27:*24*
28:*1, 6*
frame  11:*10*  39:*1,*
*8*
frames  40:*23*
Fretty  20:*20*  21:*1,*
*9*  33:*19*  34:*1, 4, 8*
59:*17*
front  31:*5*  35:*15*
full  25:*9*  34:*2*
further  3:*13*  61:*11*
66:*12, 15*


< G >
gainful  12:*11*
Garage  10:*25*
15:*19*  16:*20, 24*
18:*7, 17, 20*  19:*10*
20:*13*  21:*5, 11, 21*
22:*25*  23:*2, 13, 18,*
*21*  24:*3*  26:*3*  27:*5,*
*5, 23*  28:*14, 25*
29:*2, 11, 14*  31:*8,*
*11, 21, 25*  32:*7, 22,*
*25*  33:*16, 21*  34:*8,*
*23*  36:*7, 16*  37:*6, 7*
38:*22*  41:*12, 21*
42:*7*  43:*16*  44:*4,*
*17, 25*  45:*5, 8, 10,*
*15*  46:*24*  47:*2*
51:*8, 15, 16, 22*
52:*4, 13*  53:*6, 8, 16,*
*18, 20, 22*  54:*10, 15,*
*20, 21*  56:*6, 8, 13,*
*19*  57:*10, 20*  58:*4,*
*15*  59:*4, 5*  60:*18*
61:*2*
garages  16:*8, 17,*
*18, 20*  18:*9*
GARETT  1:*9*  64:*7*
Garrett  7:*1*
GARY  1:*10*  7:*1*
15:*24, 25*  16:*2, 3, 4,*
*12, 13*  17:*10, 24*
18:*3, 12, 15*  19:*2, 8*
20:*17*  21:*8, 22*

22:*20, 22*  23:*14, 20,*
*22*  24:*3*  32:*2, 9*
33:*4, 5*  37:*1*  39:*21*
40:*2, 12, 14*  41:*19*
42:*12, 19, 22*  43:*3*
46:*16*  48:*8*  49:*18*
56:*17, 18*  57:*4, 14,*
*17*  58:*10, 19*  59:*13*
64:*7*
general  14:*25*
38:*10*  42:*17*
Generally  8:*25*
9:*12*  38:*10*  41:*3*
42:*9*  43:*13*
Generation  35:*13*
gentleman  22:*13,*
*14*
getting  39:*16, 17*
40:*24*  41:*15*  43:*1*
48:*2*
Give  61:*5, 6*
given  50:*13*  66:*11*
GKD  18:*9, 12, 15*
29:*1, 1, 15, 19, 21*
30:*1, 13*  31:*6*  32:*7,*
*10, 11*  35:*21*  56:*9,*
*14, 19*  57:*2, 5, 10,*
*16, 19*
glasses  25:*7*
go  11:*19*  18:*5, 6*
35:*2*  50:*14*
goal  45:*6*
goals  55:*3*  60:*19*
goes  25:*16, 20*
47:*25*
going  9:*4*  12:*24*
23:*17*  34:*11, 22*
39:*5*  50:*22*  61:*14*
graduated  12:*4, 19,*
*21*
graduating  12:*12*
graduation  12:*20*
group  19:*6, 7*
20:*16, 18, 23, 24*
32:*21*  53:*22*
guarantee  24:*23*
25:*16, 21, 24*
guaranteed's  25:*12*
guarantees  25:*9*
Guarantor  25:*8*

guess  10:*22*
guys  24:*2, 2*


< H >
hand  66:*19*
happened  19:*4*
41:*24*
happy  8:*5*
Hartford  1:*16, 25*
head  7:*15*  52:*9*
heading  36:*6*  37:*4*
hear  39:*22*
hearing  39:*9*
Heat  37:*12*
HELD  1:*15*  15:*6*
54:*1*
HENZY  2:*12*  6:*9,*
*11*  8:*21*  9:*4, 16, 23,*
*24*  10:*3, 6*  17:*19*
19:*22*  28:*10*  31:*13*
35:*22*  36:*12*  38:*8*
40:*18, 20*  41:*7*
42:*14*  43:*17, 20, 25*
44:*7*  45:*17, 19*
47:*19*  48:*13, 19*
49:*1, 8, 25*  50:*3, 9,*
*13, 19*  51:*10, 18, 24*
52:*5*  53:*11*  56:*11,*
*21*  57:*6, 22*  59:*6*
61:*8, 13, 16, 22, 23,*
*25*
hereto  66:*17*
high  12:*4, 6*
Hills  22:*6*
hired  45:*8*  52:*12*
hiring  45:*2*
hold  12:*17*  14:*2,*
*11*
Home  11:*21, 22, 23,*
*24*
hoped  38:*12*
HUNTINGTON
1:*4*  6:*21*  64:*4*


< I >
idea  16:*9, 11, 13*
identification  5:*1*
identified  27:*25*
identifies  28:*25*
imagine  7:*8*
immediate  29:*20*

implementation 18:*16*

inability 41:*12*

included 15:*25* 17:*10, 22*

including 25:*19* 63:*5*

independent 25:*17* 40:*15* 42:*10* 55:*12*

independently 40:*8* 43:*3* 57:*17*

INDEX 4:*1* 5:*1*

Indicates 4:*15*

individually 24:*8, 12*

information 7:*3* 9:*13* 23:*10* 55:*14, 21*

input 58:*20*

installation 17:*2*

instructed 54:*14*

instructing 54:*9*

intention 39:*14*

interact 31:*25*

interest 13:*8* 31:*10* 59:*4, 23* 60:*2, 6, 8, 14*

interested 66:*18*

interim 13:*3*

interpose 7:*11*

interrupted 4:*15*

introduced 19:*17, 20* 20:*14*

invested 18:*22* 42:*19, 22*

investing 18:*20* 36:*16*

investment 15:*2* 29:*8*

investor 17:*16* 35:*14*

involved 9:*5, 17* 14:*13* 17:*3* 20:*11* 23:*24* 26:*1, 4* 28:*18, 19, 22* 30:*15* 39:*20* 41:*15* 53:*23* 58:*2*

involvement 17:*4, 14, 15*

issues 41:*25*

its 16:*7* 37:*21* 38:*6* 42:*7* 45:*5* 51:*8, 16* 60:*1, 8, 18*

< J >

Jersey 32:*23*

job 13:*1, 3, 12, 15, 24*

JOHN 1:*10* 2:*6* 6:*20, 25* 13:*11* 15:*24* 16:*2, 3, 3, 12, 12* 17:*10* 18:*3, 11, 14* 19:*1* 21:*22* 22:*13, 20, 23* 23:*19* 24:*3* 28:*17* 39:*21, 24* 40:*3, 12, 14* 41:*15, 18* 48:*2* 49:*12, 18* 50:*6* 56:*17* 57:*1, 12, 14, 17* 58:*11, 20, 21, 22, 23* 59:*13* 61:*22* 64:*7*

Johnson 20:*20* 21:*1, 9* 33:*19* 34:*1, 4, 8* 59:*17*

joint 15:*16*

jokeefe@metzlewis.com 2:*7*

JR 2:*6*

JURAT 63:*1*

< K >

KARL 1:*10, 11* 4:*8* 6:*3, 17, 17* 63:*3, 10, 17* 64:*8* 66:*6*

keeping 23:*17*

kindly 41:*13*

knew 41:*16*

know 6:*19* 7:*23* 8:*6* 16:*9, 12, 22* 19:*6, 9, 13* 23:*6* 24:*7, 10* 27:*2, 4, 7* 29:*5* 30:*7, 12* 31:*1, 2, 11* 33:*21* 34:*4* 37:*1, 3, 6, 10, 18, 23* 38:*2, 4, 11* 39:*2, 16, 17* 41:*17* 42:*20, 22* 43:*9* 44:*19* 46:*15* 51:*6* 55:*4, 19* 56:*5*

57:*1, 10* 59:*17* 60:*20* 61:*1*

knowledge 26:*9* 37:*11* 40:*1* 45:*4* 55:*12* 57:*16* 61:*3* 63:*6*

known 22:*24*

< L >

laid 21:*11*

language 25:*13, 21*

lawyer 7:*10* 24:*11*

leading 15:*25* 17:*5*

learn 57:*3*

lease 10:*25* 26:*2, 6* 41:*13* 50:*18*

led 17:*11*

left 58:*18*

legal 6:*23*

legally 31:*7*

legs 8:*4*

lent 53:*16, 16*

letter 34:*16* 54:*19*

leverage 42:*20*

LEWIS 2:*1*

license 29:*18, 20*

light 56:*3*

limited 17:*14* 21:*24*

LINE 64:*8*

Liquid 45:*2*

list 25:*20*

listen 8:*13*

little 33:*6*

live 34:*23* 38:*24* 39:*5* 43:*14* 44:*3*

LLC 1:*6, 24* 2:*1* 64:*6*

long 9:*19* 12:*17* 13:*12* 14:*2, 11* 15:*6*

look 10:*15* 24:*15* 26:*20* 30:*18* 32:*14* 34:*12* 35:*2* 38:*15* 59:*18*

Looking 27:*22* 43:*9* 47:*4*

looks 30:*25* 33:*4*

loop 49:*11*

lot 39:*17* 40:*24* 43:*1* 47:*12*

LSR 1:*16* 6:*4* 66:*24*

< M >

MACQUARIE 1:*4, 5* 6:*22* 11:*1* 19:*14* 20:*14* 21:*20* 22:*5* 25:*9* 26:*14* 27:*6, 10, 14* 33:*17, 22* 39:*18, 24* 40:*4, 13, 15* 42:*11* 44:*20* 47:*12* 48:*10* 49:*5, 10* 50:*22* 54:*9, 13, 14, 19* 64:*4, 5*

Magrin 21:*22* 22:*2, 15*

management 27:*25* 53:*5* 60:*18, 24*

manager 14:*10, 13, 18, 25*

manufactured 14:*1*

MARK 1:*10* 64:*7*

Marked 5:*1, 3* 10:*14*

marketing 45:*11*

Mass 12:*6*

me, 63:*21*

mean 10:*6* 29:*3* 36:*20* 42:*19* 43:*8* 50:*10*

meaning 24:*3*

meant 37:*7* 41:*12*

Media 10:*25* 15:*19* 18:*20* 19:*10* 20:*13* 21:*5, 11* 22:*25* 23:*2, 13, 18, 21* 24:*3* 26:*3* 27:*5, 5, 23* 28:*14, 25* 29:*2, 11, 14, 19, 21* 30:*1, 25* 31:*8, 11, 21, 25* 32:*7, 22, 25* 33:*16, 21* 34:*8, 23* 35:*13, 21* 36:*7, 16* 38:*22* 41:*12, 21* 42:*7* 43:*16* 44:*4, 17, 25* 45:*5, 8, 15* 46:*24* 47:*2* 51:*8, 15, 16, 22* 52:*13* 53:*6, 8, 16, 18, 20, 22* 54:*10, 15, 20, 22* 56:*6, 8, 13, 19*

57:10, 20  58:4, 15
59:4, 5  60:18  61:2
**Media-Garage**  37:6
**Media's**  45:10
52:4
**medical**  8:14
**medication**  8:15
**meet**  9:22  10:3
22:4  42:7
**meeting**  10:10
18:11, 14  21:19
22:18, 21  59:24
60:3, 10, 12, 19, 19
**meetings**  19:1
21:25  22:2  39:21,
23  59:21  60:1, 7,
16
**member**  13:7
**membership**  29:9
31:10
**memory**  60:10
**mention**  53:7
**mentioned**  30:6, 8
46:3, 4  60:4
**mentioning**  45:13
**mesh**  29:19, 21
30:1  35:21
**met**  10:9  19:24
20:2, 6  21:22, 23
22:11  45:5
**Metal**  31:6
**METZ**  2:1
**Miami**  18:3, 5
30:4  37:12
**Michigan**  22:4
27:13, 16
**Middle**  2:10  25:7,
13  36:5
**million**  36:7, 8, 17,
23
**minimum**  17:10
**minority**  20:11
**minute**  11:19
23:24  42:4  61:5, 7
**mischaracterizes**
56:22
**moment**  24:15
34:12  38:14
**monetize**  16:17
**money**  18:20, 22
40:21  42:18, 19

47:13  48:1  49:14,
15  53:16
**moneys**  41:9, 19
**months**  12:18
13:13  38:24  39:5,
8  44:2
**moving**  12:25

**< N >**
**name**  6:15, 16, 18,
19  20:18  37:9
52:8  53:7  65:2
**named**  66:5
**nature**  13:19  16:16
**near**  11:6  26:8
34:22  43:13
**necessarily**  34:2
37:2  42:24
**necessary**  42:7
**need**  7:23  8:9, 10
25:7
**NEFF**  1:9, 10  7:1,
1  8:24  9:22  10:4,
11  11:13, 16, 18
16:4  23:14, 16
26:15  32:2, 9  33:4
34:9, 23  38:23
40:2  42:12  43:15
44:3, 13, 16, 23
46:16, 19  48:8
57:4  58:19  64:7, 7
**Neff's**  34:18
**negotiation**  23:25
33:7
**neither**  66:12
**Network**  37:6, 7
**never**  56:19
**New**  13:18  15:19
21:24  22:1, 25
24:3  32:22, 23, 23
47:4  56:1
**nonexclusive**  43:6
45:1
**nonpayment**  47:14
**Notary**  3:10, 15
6:5  63:21  66:2
**noted**  63:5
**notice**  3:11
**notion**  46:15
**number**  43:4

**NY**  10:25

**< O >**
**Oak**  1:24
**oath**  63:17  66:8
**Object**  17:19
19:22  28:10  31:13
35:22  36:12  40:18
41:7  43:20  51:10,
24  52:5  57:6, 22
59:6
**objection**  7:11  9:4,
24  38:8  42:14
44:7  45:17  47:19
48:13, 19  49:1, 8
50:3, 19  51:18
53:11  56:11, 21, 23
**objections**  3:4, 5
**obligations**  25:10
42:8
**obligations'**  25:12
**obligor**  25:11
**observance**  25:10
**obtain**  27:15
**occurred**  21:25
**October**  11:3
24:24
**offering**  60:8
**officer**  15:2, 3
**Oh**  14:12
**Okay**  8:20, 23
9:21  10:13, 18
11:19  15:13, 18
20:8, 13  24:14, 17
26:1, 23  27:22
28:7, 21, 24  30:17,
20  31:20  32:16
34:4, 16  35:1, 5, 16
36:2, 4, 23  37:4, 11,
19  38:14, 18  41:5,
24  42:4  43:25
44:25  45:19  50:9,
9  51:4, 7  53:25
57:19  61:13
**O'KEEFE**  2:1, 6
4:8  6:10, 14, 20
9:7, 8, 18, 20  10:2,
12, 20  18:1  20:1
24:19  26:24  28:13
31:19  32:17  34:15
35:6  36:1, 15

38:13, 19  41:4, 10
43:2, 19, 21, 23
44:1, 11  45:22
47:21  48:6, 15, 23
49:3, 17  50:1, 7, 11,
15, 24  51:13, 21
52:1, 10  53:14
54:7  56:15, 24
57:9  58:1  59:9
61:5, 9, 11, 14, 17,
23
**Old**  11:25
**omission**  4:15
**once**  22:6
**open**  30:20, 22
59:15
**operate**  33:14
**operating**  15:2
**operation**  23:12
**opportunity**  17:7,
13  19:11, 18, 21
20:4, 9, 15  21:1, 5,
11  35:2
**Orchard**  11:25
**order**  61:24
**organization**  16:7
**outcome**  46:8
66:18
**Outdoor**  32:21
33:1  45:2  53:2, 4,
9, 15
**outside**  60:13
**ownership**  13:8

**< P >**
**P.C**  2:10
**Page**  4:1  5:3  25:6
27:22  28:24  29:17
31:5  35:15, 16
36:5  63:6  64:8
**pages**  25:3  29:10
36:2
**paid**  48:17, 21
**paragraph**  25:5
**Pardon**  30:21
**parking**  13:4
14:10, 13, 18  15:15
18:7, 8
**part**  10:18  28:17
30:16  34:2  36:23
41:9

participant 17:17 22:22
participants 22:20
participate 18:11, 14 19:1 20:8 52:11, 16 58:10 59:21, 25 60:6
participated 21:14, 16 24:4 27:8 32:4 45:24 58:7
participating 16:25 18:2 52:19, 21
participation 17:9 52:15
particular 9:2
parties 3:3, 9 7:6 34:19 66:14, 17
partner 16:1 20:12 29:2, 4, 5
partnered 31:5
partnering 29:6
partners 28:25 29:3, 6, 11 31:7 36:6 37:5
partnership 31:10
party 11:14 60:13
passive 17:16, 21
Patty 21:22 22:2, 15
pay 41:13
paycheck 15:11, 15
paying 41:22
payment 25:9 47:18 48:9
payments 41:8, 9, 18 47:13 48:2
payroll 14:15
Pennsylvania 2:5
people 28:18 50:22
perform 38:11 42:6 60:21
performance 25:10 39:6, 10 40:16 41:25 42:13 44:5 45:10 49:13 55:1, 17, 20 56:10 60:17
performed 38:6
performing 40:9, 23 41:16 43:1 49:10, 11
period 58:14

permit 34:24 58:12, 16 59:1, 2
person 11:12 23:9, 13, 15 26:13 31:24 34:7 66:5
personal 49:15
personally 63:16
phone 7:8
Phonetic 4:14 60:1
piece 30:25
Pittsburgh 2:5
Place 1:15
Plaintiff 1:6 2:1
Plaintiff's 10:14
plan 17:1, 1
played 33:6
please 40:11
pleasure 61:19
point 35:18 41:21, 23 47:6
Port 16:24 17:6, 12 18:16, 21 19:3, 11 20:4, 9, 15 21:5, 12, 21 22:25 29:24 32:22 33:2 34:24 36:19 37:14, 21 58:12, 16, 25
portion 7:21
position 12:17 14:2, 11 15:6 41:20
potential 47:14 49:22 52:12 57:15
practice 34:18
preparation 8:17 21:15, 17 27:9
prepared 21:4, 10 27:5 31:1, 3
present 27:6
presentation 27:14 29:12 35:14
presented 21:3, 7 27:9
pressure 39:18 40:24 41:17 42:21 43:1 44:20 47:12 48:2 49:4, 12, 15
previously 23:14
primarily 17:24 19:8

principal 11:14 26:17
principally 17:16 58:18
principle 32:9 33:1 34:7
prior 37:13
probably 12:24 14:12 19:5 20:10 52:17, 18
problems 54:24 55:1, 5, 7, 8, 19, 25 56:6, 9
process 17:5, 10
procure 38:6
project 18:21 19:3 23:1, 2, 6 29:19 33:18 34:5, 20 36:17, 18, 18, 22 37:14
projects 36:17
prompt 25:9
proof 3:9
Propark 13:3, 8, 14 14:8, 19, 20, 23 15:8, 12, 14 28:8, 15, 18, 18, 19 29:1
proposal 21:4, 8, 10 57:19
prospect 58:11
prospective 59:18
provide 7:3 23:10 55:14
provided 4:14 9:10 55:21
provider 29:15 30:13
Public 3:10, 15 6:5 63:21 66:2
purpose 22:17
pursue 16:9 17:6
pursuing 16:21
putting 16:25 40:21 47:2, 13 48:1 49:14

< Q >
qualified 66:3
question 3:6 7:12, 13, 18, 20, 21, 24, 25 8:7 10:1, 7 17:8

21:6 28:12 31:14 32:8 35:23 38:11 40:11 43:18, 24 47:20 48:20 49:2, 9 50:4, 12, 20 51:11, 12, 19, 25 52:2, 6 53:12 55:18 56:12, 22 57:3, 7, 23 59:7, 11
questions 7:10 8:14 61:12

< R >
raised 36:7
range 14:4
read 6:11 10:23 11:11 61:14
reading 3:13 4:16
Real 15:15, 16
reason 8:5 16:6 25:19 26:9, 12 64:8
recall 9:1 11:8, 12 13:5 14:5 16:25 18:2, 20, 23 19:16 20:2, 10, 13, 25 21:3, 7, 19 22:9, 11, 17 23:16, 24 24:11 25:23 26:8, 11, 25 27:8, 13, 25 28:4, 8 29:1, 14, 20, 23 30:3 31:3, 6, 20 33:10 34:22 35:9, 10, 20 36:11, 16 38:22 39:13, 19 40:6, 8 41:21, 24 42:10 43:22 44:2, 10, 12, 16, 25 45:8, 14, 24, 25 46:12, 19, 23 47:6 51:4, 22 52:3, 19, 21, 23 53:4, 8, 18 56:8 58:7, 9, 14 59:4 60:15, 17, 22
received 52:18 58:5
receiving 47:11
recess 54:3
recognize 24:20 30:24 32:18 34:16 35:7 38:20

recollection  28:*14,
20*  30:*10*  31:*16*
33:*13*  38:5  42:5
43:*13*  44:*21, 22*
46:*7, 8*  60:*5, 12*
recommendation
52:*24*  53:*1*
recommendations
46:*9*
recommended
46:*20, 24*
record  6:*16*  32:*20*
54:*1*  61:*10*  66:*10*
reduced  66:*9*
refer  16:*2, 3*
referred  56:*3*
referring  37:*3*
43:*10*  54:*25*  58:*21*
reformulate  43:*23*
refreshing  46:*6*
refusal  50:*16*
regarding  21:*20*
45:*9*  55:*19*  58:*11*
60:*8*
related  15:*14*
34:*19*  66:*13*
relation  29:*7, 8, 9*
relationship  7:*6*
44:*6*  45:*5*  46:*20*
53:*9*
relative  66:*15*
released  25:*18*
relied  37:*21*
remember  11:*10*
12:*21*  13:*2, 13*
15:*23*  16:*11*  18:*18,
19*  19:*5, 12, 15, 19,
20, 24*  20:*7, 18*
21:*2, 13, 18*  22:*7,
16, 23*  24:*10, 13, 21*
26:*4*  27:*11, 17*
28:*5*  30:*11*  31:*17*
33:*12, 15, 16, 19, 20,
24*  34:*3, 6, 25*
35:*25*  36:*14, 21*
37:*16, 17*  39:*1, 7, 8,
9*  40:*14, 22*  41:*2,
23*  43:*3, 6, 10*
44:*15, 19*  45:*3, 7,
12, 21*  46:*1, 4*  47:*2,
5, 8, 9*  52:*9, 17, 23*

53:*13, 15, 17, 21, 23*
58:*13, 17*  59:*15, 24*
60:*3, 25*
repeat  17:*8*  21:*6*
40:*11*  51:*12*  55:*18*
replace  48:*16*  49:*5*
50:*16*  57:*20*
replaced  51:*22, 23*
52:*3*  61:*2*
replacement  58:*3*
replacing  49:*22*
51:*2*
Reporter  1:*16*  6:*8*
7:*16*  61:*23*  64:*1*
66:*1*
Reporting  1:*24*
reports  41:*15*
represent  24:*11*
representative
13:*15*  19:*13*  26:*2*
54:*14, 19*  58:*25*
representatives
21:*20*  22:*5*
represented  24:*8*
Representing  2:*1, 9*
required  29:*24*
reserved  3:*4*
respect  39:*23*
respond  8:*8, 13*
response  7:*5*  8:*19*
responses  7:*14*
restroom  8:*4*
result  46:*9*
retained  34:*5*
59:*18*
review  8:*17, 20*
23:*25*  27:*9*
reviewed  8:*19*
21:*17*
reviews  10:*17*
24:*18*  26:*22*  32:*15*
34:*14*  35:*4*  38:*17*
RFP  46:*25*  47:*4*
Right  15:*14*  23:*14,
23*  28:*2*  29:*8, 10,
11*  35:*21*  36:*3*
41:*13*  42:*1*  49:*19*
61:*7, 9*
Rights  35:*17*
ring  20:*20, 22*  53:*2*
role  23:*1*  33:*6*

Roughly  14:*3*
38:*23*
running  33:*11*

< S >
sales  13:*15*  31:*17,
21*  38:*25*  39:*18, 25,
25*  42:*3, 22*  45:*6*
46:*25*  47:*4*  49:*13*
50:*22*  51:*15*  52:*4,
12*  53:*10*  54:*10, 15,
22*  55:*3*  60:*19, 23*
Salesperson  12:*16*
satisfied  29:*25*
saw  56:*2*
says  25:*8*  28:*2*
35:*16*  36:*3*
schedule  61:*18*
Scheduling  14:*14*
SCHMID  1:*10, 10,
11*  4:*8*  6:*3, 15, 17,
19, 25*  9:*23*  10:*4, 8,
11*  11:*13*  13:*11*
16:*3*  40:*3, 19*
45:*18, 20*  48:*14*
54:*8*  58:*22, 23*
61:*17, 19*  63:*3, 10,
17*  64:*7, 8*  66:*6*
S-c-h-m-i-d  6:*18*
school  12:*4, 6*
seal  66:*19*
second  25:*6*  27:*22*
29:*17*  35:*16*  37:*5*
section  25:*14*
security  29:*18*
see  18:*3, 6, 10*
24:*21*  28:*11*  29:*12,
17*  30:*22*  31:*5*
35:*16, 18*  36:*8*
56:*2*
seeing  35:*10*
seen  11:*5, 8*  18:*9*
35:*9*
selected  30:*13*
selecting  37:*20*
selection  52:*20, 22*
sell  13:*23*
selling  59:*5, 13, 16*
send  46:*24*
sense  29:*4*  41:*3*
sent  23:*11, 19*

sentence  4:*15, 16*
25:*6, 8*
separate  40:*6*  48:*9*
September  66:*25*
shakes  7:*15*
shared  9:*12, 14, 22*
16:*19*  39:*3*
sharing  40:*7, 8, 12,
14*
Sic  4:*8*
side  16:*17*
sign  6:*11*  18:*6*
22:*25*  27:*19*  29:*21*
30:*1*  33:*11, 14, 23*
34:*5, 19, 22*  35:*21*
38:*24*  39:*5*  43:*14*
44:*3*  55:*17, 20, 25*
56:*2, 10*  57:*21*
58:*3*  61:*15*
signage  18:*3, 16*
29:*15, 24*  30:*4, 14*
31:*22*  45:*11*
signator  33:*5*
signature  24:*25*
25:*2, 25*
signed  3:*15*  24:*21*
25:*24*
signing  3:*14*
signs  18:*9*
sir  16:*5*
sit  25:*23*
sitting  7:*9*
situation  31:*10*
Six  12:*18*  38:*23*
39:*4, 7*  44:*2*
Smithfield  2:*4*
sold  13:*21, 25*
soliciting  34:*23*
somebody  21:*10*
37:*24*  40:*13*  55:*15*
sorry  17:*8*  25:*7*
30:*6*  43:*17*  45:*1,
18, 20*  48:*14*  51:*23*
58:*23*
speakerphone  2:*7*
6:*14*
specific  12:*22*
15:*23*  16:*11, 20, 20*
28:*5, 23*  31:*17*
39:*1*  40:*22*  61:*3*

specifically  8:25
11:*10*  13:*2, 6*  17:*3*
18:*24*  19:*5*  20:*10*
21:*13*  22:*12, 16, 23*
26:*11*  27:*1*  29:*22*
30:*15*  31:*2, 4*  32:*8*
34:*6*  35:*10*  36:*21*
37:*16*  38:*2, 21*
39:*12, 17, 24*  41:*2*
42:*22*  43:*8, 11*
44:*15, 19*  49:*12*
52:*17, 25*  59:*20*
60:*20, 25*
specifications  29:*25*
specifics  20:*7*  46:*4*
speech  4:*14*
spell  6:*16*
spelling  4:*14*
spoken  9:*11*
Springfield  12:*6*
Stamford  20:*16*
start  50:*22*
starting  12:*3*
State  6:*5, 15*  66:*3*
statement  49:*7*
STATES  1:*1*  6:*24*
18:*15*
status  23:*6*
stems  44:*22*
stint  14:*25*
stips  6:*10*
stipulated  3:*3, 8, 13*
Stipulations  4:*5*
6:*8*
stop  56:*2*
stopped  41:*22*
Strategic  37:*5*
Street  1:*24*  2:*4, 10*
stretch  8:*4*
strictly  9:*13*
strike  27:*2*
structure  18:*7*
study  45:*9, 15*
46:*1, 8, 10, 16*
sub  35:*18*
subject  7:*7*  40:*2*
subscribed  63:*18*
successor  6:*21*
sue  56:*14*  57:*2, 10*
suing  56:*9, 19*  57:*5*

Suite  2:*4*
supervision  66:*9*
Sure  12:*5*  14:*24*
15:*23*  24:*25*  40:*24*
41:*17, 19*  47:*24*
surprise  56:*20*
57:*3, 8*
sworn  6:*4*  66:*6*

< T >
table  7:*9*  8:*7*
take  7:*2*  8:*3, 8, 9*
10:*15*  24:*15*  26:*20*
30:*18*  34:*12*  38:*15*
46:*6*  50:*23*  54:*21,*
*21*
taken  3:*10*  51:*1*
54:*3*  63:*4*  66:*15*
talk  8:*4, 23*  33:*22*
talked  54:*24*
talking  16:*21, 22*
33:*16*  53:*21*  55:*2*
talks  27:*23*  28:*7*
36:*5*
team  39:*25*
technological  55:*5,*
*6, 8, 17, 20, 24*
56:*10*
TECHNOLOGY
1:*4*  6:*21*  37:*13, 14,*
*20*  38:*3*  64:*4*
TEL  2:*5*
tell  9:*9*  10:*15*
12:*11*  14:*22*  15:*21*
24:*15*  26:*20*  30:*18*
32:*13*  34:*13*  35:*2*
38:*15*  39:*19*  56:*18*
telling  9:*21*  46:*19*
terminate  39:*14*
44:*17*  51:*15*  54:*10,*
*15, 22*  60:*23*
terminated  45:*1*
46:*21*  47:*7, 10*
51:*5*  53:*6*
terminating  43:*6*
44:*6, 13*
termination  52:*13*
terms  23:*12*  26:*2*
60:*19*

testified  6:*6*  9:*12*
27:*12, 18*  47:*25*
49:*4*  56:*18*  57:*4*
testify  66:*6*
testimony  47:*22*
51:*7*  56:*23*  63:*4*
66:*10*
Thank  61:*20, 21*
Thanks  61:*22*
Thayer  59:*22, 24*
think  6:*22*  35:*19*
37:*17*  42:*25*  47:*20,*
*25*  50:*5, 13*  56:*22*
60:*4*  61:*6*
third  25:*2*
thoughts  40:*7, 13,*
*15*
threat  40:*25*  41:*11*
47:*14*  48:*4*
three  14:*12*  25:*3*
time  3:*4*  8:*3*  11:*6,*
*9, 10, 11*  12:*19, 24*
13:*8*  15:*8, 9, 10*
18:*25*  19:*2*  21:*1, 6,*
*23*  23:*19, 19*  26:*8*
31:*21*  33:*11*  34:*22*
39:*1, 8, 9, 10, 22, 22*
40:*22*  42:*19*  43:*13*
45:*4, 8*  53:*6*  58:*14*
61:*20*
times  21:*23*  43:*4*
Tina  1:*16*  6:*4*
64:*1*  66:*2, 24*
titled  28:*24*  32:*21*
35:*13*
today  7:*2*  8:*14, 18*
15:*4*  25:*23*  33:*13*
told  44:*23*  49:*24*
52:*8*  55:*6, 10, 15*
Tolland  11:*25*
top  52:*9*
topic  55:*16*
trailing  4:*16*
transaction  24:*5, 9,*
*12*  31:*8, 12*
transcribe  7:*16*
transcript  3:*14*
61:*24*  64:*1*
travel  22:*4*
traveled  22:*6*

trial  3:*5*
trip  27:*16, 17*
true  24:*22*  32:*6*
37:*23*  63:*4*  66:*10*
truth  63:*18*  66:*7, 7*
try  7:*18*  16:*17*
42:*21*
trying  47:*22*
48:*24*  49:*21, 24*
Turning  23:*23*
29:*10*  36:*2*
two  9:*11*  28:*17*
29:*10*
type  16:*10*  18:*6*
33:*2*
typically  23:*21*

< U >
Ultimately  16:*23*
17:*11*
unclear  7:*22*
unconditionally
25:*8*
underperforming
40:*17*  43:*5, 15*
understand  8:*13*
9:*25*  28:*11*  47:*22*
48:*24*  49:*21, 23, 24*
52:*7*  59:*11*
understanding
16:*6, 15*  30:*2*
41:*14*  47:*11, 15*
48:*7*  49:*16*  50:*21,*
*25*  51:*3, 14, 20*
56:*13, 16*  57:*11, 13*
understood  7:*25*
undertaken  46:*2,*
*12, 16*  56:*6*
Union  1:*15*
UNITED  1:*1*  6:*24*
18:*15*
University  12:*7, 9,*
*12*
unlimited  25:*17*
Urban  35:*13*
USA  29:*1, 1*
use  7:*14*  8:*4*
37:*13*
Usual  6:*8*
utilized  30:*4*

utilizing  41:9

< V >
vaguely  21:13
 29:22  30:11  39:12
 45:12, 12  46:3
 53:21  59:15
venture  15:16
verbal  7:14
view  40:9
visits  18:2
voice  8:10
volition  46:17
VS  1:7  64:6

< W >
waived  3:11, 11
want  7:22  9:9
 14:3  57:12
wanted  56:14  57:2
Way  11:25  46:7
well  22:21  43:12
 50:7, 9  60:21
went  9:19  22:8
 27:19  38:24  43:14
 44:3  56:1
We're  7:2  12:24,
 25  14:6, 16  29:5, 6
whatsoever  25:19
wide  13:25
wit  66:5
Witco  13:16  14:7
Witco's  13:19
witness  3:14  4:8
 10:17  24:18  26:22
 32:15  34:14  35:4
 38:17  40:19  45:18,
 20  48:14  55:24
 61:19  66:11, 19
word  4:15
work  10:8  14:8
 19:10  20:9  57:1
worked  12:13
 15:8, 9  30:3
working  13:3
 15:24
worried  48:5
worse  42:2
writing  43:3  54:8,
 18  66:9

written  28:11

< Y >
Yeah  13:2  35:25
 40:21  48:21
year  12:3  14:3
years  14:12
York  13:18  15:19
 21:24  22:1, 25
 24:3  32:22, 23
 56:1
younger  22:14

< Z >
ZEISLER  2:10, 10
Zimmeth  22:13
 39:24  41:15  48:2
 49:12  57:12

```
 1                              JURAT

 2

 3          I, DAVID KARL SCHMID, do hereby certify that

 4     the foregoing testimony taken on May 15, 2019, is true

 5     and accurate, including any corrections noted on the

 6     corrections page, to the best of my knowledge and

 7     belief.

 8

 9

10                                   DAVID KARL SCHMID

11

12

13

14

15          At  Hartford  in said county of  Hartford ,

16     this   3   day of  June  , 2019, personally

17     appeared DAVID KARL SCHMID, and he made oath to the

18     truth of the foregoing corrections by him subscribed.

19

20

21     Before me,                        , Notary Public

22     My commission expires:

23                    COURTNEY V. KEANY
                Notary Public, State of Connecticut
24           My Commission Expires May 31, 2021

25
```

# EXHIBIT  N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HUNTINGTON TECHNOLOGY FINANCE, INC. f/k/a MACQUARIE EQUIPMENT FINANCE, INC. f/k/a MACQUARIE EQUIPMENT FINANCE, LLC | Case No. 3:18-cv-01708-VLB<br><br>HONORABLE VANESSA L. BRYANT |
| Plaintiff, | |
| vs. | |
| GARETT ALAN NEFF a/k/a GARY NEFF, JOHN MARK SCHMID, and DAVID KARL SCHMID | |
| Defendants. | |

## AFFIDAVIT OF EDWARD KITCHEN

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) |
| | ) |
| COUNTY OF ALLEGHENY | ) |

I, Edward Kitchen, sworn according to law, states of my own personal knowledge that:

1.      My name is Edward Kitchen, and I am over 21 years of age. I am a Senior Vice President and Special Assets Team Leader for The Huntington National Bank ("Huntington") resident in Huntington's Pittsburgh, PA office, and I make this affidavit in that capacity.

2.      The facts and information contained in this affidavit are true and correct, and are based on personal knowledge and upon my review of the business records of Huntington, which records were made by, or from information transmitted by, a person with knowledge of the events described therein, at or near the time of the event described, and kept in the ordinary course of business. It is the regular business practice of Huntington to make such records, and the aforementioned records are kept under my custody and control.

3.      I am the individual primarily responsible for retaining and directing the activities of counsel relative to the above-captioned matter. To that end, I retained the law firm of Metz Lewis Brodman Must O'Keefe LLC ("Metz Lewis") to represent Huntington Technology Finance, Inc. ("HTF") in connection with the enforcement of the lease agreement by and between HTF and Garage Media NY, LLC ("GMNY") and the guaranty obligations of Garett Alan Neff a/k/a Gary Neff, John Mark Schmid, and David Karl Schmid (the "Guarantors").

4.      The primary individuals at Metz Lewis responsible for HTF's representation are John R. O'Keefe, Jr. and Justin M. Tuskan. Mr. O'Keefe is a Member at Metz Lewis and is Co-Chair of the firm's Banking Group. Mr. O'Keefe has over 35 years' experience representing financial institutions in complex loan and lease workout and enforcement matters. A complete biography for Attorney O'Keefe can be accessed at https://www.metzlewis.com/attorney/john-okeefe-jr/ (last accessed July 25, 2019). Mr. Tuskan is an Associate at Metz Lewis with eight years' experience representing financial institutions in mortgage foreclosure actions, collections, and loan and lease workouts. Mr. Tuskan's biography is accessible as follows: https://www.metzlewis.com/attorney/justin-tuskan/ (last accessed July 25, 2019).

5.      Attached hereto marked as **Exhibit N-1** are copies of invoices sent by Metz Lewis to Huntington for the work performed from inception of this matter through June 30, 2019. Each of the invoices sets forth in detail the tasks performed by Mr. O'Keefe, Mr. Tuskan, and/or paralegals or law clerks, as well as the time spent performing those tasks.

6.      All attorneys, paralegals, and law clerks at Metz Lewis keep time and expense records on a regular daily basis for professional services rendered to clients. Those records are based on a minimum time unit of one-tenth of one hour.

7.    Metz Lewis' billing rates for attorneys currently range from $180 an hour to $425 an hour for its most senior attorneys. For work performed on behalf of HTF, Mr. O'Keefe's hourly rate is $270.00 and Mr. Tuskan's rate is $190.00.

8.    The tasks undertaken by Metz Lewis on behalf of HTF include: (a) review of relevant lease documents; (b) preparation and negotiation of a proposed forbearance agreement; (c) drafting a Complaint to enforce the guaranty obligations referenced above: (d) review and analysis of pertinent legal issues; and (e) discovery, including preparing and responding to interrogatories and requests for production of documents, and taking and defending depositions.

9.    As of the date of this Affidavit, HTF has incurred $73,346.00 in attorneys' fees and $18,937.32 in expenses.

10.    Huntington will continue to incur legal fees from and after June 30, 2019 to and including the date GMNY's and Guarantors' obligations are satisfied.

FURTHER AFFIANT SAYETH NOT

Date: July 26, 2019

Edward Kitchen, Senior Vice President
The Huntington National Bank

SWORN TO and subscribed before me
this 26th day of July, 2019

Andrea L. Quattrone
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Andrea L. Quattrone. Notary Public
Forward Twp., Allegheny County
My Commission Expires Oct. 13, 2021
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

EXHIBIT
tabbies
N-1

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**
**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

Huntington National Bank
EBILLED to Passport

April 26, 2018
Invoice #:   178370
Client #:    000017

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| | | | | | |
|---|---|---|---|---|---|
| 02/01/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Meeting with E. Kitchen (Re: Default and Demand) | | | 0.30 | hours |
| 02/06/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call from E. Kitchen (Re: Lease Termination Issues) | | | 0.30 | hours |
| 02/06/18 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Assemble and review loan lease and related documents | | | 1.80 | hours |
| 02/08/18 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Review and comment upon Letter of Credit Documents | | | 0.60 | hours |
| 02/08/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call E. Kitchen (Re: Lease Expiration and Letter of Credit) | | | 0.20 | hours |
| 02/09/18 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Assemble and review lease and related documents | | | 1.20 | hours |
| 02/12/18 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Assemble and review lease, permit, collateral and related documents | | | 3.30 | hours |
| 02/12/18 | O'KEEFE JR., JOHN R. | B300 | A104 | | |
| | Review Letter of Credit Documents | | | 0.60 | hours |
| 02/12/18 | O'KEEFE JR., JOHN R. | B300 | A106 | | |
| | Phone calls E. Kitchen (Re: Abandonment of Property Issue) | | | 0.30 | hours |
| 02/13/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call E. Kitchen (Re: Abandonment of Collateral and Letter of Credit) | | | 0.30 | hours |
| 02/13/18 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Review additional lease documents recently furnished by Huntington | | | 2.30 | hours |
| 03/20/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone calls and email exchange with E. Kitchen (Re: Payoff) | | | 0.20 | hours |
| 03/29/18 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Review lease and collateral documents (Re: Default Remedies) | | | 2.50 | hours |

```
    000017  Huntington National Bank              Invoice 178370          Page  2
03/29/18   O'KEEFE JR., JOHN R.              P300       A106
           Phone call and email exchange with E. Kitchen (Re:            0.30   hours
           Forbearance and Payoff)
03/30/18   O'KEEFE JR., JOHN R.              P300       A106
           Phone call E. Kitchen (Re: Default Notices and                0.20   hours
           Forbearance Terms)
03/30/18   O'KEEFE JR., JOHN R.              P300       A104
           Review lease, amendment and collateral documents (Re:         1.00   hours
           Forbearance)
03/30/18   O'KEEFE JR., JOHN R.              P300       A104
           Review Default and Reservation of Rights Notices (Re:         0.60   hours
           Same)



                                   Fees            $4,320.00
                                                   ===========
                        Total Current Charges      $4,320.00
                                                   ===========
                          Total Balance Due        $4,320.00
                                                   ===========
```

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---|---|---|
| O'KEEFE JR., JOHN R. | 16.00 | 270.00 | $4,320.00 |
| Total | | | $4,320.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**
**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

Huntington National Bank
EBILLED to Passport

May 17, 2018
Invoice #:   178581
Client #:    000017

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| Date | Attorney | Task | Activity | Description | Hours |
|------|----------|------|----------|-------------|-------|
| 04/20/18 | O'KEEFE JR., JOHN R. | P300 | A104 | Assemble and review lease, collateral and related documents to prepare Forbearance Agreement) | 2.20 hours |
| 04/23/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Phone call E. Kitchen (Re: Forbearance Agreement) | 0.20 hours |
| 04/26/18 | O'KEEFE JR., JOHN R. | P400 | A103 | Prepare proposed Forbearance Agreement | 2.40 hours |
| 04/27/18 | O'KEEFE JR., JOHN R. | P400 | A103 | Prepare proposed Forbearance Agreement | 4.10 hours |
| 04/27/18 | O'KEEFE JR., JOHN R. | P400 | A106 | Phone call and email E. Kitchen (Re: Same) | 0.20 hours |

|  |  |
|--|--|
| Fees | $2,457.00 |
| | =========== |
| Total Current Charges | $2,457.00 |
| | =========== |
| Total Balance Due | $2,457.00 |
| | =========== |

| Time Summary | Hours billed | Hourly rate | Fees billed |
|--------------|--------------|-------------|-------------|
| O'KEEFE JR., JOHN R. | 9.10 | 270.00 | $2,457.00 |
| Total | | | $2,457.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**
**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

Huntington National Bank
EBILLED to Passport

June 15, 2018
Invoice #:   179371
Client #:    000017

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| Date | Attorney | | | Hours | |
|------|----------|---|---|-------|---|
| 05/03/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call and email exchange with E. Kitchen, A. Feldstein (Re: Lessor's Return) | | | 0.30 | hours |
| 05/04/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call A. Feldstein (Re: Payment History) | | | 0.20 | hours |
| 05/04/18 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Review payment history and Lessor's Return spreadsheet | | | 0.80 | hours |
| 05/04/18 | O'KEEFE JR., JOHN R. | P300 | A108 | | |
| | Letter Garage Media NY (Re: Same) | | | 0.20 | hours |
| 05/04/18 | O'KEEFE JR., JOHN R. | P300 | A103 | | |
| | Modify Forbearance Agreement | | | 0.60 | hours |
| 05/04/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone calls and email E. Kitchen (Re: Same) | | | 0.30 | hours |
| 05/15/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call E. Kitchen (Re: Forbearance Status and Reminder Letter) | | | 0.10 | hours |
| 05/16/18 | O'KEEFE JR., JOHN R. | P300 | A108 | | |
| | Letter to Lessee and Guarantors (Re: Forbearance Agreement) | | | 0.20 | hours |
| 05/17/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call from E. Kitchen (Re: Forbearance Agreement and Compromise Payment) | | | 0.20 | hours |
| 05/18/18 | O'KEEFE JR., JOHN R. | P300 | A108 | | |
| | Phone calls E. Henzy, Esq., E. Kitchen, A. Feldstein (Re: Forbearance Agreement and Lessor's Return) | | | 0.60 | hours |
| 05/18/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone calls and email exchange with A. Feldstein (Re: Same) | | | 0.30 | hours |
| 05/18/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Email exchange with E. Henzy, Esq. (Re: Lessor's Return) | | | 0.10 | hours |
| 05/18/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Email E. Kitchen (Re: Same) | | | 0.10 | hours |
| 05/21/18 | O'KEEFE JR., JOHN R. | P500 | A107 | | |

```
  000017  Huntington National Bank              Invoice 179371          Page  2
          Email E. Henzy, Esq. (Re: Same)                          0.20  hours
05/21/18  O'KEEFE JR., JOHN R.              P500        A103
          Modify proposed Forbearance Agreement                    0.80  hours
05/21/18  O'KEEFE JR., JOHN R.              P400        A106
          Phone call E. Kitchen (Re: Contact from Counsel)         0.20  hours
05/29/18  O'KEEFE JR., JOHN R.              P300        A106
          Phone call E. Kitchen (Re: J. Schmid)                    0.10  hours
05/31/18  O'KEEFE JR., JOHN R.              P400        A106
          Email E. Kitchen, A. Feldstein (Re: Schmid Address)      0.10  hours
05/31/18  O'KEEFE JR., JOHN R.              P400        A104
          Review lease documentation                               0.60  hours
05/31/18  O'KEEFE JR., JOHN R.              P400        A107
          Phone call and letter E. Henzy, Esq. (Re: Forbearance    0.20  hours
          Agreement, Amount Due Calculation and Standby Letter of
          Credit Invoice)
```

|  | | |
|---|---|---|
| Fees | $1,674.00 |
| | ============ |
| Total Current Charges | $1,674.00 |
| | ============ |
| Total Balance Due | $1,674.00 |
| | ============ |

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---|---|---|
| O'KEEFE JR., JOHN R. | 6.20 | 270.00 | $1,674.00 |
| | | | |
| Total | | | $1,674.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**
**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

Huntington National Bank
EBILLED to Passport

July 27, 2018
Invoice #:    180516
Client #:     000017

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| | | | | | |
|---|---|---|---|---|---|
| 06/11/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call E. Kitchen (Re: Forbearance Status) | | | 0.20 | hours |
| 06/12/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call E. Kitchen (Re: Forbearance Agreement Status) | | | 0.10 | hours |
| 06/13/18 | O'KEEFE JR., JOHN R. | P300 | A107 | | |
| | Email E. Henzy, Esq. (Re: Forbearance Agreement) | | | 0.10 | hours |
| 06/18/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call E. Kitchen (Re: Standby Letter of Credit) | | | 0.10 | hours |
| 06/20/18 | O'KEEFE JR., JOHN R. | P300 | A108 | | |
| | Phone calls and email exchange with E. Henzy, Esq., E. Kitchen (Re: Forbearance and Letter of Credit Invoice Status) | | | 0.30 | hours |
| 06/28/18 | O'KEEFE JR., JOHN R. | P400 | A106 | | |
| | Phone call from E. Kitchen (Re: Debtors' Response) | | | 0.10 | hours |

```
000017 Huntington National Bank        Invoice 180516            Page  2

                                  Fees          $243.00

                                              ===========

                       Total Current Charges   $243.00

                                              ===========

                        Total Balance Due      $243.00

                                              ===========
```

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---|---|---|
| O'KEEFE JR., JOHN R. | 0.90 | 270.00 | $243.00 |
| Total | | | $243.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**
**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

|  |  |
|---|---|
| Huntington National Bank<br>EBILLED to Passport | August 23, 2018<br>Invoice #:   181166<br>Client #:    000017 |

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| Date | Timekeeper | | | Description | Hours | |
|---|---|---|---|---|---|---|
| 07/02/18 | O'KEEFE JR., JOHN R. | P400 | A106 | Phone call from E. Kitchen (Re: Response to Forbearance Proposal) | 0.10 | hours |
| 07/02/18 | O'KEEFE JR., JOHN R. | P400 | A107 | Email C. Blau, Esq. (Re: Same) | 0.10 | hours |
| 07/10/18 | O'KEEFE JR., JOHN R. | P400 | A106 | Phone call E. Kitchen (Re: Guarantor Demand) | 0.20 | hours |
| 07/12/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Phone call E. Kitchen (Re: Demand of Lessee and Guarantors) | 0.20 | hours |
| 07/13/18 | O'KEEFE JR., JOHN R. | P300 | A104 | Review correspondence from Lessee's and Guarantors' counsel | 0.60 | hours |
| 07/13/18 | O'KEEFE JR., JOHN R. | P300 | A104 | Review lease documentation (Re: Representations and Certifications) | 0.80 | hours |
| 07/16/18 | O'KEEFE JR., JOHN R. | P300 | A104 | Review relevant lease and related documents | 0.80 | hours |
| 07/16/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Letter E. Kitchen (Re: Pursuit of Guarantors and Ownership of Billboard and Equipment) | 0.60 | hours |
| 07/17/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Phone calls E. Kitchen (Re: Guarantor Status and Strategy) | 0.20 | hours |
| 07/19/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Finalize letter to E. Kitchen (Re: Guarantor Action and Equipment Ownership) | 0.20 | hours |
| 07/19/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Phone call E. Kitchen (Re: Same) | 0.10 | hours |
| 07/20/18 | O'KEEFE JR., JOHN R. | P300 | A104 | Review and analyze Compromise Demand Response and related documents and authority | 1.40 | hours |
| 07/23/18 | O'KEEFE JR., JOHN R. | P300 | A107 | | | |

```
000017  Huntington National Bank            Invoice 181166         Page  2
           Review Lessee's and Guarantors' counsel's correspondence     0.40  hours
           (Re: Claims and Settlement)
07/23/18   O'KEEFE JR., JOHN R.              P300       A106
           Phone call E. Kitchen (Re: Same)                             0.20  hours
07/25/18   O'KEEFE JR., JOHN R.              P300       A106
           Phone call E. Kitchen (Re: Lessee and Guarantor's            0.20  hours
           Response to Forbearance Agreement)
07/25/18   O'KEEFE JR., JOHN R.              P300       A106
           Letter E. Kitchen (Re: Same)                                 0.40  hours
07/25/18   O'KEEFE JR., JOHN R.              P300       A104
           Review Lease, Amendments to Lease and Acceptance             0.80  hours
           Certifications
07/26/18   O'KEEFE JR., JOHN R.              P300       A106
           Phone call and email exchange with E. Kitchen (Re:           0.20  hours
           Conference
07/27/18   O'KEEFE JR., JOHN R.              P300       A104
           Review correspondence from Lessee's and Guarantors'          0.80  hours
           counsel and related documents
07/27/18   O'KEEFE JR., JOHN R.              P300       A106
           Prepare for and participate in conference call with R.       0.60  hours
           Mace, E. Kitchen (Re: Lessee's and Guarantors' Response)
```

|  |  |  |
|---|---|---|
| Fees | $2,403.00 |
|  | =========== |
| Total Current Charges | $2,403.00 |
|  | =========== |
| Total Balance Due | $2,403.00 |
|  | =========== |

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---|---|---|
| O'KEEFE JR., JOHN R. | 8.90 | 270.00 | $2,403.00 |
| TUSKAN, JUSTIN  M | 0.00 | 0.00 | $0.00 |
| Total |  |  | $2,403.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**

**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

```
                                             September 21, 2018
Huntington National Bank                     Invoice #:   181755
EBILLED to Passport                          Client #:    000017


                                             EIN 23-2947545
```

STATEMENT FOR SERVICES RENDERED:


Matter:   00267

Garage Media NY, LLC

| | | | | | |
|---|---|---|---|---|---|
| 08/09/18 | O'KEEFE JR., JOHN R. | P300 | A107 | | |
| | Phone call and email C. Blau, Esq. (Re: Letter of Credit Invoice and Display Agreement Status) | | | 0.60 | hours |
| 08/10/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call E. Kitchen (Re: Letter of Credit and Compromise Payment) | | | 0.20 | hours |
| 08/13/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call E. Kitchen (Re: Response to Offer) | | | 0.10 | hours |
| 08/14/18 | O'KEEFE JR., JOHN R. | P300 | A107 | | |
| | Email exchange with C. Blau, Esq. (Re: Conference Call) | | | 0.20 | hours |
| 08/14/18 | O'KEEFE JR., JOHN R. | P300 | A103 | | |
| | Prepare response letter to C. Blau, Esq. (Re: Compromise Payment) | | | 0.90 | hours |
| 08/14/18 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Review Display Agreement, Equipment Purchase Agreement, GKD Warranty and Collateral Agreement, Services Purchase Agreement, Lease Agreement, as amended, and Acceptance Certificates | | | 1.30 | hours |
| 08/15/18 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Review Lease Agreement, as amended, collateral and related documents | | | 1.50 | hours |
| 08/15/18 | O'KEEFE JR., JOHN R. | P300 | A107 | | |
| | Phone call and email exchange with C. Blau, Esq. (Re: Settlement Conference) | | | 0.30 | hours |
| 08/15/18 | O'KEEFE JR., JOHN R. | P300 | A103 | | |
| | Letter response to C. Blau, Esq. (Re: Guarantors' Settlement Offer) | | | 1.80 | hours |
| 08/15/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone calls and email exchange with E. Kitchen (Re: Same) | | | 0.20 | hours |
| 08/15/18 | O'KEEFE JR., JOHN R. | P300 | A103 | | |
| | Modifications to letter to C. Blau, Esq. | | | 0.40 | hours |
| 08/16/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Phone call E. Kitchen (Re: Conference Call with Counsel) | | | 0.10 | hours |
| 08/17/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |

```
    000017 Huntington National Bank                 Invoice 181755              Page  2
               Phone call E. Kitchen (Re: Same)                                  0.20  hours
08/17/18   O'KEEFE JR., JOHN R.              P300      A107
           Prepare for and participate in conference call with E.                0.80  hours
           Henzy, Esq., C. Blau, Esq. (Re: Payment and Forbearance)
08/22/18   O'KEEFE JR., JOHN R.              P300      A104
           Review email proposal from Borrower's and Guarantors'                 0.10  hours
           counsel
08/22/18   O'KEEFE JR., JOHN R.              P300      A106
           Phone call and email E. Kitchen (Re: Same)                            0.20  hours
08/23/18   O'KEEFE JR., JOHN R.              P300      A106
           Conference call with R. Mace, E. Kitchen (Re: Response to             0.80  hours
           Borrower's and Guarantors' Counsel)
08/23/18   O'KEEFE JR., JOHN R.              P300      A107
           Email C. Blau, Esq. (Re: Response and Letter of Credit                0.30  hours
           Invoice)
08/24/18   O'KEEFE JR., JOHN R.              P300      A106
           Phone call E. Kitchen (Re: Same)                                      0.10  hours
08/24/18   O'KEEFE JR., JOHN R.              P300      A108
           Email exchange with C. Blau, Esq., R. Mace (Re: Payment               0.20  hours
           of Standby Letter of Credit Invoice)
08/27/18   O'KEEFE JR., JOHN R.              P300      A108
           Email C. Blau, Esq., E. Kitchen (Re: Letter of Credit                 0.20  hours
           Renewal Payment)


                               Fees          $2,835.00
                                            ============

                  Total Current Charges      $2,835.00
         Plus Previously Billed Charges      $2,403.00
                                            ============
                      Total Balance Due      $5,238.00
                                            ============
```

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---|---|---|
| O'KEEFE JR., JOHN R. | 10.50 | 270.00 | $2,835.00 |
| Total | | | $2,835.00 |

# METZ LEWIS BRODMAN MUST O'KEEFE LLC
## 535 Smithfield Street
### Suite 800
### Pittsburgh, PA 15222
### 412-918-1100

October 12, 2018
Invoice #:   182342
Client #:   000017

Huntington National Bank
EBILLED to Passport

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| Date | Timekeeper | | | Description | Hours |
|---|---|---|---|---|---|
| 09/05/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Phone call from E. Kitchen (Re: Borrower's Documentation and Information) | 0.10 hours |
| 09/06/18 | O'KEEFE JR., JOHN R. | P300 | A107 | Phone call and email C. Blau, Esq. (Re: Documentation and Proposal) | 0.30 hours |
| 09/12/18 | O'KEEFE JR., JOHN R. | P300 | A108 | Email exchange with C. Blau, Esq., E. Kitchen (Re: Letter of Credit Fee and Borrower's Information Package) | 0.30 hours |
| 09/19/18 | O'KEEFE JR., JOHN R. | P300 | A104 | Review Garage Media's Informational Memorandum | 1.10 hours |
| 09/19/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Phone call and email E. Kitchen (Re: Same) | 0.10 hours |
| 09/19/18 | O'KEEFE JR., JOHN R. | P300 | A107 | Phone call C. Blau, Esq. (Re: Same) | 0.10 hours |
| 09/21/18 | O'KEEFE JR., JOHN R. | P300 | A107 | Letter C. Blau, Esq. (Re: Counter Compromise Payment Offer) | 0.20 hours |
| 09/21/18 | TUSKAN, JUSTIN M | L120 | A105 | Discussion with J. O'Keefe to discuss filing of guarantor enforcement action | 0.20 hours |
| 09/25/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Phone call and email E. Kitchen (Re: Counter Offer) | 0.20 hours |
| 09/26/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Phone call and email E. Kitchen (Re: Same) | 0.10 hours |
| 09/26/18 | O'KEEFE JR., JOHN R. | P300 | A104 | Review lease and guaranty documents (Re: Default and Demand) | 0.80 hours |
| 09/26/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Phone call T. Sansone, Esq. (Re: Local Counsel) | 0.10 hours |
| 09/26/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Phone call and mail exchange with E. Kitchen, R. Mace (Re: Settlement Offer) | 0.30 hours |

```
    000017 Huntington National Bank              Invoice 182342              Page  2
09/26/18    O'KEEFE JR., JOHN R.            P300      A106
            Email exchange with A. Feldstein (Re: Updated Payoff and     0.30  hours
            Lessor's Return)
09/26/18    O'KEEFE JR., JOHN R.            P300      A104
            Review Letter of Credit (Re: Notice Not to Renew or          0.20  hours
            Maturity)
09/26/18    TUSKAN, JUSTIN M               L120      A105
            Discussion with J. O'Keefe regarding status/strategy         0.20  hours
09/27/18    O'KEEFE JR., JOHN R.            P300      A106
            Phone calls and email exchange with A. Feldstein (Re:        0.30  hours
            Payment History and Payoff)
09/27/18    O'KEEFE JR., JOHN R.            P300      A104
            Review Lease Agreement, as amended (Re: Default and          1.40  hours
            Demand)
09/30/18    TUSKAN, JUSTIN M               L210      A103
            Prepare Complaint against guarnators                         2.30  hours


                              Fees              $2,106.00
                                               ===========
                   Total Current Charges        $2,106.00
                                               ===========
                    Total Balance Due           $2,106.00
                                               ===========
```

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---|---|---|
| O'KEEFE JR., JOHN R. | 5.90 | 270.00 | $1,593.00 |
| TUSKAN, JUSTIN M | 2.70 | 190.00 | $513.00 |
| | | | |
| Total | | | $2,106.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**

**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

```
                                        November 16, 2018
Huntington National Bank                Invoice #:   183245
EBILLED to Passport                     Client #:    000017


                                        EIN 23-2947545
```

STATEMENT FOR SERVICES RENDERED:


Matter:   00267

Garage Media NY, LLC

| Date | Timekeeper | Task | Activity | Description | Hours | |
|------|------------|------|----------|-------------|-------|---|
| 10/01/18 | O'KEEFE JR., JOHN R. | L210 | A106 | Phone call E. Kitchen (Re: Federal Court Litigation Status) | 0.20 | hours |
| 10/01/18 | O'KEEFE JR., JOHN R. | L210 | A104 | Review federal civil docket (Re: Same) | 0.10 | hours |
| 10/02/18 | O'KEEFE JR., JOHN R. | P300 | A103 | Prepare Notice of Payment Default to Borrower and Guarantors | 0.80 | hours |
| 10/02/18 | O'KEEFE JR., JOHN R. | P300 | A107 | Email C. Blau, Esq. (Re: Reject Offer) | 0.10 | hours |
| 10/02/18 | O'KEEFE JR., JOHN R. | L210 | A103 | Review and revise proposed Complaint | 1.00 | hours |
| 10/02/18 | O'KEEFE JR., JOHN R. | L210 | A106 | Email E. Kitchen (Re: Same) | 0.20 | hours |
| 10/08/18 | O'KEEFE JR., JOHN R. | P300 | A107 | Phone call and email exchange with C. Blau, Esq. (Re: Same) | 0.10 | hours |
| 10/08/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Phone call E. Kitchen (Re: Lessee/Guarantor Settlement Communication) | 0.20 | hours |
| 10/08/18 | TUSKAN, JUSTIN M | L110 | A104 | Review email correspondence regarding Bank declining to provide counter-offer to guarantors | 0.10 | hours |
| 10/10/18 | O'KEEFE JR., JOHN R. | P300 | A106 | Email exchange with E. Kitchen (Re: Complaint) | 0.30 | hours |
| 10/10/18 | O'KEEFE JR., JOHN R. | P300 | A108 | Several phone calls E. Henzy, Esq., E. Kitchen (Re: Settlement and Complaint) | 0.50 | hours |
| 10/10/18 | TUSKAN, JUSTIN M | L120 | A105 | Discussion with J. O'Keefe regarding Bank's determination to move forward with litigation, possible buy-out offer, and related items | 0.20 | hours |
| 10/11/18 | TUSKAN, JUSTIN M | L210 | A103 | | | |

```
   000017 Huntington National Bank              Invoice 183245        Page  2
                 Prepare Complaint for filing                        0.30 hours
10/11/18       TUSKAN, JUSTIN  M              L120      A107
                 Email correspondence and telephone discussion with local   0.50 hours
                 counsel on the same
10/12/18       TUSKAN, JUSTIN  M              L210      A107
                 Email correspondence with local counsel regarding          0.20 hours
                 Complaint revisions and filing
10/15/18       O'KEEFE JR., JOHN R.           L140      A106
                 Email T. Sansone, Esq. (Re: Same)                          0.20 hours
10/15/18       O'KEEFE JR., JOHN R.           L210      A106
                 Phone call E. Kitchen (Re: CN Counsel)                     0.20 hours
10/15/18       O'KEEFE JR., JOHN R.           L140      A104
                 Review and execute CN Engagement                           0.20 hours
10/15/18       TUSKAN, JUSTIN  M              L120      A107
                 Email correspondence with local counsel regarding FRCP     0.20 hours
                 7.1 disclosures
10/15/18       TUSKAN, JUSTIN  M              L120      A106
                 Email correspondence with client regarding as-filed        0.20 hours
                 Complaint
10/16/18       O'KEEFE JR., JOHN R.           L210      A106
                 Phone call E. Kitchen (Re: Complaint Status)               0.20 hours
10/16/18       TUSKAN, JUSTIN  M              L120      A107
                 Email correspondence with local counsel regarding status   0.20 hours
                 of service and background on presiding judge
10/17/18       O'KEEFE JR., JOHN R.           L140      A103
                 Review and revise proposed Motion and Affidavit            0.30 hours
10/17/18       O'KEEFE JR., JOHN R.           L140      A106
                 Email T. Sansone, Esq. (Re: Same)                          0.20 hours
10/17/18       TUSKAN, JUSTIN  M              L250      A103
                 Provide comment to and finalize Motion Affidavit in        0.20 hours
                 Support thereof
10/17/18       TUSKAN, JUSTIN  M              L250      A104
                 Review Motion and Affidavit in Support thereof             0.20 hours
10/18/18       O'KEEFE JR., JOHN R.           L140      A106
                 Email exchange with T. Sansone, Esq. (Re: Affidavit)       0.20 hours
10/18/18       TUSKAN, JUSTIN  M              L120      A107
                 Email correspondence with local counsel regarding pro hac  0.10 hours
                 admission
10/25/18       TUSKAN, JUSTIN  M              L110      A104
                 Attention to matters regarding admission                   0.20 hours
10/29/18       O'KEEFE JR., JOHN R.           L210      A105
                 Phone call E. Kitchen (Re: Complaint Status)               0.10 hours
10/30/18       O'KEEFE JR., JOHN R.           L210      A103
                 Revise Affidavit                                           0.20 hours
10/30/18       O'KEEFE JR., JOHN R.           L210      A106
                 Email exchange with T. Sansone, Esq. (Re: Same)            0.20 hours
10/30/18       O'KEEFE JR., JOHN R.           L210      A104
                 Review docket and filings                                  0.40 hours
10/30/18       TUSKAN, JUSTIN  M              L110      A107
                 Email correspondence with local counsel and opposing       0.40 hours
                 counsel regarding completion of Rule 26 requirements
```

```
000017 Huntington National Bank          Invoice 183245          Page  3

                                    Fees              $2,163.00
                                                      ===========

                      Total Current Charges           $2,163.00
                                                      ===========

                         Total Balance Due            $2,163.00
                                                      ===========
```

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---|---|---|
| O'KEEFE JR., JOHN R. | 5.90 | 270.00 | $1,593.00 |
| TUSKAN, JUSTIN  M | 3.00 | 190.00 | $570.00 |
| Total | | | $2,163.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**
**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

Huntington National Bank
EBILLED to Passport

December 12, 2018
Invoice #:   183885
Client #:    000017

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| | | | | | |
|---|---|---|---|---|---|
| 11/06/18 | TUSKAN, JUSTIN M | L120 | A106 | | |
| | Email correspondence with client regarding case status | | | 0.10 | hours |
| 11/19/18 | TUSKAN, JUSTIN M | L230 | A109 | | |
| | Conduct Rule 26(f) conference with local counsel and counsel for Defendants | | | 0.40 | hours |
| 11/19/18 | TUSKAN, JUSTIN M | L230 | A101 | | |
| | Prepare for Rule 26(f) conference with local counsel and counsel for Defendants | | | 0.40 | hours |
| 11/20/18 | TUSKAN, JUSTIN M | L120 | A105 | | |
| | Discussion with J. O'Keefe regarding outcome of Rule 26(f) conference | | | 0.10 | hours |
| 11/26/18 | TUSKAN, JUSTIN M | L210 | A104 | | |
| | Review Rule 26 Report and ESI Protocol | | | 0.40 | hours |
| 11/26/18 | TUSKAN, JUSTIN M | L210 | A103 | | |
| | Revise Rule 26 Report and ESI Protocol | | | 0.30 | hours |
| 11/26/18 | TUSKAN, JUSTIN M | L210 | A103 | | |
| | Prepare Rule 26 Report and ESI Protocol | | | 3.50 | hours |
| 11/27/18 | TUSKAN, JUSTIN M | L110 | A107 | | |
| | Review local counsel's comments to draft Rule 26(f) Report and email correspondence regarding the same | | | 0.30 | hours |

Disbursements:

| | | | |
|---|---|---|---|
| 11/13/18 | Carmody Torrance Sandak Hennessey LLP; LOCAL COUNSEL EXPENSE | $2,925.51 | |

000017 Huntington National Bank                    Invoice 183885                    Page  2

|                          |              |
|--------------------------|--------------|
| Fees                     | $1,045.00    |
| Disbursements            | $2,925.51    |
|                          | ===========  |
| Total Current Charges    | $3,970.51    |
|                          | ===========  |
| Total Balance Due        | $3,970.51    |
|                          | ===========  |

| Time Summary        | Hours billed | Hourly rate | Fees billed |
|---------------------|--------------|-------------|-------------|
| TUSKAN, JUSTIN  M   | 5.50         | 190.00      | $1,045.00   |
| Total               |              |             | $1,045.00   |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**
**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

Huntington National Bank
EBILLED to Passport

January 15, 2019
Invoice #:   185182
Client #:    000017

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| Date | Timekeeper | | | Hours | |
|---|---|---|---|---|---|
| 12/03/18 | TUSKAN, JUSTIN  M | L120 | A106 | | |
| | Email correspondence with local counsel regarding FRCP Initital Disclosures | | | 0.60 | hours |
| 12/03/18 | TUSKAN, JUSTIN  M | L110 | A103 | | |
| | Prepare Rule 26(f) Report | | | 0.50 | hours |
| 12/03/18 | TUSKAN, JUSTIN  M | L210 | A103 | | |
| | Prepare FRCP 26 Initial Disclosures | | | 0.50 | hours |
| 12/04/18 | TUSKAN, JUSTIN  M | L210 | A103 | | |
| | Finalize Initial Disclosures | | | 0.20 | hours |
| 12/11/18 | TUSKAN, JUSTIN  M | L110 | A104 | | |
| | Review Case Management Order | | | 0.10 | hours |
| 12/11/18 | TUSKAN, JUSTIN  M | L120 | A106 | | |
| | Email correspondence with client and local counsel regarding review of Case Management Order | | | 0.20 | hours |
| 12/18/18 | TUSKAN, JUSTIN  M | L210 | A104 | | |
| | Review Answer and Affirmative Defenses to Complaint | | | 0.30 | hours |
| 12/19/18 | O'KEEFE JR., JOHN R. | L210 | A104 | | |
| | Review and analyze Defendants' Answer and Affirmative Defenses to Complaint | | | 0.70 | hours |
| 12/19/18 | O'KEEFE JR., JOHN R. | L210 | A106 | | |
| | Phone call E. Kitchen (Re: Same) | | | 0.20 | hours |
| 12/31/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Email exchange with E. Kitchen (Re: Payment of Letter of Credit Fee) | | | 0.20 | hours |
| 12/31/18 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Review Standby Letter of Credit Application and Agreement, Terms and Conditions of Agreement and Outfront Sight Draft on Standby Letter of Credit | | | 1.20 | hours |
| 12/31/18 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Email exchange with E. Kitchen (Re: Same and Demand for Reimbursement) | | | 0.20 | hours |

Disbursements:
| 12/31/18 | Carmody Torrance Sandak Hennessy; LOCAL COUNSEL | $1,247.00 |
|---|---|---|

```
000017 Huntington National Bank          Invoice 185182              Page  2
       EXPENSE
```

|                          |             |
|-------------------------|-------------|
| Fees                    | $1,131.00   |
| Disbursements           | $1,247.00   |
|                         | ===========  |
| Total Current Charges   | $2,378.00   |
|                         | ===========  |
| Total Balance Due       | $2,378.00   |
|                         | ===========  |

| Time Summary            | Hours billed | Hourly rate | Fees billed |
|-------------------------|--------------|-------------|-------------|
| O'KEEFE JR., JOHN R.    | 2.50         | 270.00      | $675.00     |
| TUSKAN, JUSTIN  M       | 2.40         | 190.00      | $456.00     |
| Total                   |              |             | $1,131.00   |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**
**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

Huntington National Bank
EBILLED to Serengeti

February 21, 2019
Invoice #:   185484
Client #:    000017

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| Date | Name | | | Hours | |
|---|---|---|---|---|---|
| 01/02/19 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Conference calls with R. Mace, E. Kitchen (Re: Same) | | | 0.40 | hours |
| 01/02/19 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Review Master Agreement, as Supplemented, Display Agreement and Acknowledgement and Agreement (Re: Answer and Affirmative Defenses to Complaint, Purpose for letter of Credit and Signage Status) | | | 1.90 | hours |
| 01/02/19 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Review Outfront Notice of Default, Huntington's Irrevocable letter of Credit, Outfront's Sight Draft and Outfront's Draw Letter | | | 1.40 | hours |
| 01/02/19 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Letter E. Kitchen, R. Mace (Re: Same) | | | 0.30 | hours |
| 01/02/19 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Email exchange with E. Kitchen (Re: Same) | | | 0.20 | hours |
| 01/03/19 | O'KEEFE JR., JOHN R. | P300 | A106 | | |
| | Letter R. Mace, E. Kitchen (Re: Answer and Affirmative Defenses to Complaint, Purpose for letter of Credit and Signage Status) | | | 0.80 | hours |
| 01/04/19 | TUSKAN, JUSTIN M | B100 | A105 | | |
| | Discussion with J. O'Keefe re: case status and preparation of demand as to Garage Media in connection with letter of credit | | | 0.20 | hours |
| 01/21/19 | TUSKAN, JUSTIN M | L160 | A104 | | |
| | Review letter of credit documentation and prepare letter correspondence to lessee re: default and demand | | | 2.00 | hours |
| 01/22/19 | O'KEEFE JR., JOHN R. | P300 | A104 | | |
| | Review and comment upon Reimbursement Demand Letter | | | 0.20 | hours |
| 01/22/19 | TUSKAN, JUSTIN M | B100 | A104 | | |
| | Review/revise demand letter to Garage Media re: letter of credit and email correspondence and discussion with client and J. O'Keefe on the same | | | 0.30 | hours |
| 01/23/19 | TUSKAN, JUSTIN M | B100 | A103 | | |
| | Finalize and send demand letter re: letter of credit | | | 0.20 | hours |

```
   000017 Huntington National Bank              Invoice 185484          Page  2
01/25/19    TUSKAN, JUSTIN  M              B100      A104
            Review Orders of Court granting admission pro hac vice         0.10  hours
01/28/19    TUSKAN, JUSTIN  M              B100      A103
            Prepare Notice of Appearance and attention to matters re:      0.40  hours
            filing/service of the same
Disbursements:
01/30/19    Carmody Torrance Sandak Hennessey; LOCAL COUNSEL         $861.00
            EXPENSE
```

|  |  |
|---|---:|
| Fees | $2,012.00 |
| Disbursements | $861.00 |
| | ============ |
| Total Current Charges | $2,873.00 |
| | ============ |
| Total Balance Due | $2,873.00 |
| | ============ |

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---:|---:|---:|
| O'KEEFE JR., JOHN R. | 5.20 | 270.00 | $1,404.00 |
| TUSKAN, JUSTIN  M | 3.20 | 190.00 | $608.00 |
| | | | _____ |
| Total | | | $2,012.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**

**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

March 15, 2019
Invoice #:   186127
Client #:    000017

Huntington National Bank
EBILLED to Serengeti

EIN 23-2947545

_____

STATEMENT FOR SERVICES RENDERED:


Matter:   00267

Garage Media NY, LLC

| Date | Attorney / Description | Code | Code | Hours | |
|---|---|---|---|---|---|
| 02/11/19 | TUSKAN, JUSTIN M<br>Attention to matters re: entry of appearance subsequent to pro hac admission | L210 | A103 | 0.20 | hours |
| 02/27/19 | O'KEEFE JR., JOHN R.<br>Review discovery issues and strategy | L310 | A104 | 0.50 | hours |
| 02/27/19 | TUSKAN, JUSTIN M<br>Review Guarantors' discovery requests and deposition notices | L310 | A104 | 0.80 | hours |
| 02/27/19 | TUSKAN, JUSTIN M<br>Conference with J. O'Keefe to discuss discovery status and strategy | L120 | A105 | 0.50 | hours |
| 02/27/19 | TUSKAN, JUSTIN M<br>Prepare interrogatories and requests for production directed to Guarantors | L310 | A103 | 1.80 | hours |
| 02/28/19 | O'KEEFE JR., JOHN R.<br>Review discovery plan and issues | L310 | A104 | 0.50 | hours |
| 02/28/19 | O'KEEFE JR., JOHN R.<br>Phone calls E. Kitchen, L. Osborn, Esq. (Re: Discovery Plan) | L310 | A106 | 0.30 | hours |
| 02/28/19 | TUSKAN, JUSTIN M<br>Prepare and revise discovery requests directed to Defendants | L310 | A103 | 1.80 | hours |
| 02/28/19 | TUSKAN, JUSTIN M<br>Telephone conference with client to discuss discovery strategy | L120 | A106 | 0.50 | hours |
| 02/28/19 | TUSKAN, JUSTIN M<br>Review discovery requests directed to Defendants | L310 | A104 | 0.20 | hours |
| 02/28/19 | TUSKAN, JUSTIN M<br>Telephone conference with counsel for Defendants to discuss deposition schedule | L330 | A107 | 0.30 | hours |

Disbursements:

```
     000017  Huntington National Bank          Invoice 186127          Page  2
01/29/19    EXPEDITED MAIL-CARMODY TORRANCE SANDAK, NEW              $19.26
            HAVEN, CT
```

|  |  |
|---|---|
| Fees | $1,510.00 |
| Disbursements | $19.26 |
|  | =========== |
| Total Current Charges | $1,529.26 |
|  | =========== |
| Total Balance Due | $1,529.26 |
|  | =========== |

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---|---|---|
| O'KEEFE JR., JOHN R. | 1.30 | 270.00 | $351.00 |
| TUSKAN, JUSTIN  M | 6.10 | 190.00 | $1,159.00 |
| Total |  |  | $1,510.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**

**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

Huntington National Bank
EBILLED to Serengeti

April 16, 2019
Invoice #:   187005
Client #:    000017

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| Date | Attorney | Code 1 | Code 2 | Description | Hours | |
|---|---|---|---|---|---|---|
| 03/01/19 | O'KEEFE JR., JOHN R. | L330 | A106 | Phone call and email L. Osborn, Esq. (Re: Pleadings, Scheduling Order and Discovery) | 0.60 | hours |
| 03/05/19 | TUSKAN, JUSTIN M | L120 | A105 | Discussion with J. O'Keefe regarding document production status | 0.20 | hours |
| 03/06/19 | TUSKAN, JUSTIN M | L450 | A109 | Participate in discovery status conference with court | 0.40 | hours |
| 03/06/19 | TUSKAN, JUSTIN M | L440 | A101 | Prepare for discovery status conference with court | 0.20 | hours |
| 03/07/19 | TUSKAN, JUSTIN M | L120 | A105 | Discussions with J. O'Keefe regarding discovery-related issues | 0.20 | hours |
| 03/08/19 | O'KEEFE JR., JOHN R. | L330 | A106 | Phone calls J. Zimmeth, P. Magrin, P. Leto, Esq. (Re: Interviews and Depositions) | 1.20 | hours |
| 03/08/19 | TUSKAN, JUSTIN M | L330 | A107 | Email correspondence with counsel for Guarantors regarding deposition schedule | 0.20 | hours |
| 03/11/19 | O'KEEFE JR., JOHN R. | L310 | A104 | Review and revise proposed First Set of Interrogatories and Requests for Production of Documents Directed to Defendants | 1.60 | hours |
| 03/11/19 | O'KEEFE JR., JOHN R. | L330 | A106 | Email exchange with L. Stenback, Esq., E. Kitchen, L. Osborn, J. Zimmeth, P. Magrin (Re: Same) | 0.80 | hours |
| 03/11/19 | O'KEEFE JR., JOHN R. | L330 | A106 | Several phone calls E. Kitchen, L. Osborn, Esq., L. Stenback, Esq., J. Zimmeth (Re: Complaint, Defenses and Discovery) | 1.10 | hours |
| 03/11/19 | O'KEEFE JR., JOHN R. | L310 | A104 | Review Discovery Issues and Schedule | 1.20 | hours |
| 03/11/19 | TUSKAN, JUSTIN M | L120 | A105 | Conference with J. O'Keefe to discuss discovery requests | 0.20 | hours |

000017 Huntington National Bank                Invoice 187005         Page  2
        to be propounded to Defendants

| Date | Timekeeper | Task | Activity | | |
|---|---|---|---|---|---|
| 03/11/19 | TUSKAN, JUSTIN  M | L310 | A103 | | |
| | Revise discovery requests | | | 0.20 | hours |
| 03/11/19 | TUSKAN, JUSTIN  M | L120 | A107 | | |
| | Telephone conference with J. Zimmeth regarding documents responsive to Defendants' RFP, deposition topics, and case status generally | | | 0.50 | hours |
| 03/11/19 | TUSKAN, JUSTIN  M | L440 | A101 | | |
| | Prepare for telephone status conference with court | | | 0.40 | hours |
| 03/11/19 | TUSKAN, JUSTIN  M | L450 | A109 | | |
| | Participate in telephone status conference with court | | | 0.40 | hours |
| 03/11/19 | TUSKAN, JUSTIN  M | L330 | A107 | | |
| | Telephone call to counsel for Defendants regarding deposition schedule and related items | | | 0.20 | hours |
| 03/11/19 | TUSKAN, JUSTIN  M | L120 | A106 | | |
| | Email correspondence to E. Kitchen and L. Osborn regarding collection of emails related to Garage Media | | | 0.40 | hours |
| 03/12/19 | O'KEEFE JR., JOHN R. | L330 | A106 | | |
| | Phone call and email exchange with E. Kitchen (Re: Depositions) | | | 0.20 | hours |
| 03/12/19 | O'KEEFE JR., JOHN R. | L330 | A106 | | |
| | Phone call and email exchange with P. Magrin (Re: Deposition) | | | 0.30 | hours |
| 03/12/19 | TUSKAN, JUSTIN  M | L330 | A106 | | |
| | Email correspondence with client regarding deposition schedule and custodians for email document search | | | 0.60 | hours |
| 03/12/19 | TUSKAN, JUSTIN  M | L330 | A107 | | |
| | Email correspondence with opposing counsel regarding deposition schedule and related matters concerning discovery | | | 0.60 | hours |
| 03/13/19 | SMOLIN, SUZANNE L. | L320 | A104 | | |
| | Review client documents with Attorney Tuskan in preparation for production of same | | | 1.30 | hours |
| 03/13/19 | O'KEEFE JR., JOHN R. | L330 | A106 | | |
| | Phone call and email P. Magrin (Re: Complaint and Deposition Schedule) | | | 0.40 | hours |
| 03/13/19 | O'KEEFE JR., JOHN R. | L330 | A104 | | |
| | Review deposition and other discovery issues | | | 1.20 | hours |
| 03/13/19 | TUSKAN, JUSTIN  M | L320 | A108 | | |
| | Email correspondence with L. Osborn regarding document production and retrieval of emails | | | 0.40 | hours |
| 03/13/19 | TUSKAN, JUSTIN  M | L330 | A108 | | |
| | Email correspondence with J. Zimmeth regarding Rule 30(b)(6) deposition | | | 0.30 | hours |
| 03/13/19 | TUSKAN, JUSTIN  M | L330 | A107 | | |
| | Email correspondence and telephone discussion with opposing counsel regarding deposition schedule and timing | | | 0.60 | hours |
| 03/13/19 | TUSKAN, JUSTIN  M | L320 | A104 | | |
| | Review documents provided by client in preparation for production in response to Defendants' RFP | | | 2.30 | hours |
| 03/14/19 | SMOLIN, SUZANNE L. | L320 | A104 | | |
| | Review documents for confidential information to be redacted, per Attorney Tuskan | | | 1.10 | hours |
| 03/14/19 | O'KEEFE JR., JOHN R. | L330 | A104 | | |
| | Review discovery issues and deposition schedule | | | 0.40 | hours |

```
     000017 Huntington National Bank              Invoice 187005        Page  3
03/14/19    O'KEEFE JR., JOHN R.              L330      A106
            Phone call L. Osborn, Esq. (Re: 30(b)(6) Deponent(s))           0.20  hours
03/14/19    TUSKAN, JUSTIN M                 L330      A108
            Telephone conference with J. Zimmeth regarding 30(b)(6)         0.10  hours
            deposition
03/14/19    TUSKAN, JUSTIN M                 L120      A106
            Email correspondence with client regarding designation of      0.10  hours
            confidential documentation
03/14/19    TUSKAN, JUSTIN M                 L160      A107
            Email correspondence with Defendants' counsel on               0.10  hours
            confidentiality agreement
03/14/19    TUSKAN, JUSTIN M                 L310      A103
            Prepare and revise responses to Defendants'                    0.50  hours
            interrogatories and RFP
03/14/19    TUSKAN, JUSTIN M                 L310      A104
            Review responses to Defendants' interrogatories and RFP        0.10  hours
03/14/19    TUSKAN, JUSTIN M                 L160      A103
            Prepare confidentiality agreement                              0.50  hours
03/14/19    TUSKAN, JUSTIN M                 L320      A104
            Review documents to be produced to determine                   0.80  hours
            confidentiality
03/15/19    SMOLIN, SUZANNE L.               L320      A111
            Begin to prepare documents for production to opposing          1.20  hours
            counsel
03/15/19    SMOLIN, SUZANNE L.               L320      A104
            Continue to review documents for confidential information      0.70  hours
            to be redacted, per Attorney Tuskan
03/15/19    O'KEEFE JR., JOHN R.             L310      A106
            Review discovery issues and plan with E. Kitchen               0.20  hours
03/15/19    TUSKAN, JUSTIN M                 L310      A107
            Email correspondence with opposing counsel regarding           0.20  hours
            agreed protective order and related items pertaining to
            discovery
03/15/19    TUSKAN, JUSTIN M                 L310      A106
            Email correspondence with client regarding agreed              0.40  hours
            protective order and related items pertaining to
            discovery
03/18/19    SMOLIN, SUZANNE L.               L320      A111
            Prepare documents for production                               5.80  hours
03/18/19    TUSKAN, JUSTIN M                 L310      A103
            Finalize responses/objections to Defendants'                   1.00  hours
            interrogatories and RFP and attention to matters
            regarding filing/service of the same
03/18/19    TUSKAN, JUSTIN M                 L330      A107
            Email correspondence with opposing counsel regarding           0.30  hours
            deposition schedule
03/19/19    TUSKAN, JUSTIN M                 L320      A104
            Attention to various discovery-related matters, including      1.20  hours
            deposition scheduling, production of certain ESI, and
            related items
03/20/19    SWEENY, DAWN K.                  P100      A110
            Organization of data room, Provide invitations to users        0.70  hours
03/20/19    TUSKAN, JUSTIN M                 L320      A106
            Email correspondence with client regarding ESI responsive      0.30  hours
            to Defendants' document production requests
```

```
    000017  Huntington National Bank              Invoice 187005          Page  4
03/27/19     O'KEEFE JR., JOHN R.              L320      A106
             Phone call L. Osborn (Re: E-Discovery)                       0.10   hours
03/29/19     O'KEEFE JR., JOHN R.              L320      A106
             Phone call and email L. Osborn, Esq. (Re: E-Discovery)       0.20   hours
03/29/19     O'KEEFE JR., JOHN R.              L330      A106
             Phone call E. Kitchen (Re: Deposition Schedule)             0.10   hours
Disbursements:
03/18/19     EXPEDITED MAIL-ERIC A. HENZY, BRIDGEPORT, CT         $19.53

03/29/19     Carmody Torrance Sandak Hennessey; LOCAL COUNSEL    $510.00
             EXPENSE
```

|  |  |
|---|---|
| Fees | $6,637.00 |
| Disbursements | $529.53 |
|  | =========== |
| Total Current Charges | $7,166.53 |
|  | =========== |
| Total Balance Due | $7,166.53 |
|  | =========== |

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---|---|---|
| O'KEEFE JR., JOHN R. | 9.80 | 270.00 | $2,646.00 |
| SMOLIN, SUZANNE L. | 10.10 | 125.00 | $1,262.50 |
| SWEENY, DAWN K. | 0.70 | 125.00 | $87.50 |
| TUSKAN, JUSTIN  M | 13.90 | 190.00 | $2,641.00 |
| Total |  |  | $6,637.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**

**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

Huntington National Bank
EBILLED to Serengeti

May 23, 2019
Invoice #:   187975
Client #:    000017

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| | | | | | |
|---|---|---|---|---|---|
| 04/01/19 | O'KEEFE JR., JOHN R. | L330 | A106 | | |
| | Email exchange with J. Zimmeth (Re: Deposition Schedule) | | | 0.20 | hours |
| 04/01/19 | O'KEEFE JR., JOHN R. | L320 | A106 | | |
| | Phone calls and email L. Osborn, Morgan Davis (Re: ESI Review) | | | 0.20 | hours |
| 04/03/19 | O'KEEFE JR., JOHN R. | L310 | A104 | | |
| | Review document production and discovery issues | | | 0.60 | hours |
| 04/03/19 | TUSKAN, JUSTIN M | L310 | A107 | | |
| | Email correspondence and telephone conference with counsel for Defendants regarding discovery-related issues, including status of document production | | | 0.50 | hours |
| 04/04/19 | O'KEEFE JR., JOHN R. | L310 | A106 | | |
| | Phone call E. Kitchen (Re: Depositions and Document Production) | | | 0.20 | hours |
| 04/04/19 | O'KEEFE JR., JOHN R. | L310 | A104 | | |
| | Review e-discovery issues and status | | | 0.60 | hours |
| 04/04/19 | TUSKAN, JUSTIN M | L120 | A106 | | |
| | Email correspondence and discussion with client regarding review of ESI and procedure in connection with the same | | | 0.80 | hours |
| 04/05/19 | O'KEEFE JR., JOHN R. | L320 | A106 | | |
| | Email exchange with L. Osborn, Esq. (Re: ESI Review) | | | 0.40 | hours |
| 04/05/19 | O'KEEFE JR., JOHN R. | L320 | A106 | | |
| | Phone call E. Kitchen (Re: Same) | | | 0.20 | hours |
| 04/05/19 | TUSKAN, JUSTIN M | L110 | A104 | | |
| | Attention to matters regarding ESI document review | | | 0.60 | hours |
| 04/08/19 | O'KEEFE JR., JOHN R. | L320 | A106 | | |
| | Phone call and email exchange with L. Osborn, Esq. (Re: ESI Discovery) | | | 0.40 | hours |
| 04/08/19 | O'KEEFE JR., JOHN R. | L330 | A106 | | |
| | Phone call and email exchange with E. Kitchen (Re: Deposition Schedule) | | | 0.20 | hours |
| 04/08/19 | TUSKAN, JUSTIN M | L110 | A104 | | |
| | Attention to matters regarding ESI review | | | 0.40 | hours |

```
  000017 Huntington National Bank              Invoice 187975         Page 2
04/09/19   TUSKAN, JUSTIN  M              L320      A108
           Email correspondence and telephone conference with ESI      0.60  hours
           service provider regarding document review logistics
04/09/19   TUSKAN, JUSTIN  M              L120      A106
           Telephone conference with John Zimmeth regarding case        0.50  hours
           status and current analysis regarding claims and defenses
04/10/19   TUSKAN, JUSTIN  M              L110      A104
           Address ESI document review issues.                          0.40  hours
04/11/19   SMOLIN, SUZANNE L.             L320      A105
           Meeting with Attorney Tuskan regarding protocol and          0.60  hours
           process for document review
04/11/19   O'KEEFE JR., JOHN R.           L330      A106
           Phone call E. Kitchen (Re: Depositions)                      0.20  hours
04/11/19   ROSENBERG, ERIC D              L320      A105
           Conference with J. Tuskan, Esq. re: review of pleadings,     0.60  hours
           facts of case and review of and production of documents
           responsive to Defendants' requests
04/11/19   TUSKAN, JUSTIN  M              L110      A108
           Conference with document review team regarding case          0.60  hours
           background and review process
04/11/19   TUSKAN, JUSTIN  M              L110      A104
           Attention to email correspondence regarding ESI             0.20  hours
04/11/19   REGAN, JOHN PAUL               L320      A105
           Discovery - document review project meeting, including       0.60  hours
           review of case background.
04/11/19   BERKEBILE, TIMOTHY D           L320      A104
           Initial Meeting re document review including Review of       0.60  hours
           Pleadings and case background
04/12/19   SWEENY, DAWN K.                P100      A110
           Establish document data room                                 0.20  hours
04/12/19   O'KEEFE JR., JOHN R.           L320      A106
           Phone call E. Kitchen (Re: Document Production and          0.20  hours
           Depositions)
04/12/19   TUSKAN, JUSTIN  M              L110      A104
           Attention to matters regarding ESI document review           0.50  hours
04/12/19   TUSKAN, JUSTIN  M              L110      A107
           Email correspondence with opposing counsel regarding         0.30  hours
           discovery-related issues
04/14/19   FELTON, RACHEL  D              L320      A104
           Review Complaint and discovery requests to prepare for       0.60  hours
           document review
04/14/19   FELTON, RACHEL  D              L320      A104
           Review emails, attachments, and related documentation,       0.50  hours
           and tag for privilege, relevance, and responsiveness to
           Defendants' requests for production of documents [P.
           Morgan Doc 1882-1957]
04/14/19   TUSKAN, JUSTIN  M              L110      A104
           Review emails, attachments, and related documentation,       3.30  hours
           and tag for privilege, relevance, and responsiveness to
           Defendants' requests for production of documents [J.
           Zimmeth Docs 1-495]
04/15/19   ROSENBERG, ERIC D              L320      A104
           Review emails, attachments, and related documentation,       0.80  hours
           and tag for privilege, relevance, and responsiveness to
           Defendants' requests for production of documents [E.
```

```
    000017 Huntington National Bank                Invoice 187975          Page  3
           Kitchen Docs 1-130]
04/15/19   FELTON, RACHEL  D                 L320      A104
           Review emails, attachments, and related documentation,              2.10  hours
           and tag for privilege, relevance, and responsiveness to
           Defendants' requests for production of documents [P.
           Magrin Docs 1958-2068]
04/15/19   TUSKAN, JUSTIN  M                 L110      A104
           Review emails, attachments, and related documentation,              2.20  hours
           and tag for privilege, relevance, and responsiveness to
           Defendants' requests for production of documents [J.
           Zimmeth Docs 496-816]
04/15/19   REGAN, JOHN PAUL                  L320      A104
           Review emails, attachments, and related documentation,              1.50  hours
           and tag for privilege, relevance, and responsiveness to
           Defendants' requests for production of documents [P.
           Magrin Docs 1-200]
04/16/19   O'KEEFE JR., JOHN R.              L330      A106
           Phone call E. Kitchen (Re: Deposition Schedule)                     0.20  hours
04/16/19   ROSENBERG, ERIC D                L320      A104
           Review emails, attachments, and related documentation,              1.90  hours
           and tag for privilege, relevance, and responsiveness to
           Defendants' requests for production of documents [E.
           Kitchen Docs 131-431]
04/16/19   FELTON, RACHEL  D                 L320      A104
           Review emails, attachments, and related documentation,              3.20  hours
           and tag for privilege, relevance, and responsiveness to
           Defendants' requests for production of documents [P.
           Magrin Docs 2268-2718]
04/16/19   TUSKAN, JUSTIN  M                 L330      A107
           Email correspondence with Defendants' counsel regarding             0.20  hours
           deposition schedule and demand for supplement to
           interrogatory answers under Rule 33(d)
04/16/19   TUSKAN, JUSTIN  M                 L320      A104
           Review emails, attachments, and related documentation,              1.10  hours
           and tag for privilege, relevance, and responsiveness to
           Defendants' requests for production of documents [J.
           Zimmeth Docs 816-976]
04/16/19   REGAN, JOHN PAUL                  L320      A104
           Review emails, attachments, and related documentation,              2.20  hours
           and tag for privilege, relevance, and responsiveness to
           Defendants' requests for production of documents [P.
           Magrin Docs 201-530]
04/17/19   O'KEEFE JR., JOHN R.              L330      A106
           Phone call E. Kitchen (Re: Deposition Schedule)                     0.10  hours
04/17/19   FELTON, RACHEL  D                 L320      A104
           Review documents for purpose of responding to Defendants'           1.60  hours
           Requests for Production of Documents [P. Magrin Docs
           2718-2822]
04/17/19   TUSKAN, JUSTIN  M                 L320      A104
           Review emails, attachments, and related documentation,              3.30  hours
           and tag for privilege, relevance, and responsiveness to
           Defendants' requests for production of documents [J.
           Zimmeth Docs 977-1427]
04/17/19   TUSKAN, JUSTIN  M                 L320      A107
           Email correspondence with counsel for Defendants                    0.30  hours
           regarding ESI production-related issues
04/17/19   BERKEBILE, TIMOTHY D              L320      A104
```

```
000017 Huntington National Bank              Invoice 187975           Page  4
              Review emails, attachments, and related documentation,       2.10  hours
              and tag for privilege, relevance, and responsiveness to
              Defendants' requests for production of documents [P.
              Magrin Docs 941-1251]
04/18/19      SMOLIN, SUZANNE L.              L320      A104
              Review emails, attachments, and related documentation,       5.80  hours
              and tag for privilege, relevance, and responsiveness to
              Defendants' requests for production of documents [J.
              Zimmeth Docs 1666-2416
04/18/19      ROSENBERG, ERIC D               L320      A104
              Review emails, attachments, and related documentation,       1.00  hours
              and tag for privilege, relevance, and responsiveness to
              Defendants' requests for production of documents [E.
              Kitchen Docs 432-582]
04/18/19      BARRON, JUSTIN T                L320      A104
              Review Complaint and Answer in preparation of review of      0.60  hours
              John Zimmeth emails in response to Defendants' discovery
              requests.
04/18/19      BARRON, JUSTIN T                L320      A104
              Review emails, attachments, and related documentation,       3.90  hours
              and tag for privilege, relevance, and responsiveness to
              Defendants' requests for production of documents [J.
              Zimmeth Docs 2711- 3310]
04/18/19      TUSKAN, JUSTIN  M               L110      A104
              Review emails, attachments, and related documentation,       2.00  hours
              and tag for privilege, relevance, and responsiveness to
              Defendants' requests for production of documents [J.
              Zimmeth Docs 1428-1655]
04/18/19      REGAN, JOHN PAUL                L320      A104
              Review emails, attachments, and related documentation,       2.50  hours
              and tag for privilege, relevance, and responsiveness to
              Defendants' requests for production of documents [P.
              Magrin Docs 531-940
04/18/19      BERKEBILE, TIMOTHY D            L320      A104
              Review emails, attachments, and related documentation,       2.00  hours
              and tag for privilege, relevance, and responsiveness to
              Defendants' requests for production of documents [P.
              Magrin Docs 1252-1552]
04/19/19      ROSENBERG, ERIC D               L320      A104
              Review emails, attachments, and related documentation,       0.70  hours
              and tag for privilege, relevance, and responsiveness to
              Defendants' requests for production of documents [E.
              Kitchen Docs 583-733
04/19/19      TUSKAN, JUSTIN  M               L310      A104
              Quality control review of, and attention to matters          2.30  hours
              regarding production of first batch of ESI responsive to
              Defendants' RFP
04/22/19      O'KEEFE JR., JOHN R.            L330      A104
              Review documentation in preparation for depositions          1.20  hours
04/22/19      O'KEEFE JR., JOHN R.            L330      A106
              Phone call and email E. Kitchen, J. Zimmeth (Re: Same)       0.60  hours
04/22/19      ROSENBERG, ERIC D               L320      A104
              Review emails, attachments, and related documentation,       0.80  hours
              and tag for privilege, relevance, and responsiveness to
              Defendants' requests for production of documents [E.
              Kitchen Docs 734-884]
04/22/19      TUSKAN, JUSTIN  M               L330      A106
```

```
000017 Huntington National Bank              Invoice 187975           Page 5
                 Email correspondence with client regarding deposition    0.20  hours
                 schedule and preparation
04/22/19  BERKEBILE, TIMOTHY D           L320      A104
          Review emails, attachments, and related documentation,          5.30  hours
          and tag for privilege, relevance, and responsiveness to
          Defendants' requests for production of documents [P/
          Magrin Docs 1553-1881]
04/23/19  SMOLIN, SUZANNE L.             L320      A104
          Review emails, attachments, and related documentation,          4.20  hours
          and tag for privilege, relevance, and responsiveness to
          Defendants' requests for production of documents [J.
          Zimmeth Docs 2417-2710]
04/23/19  ROSENBERG, ERIC D              L320      A104
          Review documents produced by Bank responsive to discovery       1.00  hours
          requests
04/24/19  TUSKAN, JUSTIN M               L110      A104
          Quality control review of and attending to matters re:          1.20  hours
          production of second batch of responsive ESI
04/24/19  TUSKAN, JUSTIN M               L320      A107
          Email correspondence with opposing counsel regarding            0.20  hours
          discovery-related issues
04/26/19  O'KEEFE JR., JOHN R.           L330      A106
          Phone call E. Kitchen (Re: Deposition Preparation)              0.10  hours
04/26/19  TUSKAN, JUSTIN M               L330      A103
          Prepare Notices of Deposition, Subpoena for 30(b)(6)             2.50  hours
          designee of Garage Media, and Motion to modify case
          management deadlines
04/26/19  TUSKAN, JUSTIN M               L330      A107
          Email correspondence with opposing counsel regarding            0.40  hours
          deposition schedule, consent to Motion to modify
          scheduling order, and related items
04/29/19  O'KEEFE JR., JOHN R.           L330      A106
          Phone call E. Kitchen (Re: Same)                                0.20  hours
04/29/19  O'KEEFE JR., JOHN R.           L330      A108
          Phone conference with E. Henzy, Esq., C. Blau, Esq., J.          0.70  hours
          Tuskan, Esq. (Re: Deposition and Discovery Issues)
04/29/19  TUSKAN, JUSTIN M               L320      A107
          Telephone conference with counsel for Defendants                0.80  hours
          regarding issues pertaining to production of documents
          and interrogatory responses, as well as amendment of case
          managment schedule
04/29/19  TUSKAN, JUSTIN M               L110      A104
          Review/analysis of documents produced by Defendants in          2.40  hours
          response to Request for Production
04/29/19  TUSKAN, JUSTIN M               L330      A105
          Conference with J. O'Keefe regarding upcoming depositions       0.40  hours
04/30/19  O'KEEFE JR., JOHN R.           L330      A108
          Prepare for depositions of J. Zimmeth, P. Magrin, E.            2.80  hours
          Kitchen, G. Neff, J. Schmid, D. Schmid
04/30/19  TUSKAN, JUSTIN M               L330      A101
          Prepare for depositions of Defendants, including review         4.20  hours
          of relevant documents
Disbursements:
04/30/19  Carmody Torrance Sandak Hennessey; LOCAL COUNSEL      $1,487.50
          EXPENSE
```

000017 Huntington National Bank              Invoice 187975              Page  6

|                          |              |
|--------------------------|-------------:|
| Fees                     |  $17,992.00  |
| Disbursements            |   $1,487.50  |
|                          | =========== |
| Total Current Charges    |  $19,479.50  |
| Plus Previously Billed Charges |  $1,350.00 |
|                          | =========== |
| Total Balance Due        |  $20,829.50  |
|                          | =========== |

| Time Summary           | Hours billed | Hourly rate | Fees billed |
|------------------------|-------------:|------------:|------------:|
| BARRON, JUSTIN T       |         4.50 |      190.00 |     $855.00 |
| BERKEBILE, TIMOTHY D   |        10.00 |      270.00 |   $2,700.00 |
| FELTON, RACHEL  D      |         8.00 |      270.00 |   $2,160.00 |
| O'KEEFE JR., JOHN R.   |         9.30 |      270.00 |   $2,511.00 |
| REGAN, JOHN PAUL       |         6.80 |      190.00 |   $1,292.00 |
| ROSENBERG, ERIC D      |         6.80 |      190.00 |   $1,292.00 |
| SMOLIN, SUZANNE L.     |        10.60 |       95.00 |   $1,007.00 |
| SWEENY, DAWN K.        |         0.20 |       95.00 |      $19.00 |
| TUSKAN, JUSTIN  M      |        32.40 |      190.00 |   $6,156.00 |
| Total                  |              |             |  $17,992.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**
**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

June 18, 2019

Huntington National Bank
EBILLED to Serengeti

Invoice #:   188547
Client #:    000017

EIN 23-2947545

STATEMENT FOR SERVICES RENDERED:

Matter:   00267

Garage Media NY, LLC

| | | | | | |
|---|---|---|---|---|---|
| 05/01/19 | O'KEEFE JR., JOHN R. | L330 | A106 | | |
| | Phone conference with J. Zimmeth, L. Stenback, Esq., J. Tuskan, Esq. (Re: Deposition Preparation) | | | 0.80 | hours |
| 05/01/19 | O'KEEFE JR., JOHN R. | L330 | A104 | | |
| | Preparation for depositions of J. Zimmeth, P. Magrin, E. Kitchen, G. Neff, J. Schmid & D. Schmid | | | 2.80 | hours |
| 05/01/19 | TUSKAN, JUSTIN M | L330 | A101 | | |
| | Prepare for depositions, including telephone conference with J. Zimmeth regarding his deposition | | | 6.20 | hours |
| 05/02/19 | O'KEEFE JR., JOHN R. | L330 | A109 | | |
| | Meeting with E. Kitchen, J. Tuskan, Esq. (Re: Deposition Preparation) | | | 1.20 | hours |
| 05/02/19 | O'KEEFE JR., JOHN R. | L330 | A104 | | |
| | Phone conference with P. Magrin (Re: Deposition Preparation) | | | 0.80 | hours |
| 05/02/19 | O'KEEFE JR., JOHN R. | L330 | A104 | | |
| | Preparation for depositions of J. Zimmeth, P. Magrin, E. Kitchen, G. Neff, J. Schmid & D. Schmid | | | 2.80 | hours |
| 05/02/19 | TUSKAN, JUSTIN M | L330 | A101 | | |
| | Prepare for depositions, including telephone conference with P. Magrin and meeting with E. Kitchen | | | 4.60 | hours |
| 05/03/19 | O'KEEFE JR., JOHN R. | L330 | A104 | | |
| | Prepare for depositions of J. Zimmeth, J. Schmid, D. Schmid, G. Neff, P. Magrin & E. Kitchen | | | 3.40 | hours |
| 05/05/19 | O'KEEFE JR., JOHN R. | L330 | A109 | | |
| | Travel to New Haven, CT for depositions | | | 7.50 | hours |
| 05/05/19 | O'KEEFE JR., JOHN R. | L330 | A104 | | |
| | Phone call J. Zimmeth (Re: Meeting before Deposition) | | | 0.20 | hours |
| 05/05/19 | O'KEEFE JR., JOHN R. | L330 | A104 | | |
| | Prepare for Depositions of G. Neff, J. Schmid, J. Zimmeth, P. Magrin & E. Kitchen | | | 3.80 | hours |
| 05/06/19 | O'KEEFE JR., JOHN R. | L330 | A109 | | |
| | Meeting with J. Zimmeth (Re: Deposition) | | | 1.50 | hours |
| 05/06/19 | O'KEEFE JR., JOHN R. | L330 | A104 | | |

```
000017 Huntington National Bank                Invoice 188547          Page  2
                   Prepare for depositions of J. Schmid, P. Magrin          2.00  hours
05/06/19   O'KEEFE JR., JOHN R.             L330      A109
                   Attend deposition of J. Zimmeth                           7.50  hours
05/06/19   TUSKAN, JUSTIN  M                L120      A105
                   Discussion with J. O'Keefe regarding outcome of J.        0.20  hours
                   Zimmeth deposition
05/07/19   O'KEEFE JR., JOHN R.             L330      A104
                   Prepare for deposition of G. Neff                         2.00  hours
05/07/19   O'KEEFE JR., JOHN R.             L330      A109
                   Attend deposition of P. Magrin                            4.00  hours
05/07/19   O'KEEFE JR., JOHN R.             L330      A109
                   Prepare for and conduct deposition of J. Schmid           5.00  hours
05/07/19   TUSKAN, JUSTIN  M                L250      A107
                   Email correspondence with opposing counsel on revision to 0.20  hours
                   joint motion to modify CMO
05/07/19   TUSKAN, JUSTIN  M                L330      A103
                   Prepare amended notice of deposition of David Schmid for  0.10  hours
                   service
05/07/19   TUSKAN, JUSTIN  M                L250      A103
                   Revise joint motion to modify Case Management Order       0.10  hours
05/08/19   O'KEEFE JR., JOHN R.             L330      A109
                   Prepare for and conduct deposition of G. Neff             7.00  hours
05/08/19   O'KEEFE JR., JOHN R.             L330      A104
                   Prepare for deposition of E. Kitchen                      0.20  hours
05/08/19   TUSKAN, JUSTIN  M                L330      A105
                   Discussion with J. O'Keefe regarding J. Schmid and P.     0.10  hours
                   Magrin depositions
05/08/19   TUSKAN, JUSTIN  M                L250      A103
                   Finalize and file Consent Motion to Modify Case           0.20  hours
                   Management Order
05/09/19   O'KEEFE JR., JOHN R.             L330      A109
                   Return to Pittsburgh from depositions                     7.50  hours
05/09/19   O'KEEFE JR., JOHN R.             L330      A109
                   Prepare for and attend deposition of E. Kitchen           4.50  hours
05/09/19   O'KEEFE JR., JOHN R.             L330      A109
                   Meeting with E. Kitchen (Re: Deposition Preparation)      1.00  hours
05/10/19   O'KEEFE JR., JOHN R.             L330      A104
                   Assemble and organize deposition notes and exhibits (5    2.00  hours
                   Depositions)
05/10/19   TUSKAN, JUSTIN  M                L120      A106
                   Conference/strategy regarding outcome of depositions      0.30  hours
05/13/19   O'KEEFE JR., JOHN R.             L330      A106
                   Phone calls L. Osborn, Esq., E. Kitchen (Re: Deposition   0.20  hours
                   Schedule)
05/13/19   TUSKAN, JUSTIN  M                L320      A104
                   Attention to matters regarding document discovery         0.20  hours
05/14/19   O'KEEFE JR., JOHN R.             L330      A109
                   Prepare for deposition of D. Schmid                       2.20  hours
05/14/19   TUSKAN, JUSTIN  M                L310      A107
                   Email correspondence with counsel for guarantors          0.30  hours
                   regarding deposition of D. Schmid and supplemental
                   responses to RFP and interrogatories
05/15/19   O'KEEFE JR., JOHN R.             L330      A109
                   Prepare for and take deposition of D. Schmid              2.80  hours
```

```
     000017 Huntington National Bank              Invoice 188547          Page  3
05/15/19    TUSKAN, JUSTIN  M              L330      A104
            Attention to matters regarding deposition of D. Schmid            0.30  hours
05/16/19    TUSKAN, JUSTIN  M              L120      A104
            Review/analysis of issues regarding possible motion to            0.80  hours
            compel if Plaintiffs fail to supplement discovery
            responses
05/17/19    TUSKAN, JUSTIN  M              L310      A104
            Preliminary review of supplemental discovery requests             0.20  hours
05/17/19    TUSKAN, JUSTIN  M              L310      A106
            Email correspondence with client providing update                 0.20  hours
            regarding the review of supplemental discovery requests
05/20/19    TUSKAN, JUSTIN  M              L110      A104
            Review revised case management order                              0.10  hours
05/22/19    TUSKAN, JUSTIN  M              L320      A104
            Review discovery-related items                                    1.20  hours
05/28/19    O'KEEFE JR., JOHN R.           L330      A106
            Phone call J. Zimmeth (Re: Deposition)                            0.20  hours
05/28/19    O'KEEFE JR., JOHN R.           L330      A108
            Phone call M. Carlson (Re: Deposition Transcripts)                0.10  hours
05/28/19    TUSKAN, JUSTIN  M              L120      A106
            Telephone conference with J. Zimmeth regarding case               0.20  hours
            status, analysis of depositions, and related items
05/29/19    O'KEEFE JR., JOHN R.           L330      A106
            Phone call J. Zimmeth (Re: Deposition Testimony)                  0.40  hours
05/29/19    O'KEEFE JR., JOHN R.           L330      A106
            Email J. Zimmeth, P. Magrin, E. Kitchen (Re: Review of            0.90  hours
            Deposition Transcripts)
05/29/19    TUSKAN, JUSTIN  M              L330      A107
            Email correspondence with counsel for Defendants                  0.10  hours
            regarding post-deposition discovery issues
05/30/19    TUSKAN, JUSTIN  M              L120      A106
            Conference/strategy regarding finalization of discovery           0.20  hours
            and likely Motion for Summary Judgment
Disbursements:
05/20/19    Credit Card,; CAB FARE                          $21.10

05/20/19    Cassian Reporting, LLC; DEPOSITION TRANSCRIPT(S)    $179.75

05/20/19    Cassian Reporting, LLC; DEPOSITION TRANSCRIPT(S)    $553.40

05/21/19    John R. O'Keefe, Jr.; Airfare                      $913.99

05/21/19    John R. O'Keefe, Jr.; LODGING                    $1,025.32

05/28/19    Cassian Reporting, LLC; DEPOSITION TRANSCRIPT(S)    $905.60
```

```
     000017  Huntington National Bank           Invoice 188547           Page  4
05/28/19    Cassian Reporting, LLC; DEPOSITION TRANSCRIPT(S)       $383.25


05/30/19    Cassian Reporting, LLC; DEPOSITION TRANSCRIPT(S)       $146.75


05/31/19    LogicForce Consulting, LLC                        $3,170.00


05/31/19    Carmody Torrance Sandak Hennessey; LOCAL COUNSEL  $1,615.00
            EXPENSE
```

|  | |
|---|---:|
| Fees | $23,063.00 |
| Disbursements | $8,914.16 |
|  | =========== |
| Total Current Charges | $31,977.16 |
|  | =========== |
| Total Balance Due | $31,977.16 |
|  | =========== |

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---:|---:|---:|
| O'KEEFE JR., JOHN R. | 74.30 | 270.00 | $20,061.00 |
| TUSKAN, JUSTIN  M | 15.80 | 190.00 | $3,002.00 |
| Total | | | $23,063.00 |

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**
**535 Smithfield Street**

**Suite 800**
**Pittsburgh, PA 15222**
**412-918-1100**

```
                                              July 19, 2019
Huntington National Bank                      Invoice #:   189272
EBILLED to Serengeti                          Client #:    000017


                                              EIN 23-2947545
```
---

```
STATEMENT FOR SERVICES RENDERED:


Matter:   00267

Garage Media NY, LLC

06/05/19   TUSKAN, JUSTIN  M              L110    A104
           Review of supplemental documents produced by Defendants      1.80  hours
06/13/19   TUSKAN, JUSTIN  M              L120    A106
           Conference/strategy regarding finalization of discovery      0.20  hours
           and intent to file Motion for Summary Judgment
06/17/19   TUSKAN, JUSTIN  M              L320    A104
           Review supplemental documents produced by Defendants in      4.30  hours
           response to Huntington discovery requests
06/19/19   O'KEEFE JR., JOHN R.           L330    A106
           Email J. Zimmeth, P. Magrin, E. Kitchen (Re: Errata and      0.20  hours
           Jurat Sheets)
06/19/19   TUSKAN, JUSTIN  M              L320    A104
           Review supplemental documents produced by Plainitfs          1.80  hours
06/20/19   O'KEEFE JR., JOHN R.           L330    A108
           Email exchange with J. Zimmeth, P. Magrin, E. Kitchen, E.    0.30  hours
           Henzy, Esq., C. Blau, Esq. (Re: Deposition Errata & Jurat
           Sheets)
06/20/19   O'KEEFE JR., JOHN R.           L330    A106
           Phone call E. Kitchen (Re: Same)                            0.20  hours
06/24/19   O'KEEFE JR., JOHN R.           L330    A107
           Email exchange with C. Blau, Esq. (Re: Deposition Errata    0.10  hours
           and Jurat Sheets)
Disbursements:
06/25/19   TRAVEL; NEW HAVEN CT                              $401.76



06/28/19   Carmody Torrance Sandak Hennessey; LOCAL COUNSEL  $919.00
           EXPENSE
```

```
   000017 Huntington National Bank              Invoice 189272              Page  2
06/30/19    Cassian Reporting, LLC; DEPOSITION TRANSCRIPT(S)         $372.60


06/30/19    LogicForce Consulting, LLC; LOCAL COUNSEL EXPENSE      $1,260.00




                                        Fees         $1,755.00
                                Disbursements         $2,953.36
                                              ===========
                        Total Current Charges         $4,708.36
                Plus Previously Billed Charges        $31,977.16
                                              ===========
                            Total Balance Due         $36,685.52
                                              ===========
```

| Time Summary | Hours billed | Hourly rate | Fees billed |
|---|---|---|---|
| O'KEEFE JR., JOHN R. | 0.80 | 270.00 | $216.00 |
| TUSKAN, JUSTIN  M | 8.10 | 190.00 | $1,539.00 |
| Total | | | $1,755.00 |

**EXHIBIT  O**

# Garage Media

## Brand Research Immersion Program

November 6, 2013

Presented by: FieldActivate

HTF001022

2

# Methodology

FieldActivate conducted extensive research and brand/sales mapping on Garage Media's Port Authority board – 8th and 42nd Street – during the time frame of October 7th through October 31st.

FieldActivate tapped industry contacts and relationships to facilitate in-depth conversations with media professionals from both the buying and planning side, as well as outdoor media sales executives. There was a wide geographic dispersion – a high percentage within the NYC media circles, but also included influences in Los Angeles, Chicago and Boston. In-depth discussions were completed with both current Garage Media sales partners – A2aMEDIA (Brian Schuvart) and Liquid Outdoor (Pat Snerry and Paul Ducharme). A total of 20 interviews were completed.

Interviews usually lasted about one-half hour with some stretching longer. FieldActivate employed an interview guide that allowed for specific probes and questioning based upon the direction of the conversation.

Although the research was qualitative in nature, the sample size of 20 allows for a reasonable statistical sample against which quantitative measurements can be applied for decision-making.

HTF001023

# Who we talked to:

## Media Sales/Outdoor and Digital

- **Loretta Berry** – Out of Home America/President and Owner
- **Brian Decker** – Clear Channel/Director of Digital Outdoor
- **Scott Nemeroff** – All Over Media/National Sales Manager
- **Chad Silver** – Vector Media/Vice President Sales
- **Frank McClane** – Clear Channel/Director of National Accounts
- **Harry Coghlan** – Clear Channel/COO NY Branch President
- **Brian Schuvart** – A2aMEDIA/VP Sales & Marketing
- **Pat Sherry/Paul Ducharme** – Liquid Outdoor/Principals

## Media Buyers/Planners

- **Susan Gurwitz** – Draft FCB/EVP Media Director
- **Fernando Cadena** – Mediacom/Partner & Planning Director
- **Patrick Gordon** – GM/Digital Buyer
- **Seb Maitra** – Hill Holliday/EVP Media
- **Karen Petrillo** – Tierney Advertising/Media Director
- **Irene Makiaris** – Makiaris Media/Owner
- **John Thomsen** – Brushfire/Media Director
- **Lynda Richardson** – Butler, Shine, Stern and Partners/EVP Media
- **Jason Keifer** – Strategic Outdoor/President
- **Kristen VanDusen** – Strategic Outdoor/Account Media Director
- **Jordanna Howard** – Billups Worldwide/Director of Media Strategy
- **SaraBeth Donovan/Lynette McCarthy** – Mintz & Hoke/Media V.P.'s

3

HTF001024



Major Findings

HTF001025



5

# The Product

- Viewed as a "spectacular product" however, no longer the preeminent board in the high-profile, 42nd Street and 8th Avenue, outdoor location.

- Best suited for night time viewing. Image is seen as being "washed out" in daylight. Overall board digital quality is lacking.

- The CBS Outdoor "Cube" is getting all the media buyer attention and sales cachet. It's the hot new product. The Garage Media board pales in comparison from a technology standpoint.

- MediaMesh® technology is seen as a "low quality/older technology" that is severely affecting both sales efforts and media buyer acceptance.

- The board has no strategic reason for being – buyers don't know where it fits in their plans. It is a true outlier.

HTF001026

**MEDIACOM**

People first, better results

– Fernando Cadena
Partner/Planning Director

"It's a great board. It's right for certain clients and products. Yes, it isn't the newest or best technology but it still has a place. Sell it for what it is and target the clients that are right for it. It's not a board for everyone."

**DRAFTFCB**

– Susan Gurwitz
Executive VP – Media

"It's not Times Square, but it is still spectacular. The challenge is finding the clients that it is right for. It's more of a sales targeting approach than selling to everyone. Make it special for specific clients and categories."

6

HTF001027

# Times Square – Port Authority Dynamic

- The Port Authority isn't perceived as being part of Times Square. Being outside of the media accepted Times Square "Bowtie" squarely places it as being "Port Authority."

- Many buyers and clients (especially outside of NYC) see the Port Authority audiences as low media value "bus riders." There are cheaper and more effective ways to reach these audiences – including inside the Port Authority itself.

- Selling influences recommend positioning the board as a "spectacular board" rather than a Times Square venue.

- Buyers think there are far cheaper and more effective ways to reach Jersey audiences. A "Jersey-based" audience orientation or marketing approach won't work.



HTF001028

8



"It's a bus terminal. People outside of NYC, especially buyers, equate bus riders as not being affluent. When you're out of the NYC market the perception is pervasive."

– Linda Richardson
Media Director

HTF001029

# Times Square – Media Dynamic

- Far too much inventory. Not as easy a sell as one would think.

- Lots of price cutting. Discounting of 50% and more off rate card is quite pervasive.

- Buyers are immune to the "Time Square media numbers" – view it as a national brand buy rather than local. International brand overlay.

- Sales (Clear Channel, City Outdoor, CBS Outdoor, Van Wagner) are many times bundling their Times Square media inventory into larger programs.

  - Very much opportunistic buying – lots of insertions out at all times. (Speaks for the need to have increased sales presence.)



"Too much inventory in Times Square. Prices are 50% off rate card. It's ridiculous. There are far better and more cost effective ways to buy New York."

**oohawilkins**

&mdash; Loretta Berry
President

"I thought selling Times Square would be a slam dunk. It couldn't have been further from the truth. It was flat out tough."

**ALLOVER MEDIA**

&mdash; Scott Nemeroff
National Sales Manager

10

HTF001031

# The CBS Cube

- Getting all the buzz! It is turning brand advertiser heads and hearts. Knocking their socks off.

- The technology is the latest and greatest. It exacerbates the quality issues of the Port Authority board by being directly comparable for buyers to evaluate.

- It's affecting business. Advertisers are electing to use the CBS Cube rather than the Port Authority board. There's choice and it's a better one.



12



*– Paul Ducharme*
*Principal*



*– Brian Schuvart*
*VP Sales & Marketing*

*"We've lost business to the Cube – no question. Plus, it's priced better. It's a formidable sales factor for us to deal with."*

*"We've been robbed by CBS on a couple of clients. The new board is getting all the media attention."*

HTF001033

# Sales Dynamic – A2aMEDIA

- Very little visibility. "A2a who?"

- No presence in NYC. Few contacts or relationships in place. Seen at times as being needy or hounding media buyers when they get connected.

- Pervasive opinion exists of the need to be physically located in the City. Boston is not New York.

- Sales executives felt that assigning the selling rights to A2aMEDIA doomed Garage Media from the start.

*"Had never heard of A2a, but when an opportunity opened up they wouldn't stop calling us. It felt like they were needy or desperate."*

STRATEGIC

— Jason Keifer
President

13

# Sales Dynamic – Liquid Outdoor



- Well respected sales influences in the Digital/Outdoor business. Real professionals with good contacts and relationships in place. Buyers readily knew the people personally.

- Some confusion exists as to who is selling what and to whom between A2a and Liquid Outdoor.

- Buyers and sellers both question whether Liquid Outdoor can overcome many of the issues and lack of sales velocity based upon A2a's involvement.

- Everyone cautions that even though Liquid Outdoor is quite capable, it will take time and be a slow build to realize the numbers/ad frequency that Garage Media is looking to achieve.

- Some feel that with only two people, Liquid Outdoor doesn't have sufficient feet on the street.

14

HTF001035



15

*"Pat and Paul are pros. They're known by everyone and can get appointments. Being late to the game and splitting the business certainly hasn't helped them."*

– Chad Silver
President

HTF001036

# Confusing Sales Structure = Damaged Goods

- Confusion exists as to who the sales representatives are for the board. Buyers feel that having split sales territories rarely works.

- Some buyers share a perception that having two sales organizations is an indication that the board is having issues being sold. It smells of trouble.

- Confusing and demotivating to both sales organizations. Liquid Media feels that they gave up too much in the initial negotiation.

"At Liquid Outdoor we always insist on exclusivity with a board. We didn't with the Port Authority board because we liked it so much. In hindsight, that was probably a mistake."



– Pat Sherry
Principal

16

HTF001037

# Buyer Perceptions of the Board – Unaided Based Upon No Awareness/Knowledge

- Many are unaware of the board. Never included in their RFP Insertion Requests.

- The accepted outdoor buying paradigm is based upon buying boards in bundles or packages. The Garage Media board is seen as a one-off opportunity.

- When exposed to the board, there is overall general receptivity and interest, but has to be priced right with strong audience impression delivery.

- View the board as being more national in scope. They easily categorized the board as being good for specific categories – automotive, destination/tourism, network and cable television, motion pictures/ entertainment, liquor/beverages and quick service (locations close to the Port Authority).

17

HTF001038

18



HILL HOLLIDAY

– Seb Maitra
Executive VP Media



– John Thompsen
Media Director

"It's a great property in a great location. It's Times Square but it's not. Haley from Posterscope needs to know about it. It's on my radar screen now."

"I had no knowledge that it existed. If I had, I would have bought it for the "Jersey Stronger than the Storm" campaign. I bought static boards from Clear Channel in the area."

HTF001039

# Media Buyer Mentality and Lethargy

- Media buyers are extremely busy based upon heavy account loads and downsizing. They are taking the path of least resistance to clear outdoor media – either through outdoor buyers or relying on the big players.

- Some sales influences and even a few buyers admit that that the buying community has gotten lazy. They stick with what they know and what works. It's becoming increasingly harder for unique properties to get noticed – especially digital ones that pop up daily. Many buyers are immune to new digital outdoor. What was once unique isn't the case today.



20



"'I'm not, but I see a lot of lazy buyers today. They take the path of least resistance and go with what works. Many are overworked and overburdened in buying and planning shops that have been downsized. It's really tough for sales folks to get in front of them with new products."

– Patrick Gordon
Digital Buyer – Midwest

HTF001041

# The Potential for Direct Selling – Garage Media

- The overwhelming response was that direct selling from Garage Media wouldn't work. It would only exacerbate the issues caused by A2aMEDIA – no relationships or connections, lack of physical presence in NYC and being out on an island with only one board.

- The only way this could work would be for Garage Media to hire an experienced sales influence that is well connected from one of the big outdoor selling entities.

*"Don't do it."*



– Frank McClane
Director of National Accounts

*"They could do it if they hired the right guy, but it would take time to build the book of business. If they want sales immediately, that is not the right strategy."*



– Harry Coughlan
COO/NY Branch President

21

# The Financial Value/Revenue Implications of the Board

- Based upon understanding and knowledge of what boards are worth in the Times Square area and the revenue that is being realized, the $5 million figure was greatly exaggerated.

- The sales commission of 20% was seen as extremely high.

- Lots of questions exist about the reasons for why there haven't been a lot of repeat advertisers. Sends up red flags about the quality and the perceived metrics return.

22

HTF001043

23

# Strategic Implications

## Sales/Selling Dynamics

- Not enough sales velocity. Lack of face-to-face selling presence of A2a in New York really hurts.

- Liquid Outdoor – late to the game. Questioning the relationship based upon being "hand cuffed."

- Dual selling representation doesn't work and leads to confusion.

- Not enough times at bat with RFP's and insertions. Not being able to be bundled with other surrounding digital boards hurts selling opportunities.

24

HTF001045

25

# The Competitive Gorilla

- The new CBS Cube is dominating the conversation and getting serious buyer/advertiser attention.

- From a direct comparison, the CBS Cube further exacerbates the perceived quality of the Port Authority board.

- Priced more competitively – up to 30% less.

HTF001046

26

# The Property

- It is older technology and being leap frogged by new digital entries.

- Viewed as still being spectacular in a high-profile NYC traffic area – the Port Authority location that happens to be outside the Times Square "Bowtie."

- Quality concerns. Better at night and with motion based creative. Static creative doesn't work.

- Lack of awareness. Not enough buyers/advertisers know about it.

HTF001047

# Voice of the Buyer – What They Say and Think

- The board is valuable and desirable, especially after having been introduced to it (those with no awareness).

- Feel the board is "right" for certain advertisers and clients. A target account selling strategy is their recommendation. Positioning what it is right for and what it is not right for is seen as critical.

- Sports, Motion Pictures, Entertainment, and Network TV are the key categories offering the most sales penetration potential.

- Caution against overpromising and under delivering. Bring costs in line.

- Make it easy for them. Perceptions exist that buyers are lazy and take the path of least resistance – buying and clearing lots of media through the larger outdoor companies.

27

HTF001048

28

# Recommendations

HTF001049

29

# Sales

1. Terminate the relationships with A2a and Liquid Outdoor. Manage the fallout with existing clients with an agreed upon 60 to 90 day termination period. (Consider a short-term interim direct client connection program.)

2. Immediately begin vetting new potential selling organizations with extensive sales forces and a nationwide presence that have strong relationship and engagement connections in the outdoor media buying and planning community.

3. Develop a well thought out RFP document to help in the down selecting of potential firms to present their selling strategies and methodologies for the board. (Release the RFP to the likes of Clear Channel, CBS Outdoor, Van Wagner, City Outdoor, Vector Media and others) Down select to two or three finalists to give individual presentations.

4. Put a clear and consistent sales strategy and expectations methodology in place that defines and outlines the selling and media sales delivery expecta-tions for Garage Media. (Best practice map those methodologies from the RFP that might be applicable.)

30

## Marketing/Promotion

1. Reposition the Port Authority Board – a new version or paradigm shift for "Spectacular" that gives buyers and media influences a new "reason to believe in and belong" to the board – by buying it. (Work this positioning in close conjunction with new sales partners to ensure that there is buy-in.)

2. Develop a category/industry/brand target account program. Build marketing and selling communications from a target account perspective. Concentrate on high potential category/industries that were identified by both media buyers/planners as well as sales influences:

   > Sports
   > Entertainment
   > Motion Pictures/Theatre
   > Destination/Tourism
   > Network TV
   > Automotive
   > Insurance/Financial

HTF001051

31

# Marketing/Promotion

3. Determine the feasibility and suitability of a marketing/selling program directed at key brands/clients. Given the target account program concentration, strong consideration must be given to appropriating a percentage of selling efforts directed at high profile candidate brands (CMO level).

4. Reintroduce the board based upon the new positioning and selling methodology. Give the board a whole new life through a new positioning and sales team. Use the changes to help forge new relationships with buyers unfamiliar with the board. Reintroduce the board to past advertisers and buyers that have chosen not to use the board.

5. Investigate developing sales/selling promotional materials (Garage Media sponsored) that can be used by Garage Media influences to augment and reinforce the sales of the new selling partners. The main purpose for these promotional materials would be to reach dormant accounts or current agency/client purchasers.

HTF001052

**EXHIBIT  P**

# GARAGE ∘∘ ∘∘ MEDIA™

January 10, 2012

Mr. Andrew Melton
President
A2aMedia Inc.
171 Milk Street
Boston, MA 02109

Re: Exclusivity of Port Authority of NY / NJ Bus Terminal Advertising Agreement

Dear Andy:

Pursuant to our Services Agreement, dated October 22, 2010, Garage-Media has an option to terminate the exclusivity of sales with A2aMedia should sales fall short of the goal listed in the agreement within each 6 month period, which began on July 1, 2011.

The minimum sales goal for the period was $1,710,000. Actual sales were $1,456,000. Therefore sales for the first measurement period, July 1, 2011 through December 31, 2011 fell short of the goal. The options Garage-Media have are listed below and allow us to provide notice of our intent to terminate and for A2aMedia to have the right to cure.

   1.   (b) If Contractor falls short of either or both Performance Goals for a Measurement Period for the Media Facade, and Purchaser wishes to exercise its right to terminate Contractor's exclusive right to provide Management Services, then Purchaser must provide written notice thereof to Contractor. Contractor will have 30 days, beginning 7 days from receipt of said written notice, to correct all deficiencies ("Notice Period"). If during this 30-day Notice Period, Contractor meets or exceeds on average the Performance Goals, then Contractor's exclusive right to provide Management Services will continue for the remainder of the current Measurement Period, and into the next Measurement Period. If Contractor fails to meet either or both Performance Goals for the Notice Period as aforesaid, then Contractor's exclusive right to provide Management Services will terminate.

At this point Garage-Media would like to provide an alternative solution to the above.

With this letter, we are expressing our dissatisfaction with the sales for the period ending Dec 31, 2011 and urging you to take the appropriate measures to improve the sales immediately.

Furthermore, we cannot wait for another 6 months to measure and address the issues that have placed Garage-Media in jeopardy due to less than expected sales volume.

Therefore, we are willing to provide a modified measurement period beginning on February 1, 2012, ending on April 30, 2012 known as Period 1.1. Garage-Media will

**750 Main Street, Mezzanine Level, Hartford, CT 06103**

DEF-001235

elect to allow A2aMedia to remain exclusive for this period and consider the issue cured if sales for the period meet or exceed $997,500 for the three month 1.1 period. If A2aMedia fails to meet the minimum sales, Garage-Media will have the right to exercise its option to provide A2aMedia notice of its intent to terminate the exclusivity provision in the Services Agreement. Period 1.1 is in addition to Period 2 with overlapping dates. Period 2 will be measured for 6 months beginning in January 1, 2012 and ending June 30, 2012 as stated in the agreement.

We have a vested interest in your success and trust A2aMedia will take advantage of this opportunity to bring the project in line with the agreements and your committed sales volume to the GM / PABT project.

Sincerely,


Gary Neff

Garage-Media LLC

By signing below, A2aMedia accepts the offer to create a new measurement period, 1.1, from February 1, 2012 to April 30, 2012 as detailed within this letter.



_____          _____

Name / Title                                Date

DEF-001236

**EXHIBIT  Q**

Garage-Media LLC
750 Main Street
Mezzanine Level
Hartford, CT 06103

June 26, 2012

A2a Media, Inc.
171 Milk Street
Boston, MA 02109
Attn: Andrew Melton

RE: Port Authority Bus Terminal Mediamesh Façade

Dear Andrew:

Based on the actual sales for Measurement Period 2, A2aMedia has significantly underperformed the Ad Sales Goals.

Pursuant to the Services Purchase Agreement dated October 22, 2010 between A2aMedia and Garage-Media NY LLC, Exhibit B, Sales of Advertising, this notice is provided to confirm Garage-Media NY LLC is exercising its rights to convert A2aMedia to a non-exclusive sales agent for the said project, effective immediately.

The current agreement provides A2aMedia several opportunities to cure. We believe that A2aMedia will not be able to accomplish these as required, therefor request A2aMedia acknowledge and waive its rights to cure and allow Garage-Media NY LLC to retain other selling firms to co-sale the project.

Garage-Media NY LLC will honor the agreement of Exhibit B, section 5.b and separate advertisers as detailed within.

Please sign below to both acknowledge receipt of notice and waive the cure rights.

Sincerely                                    Acknowledgement and Waiver Cure
                                             Rights per agreement:

Gary Neff                                    _____
Managing Partner                             Andrew Melton, President 6/27/12


Copy:
Macquarie Equipment Finance, LLC
2285 Franklin Road, Suite 100
Bloomfield Hills, MI 48302
Attention: John Zimmeth

**EXHIBIT  R**

Garage-Media NY LLC
One Union Place
Suite 2 South
Hartford, CT 06103

March 23, 2014

Mr. Andrew Melton
President
A2a Media, Inc.
171 Milk Street
Boston, MA 02109

RE: Port Authority Bus Terminal Sales Agreement

Dear Andrew:

Garage-Media NY LLC is exercising its rights to terminate A2aMedia as a non-exclusive sales agent for the Port Authority Bus Terminal Mediamesh project located on 42nd and 8th Ave, NYC, NY, effective immediately.

Nearly three years into the PABT project, A2aMedia has failed to build the sales team or achieve the annual sales objectives both projected by A2aMedia and required to support this project. As you are aware, we have worked for a long period of time and without success, to provide A2aMedia with a pathway to meet at least the minimum objectives.

As a result of the RFP process, which A2aMedia participated in last quarter, Clear Channel Outdoor has been selected as our exclusive sales agent.  Effective Monday, March 24th, 2014, Clear Channel Outdoor (CCO) will become the lead sales and program manager for the PABT Mediamesh.  As a result all A2aMedia accounts have been shifted to CCO.

Effective immediately, no additional proposals shall be issued by A2aMedia for the PABT Mediamesh project.

Garage-Media is committed to making the transition as smooth as possible.  Accordingly, GM/CCO will:

    1. Use A2aMedia's content management services until June 30th, 2014, and compensate A2aMedia $6,000 per month per the current agreement.

    2. Garage-Media will purchase the camera on the CBSO Cube on April 1st, 2014 as proposed by A2aMedia on March 7th, 2014.

    3. Garage-Media shall honor all existing sales agreements and compensate A2aMedia for those sales per the existing commission schedules.

4. A2aMedia shall have until Wednesday, March 26th, 2014 to provide a detailed list and copies of outstanding proposals for protection.  A2aMedia shall be allowed to secure these specific projects and receive full compensation, providing the proposals meet the following requirements and are closed on or before May 23rd, 2014.  Proposals must be documented with an email to the buyer or RFP submission to Agency and include Agency Name, Agency Contact, Advertiser, SOV, Gross Value and Flight. Without these details, protection will not be provided.

Furthermore, CCO has agreed to meet with you at the Clear Channel Outdoor office in NYC to discuss opportunities.  It will be up to both CCO and A2aMedia to decide if and how you can work together. Our goal at Garage-Media is to provide the opportunity and will support CCO's direction.  Your contact is Jesse London, Sales Manager, JesseLondon@clearchannel.com or 212-812-0037.  I suggest you contact Jesse this week.

While this outcome was not foreseen and is unfortunate, I can say, on behalf of Garage-Media, we have enjoyed working with everyone at A2aMedia.  Your entire team has been most professional and I truly believe you have done the best you can with the resources available to you.

Sincerely;

Gary Neff
Managing Partner

Copy:
Macquarie Equipment Finance, LLC
2285 Franklin Road, Suite 100
Bloomfield Hills, MI 48302
Attention: Andrew Feldstein

CONFIDENTIAL

2

**EXHIBIT  S**

METZ LEWIS BRODMAN MUST O'KEEFE LLC

535 Smithfield Street  Suite 800  Pittsburgh, Pennsylvania 15222
T: 412.918.1100  F: 412.918.1199  www.metzlewis.com

January 23, 2019



ATTORNEYS AT LAW
JUSTIN M. TUSKAN

**Via Certified and First-Class U.S. Mail**
Garage Media NY LLC
One Union Place
Hartford, CT 06103

**Re:    Notice of Default and Demand for Payment**

Dear Sir/Madam:

Reference is hereby made to: (a) that certain Lease Agreement dated October 26, 2010 by and between Garage Media NY LLC ("Lessee") and Huntington Technology Finance, Inc., formerly known as Macquarie Equipment Finance, Inc., formerly known as Macquarie Equipment Finance, LLC ("Huntington") (as amended, the "Lease Agreement"); and (b) that certain Irrevocable Standby Letter of Credit No. OSB 009044 dated December 11, 2015 for the benefit of Outfront Media Group, LLC ("Outfront"), as successor in interest to CBS Outdoor Group, Inc. (the "Letter of Credit"). Capitalized terms used herein shall have the same meaning as set forth in the Lease Agreement and the Letter of Credit unless otherwise defined.

Pursuant to letter correspondence dated October 2, 2018, Lessee was advised that rental payments, taxes, and other amounts due under the Lease Agreement have not been paid since on or about May 8, 2015. That event of default remains outstanding as of the date of this letter. In addition, Lessee is in default under the Lease Agreement by virtue of Lessee's failure to comply with the terms and conditions of the Display Agreement. More specifically, by letter correspondence dated December 5, 2018 and provided to Huntington on or about December 17, 2018, Outfront advised Lessee of Lessee's delinquency in paying $652,166.59 in guaranteed revenue fees due to Outfront. As a consequence of Lessee's nonpayment, Outfront drew on the entire principal balance of the Letter of Credit in the amount of $600,000.00.

In light of the foregoing, demand is hereby made upon Lessee to immediately reimburse Huntington in the amount of $600,000.00 as a result of Outfront's draw on the Letter of Credit. Payment shall be made in available funds at The Huntington National Bank, 310 Grant Street, 2nd Floor, Pittsburgh, PA 15219, Attention: Edward J. Kitchen, Senior Vice President. In addition, Lessee remains responsible for payment in full of all amounts due and owing to

Garage Media NY LLC
January 23, 2019
Page 2

Huntington under the Lease Agreement, together with Huntington's attorneys' fees, collection costs, and all additional interest, fees, and/or late charges which subsequently accrue in accordance with the terms of the Lease Agreement. Unless timely and full payment is received by Huntington, all remedies available to Huntington under the Lease Agreement, at law, and in equity will be pursued without further notice to Lessee.

Huntington expressly reserves all of its rights and remedies with respect to the occurrence and continuance of the events of default identified above and any other event of default which may exist or may hereafter occur. This letter is not intended to be a waiver of any rights, remedies, or recourse available to Huntington, nor an election of remedies arising as a result of the events of default set forth herein or any other event of default which may exist or may hereafter occur. No delay on the part of Huntington to take any action shall be construed to constitute a waiver of Huntington's rights under the Lease Agreement, or any and all documents executed and delivered to Huntington in connection therewith, or to impair or otherwise prejudice the latter exercise of any such rights or remedies. Nothing contained in this letter, in any prior or subsequent communication among or between Huntington, its counsel, Lessee, other parties in interest, and/or their counsel, or any action or inaction by Huntington, shall be construed to constitute or shall be deemed as: (a) a course of dealing obligating Huntington to take or not take any action at any time; (b) a commitment or an agreement to make a commitment with regard to any possible restructure of the Lease Agreement; or (c) an agreement to forbear from exercising any rights or remedies.

Please contact Mr. Kitchen or the undersigned to arrange for immediate payment.

Regards,

Justin M. Tuskan

JMT/mm

cc (via email): John R. O'Keefe, Jr.
              Christopher H. Blau
              Eric A. Henzy
              Edward J. Kitchen