## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **HUNTINGTON TECHNOLOGY FINANCE, INC., f/k/a MACQUARIE EQUIPMENT FINANCE, INC., f/k/a MACQUARIE EQUIPMENT FINANCE, LLC,** | : | **CIVIL ACTION NO. 3:18-cv-01708-VLB** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **AUGUST 30, 2019** |
| | : | |
| **GARETT ALAN NEFF a/k/a GARY NEFF, JOHN MARK SCHMID, and DAVID KARL SCHMID,** | : | |
| | : | |
| **Defendants.** | : | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF OBJECTION
## TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**ORAL ARGUMENT IS REQUESTED**

## <u>TABLE OF CONTENTS</u>

**I. INTRODUCTION** ................................................................................ **5**

**II. BACKGROUND** ............................................................................... **6**

**III. SUMMARY JUDGMENT STANDARD** ........................................... **10**

**IV. PLAINTIFF'S CLAIMS OF LIABILITY AND DAMAGES** ....................................... **11**
    **A.**    **The Lease Documents represent a financing transaction, not a true lease.** ................................................................................... **11**
    **B.**    **Huntington is not entitled to the Lessor's Return or any interest thereon because this transaction is not a true lease.** ........................ **16**
    **C.**    **The debt due Huntington does not include taxes.** .............................. **18**
    **D.**    **Huntington is not entitled to late or default interest for the period prior** ................................................................................... **20**
    **to October 2, 2018.** ................................................................ **20**
    **E.**    **Huntington's inconsistent public and private positions concerning the amount of the debt owed by GMNY.** .............................................. **22**
    **F.**    **Letter of Credit.** ................................................................... **23**

**V. AFFIRMATIVE DEFENSES** ............................................................ **25**
    **A.**    **The Defendants' Affirmative Defenses are Not Barred as a Matter of Law** ................................................................................... **25**
        **1.**    **Waiver Argument** .................................................... **26**
        **2.**    **Standing Argument** ................................................. **27**
    **B.**    **Evidence Argument** ............................................................... **29**

**VI. Defendants Object to Portions of the Zimmeth Affidavit** ................................ **35**
    **A.**    **Statements of Legal Conclusions** ............................................... **35**
    **B.**    **Hearsay in the Zimmeth Affidavit** .............................................. **39**

**VII. CONCLUSION** ............................................................................. **44**

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). ............................................... 10

*Allah v. Poole*, 506 F. Sup. 2d 174 (W.D.N.Y. 2007) .......................................... 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................... 10

*Aslandis v. U.S. Lines, Inc.*, 7 F.3d 1067 (2nd Cir. 1993) .................................... 11

*B.F. Goodrich v. Betkoski*, 99 F.3d 505 (2nd Cir. 1996) ............................... 10, 11

*Baity v. Kralik*, 51 F. Sup. 3d 414 (S.D.N.Y. 2014). ..................................... 35, 44

*Bank of China v. Chan*, 937 F.2d 780 (2nd Cir. 1990) ........................................ 29

*Belefonte Re Ins. Co. v. Argonaut Ins Co.*, 757 F.2d 523 (2nd Cir. 1985) ............ 12

*Bloor v. Shapiro*, 32 B.R. 993 (S.D.N.Y. 1983) ................................................. 28

*Cathay Bank v. Wu-Chang Lai*, 2011 U.S. Dist. LEXIS 28205 (E.D.N.Y. 2011) ............ 28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................. 11

*Cinema North Corp. v. Plaza at Latham Associates*, 867 F.2d 135 (2nd Cir. 1989) ...... 28, 29

*Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 138 F. Sup. 3d 352 (S.D.N.Y. 2015) ................................................................................. 36

*Corporate Buying Serv. V. Lenox Hill Radiology Assocs.*, 1995 U.S. Dist LEXIS 15180 (S.D.N.Y. 1995) ................................................................................. 28

*Crown Heights Jewish Community Council v. Fischer*, 63 F. Sup. 2d 231 (E.D.N.Y. 1998). ................................................................................. 39

*Fangio v. Vehifax Corp. (In re Ajax Integrated, LLC)*, 554 B.R. 568 (Bankr. N.D.N.Y. 2016) ................................................................................. 15, 16

*FDIC v. Wrapwell Corp.*, 93 Civ. 859 (CSH), 94 Civ. 5574 (CSH), 2002 U.S. Dist. LEXIS 76 (S.D.N.Y. Jan. 2, 2002) ................................................................................. 43

*Gallo v. Prudential Residential Servs.*, 22 F.3d 1219 (2nd Cir. 1994) .................... 11

*Glotzer v. Glotzer*, 111 Misc. 2d 171, 173, 443 N.Y.S.2d 812 (Sup. 1981) ................ 14

*Gruppo, Levey & Co. v. ICOM Info. & Communications, Inc.*, 2003 U.S. Dist. LEXIS 11213 (S.D.N.Y. 2003) ................................................................................. 29

*In re Campbell*, 513 B.R. 846 (Bankr. S.D.N.Y. 2014) ........................................ 20

*In re Uni Imaging Holdings, LLC*, 423 B.R. 406 (Bankr. N.D.N.Y. 2010) .................. 16

*LaRouche v. Webster*, 175 F.R.D. 452 (S.D.N.Y. 1996) ....................................... 36

*Mack v. United States*, 814 F.2d 120 (2d Cir. 1987) .......................................... 23

*Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977) ............................ 36

*Merry Charters, LLC v. Town of Stonington*, 342 F. Sup. 2d 69 (D. Conn. 2004) ............ 35

*Mignault v. Ledyard Public Schools*, 792 F. Sup. 2d 289 (D. Conn. 2011) ............ 24, 25

*Mohammad v. New York State Higher Education Services Corp.*, 422 F. App'x 61 (2d Cir. 2011) ................................................................................. 24

*Newport Electronics v. Newport Corp.*, 157 F. Sup. 2d 202 (D. Conn. 2001) ............ 43

*Park Irmat Drug Corp. v. OptumRx, Inc.*, 152 F. Sup. 3d 127 (S.D.N.Y. 2016) ............ 13

*Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969) ............ 42

*PSINet, Inc. v. Cisco Systems Capital Corp. (In re PSINet, Inc.)*, 271 B.R. 1 (Bankr. S.D.N.Y. 2001) ................................................................................. 14, 15, 16

*Royal Palm Senior Investors, LLC v. Carbon Capital II, Inc.*, 2009 U.S. Dist. LEXIS 57452

(S.D.N.Y. July 7, 2009) ...........................................................................26, 27
*SEC v. Gruss*, 245 F. Sup. 3d 527 (S.D.N.Y. 2017) ............................................36
*Setevage v. Dep't of Homeland Security*, 539 Fed. Appx. 11 (2nd Cir. 2013)....................12
*Sterling Fin. Servs. Co. v. Franklin*, 259 Fed. Appx. 367 (2nd Cir. 2008).........................28
*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)...24
*Tymon v. Wolitzer*, 39 Misc.2d 504, 240 N.Y.S.2d 888 (N.Y. Sup. Ct. 1963) ......................21
*U.S. Bank Trust Nat'l Corp. v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88 (2d Cir. 2013).21
*United States v. Aspinall*, 389 F.3d 332 (2d Cir. 2004).........................................................42
*United States v. Duncan,* 42 F.3d 97 (2d Cir. 1994)..............................................................36
*Westinghouse Electric & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342 (1924) .........14
*Wurzler v. Clifford*, 36 N.Y.S.2d 516 (N.Y. Sup. Ct. 1942) ...................................................21

**Statutes**
N.Y. U.C.C. Law § 1-201 ............................................................. 13, 15, 16, 19, 29
N.Y. U.C.C. Law §1-302(b) ..........................................................................................26
N.Y. U.C.C. Law §1-304 ...............................................................................................26
N.Y. U.C.C. Law §9-109(a)(1).......................................................................................26
N.Y. U.C.C. Law § 1-201(37) ........................................................................................14
New York Tax Law § 1105(a) .......................................................................................19
New York Tax Law § 1-201(37) .....................................................................................14

**Other Authorities**
Restatement (2d) of Contracts, § 205 comment a, d ........................................29
State of New York Commissioner of Taxation and Finance Advisory Opinion, Petition
  No. S960708A ........................................................................................................20
State of New York Commissioner of Taxation and Finance Advisory Opinion, Petition
  No. S970806E...........................................................................................................19

**Rules**
Conn. L. R. Civ. P. 7 ....................................................................................................5
Conn. L. R. Civ. P. 56 ..................................................................................................5
Fed. R. Civ. P. 56 ......................................................................................... 5, 10, 35
Fed. R. Civ. P. 30(b)(6) .......................................................................................40, 43
Fed. R. Evid. 801(c) ...................................................................................................42
Fed. R. Evid. 803(6) ...................................................................................................42
Fed. R. Evid. 806(6) ...................................................................................................42

4

I. **INTRODUCTION**

Pursuant to Fed. R. Civ. P. 56 and D. Conn. L. Civ. Rules 7 and 56, defendants Garett Neff ("Neff"), John Schmid ("J. Schmid") and David Schmid ("D. Schmid," and together with Neff and J. Schmid, the "Defendants"), by and through their undersigned counsel, respectfully submit this memorandum in support of their objection to the Plaintiff's Motion for Summary Judgment (Doc. No. 38, the "MSJ") filed by plaintiff Huntington Technology Finance, Inc. f/k/a Macquarie Equipment Finance, Inc. f/k/a Macquarie Equipment Finance, LLC (the "Plaintiff" or "Huntington"), on July 26, 2019.

The Plaintiff has wholly failed to meet its burden of showing that there are no genuine issues as to any material fact and that it is entitled to judgment as a matter of law.  In fact, as to certain issues—whether the Plaintiff is entitled to a "Lessor's Return," interest, and taxes—the Defendants believe that they are entitled to judgment as a matter of law, and have filed their own motion for summary judgment on those issues (Doc. No. 36). Even assuming that the Defendants are not entitled to summary judgment on those issues, as discussed in this memorandum and in the Rule 56(a)2 Statement filed with this memorandum, the Defendants have shown specific facts showing that there are genuine issues for trial. Underlying much of the Plaintiff's claims is the Plaintiff's argument that GMNY (as defined below) leased the Sign (as defined below) from the Plaintiff. As discussed herein and detailed in the Defendants' Rule 56(a)2 Statement, the transaction between the GMNY and the Plaintiff was not a leasing transaction, it was a financing transaction, and GMNY did not lease the Sign, it owned the Sign.  At the very least, there are genuine issues of material fact as to whether the

underlying transaction here was a financing or a lease.  In addition, the Plaintiffs have not demonstrated in any way that there are not genuine issues of material fact with respect to the affirmative defenses raised by the Defendants, and the Plaintiff is incorrect that the Defendants may not raise those defenses as a matter of law.

## II.       BACKGROUND

The Defendants are members of Garage Media, LLC ("GMCT"), a Connecticut limited liability company that was formed on or about January 15, 2009.  GMCT is the sole member of Garage Media NY LLC ("GMNY"), a New York limited liability company that was formed on or about October 5, 2010.  Through GMCT, the Defendants control GMNY.  GMNY consents to the Defendants asserting any affirmative defenses belonging to GMNY in this action.  (Defendants' Local Rule 56(a)(2) Statement in Support of Their Opposition to Plaintiff's Motion for Summary Judgment ("R. 56(a)(2) Statement"), Additional Material Facts ("Add'l Facts"), ¶ 7.

GMNY was formed for the purpose of owning and operating a Mediamesh outdoor advertising sign (the "Sign") affixed to the Port Authority Bus Terminal in New York City.  (R. 56(a)(2) Statement, Add'l Facts, ¶ 11.) In furtherance of that purpose, on October 26, 2010, GMNY and CBS Outdoor Media ("CBS") entered into a Display Agreement. (R. 56(a)(2) Statement, Add'l Facts, ¶ 12.) The Port Authority of New York and New Jersey (the "Port Authority") agreed to and acknowledged the Display Agreement. (*Id.*) As recited in the Display Agreement, CBS and the Port had earlier entered into a Permit Agreement dated May 20, 1996 (as amended, the "Permit Agreement"), pursuant to which CBS was given permission by the Port to install and

operate an outdoor advertising sign on the exterior of the Port Bus Terminal (the "PA Terminal") in New York City. (*Id.*) The Permit Agreement granted CBS the right to license its rights to a third party with the prior approval of the Port. (*Id.*) Pursuant to the Display Agreement, CBS licensed its rights under the Permit Agreement to GMNY for the purpose of granting GMNY the right to install a Mediamesh digital sign (the "Sign") on the PA Terminal. (*Id.*)

Also on October 216, 2010, GMNY, GMCT, A2a Media, Inc. ("A2a"), GKD-USA Inc. ("GKD") and the Plaintiff entered into an Equipment Purchase Agreement pursuant to which, among other things, GKD agreed to sell and construct the Sign. (R. 56(a)(2) Statement, Add'l Facts, ¶ 13.) Exhibit A-1 to the Equipment Purchase Agreement provides that the total purchase price of the Sign is $6,026,000.00. (*Id.*)

In order to finance the purchase and installation of the Sign, on October 26, 2010, GMNY entered into that certain Lease No. 001, dated October 26, 2010 (the "Lease Agreement"), with the Plaintiff. (R. 56(a)(2) Statement, Add'l Facts, ¶ 14.) GMNY granted the Plaintiff a security interest in all of its assets and property of any kind or nature whatsoever as security for its obligations under the Lease Agreement. (*Id.*) On October 26, 2010, the Defendants also signed the Guaranty. (*Id.*, at ¶ 5.)

To further secure GMNY's obligations under the Lease Agreement, GMCT entered into a guaranty of all of GMNY's obligations under the Lease Agreement. (*Id.*, at ¶ 8.) Further, GMCT entered into a Pledge and Security Agreement, pursuant to which it, among other things, granted the Plaintiff a lien on, security interest in, and right of setoff against, among other property, general intangibles and "all of the stock, shares,

membership interests, partnership interests and other equity ownership interests in [GMNY] now or hereafter held by [GMCT] (collectively, the "Ownership Interests") and all of [GMCT]'s rights to participate in the management of [GMNY], [and] all rights, privileges, authority and powers of [GMCT] as owner or holder of Ownership Interests in [GMNY] . . . ." (*Id.*, at ¶ 9.) Additionally, the Defendants entered into a Pledge Agreement pursuant to which they, among other things, granted the Plaintiff a lien on, security interest in, and right of setoff against, among other property, "all of the stock, shares, membership interests, partnership interests and other equity ownership interests in [GMCT] now or hereafter held by [the Defendants] (collectively, the "Ownership Interests") and all of [the Defendants]' rights to participate in the management of [GMCT], [and] all rights, privileges, authority and powers of [the Defendants] as owner or holder of Ownership Interests in [GMCT] . . . ." (*Id.*, at ¶ 10.)

At various dates after October 26, 2010, the Lease Agreement was amended by the following (the Lease Agreement, as amended, the "Lease Documents"): Amendment No. 1 dated June 13, 2010; Amendment No. 2 dated July 28, 2011 ("Amendment 2"); Amendment No. 3 dated September I, 2012; and, Amendment dated as of March 31, 2013 ("Amendment 4"). (*Id.*, at ¶ 16.) Pursuant to Amendment 2, in total GMNY borrowed $7,041,952.00 from the Plaintiff, $1,050,000.00 of which was used to fund a security deposit to secure GMNY's obligations to the Plaintiff. (*Id.*, at ¶ 17.) GMNY made payments to the Plaintiff under the Lease Documents totalling $5,522,724.81. (*Id.*, at ¶ 18.) Approximately $490,141.82 of this amount was on account of sales taxes paid over by the Plaintiff to the applicable government entities. (*Id.*) The Plaintiff applied the

$1,050,000.00 security deposit to GMNY's obligations under the Lease Documents. (*Id.*)

On its federal and state tax returns, GMNY treated the Lease Documents as a financing arrangement, in that it included the Sign as an asset on its balance sheet, included the amount due under the Lease as a liability on its balance sheet, and claimed deprecation with respect to the Sign. (*Id.*, at ¶ 20.)   GMNY provided copies of its federal and state tax returns to the Plaintiff. (*Id.*)

While in its Complaint the Plaintiff alleges that $8,302,118.35 is owed by the Defendants under the Lease Documents, in its internal records and communications the Plaintiff recognized that its net exposure was between $3.8 million and $3.9 million at various times in 2018. (*Id.*, at ¶ 20.)  Edward Kitchen, the workout person assigned to the GMNY account, designated by the Plaintiff as a 30(b)(6) witness and identified as a person with knowledge regarding the claims made in the Complaint in responses to interrogatories, was able to give essentially no explanation of the amount that the Plaintiff claims is owed by GMNY beyond the approximately $3.8 figure stated in the foregoing documents when questioned at his deposition. (*Id.*)

The Sign went "live" on June 10, 2010.  In July, 2011, the first of a long series of system failures with the Sign occurred.  The Sign has experienced dozens of significant technical problems and system failures. (*Id.*, at ¶ 21.)

Between February, 2015, and October 2, 2018, the Plaintiff did not send a written notice to GMNY that GMNY had failed to pay any Rental Payment (as defined in the Lease Documents) or other amount due under the Lease Documents. (*Id.*, at ¶ 22.) Monthly invoices that the Plaintiff sent to GMNY from October, 2015 through March,

2018, did not include any amount due for late or default interest. (*Id.*, at ¶ 23.) An aging report that the Plaintiff sent to GMNY in March, 2016, did not include any amount due for late or default interest. (*Id.*, at ¶ 24.)  Prior to October 2, 2018, the Plaintiff never made a demand for payment of late or default interest and never gave GMNY any indication or notice that the Plaintiff asserted that default or late interest was due or accruing. (*Id.*, at ¶ 25.) Until October 2, 2018, the Plaintiff never notified GMNY of the occurrence of an Event of Default under the Lease Documents or sought to exercise it remedies under Paragraph 18 of the Lease Agreement. (*Id.*, at ¶ 26.)

### III.　　SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides in relevant part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A party moving for summary judgment has the burden of showing the absence of a genuine issues of material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "When a court is confronted with facts that permit several different conclusions, all inferences from the underlying facts must be drawn in the nonmovant's favor." *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 521 (2nd Cir. 1996).  "The trial court must bear in mind that 'credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

"If the movant demonstrates an absence of material issues of fact, a limited burden of production shifts to the non-movant, which 'must demonstrate more than

some metaphysical doubt as to the material facts . . . [and] must come forward with specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting *Aslandis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2nd Cir. 1993)).  "Summary judgment, then is granted only when 'there is an absence of evidence to support the nonmoving party's case,' *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 . . . (1986), or, in other words, only if 'no rational jury could find in favor of the nonmoving party because the evidence to support the nonmoving party is so slight.'"  *Id.* (quoting *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2nd Cir. 1994)).  "The trial court's task is 'carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'"  *Id.* (quoting *Gallo*, 22 F.3d at 1224).

### IV.   PLAINTIFF'S CLAIMS OF LIABILITY AND DAMAGES [1]

#### A.   The Lease Documents represent a financing transaction, not a true lease.

The Guaranty provides that the Defendants guaranteed only GMNY's obligations under the "Agreements."  (Guaranty, § 2 (Exhibit 5).)  "Agreements" is a defined term in the Guaranty.  (*Id.*, at § 1.)  The Plaintiff has stated unequivocally that the "Lease Agreement is a guaranteed 'Agreement' [under the Guaranty] *because it is a personal property lease* executed in favor of Huntington pursuant to which Huntington is entitled to the benefit of payment."  Brief in Support of Plaintiff's Motion for Summary Judgment

---

[1] The Plaintiff makes arguments regarding waiver of affirmative defenses, but does not appear to argue that the Defendants are somehow barred from challenging the amount due from GMNY.  *L & B 57th Street, Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88, 92 (2d Cir. 1998) ("The language of the guaranty (unconditional as it is) is not a waiver of every defense to a damages claim, and does not foreclose a challenge to the calculation of the amount owed.")

(Doc. No. 38-1), p. 6 (emphasis added); Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment, ¶ 24 (emphasis added).  In its MSJ and supporting papers, the Plaintiff does not claim that the Lease Agreement constitutes an Agreement under the Guaranty for any reason other than that it is a personal property lease.  *See Belefonte Re Ins. Co. v. Argonaut Ins Co.*, 757 F.2d 523, 528-29 (2nd Cir. 1985) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding."); *Setevage v. Dep't of Homeland Security*, 539 Fed. Appx. 11, 13 (2nd Cir. 2013) (same).

The Lease Agreement is not a personal property lease, it is a loan agreement, this was not a leasing transaction, it was a financing transaction, GMNY did not lease the Sign from the Plaintiff, GMNY owned the Sign.

Fundamentally, "a lease involves payment for the temporary possession, use and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term.  In contrast, . . .  a security interest is only an inchoate interest contingent on default and limited to the remaining secured debt."  James J. White & Robert S. Summers, Uniform Commercial Code vol. 4, sec. 30-3, 14 n.18 (5th ed. West 2002).  Here, the way that the Plaintiff secured its claim in and of itself evidences that this was intended as a secured financing rather than a true lease — in addition to GMNY's grant of a security interest to the Plaintiff, the Plaintiff received guaranties of all of GMNY's obligations under the "Agreements" from the Defendants and GMCT, which in turn were secured by security interests in and pledges of property of the Defendants and GMCT.

12

In addition, as noted above, on its federal and state tax returns GMNY treated the Lease Documents as a financing arrangement, in that it included the Sign as an asset on its balance sheet, included the amount due under the Lease Documents as a liability on its balance sheet, and claimed deprecation with respect to the Sign. The Plaintiff was aware of this tax treatment, as GMNY provided copies of its federal and state tax returns to the Plaintiff.

Moreover, both the Lease Documents themselves and the traditional analysis under former section 1-201(37) of the New York Uniform Commercial Code ("NY UCC") confirm that the Lease Documents are not a true lease.  The Lease Agreement provides, at paragraph 23 (Exhibit 2):

> Unless [GMNY] has the right to acquire [the Plaintiff's] interest in the Equipment[2] at the end of the Term[3] for nominal or no additional consideration, the parties intend this [Lease Agreement] to be a true lease and not one intended merely for security.

Pursuant paragraph 6(b) of the Lease Agreement, as amended by Amendment 4, "at the end of the Renewal Term, this [Lease Agreement] will terminate and [GMNY][4] will be entitled to [the Plaintiff's] interest in the Equipment for $1." (Exhibit 3, art. II) It is well-settled that "an option price of a dollar is nominal."  *PSINet, Inc. v. Cisco Systems*

---

[2] "Equipment" is the same object referred to herein as the Sign.

[3] "Term" is defined as the total length of the Agreement. (Lease Agreement, at ¶ 4 (Exhibit 2).)

[4] Paragraph 6(b) of the Lease Agreement, as amended by Amendment 4, contains a scrivener's error in that it reads "Lessor will be entitled to Lessor's interest in the Equipment for $1." This is nonsensical and the only logical reading of the subject section is "[GMNY] will be entitled to [Huntington's] interest in the Equipment for $1." *See generally Park Irmat Drug Corp. v. OptumRx, Inc., 152 F. Sup. 3d 127, 135 (S.D.N.Y. 2016)* In earlier versions of paragraph 6(b), the Lease Documents provided for Huntington to transfer the Sign to GMNY. (*See* Exhibit 10, Ex. B, at ¶ 6(a)(v) ("…this Lease will terminate and Lessor will transfer the Equipment to Lessee for $1."); *Id*. at ¶ 6(a)(vii) ("… this Lease will terminate and Lessor will transfer the Equipment to

*Capital Corp. (In re PSINet, Inc.)*, 271 B.R. 1, 45 (Bankr. S.D.N.Y. 2001); *see also Westinghouse Electric & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 348 (1924) (describing one dollar as "nominal consideration"); *Glotzer v. Glotzer*, 111 Misc. 2d 171, 173, 443 N.Y.S.2d 812 (Sup. 1981) (same).  Because GMNY had the option to purchase the Sign for nominal consideration, the plain language of the Lease Agreement provides that this was a secured financing transaction and not a true lease.

Beyond the plain language of the Lease Agreement, an analysis under the NY UCC confirms that the arrangement between the Plaintiff and GMNY was a secured financing transaction rather than a true lease. NY UCC § 1-201(37) governs the distinction between a true lease and an instrument designed to create a security interest.[5] Section 1-201(37) provides:

> (a)  Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:
>
> (i)    the original term of the lease is equal to or greater than the remaining economic life of the goods,
>
> (ii)   the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
>
> (iii)  the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon

---

Lessee for $1.")

[5] The law of the state of New York governs the Lease Documents. (Exhibit 2, at ¶ 34.) Because the Agreement was entered into prior to December of 2014, this matter will be analyzed under the former Section 1-201(37) rather than the revised Section 1-203.

compliance with the lease agreement, or

(iv)    the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

Courts described this as "a two-prong 'Bright Line Test' that, if satisfied, calls for the lease to be recharacterized as a secured transaction." *Fangio v. Vehifax Corp. (In re Ajax Integrated, LLC)*, 554 B.R. 568, 578 (Bankr. N.D.N.Y. 2016).

With respect to the Lease Agreement, the first prong of the Bright Line Test is satisfied in that paragraph 5 of the Lease Agreement states that it "is noncancelable during its Term … ." (Exhibit 2, at ¶ 5.) The only manner in which GMNY would be released from its obligations under the Lease Agreement is following the payment of all amounts due thereunder and the selection of one of three End of Term options as provided by paragraph 6 thereof, as amended by Amendment 4. (Exhibit 3.) The Lease Agreement provides no mechanism by which it could be prematurely terminated by GMNY. Courts regularly hold that when an agreement cannot be terminated "without paying all amounts then due and those that would become due, including the [purchase option]," the first prong of the Bright Line Test is satisfied.  *Fangio*, 554 B.R. at 579; *In re PSINet, Inc.*, 271 B.R. at 44 (holding that because Debtor could not terminate the agreement without incurring an obligation to creditor for the full cost of the equipment, including the "buyout payment," the first prong of the Bright Line Test under UCC § 1-201(37) was satisfied).  The first prong of the Bright Line Test is met.

The second prong of the Bright Line Test presents four "mutually exclusive factors… referred to by many courts as the 'residual factors.'" *Fangio*, 554 B.R. at 579.

15

"If any one of the four residual factors are met then the agreement is recharacterized as a secured transaction as a matter of law. *In re Uni Imaging Holdings, LLC*, 423 B.R. 406, 416 (Bankr. N.D.N.Y. 2010)." *Id.*

At a minimum, the Lease Agreement in the instant matter satisfies Section 1-201(37)(a)(iv) in that GMNY had the option of buying any interest Huntington had in the Sign for one dollar, pursuant to paragraph 6(b) as modified by Amendment 4. (Exhibit 3.)  As noted above, one dollar is "nominal additional consideration" for the purposes of Section 1-201(37)(a)(iv).  *PSINet, Inc.*, 271 B.R. at 45.

The Agreement meets both prongs of the Bright Line Test and thus constitutes "a secured transaction as a matter of law." *Fangio*, 554 B.R. at 579.  As noted above, the Plaintiff's position is that the Lease Agreement is a guaranteed Agreement within the meaning of the Guaranty *because it is a personal property lease*. At the very least, there are genuine issues of material fact as to whether the Lease Agreement was a true personal property lease or secured financing.

B. <u>Huntington is not entitled to the Lessor's Return or any interest thereon because this transaction is not a true lease.</u>

The Plaintiff claims that the Defendants are liable for a Lessor's Return in the amount of $283,075.00 plus interest thereon in the amount of $27,175.20.  The Plaintiff is not entitled to a Lessor's Return or interest thereon because, as discussed above, this transaction was financing transaction rather than a true lease, rendering the Lessor's Return provision of the Lease Documents inapplicable.

Huntington's claim stems from paragraph 18(d) of the Lease Agreement, which provides (Exhibit 2, emphases added):

16

> If an Event of Default is continuing, … [the Plaintiff] may in its absolute discretion and with notice to [GMNY] exercise any one or more of these remedies:
>
> …
>
> (d) Require [GMNY] to pay the Lessor's Return, calculated by [the Plaintiff] as of the date of [the Plaintiff's] demand, and upon [the Plaintiff's] full receipt of the Lessor's Return as a result of [the Plaintiff's] demand under this section, plus all other amounts outstanding under this Lease, this Lease will terminate *and [the Plaintiff] will transfer to [GMNY] any Equipment still in [GMNY's] possession*.

Further, paragraph 19 of the Lease Agreement provides in part (Exabit 2, emphasis added):

> Lessor's Return.  Lessor may become entitled to the Lessor's Return, which shall be Lessor's anticipated benefit of its bargain and profit from this Lease transaction (to which it will specifically be entitled).  The Lessor's Return, as stipulated to herein, includes amounts attributed by the parties to (and a loss to Lessor upon a Loss or Event of Default is dependent in part upon) unpaid Rental Payments to become due, *the original cost of the Equipment and Soft Cost Items to Lessor, the unrealized anticipated value of the Equipment to Lessor*, [and] the future observance by Lessee of its nonrental Lease obligations for the benefit of Lessor.

By its very title and its plain language, the concept of a Lessor's Return was intended to be applicable only in true lease situations.  By the terms of paragraph 18(d), there is a mutual exchange that is to take place: GMNY pays money and Huntington transfers any equipment to GMNY. But here, no such exchange could take place because this was not a true lease transaction, the Plaintiff never owned the Sign and never had anything to transfer to GMNY.  Further, the definition of Lessor's Return in paragraph 19 includes things — the original cost of the sign to Huntington, the unrealized anticipated value to Huntington of the Sign — that simply are not applicable

here. In fact, Mr. Zimmeth, the person principally responsible for the underlying transaction into 2018, testified at his deposition that Huntington sometimes used the same master agreement for both true lease and financing transactions, and that depending on whether a particular transaction was a true lease or a financing, not all of the provisions of Huntington's master agreement were applicable. (Exhibit 9, pp. 81-82) He testified that in a finance transaction, the residual value, fair market value, and transfer of equipment component of Lessor's Return are not applicable. (*Id.*)

The Defendants have moved for summary judgment that the Plaintiff is not entitled to a Lessor's Return. At a minimum, there are genuine issues of material fact as to whether the debt due the Plaintiff includes the Lessor's Return with interest.

C.   The debt due Huntington does not include taxes.

The Plaintiff argues that it is entitled to collect "all taxes associated with the Sign in the amount of $12,025.63 per month based on a tax rate of 8.875%." (Huntington's Brief, at 5.).  The Defendants have moved for summary judgment that as a matter of law the Plaintiff is not entitled to claim any amount due for taxes.  At a minimum, there are genuine issues of material fact as to whether there is an amount due for taxes.

Under the Lease Agreement, GMNY was responsible to pay all taxes, including state and local sales taxes. (Lease Agreement, ¶ 7 (Exhibit 2).) In August 2010, prior to the closing on the Lease Agreement on October 26, 2010, Patty Margin, an employee of the Plaintiff, advised GMNY that state and local sales taxes on the transaction were payable on the monthly payment to be made under the Lease Documents, rather than in a lump sum at the time of the purchase of the sign. (Neff Declaration, ¶ 8 (Exhibit 4).)

GMNY followed this advice, and $490,141.82 of the amount paid to the Plaintiff through February of 2015 was on account of and used by the Plaintiff to pay state and local sales taxes, calculated based on 8.875% of the rent payments made. (*Id.*, at ¶ 6.)

New York Tax Law section 1105(a) imposes sales tax upon "[t]he receipts from every retail sale of tangible personal property, except as otherwise provided in this article."  New York Tax Law section 1132(a) provides that "[e]very person required to collect the tax shall collect the tax from the customer when collecting the price, amusement charge or rent to which it applies."  Where a transaction constitutes a true lease, "New York State and local sales taxes must be collected from the lessee on each of the . . . monthly payments [of rent], at the time of each payment.  . . . [The lessor] must remit the taxes it is required to collect to the Department when filing the sales tax returns that cover the months in question . . . ."  (New York Commissioner of Taxation and Finance Advisory Opinion, Petition No. S970806E, attached as Exhibit A, at 4-5.) However, "[i]n those instances where the intentions of the parties and the facts and circumstances surrounding . . . [the] transactions clearly establish that such transactions are merely security or financing agreements and that the [lessor] is acting only as a financing agency, the [monthly lease] transactions would not be subject to State and local sales and compensating use taxes. State and local sales or use taxes would be imposed, however, at the time of the initial sale or use of the equipment in New York State." (*Id*. at 5.) For purposes of the New York Tax Law, whether a transaction constitutes a true lease or a security interest is analyzed under the same test under UCC section 1-201(37) discussed above. (New York Commissioner of

Taxation and Finance Advisory Opinion, Petition No. S960708A, attached as Exhibit B.)

As discussed above, the Lease Agreement was not a true lease, it was a financing transaction. The Defendants owned the Sign throughout. Accordingly, under the foregoing New York Tax Law, contrary to the advice given to GMNY by Huntington, GKD should have collected state and local sales taxes at the rate of 8.875% at the time the Sign was purchased and paid for before paying such state and local taxes over to the relevant governmental agencies.  Based on the purchase price of $6,026,000.00, that would have resulted in a tax of $534,807.50.  By incorrectly calculating taxes based on the scheduled payments under the Lease Agreement rather than the purchase price, the Plaintiff inflated the state and local sales taxes owed by some $400,000.00. In addition, GKD as the seller of the Sign was responsible to collect sales tax and the Plaintiff has no liability for state and local sales tax in connection with this transaction.

> **D.** **Huntington is not entitled to late or default interest for the period prior to October 2, 2018.**

The Plaintiff asserts that it is owed late or default "interest on past due rent and taxes in the amount of $2,083,161.24."  The Plaintiff's assertion is incorrect.

Where a note provides that default interest is payable on demand, interest does not accrue until demand is made or the creditor gives some proper indication to the obligor that it is electing to treat non-payment as a default under note or that it has started charging default interest.  *In re Campbell*, 513 B.R. 846, 851 (Bankr. S.D.N.Y. 2014).

> It is recognized that . . . the Mortgage . . . provided that "[u]pon occurrence of any default hereunder, the Note and all other sums secured hereby shall bear interest at the Default Rate."  As the Second Circuit recently stated,

20

however, this type of a general paragraph has been interpreted by New York cases as "'not self-operative,' intended to simply give the creditor 'the right to treat the entire debt as matured.'"  U.S. Bank Trust Nat'l Corp. v. AMR Corp. (In re AMR Corp.), 730 F.3d 88, 100 (2d Cir. 2013), citing, Wurzler v. Clifford, 36 N.Y.S.2d 516, 517 (N.Y. Sup. Ct. 1942), see also Tymon v. Wolitzer, 39 Misc.2d 504, 240 N.Y.S.2d 888 (N.Y. Sup. Ct. 1963).

(*Id.* at 852.)

As referenced in Mr. Zimmeth's affidavit and cited in Huntington's Memorandum, paragraph 25 of the Lease Agreement provides in part: "Late Performance; Interest Limitations.  Amounts due under this Lease that are not paid within 30 days of their due date will bear interest, *payable on demand*, at the rate of 12% per year, or such lesser rate as may be the maximum legal rate, from their due dates." (Exhibit 2, at ¶ 25, emphasis added.)  Furthermore, as stated in Huntington's Memorandum at page 7, Huntington did not give a written notice of non-payment of any Rental Payment until October 2, 2018.[6] Paragraph 17 of the Lease Agreement provides in part: "Default.  It is an 'Event of Default' by Lessee under this Lease if: (a) PAYMENT.  Lessee's failure to pay any Rental Payments or other amount under this Lease when due continues for 10 days *after notice*."  (Exhibit 2, at ¶ 17, emphasis added.)

Thus, there was no event of default under the Lease Documents prior to October 2, 2018.  Monthly invoices and an aging report that Huntington sent to GMNY in March, 2016, did not include any amount due for late or default interest. (Neff Declaration ¶¶ 11-12.) Prior to October 2, 2018, the Plaintiff never made a demand for payment of late or default interest and never gave GMNY any indication or notice that the Plaintiff asserted

---

[6] Pursuant to Section 28 of the Lease Agreement, a notice of default under section 17 was required to be in writing and delivered to GMNY's address. (Lease Agreement (Exhibit 2).)

that default or late interest was due or accruing. (*Id.*, at ¶ 13.)  Given the foregoing, there are at the very least genuine issues of material fact as to whether the Plaintiff is owed interest for the period prior to October 2, 2018.

E. **Huntington's inconsistent public and private positions concerning the amount of the debt owed by GMNY.**

In addition to the forgoing reasons why the Plaintiff's claim for amounts due fails, the inconsistent nature of the Plaintiff's own representations with respect to the amount of the debt evidences further questions of material fact that preclude the Plaintiff from obtaining summary judgment.

Huntington claims in the MSJ that it is owed $8,962,074.79 (excluding the amount allegedly owed under the LOC, addressed below). (Huntington's Brief, at 5.) However, in its internal records and communications the Plaintiff recognized that its net exposure was between $3.8 million and $3.9 million at various times in 2018. (1/12/18 E-mail from Jasbir Aulakh to Mike Przytakoski (Exhibit 6); Plaintiff Write Off Memo (Exhibit 7).) Edward Kitchen, the workout person assigned to the GMNY account, designated by Huntington as a 30(b)(6) witness and identified as a person with knowledge regarding the claims made in the Complaint in responses to interrogatories, was able to give essentially no explanation of the amount that Huntington claims it is owed by GMNY beyond the approximately $3.8 figure stated in the foregoing documents when questioned at his deposition. (Kitchen Depo., at pp. 36-39 (Exhibit 8).) Similarly, John Zimmeth – the same individual who executed the Zimmeth Affidavit relied upon in Huntington's MSJ for the $8,962,074.79 amount allegedly due Huntington – testified both as a 30(b)(6) witness and identified as a person with knowledge regarding the

22

claims made in the Complaint that Huntington's exposure was only $3,820,708.65. (Zimmeth depo., pp. 69:23-25, 70:1-3 (Exhibit 9).)

This disparity of approximately $5 million between the MSJ, the documentation produced in support thereof including the Zimmeth Affidavit, and its own internal records presents an issue of material fact as to the debt actually due Huntington. Indeed, "[i]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987). There has been no credible explanation as to how the Plaintiff can seek approximately $9 million in this action and rely on an affidavit from an individual who previously testified that Huntington's exposure was no more than $3.9 million.  On this basis alone, the MSJ should be denied.

F.    <u>Letter of Credit</u>.

The Plaintiff's MSJ seeks summary judgment on the Defendants' supposed liability for $600,000, representing the amount that Outfront Media Group, LLC ("Outfront") allegedly drew against a standby letter of credit facility (specifically numbered OSB.009044, the "LOC") issued by the Plaintiff in December of 2018. However, the Plaintiff's Complaint fails to discretely identify any amount due the Plaintiff by GMNY arising out of the LOC and at no point in this matter has Huntington sought to amend the Complaint to assert additional claims arising out of the Defendants' alleged liability under the LOC. Furthermore, the amount allegedly due Huntington as a result of Outfront's drawdown of the LOC is, as a matter of law, not an

amount due under the Lease Agreement and thus the Defendants are not liable for said amount.

Indeed, nowhere in the Complaint does Huntington mention, much less proffer a short and plain statement alleging damages arising out of, the LOC. Federal "Rule [of Civil Procedure] 8(a)(2) provides that a complaint must include 'a short and plain statement of the claim showing that the pleader is entitled to relief.' The statement must be sufficient to give the defendants 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Mohammad v. New York State Higher Education Services Corp.*, 422 F. App'x 61, 62-63 (2d Cir. 2011), *quoting Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). Given the language of the Plaintiff's Complaint, the Defendants have not received "fair notice" of Huntington's claims concerning the LOC. "It is well established that a party cannot assert a claim for the first time in its motion papers." *Mignault v. Ledyard Public Schools*, 792 F. Sup. 2d 289, 301 (D. Conn. 2011) (holding that a plaintiff waived claims not asserted in the operative complaint); *Allah v. Poole*, 506 F. Sup. 2d 174, 193 (W.D.N.Y. 2007) (same). It is axiomatic that a party may only obtain summary judgment on a "claim or defense" or some part thereof, as articulated in the relevant pleading, under Fed. R. Civ. P. 56(a). The absence of any allegations concerning the LOC in the Complaint renders this portion of the Plaintiff's MSJ procedurally deficient.

The Plaintiff attempts to side-step the absence of any allegations concerning the LOC in its Complaint by claiming that the LOC "falls within the ambit of the Guaranty because it was issued in connection with the Lease Agreement and is otherwise a

financial accommodation made by Huntington for the benefit of GMNY." (MSJ, at 6.) As a threshold matter, the relevant inquiry is not whether Huntington's newfound claims arising out of the LOC "fall within the ambit of the Guaranty." Instead, the appropriate inquiry is whether the Plaintiff sufficiently asserted its LOC claims in its Complaint such that, as a procedural matter, it can seek summary judgment thereon. *Mignault*, 792 F. Supp. 2d at 301.

Furthermore, the single count of the Complaint alleges simply that (a) "upon [GMNY's] default, Huntington is entitled to payment of the Lessor's Return plus all other amounts outstanding under the Lease Documents, together with attorneys' fees and all costs," and (b) "[the Defendants have] failed or otherwise refused to pay this sum to Huntington, which constitutes a breach of their contract as memorialized in the Guaranty." (Complaint, at ¶¶ 22-23 (Exhibit 10).) The Plaintiff defines "Lease Documents" as the initial October 26, 2010, Lease Agreement and the four subsequent amendments thereto. (*Id.*, at ¶¶ 8-10.) Nowhere in those documents is the LOC ever mentioned.

As a result, the Plaintiff's attempt to gain summary judgment on the amount allegedly due stemming from the LOC is wholly unsupported and procedurally deficient. Therefore, the Court should deny the MSJ to the extent it seeks the entry of judgment against the Defendants in the amount of $600,000, and any interest thereon, arising out of the LOC issued by the Plaintiff.

## V.   AFFIRMATIVE DEFENSES

### A.   The Defendants' Affirmative Defenses are Not Barred as a Matter of Law

1.    **Waiver Argument**

The Plaintiff argues that the Defendants waived any affirmative defenses and are barred from raising such defenses.

Article 9-109(a)(1) of the NY UCC provides that Article 9 of the NYUCC applies to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract."  As noted above, section 22(a) of the Lease Agreement provides: "Security.  Lessee hereby grants Lessor a first priority security interest in all of its assets and property of any kind or nature whatsoever as security for all of its obligations under this Lease . . . ." (Exhibit 2.) In addition, GMCT granted the Plaintiff a security interest in certain of its property to secure its obligations under a guaranty of GMNY's obligations under the Lease Agreement and the Defendants granted the Plaintiff a security interest in their membership interest in GMCT.  Thus, there can be no dispute that the NYUCC governs the Lease Agreement, in that the Lease Agreement and related documents created security interests in property of GMNY, GMCT and the Defendants.

Article 1-304 of the NY UCC provides: "Every contract or duty within this act imposes a duty of good faith in its performance and enforcement."  Article 1-302(b) of the NY UCC provides in part: "The obligations of good faith, diligence, reasonableness, and care prescribed by this act may not be disclaimed by agreement."

"The prevailing view is that the UCC applies to those guaranties that are ancillary to the UCC transaction."  *Royal Palm Senior Investors, LLC v. Carbon Capital II, Inc.*, 2009 U.S. Dist. LEXIS 57452, at [*31] (S.D.N.Y. July 7, 2009) (Exhibit C).  "In determining

whether a guaranty agreement is ancillary to the UCC transaction, courts . . . look to evidence of whether the guaranty was executed as a part of the same transaction, relates exclusively to the transaction, and was an integral part of the transaction.  In addition, courts consider whether the guaranty was executed contemporaneously with, or in simultaneous contemplation of, the UCC transaction."  Id. at [*32] (citations omitted).  Where a guaranty is closely interrelated with the underlying loan transaction, the entire transaction, including the guaranty, is governed by the UCC and, accordingly, a guarantor may not waive right to assert duty of good faith, reasonableness, care and diligence.  *Royal Palm Senior Investors, LLC*, 2009 U.S. Dist. LEXIS 57452, at *34.  *See also Centerbank v. Dowcom, Inc.*, 1993 Conn. Super. LEXIS 3024, [*4] (Conn. Super. 1993) ("[A] lender owes the duty of good faith to third parties, such as guarantors, who are not 'strangers to the transaction.'" (citation omitted) (Exhibit D).  The Plaintiff has not cited any case that states to the contrary in the context of a transaction that is governed by Article 9 of the UCC.

Here, there can be no dispute that the Guaranty is governed by Article 9 of the NY UCC.  It was executed as part of one transaction, all documents were entered into and dated the same day, and the Guaranty applies exclusively to the transaction. Accordingly, the Guaranty is governed by Article 9 of the NY UCC, and as a matter of law the Defendants could not and did not waive the defenses of good faith, reasonableness, care, and diligence.

2.    **Standing Argument**

In its brief, the Plaintiff correctly states that as "a general rule, guarantors in New

York do not have standing to assert affirmative defenses properly belonging to the obligor, the party whose obligations the guaranteed . . .," *Sterling Fin. Servs. Co. v. Franklin*, 259 Fed. Appx. 367, 369 (2nd Cir. 2008), but incompletely states the exception to that general rule and incorrectly applies the exception to the facts of this case.  "An exception to this general rule has been recognized when the principal consents to the use of its cause of action by the guarantor."  *Cinema North Corp. v. Plaza at Latham Associates*, 867 F.2d 135, 139 (2nd Cir. 1989).  *See also Cathay Bank v. Wu-Chang Lai*, 2011 U.S. Dist. LEXIS 28205, [*5-*6] (E.D.N.Y. 2011) (same) (Exhibit E); *Corporate Buying Serv. V. Lenox Hill Radiology Assocs.*, 1995 U.S. Dist LEXIS 15180, [**6] (S.D.N.Y. 1995) (same) (Exhibit F).   Here, GMNY affirmatively consents to the Defendants raising affirmative defenses of GMNY. (Neff Declaration, ¶ 2 (Exhibit 4); J. Schmid Declaration ¶ 2 (Exhibit 13).)  Further, consent "'where the guarantor controls the principal, consent will be presumed.'"  *Cinema North Corp.*, 867 at 139 (quoting *Bloor v. Shapiro*, 32 B.R. 993, 1001 (S.D.N.Y. 1983)).  *See also Sterling Fin. Servs. Co.*, 259 Fed. Appx. at 369 ("New York has recognized an exception to this rule where the guarantor controls the obligor."); *Cathay Bank v. Wu-Chang Lai*, 2011 U.S. Dist. LEXIS 28205, [*5-*6] (E.D.N.Y. 2011) (same); *Corporate Buying Serv. V. Lenox Hill Radiology Assocs.*, 1995 U.S. Dist LEXIS 15180, [**6] (S.D.N.Y. 1995) (same).  The Plaintiff appears to argue that because there were three people in control of GMNY, the exception does not apply, i.e., that the exception applies only where there is one person in control.  But there is no case law that supports this proposition, and this argument has nothing to do with the underlying purpose of the rule: "[T]he purpose of the general rule precluding guarantors from

asserting claims belonging to principals is to protect the rights of the principals." *Cinema North Corp.,* 867 F.2d at 139-40.

### B.  Evidence Argument

Article 1-201(19) of the NY UCC defines "good faith" as honesty in fact in the conduct or transaction concerned."

> The Second Restatement of Contracts provides that good faith performance of a contract "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party' while bad faith 'may be overt or may consist in inaction . . . the following types are among those which have been recognized in judicial decisions: . . . abuse of power to specify terms, and interference with . . . the other party's performance."

*Bank of China v. Chan*, 937 F.2d 780, 789 (2nd Cir. 1990) (quoting <u>Restatement (2d) of Contracts</u>, § 205 comment a, d).  See also *Gruppo, Levey & Co. v. ICOM Info. & Communications, Inc.*, 2003 U.S. Dist. LEXIS 11213, [*26] (S.D.N.Y. 2003) (duty of good faith and fair dealing is "a fiduciary one meant to prevent either party from destroying or injuring the right of the other party to receive the fruits of the contract") (Exhibit G).  A lender's duty to act in a commercially reasonable way may be breached where the lender's actions reduce the value of the borrower's property (the lender's collateral) and where the lender actions cause the inability of the borrower to pay its debts, thereby destroying the borrower's health.  *See Bank of China*, 937 F.2d at 788.

In the Neff Declaration and the J. Schmid Declaration, the Defendants have come forward with ample facts showing that there are genuine issues for trial on their affirmative defenses. At the inception of the Sign project, GMNY employed A2a Media ("A2a") as its exclusive sales agent for the Sign. This was a very thought out, conscious

decision by GMNY because GMNY was concerned that other media companies in the New York City market, of which four or five dominate and own or control many of the outdoor advertising signs, would not make selling advertisements on the Sign their priority, i.e., that the performance of the Sign would suffer at the expense of such media companies' other signs. (Neff Declaration, ¶ 17 (Exhibit 4); J. Schmid Declaration, ¶ 10 (Exhibit 13).)

Through 2014, GMNY's gross annual revenue ranged from approximately $2 million at the beginning of the project to approximately $2.5 million by 2014, and appeared to have stabilized in 2014 in the range of approximately $2.5 million.  GMNY's "break even" for gross revenue, including payment of its obligations under the Lease Documents, ranged from approximately $2.2 million at the beginning of the project to approximately $2.7 to $2.8 million by 2014.   Through 2014, the deficiency in gross revenues was made up by contributions to GMNY by the Defendants, in the approximate amount of $1.5 million.  (Neff Declaration, ¶ 18 (Exhibit 4); J. Schmid Declaration, ¶ 11 (Exhibit 13).)

Sales of advertising from inception did not meet projections.  GMNY pressured A2a to improve sales, and in June 2012 GMNY terminated A2a's exclusivity and brought on an additional sales agent, known as Liquid Outdoor, to work with, not in lieu of, A2a. (Neff Declaration, ¶ 19 (Exhibit 4); J. Schmid Declaration, ¶ 12 (Exhibit 13).)

Beginning in or around April, 2013, and continuing through April, 2014, notwithstanding that GMNY had paid all amounts due under the Lease Documents, the Plaintiff demanded that GMNY replace A2a.  In verbal communications to GMNY, John

Zimmeth of the Plaintiff communicated to GMNY that a change of sales agents needed to be made, and that if a change was not made the Plaintiff would take action against GMNY.  (Neff Declaration, ¶ 20 (Exhibit 4); J. Schmid Declaration, ¶ 13 (Exhibit 13).)

GMNY continued to believe that it was in its best interests to stay with the combined team of A2a and Liquid Outdoor rather than switch to a larger media company/sales agent.  While never completely happy with A2a's performance, GMNY believed that A2a was highly motivated to succeed because the Sign was their biggest sales account.  Moreover, GMNY did not want to switch sales agents because all of the other media companies operating in New York City had competitive signs.  However, in light of the demand and threats from the Plaintiff, GMNY accepted the fact that a change would have to be made in order to avoid some action by the Plaintiff that would negatively impact GMNY's business. (Neff Declaration, ¶ 21 (Exhibit 4); J. Schmid Declaration, ¶ 14 (Exhibit 13).)

As GMNY understood that it had to make a change, in March, 2014, after commissioning a study by an outside consultant and going through an RFP process, GMNY terminated A2a and Liquid Outdoor as its sales agents and retained Clear Channel as its new sales agent.  Clear Channel is one of the largest outdoor media companies in New York City.  The Plaintiff participated extensively in the process of changing sales agents, including by interviewing Clear Channel and having its in-house counsel review and propose changes to the agreement that GMNY entered into with Clear Channel.  (Neff Declaration, ¶ 22 (Exhibit 4); J. Schmid Declaration, ¶ 15 (Exhibit 13).)

After GMNY replaced A2a and Liquid Outdoor, GMNY's fears that replacing them with a large outdoor media company that is, for all intents and purposes, a competitor of GMNY would have a negative impact on its sales were realized. GMNY's sales dropped by approximately 50%, from approximately $2.5 million in 2014 to approximately $1.275 million in 2015 and $1.25 million in 2016. Sales never recovered to the level they had been at when A2a and Liquid Outdoor were acting as GMNY's sales agent. (Neff Declaration, ¶ 23 (Exhibit 4); J. Schmid Declaration, ¶ 16 (Exhibit 13).)

With the drop in sales, the deficit between GMNY's gross revenue and its obligations, including expenses and payments due under the Lease Documents, grew dramatically to some $1.5 million annually. The Defendants were no longer able to make contributions to GMNY sufficient to make up this deficit. All payments due under the Lease Documents were made through 2014, and based on the business's historical revenue generation through 2014 if GMNY had been able to run its business free from interference by the Plaintiff, sales would not have dropped and GMNY would have been able to continue to make payments to the Plaintiff with necessary contributions from the Defendants. (Neff Declaration, ¶ 24 (Exhibit 4); J. Schmid Declaration, ¶ 17 (Exhibit 13).)

In May, 2014, Garett Neff and John Schmid attended a meeting in New York City with John Zimmeth of the Plaintiff and Tom Powley of GKD. The subject of the meeting was the technology failures with the Sign. Zimmeth was very threatening at the meeting, telling Powley that the sign was the Plaintiff's sign, that when the Plaintiff went after people in court they go after them hard, that GKD really did not want the Plaintiff to

go after GKD, so GKD better fix the Plaintiff's sign.  After that meeting Neff and John Schmid believed that the Plaintiff was directing GMNY as to what to do vis-à-vis GKD and that the Plaintiff was making decisions with respect to whether or not to pursue any claims against GKD on account of the failures with the sign.  (Neff Declaration, ¶ 25 (Exhibit 4); J. Schmid Declaration, ¶ 18 (Exhibit 13).)

In July 2017, without GMNY's knowledge or authority, John Zimmeth sent an e-mail to Gerard Del Tufo at the Port Authority informing Del Tufo, among other things, that GMNY had not made payments to the Plaintiff since 2015.  At that time, GMNY was in negotiations with the Port Authority regarding an extension of the lease on the Port Authority building.  Zimmeth's informing Del Tufo that GMNY had not made payments to the Plaintiff damaged GMNY's ability to get the extension, as the Port Authority became concerned about GMNY's financial condition.   (Neff Declaration, ¶ 26 (Exhibit 4); J. Schmid Declaration, ¶ 19 (Exhibit 13).)

GMNY's business strategy from the 2014-2015 period was to continue to operate the Sign and seek a buyer for the Sign and an extended lease with the Port Authority. Only Mediamesh technology, which allows air to pass through, was workable for the Port Authority building due to the need for steam and air to pass out of the building. New Mediamesh technology is now available that addresses the technology problems that the Sign experienced.   Thus, assumption of an extended lease with the Port Authority together with an upgraded sign would present an attractive opportunity to a buyer.   From 2015 forward, GMNY actively sought a buyer, including by having discussions with major media companies such as Clear Channel.  (Neff Declaration, ¶

27 (Exhibit 4); J. Schmid Declaration, ¶ 20 (Exhibit 13).)

Critical to this strategy was keeping the Sign stable from a financial perspective and obtaining the extension on the lease from the Port Authority, as the lease was set to expire on December 31, 2018, and no buyer would be interested in a short term lease. The Plaintiff was aware that this was the strategy being pursued by GMNY. (Neff Declaration, ¶ 28 (Exhibit 4); J. Schmid Declaration, ¶ 21 (Exhibit 13).)

Huntington enjoyed significant power over GMNY, GMCT, and the Defendants by way of the Lease Agreement and associated documents, which were largely non-negotiable and exclusively drafted by Huntington. (Neff Declaration, ¶ 16 (Exhibit 4).) The Plaintiff used this power to force GMNY to take business decisions that were contrary to GMNY's business judgment.  The Plaintiff's conduct in mandating the change in sales agents and communicating with the Port Authority regarding GMNY's financial condition directly and substantially contributed to the failure of this strategy. GMNY was not able to get an extension from the Port Authority, and the lease terminated as of December 31, 2018.  Upon termination of the Lease, title to the Sign automatically transferred to the Port Authority, so that GMNY's business has been completely destroyed.  (Neff Declaration, ¶ 28 (Exhibit 4); J. Schmid Declaration, ¶ 21 (Exhibit 13).)

At a minimum, there are genuine issues of fact to be tried as to the manner in which the Plaintiff exercised control over GMNY's business in ways that damaged GMNY's business, and whether such conduct by the Plaintiff violated the Plaintiff's duties of good faith, reasonableness, care and diligence.

## VI.   Defendants Object to Portions of the Zimmeth Affidavit

The Defendants object[7] to portions of the Zimmeth Affidavit that do not constitute admissible evidence that can appropriately support a motion for summary judgment.

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Merry Charters, LLC v. Town of Stonington*, 342 F. Sup. 2d 69, 75 (D. Conn. 2004). Indeed, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. Proc. R. 56(c)(4). A court should "not consider[]… improper assertions and arguments contained in… affirmation[s], or [any] exhibits to the affirmation containing inadmissible evidence." *Baity v. Kralik*, 51 F. Sup. 3d 414, 419 (S.D.N.Y. 2014).

The Zimmeth Affidavit contains multiple key statements on which this Court cannot properly rely in adjudicating the MSJ. Each such issue is addressed in turn.

### A.   Statements of Legal Conclusions

Throughout the Zimmeth Affidavit, Mr. Zimmeth expresses legal conclusions on central issues of dispute between the Plaintiff and the Defendants that he is not

---

[7] The Defendants challenge these portions of the Zimmeth affidavit by objection rather than by motion to strike, which previously was the preferred mechanism by which issues concerning the admissibility of a party's affidavit submitted in support of a motion for summary judgment. *Carone v. Mascolo*, 573 F. Sup. 2d 575, 580 (D. Conn. 2008) ("If a party wishes to argue that an asserted material fact is not supported by the evidence, that party may do so in its summary judgment briefing"); *Wanamaker v. Town of Westport Board of Education*, Docket No. 3:11cv1791(MPS)(WIG), 2013 U.S. Dist. LEXIS 101849, at *3 (D. Conn. July 22, 2013) (same) (Exhibit H).

qualified to make and that have no place in an affidavit. "When ultimate facts and legal conclusions appear in an affidavit, such extraneous material should also be disregarded by the court." *LaRouche v. Webster*, 175 F.R.D. 452, 455 (S.D.N.Y. 1996). *See also Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) ("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge…"); *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994) ("…this Court requires the exclusion of testimony which states a legal conclusion"); *SEC v. Gruss*, 245 F. Sup. 3d 527, 594 (S.D.N.Y. 2017) (declining to credit legal conclusions provided in affidavit submitted in support of motion for summary judgment); *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 138 F. Sup. 3d 352, 393-94 (S.D.N.Y. 2015) (same).

The Defendants respectfully submit the following paragraphs as containing statements of legal conclusions that should not be credited by this Court because the same are mere legal conclusions.

| Paragraph Nos. | Quote (emphasis added) | Reason |
|---|---|---|
| 5 | Huntington and [GMNY] are parties to that certain Lease No. 001 dated October 26, 2010 (the "Lease Agreement"), *pursuant to which GMNY leases from Huntington a 6,010 square foot Mediamesh digital signage installation at the Port Authority Bus Terminal in New York, New* | As stated at pages 8-13, *supra*, the Lease Documents, including the Lease Agreement itself, does not evidence a true lease transaction between Huntington and GMNY but instead evidence, as a matter of law and by the very terms of the Lease Agreement, a secured financing transaction. |

| | | |
|---|---|---|
| | York (the "Sign"), as more fully described therein. | |
| 8, 20 | "By the terms of that certain Guaranty… [the Defendants] *absolutely and unconditionally guaranteed the full and prompt payment, observance, and performance when due of all obligations of GMNY under the Lease Documents*."<br><br>…<br><br>"Section 2 of the Guaranty provides that [Defendants] *unconditionally agree to pay all obligations of GMNY to Huntington arising under or related to the Lease Agreement, which includes payment of the Amount Due*." | Mr. Zimmeth offers improper legal conclusions regarding the scope of the Defendants' guarantees of GMNY's obligations. |
| 10 | As more fully described below, *GMNY is in default of its obligations under the Lease Documents for failure to make payment of rent, taxes, and other amounts due under the Lease Documents in accordance with the terms thereof.* Similarly, [Defendants] are in default under the terms of the Guaranty for failure to make payment to Huntington when due and owing. | GMNY's obligation to pay taxes and "other amounts due under the Lease Documents," presumably meaning the Lessor's Return, is a legal conclusion. Mr. Zimmeth's conclusory statement that GMNY has such an obligation is incorrect as a matter of law, as detailed at pages 15-17, *supra*. |
| 12 | As of July 17, 2019, the amount due and owing by GMNY to Huntington under the Lease Documents is *$8,962,074.79* (the "Amount Due"). A breakdown of the Amount Due is attached hereto as Exhibit A- | GMNY's obligation to pay taxes, interest in the amount sought by Huntington, and the Lessor's Return, is a legal conclusion. Mr. Zimmeth's conclusory statement that GMNY has such an obligation is incorrect as a matter of law, as |

| | | |
|---|---|---|
| | 1 and is incorporated herein by reference. *The Amount Due is comprised of rent, taxes, interest, and a Lessor's Return.* | detailed at pages 8-18, *supra*. |
| 14, 15, 16 | In addition, under Section 7 of the Lease Agreement, *GMNY is responsible for the payment of all taxes associated with the Sign in the amount of $12,025.63 per month based on a tax rate of 8.875-percent (8.875%) as applicable in the State of New York.*<br><br>Thus, *the total monthly payment due to Huntington is $147,525.63.*<br><br>As illustrated on Exhibit A-1, Huntington has not received any payment whatsoever from GMNY of rent or taxes *in accordance with the terms of the Lease Documents since the partial payment applied to the amount due March 1, 2015 to and including the date of this Affidavit. The total amount of past due rent and taxes currently owed is $6,568,663.35.* | GMNY's obligation to pay taxes is a legal conclusion. Mr. Zimmeth's conclusory statement that GMNY has such an obligation is incorrect as a matter of law, as detailed at pages 15-17, *supra*. To the extent that Mr. Zimmeth incorporates amounts allegedly due Huntington out of taxes in other portions of the Zimmeth Affidavit, such other portions should also be disregarded by this Court. |
| 17 | In accordance with the provisions of Section 25 of the Lease Agreement, *past due rent accrues interest at the rate of 12-percent (12%) per annum. As such, as of July 17, 2019 the total amount of interest on past due rent and taxes currently owed is $2,083,161.24.* | Mr. Zimmeth's legal opinion that the Lease Agreement operates to provide for retroactive interest running from before a notice of default is provided by Huntington is incorrect as a matter of law, as detailed at pages 17-18, *supra*. Furthermore, GMNY's obligation to pay taxes is a legal conclusion. Mr. Zimmeth's conclusory statement that GMNY has such an obligation is incorrect as a matter of law, as detailed at pages 15-17, *supra*. |

| 18, 19 | In addition to the foregoing amounts, Sections 18(d) and 19 of the Lease Agreement permit Huntington to collect a Lessor's Return which, pursuant to the agreed-upon formula set forth in Section 19 of the Lease Agreement, as amended, is equal to *$283,075.00, and was demanded by Huntington from GMNY in the Notice.* <br><br> In accordance with Section 25 of the Lease Agreement, *past due Lessor's Return accrues interest at the rate of 12-percent (12%) per annum. As such, as of July 17, 2019, the total amount of interest on the past due Lessor's Return currently owed is $27,175.20.* | Mr. Zimmeth's legal opinion as to GMNY's obligation to pay the Lessor's Return is incorrect as a matter of law and Mr. Zimmeth's legal opinion as to GMNY's obligation to pay interest on the Lessor's Return is incorrect as a matter of law, as detailed at as detailed at pages 8-14, *supra.* |

Not only are the above-quote legal conclusions inappropriate in an affidavit submitted in the summary judgment context, *Gruss*, 245 F. Sup. 3d at 594, but for the reasons discussed herein the legal conclusions are also simply incorrect as a matter of law.  As such, this Court should disregard the above-cited legal conclusions contained in the Zimmeth Affidavit.

### B.   Hearsay in the Zimmeth Affidavit

"Hearsay testimony contained in an affidavit may not be considered on summary judgment unless it would be admissible a trial pursuant to one of the exceptions to the hearsay rule." *Crown Heights Jewish Community Council v. Fischer*, 63 F. Sup. 2d 231, 241 (E.D.N.Y. 1998). The Zimmeth Affidavit contains multiple assertions that cannot

have been made by Mr. Zimmeth on his own personal knowledge, as is required by Fed. R. Civ. Proc. R. 56(c)(4), and instead constitute impermissible hearsay not subject to a recognized exception to the hearsay rule. Likewise, Exhibit A-1 to the Zimmeth Affidavit, purporting to be a "breakdown of the Amount Due," which is incorporated into the Zimmeth Affidavit by reference in paragraph 12 thereof, is similarly inadmissible hearsay that does not fall under a recognized hearsay exception. For the reasons set forth below, this Court should disregard these portions of the Zimmeth Affidavit.

In sworn testimony given to the Defendants on May 6, 2019, Mr. Zimmeth stated both as a Fed. R. Civ. Pro. 30(b)(6) witness and identified as a person with knowledge regarding the claims made in the Complaint that Huntington's exposure to GMNY was $3,820,708.65. (Zimmeth depo., pp. 69:23-25, 70:1-3 (Exhibit 9).) As of the date of his deposition, Mr. Zimmeth had no knowledge of the amount allegedly due Huntington by GMNY. (*Id.*, at pp. 70-71.) Likewise, at no point in Mr. Zimmeth's sworn deposition testimony does he mention the LOC, much less testify as to the amount allegedly due Huntington under said instrument.

Despite Mr. Zimmeth's prior lack of concrete knowledge as to the amount Huntington claims it is due by GMNY and by extension the Defendants, the Zimmeth Affidavit contains multiple instances and indeed a whole detailed exhibit on this exact question. Specifically, the Zimmeth Affidavit states (emphasis added):

> 12. *As of July 17, 2019, the amount due and owing by GMNY to Huntington under the Lease Documents is $8,962,074.79 (the "Amount Due").* *A breakdown of the Amount Due is attached hereto marked as Exhibit A-1 and is incorporated herein by reference.* The Amount Due is comprised of rent, taxes, interest, and a Lessor's Return.

40

…

**16. As illustrated on Exhibit A-1, Huntington has not received any payment whatsoever from GMNY of rent or taxes in accordance with the terms of the Lease Documents since the partial payment applied to the amount due March 1, 2015 to and including the date of this Affidavit. _The total amount of past due rent and taxes currently owed is $6,568,663.35._**

…

**23. _By letter correspondence dated December 5, 2018 and provided to Huntington on or about December 17, 2018, Huntington was advised by Outfront that GMNY failed to make payment when due to Outfront under the terms of a Display Agreement by and between those parties_. A true and correct copy of the aforementioned letter correspondence is attached to Huntington's Motion for Summary Judgment as Exhibit J.**

**24. _As a result of GMNY's default, Outfront drew on the entire principal balance of the Letter of Credit in the amount of $600,000.00 in or about December 2018_.**

**25. In accordance with the provisions of Sections 25 of the Lease Agreement, GMNY's past due reimbursement obligation for the Letter of Credit accrues interest at the rate of 12-percent (12%) per annum. _As such, as of July 17, 2019, the total amount of interest on the past due Letter of Credit reimbursement obligation since January 1, 2019 is $39,400.00._**

Additionally, Exhibit A-1 to the Zimmeth Affidavit is a detailed, two-page schedule of amounts allegedly due Huntington by GMNY, which is incorporated into the Zimmeth Affidavit by reference. There is no evidence whatsoever in the Zimmeth Affidavit that Zimmeth is the person who did the calculations in Exhibit A-1 or otherwise constructed the exhibit.

It is beyond reasonable dispute that the underlined and italicized portions of the Zimmeth Affidavit above as well as the entirety of Exhibit A-1 to the Zimmeth Affidavit (collectively, the "Zimmeth Hearsay") fall squarely within the definition of hearsay

41

provided by the Fed. R. Evid. 801(c); each is "an out-of-court statement, offered to prove the truth of the matter asserted in that statement." *United States v. Aspinall*, 389 F.3d 332, 340 (2d Cir. 2004). Furthermore, the only potentially applicable exception to the hearsay rule that might permit this Court to consider the Zimmeth Hearsay – specifically, the exception provided by Fed. R. Evid. 803(6) for "records of a regularly conducted activity" – cannot apply on the record now before this Court because Huntington has not complied with Fed. R. Evid. 806(6)(D). Moreover, given Mr. Zimmeth's earlier sworn testimony – provided both in his individual capacity as well as in his capacity as a 30(b)(6) witness for Huntington – concerning the amount allegedly due Huntington that is entirely inconsistent with the Zimmeth Hearsay, the Defendants respectfully submit that they have satisfied Fed. R. Evid. 806(6)(E) and the Zimmeth Hearsay is inadmissible. Fundamentally, then, the Zimmeth Hearsay is hearsay that is not saved by an exception to the hearsay rule.

In addressing similar circumstances in the context of motions for summary judgment where an affiant's earlier sworn deposition testimony is inconsistent with the affidavit submitted later, Courts have declined to give weight to the affidavit. Indeed, the Second Circuit recognized that "[t]he deposition of a witness will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination." *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) (concluding that an affidavit issues of material fact raised by an affidavit that was inconsistent with prior deposition testimony were not "genuine" and thus did not create an issue of

material fact). Similarly, in *FDIC v. Wrapwell Corp.*, 93 Civ. 859 (CSH), 94 Civ. 5574 (CSH), 2002 U.S. Dist. LEXIS 76, at *52 (S.D.N.Y. Jan. 2, 2002) (Exhibit I), the Court declined to credit an affidavit that was inconsistent with the affiant's prior deposition testimony in which the affiant declined knowledge of certain key facts, and that because "[o]ne cannot amplify or expand upon one's absence of knowledge," there was no basis for the court to excuse such omissions from the deposition testimony.

Likewise, in *Newport Electronics v. Newport Corp.*, 157 F. Sup. 2d 202, 220 (D. Conn. 2001), the court disregarded an individual's affidavit as it conflicted with his prior deposition testimony given as a Rule 30(b)(6) witness. The *Newport Electronics* court noted that, as the affiant was a Rule 30(b)(6) witness just as Mr. Zimmeth was, the affiant "was not at liberty, therefore, to delay reviewing information on those topics until after the deposition and, thereby, submitting information in his affidavit which contradicts statements in his deposition regarding his lack of knowledge on various topics." *Id*. The Notice of Deposition the Defendants issued in this matter under Rule 30(b)(6), in response to which Huntington identified and produced Mr. Zimmeth, clearly identifies the "[a]ll allegations of the Complaint" and "[Huntington's] calculation of any amounts allegedly due under the Lease Agreement, including the Lessor's Return (as that term is defined in the Lease Agreement)" as topics to be covered during the deposition. (3/18/19 Email from Attorney Tuskan (Exhibit 16).) As in *Newport Electronics*, this Court should not embrace Mr. Zimmeth's newfound knowledge in analyzing Huntington's MSJ.

Therefore, this Court should decline to consider the above portions of the

Zimmeth Affidavit. *Baity* 51 F. Sup. 3d at 419 (a court should "not consider[]… improper assertions and arguments contained in… affirmation[s], or [any] exhibits to the affirmation containing inadmissible evidence").

VII.   **CONCLUSION**

  For the reasons set forth above, the Defendants respectfully request that the Court deny the MSJ and grant the Defendants such other and further relief as this Court deems just and proper.

      **GARETT ALAN NEFF ALSO KNOWN AS GARY NEFF, JOHN MARK SCHMID AND DAVID KARL SCHMID**

      */s/ Eric A. Henzy*
      **Eric A. Henzy (ct12849)**
      **Christopher H. Blau (ct30120)**
      **Zeisler & Zeisler, P.C.**
      **10 Middle Street, 15th Floor**
      **Bridgeport, CT  06604**
      **Telephone: 203-368-4234**
      **Email: ehenzy@zeislaw.com**
         **cblau@zeislaw.com**

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


  */s/ Eric A. Henzy*
Eric A. Henzy (ct12849)