# EXHIBIT I

 Neutral
As of: August 30, 2019 9:54 PM Z

# FDIC v. Wrapwell Corp.

United States District Court for the Southern District of New York

January 2, 2002, Decided ; January 3, 2002, Filed

93 Civ. 859 (CSH), 94 Civ. 5574 (CSH)

**Reporter**
2002 U.S. Dist. LEXIS 76 *; 46 U.C.C. Rep. Serv. 2d (Callaghan) 885

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of FIRST NEW YORK BANK FOR BUSINESS, Plaintiff, -against- WRAPWELL CORPORATION, LOUIS, SILBERSTEIN, HERMAN SILBERSTEIN, AARON SILBERSTEIN, H.A.L. HOLDING COMPANY, ARMIN SILBERSTEIN and 94 NINTH STREET CO., INC., Defendants. FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of FIRST NEW YORK BANK FOR BUSINESS, Plaintiff, -against- WRAPWELL CORPORATION, LOUIS, SILBERSTEIN, HERMAN SILBERSTEIN, AARON SILBERSTEIN, H.A.L. HOLDING COMPANY, ARMIN SILBERSTEIN and 94 NINTH STREET CO., INC., Defendants.

**Disposition:** [*1] Plaintiff's motion to strike the HS Affirmation granted.

## Case Summary

**Procedural Posture**
Plaintiff receiver brought consolidated cases against defendants, a guarantor and others, to recover on five defaulted promissory notes issued by the guarantor to a bank before the bank went into receivership. In a previous opinion, the court dismissed all of the defenses asserted by defendants, except one. The receiver moved for summary judgment on the remaining defense and to strike most of an affidavit filed by defendants.

**Overview**
The remaining defense was defendants' contention that the receiver's failure to collect the guarantor's accounts receivables collateral was commercially unreasonable under former N.Y. U.C.C. Law § 9-504(3). The court noted that, arguably, former N.Y. U.C.C. Law § 9-502, not former N.Y. U.C.C. Law § 9-504(3), governed the collection of accounts receivables. However, the analysis was the same under either provision. The court concluded that the commercial unreasonableness defense applied only if the receiver took control of the accounts in such a way that (1) prevented the guarantor from collecting the accounts or (2) prompted justifiable reliance on the receiver to collect the accounts. Further, the court granted the motion to strike; the challenged affidavit contradicted the affiant's sworn deposition testimony. There was no evidence demonstrating that either circumstance had occurred. Finally, the commercial reasonableness defense affected only the amount the defendants owed on the notes, not their liability, which was already established. Assuming arguendo that the commercial reasonableness defense applied, it would only decrease the amount of damages.

**Outcome**
The court granted for the most part the receiver's motion to strike. The court also granted the receiver's motion for summary judgment.

**Counsel:** For FIRST NEW YORK BANK FOR BUSINESS, plaintiff (93-CV-859): Linda Susan Charet, Marguerite Sagatyelian, Federal Deposit Insurance Corporation, NY, NY.

For LOUIS SILBERSTEIN, HERMAN SILBERSTEIN, AARON SILBERSTEIN, H.A.L. HOLDING CO., ARMIN SILBERSTEIN, 94 NINTH ST. COMPANY, defendants (93-CV-859): Leo Fox, New York, NY.

**Judges:** CHARLES S. HAIGHT, JR., Senior United States District Judge.

**Opinion by:** CHARLES S. HAIGHT, JR.

## Opinion

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC"), brought these consolidated cases to recover on five defaulted promissory notes totaling over $ 3,000,000 issued by Wrapwell Corporation ("Wrapwell") to First New York Bank for Business ("FNY") before FNY went into receivership under the FDIC's supervision. [1] Each promissory note was guaranteed by one or more of the six other named defendants.

 [*2]  In a previous opinion, this Court held that none of Wrapwell's defenses against liability were viable, and dismissed all of the guarantors' defenses except one which asserted that the FDIC's failure to collect Wrapwell's accounts receivable collateral was commercially unreasonable under NYUCC § 9-504(3). *See FDIC v. Wrapwell Corporation*, 922 F. Supp. 913, 925 (S.D.N.Y. 1996) (the "1996 Opinion"). The Court noted that the commercial reasonableness defense affects only the amount the guarantors owe on the notes but not their liability, which was already established. 922 F. Supp. at 924. Because familiarity with the 1996 Opinion is assumed, the factual background of the case will be recited here only as necessary for an understanding of the present discussion.

After issuance of the 1996 Opinion, the parties engaged in several years of discovery supervised by Magistrate Judge Kevin N. Fox on the narrow issues presented by the commercial reasonableness defense. During discovery, the parties took numerous depositions including that of Herman Silberstein, Wrapwell's former Vice President. Silberstein's deposition was held over the course of three days.

In February [*3] 2000, after the close of discovery, the FDIC filed a motion for summary judgment dismissing the commercial reasonableness defense. In opposition, defendants filed the affirmation of Herman Silberstein dated May 3, 2000 ("HS Affirmation") and the report of an expert witness which opined that the FDIC's failure to collect the accounts receivable was commercially unreasonable. The submission of these documents sparked further motion practice. Plaintiff also moved to exclude the expert report on the ground that it was untimely in violation of Fed. R. Civ. P. 37(c)(1). That motion was granted by Magistrate Judge Fox on October 20, 2000. Plaintiff also moved, in unison with its reply in further support of its summary judgment motion, to strike most of the HS Affirmation on the ground that it conflicts with Herman Silberstein's prior sworn deposition testimony. This Court now resolves both intertwined motions. For the reasons discussed below, they are granted.

I. Applicability of Commercial Reasonableness

The first question this Court must address is whether the requirement of commercial reasonableness applies to the collection of accounts receivable collateral and, if so, under what [*4] criteria. In arguing that their indebtedness should be reduced because of the plaintiff's commercially unreasonable collection activity, defendants refer exclusively to the version of NYUCC § 9-504 in effect at all pertinent times which provides in relevant part:

> (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing.
> * * *
>
> (3) Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be *commercially reasonable.*

(Emphasis added).

The cases applying § 9-504 almost universally deal with the sale, lease or other similar disposition of goods or property -- not with the collection of accounts receivable. This Court's independent research has disclosed only a handful of cases applying § 9-504 in the context of accounts receivable. *See, e.g., Bank of China v. Chan*, 937 F.2d 780 (2d Cir. 1991) (issue of fact precluded summary judgment on commercial reasonableness in bank's handling [*5] of letters of credit backed by accounts receivable); *Mercantile Bank of Joplin N.A. v. Nicsinger*, 136 B.R. 228, 235 (W.D.Mo. 1992) (bank's good faith effort to collect accounts receivable was commercially reasonable pursuant to § 9-504(3)); *In re Wells*, 51 B.R. 563, (Bankr. D. Colo. 1985) (creditor failed to show that collection of accounts receivable was made in a commercially reasonable manner under § 9-504(3)); *Fedders Corp. v. Taylor*, 473 F. Supp. 961, 977 (D.Minn. 1979) (creditor failed to comply with § 9-504(3) in its liquidation of debtors' accounts receivable).

A different NYUCC section requires the creditor to liquidate accounts receivable in a commercially reasonable manner. [2] [*7] Section 9-502(2) provides in

---

[1] Throughout this Opinion, all references to the "Bank" include either FNY or the FDIC or both, as the temporal context requires.

[2] Defendants initially raised this defense only in their answer to

part:

> A secured party who by agreement is entitled to charge back uncollected collateral or otherwise to full or limited recourse against the debtor and who undertakes to collect from the account debtors or obligors must proceed in a commercially reasonable manner . . . . [3]

It is arguable that § 9-502, not § 9-504(3), governs the collection of accounts receivable because it deals with "collections" [*6] not "dispositions" of collateral. As far as the Court can tell, however, the defendants' failure to cite that section makes no practical difference. The defendants argue that the Bank's collection efforts were commercially unreasonable, and there can be no doubt that Part 9 of the NYUCC, under which both provisions fall, imposes a commercial reasonableness requirement on creditors undertaking to collect accounts receivable. *See* § 9-502(2). Plaintiff does not argue that the commercial reasonableness defense should be precluded because of defendants' reliance on § 9-504 rather than § 9-502. That being the case, the question becomes, regardless of which provision the requirement is derived from, when is that requirement triggered? More specifically, did it come into play in the circumstances of this case?

[*8] Because the statutes themselves do not furnish guidelines as to their applicability, to answer the question one must look to the relatively few cases interpreting them. The leading case is *FDIC v. Fort Worth Aviation*, 806 F.2d 575 (5th Cir. 1986). In that case, the FDIC sought to recover from the guarantors on promissory notes issued to an insolvent bank. The guarantors argued that the FDIC's failure to pursue rent payments under leases the bank accepted as security should have reduced their indebtedness under the notes. The Fifth Circuit, affirming the district court, disagreed. In its analysis, the court rejected the notion that § 9-502 [4] contained an affirmative requirement on the part of secured creditors to collect from account debtors, noting that:

> to hold that a secured party who has taken a security interest in accounts receivable must first collect on those accounts would be inconsistent with the settled rule that "the creditor can ignore his security interest and obtain a judgment on the underlying obligation and proceed by execution and

---

[3] Effective July 1, 2001, the NYUCC underwent a major overhaul. The provisions cited herein were renumbered, reorganized and amended. Former § 9-502 is recodified at § 9-607 which provides, *inter alia*, that:

(a) *Collection and enforcement generally.* If so agreed, and in any event after default, a secured party:

(1) may notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party;

* * *

(c) *Commercially reasonable collection and enforcement.* A secured party shall proceed in a commercially reasonable manner if the secured party:

(1) undertakes to collect form or enforce an obligation of an account debtor or other person obligated on collateral;

Former § 9-504(3) became new § 9-610(b) which provides:

94 Civ. 5574 which involves the last of the five promissory notes. But, the answer does not specify the statutory section upon which it relies for the defense. The Court noted in the 1996 Opinion that defendants relied on three NYUCC provisions in asserting the commercial reasonableness defense: NYUCC 9-504, 9-207(1) and 3-606(1) §§ . The Court dismissed the latter two defenses. In defendants' papers on the present motion, they reiterate their reliance on § 9-504. It is puzzling that defendants nowhere refer to the NYUCC section that deals with commercial unreasonableness in the specific context of accounts receivable -- § 9-502(2). But I see no reason why this should prevent me from considering NYUCC § 9-502(2) in connection with the commercial reasonableness defense, particularly since the defendants did not limit themselves to a specific section of the NYUCC in their answer. Moreover, despite the fact that commercial unreasonableness is not listed as an affirmative defense in the defendants' answer to 93 Civ. 859, the action related to the first four promissory notes, plaintiff does not suggest that I cannot consider it as a defense to both actions.

(b) *Commercially reasonable disposition.* Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

Despite the reorganization, the terminology of these statutes remains substantially the same at least for purposes of the issues faced by this Opinion. Accordingly, in the interest of consistency, the Court will refer to and construe the NYUCC provisions in effect at the time of the salient events in this case and to which the parties and the cited cases refer.

[4] *Fort Worth Aviation* construed § 9-502 of the Texas enactment of the UCC which is for all practical purposes identical to the New York enactment of the same provision.

levy." J. White & R. Summers, Uniform Commercial Code § 26-4, at 1091 (2d ed. 1980).

806 F.2d at 577. **[*9]** Reasoning that the purpose behind the commercial reasonableness requirement is to protect "the debtor from an avoidable deficiency judgment or the squandering of a possible surplus through the secured party's inaction," the court concluded that the requirement

> thus comes into play when the secured party *takes possession and control of the accounts, preventing the debtor* from acting on the accounts himself, or when the secured party *undertakes collection so as to entitle the debtor to rely* on the former to protect the accounts.

*Id.* (emphases added).

The Fifth Circuit's well-reasoned formulation of the requirement obliges the secured creditor to make commercially reasonable collection efforts only if it takes action that removes the debtor's ability or wherewithal to make its own collection efforts. In such a case, **[*10]** it is only fair that the creditor be required to do what is commercially reasonable to collect the security because the debtor's hands are effectively tied. In the absence of such action by the creditor, the requirement to collect in a commercially reasonable manner simply does not arise. This rationale makes sense given the nature of accounts receivable, which are not tangible collateral that can be readily sold at auction, leased or repossessed. Thus, cases evaluating commercial reasonableness under § 9-504 involving auctions and the like, *see, e.g., Central Budget Corp. v. Garrett*, 48 A.D.2d 825, 368 N.Y.S.2d 268 (App. Div. 2d Dep't 1975) (repossessed car was not sold in commercially reasonable manner), have little practical application in the accounts receivable context.

No case within the Second Circuit or New York courts explicitly discusses the threshold applicability of commercial reasonableness under either § 9-504 or § 9-502. However, many of the cases that have considered the commercial reasonableness requirement in the accounts receivable context support the *Fort Worth Aviation* analysis by implicitly requiring an element of possession and control **[*11]** on the part of the secured party.

In *Bank of China v. Chan, supra*, 937 F.2d 780, the bank sued an individual guarantor to recover its exposure on letters of credit issued by the bank for the benefit of customers of the debtor corporation. In connection with the transaction, the bank had also issued letters of credit for the benefit of the corporation which were to be drawn down when the corporation provided documents to show that it had shipped merchandise to its customers. The guarantor argued that the bank had acted in a commercially unreasonable manner under NYUCC § 9-504 with respect to the accounts receivable represented by the letters of credit when it refused to pay the corporation on those letters of credit. In determining that genuine issues of fact existed as to the commercial reasonableness of the bank's handling of the collateral, the Second Circuit noted that the bank "had *effective possession* of the collateral securing [the company's] loans, that is, the letters of credit that allowed it to collect certain of the company's accounts receivable." 937 F.2d at 783 (emphasis added). Underscoring the significance of that fact, the court **[*12]** reiterated that "there can be no doubt that the Bank was in possession of the collateral and that it is alleged to have taken actions impairing its value." 937 F.2d at 784. It followed that:

> [the Bank] owed a duty to preserve the value of the accounts receivable by drawing down the master letters of credit when the shipping documents were properly presented to it.

*Id.* Although the Second Circuit, unlike the Fifth Circuit in *Fort Worth Aviation*, does not explain *why* possession matters, it is apparent from the structure and substance of the court's opinion that the commercial reasonableness requirement presupposed possession of the collateral by the bank. In *Bank of China* possession was clear because the bank had the exclusive power to draw down the letters of credit which were secured by the receivables. When it failed to do so, the receivables became worthless.

Most of the other cases that have applied the commercial reasonableness standard in the receivables context involve debtors who by virtue of operation of a bankruptcy plan or other agreement ceded control of the receivables to the secured creditor. *See, e.g., In re Wells*, 51 B.R. at 564 **[*13]** (disposition of accounts receivable was not commercially reasonable because creditor bank made no effort to collect them; under bankruptcy plan debtors had "surrendered" the accounts receivable to the creditor bank); *Nicsinger*, 136 B.R. at 235 (bank made good faith, commercially reasonable effort to collect accounts receivable collateral after possession of debtor's factory was relinquished to it); *In re Emergency Beacon Corp.*, 48 B.R. 341, 349 (Bankr. S.D.N.Y. 1985) (secured creditor made a commercially reasonable disposition of the accounts receivable

collateral debtor "turned over" to it after bankruptcy trustee attempted without success to recover from the account debtors); *cf. In the Matter of Braten Apparel Corporation*, 68 B.R. 955, 958 n.7 & 966 (Bankr. S.D.N.Y. 1987) (bank violated UCC § 9-502(2) when it failed to give proper accounting for each account receivable as to which collection was undertaken; bank's right to collect accounts receivable was so well-established that no lift of the stay order was viewed as necessary).

This Court's independent research has not found, and defendants have not cited, a case applying the **[*14]** commercial reasonableness standard to the collection of accounts receivable where the secured creditor was not afforded the right or took no responsibility to be the exclusive collector. Indeed, defendants' arguments implicitly accept that such control is a prerequisite to application of the requirement. The cases discussed above lend force to the conclusion that application of commercial reasonableness presupposes possession and control over collection of the accounts receivable and/or justifiable reliance by the debtor on the creditor's collection efforts. I therefore adopt the approach of *Fort Worth Aviation* and hold that control or justifiable reliance is necessary before the commercial reasonableness standard will be applied in the context of accounts receivable collection. The decisive question thus becomes whether a genuine issue of fact exists from which a reasonable jury could infer that FDIC had possession and control over Wrapwell's receivables or that Wrapwell justifiably relied on the FDIC's collection efforts.

II. Control over Wrapwell Collection Efforts

Summary judgment may be granted in favor of the moving party "if the pleadings, depositions, answers to interrogatories, **[*15]** and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir .), *cert. denied*, 524 U.S. 911 (1998). In considering such a motion the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)). In determining whether to grant a motion for summary judgment, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir.1967). The party "seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and **[*16]** identifying . . . [what] it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Once such a showing is made, the party opposing the motion must come forward with "specific facts showing that there is a genuine issue for trial." Rule 56(e). In so doing, the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, while the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). However, "the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 252. Instead, the nonmovant must **[*17]** offer "concrete evidence from which a reasonable juror could return a verdict in his favor." 477 U.S. at 256. Summary judgment should only be granted if no rational factfinder could rule in favor of the non-moving party. *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718, 721 (2d Cir.1994).

As noted, the threshold question is whether the commercial reasonableness principle applies here. In support of its motion, the FDIC has submitted the affidavit of Frank E. Williams (the "Williams Affidavit"), an FDIC employee who was assigned to the Wrapwell litigation, which attests that neither the FDIC nor FNY ever agreed to or was furnished with the exclusive responsibility to collect Wrapwell's accounts receivables. Williams Affidavit at P 25. Williams further explains that Wrapwell and Louis Silberstein (Wrapwell's former President) hampered the FDIC's collection efforts by, *inter alia*, "withholding necessary data, collecting the receivables themselves, telling the account debtors not to send their payments to FNY or the FDIC, secreting the money away in non-FNY accounts, [and] not turning over the money to the FDIC but disposing of the funds for purposes other **[*18]** than paying down the FNY debt which the collateral secured." *Id.*

According to the Williams Affidavit and the attached

notes of the loan officer in charge of collecting the Wrapwell receivables, despite its obligation to provide monthly accounts receivable schedules and despite the loan officer's repeated requests, Wrapwell never provided an updated detailed accounts receivable aging schedule after September 30, 1992. [5] The loan officer's requests were frequently met with uncooperativeness. Exhibits U, DD. In addition, according to Williams, Wrapwell embarked on its own successful efforts to collect its accounts receivable. Williams Affidavit PP 29-32. While the exact figure is a subject of dispute, it is apparent that Wrapwell collected a portion of its accounts receivable which, instead of forwarding to FNY or FDIC, it deposited in an account established at a different bank. Williams also maintains that the FDIC's collection efforts were hindered by the interference of "Wrapwell and Louis Silberstein who contacted customers and told them not to pay FNY or the FDIC but to send payments to Wrapwell and, in some instances, to Domino Paper Co. ("Domino")," *id.* at P 35, a company **[*19]** that defendants say had been established to fill "certain orders which Wrapwell was unable to fill because of the actions of the Bank." HS Affirmation at P 38.

In response, the only evidence the defendants offer comes from the HS Affirmation and a few attached exhibits. The gist of the affirmation is that the Bank's actions deprived Wrapwell of its ability to collect its own receivables and caused the company to rely instead on the Bank to collect. The affirmation and the defendants' Rule 56.1 Statement indicate that this contention rests on the following three factors: (1) the Bank's agreement in a June 24, 1992 letter that it would be "obliged to collect receivables," HS Affirmation at P 17; (2) the fact that FNY and FDIC each sent letters to Wrapwell's customers **[*20]** informing them that they should remit all sums due Wrapwell directly to FNY or FDIC. *Id.* at P 26; and (3) the fact that "on or about July, 1992, representatives from the Bank arrived at Wrapwell's premises and removed documents pertaining to accounts receivables *explaining that they would collect such receivables." Id.* at P 20 (emphasis added).

None of the evidence submitted by the defendants presents an issue of fact as to whether the accounts receivable were in the Bank's possession and control such that Wrapwell was prevented from making collections itself, or as to whether Wrapwell should have relied on the Bank to make the collections. There is simply no admissible evidence that Wrapwell agreed to take or acted as if it took sole responsibility to collect the accounts receivable. The June 24, 1992 letter agreement to which the HS Affirmation refers contains no provision that can even arguably be interpreted to "oblige" FNY to collect accounts receivable to the exclusion of Wrapwell. *See* Williams Affidavit at Ex. K. Moreover, the notice letters do not demonstrate the requisite control over the accounts receivable or suggest an inference of unreasonableness. Such notice **[*21]** is commonplace and expressly permitted by NYUCC § 9-502(1) which provides, "When so agreed and in any event on default the secured party is entitled to notify an account debtor . . . to make payment to him whether or not the assignor was theretofore making collections on the collateral . . . ." *See Manufacturers and Traders Trust Co. v. Pro-Mation, Inc.*, 115 A.D.2d 976, 497 N.Y.S.2d 541, 542 (App. Div. 4th Dep't 1985) ("Defendants' contention that plaintiff did not act in a commercially reasonable manner when it notified Pro-Mation's accounts receivable debtors and instructed them to remit their payments to the bank is without merit. Such action is authorized by UCC 9-502(1) . . . ."); *Chase Manhattan Bank, N.A. v. Our Own Farm, Inc.*, 237 A.D.2d 222, 655 N.Y.S.2d 938 (App. Div. 1st Dep't 1997) ("Plaintiff clearly acted in a commercially reasonable manner in directly seeking to collect payment from the borrower's account debtors . . . .").

Finally, the HS Affirmation's contention that representatives from FNY removed accounts receivable documents and asserted that they would collect the receivables does not create an issue of fact because that contention **[*22]** is based upon inadmissible hearsay. Paragraph 7 of Defendant's Rule 56.1 Statement cites two pieces of evidence in support of this fact: the HS Affirmation itself, and two memoranda written by the FNY loan officer stating that a bank examiner picked up copies of invoices and shipping receipts from Wrapwell in July of 1992. The memoranda do not support the statement. Nowhere do they suggest that the relevant accounts receivable documents were confiscated by FNY -- they simply mention that *copies* of documents were taken. Nor do they state that FNY informed anyone that FNY was taking sole responsibility for collecting the receivables.

The basis for this statement in the affirmation is contained in Herman Silberstein's earlier deposition testimony ("HS Dep.") which sheds important light on his

---

[5] FNY filed the 93 Civ. 859 complaint in June of 1992, but refrained from prosecuting the action while it worked with Wrapwell to refinance its business. The FDIC was appointed FNY's receiver on November 13, 1992. Williams Affidavit at §§ 18, 24.

Case 3:18-cv-01708-VLB   Document 43-10   Filed 08/30/19   Page 8 of 17

Page 7 of 16
2002 U.S. Dist. LEXIS 76, *22

knowledge of the surrounding events. In his deposition, Silberstein gave the following testimony concerning the circumstances of the visit:

> Q: Okay. The central issue or one of the central issues is regarding the accounts receivable. Do you have any familiarity with the accounts receivable?
>
> A: I don't know nothing about the receivables. I know one thing that the First New York Bank **[*23]** came one day and picked up the papers and said you have nothing to collect, they will collect. Finished, history.
>
> Q: So just so I understand this, are you testifying that you know nothing about the accounts receivable?
>
> A: I know one thing, that the First New York Bank took all the paperwork and they say we should not collect. They will collect. History. (HS Dep. at 33-34).
>
> * * *
>
> Q: Are there documents that would reflect any returns or credits?
>
> A: I don't know. All the documents, you know, you have all the documents. The bank has all the documents. As I explained [sic] you last time, they came and they picked up all the documents. I don't know, you should have all the documents. They came, they picked up all the documents whatever it was.
>
> Q: What documents are you --
>
> A: Everything they took from us. Everything.
>
> Q: Could you identify what these documents were, Mr. Silberstein?
>
> A: I don't know. I don't know. I know one thing, they came to take everything. Whatever was there.
>
> Q: You are unable to identify which documents were taken?
>
> A: No.
>
> Q: Do you know when this occurred?
>
> A: No. I don't keep track of dates.
>
> Q: Do you **[*24]** know who was there, who took the documents?
>
> A: No. They sent somebody. I don't know who it was.
>
> Q: Were you given a receipt when this person supposedly came in and took these documents?
>
> A: I don't remember. It could be. I don't remember. It could be. I don't remember. (HS Dep. at 139-40).
>
> * * *
>
> A: They came, I was all the time in shipping. I don't know. I was in back.
>
> Q: The back is the shipping area?
>
> A: Yes.
>
> Q: And the front is what?
>
> A: The office.
>
> Q: Who was in the office at that time?
>
> A: I don't remember. You asked me before this question.
>
> Q: I mean, who was in the office at the time that this alleged taking of documents occurred?
>
> A: I don't remember.
>
> Q: Is there anyone else who might remember?
>
> A: I don't know. (HS Dep. at 141).

According to his testimony, Silberstein did not actually witness the alleged confiscation of the accounts receivable documents and did not personally hear the statement by the FNY representative. He made it clear that he was in a different part of the building when the representative came. He doesn't even remember who was present from his company and, consequently, who imparted the **[*25]** information to him. It is patently clear from his deposition that Silberstein's statement in his affidavit is based on hearsay and is therefore inadmissible.

> Hearsay testimony contained in an affidavit may not be considered on summary judgment unless it would be admissible at trial pursuant to one of the exceptions to the hearsay rule. Of course, "to the extent that a Rule 56(e) affidavit contains inadmissible hearsay which references other evidence that is properly before the court, the court may disregard the hearsay but separately consider the admissible evidence."

*Crown Heights Jewish Community Council, Inc. v. Fischer*, 63 F. Supp. 2d 231, 241 (E.D.N.Y. 1999) (citations omitted) (quoting *Hollander v. American Cyanamid Co.*, 999 F. Supp. 252, 256 (D.Conn. 1998), *aff'd* 216 F.3d 1071 (2d Cir. 2000) (unpublished disposition). Although the affirmation's statement is not couched in the form of hearsay, there can be no doubt based on Silberstein's deposition testimony that he was not there to hear the exchange and it was therefore not based on personal knowledge. If, as he related in his deposition, he was not there to hear **[*26]** the statement personally, then *a fortiori* his affirmation testimony about what was conveyed is hearsay. Silberstein's statement could be based only on what he had been told by others whose affidavits are not submitted here and may not therefore be considered for purposes of summary judgment. Cf. *Schultz v. Wills*, 126 B.R. 489, 494 n.3 (Bankr. E.D.Va. 1991). Even if the statement, ascribed

to a bank representative, fell within an exception to the hearsay rule, an argument which defendants do not make, [6] there can be no doubt based on Silberstein's deposition testimony that the statement is inadmissible because its existence is not based on his personal knowledge. *See Randell v. U.S.*, 64 F.3d 101, 109 (2d Cir. 1995) (statements in attorney's affirmation in opposition to summary judgment motion were not based on personal knowledge and therefore "inadequate to defeat a motion for summary judgment"); *U.S. v. Alessi*, 599 F.2d 513, 514-15 (2d Cir. 1979) (per curiam) (portions of affidavit submitted in support of summary judgment motion stricken because they did not appear to have been made on personal knowledge).

**[*27]** The only evidence that defendants have proffered to show that the bank took control of the accounts receivable or acted in such a way as to cause the defendants to rely on their collection efforts is the aforementioned statement in the HS Affirmation. But, the HS Affirmation and the Defendants' Rule 56.1 Statement do not disclose any other evidence that supports that statement. Because this statement amounts to hearsay which may not be considered on summary judgment, I conclude that there is no evidence to demonstrate that the Bank had the exclusive responsibility to collect Wrapwell's receivables. Accordingly, the UCC requirement that the Bank make commercially reasonable efforts to collect the receivables did not come into play.

III. Commercial Reasonableness of the Bank's Efforts

Assuming without deciding that the Bank's mere attempt to collect receivables -- though it was not in control of the collection -- could trigger the commercial reasonableness requirement, no evidence has been submitted by defendants that creates an issue of fact demonstrating that the Bank's efforts were commercially unreasonable.

Commercial reasonableness is not defined in the statute. In some **[*28]** circumstances, the fact that the highest price was not achieved in a disposition of collateral may indicate the commercial unreasonableness of the disposition. *See, e.g., Bankers Trust Co. v. J.V. Dowler & Co.*, 47 N.Y.2d 128, 135, 417 N.Y.S.2d 47, 51, 390 N.E.2d 766 (1979) (implicitly validating two tests for determining whether a disposition of property was commercially reasonable, one focusing on the procedures employed, and the other on maximizing resale price). However, the consensus of authorities appears to view commercial reasonableness as hinging on the totality of the circumstances, including the good faith efforts of the creditor. "It is the aggregate of circumstances in each case -- rather than specific details of the sale taken in isolation -- that should be emphasized in a review of the sale." *In the Matter of Zsa Zsa Limited*, 352 F. Supp. 665, 670 (S.D.N.Y. 1972), *aff'd* 475 F.2d 1393 (2d Cir. 1973) (unpublished disposition); *First National Bank of Glens Falls v. G.F. Clear, Inc.*, 93 A.D.2d 925, 462 N.Y.S.2d 327, 329 (App. Div. 3d Dep't 1983) ("The record demonstrates a good faith attempt by the plaintiff **[*29]** to dispose of all of the collateral to the parties' best advantage, and, therefore consideration must be given to the totality of the circumstances surrounding the entire proceedings, rather than an isolated portion thereof."); *SNCB Corporate Finance Limited v. Schuster*, 877 F. Supp. 820, 828 (S.D.N.Y. 1994) ("A commercially reasonable disposition makes a good faith attempt to dispose of the collateral to the parties' mutual best advantage.") (quotations omitted), *aff'd* 71 F.3d 406 (2d Cir. 1995) (unpublished disposition). When the collateral involves an intangible, such as accounts receivable, that does not have an easily determined fair market value, it seems even more appropriate to apply the "procedures" approach as the measure of commercial reasonableness.

Once commercial reasonableness is raised as a defense to a deficiency action, the burden is on the creditor to establish the commercial reasonableness of its actions. *See General Electric Credit Corp. v. Durante Bros. & Sons, Inc.*, 79 A.D.2d 509, 433 N.Y.S.2d 574, 576 (App. Div. 1st Dep't 1980). If the creditor offers evidence to establish this, the debtor must then offer evidence **[*30]** demonstrating that an issue of fact remains. *See Chemical Bank v. Haseotes*, 1994 U.S. Dist. LEXIS 859, 38 U.C.C. Rep. Serv. 2d (Callaghan) 259 (S.D.N.Y. 1994). The Williams Affidavit and its attached exhibits furnish evidence that the Bank took the following steps with respect to collecting Wrapwell accounts receivable. It sent letters to Wrapwell's account debtors in July and December, 1992 informing them that they were to remit all amounts owed Wrapwell to FNY or to the FDIC, as the case may be. Williams Affidavit PP 20, 27, Exh. L, O. It assigned a loan officer to pursue collection of Wrapwell receivables and maintained files and records regarding the status of the effort. *Id* at P 27. A bank examiner made visits to Wrapwell's offices, and the examiner and the loan

---

[6] Arguably the bank representative's statement, if made, was "[a] statement of the declarant's then existing state of mind . . . (such as intent . . .)," falling within the hearsay exception found in Rule 803(3), Fed. R. Evid.

officer were rebuffed on several occasions when they requested important receivables information from Wrapwell which was never ultimately delivered. The loan officer was given the apparently incorrect information by Wrapwell in early December that Wrapwell had received no further payments from account debtors. *Id.* at P 37. The loan officer also learned that Wrapwell had contacted many of its customers and told **[*31]** them to send payments not to the FDIC but to Domino. *Id.* at P 35. Williams attests that in view of the "roadblocks" set up by Wrapwell, "it was not reasonable as a commercial, business matter to continue to throw good effort, time, money and labor to so purposeless and unproductive an exercise. It is apparent that the appropriate thing to do from a business perspective was to pursue [this] litigation . . . ." *Id.* at P 38.

A. Motion to Strike

As noted, the only evidence defendants offer in opposition to plaintiff's motion is the HS Affirmation and its several exhibits. Plaintiff moves to strike the majority of the affirmation on the ground that the statements contradict Silberstein's prior deposition testimony on the subjects covered. The paragraphs I perceive as relevant to this issue are paragraphs 17, 20, 22, 23, 26-33, 35, 38-40, 42, 44 and 45. Instead of repeating the lengthy assertions in those paragraphs, I will summarize them in material part.

. Paragraph 17 mentions the June, 1992 letter agreement by which FNY assertedly became "obliged to collect receivables".

. Paragraph 20 describes FNY's removal of the receivables documents from Wrapwell along with the **[*32]** representative's statement "that they would collect such receivables."

. Paragraphs 22 and 23 explain that by failing to properly collect the accounts receivable, "the Bank provided a basis for customers to withhold payment entirely," and that the amounts collected due to "the Bank's failures and the FDIC's inability" were insufficient to cover Wrapwell's indebtedness and operations.

. Paragraph 26 states that "Defendant learned that the FDIC had sent notices to Wrapwell's customers in December, 1992, demanding all sums be paid directly to the FDIC."

. In paragraph 27, Silberstein states that customers told Wrapwell that the money belonged to the FDIC and admitted when contacted by Wrapwell between December, 1992 and March, 1993, that they had not paid their bills.

. Paragraph 28 claims that plaintiff's statement that the Bank never had control of Wrapwell's receivables is "totally inconsistent with the facts of this case."

. In paragraph 29, Silberstein asserts that "neither the FDIC nor FNY ever contacted Wrapwell and requested assistance in collecting from Wrapwell customers. Neither did they contact myself or Wrapwell regarding their allegations that Wrapwell or its principals **[*33]** was interfering with their collection efforts. These allegations are completely false."

. Paragraphs 30 and 31 explain that Williams was "advised" that the Bank never made any effort to pursue collection from Buy-Save Trading and other account debtors after sending out the initial notices. "Wrapwell will be able to produce a witness who will testify to these facts at trial."

. Paragraph 32 accuses the FDIC of a "lack of diligence" in failing to give proper instructions so that Wrapwell could collect on a $ 10,000 letter of credit issued on behalf of a customer, Jeannine Fund Raising. Silberstein claims that he "informed Jeannie that payment should be made to the FDIC" but the FDIC never gave the issuing bank instructions so that FDIC could collect on the letter.

. The only portion of paragraph 33 that plaintiff seeks to strike states that "neither the Bank nor the FDIC ever made a concerted effort to collect on this collateral. Instead, the FDIC decided to focus its efforts on collecting from the defendants instead."

. Paragraph 35 takes issue with plaintiff's calculation of the value of the accounts receivable.

. Paragraph 38 explains that Wrapwell never became Domino, that neither **[*34]** Herman nor Louis Silberstein "ever informed Wrapwell customers that Wrapwell's name had been changed to Domino;" and that Domino simply filled orders which Wrapwell was unable to fill and received payments for its own shipments, not Wrapwell's.

. Paragraphs 39 and 40 claim that the FDIC did not fail to pursue accounts because it lacked information, to the contrary "the FDIC possessed detailed information from the Bank regarding these accounts;" and that the plaintiff's papers show that after sending the initial form

letters the FDIC never made any attempt to collect on any of the accounts.

. Paragraphs 42, 44 and 45 challenge the validity of the schedules provided by plaintiff which list checks purportedly received by account debtors and deposited by Wrapwell into the Republic account.

What these paragraphs reveal is the affiant's thorough command of relevant facts such as the status and disposition of Wrapwell's accounts receivables, the Bank's efforts at collection and the Bank's contacts (or lack thereof) with Wrapwell and its customers. This mastery of the subject lies in stark contrast to Silberstein's earlier deposition testimony in which he affirmatively disavowed any knowledge **[*35]** about these matters. During three separate days of testimony in 1999 on the exclusive issue remaining in the case -- the commercial reasonableness of the Bank's failure to collect the accounts receivable -- Herman Silberstein consistently and repeatedly denied having knowledge of information related to Wrapwell's accounts receivable. Examples abound in his testimony, but a few selections will afford the substance of his denials.

Silberstein testified that he knew practically nothing about Wrapwell's accounts receivable or the methods of accounting for them.

> Q: Do you have any familiarity with the accounts receivable?
> A: I don't know nothing about the receivables. I know one thing that the First New York Bank came one day and picked up the papers and said you have nothing to collect, they will collect. Finished, history. (HS Dep. 33-34)
> * * *
> Q: And if I remember correctly, you testified that it was Louis [Silberstein] who did the billing and kept the books?
> A: Correct.
> Q: Was it also Louis who did the collecting of the receivables?
> A: That I don't know. (HS Dep. 34)
> * * *
>
> Q: Let me ask you this, did Wrapwell prepare summary aged receivable **[*36]** reports?
> A: I don't know.
> Q: Did Wrapwell keep track of its accounts receivable?
> A: I don't know. Most probably.
> Q: You don't know whether you kept count whether people owed you money or not?
> A: They had an accountant. Probably.
> Q: Only probably.
> A: I don't know, I was not in the office. (HS Dep. 71-72)
> * * *
> Q: Let me finish my question. Who at Wrapwell would know whether Wrapwell maintained accounts receivable records?
> A: Who will know?
> Q: Who would know that?
> A: I don't know what to answer you. Thinking anyone who worked there or what [sic]. I don't know.
> Q: You are telling me that you don't know who would make a report?
> A: No. (HS Dep. 75-76)
> * * *
> Q: And in all that time [that you worked with Wrapwell] you don't remember seeing any computer schedule?
> A: Not only [sic] a computer sheet.
> Q: I'm asking a receivable schedule.
> A: No, I don't remember if I saw.
> Q: Did you ever ask to see one?
> A: Not me.
> Q: Why is that?
> A: I told you I was an inside man. I was not responsible for every dot. (HS Dep. 90-91)
> * * *
>
> Q: Are you saying then that Louis Silberstein and Herman **[*37]** Silberstein handled Wrapwell's accounts receivables from the period 1990 to the present?
> A: I don't remember.
> Q: You don't remember what?
> A: I collected anything [sic]. (HS Dep. 198-99)

Apart from testifying that a representative from FNY took Wrapwell's receivables documents, Silberstein testified that he was unfamiliar with Wrapwell's cooperation in furnishing information about the receivables and with anyone's efforts to collect them.

> Q: Do you know whether Wrapwell ever supplied First New York Bank for Business with records of its accounts receivable?
> A: I don't know.
> Q: Do you know if the bank ever asked for information regarding the accounts receivable?
> A: They came down and looked. (HS Dep. 87)
> * * *
> Q: First I would like to ask you, do you have any familiarity with any activity by the bank . . . or the

FDIC, to collect any of the Wrapwell accounts receivable?
A: No. I was not involved. I know nothing about that. (HS Dep. 122).
* * *
Q: The second question was activity by Wrapwell to collect Wrapwell's accounts receivable. It's a different question.
A: I don't remember.

Q: Do you know of anyone else who might **[*38]** remember? . . .
A: I don't remember, who else should be involved here. (HS Dep. 124)
* * *
Q: Mr. Silberstein, do you have any knowledge whether any of Wrapwell's accounts receivables on the books from September 1992 forward were not collected at all?
A: I don't know.
Q: Just so that I understand your testimony, when you say that you don't know, your response to the last question, are you saying that you don't have any knowledge?
A: I was not involved. (HS Dep. 128)
* * *

A: I don't know what FDIC has collected or what they have not collected. *I was not involved. I don't know what you collected. I don't know what Wrapwell has collected. I don't know nothing about it.*
Q: So then your testimony is that you don't know what receivables were collected either by the FDIC or by Wrapwell?
A: Yes.
Q: Do you know anything about accounts receivable that might have been collected by the bank?

A: *I was not involved financially.*

Q: So then your testimony is that you, if I understand you, that your testimony, you don't have any knowledge with respect to accounts receivable that might have been collected by Wrapwell, the bank or the **[*39]** FDIC?
A: As far as I know, I don't know. (HS Dep. 128-29) (emphases added).
* * *
Q: Does this [document] refresh your recollection of how much Everything's A Dollar owed in receivables to Wrapwell at a certain point in time?

A: I told you last time when I had testified I was not involved in no billing, I had nothing to do with the whole thing. You asked me the question again.

Customer I know, *I was involved in shipping, but more than that, I don't know nothing. I don't remember. I don't know.* (HS Dep. 185-86) (emphasis added).

Silberstein also denied that certain documents would refresh his recollection of matters related to the accounts receivable, collection efforts or the Bank's communication with Wrapwell.

Q: Is there a document that might refresh your recollection about any of these matters [i.e. the taking of the receivables documents by the Bank]?
A: You have documents. I can see but I don't remember. (HS Dep. 142)
* * *
Q: . . . Is it possible that those, that those two debits that you pointed out could have come from checks or other form of payment from Wrapwell customers to the bank directly?
A: I don't know.

Q: Is **[*40]** there anything else in that statement that refreshes your memory with respect to any other matters at issue in this case?

A: *I don't remember nothing. I have told you before. It's my statement, I don't remember nothing. I had nothing to do with that.* That is the only thing I knew they told me at that time that it is a subject even -- (HS Dep. 176-77) (emphasis added)
* * *
Q: As you review this document [a debit memo], does it refresh your memory with respect to any other matters in this case?

A: *No. I don't know nothing. I don't remember nothing.* (HS Dep. 183) (emphasis added)

Silberstein continued to profess his ignorance even after his lawyer agreed in his presence to have him review all documents in the case before his final day of testimony.

MS. CHARET: Counsel for the parties and deponent, Herman Silberstein, have agreed that deponent Herman Silberstein and Louis Silberstein will review all documents produced in this case in order that Herman Silberstein and Louis Silberstein be able to testify whether or not any of those documents contain information responsive to or refresh deponent's recollection with regard to any

questions made to them **[*41]** in their respective depositions to which they answered either that they do not know or do not remember. (HS Dep. 153)

Despite that agreement, at the beginning of his last day of testimony Silberstein stated that he had not reviewed any documents.

> Q: Did you review any documents in preparation for your deposition today?
> A: Not today.
> Q: Not today, but in preparation for today's deposition, did you review any documents?
> A: I only looked through the documents what I discuss [sic] with you last week when I told you that my father's loan was paid off and I was just looking on that checking bank statements because I don't remember no bank statements, I wasn't involved. (HS Dep. 166-67)

Time after time during the course of his testimony, Silberstein denied having knowledge about the receivables and distanced himself from the billing, accounting and collection process at Wrapwell. He maintained this stance even after having been pointedly asked whether certain documents refreshed his recollection. Now, in a 180-degree change of course, he purports to furnish detailed information about Wrapwell's receivables, including how much was owed at various times and **[*42]** by whom, whether customers paid outstanding receivables, whether or not the Bank contacted customers to collect the receivables, how cooperative Wrapwell was in assisting the Bank, what kind of information the Bank had, and how little effort the Bank expended in trying to collect. The only explanation given for this epiphany is that "I have in the recent past begun to review extensively the documentation in the case herein and have become fully familiar with the facts and circumstances herein." HS Affirmation at P 1. Particularly in light of counsel's agreement that Silberstein would review documents to refresh his recollection before his final day of testimony, this explanation rings hollow. It does not justify consideration on this motion of the paragraphs in Silberstein's affirmation which starkly contradict his clear and repeated sworn testimony in his deposition that he did not have then, and never had, the information he now offers.

In *Perma Research and Development Co. v. The Singer Company*, 410 F.2d 572 (2d Cir. 1969), the Second Circuit established the cardinal rule that a party cannot defeat a motion for summary judgment by proffering an affidavit that contradicts **[*43]** in material respects his prior sworn deposition testimony. In *Perma*, the plaintiff claimed that the defendant breached a contract and committed fraud in connection therewith. An officer of the plaintiff corporation submitted an affidavit in opposition to summary judgment stating that he was told by an employee of the defendant that the defendant never had any intention of honoring the contract. Yet, during four days of earlier deposition testimony the officer, after having been asked to specify the basis of the fraud claimed, stated "there is no way of me knowing exactly what their intention was at the time they said it, except that they promised me certain things when everything else points to the fact that they did not intend to do what they said they were going to do." The officer never referred to the conversation mentioned in his affidavit. 410 F.2d at 577-78. Although the affidavit statement regarding the conversation would have raised a triable issue as to defendant's fraudulent intent, the court of appeals held that the district court properly disregarded it as unreliable because it contradicted the affiant's deposition testimony. Allowing the later contradictory **[*44]** statement to defeat summary judgment would have been unacceptable because

> if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. . . . [A] party who resists summary judgment cannot hold back his evidence until the time of trial.

410 F.2d at 578 (citations omitted).

Later cases have construed *Perma Research* as standing for the proposition that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, *by omission or addition*, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (emphasis added). However, courts have recognized that "a material issue of fact may be revealed by [a deponent's] subsequent sworn testimony that *amplifies or explains*, but does not merely contradict, his prior testimony, especially where the party was not previously asked sufficiently precise questions **[*45]** to elicit the amplification or explanation." *Rule v. Brine*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citation omitted) (emphasis added).

Nearly all of the paragraphs of Silberstein's affirmation

testimony summarized above fall squarely within the *Perma Research* conflict-by-omission proscription. In his deposition, Silberstein made it abundantly clear that while he was at Wrapwell he did not know, was not in a position to know, and did not care to know, anything connected to the receivables or the collection efforts. Yet less than one year later, Silberstein claims in his affirmation to possess the information, in detail, that he previously claimed not to have. His explanation for this sudden boost in knowledge does not explain the omissions in his deposition testimony. He states that he has recently reviewed documents in the case, but two of the documents he claims have recently made him familiar with the facts are documents that he could not identify at his deposition and did not refresh his recollection. *See* FDIC Memorandum in Support of Its Motion to Strike, at p. 6.

The circumstances of this case are very close to those in *Newport Electronics, Inc. v. Newport Corporation*, 157 F. Supp. 2d 202 (D.Conn. 2001), **[*46]** in which the court struck portions of the affidavits of two witnesses, Blake and Hewitt, because they contradicted their previous deposition testimony. In his deposition, Blake was unable to answer certain questions and denied knowledge about other matters that he later discussed in detail in an affidavit in opposition to plaintiff's summary judgment motion. Hewitt's affidavit contained "testimony regarding his personal knowledge of and involvement in" issues about which he had disclaimed knowledge in his deposition. 157 F. Supp. 2d at 220. The court held that the affidavits contained contradictory information which could not be used to create an issue of fact to defeat summary judgment. In language that resonates here, the court held that because Blake had received notice of the topics that were the subject of the deposition, he was not "at liberty" "to delay reviewing information on those topics until after the deposition and, thereby, submitting information in his affidavit which contradicts statements in his deposition regarding his lack of knowledge on various topics." [7] *Id.*

**[*47]** The inconsistencies between Silberstein's deposition and affirmation testimony are also analogous to testimony the Second Circuit found to be contradictory in *Raskin v. The Wyatt Company*, 125 F.3d 55 (2d Cir. 1997). *Raskin* was an age discrimination case in which the defendant sought summary judgment on the basis that Raskin had failed to raise an inference of discrimination. In his declaration in opposition to summary judgment, Raskin stated that in a key meeting with him the company president had made a comment that could be interpreted as expressing a concern about Raskin's age. But the court noted that with one minor exception Raskin had testified in his deposition eleven months earlier that he "could not remember the points that were covered" during that meeting. 125 F.3d at 63. Because the declaration was "at odds with" his prior deposition testimony, the court held that it did not raise an issue of fact concerning age discrimination. The court concluded: "we follow the rule that 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts that affiant's **[*48]** previous deposition testimony.'" *Id.* (quoting *Hayes*, 84 F.3d at 619). *See also Unterreiner v. Volkswagen of Amer., Inc.*, 8 F.3d 1206, 1210 (7th Cir. 1993) (subsequent recollection in an affidavit of a matter about which the witness had no recollection at his deposition will not create an issue of fact; "A party cannot claim a lack of general knowledge about a subject and later make a statement which requires detailed knowledge about the same subject."). In a remarkably similar vein, Silberstein's affirmation offers detailed information concerning Wrapwell's accounts receivable, billing procedures and collection efforts and the Bank's failure to collect, subjects about which he was unable to answer any questions at his earlier deposition.

The defendants argue that Silberstein's affirmation should not be stricken as it does not "contradict" his earlier sworn testimony since he was not asked the specific questions to which his affirmation relates. In *Rule v. Brine, Inc., supra*, the Second Circuit held:

> Although a party does not show a triable issue of fact merely by submitting an affidavit that disputes his own prior sworn **[*49]** testimony, a material issue of fact may be revealed by his subsequent sworn testimony that amplifies or explains, but does not merely contradict, his prior testimony, especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation.

85 F.3d at 1011. Relying on *Rule*, defendants urge that the HS Affirmation properly "amplifies" rather than contradicts his deposition testimony. This argument is sheer nonsense. Silberstein cannot argue that he was

---

[7] Although Blake was a witness designated for deposition under Rule 30(b)(6), the *Newport* court's reasoning applies with equal, if not more, force to a witness with personal knowledge such as Silberstein.

not questioned about accounts receivable. To the contrary, Silberstein was asked *ad nauseum* about his knowledge of the accounts receivable and the processes of collecting them. He repeatedly, and adamantly, denied possessing any knowledge on the subject. It would be a perverse application of the *Perma Research* principle to hold that Silberstein's statements are not contradictory because counsel failed to ask him specific questions within a broad subject about which Silberstein had denied all knowledge. Having unequivocally disclaimed knowledge, Silberstein cannot now argue that he would have been more forthcoming if only he had been asked more specific **[*50]** questions. In any event, counsel, to her credit, did ask many specific questions about the company's billing procedures, the status of accounts receivable, collection efforts, and cooperation with the Bank, even in the face of Silberstein's professed ignorance.

The cases upon which defendants rely which apply *Rule* are inapposite and do not require a contrary conclusion. In *Palazzo v. Corio*, 232 F.3d 38 (2d Cir. 2000), the issue confronted by the court was whether the plaintiff resided in New York so as to establish diversity jurisdiction. In his deposition the plaintiff answered affirmatively when asked whether he had "moved" to Pennsylvania. Testifying at a subsequent hearing, however, the plaintiff stated that he never intended the move to be permanent -- a fact which meant that he had not changed his domicile for diversity purposes. Defendant argued that the district court should have refused to consider plaintiff's hearing testimony on the grounds that it contradicted his prior deposition testimony about the move. The court of appeals disagreed, concluding that the *Perma Research* principle did not govern because plaintiff was never asked at his deposition **[*51]** whether he intended his move to be permanent and therefore his testimony at the hearing did not contradict his deposition testimony. 232 F.3d at 43.

Similarly, in *Thomas v. Roach*, 165 F.3d 137 (2d Cir. 1999), in which the plaintiff sued arresting police officers for violation of his civil rights, the Second Circuit reversed the district court's refusal to consider the plaintiff's affidavit statement that he did not have a knife at the time of his arrest because that statement contradicted his earlier plea of *nolo contendere*. The court of appeals held that by pleading *nolo contendere* to assault charges the plaintiff admitted only that he would probably lose if he went to trial, not that he assaulted the police officer. The court noted that the plaintiff's plea statements regarding the knife were "vague and inconclusive" and therefore did not contradict his later affidavit which created a genuine issue of fact as to whether the officers used excessive force. 165 F.3d at 144. *See also Langman Fabrics v. Graff California Wear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998) (prior deposition statement that artist was "freelance" **[*52]** did not contradict later testimony giving more details relevant to the question whether she was an employee; the statement that the artist was not an employee was a legal conclusion, not a factual statement, and witness was entitled to testify about facts that would lead to a different legal conclusion), *as amended by* 169 F.3d 782 (2d Cir. 1998).

Here, Silberstein's prior statements regarding his lack of knowledge were far from vague. He could not have been more precise in his answers to counsel's questions about the receivables and collection activities. Unlike the cited cases, his affirmation testimony did not flesh out previous testimony on the subject. Because he could not answer the questions concerning receivables, there were no facts to amplify. One cannot amplify or expand upon one's absence of knowledge.

Accordingly, I conclude that all but one of the paragraphs in the HS Affidavit identified *supra* as relevant to the commercial reasonableness issue must be disregarded as they contradict his prior deposition testimony on the matter. [8] The one exception is paragraph 38 in which Silberstein discusses the role of Domino. The excerpts of the deposition testimony **[*53]** provided to the Court do not contain any inquiries by counsel about Domino. Since the role of Domino was evidently not explored at the deposition, I cannot conclude that Silberstein's statements concerning Domino in the affirmation contradict his testimony in his deposition. After all, Silberstein claims in his affirmation that Domino had nothing to do with Wrapwell's accounts receivable and therefore his knowledge about Domino does not necessarily contradict his earlier professed lack of knowledge about the Wrapwell accounts receivable.

---

[8] Defendants argue that the motion to strike should be denied because it is not particularized. It is true that motions to strike affidavits must be "made with particularity," *Richmond Boro Gun Club v. City of New York*, 1992 U.S. Dist. LEXIS 15983, No. 92- Cv-0151, 1992 WL 314896, *2 (E.D.N.Y. October 13, 1992). However, plaintiff had adhered to this requirement. Counsel for plaintiff has specified line by line which statements in the affirmation should be stricken. *See* Declaration of Linda S. Charet, Esq. dated November 14, 2000 at Ex. 4.

 **[*54]** B. <u>Have Defendants Created a Material Issue of Fact?</u>

Having determined that the aforementioned portions of the affirmation must be disregarded, the question remains whether any other evidence offered by the defendants creates an issue of fact suggesting that the Bank's efforts at collecting the receivables were commercially unreasonable. Silberstein repeatedly complains that the Bank did little other than send the initial notification letters to customers in its effort to collect. However, apart from certain statements in the HS Affirmation which I have stricken, the defendants have offered no evidence to counter the Bank's showing that it was stymied by Wrapwell's lack of cooperation. The Bank, through the Williams Affidavit, has demonstrated that it initiated a good faith effort to collect Wrapwell receivables, which included making visits to the Wrapwell premises and repeatedly contacting people at Wrapwell to obtain crucial data. The Bank has also offered evidence to show that Wrapwell did not provide the data necessary to make an effective collection effort, that Wrapwell claimed that it had not received payments on receivables when it really had, and that Wrapwell deposited **[*55]** at least some of its payments on the receivables in an account at Republic in violation of its agreements with the Bank. The defendants have submitted no admissible evidence to rebut these facts. [9]

---

[9] One of the documents attached to the HS Affirmation is the affidavit of Louis Silberstein dated August 15, 1994 (the "Louis Affidavit") which was submitted in opposition to plaintiff's original motion for summary judgment. *See* HS Affirmation at Ex. D. The HS Affirmation cites the Louis Affidavit in support of its statement that Wrapwell was told by customers between December, 1992 and March, 1993 that the money it was trying to collect belonged to the FDIC, not to Wrapwell. HS Affirmation P 27. Much of the Louis Affidavit is either irrelevant for purposes of this motion or overlaps the statements made in the HS Affirmation. Thus, apart from providing support for P 27 of the HS Affirmation, it is unclear whether the defendants intend to offer the Louis Affidavit as evidence of anything. The only non-cumulative and relevant information the Louis Affidavit imparts is contained in (i) P 17 -- the names of the customers contacted between December and March; and (ii) P 18 -- the fact that during that time Wrapwell had $ 400,000 in receivables that it was denied access to because of the Bank's collection efforts.

This evidence does not defeat summary judgment. The fact that customers told Wrapwell that the money belonged to the Bank does not suggest that the Bank engaged in commercially unreasonable efforts to collect or that the Bank had the exclusive responsibility to collect. If anything, it shows that Wrapwell initiated its own efforts to collect. Moreover, the amount of receivables Louis claims was owing is far less than the Bank says remained in September of 1992 and therefore would serve to reduce the amount of indebtedness even less than defendants would hope. In any event, even if this information does raise an inference of commercially unreasonable behavior by the Bank, it cannot serve as evidence to defeat summary judgment. When shown a copy of his affidavit during his deposition in 1999, Louis could not identify it and said he could not remember any of the facts he asserted in it. *See* Declaration of Linda S. Charet, Esq. dated November 14, 2000 at Ex. 5. Having been implicitly disavowed by its affiant, this affidavit has no probative force.

 **[*56]** The only substantial fact that Wrapwell offers admissible evidence to rebut is the allegation that Wrapwell interfered with the Bank's collection process by urging certain customers to divert payments to Domino. By virtue of paragraph 38 of the HS Affirmation, discussed *supra*, the defendants have raised a disputed issue of fact as to whether Domino was used as a vehicle to interfere with the Bank's collection process. However, this is not a *material* fact. In evaluating the totality of the Bank's collection efforts what is significant is that the Bank reasonably *believed* that Wrapwell was undermining its ability to collect. Silberstein states that the payments made to Domino were for merchandise generated by Domino after Wrapwell's demise. This may well be the case. But Wrapwell has not attempted to show that the Bank knew or should have known that the payments were not an improper diversion. Williams claims, and the defendants do not dispute, that the Bank learned from numerous Wrapwell customers that they had been asked to make payments to Domino. Silberstein readily admits that former Wrapwell customers made payments to Domino. HS Affirmation P 38. According to the undisputed **[*57]** evidence, the Bank had good reason to suspect that Wrapwell was successfully interfering with its collection efforts by waging a campaign to have payments made to Domino rather than Wrapwell and that further collection efforts would therefore be fruitless. In view of Wrapwell's perceived interference and its undisputed lack of cooperation, the Bank's failure to go to greater lengths to collect the receivables cannot be regarded as commercially unreasonable.

In the end, the defendants have not offered credible, admissible evidence to show that the Bank took exclusive control of the accounts receivable with the result that it was required to make a commercially reasonable effort to collect them. Nor have defendants

disputed the plaintiff's evidence showing that even if the Bank were required to take steps to collect the receivables it possessed sufficient information and cooperation to take the collection effort further than it did.

C. Value of the Receivables

As previously noted, the commercial reasonableness defense does not affect liability, it only reduces the amount of the deficiency on the promissory notes. *FDIC v. Wrapwell*, 922 F. Supp. at 924. The defendants **[*58]** have not created an issue of fact as to the value of the uncollected receivables. The Bank has submitted evidence indicating that the most updated schedule received from Wrapwell was the "Wrapwell Accounts Receivable Detailed Aging Report" dated September 30, 1992 which showed that the company was owed a total of $ 860,110.00 as of that date. Williams Affidavit. P 28, Ex. P. The only other schedule the Bank was provided showed receivables totaling $ 868,708.08 as of August 31, 1992. *Id.* Defendants contend that the amounts on the schedules are too low due to the seasonal nature of their business in which most of the receivables were generated in the latter months of the year. The only evidence the defendants offer to support this contention is the conclusory statement of Silberstein to that effect in his affirmation. HS Affirmation P 35. This stricken statement cannot create an issue as to the value of the receivables, and the defendants offer no documents or other evidence to support a higher figure. Even if I had not struck the statement it would be insufficient to create an issue of fact. Silberstein does not suggest a figure, he merely speculates that the figure must have been **[*59]** greater because Wrapwell's "busiest months were in August - November". P 35. However, Silberstein also admits that Wrapwell's business was suffering during that period and that Domino was formed to fill orders Wrapwell wasn't able to fulfill. P 38. Under these circumstances, it is by no means self-evident that the receivables figure would have been higher after September 30, 1992 simply because in past years it had been. In the absence of contrary evidence, the defendants have not identified a genuine issue of fact indicating that the amount that the Bank should be accountable for failing to collect is anything greater than $ 860,110. Accordingly, even assuming *arguendo* that this Court is incorrect in dismissing the commercial reasonableness defense, the defendants would remain liable to plaintiff for the full amounts of the five promissory notes minus $ 860,110 at the most.

V. CONCLUSION

Consistent with the above discussion, the Court grants for the most part plaintiff's motion to strike the HS Affirmation and holds that defendants have not presented a genuine issue of material fact precluding summary judgment for the plaintiff on their commercial reasonableness defense. **[*60]** Accordingly, the defendants are liable to plaintiff on the full amounts of the guarantees.

Apart from generally opposing the dismissal of their commercial reasonableness defense, the defendants have not contested the plaintiff's calculation of the total sums due it by each of the defendants. *See* Williams Affidavit at PP 38-39. Plaintiff is therefore entitled to a judgment in the amount it has calculated against the respective defendants plus interest accruing daily at the respective rates set out in each promissory note. [10]

On or before January 25, 2002 counsel for plaintiff is directed to settle an Order and Judgment consistent with this Opinion on (10) ten days' notice.

The foregoing is SO ORDERED.

Dated: New York, New York

January 2, 2002

CHARLES S. HAIGHT, JR.

Senior United States District Judge

---

[10] Post-judgment interest will be calculated in accordance with 28 U.S.C. § 1961.

**End of Document**