# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HUNTINGTON TECHNOLOGY FINANCE, INC., f/k/a MACQUARIE EQUIPMENT FINANCE, INC., f/k/a MACQUARIE EQUIPMENT FINANCE, LLC, | : CIVIL ACTION NO. 3:18-cv-01708-VLB<br>:<br>:<br>: |
| Plaintiff, | : |
| vs. | : |
| GARETT ALAN NEFF a/k/a GARY NEFF, JOHN MARK SCHMID, and DAVID KARL SCHMID, | : August 30, 2019<br>:<br>: |
| Defendants, | : |

## DEFENDANTS' LOCAL RULE 56(a)(2) STATEMENT IN SUPPORT OF THEIR
## OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In compliance with D. Conn. L. Civ. R. 56(a)(2) and in support of their Objection to Plaintiff's Motion For Summary Judgment to Plaintiff's Motion For Summary Judgement (Doc. No. 38, the "Motion"), the defendants Garett Neff ("Neff"), John Schmid ("J. Schmid"), and David Schmid ("D. Schmid" and, collectively with Neff and J. Schmid, the "Defendants") respectfully submit their statement of admissions, objections, and denials of the facts asserted by the Plaintiff in its Local Rule 56(a)(1) Statement (the "Statement"), statement of additional material facts, and statement of disputed issues of material fact:

## ADMISSIONS, OBJECTIONS, AND DENIALS OF FACTS ASSERTED BY
## PLAINTIFF IN ITS LOCAL RULE 56(a)1 STATEMENT

1.       Huntington and Garage Media NY LLC ("GMNY") are parties to that certain Lease No. 001 dated October 26, 2010 (as amended, the "Lease Agreement"), pursuant to which GMNY leases from Huntington a 6,010 square foot Mediamesh digital signage installation at the Port Authority Bus Terminal in New York, New York (the "Sign"), as more fully described therein. Lease Agreement (Exhibit B) at p.1.

RESPONSE: Defendants admit that the Plaintiff and GMNY are parties to the Lease Agreement.   Because the Lease Agreement was a financing transaction, not a true lease, and GMNY owned the Sign, Defendants deny that that GMNY leased the Sign from the Plaintiff. (Lease Agreement, §§ 5, 6(b), 23 (attached hereto as Exhibit 2); 4th Amendment to Lease Agreement (attached hereto as Exhibit 3); Declaration of Garett Alan Neff In Support of Defendants' Objection to Plaintiff's Motion For Summary Judgment ("Neff Declaration," attached hereto as Exhibit 4), at ¶¶ 5, 7.)

2.       By the terms of that certain Guaranty dated October 26, 2010 (the "Guaranty"), Garett Alan Neff a/k/a Gary Neff, John Mark Schmid, and David Karl Schmid (collectively "Guarantors") absolutely and unconditionally guaranteed the full and prompt payment, observance, and performance when due of all obligations of GMNY under the Lease Agreement.  Guaranty (Exhibit C) at § 2.

RESPONSE: The Defendants admit that the Guaranty states that the Defendants "unconditionally guarantees to [the Plaintiff] the full and prompt payment, observance and performance when   due   of   all   obligations   of   Obligor   arising   under   the

2

Agreements…." Defendants deny that "Lease Agreement" is a defined term in the Guaranty.  (Guaranty, §§ 1, 2 (attached hereto as Exhibit 5).)

3.      The terms of the Lease Agreement were modified pursuant to Amendment No. 1 dated June 13, 2010 ("Amendment 1"), Amendment No. 2 dated July 28, 2011 ("Amendment 2"), Amendment No. 3 dated September 1, 2012 ("Amendment 3"), and Amendment No. 4 contained in an Amendment dated as of March 31, 2013 ("Amendment 4"). Amendment 1 (Exhibit D); Amendment 2 (Exhibit E); Amendment 3 (Exhibit F); Amendment 4 (Exhibit G).

RESPONSE: Admitted.

4.      Rent is due to Huntington in the amount of $135,500.00 per month.  Lease Agreement (Exhibit B) at § 5; Amendment 4 (Exhibit G) at § II.

RESPONSE: Defendants admit that the Lease Agreement as amended states that GMNY was obligated to make payments of $135,000.00 per month for certain months. Defendants deny that under the Lease Agreement as amended GMNY was obligated to make payments of $135,000.00 for all months and deny that GMNY is obligated to make monthly payments to the Plaintiff on a current basis, as the Lease Agreement has terminated.  (Lease Agreement, § 5 (Exhibit 2); 4th Amendment, art. II (Exhibit 3).)

5.      In addition, GMNY is responsible for the payment of all taxes associated with the Sign in the amount of $12,025.63 per month based on a tax rate of 8.875-percent (8.875%) as applicable in New York. Lease Agreement (Exhibit B) at § 7; Affidavit of John Zimmeth ("Zimmeth Affidavit") at ¶ 14.

RESPONSE: Defendants admit that section 7 of the Lease Agreement states that GMNY

3

will pay the Plaintiff or pay directly to the applicable taxing authority all taxes.  Because the Lease Agreement was a financing transaction, not a true lease, and GMNY owned the Sign, and because GMNY paid to the Plaintiff an amount approximately equal to the sales taxes owed upon the purchase of the Sign, Defendants deny that GMNY was responsible for the payment of taxes associated with the Sign in the amount of $12,025.63 per month.  (Neff Declaration, ¶¶ 6-8 (Exhibit 4); Lease Agreement, §§ 5, 6(b), 7, 23 (Exhibit 2); 4th Amendment (Exhibit 3).) Further, the Defendants object insofar as this portion of the Statement relies on the Zimmeth Affidavit's improper legal conclusions, as more fully briefed in the Defendants' Memorandum in Support of Objection to Plaintiff's Motion for Summary Judgment ("Defendants' Memorandum") at pp. 35-44.

6.      Thus, the total monthly payment due from GMNY to Huntington is $147,525.63. Agreement (Exhibit B) at § 5; Amendment 4 (Exhibit G) at § II; Lease Agreement (Exhibit B) at § 7; Zimmeth Affidavit at ¶ 15.

RESPONSE: Denied.  See Responses to Nos. 4 and 5, *supra*. Further, the Defendants object insofar as this portion of the Statement relies on the Zimmeth Affidavit's improper legal conclusions, as more fully briefed in the Defendants' Memorandum at pp. 35-44.

7.      On or about December 11, 2015, Huntington issued that certain Irrevocable Standby Letter of Credit No. OSB 009044 dated December 11, 2015 in the amount of $600,000.00 for the benefit of Outfront Media Group, LLC ("Outfront"), as successor in interest to CBS Outdoor Group, Inc. (the "Letter of Credit"). Letter of Credit (Exhibit I) at

4

p.1.

**RESPONSE: Admitted.**

8.   GMNY is in default of its obligations under the Lease Agreement for failure to make payment of rent, taxes, and other amounts due under the Lease Agreement in accordance with the terms thereof. Zimmeth Affidavit (Exhibit A) at ¶ 10. Similarly, Guarantors are in default under the terms of the Guaranty for failure to make payment to Huntington when due. Id.

**RESPONSE: Defendants admit that GMNY failed to make certain payments of rent due under the Lease Agreement in accordance with the terms thereof.  Because the Lease Agreement was a financing transaction, not a true lease, and GMNY owned the Sign, and because GMNY paid to the Plaintiff an amount approximately equal to the sales taxes owed upon the purchase of the Sign, Defendants deny that GMNY is in default of its obligation to make payment of taxes due under the Lease Agreement. (Neff Declaration, ¶¶ 6, 7 (Exhibit 4); Lease Agreement, §§ 5, 6(b), 7, 23 (Exhibit 2); 4th Amendment (Exhibit 3).)  Plaintiff fails in paragraph 8 to specify what "other amounts due" it is referring to, and therefore Defendants lack knowledge or information sufficient to form a belief about the allegation in paragraph 8 that GMNY is in default of its obligation to pay other amounts due under the Lease Agreement.  The Plaintiff's position is that the Lease Agreement is a guaranteed "Agreement" under the Guaranty because it is a personal property lease (Plaintiff Rule 56(a)(1) Statement ¶ 24) but because the Lease Agreement was a financing transaction, not a true lease, and GMNY owned the Sign, Defendants deny that they are in default under the terms of the**

5

Guaranty. (Neff Declaration, ¶¶ 5, 7 (Exhibit 4); Lease Agreement, §§ 5, 6(b), 23 (Exhibit 2); 4th Amendment (Exhibit 3).) Further, the Defendants object insofar as this portion of the Statement relies on the Zimmeth Affidavit's improper legal conclusions, as more fully briefed in the Defendants' Memorandum at pp. 35-44.

9.      By letters sent on various dates from time to time, most recently by letter dated October 2, 2018 (the "Notice"), Huntington furnished the Lessee and Guarantors notice of past due payments under the terms of the Lease Agreement and the Guaranty and demanded payment of all amounts due under the Lease Agreement. Notice (Exhibit H) at p.1.

RESPONSE: Defendants admit that they received the letter dated October 2, 2018, and attached as Exhibit H to the Motion, from the Plaintiff's attorneys.  Other than a letter dated October 3, 2013, notifying GMNY (but not the Defendants) that a payment due on October 1, 2013, had not been paid (but which was subsequently paid), Defendants deny that GMNY or the Defendants ever received any other notice of past due payments under the terms of the Lease Agreement and the Guaranty and demand for payment of all amounts due under the Lease Agreement. (Neff Declaration, ¶ 10 (Exhibit 4).)

10.     The Guarantors admit that payments required under the Lease Agreement have not been made to Huntington. Answer (Doc. 24) at ¶ 13; Deposition Transcript of Garrett Alan Neff ("Neff Tr.") (Exhibit K) at 88:9-17. Deposition Transcript of John Mark Schmid ("J. Schmid Tr.") (Exhibit L) at 69:22-25; 85:1-5; Deposition Transcript of David Karl Schmid ("D. Schmid Tr.") (Exhibit M) at 41:21-23.

RESPONSE: Admitted.

11.    As of July 17, 2019, the principal amount due by GMNY to Huntington under the Lease Agreement is $8,962,074.79 (the "Amount Due"). Zimmeth Affidavit (Exhibit A) at ¶ 12.

RESPONSE:  Denied, in that the Plaintiff's Motion does not demonstrate that such principal amount is due and the Plaintiff's own internal communications belie such claim. (See 1/12/18 E-mail from Jasbir Aulakh to Mike Przytakoski, attached hereto as Exhibit 6;[1] Plaintiff Write Off Memo, attached hereto as Exhibit 7; Edward Kitchen Deposition, at p. 36-39, attached hereto as Exhibit 8.) Moreover, the purported "principal amount due" includes: (i) taxes, which are not owed (see Response to No. 5, supra); (ii) interest from February, 2015, and the Plaintiff is not entitled to interest for the majority of the period claimed (Neff Declaration ¶¶ 10-14 (Exhibit 4); Lease Agreement §§ 17, 25 (Exhibit 2)); and (iii) a Lessor's Return, to which, because the Lease Agreement was a financing transaction, not a true lease, and GMNY owned the Sign, the Plaintiff is not entitled. (Lease Agreement §§ 5, 6(b), 18, 19, 23 (Exhibit 2); 4th Amendment (Exhibit 3); Neff Declaration ¶¶ 5, 7 (Exhibit 4); John Zimmeth Deposition, at p. 80-83, attached hereto as Exhibit 9.) Further, the Defendants object insofar as this portion of the

---

[1] While Exhibit 6 is labeled "CONFIDENTIAL," counsel for the Plaintiff advised the undersigned that Huntington has withdrawn the "CONFIDENTIAL" designation as to Exhibit 6.

[1] The Defendants have filed a motion for summary judgment, Doc. No. 36, seeking a judgment that the Lease Agreement was a financing, not true lease.  The Defendants believe that there is no genuine issue of material fact that the Lease Agreement was a financing, but at the very least there are disputed issues of material fact as to whether the Lease Agreement was a financing or a true lease.

[1] The Defendants have filed a motion for summary judgment, Doc. No. 36, seeking a judgment that GMNY owned the Sign.  The Defendants believe that there is no genuine issue of material fact that GMNY owned the Sign, but at the very least there are disputed issues of material fact as to whether GMNY owned the Sign.

Statement relies on the Zimmeth Affidavit's improper legal conclusions, as more fully briefed in the Defendants' Memorandum at pp. 35-44.

12.     Huntington has not received any payment whatsoever from GMNY of rent or taxes in accordance with the terms of the Lease Agreement since a partial payment applied to the amount due on March 1, 2015. Id. at ¶ 16.

**RESPONSE:** Denied.  (Neff Affidavit ¶ 15 (Exhibit 4).) Further, the Defendants object insofar as this portion of the Statement relies on the Zimmeth Affidavit's improper legal conclusions, as more fully briefed in the Defendants' Memorandum at pp. 35-44.

13.     The total amount of past due rent and taxes owed is $6,568,663.35. Id. at ¶ 17.

**RESPONSE:** Denied, in that the Plaintiff's own internal communications belie such claim.  (*See* 1/12/18 E-mail from Jasbir Aulakh to Mike Przytakoski (Exhibit 6); Plaintiff Write Off Memo (Exhibit 7); Edward Kitchen Deposition, at p. 36-39, (Exhibit 8).) Additionally, denied in that taxes are not owed.  (*See* Response to No. 5, *supra*.)

14.     Past due amounts under the Lease Agreement accrue interest at the rate of 12-percent (12%) per annum. Lease Agreement (Exhibit B) at § 25.

**RESPONSE:** Denied. (Lease Agreement §§ 17, 25 (Exhibit 2).)

15.     As such, the total amount of interest on past due rent and taxes currently owed is $2,083,161.24. Zimmeth Affidavit (Exhibit A) at ¶ 17.

**RESPONSE:** Denied, in that taxes are not owed (*see* Response to No. 5, *supra*) and the Plaintiff is not entitled to interest for the majority of the period claimed. (*See* Neff Declaration ¶¶ 10-14 (Exhibit 4); Lease Agreement §§ 17 and 25 (Exhibit 2).) Further, the

8

Defendants object insofar as this portion of the Statement relies on the Zimmeth Affidavit's improper legal conclusions, as more fully briefed in the Defendants' Memorandum at pp. 35-44.

16.     In addition, Huntington is permitted to collect a Lessor's Return from GMNY which, pursuant to the agreed-upon formula set forth in the Lease Agreement, is equal to $283,075.00. Lease Agreement (Exhibit B) at §§ 18(d), 19.

**RESPONSE:** Denied, in that because the Lease Agreement was a financing transaction, not a true lease, and GMNY owned the Sign, the Plaintiff is not entitled to a Lessor's Return. (Lease Agreement §§ 5, 6(b), 18, 19, 23 (Exhibit 2); 4th Amendment (Exhibit 3); Neff Declaration ¶¶ 5, 7 (Exhibit 4); Zimmeth depo., at 80-83 (Exhibit 9).)

17.     The unpaid Lessor's Return accrues interest at the rate of 12-percent (12%) per annum, and as of July 17, 2019, the total amount of interest on the Lessor's Return currently owed is $27,175.20. Lease Agreement (Exhibit B) at § 25; Zimmeth Affidavit (Exhibit A) at ¶ 19.

**RESPONSE:** Denied, in that because the Lease Agreement was a financing transaction, not a true lease, and GMNY owned the Sign, the Plaintiff is not entitled to a Lessor's Return. (Lease Agreement §§ 5, 6(b), 18, 19, 23 (Exhibit 2); 4th Amendment (Exhibit 3); Neff Declaration ¶¶ 5, 7 (Exhibit 4); Zimmeth depo., at 80-83 (Exhibit 9).) Plaintiff is also not entitled to interest for the majority of the period claimed. (Neff Declaration ¶¶ 10-14 (Exhibit 4); Lease Agreement §§ 17, 25 (Exhibit 2).) Further, the Defendants object insofar as this portion of the Statement relies on the Zimmeth Affidavit's improper legal conclusions, as more fully briefed in the Defendants' Memorandum at pp. 35-44.

9

18.     In pertinent part, Section 2 of the Guaranty provides as follows:

As Guarantor will derive commercial benefit from the provisions of this Guaranty, and in order to induce Macquarie to enter into the Agreements, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor unconditionally guarantees to [Huntington] the full and prompt payment, observance and performance when due of all obligations of [GMNY] arising under the Agreements. This Guaranty is absolute, continuing, unlimited, and independent, and shall not be affected, diminished or released for any reason whatsoever . . .

Guaranty (Exhibit C) at § 2.

RESPONSE: Admitted, in that the above quote of the Guaranty is accurate.

19.     The guaranteed "Agreements" are defined as:

"any and all of the various agreements, instruments, documents, or other arrangements . . . by [GMNY] in favor of [Huntington] or which [Huntington] may be entitled to the benefit of . . . including any personal property leases, and also including any security agreements, collateral agreements, or other agreements entered into in connection with any of the foregoing . . in connection with a loan, lease, or other financial accommodation made by [Huntington] to or for [GMNY], or in connection with any other transition to which [GMNY] is a party or otherwise bound . . .

Id. at § 1.

RESPONSE: Admitted, in that the above quote of the Guaranty is accurate.

20.     By letter correspondence dated December 5, 2018 and provided to Huntington on or about December 17, 2018, Huntington was advised by Outfront that GMNY failed to make payment when due to Outfront under the terms of a Display Agreement by and between those parties. Outfront letter correspondence (Exhibit J) at p.1.

RESPONSE: Defendants lack knowledge or information sufficient to form a belief about the accuracy of the statement in paragraph 20 because no December 5, 2018,

correspondence to Huntington was produced in discovery and is not otherwise provided by the Plaintiff in its Local Rule 56(a)(1) Statement.

21.     As a result of GMNY's default, Outfront drew on the entire principal balance of the Letter of Credit in the amount of $600,000.00 in or about December 2018. Id.

**RESPONSE:** Defendants admit that in the December 17, 2018, letter annexed as Exhibit J to the Motion, Outfront Media states to the Plaintiff that in the judgment of Outfront Media GMNY was in default under the Display Agreement and makes a demand for payment under a letter of credit issued to Outfront Media by Huntington. Because the Plaintiff's Complaint in this action does not make any claim or seek damages in connection with such letter of credit, Defendants did not conduct discovery related to such letter of credit, and accordingly Defendants lack knowledge or information sufficient to form a belief about whether Huntington made payment to Outfront Media on the letter of credit or any other matter regarding such letter of credit. (Lease Agreement (Exhibit 2); Complaint (Exhibit 10).)

22.     Huntington made demand for reimbursement of all amounts drawn under the Letter of Credit. Letter of Credit Demand dated January 2019 (Exhibit S) at p.1.

**RESPONSE:** Defendants admit that GMNY received the letter dated January 23, 2019, from the Plaintiff's counsel and annexed as Exhibit S to the Motion, in which the Plaintiff's counsel asserted that Outfront Media drew on the foregoing letter of credit in the amount of $600,000.00 and made demand that GMNY reimburse the Plaintiff in the amount of $600,000.00.  Because the Plaintiff's Complaint in this action does not make any claim or seek damages in connection with such letter of credit, Defendants did not

11

conduct discovery related to such letter of credit, and accordingly Defendants lack knowledge or information sufficient to form a belief about whether Huntington made payment to Outfront Media on or any other matter regarding such letter of credit. (Lease Agreement (Exhibit 2); Complaint (Exhibit 10).)

23.    GMNY's past due reimbursement obligation for the Letter of Credit accrues interest at the rate of 12-percent (12%) per annum. Lease Agreement (Exhibit B) at § 25.

**RESPONSE:** Denied, in that any reimbursement obligation of GMNY in connection with the letter of credit is not an amount due under the Lease Agreement.  (Lease Agreement (Exhibit 2).)

24.    The Lease Agreement is a guaranteed "Agreement" under the Guaranty because it is a personal property lease executed in favor of Huntington pursuant to which Huntington is entitled to the benefit of payment. Guaranty (Exhibit C) at § 2.

**RESPONSE:** Denied, in that the Lease Agreement was a financing transaction, not a true lease, and GMNY owned the Sign.  (Lease Agreement §§ 5, 6(b), 23 (Exhibit 2); 4th Amendment (Exhibit 3); Neff Declaration ¶¶ 5, 7 (Exhibit 4); Zimmeth depo., at 80-83 (Exhibit 9).)

25.    Similarly, the Letter of Credit falls within the ambit of the Guaranty because it was issued in connection with the Lease Agreement and is otherwise a financial accommodation made by Huntington for the benefit of GMNY. Id.

**RESPONSE:** Denied, in that the Letter of Credit is not an obligation under the Lease Agreement.  (Lease Agreement (Exhibit 2).)

26.    The Guarantors admit that they executed the Guaranty and that a true and

12

correct copy thereof was appended to the Complaint. Neff Tr. (Exhibit K) at 37:3-21; J. Schmid Tr. (Exhibit L) at 23:14-22, 24:1; D. Schmid Tr. (Exhibit M) at 24:22-25; Answer (Doc 24) at ¶ 11.

**RESPONSE: Admitted.**

27.     By executing the Guaranty, the Guarantors "unconditionally" guaranteed the full and prompt payment of all amounts due from GMNY to Huntington. Guaranty (Exhibit B) at § 2. Guarantors' obligations to Huntington are "absolute, continuing, unlimited, and independent, and shall not be affected, diminished, or released for any reason whatsoever . . ." Id. Furthermore, Guarantors waived "demand, protest or notice of any default or nonperformance by [GMNY], [and] all affirmative defenses, offsets and counterclaims against [Huntington] . . ." Id. at § 3.

**RESPONSE: Defendants deny that by executing the Guaranty they unconditionally guaranteed the full and prompt payment of all amounts due from GMNY to the Plaintiff, in that the Guaranty provides that the Defendants guaranteed obligations of GMNY arising under the Agreements, not all amounts due from GMNY to the Plaintiff. (Guaranty (Exhibit 5).) The Defendants admit the balance of paragraph 27.**

28.     Moreover, Guarantors agreed to pay all costs and expenses, including all court costs and legal fees and expenses, incurred by Huntington in connection with the enforcement of the Guaranty. Id. at ¶ § 7.

**RESPONSE: Defendants admit that the statement of paragraph 28 accurately reflects the language of the section 7 of the Guaranty.**

29.     Huntington has incurred legal fees and costs of $92,283.32.  Affidavit of

Edward Kitchen ("<u>Kitchen Affidavit</u>") (Exhibit N) at ¶ 9.  This amount includes sums billed by Huntington's counsel from inception of the matter to and including July 2019, with additional amounts to accrue thereafter. <u>Id</u>. at ¶ 5.

<u>RESPONSE:</u> Defendants lack knowledge or information sufficient to form a belief about the allegations asserted in paragraph 29 because the Defendants do not know how much the Plaintiff has incurred in legal fees and costs. The Defendants admit that the $92,283.32 figure stated in paragraph 29 accurately reflects the sum of the two figures in paragraph 9 of the Kitchen Affidavit, attached to the Motion as Exhibit N.

30.     The Sign is an electronic billboard that displays advertisements for various companies, including Netflix, Facebook, and Twitter. Neff Tr. at 168:2-10.

<u>RESPONSE:</u> Admitted.

31.     At or near the inception of the Lease Agreement, GMNY retained A2a Media, Inc. ("<u>A2a</u>") as its sales agent in connection with the Sign. Answer (Doc. 24) at ¶ 36.

<u>RESPONSE:</u> Admitted.

32.     A2a consistently failed to reach its sales projections. Neff Tr. at 124:3-15.

<u>RESPONSE:</u> Admitted.

33.     By way of example, for the sales period July 1, 2011 to December 31, 2011, the minimum sales goal was $1,710,000, but actual sales totaled only $1,456,000. Letter correspondence from GMNY to A2a dated January 10, 2012 (Exhibit P) at p.1.

<u>RESPONSE:</u> Admitted.

34.     GMNY was understandably dissatisfied with A2a's sales efforts, and urged

A2a to institute corrective measures. Id.

**RESPONSE: Admitted.**

35.    When A2a failed to meaningfully increase sales figures, GMNY elected to convert A2a to a non-exclusive sales agent. Letter correspondence from GMNY to A2a dated June 26, 2012 (Exhibit Q) at p1.

**RESPONSE: The Defendants admit that GMNY converted A2a to a non-exclusive sales agent. The Defendants lack knowledge or information sufficient to form a belief about the remainder of paragraph 35 because the Defendants do not know what definition the Plaintiff gives to the term "elected."**

36.    In late-2013, GMNY retained Field Activate to evaluate the current marketing strategy for the Sign, including A2a's performance as sales agent. Neff Tr. (Exhibit K) at 143:1-25, 144:1-23; Field Activate Brand Research Immersion Program report (the "Field Activate Report") (Exhibit O) at p.2.

**RESPONSE: Admitted.**

37.    Among other things, Field Activate concluded that A2a had very little visibility in the New York, New York market and that its sales efforts were deficient. Field Activate Report (Exhibit O) at p.13. As a result, Field Activate recommended that GMNY terminate its relationship with A2a. Id. at p.29.

**RESPONSE: Defendants admit that Field Activate stated that A2a had very little visibility and recommended that GMNY terminate its relationship with GMNY.  Defendants deny that Field Activate stated that A2a's sales efforts were deficient.  (Field Activate Report, p. 13 (Exhibit 11).)**

38.     Field Activate further advised GMNY that it should develop an RFP process to help select potential firms to act as sales agent. Id. GMNY agreed with this recommendation and proceeded to create an RFP document. Neff Tr. (Exhibit K) at 150:3-14.

**RESPONSE:** Defendants admit that Field Activate advised GMNY that it should develop an RFP process to help select potential firms to act as sales agents and that GMNY agreed with this recommendation. Defendants deny that GMNY created an RFP document.  (Gary Neff Deposition, at 150:24-25 (Exhibit 12); Neff Declaration, at ¶ 22 (Exhibit 4).)

39.     After the RFP process began, GMNY received proposals from various ad agencies, including Clear Channel, A2a, Big Outdoor, and Radiant Outdoor.  Id. at 152:9-15.

**RESPONSE:** Admitted.

40.     Ultimately, Clear Channel and A2a were invited to make presentations to GMNY. Id. at 157:7-15. The decision to invite Clear Channel and A2a to present was made by GMNY with advice from Field Activate; Huntington was not involved. Id.

**RESPONSE:** Defendants admit that Clear Channel and A2a were invited to make presentations to GMNY and that the decision to invite Clear Channel and A2a to present was made by GMNY with advice from Field Activate.  Defendants deny that the Plaintiff was not involved. (Neff Declaration, at ¶ 22 (Exhibit 4); Emails of Andrew Feldstein (Exhibit 14); Declaration of John Schmid In Support of Defendants' Objection to Plaintiff's Motion For Summary Judgment, at ¶ 15 (Exhibit 13).)

41.     The final decision to terminate A2a and retain Clear Channel was made by GMNY's principals, and them alone. <u>Id</u>. at 159:6-12.

**RESPONSE:** Denied.  (Neff Declaration, at ¶ 20-22 (Exhibit 4); J. Schmid Declaration, at ¶¶ 13-15 (Exhibit 13).)

42.     On or about March 23, 2014, GMNY terminated its agreement with A2a. Letter correspondence from GMNY to A2a dated March 23, 2014 (Exhibit R) at p.1.

**RESPONSE:** Admitted.

43.     A2a was terminated because A2a had "failed to build the sales team or achieve the annual sales objectives both projected by [A2a] and required to support [the] project." <u>Id</u>.

**RESPONSE:** Denied.  (Neff Declaration, at ¶¶ 20-22 (Exhibit 4); J. Schmid Declaration, at ¶¶ 13-15 (Exhibit 13).)

44.     Thereafter, GMNY proceeded to formalize its new partnership with Clear Channel. Huntington did not participate in the negotiation of GMNY's agreement with Clear Channel. Neff Tr. at 160:3-9.

**RESPONSE:** GMNY admits that it formalized its relationship with Clear Channel.  GMNY denies that the Plaintiff did not participate in the negotiation of GMNY's agreement with Clear Channel.   Among other things, the Plaintiff's in-house counsel participated directly in the negotiation of GMNY's agreement with Clear Channel.  (Neff Declaration, at ¶ 22 (Exhibit 4); J. Schmid Declaration, at ¶ 15 (Exhibit 13); Emails of Andrew Feldstein (Exhibit 14).)

45.     The Sign was purchased from and installed by GKD-USA, Inc. ("<u>GKD</u>").

17

**Answer (Doc. 24) at ¶ 28.**

**RESPONSE: Admitted.**

46.     In July, 2011, the first of a series of system failures with the Sign occurred, and all told, the Sign has experienced dozens of significant technical problems. <u>Id</u>. at ¶ 35. GKD performed service on the Sign, but never fully remedied the technical issues. <u>Id</u>.

**RESPONSE: Admitted.**

47.     Notwithstanding these ongoing technical issues, GMNY never considered filing a lawsuit against GKD. Neff Tr. at 70:6-8, 22-23.

**RESPONSE: Denied.  (Neff Declaration, at ¶ 25 (Exhibit 4); J. Schmid Declaration, at ¶ 18 (Exhibit 13); John Schmid Deposition, pp. 54:12-25, 55:1-17 (Exhibit 17).)**

<u>**ADDITIONAL MATERIAL FACTS**</u>

1.     Mr. Zimmeth exchanged private communications with representatives of the Port Authority without including representatives of GMNY, including the Defendants, on such communications. (Email July 2017 Email Exchange Between John Zimmeth and Gerard Del Tufo (Exhibit 15).) In one such private communication on July 21, 2017, Mr. Zimmeth advises the Port Authority's representative that for some time "[GMNY] has not made a single payment to meet their financial obligations to Huntington." (*Id*.)

2.     Mr. Zimmeth's representations to representatives of the Port Authority about GMNY not making timely payments to Huntington harmed GMNY's relationship with the Port Authority. (J. Schmid Deposition, p. 60:19-25, 61:1-3 (Exhibit 17).)

3.      Huntington designated both Mr. Zimmeth and Mr. Kitchen as Fed. R. Civ. P. 30(b)(6) witnesses in this matter. (Email Exchange Between Counsel for Defendants and Huntington (Exhibit 16).)

4.      The Lease Agreement terminated as of December 31, 2018. (Lease Agreement, p. 1 (Exhibit 2).)  Upon termination of the Lease Agreement, title to the Sign automatically transferred to the Port Authority, so that GMNY's business has been completely destroyed. (Neff Declaration, at ¶ 28 (Exhibit 4).)

5.      UCC Article 9 governs the transaction between the Plaintiff and GMNY because, *inter alia*, pursuant to section 22(a) of the Lease Agreement, GMNY "grant[ed] [Huntington] a first priority continuing security interest in all of its assets and property of any kind or nature whatsoever as security for all of its obligations under this Lease…." (Lease Agreement, § 22(a) (Exhibit 2); N.Y. U.C.C. Law § 9-109)

6.      Mr. Zimmeth stated both as a Fed. R. Civ. Pro. 30(b)(6) witness and identified as a person with knowledge regarding the claims made in the Complaint that Huntington's exposure to GMNY was only $3,820,708.65. As of the date of his deposition, Mr. Zimmeth had no knowledge of the amount allegedly due Huntington by GMNY. (Zimmeth depo., at 69-71 (Exhibit 9.))

7.      Through GMCT, the Defendants control GMNY.  GMNY consents to the Defendants asserting any affirmative defenses belonging to GMNY in this action. (Neff Declaration, at ¶ 2 (Exhibit 4); J. Schmid Declaration, at ¶ 2 (Exhibit 13).)

8.      In connection with the execution of the Lease Agreement, GMCT entered into a guaranty of all of GMNY's obligations under the Lease Agreement. (Guaranty

19

(Exhibit 18).)

9.      In connection with the execution of the Lease Agreement, to secure its obligations under the Lease Agreement, GMCT entered into a Pledge and Security Agreement, pursuant to which it, among other things, granted Macquarie Equipment Finance, LLC ("Macquarie") a lien on, security interest in, and right of setoff against, among other property, general intangibles and "all of the stock, shares, membership interests, partnership interests and other equity ownership interests in [GMNY] now or hereafter held by [GMCT] (collectively, the "Ownership Interests") and all of [GMCT]'s rights to participate in the management of [GMNY], [and] all rights, privileges, authority and powers of [GMCT] as owner or holder of Ownership Interests in [GMNY] . . . ." (Pledge and Security Agreement, § 2, at pp. 3-5 (Exhibit 19)).)

10.     In connection with the execution of the Lease Agreement, the Defendants entered into a Pledge Agreement, pursuant to which they, among other things, granted Macquarie a lien on, security interest in, and right of setoff against, among other property, "all of the stock, shares, membership interests, partnership interests and other equity ownership interests in [GMCT] now or hereafter held by [the Defendants] (collectively, the "Ownership Interests") and all of [the Defendants]' rights to participate in the management of [GMCT], [and] all rights, privileges, authority and powers of [the Defendants] as owner or holder of Ownership Interests in [GMCT] . . . ." (Pledge Agreement, § 2, pp. 2-3 (Exhibit 20)).)

11.     GMNY was formed for the purpose of owning and operating a Mediamesh outdoor advertising sign (the "Sign") affixed to the Port Authority Bus Terminal in New

York City. (Neff Declaration, ¶ 4.)

12.     GMNY and CBS Outdoor Media ("CBS") entered into a Display Agreement dated as October 26, 2010.  The Port Authority of New York and New Jersey (the "Port") agreed to and acknowledged the Display Agreement.  (Display Agreement, p. 14 (Exhibit 21).  CBS and the Port had earlier entered into a Permit Agreement dated May 20, 1996 (as amended, the "Permit Agreement"), pursuant to which CBS was given permission by the Port to install and operate an outdoor advertising sign on the exterior of the Port Bus Terminal (the "PA Terminal") in New York City. Id. at p. 1. The Permit Agreement granted CBS the right to license its rights to a third party with the prior approval of the Port.  Id.  Pursuant to the Display Agreement, CBS licensed its rights under the Permit Agreement to GMNY for the purpose of granting GMNY the right to install a Mediamesh digital sign (the "Sign") on the PA Terminal.  Id.

13.     GMNY, GMCT, A2a Media, Inc., GKD and the Plaintiff entered into an Equipment Purchase Agreement, attached hereto as Exhibit 21, pursuant to which, among other things, GKD agreed to sell and construct the Sign. Exhibit A-1 to the Equipment Purchase Agreement provides that the total purchase price of the Sign is $6,026,000.00. (Exhibit 21, pp. 22-28.)

14.     In order to finance the purchase and installation of the Sign, on October 26, 2010, GMNY entered into that certain Lease No. 001, dated October 26, 2010 (the "Lease Agreement"), with the Plaintiff. (Exhibit 10, ¶ 8 and Exhibit A; Exhibit 23, ¶ 8.) GMNY granted the Plaintiff a security interest in all of its assets and property of any kind or nature whatsoever as security for its obligations under the Lease Agreement. (Lease

21

Agreement, ¶ 22 (Exhibit 2).)

15.     In connection with the execution of the Lease Agreement, the Defendants signed the Guaranty. (Exhibit 5.)

16.     At various dates after October 26, 2010, the Lease Agreement was amended by the following (the Lease Agreement, as amended, the "Lease Documents"): Amendment No. 1 dated June 13, 2010; Amendment No. 2 dated July 28, 2011 ("Amendment 2"); Amendment No. 3 dated September 1, 2012; Amendment dated as of March 31, 2013 ("Amendment 4"). (Exhibit 10, ¶ 9 and Exhibit B, C, D, and E; Exhibit 23, ¶ 9.)

17.     Pursuant to Amendment 2, in total GMNY borrowed $7,041,952.00 from the Plaintiff, $1,050,000.00 of which was used to fund a security deposit to secure GMNY's obligations to the Plaintiff.  (Exhibit 10, at Exhibit C ¶ A; Neff Declaration ¶ 5.)

18.     GMNY made payments to the Plaintiff under the Lease Documents totalling $5,522,724.81.  Approximately $490,141.82 of this amount was on account of sales taxes paid over by the Plaintiff to the applicable government entities.  In addition, the Plaintiff applied the $1,050,000.00 security deposit to GMNY's obligations under the Lease Documents.  (Neff Declaration ¶ 6.)

19.     On its federal and state tax returns, GMNY treated the Lease Documents as a financing arrangement, in that it included the Sign as an asset on its balance sheet, included the amount due under the Lease Documents as a liability on its balance sheet, and claimed deprecation with respect to the Sign.  GMNY provided copies of its federal and state tax returns to the Plaintiff.  (Neff Declaration ¶ 7.)

20.     While in its Complaint the Plaintiff alleges that $8,302,118.35 is owed by the Defendants under the Lease Documents (Exhibit 10, ¶ 16) in its internal records and communications the Plaintiff recognized that its net exposure was between $3.8 million and $3.9 million at various times in 2018.  (1/12/18 E-mail from Jasbir Aulakh to Mike Przytakoski (Exhibit 6); Plaintiff Write Off Memo (Exhibit 7).) Edward Kitchen, the workout person assigned to the GMNY account, designated by the Plaintiff as a 30(b)(6) witness and identified as a person with knowledge regarding the claims made in the Complaint in responses to interrogatories, was able to give essentially no explanation of the amount that the Plaintiff claims is owed by GMNY beyond the approximately $3.8 figure stated in the foregoing documents when questioned at his deposition. (Kitchen Depo., at pp. 36-39 (Exhibit 8).)

21.     The Sign went "live" on June 10, 2010.  In July, 2011, the first of a long series of system failures with the Sign occurred.  The Sign has experienced dozens of significant technical problems and system failures.  (Neff Declaration, ¶ 9.)

22.     Between February, 2015, and October 2, 2018, the Plaintiff did not send a written notice to GMNY that GMNY had failed to pay any Rental Payment (as defined in the Lease Documents) or other amount due under the Lease Documents. (Neff Declaration ¶10.)

23.     Monthly invoices that the Plaintiff sent to GMNY from October, 2015 through March, 2018, did not include any amount due for late or default interest.  (Neff Declaration ¶ 11.)

24.     An aging report that the Plaintiff sent to GMNY in March, 2016, did not

include any amount due for late or default interest.  (Neff Declaration ¶ 12.)

25.    Prior to October 2, 2018, the Plaintiff never made a demand for payment of late or default interest and never gave GMNY any indication or notice that the Plaintiff asserted that default or late interest was due or accruing.  (Neff Declaration ¶ 13.)

26.    Until October 2, 2018, the Plaintiff never notified GMNY of the occurrence of an Event of Default under the Lease Documents or sought to exercise it remedies under Paragraph 18 of the Lease Agreement.  (Neff Declaration ¶ 14.)

## DISPUTED ISSUES OF MATERIAL FACT

1.    Whether the Lease Agreement was a financing or a true lease.[2] (Neff Declaration, ¶¶ 5-7 (Exhibit 4); Lease Agreement, §§ 5, 6(b), 7, 23 (Exhibit 2); 4th Amendment (Exhibit 3).)

2.    Whether GMNY owned the sign or leased the Sign from the Plaintiff. [3] (Neff Declaration, ¶¶ 5-7 (Exhibit 4); Lease Agreement, §§ 5, 6(b), 7, 23 (Exhibit 2); 4th Amendment (Exhibit 3).)

3.    Whether the Plaintiff furnished GMNY and/or the Defendants with notice of past due payments under the Lease Agreement and/or the Guaranty and demanded payment of amounts due under the Lease Agreement, other than by letter dated October

---

[2] The Defendants have filed a motion for summary judgment, Doc. No. 36, seeking a judgment that the Lease Agreement was a financing, not a true lease.  The Defendants believe that there is no genuine issue of material fact that the Lease Agreement was a financing, but at the very least there are disputed issues of material fact as to whether the Lease Agreement was a financing or a true lease.

[3] The Defendants have filed a motion for summary judgment, Doc. No. 36, seeking a judgment that GMNY owned the Sign.  The Defendants believe that there is no genuine issue of material fact that GMNY owned the Sign, but at the very least there are disputed issues of material fact as to whether GMNY owned the Sign.

2, 2018.  (Neff Declaration, ¶¶ 10-14 (Exhibit 4).)

4.      Whether the Plaintiff demanded that GMNY replace A2a Media, Inc. as GMNY's sales agent.  (Neff Declaration, at ¶ 20 (Exhibit 4); J. Schmid Declaration, at ¶ 13 (Exhibit 13).)

5.      Whether the Plaintiff exerted control over GMNY's relationship with GKD and/or with respect to GMNY's claims, and the pursuit of said claims, against GKD.  (Neff Declaration, at ¶ 25 (Exhibit 4); J. Schmid Declaration, at ¶ 18 (Exhibit 13); J. Schmid Deposition, pp. 54:12-25, 55:1-17 (Exhibit 17).)

6.      Whether the Plaintiff and/or its representatives interfered with GMNY's relationship with the Port Authority, including by advising representative(s) of the Port Authority that GMNY was not paying its obligations to Huntington in a timely fashion.  (Neff Declaration, at ¶ 26 (Exhibit 4); J. Schmid Declaration, at ¶ 17 (Exhibit 13); (Email July 2017 Email Exchange Between John Zimmeth and Gerard Del Tufo (Exhibit 15).)

7.      The amount of the debt allegedly due the Plaintiff by GMNY.

8.      Whether any taxes are due to the Plaintiff under the Lease Agreement.  (Neff Declaration, ¶¶ 6-8 (Exhibit 4); Lease Agreement, §§ 5, 6(b), 7, 23 (Exhibit 2); 4th Amendment (Exhibit 3).)

9.      The amount of interest due to the Plaintiff, if any, on any amount due to the Plaintiff.  (Neff Declaration, ¶¶ 10-14 (Exhibit 4); Lease Agreement §§ 17 and 25 (Exhibit 2).)

10.     Whether the Plaintiff is entitled to the Lessor's Return.  (Lease Agreement §§ 5, 6(b), 18, 19, 23 (Exhibit 2); 4th Amendment (Exhibit 3); Neff Declaration, ¶¶ 5, 7

(Exhibit 4); Zimmeth depo., at 80-83 (Exhibit 9).)

11.    Whether the actions of the Plaintiff and/or its representatives interfered with GMNY's right to quiet use and enjoyment of its business and property, including the Sign.  (Neff Declaration, at ¶¶ 20-29 (Exhibit 4); J. Schmid Declaration, at ¶¶ 13-22 (Exhibit 13).)

12.    Whether the actions of the Plaintiff and/or its representatives constitute a breach of the Plaintiff's duties of good faith, reasonableness, care, and diligence as to GMNY.  (Neff Declaration, at ¶¶ 20-29 (Exhibit 4); J. Schmid Declaration, at ¶¶ 13-22 (Exhibit 13).)


GARETT ALAN NEFF ALSO KNOWN AS GARY NEFF, JOHN MARK SCHMID AND DAVID KARL SCHMID

 /s/ Eric A. Henzy
Eric A. Henzy (ct12849)
Christopher H. Blau (ct30120)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06604
Telephone: 203-368-4234
Email: ehenzy@zeislaw.com
           cblau@zeislaw.com