```
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF CONNECTICUT

 3                                       )
      HUNTINGTON TECHNOLOGY
 4    FINANCE, INC., f/k/a               )
      Macquarie EQUIPMENT FINANCE,
 5    INC., f/k/a Macquarie             )
      EQUIPMENT FINANCE, LLC
 6                    Plaintiff,         )

 7    vs                                )   Case No. 3:18CV01708(VLB)

 8    GARRETT ALAN NEFF, a/k/a          )
      GARY NEFF, JOHN MARK SCHMID,
 9    and DAVID KARL SCHMID,            )
                    Defendants.

10

11

12

13    DEPOSITION OF:  EDWARD J. KITCHEN
      DATE:           May 9, 2019
      HELD AT:        Carmody Torrance Sandak & Hennessey LLP
14                    195 Church Street
                      New Haven, Connecticut 06510
15

16

17

18

19

20

21

22

23
           Reporter:  THEA FINKELSTEIN, RMR, CRC, LSR 126
24                    Cassian Reporting, LLC
                      21 Oak Street
25                    Hartford, Connecticut 06106
                      860-595-7462
```

EXHIBIT

T

```
 1
        APPEARANCES:
 2

 3        Representing the Plaintiff:

 4            METZ LEWIS BRODMAN MUST O'KEEFE
              535 Smithfield Street
 5            Suite 800
              Pittsburgh, PA 15222
 6            412-918-1133
              jokeefe@metzlewis.com
 7            JOHN R. O'KEEFE, JR., ESQ.

 8

 9        Representing the Defendants:

10            ZEISLER & ZEISLER, P.C.
              10 Middle Street
11            15th Floor
              Bridgeport, CT 06604
12            203-368-5465
              cblau@zeislaw.com
13            By:  CHRISTOPHER H. BLAU, ESQ.

14        Also Present:

15            ROB MACE, SENIOR VICE-PRESIDENT and
              SPECIAL ASSETS SENIOR DIRECTOR
16            THE HUNTINGTON NATIONAL BANK
              7 Easton Oval
17            EA4W67
              Columbus, OH 43219
18            614-480-1537
              Robert.Mace@Huntington.com
19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2

 3      Examinations                                    Page

 4      EDWARD J. KITCHEN

 5        Direct Examination by Mr. Blau                  4

 6

 7    E X H I B I T S

 8      No.           Description                        Page

 9      1        International Systems, Notification in    11
                 Account Officer 12/7/17 Bates HTF000766
10
        2        Garage Media Account - Amort Profile      29
11               Bates HTF000056

12
        3        Email chain, to Edward Kitchen from Norman   29
13               Solomon 11/5/2015 Bates HTF009088

14      4        Email to Edward Kitchen from John          32
                 Maurer 11/5/2015 Bates HTF009097
15
        5        Email chain, to Edward Kitchen from Norman   34
16               Solomon 6/25/15 Bates HTF009098

17      6        Email chain, to Gerard Del Tufo from Edward   35
                 Kitchen 1/12/2018 Bates HTF001829
18
        7        Email chain, to John Glodich from Edward    36
19               Kitchen 1/17/2018 Bates HTF001802

20      8        Email to Rob Mace from Edward Kitchen       39
                 2/12/2018 Bates HTF001698
21
        9        Email chain, to Michael DiCecco from John   40
22               Zimmeth 3/19/2018 Bates HTF004332

23      10       SAD Transfer, 12/7/2017 Bates HTF006655     42

24      11       Email chain to Edward Kitchen from Donald   43
                 Helmrich 9/20/2018 Bates HTF002066
25
                 (Original exhibits retained by the reporter.)
```

Page 4

1    (Deposition commenced at 10:00 a.m.)
2        EDWARD J. KITCHEN
3    310 Grant Street, Pittsburgh, Pennsylvania 15299
4    having been called as a witness, was first duly
5    sworn/affirmed, and testified on his oath as
6    follows:

8        THE REPORTER:  Stipulations?
9        MR. O'KEEFE:  It's federal, so no.  Read and sign.
10       DIRECT EXAMINATION
11  BY MR. BLAU:
12       Q.  Good morning, Mr. Kitchen.
13       A.  Good morning.
14       Q.  My name is Chris Blau.  We met briefly off the record.
15  I represent the Schmids and Mr. Neff in a lawsuit brought by
16  Huntington.  Obviously here to take your deposition today.
17       Have you been deposed before.
18       A.  Yes.
19       Q.  How many times?
20       A.  Couple.
21       Q.  In connection with your employment at Huntington?
22       A.  No.
23       Q.  So fair to say they didn't involve any guaranties or
24  anything of that nature?
25       A.  No.

Page 5

1        MR. O'KEEFE:  Object to form.
2        You can answer.
3        Q.  Just to review the ground rules, please only provide
4   verbal answers so the court reporter can get your response.
5   I'll try to not talk over you if you try to not talk over me,
6   again so the court reporter can get everything down.
7        If at any point my question doesn't make sense, it's
8   confusing, or you didn't hear me, please ask me to clarify.  If
9   you do provide an answer, I'll assume that you understood the
10  question.  Is that fair to say?
11       A.  Yes.
12       Q.  If you want a break at anytime, let me know.  Totally
13  fine.  I would just ask if there's a question pending, that you
14  provide an answer before taking the break.  Is that okay?
15       A.  Yes.
16       Q.  If, for some reason, you remember any additional
17  information later about a question I previously asked, please
18  volunteer it, let me know.  I'm here to get whatever
19  recollection you have about the questions I'm asking.
20       If you think there's a document that would help, let me
21  know and we can see if either I have it or it can be made
22  available.
23       Do all those ground rules make sense.
24       A.  Yes.
25       Q.  Is there any reason why you would not be able to

Page 6

1   testify truthfully today, or recall accurately?
2        A.  No.
3        Q.  Besides speaking to counsel, how did you prepare for
4   today's deposition?
5        A.  Gleaned over, I think, the document.  I didn't look
6   over a whole lot of information.
7        Q.  What do you mean by the document?
8        A.  The complaint.
9        Q.  Okay.  Did you review any other documents?
10       A.  No.
11       Q.  Any particular part of the complaint that you reviewed
12  or just read through the thing just to make sure that you knew
13  what this was about?
14       MR. O'KEEFE:  Object to form.
15       You can answer.
16       A.  Yes, just to review.  That's it.
17       Q.  Did you speak to anyone besides counsel in connection
18  with today's deposition?
19       A.  No.
20       Q.  Have you spoken to Mr. Zimmeth after his deposition?
21       A.  No.
22       Q.  Have you spoken to Ms. Magrin after her deposition?
23       A.  No.
24       Q.  Very briefly, I want to get into your background.  You
25  went to college?

Page 7

1        A.  Yes.
2        Q.  Where did you go to college?
3        A.  Robert Morris.
4        Q.  And did you receive a degree?
5        A.  No.
6        Q.  How many credits did you get?
7        A.  It's been some time.  I don't recall.
8        Q.  Do you recall how many years you went there?
9        A.  Three.
10       Q.  Do you have any other certifications or professional
11  qualifications or anything like that?
12       MR. O'KEEFE:  Object to form.
13       You can answer.
14       A.  Yes.
15       Q.  What are those?
16       A.  An Act 235, state of Pennsylvania.
17       Q.  Can you explain to me what that is?
18       A.  It's a security, high security, basics.  It's called
19  certified agent.  Typically you can work security, you can
20  transport people.
21       Q.  So like a private security?
22       A.  Um-hum, yes.
23       Q.  I assume that was in connection with some prior job,
24  not your current job at Huntington, right?
25       A.  Correct.

Page 8

1  Q.  How long have you been at Huntington?

2  A.  Be ten years in June.

3  Q.  So early 2009?  June 2009?

4  A.  June 2009.

5  Q.  And when you joined Huntington in June 2009, what was

6  your title?

7  A.  Special assets rep.  Workout officer.

8  Q.  And what kind of duties and responsibilities did you

9  have in that job?

10  A.  Risk management.  Handled trouble loans, nonpayment.

11  Q.  Okay.  Is that your current title now?

12  A.  Yes.

13  Q.  And fair to say your job responsibilities are about the

14  same as they were in June 2009?

15  A.  Yes.

16  Q.  Do you have any information about the merger between or

17  purchase between Huntington and Macquarie?

18  A.  No.

19      MR. O'KEEFE: Object to form.

20  Q.  In some of the documents I'm going to show you today,

21  there are some acronyms.  HTF and HNB.  I can get into the

22  documents, but my understanding is that HTF is Huntington

23  Technology Finance and HNB is Huntington National Bank.  Is that

24  fair to say?

25  A.  Yes.

Page 9

1  Q.  What's the difference between those two organizations?

2  A.  Different arm for providing financing.

3  Q.  Okay.  So what type of financing does Huntington

4  Technology Finance provide?

5  A.  Say leasing for just equipment.  Various types of

6  equipment.  Could be hospital, those type of financing

7  arrangements.

8  Q.  Okay.  And what type of services does Huntington

9  National Bank provide?

10  A.  Commercial loans, retail.

11  Q.  And which do you work for?

12  A.  Huntington National Bank.

13  Q.  When did you first learn of -- I'm going to say GMNY

14  but can we agree GMNY means Garage Media New York?

15  A.  (Nodding head.)

16  Q.  When did you first learn of GMNY's existence?

17  A.  When it was transferred into our department.

18  Q.  And when was that?

19  A.  January 2018 -- let me rephrase that.  End of December

20  2017, January 2018.

21  Q.  And when you say you were transferred into our

22  department, what do you mean?

23      MR. O'KEEFE: Object to form.

24      Go ahead.

25  A.  Servicing.

Page 10

1  Q.  What do you mean by that?

2  A.  Nonpayment.

3  Q.  Okay.  So because GMNY was not paying on its

4  obligations, you were transferred in to oversee the --

5      MR. O'KEEFE: Object to form.  I don't think he said

6  he was transferred in.  He said it was transferred in.

7      MR. BLAU:  Oh, apologies.

8      MR. O'KEEFE: You were going down the wrong path.

9  Q.  So GMNY was transferred into your department --

10  A.  Yes.

11  Q.  -- because of nonpayment?

12  A.  Default.

13  Q.  Do you have any knowledge about the origins of, at the

14  time, Macquarie's loan financing with GMNY?

15      MR. O'KEEFE: Object to form.

16      You can answer.

17  A.  No.

18  Q.  So you don't have any information about how the

19  technology for the sign was selected?

20  A.  No.

21  Q.  Earlier, you testified that Huntington Technology

22  Finance provides financing for various types of equipment,

23  correct?

24      MR. O'KEEFE: Object to form.

25      You can answer.

Page 11

1  A.  Yes.

2  Q.  And what types -- I think you mentioned hospital

3  equipment, correct?

4  A.  Yes.  Computer equipment, things of that nature.

5  Q.  How many advertising signs are financed by Huntington

6  Technology Finance?

7  A.  I don't know.

8  Q.  Is that information you could get?

9  A.  I don't know.

10  Q.  What would you need to know -- strike that.

11      MR. BLAU:  Can we have this marked?

12      (Defendant's Exhibit 1 for identification was marked

13  by the reporter.)

14      MR. O'KEEFE: Do you want to give him that?

15      MR. BLAU:  I want to go back a couple of questions.

16  I'll give it to him soon.

17  Q.  Are you aware of any details of a negotiation of the

18  lease between Macquarie and GMNY?

19  A.  I don't understand the question.

20  Q.  There was a lease executed between GMNY and Macquarie?

21  A.  Yes.

22  Q.  Are you aware of any negotiations leading up to the

23  execution of that lease?

24  A.  No.

25  Q.  So fair to say you have no idea how Macquarie got

5/9/2019                          Edward J. Kitchen                    Page: 6 (12 - 15)

---

Page 12

1  involved initially with GMNY?
2    A.  Correct.
3    Q.  Do you know how Mr. Zimmeth became involved in the
4  project at Macquarie?
5    A.  No.
6    Q.  Showing you what's been marked as Defendant's 1,
7  Internal Systems Notification of Change in Account Officer, what
8  is this document?
9    A.  Transferring the relationship to myself as the person
10  handling the account going forward.
11    Q.  In place of Mr. Zimmeth?
12    A.  Correct.
13    Q.  Its effective date is December 7, 2017, correct?
14    A.  Yes.
15    Q.  And I believe you testified earlier this is the date on
16  which you first became involved in GMNY?
17    A.  This is the date when it was transferred.  Documents
18  and things the like, getting transferred over to me, were --
19  took some time, so there was no contact made.  Yes, it was
20  transferred that date, but there's a process, if you will, of
21  the legal documents associated with it.
22    Q.  And that process began on December 7, 2017?
23    A.  Roughly.
24    Q.  Just so I'm clear, what is an account officer?
25    A.  Me.  I'm hands on the account.

---

Page 13

1    Q.  Okay.  So what are the responsibilities of an account
2  officer?
3    A.  Going forward to collection.  In this matter, default
4  matter, default loan.  Moving forward, contacting the customer
5  regarding repayment.
6    Q.  Are there any responsibilities in connection with
7  trying to resolve the default and reform the deal?
8        MR. O'KEEFE:  Object to form.
9        Go ahead.
10    A.  Try to cure the default?
11    Q.  Um-hum.
12    A.  When this was assigned to me, at that time, they were
13  three years past due.  Reform it?  No, we weren't.  We were
14  looking to exit the credit.
15    Q.  What do you mean by exit the credit?
16    A.  Paid off.
17    Q.  Paid off by GMNY?
18    A.  Guarantors.  The fact that the loan, the lease, was
19  three years past due, Garage Media, that they weren't making
20  payment, so we looked to the guarantors.
21    Q.  How are account officers selected?
22        MR. O'KEEFE:  Object to the form.
23        You can answer.
24    A.  There's no certain -- they're assigned.  It's a
25  commitment workload.

---

Page 14

1    Q.  And is there a reason why they're removed from a deal,
2  for lack of a better term?
3        MR. O'KEEFE:  Object to form.
4        Go ahead.
5    A.  I don't understand your question.  Say that again.
6    Q.  In this instance, you replaced Mr. Zimmeth as
7  overseeing the GMNY loan, correct?
8    A.  Yes.
9    Q.  Why was Mr. Zimmeth removed from overseeing the GMNY
10  loan?
11        MR. O'KEEFE:  Object.
12    A.  We handle loans in default.  It was three, almost four
13  years.  So we were seeking payment.
14    Q.  It was in default for, and Mr. Zimmeth was not
15  reassigned, correct?
16        MR. O'KEEFE:  Object to form.
17        You can answer.
18    A.  Reassigned to another department?
19    Q.  Let's go back.  As of December 2017, the loan was in
20  default for three years, correct?
21    A.  Yes.
22    Q.  And during that three-year period, Mr. Zimmeth was
23  overseeing the loan, correct?
24    A.  Yes.
25    Q.  Then on December 7th, 2017, approximately, you assumed

---

Page 15

1  responsibility for the loan, correct?
2    A.  Yes.
3    Q.  Why was Mr. Zimmeth — why was Mr. Zimmeth removed from
4  the overseeing position and replaced with you around December 7,
5  2017?
6    A.  To collect the debt.
7    Q.  The loan had been in default, though, for over three
8  years, correct?
9    A.  Yes.
10    Q.  So was there any acute reason that caused you to
11  replace Mr. Zimmeth?
12    A.  I don't know.
13    Q.  And who did you report to at Huntington regarding this
14  deal?
15    A.  Rob Mace.
16    Q.  Do you recall any discussions with Mr. Zimmeth about
17  the hand-over of responsibilities?
18    A.  Just the transfer of the original documents, copies
19  thereof, of the operating documents.
20    Q.  When did these conversations take place?
21    A.  Right about, I want to say, end of December, beginning
22  of January.
23    Q.  And you say the operating documents.  Can you tell me
24  what you mean by that?
25    A.  Lease documents, guaranty agreements, and related

---

## Page 16

1  documents to the transaction.

2  **Q.  Do you recall any other discussions with Mr. Zimmeth**

3  about the hand-over?

4  A.  I don't recall.

5  **Q.  Were there any written file memos or other memoranda of**

6  that type to assist with the hand-over from Zimmeth to you?

7  A.  Not that I recall.

8  **Q.  Do you oversee, as account officer, other similar deals**

9  at Huntington?

10  MR. O'KEEFE:  Object to form.

11  A.  When you say similar deals, do you mean signage?

12  **Q.  Correct, signage.**

13  A.  That's the only two I'm handling the signage.

14  **Q.  Do you know how many other deals Huntington has where**

15  the asset being financed or the item being financed is assigned

16  in this nature?

17  MR. O'KEEFE:  Objection.  Asked and answered.

18  You can answer again.

19  A.  I don't know.

20  **Q.  So as part of your account officer duties, do you have**

21  any occasion to have interactions with the Port Authority -- or

22  did you?

23  A.  No.

24  **Q.  So you never interacted with the Port Authority?**

25  A.  Not that I recall.

## Page 17

1  **Q.  Did you ever have any interactions with Clear Channel?**

2  A.  No.

3  **Q.  Did you ever have any interactions with competitors of**

4  GMNY?

5  A.  No.

6  **Q.  Did you provide any advice or guidance to GMNY or the**

7  Schmids or Mr. Neff --

8  A.  No.

9  **Q.  -- after you --**

10  MR. O'KEEFE:  Let him finish the question.

11  A.  Oh, I'm sorry.

12  **Q.  At any point, did you provide information or guidance?**

13  A.  No.

14  **Q.  Were there ever any instances where you disagreed with**

15  GMNY's post course of conduct?

16  MR. O'KEEFE:  Object to form.

17  A.  I don't recall that.

18  **Q.  What would you say the scope of your involvement with**

19  GMNY, after becoming account officer, is typical of the scope of

20  your involvement with other, in other deals at Huntington?

21  MR. O'KEEFE:  Object to form.

22  A.  Each account is handled various -- there's various --

23  each account's different, so they're handled different.

24  **Q.  Given your testimony thus far, I imagine the answer to**

25  the next question is no, but I want to confirm.  Know how A2A

## Page 18

1  was selected as the sales agent for the sign?

2  A.  No.

3  **Q.  Have you ever talked to anyone, besides counsel, about**

4  the selection of A2A?

5  A.  No.

6  MR. O'KEEFE:  Object to form, but you already

7  answered.

8  **Q.  Do you know who made the decision to replace A2A?**

9  A.  No.

10  **Q.  Do you know why Liquid Outdoor was engaged?**

11  A.  No.

12  **Q.  Do you have any knowledge as to how Clear Channel was**

13  selected as sales agent?

14  A.  No.

15  **Q.  You've never discussed Clear Channel's selection with**

16  anyone besides counsel?

17  MR. O'KEEFE:  Object to form.

18  A.  No.

19  **Q.  Were system failures a concern with this sign?**

20  A.  I don't know.

21  **Q.  You're not aware of any system failures with this sign?**

22  A.  Only with the guarantors, when we met and talked

23  about.  Other than that, no.

24  **Q.  When did those conversations take place?**

25  A.  Met with them in January of 2018.

## Page 19

1  **Q.  And who's we in this statement?**

2  A.  Myself and Rob Mace.

3  **Q.  Where did this meeting take place?**

4  A.  At their offices, Gary Neff's office.

5  **Q.  In New York?**

6  A.  Yes.

7  **Q.  And Mr. Neff and Dave and John Schmid were there?**

8  A.  Yes.

9  **Q.  What was the purpose of the meeting?**

10  A.  Introduce ourselves, and also get updated financial

11  information, a timeline to exit the credit.

12  **Q.  Did you have any other meetings with them?**

13  A.  No.

14  **Q.  During that meeting, the discussion at some point**

15  turned into some failures.  Fair to say?

16  A.  I recall just talking about bulbs and lighting, but I

17  don't recall much more than that.

18  **Q.  So there was never a discussion about finding a**

19  solution to the system failures or anything of that nature?

20  A.  I don't recall.

21  **Q.  Are you aware of any discussions at Huntington or**

22  Macquarie where the decision was made not to sue GKD?

23  MR. O'KEEFE:  Object to form.

24  A.  No.

25  **Q.  As account officer with oversight responsibilities for**

5/9/2019                     Edward J. Kitchen                Page: 8 (20 - 23)

Page 20

1  this deal, did you ever consider suing GKD?
2      A.  Focused -- for the default, Garage Media wasn't
3  paying, so our focus to get paid was on the guarantors.  So we
4  focused on the guarantors.
5      Q.  Was there any discussion at Huntington or Macquarie
6  that you're aware of suing Lorocom, L-O-R-O-C-O-M?
7      A.  No.
8      Q.  Did you have any involvement in attempts to extend the
9  lease with Port Authority?
10     A.  No.
11     Q.  Do you have any knowledge about the negotiation process
12 of the lease extension with the Port Authority?
13     A.  No, only from what the guarantors brought up at the
14 meeting.
15     Q.  And what do you recall from that meeting?
16     A.  It was imminent that they were getting ready to enter
17 into a permanent arrangement.  That was it.
18     Q.  Why was that extension important?
19         MR. O'KEEFE:  Object to form.
20         MR. BLAU:  Let me rephrase.
21     Q.  Was that extension important?
22     A.  Say it again?
23     Q.  Was the lease extension with Port Authority important
24 to the ability of GMNY to become current on its obligations?
25         MR. O'KEEFE:  Object to form.

Page 21

1          You can answer.
2      A.  I don't know.  The reason why I answered that way is
3  we requested a copy of the arrangement, and not sure what they
4  were -- they were looking to have someone else come in and
5  take -- they hired, if I recall at that meeting they hired, an
6  investment banker for -- some investment banker, if you will --
7  and they were looking to sell or transfer the sign, and the
8  lease was relevant to that transfer.
9      Q.  When you say they, you mean the Schmids and Mr. Neff?
10     A.  Schmids.
11     Q.  When you say the extension with the Port Authority was
12 relevant, what do you mean?
13     A.  That's what they told me.  For them to consummate the
14 transaction, the transfer, they being the Schmids and Neff.
15     Q.  Transfer being what?
16     A.  New owner.
17     Q.  Who owns the sign today?
18         MR. O'KEEFE:  Object to form.
19         You can answer.
20     A.  I don't know.
21     Q.  You don't know who owns the sign today?
22     A.  I don't know if Garage Media still owns it.  I don't
23 know.  Let me just be clear, we talked about the lease
24 arrangement.  We requested a copy what they were looking to
25 sign with them.  So I don't know if they ever did sign it.  We

Page 22

1  never saw it, because we asked for a copy of that document, we
2  never received it.  So from my knowledge, I don't know if they
3  entered into it and they still -- I don't know.
4      Q.  So you're referring to the conversation that happened
5  in January 2018?
6      A.  Correct.
7      Q.  During that conversation, you discussed the extension
8  with Port Authority?
9      A.  They were discussing what they were looking to do.  We
10 were discussing updating financials and entering into a
11 forbearance agreement, short-term forbearance agreement, to
12 allow them time.
13     Q.  And whose financials were you looking for?
14     A.  Guarantors'.
15     Q.  And the ownership of the sign came up at that meeting?
16     A.  No.
17     Q.  So as you sit here today, you don't know who owns the
18 sign today?
19     A.  No, I do not.
20     Q.  Do you know who owned the sign on December 30, 2018?
21     A.  Garage Media.
22     Q.  By Garage Media, you mean GMNY?
23     A.  Yes.
24     Q.  So it's fair to say that today, Huntington is not
25 carrying the sign as an asset, right?

Page 23

1      A.  No.
2      Q.  And from your testimony a minute ago, it's fair to say
3  that Huntington was not carrying the sign as an asset in late
4  2018?
5          MR. O'KEEFE:  Object to form.
6      A.  They were the actually lessor, if you will, of the
7  documents, with the guaranties.  So Garage Media owned the
8  sign.
9      Q.  Was Huntington depreciating the sign on its taxes in
10 late 2018?
11     A.  I don't know.
12     Q.  What about now, in 2019?
13     A.  I don't know.
14     Q.  So on the forbearance agreement that you just
15 mentioned, were there ever any other actions taken to try to
16 bring GMNY current on subrogation?
17         MR. O'KEEFE:  Object to form.
18     A.  No, we were seeking a forbearance agreement to give
19 them opportunity to retire the debt, because they were in
20 default.
21     Q.  And once they were unable to retire the debt during the
22 forbearance period, did you make a decision to initiate the
23 lawsuit that brings us here today?
24         MR. O'KEEFE:  Object to form.
25     A.  They never entered into the forbearance agreement.

Page 24

1    They never signed it.
2      **Q.  Did you discuss them -- by them I mean GMNY and the**
3    Schmids, Mr. Neff -- not filing a forbearance agreement with
4    anyone at Huntington?
5      A.  I don't understand the question.
6      **Q.  Did you discuss the nonsigning of the forbearance**
7    agreement with anyone else?
8      A.  Yes.  It's not executed.
9      **Q.  And who did you discuss it with?**
10     A.  Rob Mace.
11     **Q.  And when was that?**
12     A.  If I recall, I believe the forbearance agreement,
13   according to the timeline, was July 1st to give them time.
14   But thereafter, July 1st, coming up to that time period, they
15   never signed the agreement.
16     **Q.  Okay.  Did you ever have any discussions with other**
17   sign owners or operators about the GMNY sign?
18     A.  When you -- restate the question, I'm sorry.
19     **Q.  Sure.  There's other sign owners and operators**
20   operating other signs in New York, correct?
21     A.  Yes.
22     **Q.  Did you have any conversations with them about the GMNY**
23   sign on the Port Authority building?
24     A.  No.
25     **Q.  Setting aside the GMNY deal for a moment, generally**

Page 25

1    speaking, if a default does not occur, how does a deal like this
2    typically end for Huntington?
3        MR. O'KEEFE:  Object to form.
4        You can answer.
5      A.  As I stated earlier, they're all different so they're
6    handled differently.  There's no cookie cutters.
7      **Q.  There's no typical exit strategy for Huntington in**
8    these type of deals?
9      A.  Each one's different.
10     **Q.  Were you ever part of any discussions at Huntington**
11   about an exit strategy for this deal?
12     A.  The only discussion that was had was when we were up
13   there -- when I say there, at their offices -- and we
14   discussed the default at the time period and last payment and
15   providing for, looking for a short time period, which they
16   gave us July 1st, to enter into the forbearance agreement.
17   That was it.
18     **Q.  You were not aware or part of any other discussions**
19   with Huntington about exiting this credit, to use your term?
20     A.  No.
21       MR. O'KEEFE:  Do you mind if we take a short break?
22       MR. BLAU:  Sure.
23       (Recess 10:35 a.m. to 10:39 a.m.)
24     **Q.  When you became the account officer for this deal, was**
25   there an exit strategy?

Page 26

1        MR. O'KEEFE:  Object to form.
2      A.  Not when it was transferred, no.  Until we met with
3    them and we discussed a timeline on the forbearance agreement
4    with regards to them being in default and structuring a
5    forbearance agreement to give them an opportunity, until we
6    met with them, updated financials, and meet with them.  When I
7    say them, Schmids and Mr. Neff.
8      **Q.  Were you solely responsible for approving that exit**
9    strategy?
10       MR. O'KEEFE:  Object to form.
11     A.  No.
12     **Q.  Who else was responsible?**
13     A.  Rob Mace.
14     **Q.  Anybody else?**
15     A.  No.
16     **Q.  And I know Mr. Mace is sitting here today.  Where do**
17   your responsibilities and his -- do your responsibilities
18   overlap, as far as approval of an exit strategy?
19       MR. O'KEEFE:  Are we talking about this credit or
20   generally?
21       MR. BLAU:  This credit.
22     A.  He is the department head, so he would have final
23   approval, if they agreed upon our exit strategy.  That's what
24   they provided to us for the timing for the forbearance
25   agreement.  So yes, he would approve it.

Page 27

1      **Q.  Was the forbearance agreement your idea, their idea, or**
2    someone else's idea?
3      A.  It was my idea.
4      **Q.  Did you discuss an idea with Mr. Mace before the**
5    January meeting with the Schmids and Mr. Neff?
6      A.  No.
7      **Q.  So you offered that forbearance agreement idea for the**
8    first time in January, at the January meeting?
9      A.  At the January meeting when we met them.
10     **Q.  Was an extension with the Port Authority part of the**
11   exit strategy at all?
12     A.  No.
13     **Q.  Was the sale of Huntington's position in this deal to**
14   another bank or financial institution part of the exit strategy
15   at all?
16     A.  No.
17     **Q.  Was the investment and upgrade of the sign part of the**
18   exit strategy at all?
19     A.  No.
20     **Q.  Was Mr. Zimmeth involved in this deal after you assumed**
21   responsibility for it?
22     A.  Define involved.
23     **Q.  Did you speak to Mr. Zimmeth about this deal after you**
24   became the account officer responsible?
25     A.  I requested the balance, which we entered into the

Page 28

1  forbearance agreement, which was a compromise settlement for a
2  July 1st date, had they signed.  They did not sign.
3     Q.  What do you mean by -- I believe you said compromise
4  amount?
5     A.  Yes.
6     Q.  What do you mean by that?
7     A.  The amount, as I recall, was the bank's book balance
8  including, I believe, sales tax and interest.  Didn't include,
9  didn't include default interest, lessor return, anything of
10 that nature.
11    Q.  So you requested that information from Mr. Zimmeth?
12    A.  Yes.
13    Q.  Was that request made in connection with the January
14 2018 meeting?
15    A.  Yes, subsequent.
16    Q.  Oh, after the meeting, you requested information from
17 Mr. Zimmeth?
18    A.  Yes.
19    Q.  Did you discuss this deal with Mr. Zimmeth at any other
20 point after you became account officer?
21    A.  Very little.
22    Q.  Do you recall any conversations you had with him?
23    A.  May have inquired how things were going along, as I
24 recall it.  Other than that, we hadn't reached an agreement.
25    Q.  And when did he inquire?

Page 29

1     A.  I don't recall the exact date.
2     Q.  Do you know why he inquired?
3     A.  It originated from his department, which is to inquire
4  on one of his credits.
5     Q.  Do you recall any other conversation with Mr. Zimmeth
6  after you became account officer?
7     A.  No, I don't recall.
8        (Defendant's Exhibit 2 was marked by the reporter.)
9     Q.  Showing you what's been marked Defendant's 2, do you
10 recognize this document?
11    A.  No.
12    Q.  You've never seen it before?
13    A.  No, that I recall.
14       (Defendant's Exhibit 3 for identification was marked
15 by the reporter.)
16    Q.  Showing you what's been marked Defendant's 3, please
17 take a second and familiarize yourself with the document.
18       Who is J.D. Stillion, S-T-I-L-L-I-O-N?
19    A.  Colleague that handles, I want to say, reports the
20 banking.
21    Q.  Internal reporting?
22    A.  Yeah.
23    Q.  And who is Shari Cappuzzello?
24    A.  Secretary.
25    Q.  Secretary for anyone in particular?

Page 30

1     A.  Fred Manning.
2     Q.  Who's Fred Manning?
3     A.  He's the executive director, special assets.
4     Q.  And who's William Harris?
5     A.  He is a director, special assets.
6     Q.  And special assets is your department, the department
7  you're in at Huntington?
8     A.  Yes.
9     Q.  Do you know why it's called special assets?
10    A.  Refers to accounts that are in default, trouble
11 assets, so...
12    Q.  So they're special in that they're in default?
13       MR. O'KEEFE:  Object to form.
14    A.  Yeah, default or -- could not only be payment default;
15 could be covenant default.
16    Q.  Different forms of default?
17    A.  Right.
18    Q.  Referring you to Mr. Harris's email of 8:55 a.m. on
19 page 1 of Defendant's 3, it says:  Garage Media is on the NPA
20 grid.  What does that mean?
21    A.  Nonperformance. Nonaccrual.
22    Q.  And how does one become -- what causes someone to be on
23 the NPA grid?
24    A.  Delinquency extending on 90 days or greater.
25    Q.  Going up the page, you refer to something called NTA

Page 31

1  comments.  What are those?
2     A.  Explaining why they're delinquent and what the default
3  and what's going on with the credit.
4     Q.  So these emails are dated November 5, 2015.  I believe
5  you testified earlier that you were not involved in this credit
6  until December 2017.  Why were you included in these email
7  chains in November 2015?
8     A.  At that time, if I recall -- and I can't recall when
9  Huntington acquired H -- Macquarie, I should say -- so I'm not
10 certain as to why, what was going on at that period of time.
11 I don't know when we acquired them, so we may have been
12 interfacing with them as we transitioned them in.  But I can't
13 recall.
14    Q.  Okay.  All the other individuals on this email chain
15 are at Huntington, right?
16    A.  Yes.
17    Q.  So your involvement in this credit in November of 2015
18 you think would have something to do with Huntington's
19 acquisition of Macquarie?
20    A.  I believe.
21    Q.  Fair to say you had no -- you stand by your testimony
22 from earlier that you had no -- involvement in this credit
23 before December 2017?
24    A.  Yes.
25    Q.  Who writes the comments in the NTA grid?

Page 32

1    A. Credit officer who's handling the credit.

2    Q. When you say credit officer, is that the same thing as

3    account officer?

4    A. Yes.

5    Q. And what is the purpose of the comments?

6    A. Again, describing the default status and what's going

7    on with the credit.

8        (Defendant's Exhibit 4 for identification was marked

9    by the reporter.)

10       (A discussion was held off the record.)

11   Q. Showing you what's been marked Defendant's 4, take a

12   second, review that. Look at me when you're done.

13       Who's John Maurer?

14   A. He is director of Huntington Equipment Finance, and

15   HTF.

16   Q. Sorry?

17   A. Huntington Equipment Finance and HTF.

18   Q. So Huntington Equipment Finance is a subsidiary or

19   subset of HTF?

20       MR. O'KEEFE: Object to form.

21   A. Two separate lending arms.

22   Q. So the subject of this email is: Garage Media comment.

23   Feel free to make changes. Do you know why you were sent this

24   email?

25   A. I don't want to speculate, but it may be in light of

Page 33

1    the previous one for the grid.

2    Q. So I'm not asking, I don't want you to speculate, but

3    you think it might be the NTA comment would be what is in the

4    body of this email?

5        MR. O'KEEFE: Object to form.

6    A. Could be.

7    Q. Could it be anything else?

8        MR. O'KEEFE: Object to form.

9    A. I don't know.

10   Q. Why were you given an opportunity to make changes to

11   it?

12   A. Again, speculate.

13       MR. O'KEEFE: No. If you don't know, you don't --

14   A. I don't know.

15       MR. O'KEEFE: No speculation.

16   A. I don't know. They wrote it. I don't know.

17   Q. That's fine. Do you recall making any changes to this

18   comment?

19   A. No.

20   Q. Do you recall being sent any other -- strike that.

21   What did you take issues with sales management to mean?

22       MR. O'KEEFE: Object to form.

23   A. What are you referring to?

24   Q. In the third line, it says: Projected revenues due to

25   issues with sales management. My question is what did you

Page 34

1    understand sales management to mean?

2        MR. O'KEEFE: If you did.

3    Q. If you did.

4    A. I didn't.

5    Q. So you didn't know what Mr. Maurer was referring to?

6    A. No.

7    Q. What did you take equipment performance to mean?

8    A. I didn't. I don't recall.

9        Defendant's Exhibit 5 for identification was marked

10   by the reporter.)

11   Q. Showing you what's been marked Defendant's 5, please

12   take a second to review, and look up at me when you're done.

13       Who is Michael DiCecco?

14   A. He's the president of Huntington Equipment Finance.

15   Q. Who's Gregg Goldstein?

16   A. I don't know.

17   Q. Do you know why Mr. Zimmeth forwarded this email to the

18   president of --

19   A. No.

20   Q. Who's Norman Solomon?

21   A. A fellow colleague in my department.

22   Q. And who's John Glodich?

23   A. He's with Huntington Technology -- he's with

24   Macquarie, with Huntington Technology.

25   Q. What was his role, if you recall?

Page 35

1    A. I don't recall.

2    Q. May be a question for Mr. Maurer, but do you know what

3    he meant by duo in the email at 3:24 p.m.?

4        MR. O'KEEFE: Object to form.

5    A. No.

6    Q. Why did Mr. Solomon forward this email to you, if you

7    know?

8    A. I don't.

9    Q. Do you know why he said FYI, just in case?

10   A. No.

11   Q. You don't know what he was referring to?

12   A. No.

13   Q. So you don't know what prompted that email?

14   A. I don't recall, I'm sorry.

15       Defendant's Exhibit 6 for identification was marked

16   by the reporter.)

17   Q. Showing you what's been marked Defendant's 6, please

18   review and let me know when you're done.

19       Other than this email from January 12, 2018, did you

20   ever communicate directly with individuals associated with the

21   Port Authority?

22   A. No.

23   Q. Did you ever, other than this email, communicate with

24   individuals associated with the Port Authority without cc'ing

25   Gary Neff or the Schmids?

Page 36

1    MR. O'KEEFE:  Object to form.
2    A.  No.
3    Q.  What did you mean by see you soon?
4    A.  Looking at the timing of the email, I was just getting
5    involved in this credit and basically acquainting myself with
6    the individuals involved.  So after I realized it, this fellow
7    wasn't one of our guarantors, even reading, there was nothing
8    for me to talk to him about.  There was no need to talk to
9    him.
10   My concern, once I realized who the players were,
11   guarantors, if you will, that's who I met with.  I didn't seek
12   to reach out to him or talk to him.  Didn't need to.
13   Q.  So you never met with Del Tufo in person?
14   A.  No.
15   Q.  I think I asked, but you never met with anyone else at
16   the Port Authority in person?
17   A.  No.
18   (Defendant's Exhibit 7 for identification was marked
19   by the reporter.)
20   Q.  Showing you what's been marked Defendant's 7, please
21   take a look, and look up at me when you're done.
22   What's a CARS amount?
23   A.  First of all, CARS, Credit Asset Report, and those are
24   generated with regards to delinquent accounts, deficiency
25   accounts.  So the leasing system generates, they populate, if

Page 37

1    you will.  But I don't have access to the leasing system to
2    get numbers and dollar amounts, so it's provided by the
3    leasing department.
4    So as I read that, I needed to get an understanding
5    of what the CARS amount was in there, because I have no access
6    re vision into their systems.
7    Q.  Okay.  So you're looking for a report from another
8    department for that figure?
9    A.  That's correct.
10   Q.  What's the significance of the CARS amount?
11   A.  What's actually owed.
12   Q.  So it's the sum total of what's actually owed?
13   A.  It would include real estate -- real estate -- taxes,
14   things of that nature.  It wouldn't just be the lease amount.
15   If -- if -- and I say if -- it populates it correctly.  So
16   again, why I'm asking them what's in there, so apparently I
17   must be questioning something in there.  I don't recall, but I
18   wanted to verify what the numbers were.
19   Q.  Okay.
20   A.  Because again, I don't have revision into their
21   systems.
22   Q.  Okay.  Is the CARS amount, as you understand it, on
23   this page somewhere?
24   A.  I don't know if that was the actual CARS amount or if
25   that's what it was at that time.  I don't recall if there was

Page 38

1    subsequent questions after the fact to get some accuracy or
2    confirming it.  So I don't know if that was -- if that would
3    be the final number.  I don't know.
4    Q.  By that, are you referring to the approximately $3.8
5    million figure?
6    A.  Yes.
7    Q.  Just to clarify, your email of January 17, 2018, is
8    trying to, to use your term, get vision into what resulted in
9    this $3.8 million figure, is that fair to say?
10   MR. O'KEEFE:  Object to form.
11   A.  Yes.  As I stated, if that was the final number, I
12   don't know.
13   Q.  Okay.  And what is meant by exposure?
14   A.  What's owed.
15   Q.  So Huntington's exposure?
16   MR. O'KEEFE:  Object to form.
17   A.  Well, also the guarantors' and payers obligated to pay
18   the debt.  That's their exposure, too, along with Huntington.
19   Q.  So the guarantors' only exposure was the $3.8 million
20   amount?
21   A.  No.
22   Q.  And as you sit here, do you know if accrued interest is
23   reflected in this number?
24   A.  No, I do not.
25   (Defendant's Exhibit 8 for identification was marked

Page 39

1    by the reporter.)
2    Q.  Showing you what's been marked as Defendant's 8.
3    Please take a second to review.
4    What did you mean by tax liability for Garage Media?
5    A.  There's, as I recall, there was some issue -- again,
6    we have no vision into the leasing system -- so there must
7    have been a dollar amount, advised there was a tax bill due
8    and we were trying to determine what that exact number is, and
9    that's what we were trying to get to.  And again, we have no
10   vision so we were getting someone from the leasing department
11   to get on it and try to explain it to us.
12   Q.  There was a tax bill due by Huntington?
13   A.  I don't recall.  I don't know if it was -- I don't
14   recall.  I don't recall.
15   Q.  Do you recall the significance of this tax liability
16   issue?
17   MR. O'KEEFE:  Object to form.
18   A.  For us to be trying to figure it out, it must have
19   been a large amount.  That's the only thing I can estimate.
20   Q.  But you don't recall, as you sit here today, what that
21   amount was?
22   A.  No.  No.
23   Q.  Do you know how this tax liability issue was resolved,
24   if it was resolved?
25   A.  I don't know.

5/9/2019                    Edward J. Kitchen                  Page: 13 (40 - 43)

Page 40

1    Q.  Do you remember anything else about this tax liability
2   issue?
3    A.  No.
4    Q.  Besides Mr. Mace and it looks like Mr. Maurer, was
5   there anyone who joined this conversation?
6        MR. O'KEEFE:  Object to form.
7    A.  I don't recall.
8    Q.  What did you mean by this is incredible?
9    A.  Again trying to figure out a number.  We have no
10  vision into the system, and whatever we were discussing, I
11  can't get in there to see it, if it's right or wrong.  So I
12  don't know.
13       (Defendant's Exhibit 9 for identification was marked
14  by the reporter.)
15   Q.  Showing you what's been marked as Exhibit 9, please
16  take a second to review.
17       Who is Adel Wahab?
18       MR. O'KEEFE:  Right here.
19   A.  I don't know.
20   Q.  You don't recognize the name?
21   A.  No.
22   Q.  Did you ever request this information from Mr. Zimmeth?
23   A.  If I recall, this was following up on our meeting with
24  the Schmids and Gary in January, and whereby we were putting
25  together a forbearance agreement and talking about a timeline

Page 41

1   as to when they would resolve, retire, the outstanding
2   obligation and I believe -- I believe -- because again, we
3   don't have vision into the system, I was looking to confirm
4   the dollar amount and I believe -- I could be -- there was a
5   discussion.
6        Gary mentioned that there was a number said and he
7   wanted it confirmed.  There was a dollar amount he hinted to
8   at the meeting, if I recall, and again I was looking for it to
9   put a number into which would be to settle it and retire the
10  debt on July 1st with a forbearance agreement, was due to
11  expire which he did not sign.  I'd have to look at the
12  forbearance agreement but I don't recall if that was the
13  number we put in there.
14   Q.  Referring to Mr. Zimmeth's email at 4:58 p.m.
15  $7,041,000 figure, do you know if that included sales tax?
16   A.  I'm -- I don't know.  And to indicate, to be honest,
17  what's before me, it was relative.  Give me a number of what
18  we're trying to do when we were trying to put together a
19  forbearance agreement.
20   Q.  Referring to the fourth line of Mr. Zimmeth's email, do
21  you know what is meant by Net Investment?
22   A.  I believe he's referring to the book, the book
23  balance, without taxes or interest.  Whatever else was
24  outstanding to finalize the number.
25   Q.  And what is IRR?

Page 42

1    A.  Investment rate of return?
2        MR. O'KEEFE:  If you know.
3    A.  I'm -- I don't -- for their purposes, I don't know.
4    Q.  Okay.  Do you know what a typical yield rate for
5   financing regarding an advertising sign is?
6        MR. O'KEEFE:  Object to the relevance, and form.
7        You can answer, if you can.
8    A.  No.
9    Q.  Do you have any understanding as to why Macquarie
10  insisted that this be booked at "a high yield"?
11       MR. O'KEEFE:  Object to form.
12   A.  No.
13   Q.  Do you know what the typical yield is for Huntington's
14  loans --
15       MR. O'KEEFE:  Object to form.
16   Q.  Go ahead.
17   A.  No.
18       (Defendant's Exhibit 10 for identification was marked
19  by the reporter.)
20   Q.  Showing you what's been marked Exhibit 10, do you
21  recognize this document?
22       MR. O'KEEFE:  I don't know if this works better for
23  you.
24       THE WITNESS:  I'm good.
25       MR. O'KEEFE:  This is probably a clearer copy.

Page 43

1    Q.  You can see it then, it's clear enough?
2    A.  Yes.
3    Q.  Do you recognize it?
4    A.  Yes.
5    Q.  What causes this document to be generated?
6    A.  I generate it.
7    Q.  So you fill it out?
8    A.  It's a document requesting legal counsel to prepare a
9   forbearance agreement.
10   Q.  What does SAD stand for?
11   A.  Special assets department.
12   Q.  Did you write the language under transfer reason?
13   A.  No.
14   Q.  So you filled out the form but you didn't fill out that
15  part of it?
16   A.  I don't know what's generated in the background.  What
17  I see, if you look, this part up here I'm not familiar with.
18  The bottom borrower, as you go down, you could see where I
19  choose the law firm and forbearance agreement and approvals.
20  That's what I see.
21       When I do engage in a counsel to get a legal document
22  provided or representation, that's what I see, that's the
23  section I see, which clearly I filled out.  I checked the
24  forbearance agreement and I assigned it to Mets Lewis.
25       (Defendant's Exhibit 11 for identification was marked

Page 44

1   by the reporter.)
2       Q.  Showing you what's been marked 11.  Take a minute to
3   review.
4       Do you recall what you meant by had a problem getting
5   processed?
6       A.  Referring to the 33,590 on the back page.
7       Q.  What problem was there with it getting processed?
8       A.  Garage Media was setting the fee for the first letter
9   of credit and the first one got lost, so someone had it,
10  couldn't find it, couldn't locate it, and they subsequently
11  signed another one.  But where it was, I had a problem getting
12  it processed.  He, I recall, because it came into their
13  department and got lost somewhere or sent to me in our office
14  or however it was, that's what it was.  Had a problem getting
15  it processed.
16      Q.  Okay.  Who's Donald Helmrich?
17      A.  Representative at the Huntington Technology Finance,
18  formerly with Macquarie.
19      Q.  What is his role?
20      A.  Payments, processing payments, things.  And providing
21  or tracking down balances for leases.
22      Q.  What is meant by charged off?
23      A.  Charged off, the book balance is charged off.
24      Q.  What does that mean?
25      A.  Well, it's going to be a lengthy process when this was

Page 45

1   going on.  At that point in time, we initiated suit.  So
2   keeping it on our books, we charged it off to collect it at
3   some point in the future.
4       Q.  And what causes something to be charged off?
5       A.  Length of time, collection process that we have to go
6   through.  Again, as I mentioned, we entered suit, civil suit,
7   and it's going to take some time.  So carrying it without no
8   payments which now is for four years, so it's going to be a
9   length of time to collect it.
10      Q.  Who makes the decision to charge off?
11      A.  In this particular instance, I don't recall.  In this
12  particular instance.
13      Q.  It wasn't you?
14      A.  No.  I don't have that authority.
15      Q.  Typically, who charges it off in other instances?
16      MR. O'KEEFE:  Object to form.
17      Go ahead.
18      A.  Could be a department head, could be the previous unit
19  that was handling it, what the thought processes are; and the
20  fact that this was again going to litigation and the agreement
21  wasn't signed and wasn't resolved, so...
22      MR. BLAU:  Okay.  Thank you very much for your time.
23      MR. O'KEEFE:  I have no questions.  We will read and
24  review.
25      THE REPORTER:  How would you like your transcript?

Page 46

1       MR. O'KEEFE:  Same order as yesterday.  I don't
2   remember what it was, but check with Margaret, she'll
3   remember.  There was a lot of technology involved in what she
4   was proposing.
5       (11:31 a.m.)

Page 47

1                   JURAT
2
3       I, EDWARD J. KITCHEN, do hereby certify that the
4   foregoing testimony taken on May 9, 2019, is true and accurate,
5   including any corrections noted on the corrections page, to the
6   best of my knowledge and belief.
7
8
9                   EDWARD J. KITCHEN
10
11
12
13
14      At _____ in said County of _____,
15  this _____ day of _____, 2019, personally appeared
16  EDWARD J. KITCHEN, and he made oath to the truth of the
17  foregoing corrections by her subscribed.
18
19  Before me, _____, Notary Public
20
21  My commission expires:
22
23
24
25

Page 48

1    TRANSCRIPT CORRECTIONS

2    REPORTER:    THEA FINKELSTEIN

3

4    CASE:  HUNTINGTON TECHNOLOGY FINANCE INC. versus GARRETT NEFF,
     JOHN SCHMID, and DAVID SCHMID

5

6    PAGE  LINE  CORRECTION                    REASON

7                                    _____

8                                    _____

9                                    _____

10                                   _____

11                                   _____

12                                   _____

13                                   _____

14                                   _____

15                                   _____

16                                   _____

17                                   _____

18                                   _____

19                                   _____

20                                   _____

21

22        NAME:

23        DATE:

24

25

Page 49

1         CERTIFICATE OF REPORTER

2         I, THEA FINKELSTEIN, a Registered Merit Reporter/Notary

3    Public within and for the State of Connecticut, do hereby

4    certify there came before me, on the 9th day of May, 2019, the

5    following named person, to wit:  EDWARD J. KITCHEN, who was by

6    me duly sworn/affirmed to testify to the truth and nothing but

7    the truth; that he was thereupon carefully examined upon his

8    oath and his examination reduced to writing under my

9    supervision; that this deposition is a true record of the

10   testimony given by the witness.

11        I further certify that I am neither counsel for, related to

12   nor employed by any of the parties to the action in which this

13   deposition is taken; and further, that I am not a relative or

14   employee of any attorney or counsel employed by the parties

15   hereto, nor financially or otherwise interested in the outcome

16   of the action.

17             WITNESS my hand and affixed my seal this

18   May 22, 2019.

19

20

21

22

23             THEA FINKELSTEIN, RMR, CT CSR 126

24

25   My commission expires:  March 31, 2020

## WORD INDEX

**< $ >**
**$3.8** 38:*4, 9, 19*
**$7,041,000** 41:*15*

**< 0 >**
**06106** 1:*25*
**06510** 1:*14*
**06604** 2:*11*

**< 1 >**
**1** 3:*9, 17, 19*  11:*12*
  12:*6*  30:*19*
**10** 2:*10*  3:*23*
  42:*18, 20*
**10:00** 4:*1*
**10:35** 25:*23*
**10:39** 25:*23*
**11** 3:*9, 13, 14, 24*
  43:*25*  44:*2*
**11:31** 46:*5*
**12** 3:*9, 17, 20, 23*
  35:*19*
**126** 1:*14*  49:*23*
**15** 3:*16*
**15222** 2:*5*
**15299** 4:*3*
**15th** 2:*10*
**17** 3:*9, 19*  38:*7*
**19** 3:*22*
**195** 1:*14*
**1st** 24:*13, 14*
  25:*16*  28:*2*  41:*10*

**< 2 >**
**2** 3:*9, 20*  29:*8, 9*
**20** 3:*24*
**2009** 8:*3, 3, 4, 5, 14*
**2015** 3:*13, 14*  31:*4,*
  *7, 17*
**2017** 3:*23*  9:*20*
  12:*13, 22*  14:*19, 25*
  15:*5*  31:*6, 23*
**2018** 3:*17, 19, 20,*
  *22, 24*  9:*19, 20*
  18:*25*  22:*5, 20*
  23:*4, 10*  28:*14*
  35:*19*  38:*7*
**2019** 1:*13*  23:*12*

**47**:*4, 15*  49:*4, 18*
**2020** 49:*25*
**203-368-5465** 2:*11*
**21** 1:*24*
**22** 49:*18*
**235** 7:*16*
**25** 3:*16*
**29** 3:*9, 11*

**< 3 >**
**3** 3:*11, 22*  29:*14,*
  *16*  30:*19*
**3:18CV01708** 1:*7*
**3:24** 35:*3*
**30** 22:*20*
**31** 49:*25*
**310** 4:*3*
**32** 3:*14*
**33,590** 44:*6*
**34** 3:*14*
**35** 3:*17*
**36** 3:*17*
**39** 3:*20*

**< 4 >**
**4** 3:*5, 14*  32:*8, 11*
**4:58** 41:*14*
**40** 3:*20*
**412-918-1133** 2:*6*
**42** 3:*23*
**43** 3:*24*
**43219** 2:*17*

**< 5 >**
**5** 3:*13, 14, 14*  31:*4*
  34:*9, 11*
**535** 2:*4*

**< 6 >**
**6** 3:*16, 17*  35:*15,*
  *17*
**614-480-1537** 2:*18*

**< 7 >**
**7** 2:*16*  3:*9, 17, 23*
  12:*13, 22*  15:*4*
  36:*18, 20*
**7th** 14:*25*

**< 8 >**

**8** 3:*20*  38:*25*  39:*2*
**8:55** 30:*18*
**800** 2:*5*
**860-595-7462** 1:*25*

**< 9 >**
**9** 1:*13*  3:*20, 24*
  40:*13, 15*  47:*4*
**90** 30:*24*
**9th** 49:*4*

**< A >**
**a.m** 4:*1*  25:*23, 23*
  30:*18*  46:*5*
**A2A** 17:*25*  18:*4, 8*
**ability** 20:*24*
**able** 5:*25*
**access** 37:*1, 5*
**Account** 3:*9, 9*
  12:*7, 10, 24, 25*
  13:*1, 21*  16:*8, 20*
  17:*19, 22*  19:*25*
  25:*24*  27:*24*  28:*20*
  29:*6*  32:*3*
**accounts** 30:*10*
  36:*24, 25*
**account's** 17:*23*
**accrued** 38:*22*
**accuracy** 38:*1*
**accurate** 47:*4*
**accurately** 6:*1*
**acquainting** 36:*5*
**acquired** 31:*9, 11*
**acquisition** 31:*19*
**acronyms** 8:*21*
**Act** 7:*16*
**action** 49:*12, 16*
**actions** 23:*15*
**actual** 37:*24*
**acute** 15:*10*
**additional** 5:*16*
**Adel** 40:*17*
**advertising** 11:*5*
  42:*5*
**advice** 17:*6*
**advised** 39:*7*
**affirmed** 4:*5*  49:*6*
**affixed** 49:*17*
**agent** 7:*19*  18:*1, 13*
**ago** 23:*2*

**agree** 9:*14*
**agreed** 26:*23*
**agreement** 22:*11,*
  *11*  23:*14, 18, 25*
  24:*3, 7, 12, 15*
  25:*16*  26:*3, 5, 25*
  27:*1, 7*  28:*1, 24*
  40:*25*  41:*10, 12, 19*
  43:*9, 19, 24*  45:*20*
**agreements** 15:*25*
**ahead** 9:*24*  13:*9*
  14:*4*  42:*16*  45:*17*
**ALAN** 1:*8*
**allow** 22:*12*
**Amort** 3:*9*
**amount** 28:*4, 7*
  36:*22*  37:*5, 10, 14,*
  *22, 24*  38:*20*  39:*7,*
  *19, 21*  41:*4, 7*
**amounts** 37:*2*
**answer** 5:*2, 9, 14*
  6:*15*  7:*13*  10:*16,*
  *25*  13:*23*  14:*17*
  16:*18*  17:*24*  21:*1,*
  *19*  25:*4*  42:*7*
**answered** 16:*17*
  18:*7*  21:*2*
**answers** 5:*4*
**Anybody** 26:*14*
**anytime** 5:*12*
**apologies** 10:*7*
**apparently** 37:*16*
**APPEARANCES**
  2:*1*
**appeared** 47:*15*
**approval** 26:*18, 23*
**approvals** 43:*19*
**approve** 26:*25*
**approving** 26:*8*
**approximately**
  14:*25*  38:*4*
**arm** 9:*2*
**arms** 32:*21*
**arrangement** 20:*17*
  21:*3, 24*
**arrangements** 9:*7*
**aside** 24:*25*
**asked** 5:*17*  16:*17*
  22:*1*  36:*15*
**asking** 5:*19*  33:*2*
  37:*16*

asset  16:15  22:25
23:3  36:23
ASSETS  2:15  8:7
30:3, 5, 6, 9, 11
43:11
assigned  13:12, 24
16:15  43:24
assist  16:6
associated  12:21
35:20, 24
assume  5:9  7:23
assumed  14:25
27:20
attempts  20:8
attorney  49:14
Authority  16:21,
24  20:9, 12, 23
21:11  22:8  24:23
27:10  35:21, 24
36:16  45:14
available  5:22
aware  11:17, 22
18:21  19:21  20:6
25:18

< B >
back  11:15  14:19
44:6
background  6:24
43:16
balance  27:25
28:7  41:23  44:23
balances  44:21
BANK  2:16  8:23
9:9, 12  27:14
banker  21:6, 6
banking  29:20
bank's  28:7
basically  36:5
basics  7:18
Bates  3:9, 11, 13,
14, 16, 17, 19, 20, 22,
23, 24
becoming  17:19
began  12:22
beginning  15:21
belief  47:6
believe  12:15
24:12  28:3, 8  31:4,
20  41:2, 2, 4, 22

best  47:6
better  14:2  42:22
bill  39:7, 12
BLAU  2:12  3:5
4:11, 14  10:7
11:11, 15  20:20
25:22  26:21  45:22
body  33:4
book  28:7  41:22,
22  44:23
booked  42:10
books  45:2
borrower  43:18
bottom  43:18
break  5:12, 14
25:21
Bridgeport  2:11
briefly  4:14  6:24
bring  23:16
brings  23:23
BRODMAN  2:4
brought  4:15
20:13
building  24:23
bulbs  19:16

< C >
called  4:4  7:18
30:9, 25
Cappuzzello  29:23
carefully  49:7
Carmody  1:13
carrying  22:25
23:3  45:7
CARS  36:22, 23
37:5, 10, 22, 24
Case  1:7  35:9
48:4
Cassian  1:24
caused  15:10
causes  30:22  43:5
45:4
cblau@zeislaw.com
2:12
cc'ing  35:24
certain  13:24
31:10
CERTIFICATE
49:1
certifications  7:10
certified  7:19

certify  47:3  49:4,
11
chain  3:11, 14, 17,
17, 20, 24  31:14
chains  31:7
Change  12:7
changes  32:23
33:10, 17
Channel  17:1
18:12
Channel's  18:15
charge  45:10
charged  44:22, 23,
23  45:2, 4
charges  45:15
check  46:2
checked  43:23
choose  43:19
Chris  4:14
CHRISTOPHER
2:12
Church  1:14
civil  45:6
clarify  5:8  38:7
clear  12:24  17:1
18:12, 15  21:23
43:1
clearer  42:25
clearly  43:23
Colleague  29:19
34:21
collect  15:6  45:2, 9
collection  13:3
45:5
college  6:25  7:2
Columbus  2:17
come  21:4
coming  24:14
commenced  4:1
comment  32:22
33:3, 18
comments  31:1, 25
32:5
Commercial  9:10
commission  47:21
49:25
commitment  13:25
communicate
35:20, 23
competitors  17:3

complaint  6:8, 11
compromise  28:1, 3
Computer  11:4
concern  18:19
36:10
conduct  17:15
confirm  17:25
41:3
confirmed  41:7
confirming  38:2
confusing  5:8
CONNECTICUT
1:2, 14, 25  49:3
connection  4:21
6:17  7:23  13:6
28:13
consider  20:1
consummate  21:13
contact  12:19
contacting  13:3
conversation  22:4,
7  29:5  40:5
conversations
15:20  18:24  24:22
28:22
cookie  25:6
copies  15:18
copy  21:3, 24  22:1
42:25
Correct  7:25
10:23  11:3  12:2,
12, 13  14:7, 15, 20,
23  15:1, 8  16:12
22:6  24:20  37:9
CORRECTION
48:6
corrections  47:5, 5,
17  48:1
correctly  37:15
counsel  6:3, 17
18:3, 16  43:8, 21
49:11, 14
County  47:14
Couple  4:20  11:15
course  17:15
COURT  1:1  5:4, 6
covenant  30:15
CRC  1:14
credit  13:14, 15
19:11  25:19  26:19,
21  31:3, 5, 17, 22

32:*1, 1, 2, 7*  36:*5, 23*  44:*9*
credits  7:*6*  29:*4*
**CSR**  49:*23*
**CT**  2:*11*  49:*23*
cure  13:*10*
current  7:*24*  8:*11*  20:*24*  23:*16*
customer  13:*4*
cutters  25:*6*

**< D >**
**DATE**  1:*13*  12:*13, 15, 17, 20*  28:*2*  29:*1*  48:*23*
dated  31:*4*
**Dave**  19:*7*
**DAVID**  1:*9*  48:*4*
day  47:*15*  49:*4*
days  30:*24*
deal  13:*7*  14:*1*  15:*14*  20:*1*  24:*25*  25:*1, 11, 24*  27:*13, 20, 23*  28:*19*
deals  16:*8, 11, 14*  17:*20*  25:*8*
debt  15:*6*  23:*19, 21*  38:*18*  41:*10*
**December**  9:*19*  12:*13, 22*  14:*19, 25*  15:*4, 21*  22:*20*  31:*6, 23*
decision  18:*8*  19:*22*  23:*22*  45:*10*
**Default**  10:*12*  13:*3, 4, 7, 10*  14:*12, 14, 20*  15:*7*  20:*2*  23:*20*  25:*1, 14*  26:*4*  28:*9*  30:*10, 12, 14, 14, 15, 16*  31:*2*  32:*6*
**Defendants**  1:*9*  2:*7*
**Defendant's**  11:*12*  12:*6*  29:*8, 9, 14, 16*  30:*19*  32:*8, 11*  34:*9, 11*  35:*15, 17*  36:*18, 20*  38:*25*  39:*2*  40:*13*  42:*18*  43:*25*
deficiency  36:*24*

**Define**  27:*22*
degree  7:*4*
**Del**  3:*17*  36:*13*
**Delinquency**  30:*24*
delinquent  31:*2*  36:*24*
department  9:*17, 22*  10:*9*  14:*18*  26:*22*  29:*3*  30:*6, 6*  34:*21*  37:*3, 8*  39:*10*  43:*11*  44:*13*  45:*18*
deposed  4:*17*
**DEPOSITION**  1:*9*  4:*1, 16*  6:*4, 18, 20, 22*  49:*9, 13*
depreciating  23:*9*
describing  32:*6*
**Description**  3:*8*
details  11:*17*
determine  39:*8*
**DiCecco**  3:*20*  34:*13*
difference  9:*1*
**Different**  9:*2*  17:*23, 23*  25:*5, 9*  30:*16*
differently  25:*6*
**Direct**  3:*5*  4:*10*
directly  35:*20*
**DIRECTOR**  2:*15*  30:*3, 5*  32:*14*
disagreed  17:*14*
discuss  24:*2, 6, 9*  27:*4*  28:*19*
discussed  18:*15*  22:*7*  25:*14*  26:*3*
discussing  22:*9, 10*  40:*10*
discussion  19:*14, 18*  20:*5*  25:*12*  32:*10*  41:*5*
discussions  15:*16*  16:*2*  19:*21*  24:*16*  25:*10, 18*
**DISTRICT**  1:*1, 2*
document  5:*20*  6:*5, 7*  12:*8*  22:*1*  29:*10, 17*  42:*21*  43:*5, 8, 21*

documents  6:*9*  8:*20, 22*  12:*17, 21*  15:*18, 19, 23, 25*  16:*1*  23:*7*
dollar  37:*2*  39:*7*  41:*4, 7*
**Donald**  3:*24*  44:*16*
due  13:*13, 19*  33:*24*  39:*7, 12*  41:*10*
duly  4:*4*  49:*6*
duo  35:*3*
duties  8:*8*  16:*20*

**< E >**
**EA4W67**  2:*17*
**Earlier**  10:*21*  12:*15*  25:*5*  31:*5, 22*
early  8:*3*
**Easton**  2:*16*
**EDWARD**  1:*9*  3:*4, 11, 14, 14, 17, 17, 20, 24*  4:*2*  47:*3, 6, 16*  49:*5*
effective  12:*13*
either  5:*21*
else's  27:*2*
**Email**  3:*11, 14, 14, 17, 17, 20, 20, 24*  30:*18*  31:*6, 14*  32:*22, 24*  33:*4*  34:*17*  35:*3, 6, 13, 19, 23*  36:*4*  38:*7*  41:*14, 20*
emails  31:*4*
employed  49:*12, 14*
employee  49:*14*
employment  4:*21*
engage  43:*21*
engaged  18:*10*
enter  20:*16*  25:*16*
entered  22:*3*  23:*25*  27:*25*  45:*6*
entering  22:*10*
**EQUIPMENT**  1:*4, 5*  9:*5, 6*  10:*22*  11:*3, 4*  32:*14, 17, 18*  34:*7, 14*
**ESQ**  2:*7, 12*

estate  37:*13, 13*
estimate  39:*19*
exact  29:*1*  39:*8*
**Examination**  3:*5*  4:*10*  49:*8*
**Examinations**  3:*3*
examined  49:*7*
executed  11:*20*  24:*8*
execution  11:*23*
executive  30:*3*
**Exhibit**  11:*12*  29:*8, 14*  32:*8*  34:*9*  35:*15*  36:*18*  38:*25*  40:*13, 15*  42:*18, 20*  43:*25*
exhibits  3:*24*
existence  9:*16*
exit  13:*14, 15*  19:*11*  25:*7, 11, 25*  26:*8, 18, 23*  27:*11, 14, 18*
exiting  25:*19*
expire  41:*11*
expires  47:*21*  49:*25*
explain  7:*17*  39:*11*
**Explaining**  31:*2*
exposure  38:*13, 15, 18, 19*
extend  20:*8*
extending  30:*24*
extension  20:*12, 18, 21, 23*  21:*11*  22:*7*  27:*10*

**< F >**
fact  13:*18*  38:*1*  45:*20*
failures  18:*19, 21*  19:*15, 19*
fair  4:*23*  5:*10*  8:*13, 24*  11:*25*  19:*15*  22:*24*  23:*2*  31:*21*  38:*9*
familiar  43:*17*
familiarize  29:*17*
far  17:*24*  26:*18*
federal  4:*9*
fee  44:*8*

Feel 32:23
fellow 34:21 36:6
figure 37:8 38:5, 9
39:18 40:9 41:15
file 16:5
filing 24:3
fill 43:7, 14
filled 43:14, 23
final 26:22 38:3,
11
finalize 41:24
FINANCE 1:4, 4, 5
8:23 9:4 10:22
11:6 32:14, 17, 18
34:14 44:17 48:4
financed 11:5
16:15, 15
financial 19:10
27:14
financially 49:15
financials 22:10, 13
26:6
financing 9:2, 3, 6
10:14, 22 42:5
find 44:10
finding 19:18
fine 5:13 33:17
finish 17:10
FINKELSTEIN
1:14 48:1 49:2, 23
firm 43:19
first 4:4 9:13, 16
12:16 27:8 36:23
44:8, 9
Floor 2:10
focus 20:3
Focused 20:2, 4
following 40:23
49:5
follows 4:6
forbearance 22:11,
11 23:14, 18, 22, 25
24:3, 6, 12 25:16
26:3, 5, 24 27:1, 7
28:1 40:25 41:10,
12, 19 43:9, 19, 24
foregoing 47:4, 17
form 5:1 6:14
7:12 8:19 9:23
10:5, 15, 24 13:8,
22 14:3, 16 16:10

17:16, 21 18:6, 17
19:23 20:19, 25
21:18 23:5, 17, 24
25:3 26:1, 10
30:13 32:20 33:5,
8, 22 35:4 36:1
38:10, 16 39:17
40:6 42:6, 11, 15
43:14 45:16
formerly 44:18
forms 30:16
forward 12:10
13:3, 4 35:6
forwarded 34:17
four 14:12 45:8
fourth 41:20
Fred 30:1, 2
free 32:23
further 49:11, 13
future 45:3
FYI 35:9

< G >
Garage 3:9 9:14
13:19 20:2 21:22
22:21, 22 23:7
30:19 32:22 39:4
44:8
GARRETT 1:8
48:4
GARY 1:8 19:4
35:25 40:24 41:6
generally 24:25
26:20
generate 43:6
generated 36:24
43:5, 16
generates 36:25
Gerard 3:17
getting 12:18
20:16 36:4 39:10
44:4, 7, 11, 14
give 11:14, 16
23:18 24:13 26:5
41:17
Given 17:24 33:10
49:10
GKD 19:22 20:1
Gleaned 6:5
Glodich 3:17
34:22

GMNY 9:13, 14
10:3, 9, 14 11:18,
20 12:1, 16 13:17
14:7, 9 17:4, 6, 19
20:24 22:22 23:16
24:2, 17, 22, 25
GMNY's 9:16
17:15
go 7:2 9:24 11:15
13:9 14:4, 19
42:16 43:18 45:5,
17
going 8:20 9:13
10:8 12:10 13:3
28:23 30:25 31:3,
10 32:6 44:25
45:1, 7, 8, 20
Goldstein 34:15
Good 4:12, 13
42:24
Grant 4:3
greater 30:24
Gregg 34:15
grid 30:20, 23
31:25 33:1
ground 5:3, 23
guaranties 4:23
23:7
Guarantors 13:18,
20 18:22 20:3, 4,
13 36:7, 11 38:17,
19
Guarantors' 22:14
guaranty 15:25
guidance 17:6, 12

< H >
hand 49:17
handle 14:12
Handled 8:10
17:22, 23 25:6
handles 29:19
handling 12:10
16:13 32:1 45:19
hand-over 15:17
16:3, 6
hands 12:25
happened 22:4
Harris 30:4
Harris's 30:18

Hartford 1:25
Haven 1:14
head 9:15 26:22
45:18
hear 5:8
HELD 1:13 32:10
Helmrich 3:24
44:16
help 5:20
Hennessey 1:13
hereto 49:15
high 7:18 42:10
hinted 41:7
hired 21:5, 5
HNB 8:21, 23
honest 41:16
hospital 9:6 11:2
HTF 8:21, 22
32:15, 17, 19
HTF000056 3:11
HTF000766 3:9
HTF001698 3:20
HTF001802 3:19
HTF001829 3:17
HTF002066 3:24
HTF004332 3:22
HTF006655 3:23
HTF009088 3:13
HTF009097 3:14
HTF009098 3:16
HUNTINGTON
1:3 2:16 4:16, 21
7:24 8:1, 5, 17, 22,
23 9:3, 8, 12 10:21
11:5 15:13 16:9,
14 17:20 19:21
20:5 22:24 23:3, 9
24:4 25:2, 7, 10, 19
30:7 31:9, 15
32:14, 17, 18 34:14,
23, 24 38:18 39:12
44:17 48:4
Huntington's 27:13
31:18 38:15 42:13

< I >
idea 11:25 27:1, 1,
2, 3, 4, 7
identification
11:12 29:14 32:8
34:9 35:15 36:18

38:25 40:13 42:18
43:25
**imagine** 17:24
**imminent** 20:16
**important** 20:18,
21, 23
**include** 28:8, 9
37:13
**included** 31:6
41:15
**including** 28:8
47:5
**incredible** 40:8
**indicate** 41:16
**individuals** 31:14
35:20, 24 36:6
**information** 5:17
6:6 8:16 10:18
11:8 17:12 19:11
28:11, 16 40:22
**initially** 12:1
**initiate** 23:22
**initiated** 45:1
**inquire** 28:25 29:3
**inquired** 28:23
29:2
**insisted** 42:10
**instance** 14:6
45:11, 12
**instances** 17:14
45:15
**institution** 27:14
**interacted** 16:24
**interactions** 16:21
17:1, 3
**interest** 28:8, 9
38:22 41:23
**interested** 49:15
**interfacing** 31:12
**Internal** 12:7
29:21
**International** 3:9
**Introduce** 19:10
**investment** 21:6, 6
27:17 41:21 42:1
**involve** 4:23
**involved** 12:1, 3, 16
27:20, 22 31:5
36:5, 6 46:3
**involvement** 17:18,

20 20:8 31:17, 22
**IRR** 41:25
**issue** 39:5, 16, 23
40:2
**issues** 33:21, 25
**item** 16:15
**its** 10:3 12:13
20:24 23:9

< J >
**J.D** 29:18
**January** 9:19, 20
15:22 18:25 22:5
27:5, 8, 8, 9 28:13
35:19 38:7 40:24
**job** 7:23, 24 8:9,
13
**JOHN** 1:8 2:7
3:14, 17, 20 19:7
32:13 34:22 48:4
**joined** 8:5 40:5
jokeefe@metzlewis.c
om 2:6
**JR** 2:7
**July** 24:13, 14
25:16 28:2 41:10
**June** 8:2, 3, 4, 5, 14
**JURAT** 47:1

< K >
**KARL** 1:9
**keeping** 45:2
**kind** 8:8
**KITCHEN** 1:9
3:4, 11, 14, 14, 17,
19, 20, 24 4:2, 12
47:3, 6, 16 49:5
**knew** 6:12
**know** 5:12, 18, 21
11:7, 9, 10 12:3
15:12 16:14, 19
17:25 18:8, 10, 20
21:2, 20, 21, 22, 23,
25 22:2, 3, 17, 20
23:11, 13 26:16
29:2 30:9 31:11
32:23 33:9, 13, 14,
16, 16 34:5, 16, 17
35:2, 7, 9, 11, 13, 18
37:24 38:2, 3, 12,
22 39:13, 23, 25

40:12, 19 41:15, 16,
21 42:2, 3, 4, 13, 22
43:16
**knowledge** 10:13
18:12 20:11 22:2
47:6

< L >
**lack** 14:2
**language** 43:12
**large** 39:19
**late** 23:3, 10
**law** 43:19
**lawsuit** 4:15 23:23
**leading** 11:22
**learn** 9:13, 16
**lease** 11:18, 20, 23
13:18 15:25 20:9,
12, 23 21:8, 23
37:14
**leases** 44:21
**leasing** 9:5 36:25
37:1, 3 39:6, 10
**legal** 12:21 43:8,
21
**lending** 32:21
**Length** 45:5, 9
**lengthy** 44:25
**lessor** 23:6 28:9
**letter** 44:8
**LEWIS** 2:4 43:24
**liability** 39:4, 15,
23 40:1
**light** 32:25
**lighting** 19:16
**line** 33:24 41:20
48:6
**Liquid** 18:10
**litigation** 45:20
**little** 28:21
**LLC** 1:5, 24
**LLP** 1:13
**loan** 10:14 13:4,
18 14:7, 10, 19, 23
15:1, 7
**loans** 8:10 9:10
14:12 42:14
**locate** 44:10
**long** 8:1

**look** 6:5 32:12
34:12 36:21, 21
41:11 43:17
**looked** 13:20
**looking** 13:14
21:4, 7, 24 22:9, 13
25:15 36:4 37:7
41:3, 8
**looks** 40:4
**Lorocom** 20:6
**L-O-R-O-C-O-M**
20:6
**lost** 44:9, 13
**lot** 6:6 46:3
**LSR** 1:14

< M >
**MACE** 2:15 3:20
15:15 19:2 24:10
26:13, 16 27:4
40:4
**Macquarie** 1:4, 5
8:17 11:18, 20, 25
12:4 19:22 20:5
31:9, 19 34:24
42:9 44:18
**Macquarie's** 10:14
**Magrin** 6:22
**making** 13:19
33:17
**management** 8:10
33:21, 25 34:1
**Manning** 30:1, 2
**March** 49:25
**Margaret** 46:2
**MARK** 1:8
**marked** 11:11, 12
12:6 29:8, 9, 14, 16
32:8, 11 34:9, 11
35:15, 17 36:18, 20
38:25 39:2 40:13,
15 42:18, 20 43:25
44:2
**matter** 13:3, 4
**Maurer** 3:14
32:13 34:5 35:2
40:4
**mean** 6:7 9:22
10:1 13:15 15:24
16:11 21:9, 12
22:22 24:2 28:3, 6

30:20  33:21  34:1,
7  36:3  39:4  40:8
44:24
**means**  9:14
**meant**  35:3  38:13
41:21  44:4, 22
**Media**  3:9  9:14
13:19  20:2  21:22
22:21, 22  23:7
30:19  32:22  39:4
44:8
**meet**  26:6
**meeting**  19:3, 9, 14
20:14, 15  21:5
22:15  27:5, 8, 9
28:14, 16  40:23
41:8
**meetings**  19:12
**memoranda**  16:5
**memos**  16:5
**mentioned**  11:2
23:15  41:6  45:6
**merger**  8:16
**Merit**  49:2
**met**  4:14  18:22, 25
26:2, 6  27:9  36:11,
13, 15
**Mets**  43:24
**METZ**  2:4
**Michael**  3:20
34:13
**Middle**  2:10
**million**  38:5, 9, 19
**mind**  25:21
**minute**  23:2  44:2
**moment**  24:25
**morning**  4:12, 13
**Morris**  7:3
**Moving**  13:4

< N >
**name**  4:14  40:20
48:22
**named**  49:5
**NATIONAL**  2:16
8:23  9:9, 12
**nature**  4:24  11:4
16:16  19:19  28:10
37:14
**need**  11:10  36:8,

12
**needed**  37:4
**NEFF**  1:8, 8  4:15
17:7  19:7  21:9, 14
24:3  26:7  27:5
35:25  48:4
**Neff's**  19:4
**negotiation**  11:17
20:11
**negotiations**  11:22
**neither**  49:11
**Net**  41:21
**never**  16:24  18:15
19:18  22:1, 2
23:25  24:1, 15
29:12  36:13, 15
**New**  1:14  9:14
19:5  21:16  24:20
**Nodding**  9:15
**Nonaccrual**  30:21
**nonpayment**  8:10
10:2, 11
**Nonperformance**
30:21
**nonsigning**  24:6
**Norman**  3:11, 14
34:20
**Notary**  47:19  49:2
**noted**  47:5
**Notification**  3:9
12:7
**November**  31:4, 7,
17
**NPA**  30:19, 23
**NTA**  30:25  31:25
33:3
**number**  38:3, 11,
23  39:8  40:9  41:6,
9, 13, 17, 24
**numbers**  37:2, 18

< O >
**Oak**  1:24
**oath**  4:5  47:16
49:8
**Object**  5:1  6:14
7:12  8:19  9:23
10:5, 15, 24  13:8,
22  14:3, 11, 16
16:10  17:16, 21
18:6, 17  19:23

20:19, 25  21:18
23:5, 17, 24  25:3
26:1, 10  30:13
32:20  33:5, 8, 22
35:4  36:1  38:10,
16  39:17  40:6
42:6, 11, 15  45:16
**Objection**  16:17
**obligated**  38:17
**obligation**  41:2
**obligations**  10:4
20:24
**Obviously**  4:16
**occasion**  16:21
**occur**  25:1
**offered**  27:7
**office**  19:4  44:13
**Officer**  3:9  8:7
12:7, 24  13:2  16:8,
20  17:19  19:25
25:24  27:24  28:20
29:6  32:1, 2, 3
**officers**  13:21
**offices**  19:4  25:13
**OH**  2:17  10:7
17:11  28:16
**okay**  5:14  6:9
8:11  9:3, 8  10:3
13:1  24:16  31:14
37:7, 19, 22  38:13
42:4  44:16  45:22
**O'KEEFE**  2:4, 7
4:9  5:1  6:14  7:12
8:19  9:23  10:5, 8,
15, 24  11:14  13:8,
22  14:3, 11, 16
16:10, 17  17:10, 16,
21  18:6, 17  19:23
20:19, 25  21:18
23:5, 17, 24  25:3,
21  26:1, 10, 19
30:13  32:20  33:5,
8, 13, 15, 22  34:2
35:4  36:1  38:10,
16  39:17  40:6, 18
42:2, 6, 11, 15, 22,
25  45:16, 23  46:1
**once**  23:21  36:10
**one's**  25:9
**operating**  15:19, 23

24:20
**operators**  24:17, 19
**opportunity**  23:19
26:5  33:10
**order**  46:1
**organizations**  9:1
**Original**  3:24
15:18
**originated**  29:3
**origins**  10:13
**outcome**  49:15
**Outdoor**  18:10
**outstanding**  41:1,
24
**Oval**  2:16
**overlap**  26:18
**oversee**  10:4  16:8
**overseeing**  14:7, 9,
23  15:4
**oversight**  19:25
**owed**  37:11, 12
38:14
**owned**  22:20  23:7
**owner**  21:16
**owners**  24:17, 19
**ownership**  22:15
**owns**  21:17, 21, 22
22:17

< P >
**P.C**  2:7
**p.m**  41:14
**p.m.**  35:3
**PA**  2:5
**Page**  3:3, 8  30:19,
25  37:23  44:6
47:5  48:6
**Paid**  13:16, 17
20:3
**part**  6:11  16:20
25:10, 18  27:10, 14,
17  43:15, 17
**particular**  6:11
29:25  45:11, 12
**parties**  49:12, 14
**path**  10:8
**pay**  38:17
**payers**  38:17
**paying**  10:3  20:3
**payment**  13:20
14:13  25:14  30:14

payments 44:20, 20
45:8
pending 5:13
Pennsylvania 4:3
7:16
people 7:20
performance 34:7
period 14:22
23:22 24:14 25:14,
15 31:10
permanent 20:17
person 12:9 36:13,
16 49:5
personally 47:15
Pittsburgh 2:5 4:3
place 12:11 15:20
18:24 19:3
Plaintiff 1:6 2:3
players 36:10
please 5:3, 8, 17
29:16 34:11 35:17
36:20 39:3 40:15
point 5:7 17:12
19:14 28:20 45:1,
3
populate 36:25
populates 37:15
Port 16:21, 24
20:9, 12, 23 21:11
22:8 24:23 27:10
35:21, 24 36:16
position 15:4
27:13
post 17:15
prepare 6:3 43:8
Present 2:14
president 34:14, 18
previous 33:1
45:18
previously 5:17
prior 7:23
private 7:21
probably 42:25
problem 44:4, 7, 11,
14
process 12:20, 22
20:11 44:25 45:5
processed 44:5, 7,
12, 15
processes 45:19

processing 44:20
professional 7:10
Profile 3:9
project 12:4
Projected 33:24
prompted 35:13
proposing 46:4
provide 5:3, 9, 14
9:4, 9 17:6, 12
provided 26:24
37:2 43:22
provides 10:22
providing 9:2
25:15 44:20
Public 47:19 49:3
purchase 8:17
purpose 19:9 32:5
purposes 42:3
put 41:9, 13, 18
putting 40:24

< Q >
qualifications 7:11
question 5:7, 10, 13,
17 11:19 14:5
17:10, 25 24:5, 18
33:25 35:2
questioning 37:17
questions 5:19
11:15 38:1 45:23

< R >
rate 42:1, 4
reach 36:12
reached 28:24
Read 4:9 6:12
37:4 45:23
reading 36:7
ready 20:16
real 37:13, 13
realized 36:6, 10
reason 5:16, 25
14:1 15:10 21:2
43:12 48:6
reassigned 14:15,
18
recall 6:1 7:7, 8
15:16 16:2, 4, 7, 25
17:17 19:16, 17, 20
20:15 21:5 24:12
28:7, 22, 24 29:1, 5,

7, 13 31:8, 8, 13
33:17, 20 34:8, 25
35:1, 14 37:17, 25
39:5, 13, 14, 14, 15,
20 40:7, 23 41:8,
12 44:4, 12 45:11
receive 7:4
received 22:2
Recess 25:23
recognize 29:10
40:20 42:21 43:3
recollection 5:19
record 4:14 32:10
49:9
reduced 49:8
refer 30:25
referring 22:4
30:18 33:23 34:5
35:11 38:4 41:14,
20, 22 44:6
Refers 30:10
reflected 38:23
reform 13:7, 13
regarding 13:5
15:13 42:5
regards 26:4 36:24
Registered 49:2
related 15:25
49:11
relationship 12:9
relative 41:17
49:13
relevance 42:6
relevant 21:8, 12
remember 5:16
40:1 46:2, 3
removed 14:1, 9
15:3
rep 8:7
repayment 13:5
rephrase 9:19
20:20
replace 15:11 18:8
replaced 14:6 15:4
report 15:13
36:23 37:7
Reporter 1:14
3:24 4:8 5:4, 6
11:13 29:8, 15
32:9 34:10 35:16
36:19 39:1 40:14

42:19 44:1 45:25
48:1 49:1, 2
Reporting 1:24
29:21
reports 29:19
represent 4:15
representation
43:22
Representative
44:17
Representing 2:3, 7
request 28:13
40:22
requested 21:3, 24
27:25 28:11, 16
requesting 43:8
resolve 13:7 41:1
resolved 39:23, 24
45:21
response 5:4
responsibilities 8:8,
13 13:1, 6 15:17
19:25 26:17, 17
responsibility 15:1
27:21
responsible 26:8,
12 27:24
restate 24:18
resulted 38:8
retail 9:10
retained 3:24
retire 23:19, 21
41:1, 9
return 28:9 42:1
revenues 33:24
review 5:3 6:9, 16
32:12 34:12 35:18
39:3 40:16 44:3
45:24
reviewed 6:11
revision 37:20
right 7:24 15:21
22:25 30:17 31:15
40:11, 18
Risk 8:10
RMR 1:14 49:23
ROB 2:15 3:20
15:15 19:2 24:10
26:13
Robert 7:3

Robert.Mace@Hunt
ington.com  2:18
role  34:25  44:19
Roughly  12:23
rules  5:3, 23

< S >
SAD  3:23  43:10
sale  27:13
sales  18:1, 13  28:8
  33:21, 25  34:1
  41:15
Sandak  1:13
saw  22:1
says  30:19  33:24
SCHMID  1:8, 9
  19:7  48:4, 4
Schmids  4:15
  17:7  21:9, 10, 14
  24:3  26:7  27:5
  35:25  40:24
scope  17:18, 19
seal  49:17
second  29:17
  32:12  34:12  39:3
  40:16
Secretary  29:24, 25
section  43:23
security  7:18, 18,
  19, 21
see  5:21  36:3
  40:11  43:1, 17, 18,
  20, 22, 23
seek  36:11
seeking  14:13
  23:18
seen  29:12
selected  10:19
  13:21  18:1, 13
selection  18:4, 15
sell  21:7
SENIOR  2:15, 15
sense  5:7, 23
sent  32:23  33:20
  44:13
separate  32:21
services  9:8
Servicing  9:25
Setting  24:25  44:8
settle  41:9

settlement  28:1
Shari  29:23
she'll  46:2
short  25:15, 21
short-term  22:11
show  8:20
Showing  12:6
  29:9, 16  32:11
  34:11  35:17  36:20
  39:2  40:15  42:20
  44:2
sign  4:9  10:19
  18:1, 19, 21  21:7,
  17, 21, 25, 25  22:15,
  18, 20, 25  23:3, 8, 9
  24:17, 17, 19, 23
  27:17  28:2  41:11
  42:5
signage  16:11, 12,
  13
signed  24:1, 15
  28:2  44:11  45:21
significance  37:10
  39:15
signs  11:5  24:20
similar  16:8, 11
sit  22:17  38:22
  39:20
sitting  26:16
Smithfield  2:4
solely  26:8
Solomon  3:13, 16
  34:20  35:6
solution  19:19
soon  11:16  36:3
sorry  17:11  24:18
  32:16  35:14
speak  6:17  27:23
speaking  6:3  25:1
SPECIAL  2:15
  8:7  30:3, 5, 6, 9, 12
  43:11
speculate  32:25
  33:2, 12
speculation  33:15
spoken  6:20, 22
stand  31:21  43:10
state  7:16  49:3
stated  25:5  38:11
statement  19:1

STATES  1:1
status  32:6
Stilliion  29:18
S-T-I-L-L-I-O-N
  29:18
Stipulations  4:8
strategy  25:7, 11,
  25  26:9, 18, 23
  27:11, 14, 18
Street  1:14, 24  2:4,
  10  4:3
strike  11:10  33:20
structuring  26:4
subject  32:22
subrogation  23:16
subscribed  47:17
subsequent  28:15
  38:1
subsequently  44:10
subset  32:19
subsidiary  32:18
sue  19:22
suing  20:1, 6
suit  45:1, 6, 6
Suite  2:5
sum  37:12
supervision  49:9
sure  6:12  21:3
  24:19  25:22
sworn  4:5  49:6
system  18:19, 21
  19:19  36:25  37:1
  39:6  40:10  41:3
Systems  3:9  12:7
  37:6, 21

< T >
~take  4:16  15:20
  18:24  19:3  21:5
  25:21  29:17  32:11
  33:21  34:7, 12
  36:21  39:3  40:16
  44:2  45:7
taken  23:15  47:4
  49:13
talk  5:5, 5  36:8, 8,
  12
talked  18:3, 22
  21:23
talking  19:16
  26:19  40:25

tax  28:8  39:4, 7,
  12, 15, 23  40:1
  41:15
taxes  23:9  37:13
  41:23
TECHNOLOGY
  1:3  8:23  9:4
  10:19, 21  11:6
  34:23, 24  44:17
  46:3  48:4
tell  15:23
ten  8:2
term  14:2  25:19
  38:8
testified  4:5  10:21
  12:15  31:5
testify  6:1  49:6
testimony  17:24
  23:2  31:21  47:4
  49:10
Thank  45:22
THEA  1:14  48:1
  49:2, 23
thereof  15:19
thing  6:12  32:2
  39:19
things  11:4  12:18
  28:23  37:14  44:20
think  5:20  6:5
  10:5  11:2  31:18
  33:3  36:15
third  33:24
thought  45:19
Three  7:9  13:13,
  19  14:12, 20  15:7
three-year  14:22
time  7:7  10:14
  12:19  13:12  22:12
  24:13, 14  25:14, 15
  27:8  31:8, 10
  37:25  45:1, 5, 7, 9,
  22
timeline  19:11
  24:13  26:3  40:25
times  4:19
timing  26:24  36:4
title  8:6, 11
today  4:16  6:1
  8:20  21:17, 21
  22:17, 18, 24  23:23

26:16  39:20
today's  6:4, 18
told  21:13
Torrance  1:13
total  37:12
Totally  5:12
tracking  44:21
transaction  16:1
21:14
transcript  45:25
48:1
Transfer  3:23
15:18  21:7, 8, 14,
15  43:12
transferred  9:17,
21  10:4, 6, 6, 9
12:17, 18, 20  26:2
Transferring  12:9
transitioned  31:12
transport  7:20
trouble  8:10  30:10
true  47:4  49:9
truth  47:16  49:6, 7
truthfully  6:1
try  5:5, 5  13:10
23:15  39:11
trying  13:7  38:8
39:8, 9, 18  40:9
41:18, 18
Tufo  3:17  36:13
turned  19:15
two  9:1  16:13
32:21
type  9:3, 6, 8  16:6
25:8
types  9:5  10:22
11:2
typical  17:19  25:7
42:4, 13
Typically  7:19
25:2  45:15

< U >
Um-hum  7:22
13:11
unable  23:21
understand  11:19
14:5  24:5  34:1
37:22
understanding

8:22  37:4  42:9
understood  5:9
unit  45:18
UNITED  1:1
updated  19:10
26:6
updating  22:10
upgrade  27:17
use  25:19  38:8

< V >
Various  9:5  10:22
17:22, 22
verbal  5:4
verify  37:18
versus  48:4
VICE-PRESIDENT
2:15
vision  37:6  38:8
39:6, 10  40:10
41:3
VLB  1:7
volunteer  5:18
vs  1:7

< W >
Wahab  40:17
want  5:12  6:24
11:14, 15  15:21
17:25  29:19  32:25
33:2
wanted  37:18  41:7
way  21:2
Well  38:17  44:25
went  6:25  7:8
we're  41:18
William  30:4
wit  49:5
witness  4:4  42:24
49:10, 17
work  7:19  9:11
workload  13:25
Workout  8:7
works  42:22
write  43:12
writes  31:25
writing  49:8
written  16:5
wrong  10:8  40:11
wrote  33:16

< Y >
Yeah  29:22  30:14
years  7:8  8:2
13:13, 19  14:13, 20
15:8  45:8
yesterday  46:1
yield  42:4, 10, 13
York  9:14  19:5
24:20

< Z >
ZEISLER  2:7, 7
Zimmeth  3:22
6:20  12:3, 11  14:6,
9, 14, 22  15:3, 3, 11,
16  16:2, 6  27:20,
23  28:11, 17, 19
29:5  34:17  40:22
Zimmeth's  41:14,
20

| | |
|---|---|
| 1 | JURAT |
| 2 | |
| 3 | I, EDWARD J. KITCHEN, do hereby certify that the |
| 4 | foregoing testimony taken on May 9, 2019, is true and accurate, |
| 5 | including any corrections noted on the corrections page, to the |
| 6 | best of my knowledge and belief. |
| 7 | |
| 8 | |
| 9 | EDWARD J. KITCHEN |
| 10 | |
| 11 | |
| 12 | COMMONWEALTH OF PENNSYLVANIA |
| 13 | COUNTY OF ALLEGHENY |
| 14 | At 3.36 pm (EST) in said County of ALLEGHENY , |
| 15 | this 20th day of JUNE , 2019, personally appeared |
| 16 | EDWARD J. KITCHEN, and he made oath to the truth of the |
| 17 | foregoing corrections by her subscribed. |
| 18 | |
| 19 | Before me, ANDREA L QUATTRONE , Notary Public |
| 20 | Andrea L. Quattrone |
| 21 | My commission expires: 10/13/21 |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Andrea L. Quattrone. Notary Public
Forward Twp., Allegheny County
My Commission Expires Oct. 13, 2021
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

5/9/2019                          Edward J. Kitchen                        Page: 48

1                        TRANSCRIPT CORRECTIONS

2
       REPORTER:        THEA FINKELSTEIN
3

4      CASE:   HUNTINGTON TECHNOLOGY FINANCE INC. versus GARRETT NEFF,
               JOHN SCHMID, and DAVID SCHMID
5

6      PAGE    LINE    CORRECTION                    REASON

7       4       3      15219                INSTEAD OF  15299

8      16      13      ONE                  INSTEAD OF  TWO

9      37 - 6          VISION               INSTEAD OF  RE - VISION

10     37 - 20         VISION               INSTEAD OF  REVISION

11     44 - 8          SEPPING              INSTEAD OF  SETTING

12                                          _____

13                                          _____

14                                          _____

15                                          _____

16                                          _____

17                                          _____

18                                          _____

19                                          _____

20                                          _____

21

22                              NAME:  _____

23                              DATE:  June 20 / 2019

24

25

Cassian Reporting, LLC
(860) 595-7462 - scheduling@cassianreporting.com