| | | |
|---|---|---|
| HUNTINGTON TECHNOLOGY FINANCE, INC. f/k/a MACQUARIE EQUIPMENT FINANCE, INC. f/k/a MACQUARIE EQUIPMENT FINANCE, LLC, Plaintiff, | : : : : : : | CIVIL ACTION 3:18-CV-01708 (VLB) |
| v. | : : | |
| GARETT ALAN NEFF, a/k/a GARY NEFF, JOHN MARK SCHMID, and DAVID KARL SCHMID, Defendants. | : : : : | March 24, 2020 |

**MEMORANDUM OF DECISION GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT [ECF NO. 38] AND DENYING
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [ECF NO. 36]**

Plaintiff Huntington Technology Finance, Inc., f/k/a Macquarie Equipment Finance, Inc., f/k/a Macquarie Equipment Finance, LLC ("Huntington") brought the instant action for breach of contract, seeking payment allegedly owed by Defendants Garett Alan Neff (a/k/a Gary Neff), John Mark Schmid, and David Karl Schmid (collectively "Defendants") pursuant to their guaranty of a lease of a multimedia advertising sign in New York City. Presently before the Court are Huntington's Motion for Summary Judgment, [ECF No. 38], and Defendants' Motion for Partial Summary Judgment [ECF No. 36]. For the reasons discussed below, the Court GRANTS Huntington's Motion for Summary Judgment and DENIES Defendants' Motion for Partial Summary Judgment.

I. **Material Facts**

Huntington is a lease finance corporation organized under the laws of the State of Delaware with a place of business in Pittsburgh, Pennsylvania. [ECF No.

1 (Complaint) ¶ 1]. Defendants are three adult individuals residing in Connecticut. *Id.* ¶¶ 2-4.

The Defendants are members of Garage Media, LLC ("GMCT"), a Connecticut limited liability company that was formed on or about January 15, 2009. [ECF No. 37: Defendants' Local Rule 56(a)(1) Statement ("Defs.' 56(a)(1) Stmt.") ¶ 2]; [ECF No. 36-7: Exhibit 4 to Defs.' 56(a)(1) Stmt.; Declaration of Garett Neff ("Neff Decl.") ¶ 2]; [ECF No. 42: Huntington's Local Rule 56(a)(2) Statement ("Pl.'s 56(a)(2) Stmt.") ¶ 2].

GMCT is the sole member of Garage Media NY LLC ("GMNY"), a New York limited liability company that was formed on or about October 5, 2010. Defs.' 56(a)(1) Stmt. ¶ 3; Neff Decl. ¶ 3; Pl.'s 56(a)(2) Stmt. ¶ 3.

On October 26, 2010, Huntington and GMNY entered into a Lease Agreement entitled "Lease No. 001," in which GMNY leased "a 6,010 square foot Mediamesh installation [the "Sign"] manufactured by GKD – Gebr. Kufferath AG of Düren, Germany" ("GKD") from Huntington. [ECF No. 38-2: Huntington's Local Rule 56(a)(1) Statement ("Pl.'s 56(a)(1) Stmt.") ¶ 1]; [ECF No. 38-3 at 11-21 (the "Lease")]. The Sign is an electronic billboard mounted on the bus terminal of the Port Authority of New York and New Jersey (the "Port Authority") in New York City that displays advertisements for various companies, including Netflix, Facebook, and Twitter. Pl.'s 56(a)(1) Stmt. ¶ 30.

The Lease called for GMNY to make four types of payments. GMNY was obligated to pay rent monthly and, in the event of a payment default, to pay interest on all amounts past due 30 or more days at a rate of 12% per year. Defs.'

Rule 56(a)(1) Stmt. ¶ 25; Lease ¶ 25. Third, GMNY was obligated to pay taxes levied on the Sign. Lease ¶ 7; Defs.' Rule 56(a)(1) Stmt. ¶ 24. Finally, GMNY was required to pay a "Lessor's Return" in the event of default, calculated in accordance with Paragraph 19 of the Lease. Pl.'s Rule 56(a)(1) Stmt. ¶ 16; Defs.' Rule 56(a)(1) Stmt. ¶ 23. At the end of the lease term, should GMNY exercise the "Three Year Renewal with End-of-Term Ownership" option, GMNY could make monthly rent payments of $71,987 for three years, and GMNY could then purchase the sign for one dollar, irrespective of its value. Lease ¶ 6(a)(v).

In support of the Lease, Defendants each signed a Guaranty that guaranteed GMNY's payment of the amounts due under the Lease. Pl.'s 56(a)(1) Stmt. ¶ 2; [ECF No. 38-3 at 23-25 ("Defendants' Guaranty")]; Defs.' 56(a)(1) Stmt. ¶ 4(d). In further support of the Lease, GMCT also executed a Guaranty, signed by Defendant Garett Neff, guaranteeing GMNY's payments due under the Lease. Defs.' 56(a)(1) Stmt. ¶ 4(e); [ECF No. 36-10 ("GMCT's Guaranty")].

The Lease, Defendant's Guaranty and GMCT's Guaranty each state that they are governed by New York law without regard to conflicts of law principles. Lease ¶ 34; Defendant's Guaranty ¶ 9; GMCT's Guaranty ¶ 9.

Defendants' Guaranty stated that the "Agreements" being guaranteed included:

> any and all of the various agreements, instruments, documents, or other arrangements, now or hereinafter arising, or from time to time in effect, by [GMNY and/or GMCT] in favor of [Huntington] or which [Huntington] may be entitled to the benefit of, including such as are executed, entered into, or made by [GMNY and/or GMCT] directly with or to [Huntington], or of which [Huntington] is a third-party beneficiary, or which may be assigned or collaterally assigned, in whole or in part, to [Huntington], including any promissory notes,

any personal property leases, and also including any security agreements, collateral agreements, or other agreements entered into in connection with or in furtherance of any of the foregoing or otherwise providing for additional collateral or security to [Huntington], in connection with a loan, lease, or other financial accommodation made by [Huntington] to or for [GMNY and/or GMCT], or in connection with any other transaction to which [GMNY and/or GMCT] is a party or otherwise bound, whether any of the foregoing are written or oral or electronic or otherwise established.

**Defendants' Guaranty ¶ 1.**

Defendants' Guaranty stated that it was an absolute and unconditional guaranty that was not to be affected, diminished, or released under any conditions:

[Defendants] unconditionally guarantee[] to [Huntington] the full and prompt payment, observance and performance when due of all obligations of [GMNY and/or GMCT] arising under the Agreements (collectively the "Guaranteed Obligations"). This Guaranty is absolute, continuing, unlimited, and independent, and shall not be affected, diminished or released for any reason whatsoever, including the following: (a) any invalidity or lack of enforceability of any of the Guaranteed Obligations, or (b) the absence of any attempt by [Huntington] to collect any of the Guaranteed Obligations from [GMNY and/or GMCT] or any other guarantor of the Guaranteed Obligations, or the absence of any other action to enforce the same, or (c) the renewal, extension, acceleration or any other change in the time for payment of, or other terms relating to the Guaranteed Obligations; or (d) any modification, amendment, waiver, or other change of the terms of the Agreements, including any such modification, amendment, waiver, or change which expands or increases [Defendants'] obligations under this Guaranty; or (e) the failure by [Huntington] to take any steps to perfect and maintain any security interest in, or to preserve its rights to, any security or collateral relating to the Guaranteed Obligations; or (f) any action affecting [GMNY and/or GMCT] or any other guarantor of the Guaranteed Obligations; or (g) any judicial or governmental action affecting [GMNY and/or GMCT] or the Guaranteed Obligations, including [GMNY and/or GMCT's] release from the Guaranteed Obligations or the rejection or disaffirmance of the Agreements or other agreement or any of the terms thereof; or (h) any disability, defense or cessation of the liability of [GMNY and/or GMCT]; or (i) any assignment or transfer of any rights relating to the Guaranteed

4

Obligations; or (j) any other circumstance which might otherwise constitute a defense or a discharge of [GMNY and/or GMCT], [Defendants] or any other guarantor of the Guaranteed Obligations, including the disallowance of all or any portion of [Huntington's] claims for payment or performance of the Guaranteed Obligations under Section 502 of Title 11 of the United States Code.

**Defendants' Guaranty ¶ 2.**

Defendant's Guaranty also provided that Defendants' defenses to

enforcement of the Guaranty were waived:

[Defendants] waive[] demand, protest or notice of any default or nonperformance by [GMNY and/or GMCT], all affirmative defenses, offsets and counterclaims against [Huntington], any right to the benefit of any security, and any requirement that [Huntington] proceed first against [GMNY and/or GMCT], any other guarantor of the Guaranteed Obligations, or any collateral security.

*Id.* ¶ 3.

GMCT's Guaranty stated that the "Agreements" being guaranteed

included:

any and all of the various agreements, instruments, documents, or other arrangements, now or hereinafter arising, or from time to time in effect, by [GMNY] in favor of [Huntington] or which [Huntington] may be entitled to the benefit of, including such as are executed, entered into, or made by [GMNY] directly with or to [Huntington], or of which [Huntington] is a third-party beneficiary, or which may be assigned or collaterally assigned, in whole or in part, to [Huntington], including any promissory notes, any personal property leases, and also including any security agreements, collateral agreements, or other agreements entered into in connection with or in furtherance of any of the foregoing or otherwise providing for additional collateral or security to [Huntington], in connection with a loan, lease, or other financial accommodation made by [Huntington] to or for [GMNY], or in connection with any other transaction to which [GMNY] is a party or otherwise bound, whether any of the foregoing are written or oral or electronic or otherwise established.

**GMCT's Guaranty ¶ 1.**

GMCT's Guaranty stated that it was an absolute and unconditional guaranty that was not to be affected, diminished, or released under any conditions:

> [GMCT] unconditionally guarantees to [Huntington] the full and prompt payment, observance and performance when due of all obligations of [GMNY] arising under the Agreements (collectively, the "Guaranteed Obligations"). This Guaranty is absolute, continuing, unlimited, and independent, and shall not be affected, diminished or released for any reason whatsoever, including the following: (a) any invalidity or lack of enforceability of any of the Guaranteed Obligations; or (b) the absence of any attempt by [Huntington] to collect any of the Guaranteed Obligations from [GMNY] or any other guarantor of the Guaranteed Obligations, or the absence of any other action to enforce the same; or (c) the renewal, extension, acceleration or any other change in the time for payment of, or other terms relating to the Guaranteed Obligations; or (d) any modification, amendment, waiver, or other change of the terms of the Agreements, including any such modification, amendment, waiver, or change which expands or increases [GMCT's] obligations under this Guaranty; or (e) the failure by [Huntington] to take any steps to perfect and maintain any security interest in, or to preserve its rights to, any security or collateral relating to the Guaranteed Obligations; or (f) any action affecting [GMNY] or any other guarantor of the Guaranteed Obligations; or (g) any judicial or governmental action affecting [GMNY] or the Guaranteed Obligations, including [GMNY's] release from the Guaranteed Obligations or the rejection or disaffirmance of the Agreements or other agreement or any of the terms thereof; or (h) any disability, defense or cessation of the liability of [GMNY]; or (i) any assignment or transfer of any rights relating to the Guaranteed Obligations; or (j) any other circumstance which might otherwise constitute a defense or a discharge of [GMNY], [GMCT] or any other guarantor of the Guaranteed Obligations, including the disallowance of all or any portion of [Huntington's] claims for payment or performance of the Guaranteed Obligations under Section 502 of Title 11 of the United States Code.

GMCT's Guaranty ¶ 2.

GMCT's Guaranty also provided that GMCT's defenses to the enforcement of the Guaranty were waived:

[GMCT] waives demand, protest or notice of any default or nonperformance by [GMNY], all affirmative defenses, offsets and counterclaims against [Huntington], any right to the benefit of any security, and any requirement that [Huntington] proceed first against [GMNY], any other guarantor of the Guaranteed Obligations, or any collateral security.

GMCT's Guaranty ¶ 3.

Several other agreements were also executed on October 26, 2010 in conjunction with the signing of the Lease. These included:

- A "Display Agreement" between GMNY and CBS Outdoor Media ("CBS"). This agreement allowed CBS, who had previously gotten permission from the Port Authority to install and operate an outdoor advertising sign on the exterior of the Port Authority bus terminal, to license those rights to GMNY and allow GMNY to install the Sign on the bus terminal between October 26, 2010 and December 31, 2018. Defs' 56(a)(1) Stmt. ¶ 4(a); [ECF No. 36-8 ("Display Agreement")].

- An Equipment Purchase Agreement between GMCT, GMNY, A2a Media, Inc. ("A2a Media"), who was to obtain advertising for the sign for GMNY, and GKD, in which GKD agreed to sell and construct the Sign for $6,026,000. Defs' 56(a)(1) Stmt. ¶ 4(b); [ECF No. 36-9 ("Equipment Purchase Agreement")].

- A Pledge and Security Agreement between Huntington and GMCT in which GMCT, in order to "secure the payment and performance of GMCT's [o]bligations" to Huntington under the Lease, Guaranty, and any associated agreements, granted Huntington "a lien on, security interest in, and right of setoff against, among other property, general intangibles and 'all of the stock, shares, membership interests, partnership interests and other equity ownership interests in [GMNY] now or hereafter held by [GMCT]' and 'all of [GMCT]'s rights to participate in the management of [GMNY], [and] all rights, privileges, authority and powers of [GMCT] as owner or holder of Ownership Interests in [GMNY].'" Defs.' 56(a)(1) Stmt. ¶ 4(f); [ECF No. 36-11 ("GMCT's Pledge and Security Agreement")].

- An Equity Power Agreement in which GMCT pledged its entire ownership interest in GMNY. Defs.' 56(a)(1) Stmt. ¶ 4(g); [ECF No. 36-12 ("GMCT's Equity Power Agreement")].[1]

---

[1] The party to whom GMCT pledged its entire ownership in GMNY is blank in the Equity Power Agreement; the Agreement states "To Remain Blank – Not Completed at Closing." GMCT's Equity Power Agreement. The Agreement also

- A Pledge Agreement between Defendants and Huntington in which Defendants, in order to "secure the payment and performance of [Defendants'] [o]bligations" to Huntington under the Lease, Guaranty, and any associated agreements, granted Huntington "a lien on, security interest in, and right of setoff against, among other property, 'all of the stock, shares, membership interests, partnership interests and other equity ownership interests in [GMCT] now or hereafter held by [the Defendants]' and 'all of [the Defendants]' rights to participate in the management of [GMCT], [and] all rights, privileges, authority and powers of [the Defendants] as owner or holder of Ownership Interests in [GMCT].'" Defs.' 56(a)(1) Stmt. ¶ 4(h); [ECF No. 36-13 ("Defendants' Pledge Agreement")].

- An Equity Power Agreement in which the Defendants pledged their entire ownership interest in GMCT. Defs.' 56(a)(1) Stmt. ¶ 4(i); [ECF No. 36-14 ("Defendants' Equity Power Agreement")].[2]

The Lease was amended four times. Amendment No. 1 was dated June 13, 2010[3] and was executed on June 23, 2011, Amendment No. 2 was dated July 28, 2011 and was executed on July 29, 2011, Amendment No. 3 was dated September 1, 2012 and was executed on October 30, 2012, and Amendment No. 4 was dated March 31, 2013 and was executed on March 18, 2013. Defs.' 56(a)(1) Stmt. ¶ 5;

---

makes no mention of the reason for the Pledge of GMCT's entire ownership interest in GMNY. *Id.*

[2] Although Defendants' 56(a)(1) Statement ¶ 4(i) states that Defendants' Equity Power Agreement constituted a pledge that "was retained by [Huntington]," Defendants' actual Equity Power Agreement, like GMCT's, leaves blank who their ownership interest was pledged to, stating "To Remain Blank – Not Completed at Closing." Defendants' Equity Power Agreement. The Agreement also makes no mention of the reason for the Pledge of Defendants' entire ownership interest in GMCT. *Id.*

[3] Garett Neff testified at his deposition that the date June 13, 2010 at the top of page 1 of Amendment No. 1 was a typographic error; it should have read June 13, 2011. Deposition Transcript of Garett Neff ("Neff Depo. Tr.") at 64:21-65:4.

[ECF No. 38-3 at 27-29 (Amend. No. 1), 31-32 (Amend. No. 2), 34 (Amend. No. 3), and 36-37 (Amend. No. 4) (collectively the "Lease Agreement")].

The Sign went "live" on June 10, 2010. In July 2011, the first of a series of technical problems with the Sign occurred. Defs.' 56(a)(1) Stmt. ¶ 12; Pl.'s 56(a)(2) Stmt. ¶ 12. GKD performed maintenance services on the Sign, but never fully remedied the technical issues. Pl's 56(a)(1) Stmt. ¶ 46.

A2a Media was GMNY's initial exclusive sales agent engaged to obtain advertising for the Sign. Pl.'s 56(a)(1) Stmt. ¶ 31. A2a Media underperformed, GMNY initially relegated A2a Media to its non-exclusive sales agent on June 26, 2012, and later terminated A2a Media and replaced it with Clear Channel Media in March 2014. Pl.'s 56(a)(1) Stmt. ¶¶ 35, 42-44.

GMNY did not make certain payments required under the Lease and its amendments to Huntington. Compl. ¶ 13; [ECF No. 24 (Answer) ¶ 13 ("the Defendants admit that certain payments of rent and taxes due under the Lease Documents (as defined in the Complaint) were not made by GMNY.")]; Pl.'s 56(a)(1) Stmt. ¶ 8; Defs.' 56(a)(1) Stmt. ¶ 12 ("GMNY was unable to earn sufficient sums from selling advertising on the Sign to service the debt due to the Plaintiff and cover operating costs."). Specifically, after making monthly payments from the start of the lease in November 2011, GMNY made only a partial payment of $70,000 for the month of February 2015, and then ceased paying anything to Huntington after that. [ECF No. 38-3 at 36, 8][4]; [ECF No. 45 at 4-5].

_____

[4] Huntington provided an affidavit by their employee John Zimneth enclosing a tabular summary of payments allegedly owing by GMNY/Defendants. [ECF No. 38-3 at 2-9]. The summary shows that in February 2015, GMNY allegedly owed

On or about December 11, 2015, Huntington issued a Letter of Credit in the amount of $600,000 for the benefit of Outfront Media Group, LLC ("Outfront"), the successor-in-interest to CBS, who had, as discussed earlier, entered into the Display Agreement with GMNY. Pl.'s Rule 56(a)(1) Stmt. ¶ 7. Defs.' Rule 56(a)(2) Stmt. ¶ 7. The letter of credit was issued to secure GMNY's obligation to make payment to Outfront under the Display Agreement. [ECF No. 38-3 at 42-43 ("Letter of Credit")].

On October 2, 2018, Huntington sent a letter to GMNY and to GMCT and Defendants as guarantors notifying them that certain payments due to Huntington were past due. Pl.'s Rule 56(a)(1) Stmt. ¶ 9; [ECF No. 38-3 at 39-40].

On October 15, 2018, Huntington filed suit, asserting a single count for breach of contract, in that the Defendant "Guarantors have absolutely and unconditionally guaranteed the payment of all sums due and owing by [GMNY] to Huntington under the terms and conditions of the Lease Documents," and therefore "Guarantors are in default under the terms and conditions of the Guaranty for, among other reasons, failure to make payments when due in accordance with the Lease Documents and the Guaranty." Compl. ¶¶ 19-20.

On December 5, 2018, Outfront sent Huntington a letter notifying them that GMNY had failed to make certain required payments under the Outfront-GMNY Display Agreement; Outfront therefore drew on the entire principal balance of the Letter of Credit in the amount of $600,000. Pl.'s Rule 56(a)(1) Stmt. ¶¶ 20-21. On

$135,500 rent and $12,025.63 interest, for a total of $147,525.63, and had an unpaid amount owing of $77,525.63, which means that GMNY made a payment of $70,000 that month. *Id.* at 8.

January 23, 2019, Huntington sent GMNY a letter demanding that GMNY reimburse it for the $600,000 payment made to Outfront pursuant to the previously issued Letter of Credit.  *Id.* ¶ 22.  GMNY has not made any payment on the Letter of Credit.

## II. <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. Cnty. Of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).  Put

another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518. Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726-27 (2d Cir. 2010).

III. <u>The Parties' Arguments</u>

A.    Huntington's Argument

Huntington argues that "[i]t is undisputed that GMNY failed to make payment to Huntington when due," "that Guarantors [i.e. Defendants] . . . unconditional[ly] . . . guaranteed the obligations of GMNY," and Defendants "waived all defenses to enforcement."  [ECF No. 38-1 at 3].  Because of this, any of Defendants' purported defenses are ineffective to prevent enforcement of Defendants' Guaranty; therefore, Defendants owe all unpaid amounts under the Lease Agreement and summary judgment should enter in Huntington's favor.  *Id.*

According to Huntington, "[t]he Guaranty, like any written agreement, 'is subject to the ordinary principles of contract construction.'"  *Id.* at 4 (quoting

12

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 36 N.E.3d 80, 85 (N.Y. 2015)). Therefore, Defendants' Guaranty "must be enforced according to the plain meaning of its terms." *Id.* (citing *Navarro*, 36 N.E.3d at 85). "[T]o establish a prima facie case that it is entitled to recover on the Guaranty, [Huntington] must show: '(1) that it is owed a debt from a third party; (2) that the defendant[s] made a guarantee of payment of the debt; and (3) that the debt has not been paid by either the third party or the defendant[s].'" *Id.* (quoting *Chem. Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir. 1994) and noting that, according to *HSH Nordbank AG N.Y. Branch v. Street*, 421 F. App'x 70, 72 (2d Cir. 2011), "where a creditor seeks summary judgment upon a written guaranty, 'the creditor need prove no more than an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guarantee.'").

Huntington contends all three elements supporting its claim are satisfied.

First, Huntington says, it is undisputed that GMNY owes unpaid rent under the Lease Agreement and owes "the [required] payment of all taxes associated with the Sign." *Id.* at 4-5 (citing Defendants' Answer[5] and Defendants' individual deposition transcripts[6] admitting GMNY's failure to make payment). Huntington also claims GMNY owes interest due on the outstanding rent and taxes, owes

---

[5] [ECF No. 24 ¶ 13 ("Defendants admit that certain payments of rent and taxes due under the Lease Documents (as defined in the Complaint) were not made by GMNY.")].

[6] *See, e.g.*, Deposition Transcript of Garett Neff, [ECF No. 38-3 at 50-138], 88:9-17 ("You would agree that from time to time payments were missed; is that correct? . . . A. That's correct. . . . Q. At some point you stopped paying; is that correct? A. Yep.").

Huntington the Lessor's Return and interest on the Lessor's Return, owes Huntington for the Letter of Credit to Outfront Media, as well as interest on the Letter of Credit, *id.* at 5-6, and, under Paragraph 7 of the Defendants' Guaranty, Defendants "agreed to pay all costs and expenses, including all court costs and legal fees and expenses, incurred by Huntington in connection with the enforcement of the Guaranty." [ECF No. 38-1 at 7 (citing Defendants' Guaranty ¶ 7)].

Second, Defendants "unconditionally guaranteed the full and prompt payment of all amounts due and owing by GMNY to Huntington," *id.* at 6 (quoting Defendants' Guaranty ¶¶ 1-2), which means Defendants waived any possible defenses at the time they signed the Guaranty. *Id.* at 9-11 ("Because [Defendants] expressly agreed that their guarantee of GMNY's obligations to Huntington was absolute and without setoff of any kind, their defenses fail as a matter of law."). Huntington cites New York cases allegedly holding that an absolute and unconditional guaranty "foreclose[s], as a matter of law, guarantors from asserting any defenses or counterclaims." *Id.* (quoting *First N.Y. Bank for Bus. v. DeMarco*, 130 B.R. 650, 654 (S.D.N.Y. 1991)); *see also e.g. id.* at 9 (quoting *Compagnie Financiere de Cic et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 36 (2d Cir. 1999), in which "the Second Circuit Court of Appeals found that a guaranty which defined the guarantor's obligations as 'unconditional and irrevocable, irrespective of . . . any other circumstances which might otherwise constitute a legal or equitable discharge [or] defense' had the effect of waiving all legal or equitable defenses raised by the defendants.");

14

*id.* at 10-11 n.3 (citing New York appellate or Court of Appeals cases holding the same). Because New York law, according to Huntington, prohibits a guarantor's defenses from nullifying the legal effect of an absolute and unconditional guarantee, each of the Defendants' claimed defenses "necessarily fails, and Huntington is entitled to judgment in its favor." *Id.* at 11.

Third, Huntington argues that "[a]s of the date of the Motion [for Summary Judgment], the sums owed to Huntington have not been repaid by GMNY or the [Defendants]." *Id.* at 7. Because of this, all three elements of liability under a guaranty are met, and therefore "the Court should grant summary judgment in Huntington's favor and against the [Defendants]." *Id.* at 8.

Huntington argues that even if Defendants' anticipated defenses are assertible by Defendants in their effort to overcome the Guaranty, Huntington did not, in fact, interfere with GMNY's use of the Sign, either by demanding that Defendants' fire their advertising sales agent, A2a Media, or preventing GMNY from suing the Sign's manufacturer, GKD, or otherwise acting unreasonably or in bad faith. *Id.* at 12-13. Huntington cites GMNY's use of an advertising consultant called "Field Activate," which Huntington claims was the entity that recommended terminating A2a Media, not Huntington, *id.* at 13-14, and Defendant Garett Neff's own deposition testimony where he stated that "we got on the bandwagon of the program . . . we understood we had to make a change . . . [and] leave A2a behind." *Id.* at 15 (quoting Neff Depo. Tr. at 159:6-12). Huntington also quotes Garett Neff who stated "that GMNY 'never' considered a lawsuit against GKD," *id.* (quoting Neff Depo. Tr. at 70:6-8, 22-23), belying Defendants' anticipated

argument that Huntington prevented GMNY from doing so. Huntington argues that Defendants even complimented Huntington on its commercial behavior as GMNY ran into difficulties, with Mr. Neff testifying that Huntington was not only looking out for its own interests but that it "was sincerely looking at our interest as well." *Id.* at 16 (quoting Neff Depo. Tr. at 186:3-6). In sum, Huntington argues that even if Defendants can assert GMNY's defenses to attempt to thwart their Guaranty obligations, Defendants "have failed to adduce sufficient evidence to prove their defenses" and "[s]ummary judgment in favor of Huntington is therefore warranted." *Id.*

## B. Defendants' Arguments

Defendants do not contest the fact that GMNY failed to pay certain rent payments required under the Lease Agreement, nor do they argue that Defendants' Guaranty, that they each signed, is invalid or unenforceable. Rather, Defendants argue that the Lease Agreement is not, in fact, a true leasing arrangement, but rather represents a mere security interest in Huntington's favor in GMNY's payments under the lease. As a result, Defendants claim that many items other than the unpaid rent, such as the Lessor's Return and Letter of Credit and interest on both, as well as taxes owing under the Lease Agreement, are inapplicable. [ECF No. 43-1 at 16-25]; [ECF No. 36 (Motion for Partial Summary Judgment)]. And, because the true nature of the Lease Agreement, according to Defendants, is a security interest, it is governed by Article 9 of the Uniform Commercial Code ("UCC"), not Article 2A, as a lease would be, and therefore they *can* assert defenses such as the requirement of good faith and fair dealing, which

16

can never be waived under Article 9 of the UCC. [ECF No. 43-1 at 11-27]; [ECF No. 36-1].[7]

Defendants argue that the record shows that there are at least "genuine issues for trial on [Defendants'] affirmative defenses." *Id.* at 29. For example, according to Defendants, when A2a Media underperformed, Huntington demanded that GMNY replace it and Huntington threatened to "take action against GMNY" if it did not. *Id.* at 30-31. When GMNY did so, its income dropped precipitously and never recovered. *Id.* at 32. This shows, according to Defendants, that "if GMNY had been able to run its business free from interference by [Huntington], sales would not have dropped and GMNY would have been able to continue to make payments to [Huntington] with necessary contributions from the Defendants." *Id.* Defendants also assert that Huntington made clear GMNY should not sue GKD about the faulty Sign, *id.* at 33, and Huntington torpedoed GMNY's relationship with the Port Authority at a critical time by informing them that GMNY was behind on its payments to Huntington, which "completely destroyed" GMNY's business because the Port Authority declined to renew its Display Agreement with GMNY when it expired on December 31, 2018. *Id.* at 33-34. In sum, Defendants argue that "[a]t a minimum, there are genuine issues of fact to be tried as to the manner in which the Plaintiff exercised

---

[7] Defendants' arguments as to why the Lease Agreement is a mere security interest and not a true lease are detailed in both their Motion for Partial Summary Judgment and their Opposition to Huntington's Motion for Summary Judgment. [ECF No. 36-1 at 11-15]; [ECF No. 43-1 at 11-16]. Essentially, Defendants argue that under the controlling UCC Article 9 "Bright Line Test," the fact that they (i) could not terminate the Lease and (ii) could purchase the Sign at the end of the Renewal Term for $1 makes the Lease a mere security interest, not a true lease.

control over GMNY's business in ways that damaged GMNY's business, and whether such conduct by the Plaintiff violated the Plaintiff's duties of good faith, reasonableness, care and diligence." *Id.* at 34. For this reason, according to Defendants, summary judgment should not enter in Huntington's favor.

C.    Huntington's Reply

Huntington replies that the Defendants "expressly waived any defenses to enforcement under the[ir] Guaranty's express terms. Accordingly, [Defendants] are precluded from arguing that the Lease Agreement represents a secured financing transaction." [ECF No. 45 at 2-3 (citing *136 Field Point Circle Holding Co. v. Invar Int'l Holding, Inc.*, 644 F. App'x 10, 12-13 (2d Cir. 2016), which held that "these plain terms, in broad, sweeping and unequivocal language, bound [guarantor] to the obligations recited in the [l]ease, regardless of whether the [l]ease or its provisions were enforceable as to the [lessor].")." Further, Huntington argues that "there is no authority outside of the bankruptcy context that stands for the proposition that in an action filed in state or federal district court governed by state law, guarantors under a lease agreement have the right to seek recharacterization as a defense." *Id.* at 3.[8]

In response to Defendants' Motion for Partial Summary Judgment, Huntington argues that even if the Lease Agreement must be recharacterized as a

_____

[8] Huntington's arguments as to why the Lease Agreement is, in fact, a true lease are contained in its Opposition to Defendants' Motion for Partial Summary Judgment. [ECF No. 41 at 6-8]. Huntington argues that because the Lease allowed GMNY to purchase the Sign at the end of the Base Term for approximately $1.2 million, the governing "Bright Line Test" was not met, which means the Lease is a true lease.

security interest and not a true lease, Defendants are still liable for the Lessor's

Return, taxes, default interest, and the Letter of Credit:

> even if the factors set forth at Section 1-201(37) of the UCC indicate that the Lease Agreement represents a secured financing transaction, . . . Section 1-302 of the UCC provides that, with the exception of parties' obligations of good faith, all UCC provisions may be varied by agreement. N.Y. U.C.C. Law § 1-302. . . . [T]he parties mutually agreed under the Lease Agreement and the Guaranty that certain amounts must be paid by GMNY and/or Guarantors in exchange for use of the Sign and after default, including a Lessor's Return and taxes.  Labeling the parties' transaction as a "lease" or "financing" does not alter the parties' prior mutual agreement.

[ECF No. 41 at 9-10 (citing *In re 3 Ram, Inc.*, 343 B.R. 113, 119 n.17 (Bankr. E.D. Pa. 2006))].

Finally, Huntington argues that its disclosure to the Port Authority

regarding GMNY's failure to make payment under the Lease Agreement did not

evince bad faith because (1) the disclosure did not prevent GMNY from making

payment under the Lease Agreement, and (2) the disclosure did not negatively

impact GMNY's relationship with the Port Authority as "the Port Authority

continued to negotiate an extension [with GMNY], and even proposed a draft

agreement in connection with the same."  [ECF No. 45 at 10 n.4].

IV. <u>Analysis</u>

A.    Defendants Have Not Shown the Lease is a Security Interest, not a True Lease, which Means Defendants May Not Assert Defenses to Enforcement of the Guaranty

For the following reasons, the Court finds Defendants have not met their

burden to show that the Lease Agreement is a mere security interest rather than a

true lease.   Because of this, (i) Defendants may not assert their purported

defenses, which they waived as allowed by UCC Article 2A governing leases, and, (ii) there are important implications regarding the amounts Defendants owe under the Lease.

"Under New York Law, [if Defendants are] seeking to characterize the [Lease Agreement] as a secured financing arrangement rather than a lease, [Defendants] bear the burden of proof on that issue." *In re Pillowtex*, 349 F.3d 711, 716 (3d Cir. 2003) (citing New York law and *In re Owen*, 221 B.R. 56, 60 (Bankr. N.D.N.Y. 1998)); *In re Owen*, 221 B.R. at 60 ("The Debtors have the burden of demonstrating that the transaction was other than what it purports to be in the Agreement.").

The Court first notes that neither Huntington nor the Defendants have adequately explained how one makes the true lease vs. security interest determination, and neither have properly applied the required tests.

The "Bright Line Test" for whether a lease is a true lease or a sale with a security interest is statutorily contained in New York UCC § 1-201(37),[9] and consists of two parts. Recited in full, the test is as follows:

> (a) Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:

> (i) the original term of the lease is equal to or greater than the remaining economic life of the goods,

---

[9] Defendants note that because the Lease was entered into prior to December 2014, they analyze it under the former Section 1-201(37) rather than the revised Section 1-203. The Court follows suit.

**(ii)** the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

**(iii)** the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or

**(iv)** the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

[ECF No. 43-1 at 14-15 (quoting New York UCC § 1-201(37))]. The Lease provides at the end of the lease term, should GMNY exercise the "Three Year Renewal with End-of-Term Ownership" option, GMNY could make monthly rent payments of $71,987 for three years, and GMNY could then purchase the sign for one dollar, irrespective of its value. Lease ¶ 6(a)(v).[10] On the only clear measure of whether the Lease meets the Bright Line Test it fails because GMNY's right to purchase the sign at a nominal price is not triggered at the end of the lease term, but rather after GMNY extends the Lease past its term. There is no evidence of the economic life of the sign in the record or any other facts determinative of whether any of the other Bright Line Test criteria apply.

Further, Defendants are correct that the so-called "Bright Line Test" is used to determine whether a lease is a true lease or a security interest, but it is only part one of the analysis. As Defendants correctly explained, if the Bright Line Test is satisfied, then the lease at issue is actually a disguised "security

---

[10] Even after Lease Amendment Four, GMNY could only purchase the Sign for one dollar after exercising the "Renewal with End-of-Term Ownership" option, which would have required it to make nine monthly payments of $135,500 plus taxes. Lease Amendment Four ¶ 6(b).

interest as a matter of law," *Pillowtex*, 349 F.3d at 717, and not a true lease. But the reverse is not true. *Id.* "If, on the other hand, it is determined that 'the transaction is not a disguised security agreement per se, [we] must then look at the specific facts of the case to determine whether the economics of the transaction suggest such a result." *Id.* at 717-18 (citing cases). In other words, if the Bright Line Test is not satisfied, the lease in question is not automatically a true lease, as Huntington suggests, but rather is either a true lease or a security interest based on the facts of the "Lease" transaction.

The key fact determining whether a lease is a true lease or a security interest, assuming the Bright Line Test is not satisfied, is "whether the lessor retained a reversionary interest [in the property]. If there is a meaningful reversionary interest-either an up-side right or a down-side risk-the parties have signed a lease, not a security agreement. If there is no reversionary interest, the parties have signed a security agreement, not a lease." 4 White & Summers on the UCC § 30:14 n.1 (6th ed. 2019) (citing cases); *see also Addison v. Burnett*, 41 Cal. App. 4th 1288, 1296 (1996) ("In such a case [i.e. when the Bright Line Test is not satisfied], the court must then resort to an examination of the facts of the case to determine whether the lessor has retained a "meaningful residual interest" in the goods.") (citing White & Summers and cases). "As one court has explained, 'if the lessor retains a meaningful residual interest in the leased property at the end of the lease term, the lease is a true lease. If, however, the lessor cannot reasonably expect to receive back anything of value at the end of

the lease, then the lease creates a security interest." *Id.* at 1296 (quoting *Kimco Leasing, v. State Bd. of Tax Comm'rs*, 656 N.E.2d 1208, 1218 (Ind. 1995)).

Defendants claim, as mentioned, that they could not terminate the Lease Agreement, so part one of the Bright Line Test is satisfied, and at the end of the Renewal Term they could buy Huntington's interest in the Sign for $1, which is nominal, so part two (per paragraph four) is satisfied ("the lessee has an option to become the owner of the goods for no additional consideration or nominal consideration upon compliance with the lease agreement."). [ECF No. 43-1 at 14-16 (quoting N.Y. UCC § 1-201(37)(a)(iv))]. However, as noted above, GMNY does not have the right to purchase the sign at the end of the Lease for nominal consideration. That right is triggered only if the Lease is extended past its expiration date.

As explained by White & Summers, some leases are "chameleon" leases, taking on aspects of both true leases and security interests:

> consider a true lease for a term less than the economic life [of the goods…meaning that lessor retains a residual interest in them] that contains a renewal option . . . for the remaining economic life at a fair rental value. Until the option is exercised, the transaction is clearly a lease because it is not certain that the lessee will extend. If the lessee does exercise the option, by hypothesis, it will have to pay more than nominal consideration. On the other hand, once it has exercised the option, the lease absorbs the remaining economic life and will absorb the entire reversion. This is a 'chameleon' lease, a transaction that is a lease for its original term, which changes into a secured transaction if the option is exercised.

4 White & Summers § 30:16; *see also In re Marhoefer Packing*, 674 F.2d 1139, 1143-44 (7th Cir. 1982):

> Applying section 1-201(37), so construed, to the facts of this case, it is clear that the district court erred in concluding that the possibility

of Marhoefer's purchasing the [goods] for one dollar at the conclusion of a second four-year [renewal] term was determinative. Because Marhoefer could have fully complied with the lease without that option ever arising, the district court was mistaken in thinking that the existence of that option alone made the lease a conditional sale [i.e. not a lease]. Certainly, if Marhoefer had elected to renew the lease for another term, in which case the nominal purchase option would necessarily have arisen, then the clause (b) test would apply. But that is not the case we are faced with here. Marhoefer was not required to make any payments beyond the first four years. The fact that, at the conclusion of that term, it could have elected to renew the lease and obtain an option to purchase the [goods] for one dollar at the end of the second term <u>does not transform the original transaction into a conditional sale</u>.

*Id.* (emphasis added).

As can be seen from the Lease Agreement documents, specifically Lease Amendment No. 4, GMNY was required to make payments starting on November 1, 2011, and continuing until March 31, 2018. [ECF No. 38-3 at 36]. After that, GMNY had three options; (1) it could simply return the Sign to Huntington within 10 days of the end of the base term, (2) it could purchase the sign for $1,170,000, or (3) it could enter a nine-month Renewal Term, paying $135,500 each month, with the option to purchase the Sign at the end of the Renewal Term for $1. *Id.*

It is undisputed that GMNY stopped making any payment as of March 2015. Therefore, GMNY was still in the "base term" of the Lease and never got the chance to enter the renewal term. Therefore, the lease terms in question are the lease terms defined during the base term. Therefore, whether the Lease during the base term is a true lease or a mere security interest turns on whether "the lessor retains a meaningful residual interest in the leased property at the end of the [base] term." *Addison*, 41 Cal. App. 4th at 1296 (citing *Kimco Leasing*, 656 N.E.2d at 1218).

The problem for Defendants is that they have produced no evidence and do not even address whether Huntington retained a "meaningful residual interest" in the sign following the end of the base term. Defendants argue that because GMNY could purchase the sign for $1 at the end of the *renewal term* the lease was actually a mere security interest and not a true lease. But as White & Summers explain, and as the Court in *Marhoefer* held, that is not the proper question in a "chameleon" lease such as this. "The fact that, at the conclusion of that term, it could have elected to renew the lease and obtain an option to purchase the [goods] for one dollar at the end of the second term <u>does not transform the original transaction into a conditional sale</u>." *Marhoefer*, 674 F.2d at 1143-44 (emphasis added); *see also* 4 White & Summers § 30:16 ("Until the option is exercised, the transaction is clearly a lease because it is not certain that the lessee will extend. . . . On the other hand, once it has exercised the option, the lease absorbs the remaining economic life and will absorb the entire reversion. This is a "chameleon" lease, a transaction that is a lease for its original term, which changes into a secured transaction if the option is exercised.").

Because the burden is on the Defendants to show that the Lease Agreement was a security intertest and not a true lease, and they have failed to provide any material evidence in support of that argument, rather providing only irrelevant evidence of what would have happened *if GMNY had exercised the renewal option*, the Court finds Defendants have failed to establish the Lease Agreement is not what it purports to be, namely, a true lease, rather than a mere security interest. *See In re Johnson*, No. 15-00104-NPO, 2015 WL 1508460, at *6

(Bankr. S.D. Miss. Mar. 27, 2015) ("[T]he Court finds that the Debtor has failed to meet his burden in showing that the facts and circumstances of the transaction demonstrate that CTE did not retain a meaningful reversionary interest in the Freightliner at the end of the [base] lease term. Therefore, the Court finds that the Agreement is a 'true' lease under Mississippi commercial law."); *GEO Finance, LLC v. University Square 2751, LLC*, 105 F. Supp. 3d 753, 765 (E.D. Mich. 2015) ("The defendant has not submitted sufficient evidence from which a jury reasonably could conclude that GEO Finance had no expectation of recovering its equipment 'with some expected residual interest of value remaining at the end of the lease term.'") (quoting *In re Purdy*, 763 F.3d 513, 518 (6th Cir. 2014)); *Purdy*, 763 F.3d at 519 ("At all points in this analysis, the party challenging the leases bears the burden of proving that they are something else.").

Moreover, although the fact that GMNY could purchase the sign at the end of the base term of close to $1.2 million does not conclusively establish that the Lease is a true lease, as Huntington suggests, [ECF No. 45 at 3 ("[a] purchase price of nearly $1.2 million is not a nominal amount")], because some courts have found amounts other than $1 to be nominal, it strongly suggests that the parties envisioned that Huntington was to retain some residual, reversionary interest in the Sign at the end of the base term of the Lease. That supports the idea that the Lease Agreement is a true lease during the base term, and not a mere security interest.

In sum, under the Bright Line Test and the UCC rules for determining the nature of a purported lease, Defendants have failed to carry their burden to show

that the Lease Agreement is a mere security interest, and not a true lease. Because of this, UCC Article 2A, not Article 9, applies, which means that Defendants can and did waive any and all defenses to the enforcement of their Guaranty. There are also implications for the amounts owing by Defendants under the Lease, which will be discussed, *infra*.

B. **Even if Defendants' Defenses were Assertible, Huntington Evinced No Bad Faith**

Even if the Lease Agreement could be recharacterized as a mere security interest and not a true lease, which might serve to allow Defendants to assert defenses of bad faith and the like, the Court holds that the record fails to evince any bad faith conduct on Huntington's part.

Under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Svc.*, 663 N.E.2d 289, 291 (N.Y. 1995) (citing *Van Valkenburgh, Nooger & Neville v. Hayden Publ. Co.,* 281 N.E.2d 142, 144 (N.Y. 1972), *cert denied* 409 U.S. 875 (1972)). "This embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* at 291 (quoting *Kirke La Shelle Co. v. Armstrong Co.,* 188 N.E. 163, 167 (N.Y. 1933)). Put another way, "[t]he covenant of good faith and fair dealing, implied in every contract under New York law, 'includes an implied undertaking on the part of each party that he will not <u>intentionally and purposely</u> do anything to prevent the other party from carrying out the agreement on his part.'" *Lykins v. IMPCO Techs., Inc.*, No. 15 Civ. 2102 (PGG), 2018 U.S. Dist. LEXIS 111705, at *20 (S.D.N.Y. Mar. 6, 2018) (quoting *Kader v. Paper Software,*

*Inc.*, 111 F.3d 337, 342 (2d Cir. 1997)) (emphasis in original).  And, while the duty "includes a promise not to act arbitrarily or irrationally," *Dalton*, 663 N.E.2d at 291, "[a] plaintiff must show substantially more than evidence that the defendant's actions were negligent or inept." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014) (citing *Behren v. Warren Gorham & Lamont*, 808 N.Y.S.2d 157, 158 (N.Y. App. Div. 2005)); *see also Thompson v. Advanced Armament Corp.*, 614 F. App'x 523, 525 (2d Cir. 2015) ("Acts done out of 'negligence' or 'ineptitude' are insufficient, as are intentional acts done without the purpose of cheating the plaintiff.") (quoting *Sec. Plans*, 769 F.3d at 817).

"The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" *Dalton*, 663 N.E.2d at 291-92 (quoting *Murphy v. Am. Home Prods. Corp.,* 448 N.E.2d 86, 91 (N.Y. 1983)).  In addition, "[t]he boundaries of the duty do not . . . extend so far as to prevent a party from acting in its own interests even if the result is to incidentally lessen the value the other party expected to receive from the contract." *Gruppo, Levey & Co. v. ICOM Info. & Commc'ns., Inc.*, No. 01 Civ. 8922 (JFK), 2003 U.S. Dist. LEXIS 11213, at *28 (S.D.N.Y. July 12, 2003) (citing *M/A-Com Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)).  For this reason, "[t]he covenant will be breached only in a narrow range of cases." *Sec. Plans*, 769 F.3d at 817.  Indeed, "a party who asserts the existence of an implied-in-fact covenant bears a heavy burden, [because] it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists." *Lykins*, 2018 U.S. Dist. LEXIS 111705, at *21.

"Bad faith implies 'actual or constructive fraud,' a 'design to mislead or deceive another,' or a 'neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith means more than mere negligence; it involves a dishonest purpose.'" *Richards v. Direct Energy Servs., LLC*, 246 F. Supp. 3d 538, 557 (D. Conn. 2017) (citation omitted).

The case of *Wagner v. JP Morgan Chase Bank* is instructive. No. 06 Civ. 3126 (RJS), 2011 U.S. Dist. LEXIS 24518 (S.D.N.Y. Mar. 9, 2011). There, Plaintiffs sold a software company called Plexus to JP Morgan Chase, who planned to integrate Plexus' software into Chase's investment software portfolio. But after disappointing earnings deprived Plaintiffs of their earn-out payments, they sued Chase, claiming that Chase's firing of Plexus' Head of Sales, closing of Plexus' main office, and ultimate sale of Plexus to a third party constituted a breach of the implied covenant of good faith and fair dealing. The Court disagreed:

> Here, Plaintiffs have presented no evidence that any of Defendant's management decisions were undertaken for the purpose of depriving Plaintiffs of their earn-outs. To the contrary, from the time that the [Plexus purchase agreement] was executed, Plaintiffs' and Defendant's interests were perfectly aligned — both parties would have benefitted from Plexus' success. Given this alignment of interests, there is no credible evidence showing that Defendant sabotaged its own investment in Plexus in order to avoid making earn-out payments to Plaintiffs.

*Id.* at *12-13.

In *Keene Corp. v. Bogan*, Plaintiff Keene bought Defendant Bogan's company, SRS, and tried various schemes to make it profitable, which would have resulted in extra payments to Bogan. No. 88 Civ. 0217 (MBM), 1990 U.S.

Dist. LEXIS 220 (S.D.N.Y. Jan. 11, 1990). When SRS failed to become profitable, resulting in no payments to Bogan, and *Keene Corp.* sued Bogan on a promissory note signed in connection with the sale of Bogan's company, Bogan counterclaimed for breach of the implied covenant of good faith and fair dealing.

The Court found for *Keene Corp.*:

> A rational factfinder could conclude, from the evidence presented, only that Keene intended to make money, a conclusion fully supported by Bogan's own statements. At his own deposition, Bogan explained that the number of defective parts shipped out increased because the 'personnel at SRS were driven by forecasts to produce so many dollars per month, so many dollars per quarter, there was literally hell to pay, by the chairman of the board, and there were careers made and broke, if those dollars and those profits were not achieved.' (Bogan Dep. at 121, Pl. Exh. A) That Keene's policies were misguided or ignorant or even merely negligent does not show a breach of the implied covenant of good faith. In order for a jury to return a verdict for Bogan on this claim, it would have to find that Keene acted contrary to its apparent self-interest such that it would lose more by its alleged misconduct than it saved in payments to Bogan. There is no evidence to support this bizarre scenario. Therefore, Bogan's motion for summary judgment on his claim of breach of the implied covenant is denied, and Keene's motion for summary judgment dismissing that claim is granted.

*Keene Corp.*, 1990 U.S. Dist. LEXIS 220, at *47-48.

In *Lykins*, Plaintiff sold his vehicle fuel conversion company to Defendant, who mismanaged it, resulting in reduced payment to Plaintiff. Plaintiff sued, claiming breach of the implied covenant of good faith and fair dealing due to Defendant's "gross negligence and/or reckless management of the" purchased company. 2018 U.S. Dist. LEXIS 111705, at *23. The court disagreed, finding that "[a]ny inference that [Defendant] IMPCO acted with the intent of depriving Plaintiffs of their earn-out payments is belied by the fact that Plaintiffs' and Defendant's 'interests were perfectly aligned — both parties would have

benefitted from [IMPCO's] success.'" *Id.* at *28 (quoting *Wagner*, 2011 U.S. Dist. LEXIS 24518, at *12-13). In addition, "[Plaintiff] conceded as much at his deposition." *Id.* at *29 (quoting Plaintiff's deposition testimony conceding that it was in Defendant IMPCO's interest to fix the problems occurring with the purchased company). Summing up, the Court held: "In these circumstances, '[s]elf-interest ensures that the goal of profit maximization for the venture, not bad faith, guides th[e] party's decisions. Given this alignment of interests, there is no credible evidence showing that Defendant sabotaged its own investment in [the vehicle fuel conversion business] in order to avoid making earn-out payments to Plaintiffs." *Id.* at *31. "Accordingly, where a defendant has 'a genuine and colorable business justification for its decision, then its actions will not have been arbitrary, and thus will not have violated the implied covenant [of good faith].'" *Id.* at *32 (quoting *Sec. Plans*, 769 F.3d at 820).

Defendants' assertion that Huntington required them to fire A2a Media, which led to reduced sales and damaged GMNY's ability to make required payments under the Lease Agreement, [ECF No. 43-1 at 30-31], even if true, is not evidence of bad faith under New York law. Under binding New York precedent with similar fact patterns, Huntington was simply operating in its own self-interest to maximize its own profits under the Lease Agreement. Huntington's insistence that GMNY switch from A2a Media to another advertising provider may have been negligent, because perhaps A2a Media *was* GMNY's best option to obtain quality advertising, but there is no evidence to suggest that Huntington's insistence

existed to intentionally damage GMNY or Defendants; rather, Huntington was trying to maximize its return under the Lease Agreement.

As in *Lykins* and *Keene Corp.*, Defendants here conceded during their depositions that it was clear in GMNY's discussions with Huntington's point of contact John Zimmeth that Huntington's only motivation in insisting that GMNY replace A2a Media was to earn the money owing to Huntington under the Lease Agreement. GMNY's managing partner Garett Neff testified:

> Q. Did he tell you why he or someone at [Huntington] believed A2a Media had to go and be replaced?
>
> A. Purely the numbers. That's all he cared about; and rightly so, I'd say. Because the numbers were underneath the amount of funds to allow us to stay afloat. We were slightly below. We reorganized the debt a number of times, the payment schedule; but they were under-performing.
>
> . . .
>
> Q. Do you believe that he conscientiously engaged in dialog with you about where you were and what options Garage-Media might have at any given time?
>
> Mr. Henzy: Objection to form.
>
> A. I believe he was doing – I believe he was doing the right thing for [Huntington]. I think he was trying his best to maneuver the situation, and he was sincerely looking at our interest as well.
>
> Q. If you fast forward to today, do you think that he was able to extend the time within which Garage-Media had an opportunity to fix the financial situation, longer than you expected . . . Huntington to wait?
>
> A. I do, . . . ."

Neff Depo. Tr. at 185:3-186:12. Defendant John Schmid, GMNY member, testified:

> Q. Do you recall there being a point in time when Garage-Media commissioned Field Activate to study the performance and the future prospects for marketing for Garage-Media?
>
> A. I remember that John Zimmeth at that time was very unhappy and wanted us to find alternatives. As part of that, I was aware that we had the study done, but I don't remember.
>
> Q. Do you know whether on a periodic basis Gary Neff corresponded with Mr. Zimmeth and repeatedly advised him of the fact that A2a was under-performing?

A.      I know that on a regular basis Gary and John had calls. I was on a couple of them, and John was very aggressive about paying him his money.

Q.      Not uncharacteristic for a lessor or banker?

A.      Fair.

Q.      You mentioned that John Zimmeth – and I don't want to misstate your testimony – stated, suggested, or demanded that Garage-Media get rid of A2a Media, which was it?

A.      He – John Zimmeth was very aggressive with us to figure out how to manage the business so that we could pay [Huntington], yes.

. . .

Q.      You would say that he was vigilant in pursuing payment, would you not?

A.      Yes.

. . .

Q.      Do you know why Mr. Zimmeth never pulled the plug on the sign and took it back and declared you in default and demanded payment?

A.      I think he wanted to see the project be a success.

Q.      He was trying to make it a success rather than putting an end to it?

A.      Yes.

Q.      That was notwithstanding the fact that you were not making the payments?

A.      Yes.

Q.      For years?

A.      Yes. . . . When John was in the room, he was leading the meeting, and it was very clear that he considered – that he was trying to save the board.

Q.      He was trying to save the board for Garage-Media and so that [Huntington] got paid?

A.      Yes.

. . .

Q.      You would agree that Zimmeth's efforts were to assist Garage-Media in propping up the business so that it succeeded and/or [could] be sold?

A.      Yes.

Deposition Transcript of John M. Schmid ("Schmid Depo. Tr.") at 50:19-51:15, 83:10-12, 84:19-85:5, 95:17-22, 99:1-4, [ECF No. 38-4 at 18-30].

Given Defendants' concession that Huntington's motivation was *not* to destroy Defendants' business, GMNY, but rather to simply maximize its return under the Lease Agreement, the Court finds that "[a]ny inference that

[Huntington] acted with the intent of depriving [Defendants] of their [contract benefits] is belied by the fact that Plaintiffs' and Defendant['s] 'interests were perfectly aligned — both parties would have benefitted from [GMNY's] success.'" *Lykins*, 2018 U.S. Dist. LEXIS 111705, at *28 (quoting *Wagner*, 2011 U.S. Dist. LEXIS 24518, at *12-13). Huntington acted not only in its own interest but in the interest of GMNY. As in *Keene Corp.*, Defendants testified that Huntington was driven only by a desire to make money. 1990 U.S. Dist. LEXIS 220, at *47-48 ("A rational factfinder could conclude, from the evidence presented, only that [Huntington] intended to make money, a conclusion fully supported by [Defendants'] own statements."). Defendants do not allege and did not testify regarding any "sinister motive" or "dishonest purpose." *Richards*, 246 F. Supp. 3d at 557. "That [Huntington's] policies were misguided or ignorant or even merely negligent does not show a breach of the implied covenant of good faith." *Keene Corp.*, 1990 U.S. Dist. LEXIS 220, at *47-48.

In sum, Huntington's insistence, even if true, that Defendants/GMNY replace A2a Media is not evidence of bad faith, because Huntington's motive, as Defendants conceded, was not improper, rather, it was the same as Defendants', to make money.

Defendants also argue that Huntington's insistence that GMNY not sue GKD is evidence of bad faith as well, because Huntington "was making decisions with respect to whether or not to pursue any claims against GKD on account of the failures of the sign." [ECF No. 43-1 at 32-33]. The Court disagrees.

First, the only evidence Defendants cite for this instance of alleged bad faith is Huntington's employee John Zimmeth's strident behavior at one meeting with representatives from GKD, where he threatened GKD with suit:

A.    We called the president of GKD to the meeting.  It was myself, John Zimmeth, and Tom Polly [of GKD] was there.  He made it really, really clear that, you know, that this is a lemon product.  He felt strongly that he should be suing them for defective product. . . . He talked about suing GKD if they didn't resolve the technical issues because it's impacting everything in the project.

Q.    -- Zimmeth talked about the prospect of bringing suit against GKD?

A.    He played the heavy.  He was strong in his position to Tom Polly that he would have to resolve the problem, otherwise we are coming after you. . . . By selling them – even though the product was out of warrantee, and the product was, you know, challenged, they must resolve it.  Tom Polly committed – recommitted to his position that he's doing everything he can do to resolve it.  He continued to do that throughout the different phases of the project.

Q.    Did he react in that fashion, to continue his commitment to try to fix the project?

A.    It never deviated.

Q.    Okay.  And did you view these words by Mr. Zimmeth to be an effort to try to assist Garage-Media in procuring a positive outcome with GKD?

A.    . . . it had benefit to us.

Neff Depo. Tr. at 69:19-72:10.

Q.    When you talk about a meeting with GKD, tell me about that.

A.    . . . We were having issues with the technology, and he was basically telling GKD – oh, I remember exactly what he said.  He said, I represent [Huntington], and I can tell you that we are an Australian company.  We are not litigious by nature, but we come from a penal island.  When we do take you to court or when we do go after you, we go after you really hard.  I'm sure that you don't want us to go after you, so you better fix my sign.

Q.    So he was trying to help get the sign fixed that wasn't working properly?

A.    He was trying to help with that, yes.

. . .

Q.    What was the outcome of the meeting with [GKD]?

A.    I don't genuinely – I think GKD was working faster to get stuff done after that, but that was about it.

> Q. And by working faster to get stuff done, did you – do you mean to fix problems with the sign?
>
> A. Yes.

Schmid Depo. Tr. at 54:12-25, 59:13-19.

As with Huntington's alleged insistence that GMNY replace A2a Media, here there was no bad faith because Defendants' sworn testimony makes clear that Huntington's and GMNY/Defendants' "interests were perfectly aligned." *Lykins*, 2018 U.S. Dist. LEXIS 111705, at *28 (quoting *Wagner*, 2011 U.S. Dist. LEXIS 24518, at *12-13). Defendants do not allege that Huntington had some "sinister motive" or "dishonest purpose," *Richards*, 246 F. Supp. 3d at 557, such as, for example, intentionally depriving GMNY of the fruits of a potentially successful lawsuit against GKD. Rather, Defendants simply suggest that they deferred to Huntington to force GKD to fix the sign through threat of suit, which Defendants admit redounded to GMNY's benefit. Under these circumstances, there was no bad faith on Huntington's part, even if that action had the effect of somehow "incidentally lessening" GMNY's/Defendants' rights under the Lease Agreement. *Gruppo, Levey & Co.*, 2003 U.S. Dist. LEXIS 11213, at *28 (citing *M/A-Com*, 904 F.2d at 136).[11]

---

[11] Defendants disagreed over whether they ever considered suing GKD, with GMNY's managing partner Garett Neff testifying that Defendants "never considered" suing GKD, Neff Depo. Tr. at 70:6-8, but with Defendant John Schmid testifying that Defendants "were thinking of suing [GKD] at one point for technology failure." Schmid Depo. Tr. at 55:6-9. Thus, it is unclear whether there would have been any effect on GMNY even if Huntington had exhibited bad faith in threatening GKD with suit.

Lastly, Defendants argue that Huntington acted with bad faith in disclosing to the Port Authority that GMNY was behind on its payments to Huntington. The disclosure occurred on July 21, 2017, when GMNY was negotiating with the Port Authority for extension of their Display Agreement, which was set to expire on December 31, 2018. When the Port Authority heard GMNY was behind on its payments to Huntington under the Lease Agreement, it allegedly declined to extend GMNY's Display Agreement, "completely destroy[ing]" its business, according to Defendants. [ECF No. 43-1 at 33-34]. The Court disagrees that this disclosure was evidence of bad faith on Huntington's part.

The communication during which Huntington made the allegedly bad faith disclosure was a July 21, 2017 email from Huntington's John Zimmeth to Port Authority employee Gerard Del Tufo. The email reads as follows:

> I appreciated the time on the phone recently regarding the status of the extension of the digital board operated by Garage Media at the Port Authority Bus Terminal. As you are aware, we have been involved with the board since it was installed, financing the project for Garage Media originally as part of Macquarie Bank, and subsequently as part of Huntington Bank (following the sale by Macquarie of a portion of its US business to Huntington). After considering your update I feel it necessary to let you know the profound disappointment I feel that the patience we have shown over the past two+ years is not being adequately understood by others at the Port. Beginning in early 2015 in conversations with Roy Bickley [of the Port Authority], Garage Media and Huntington have been working with the Port in order to keep this project stable, while all the while pursuing a reasonable and viable solution to upgrade the equipment and extend the term of the contract. Over that time Garage has met all of their financial obligations to the Port, allowed the Port to use the board for public service and other type content, and kept the board operating under hugely difficult circumstances. You will notice that I was careful to say that Garage has met all of their financial obligations to the Port, because over that entire time (due to the challenges associated with the existing technology) Garage has not made a single payment to meet their financial

obligations to Huntington. Since those early discussions with Roy, I have urged the bank to be patient because I felt the extension being discussed would allow for the needed upgrade which would dramatically improve the quality of the product, enhance the board's competitive position versus other digital alternatives in the Times Square district, and allow Garage to fulfill their financial obligations to the bank. Throughout that time I have been assured on multiple occasions through communication from the Port that the extension was being viewed positively within the Port and that we had done everything required to secure the extension. Garage has answered an RFP even though they had been told that Board approval had been granted to do the extension without one, they have on several occasions proven that the proposed mediamesh upgrade is the best and only alternative that meets the Port's requirements, they have worked with outside counsel and our legal team to provide the Port with a proposed extension agreement that is a win/win for all involved, and I reiterate they have met all of their financial obligations to the Port. Garage Media and Huntington Bank have been exemplary partners to the Port, but I fear that our belief that the Port would do what they said and grant the extension was misplaced. I will need to provide our central risk team with a quarterly update on this project in the coming weeks and I am hopeful that somehow we can make progress towards a mutually beneficial arrangement (that keeps this valuable asset operating) before that meeting. I would appreciate the opportunity to meet with you, and anyone else in the Port organization that I need to, in order for that to happen. I will contact you next week to get your thoughts.

[ECF No. 44-15 at 3-4].

This email shows that Huntington was advocating on behalf of GMNY in an effort to convince the Port Authority to extend the GMNY Display Agreement to maximize Huntington's return under the Lease Agreement and potential follow-on agreements. "I am hopeful that somehow we can make progress towards a mutually beneficial arrangement (that keeps this valuable asset operating) . . . that is a win/win for all involved." *Id.* This was the same exact motive and strategy GMNY had at that time: "[T]his strategy was keeping the Sign stable from a financial perspective and obtaining the extension on the lease from the Port

38

Authority." [ECF No. 43-1 at 33-34]. Because of this there was no bad faith on Huntington's part. Huntington's and GMNY/Defendants' "interests were perfectly aligned." *Lykins*, 2018 U.S. Dist. LEXIS 111705, at *28 (quoting *Wagner*, 2011 U.S. Dist. LEXIS 24518, at *12-13). Defendants do not allege that Huntington had some "sinister motive" or "dishonest purpose," *Richards*, 246 F. Supp. 3d at 557, such as, for example, intentionally destroying GMNY's business, which would have also terminated the benefits to Huntington of an extended Display Agreement between the Port Authority and GMNY. At worst, John Zimmeth's disclosure regarding GMNY's lack of payment to Huntington under the Lease Agreement may have been negligent or misguided, as this disclosure was not required for Huntington to emphasize to the Port Authority that the best result for all involved would be an extension of GMNY's Display Agreement, but its intent was clearly *not* to destroy GMNY, which could only damage Huntington.

The case of *Rebecca Broadway Limited Partnership v. Hotton* provides the perfect illustration of how such a disclosure *can be* a demonstration of bad faith, and how such demonstration is lacking here. 37 N.Y.S.3d 72 (N.Y. App. Div. 2016). In that case, a Broadway play publicist, who had been hired under contract to promote the play, discovered that an unknown foreign investor in the play was actually fictitious and had been fraudulently created by the play's fundraiser, who eventually was sentenced to three years' imprisonment on federal wire fraud charges. When the publicist brought this information to the play producer's attention, the producer told him to keep it quiet. "Apparently stung by this dismissive treatment," *id.* at *73*, the publicist sent an email under a fictitious

name, using the producer's confidential information, to a new "angel investor," *id.* at 73-74, who wished to remain anonymous. The email falsely told the angel investor that the producer and the play were about to go bankrupt, that the play had been dismissed by "regular Broadway investor[s]," and that "with this prospect of fraud, an ongoing money shortage, a bad public perception, anemic ticket sales, and a rabid press corps, the only good reason to invest in [the play] would be for a tax write-off and a desire to be dragged into a fraud trial." *Id.* at 76. The angel investor promptly withdrew his backing, and the play was never staged. *Id.*

Calling the publicist's actions "the very definition of a breach of the covenant of good faith and fair dealing that the law of New York implies in every contract," the court affirmed the grant of summary judgment to the plaintiff, because the "contract had been intended to facilitate the very theatrical production that the [publicist] sabotaged by means of his emails, which he had only been able to send by misusing the producer's confidential information." *Id.* at 74. This resulted in the publicist "utterly defeating the purpose for which the other party had entered into the contract." *Id.* at 78.

By contrast, here, John Zimmeth and Huntington were doing everything they could to get GMNY's Display Agreement extended, searching for "a mutually beneficial arrangement (that keeps this valuable asset operating) . . . that is a win/win for all involved." [ECF No. 44-15 at 3-4]. Zimmeth's intent, unlike the publicist in *Rebecca Broadway,* was to further the goals of the Display and Lease

Agreements, not sabotage them. Because of this, there was no bad faith on Huntington's part.

Moreover, the Court also holds that Defendants' argument that Huntington acted in bad faith, i.e. interfered with GMNY's performance under the Lease Agreement, is unavailing given that at the time Huntington told the Port Authority about GMNY's lack of payment under the Lease Agreement, in July 2017, GMNY had itself failed to perform under the Lease Agreement *for over two years*, since March 2015. In addition, GMNY's last payment to Huntington under the Lease Agreement was due March 31, 2018, but Defendants argue that Huntington's disclosure to the Port Authority about GMNY's lack of payment caused the Port Authority to not renew GMNY's Display Agreement *nine months later*, on December 31, 2018. But by that time the Lease Agreement had long since expired, which means that Huntington's disclosure to the Port Authority had no ill effect on GMNY during the Lease Agreement's term.

In sum, even if the Lease Agreement is a mere security interest and not a true lease, which might serve to allow Defendants to assert defenses of bad faith, such bad faith is lacking here.

C. **Since Defendants' Defenses are Non-assertible, and Fail even if they are, the Lease and Defendants' Guaranty of it are Enforceable as Written**

The Court also agrees with Huntington that

even if the factors set forth at Section 1-201(37) of the UCC indicate that the Lease Agreement represents a secured financing transaction, . . . [T]he parties mutually agreed under the Lease Agreement and the Guaranty that certain amounts must be paid by GMNY and/or Guarantors in exchange for use of the Sign and after default, including a Lessor's Return and taxes. Labeling the parties'

> transaction as a "lease" or "financing" does not alter the parties' prior mutual agreement.

[ECF No. 41 at 9-10].

New York courts have consistently held that guarantees such as Defendants' absolute and unconditional Guaranty are enforceable, even in extreme cases such as when the guaranty at issue is induced by fraud or even, as here, where Defendants claim that portions of the lease are unenforceable as to GMNY. *136 Field Point Circle Holding Co.*, 644 F. App'x at 12 ("'broad, sweeping and unequivocal language' in an absolute and unconditional guaranty generally 'forecloses any challenge to the enforceability and validity of the documents which establish defendant's liability for payments arising under the [underlying] agreement, <u>as well as to any other possible defense to his liability for the obligations</u>.'") (quoting *Navarro*, 36 N.E.3d at 85) (emphasis added); *see also Compagnie Financiere*, 188 F.3d at 35 (guaranty which defined the guarantor's obligations as "unconditional and irrevocable, irrespective of . . . any other circumstances which might otherwise constitute a legal or equitable discharge [or] defense" waived all legal or equitable defenses raised by the defendants); *Navarro*, 36 N.E.3d at 85 ("This Court has acknowledged the application of these absolute guaranties even to claims of fraudulent inducement in the execution of the guaranty") (citing *Citibank v. Plapinger*, 485 N.E.2d 974 (N.Y. 1985)). Allowing Defendants to now skirt the express guaranty that they each signed, which foreswore the applicability of any affirmative defense, "would in effect condone defendants' own fraud in 'deliberately misrepresenting [their] true intention.'"

*Plapinger*, 485 N.E.2d at 977 (quoting *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 600 (N.Y. 1959)).

Thus, Defendants' arguments made in their Motion for Partial Summary Judgment regarding the inapplicability of some of the unpaid amounts owing under the Lease Agreement, such as the Lessor's Return, taxes, the Letter of Credit, etc., are unfounded. Even if the Lease Agreement should be recharacterized as a security interest and not a true lease under the UCC, the Parties contracted around the UCC's provisions and bargained for the broad guaranties contained in Defendants' Guaranty, guaranteeing payment of all amounts due under the Lease Agreement.

Additionally, Defendants waived any and all defenses to enforcement of the Lease Agreement. "[Defendants] waive[] demand, protest or notice of any default or nonperformance by [GMNY and/or GMCT], all affirmative defenses, offsets and counterclaims against [Huntington], [and] any right to the benefit of any security, . . ." Defendants' Guaranty ¶ 3. Because Defendants' Guaranty applies with full force, all defenses to enforcement are waived, and Defendants do not deny that at least some rent payments were not made by GMNY under the Lease Agreement, Defendants are liable for those payments. *HSH Nordbank*, 421 F. App'x at 72 ("where a creditor seeks summary judgment upon a written guaranty, 'the creditor need prove no more than an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guarantee.'").

In sum, Defendants' signed Guaranty applies and makes Defendants responsible for all rent payments GMNY owes to Huntington.

D.    Damages

Huntington argues that the amounts it is owed includes not only unpaid rent, but also taxes on the unpaid rent, interest on the unpaid rent and taxes, the Lessor's Return and interest on it, the Letter of Credit and interest on it, and attorneys' fees.  The Court addresses each in turn:

1.    Rent and Taxes.

It is undisputed that GMNY made a partial rent payment on the Lease Agreement amount in February 2015, and that after that it failed to make any more payments.  Huntington claims that it is owed rent per Section II of the Amended Lease, [ECF No. 45 at 4; Amended Lease Section II at ECF No. 38-3 at 36], and that therefore it is owed a partial payment for February 2015, and then monthly rent payments thereafter.  Defendants do not dispute that GMNY failed to make rent payment nor that GMNY, and thus, Defendants, lacked notice of the rent payments owed.  [ECF No. 43-1 at 21 (Defendants continued to receive "[m]onthly invoices" after February 2015)].

Defendants do not dispute the tax rate Huntington employs of 8.875%. [ECF No. 43-1 at 19 ("taxes [are] calculated based on 8.875% of the rent payments made.")].  Defendants do dispute that they owe any taxes at all, however, arguing that because the Lease Agreement was actually a mere security interest and not a true lease, they should have been required to pay taxes one time upon the original sale of the Sign, and not on a monthly basis.  *Id.* at 18-20 (citing New York Comm'r of Taxation and Fin. Advisory Opinion Petition No. S970806E, Nov. 4, 1997), [ECF No. 43-2 at 2-7].  Because the Court holds that (i) Defendants owe all

amounts due under the Lease Agreement even if the Lease Agreement is not, in fact, a true lease, and that (ii) Defendants have failed to show that the Lease is a mere security interest, Defendants are responsible for taxes as set forth in Section 7 of the Lease Agreement. [ECF No. 38-3 at 14-15 ("Lessee will pay Lessor . . . all taxes, fees, and assessments that may be imposed by any governmental entity or taxing authority on the Rental Payments.")].

In addition, Defendants do not contest that they owe taxes. They merely contest when taxes were due to be paid to the taxing authority. They offer no law which requires parties to contract for the reimbursement of taxes when taxes are due to be paid. Section 1-302 of the UCC provides that, with the exception of parties' obligations of good faith, all UCC provisions may be varied by agreement. N.Y. U.C.C. Law § 1-302.

Because GMNY failed to make payment and Defendants are liable for amounts owed by GMNY, they are responsible for the remainder of the partial rent and tax payment of February 2015 until the last payment called for in Section II of Lease Agreement Amendment 4, which is March 2018. [ECF No. 38-3 at 36].[12]

### 2. Interest on Rent and Taxes

Huntington asserts that it is entitled to interest at the rate of 12% per annum on unpaid rent and taxes. Defendants argue that they are only liable, if at all, for interest after October 2, 2018, when they were notified by GMNY that such interest was due and owing. The Court finds that Defendants are liable for interest on all unpaid rent and taxes, because that is what is called for in the

---

[12] Inexplicably, Huntington's calculation shows Defendants owing rent until October 2018, not March. [ECF No. 38-3 at 8-9].

Lease Agreement, and because Defendants specifically waived notice as a precondition to payment of amounts under the lease. "[Defendants] waive[] demand, protest or notice of any default or nonperformance by [GMNY and/or GMCT]." Defendants' Guaranty ¶ 3.

The Court is unable to replicate Huntington's calculations for interest on rent and taxes, and because Huntington provided no explanation of how interest was calculated, the Court requires further briefing on this subject.

### 3. Lessor's Return and Interest Thereupon

Huntington asserts that it is entitled to the Lessor's Return, while Defendants argue that because the Lease Agreement is a security interest and not a true lease, "the Lessor's return provision of the Lease Documents [is] inapplicable." [ECF No. 43-1 at 16].

The Court holds that Defendants failed to establish the Lease is a financing transaction and Defendants owe all amounts due under the Lease Agreement even if the Lease Agreement is not, in fact, a true lease. Consequently, Defendants are liable for the Lessor's Return. However, as with the interest amount, the court is unable to replicate Huntington's calculations for the Lessor's Return and will require further briefing on the Lessor's Return and interest thereupon with details on the exact calculations employed.

### 4. Letter of Credit and Interest Thereupon

Huntington argues that Defendants are responsible for reimbursing it for the $600,000 it paid under the Letter of Credit because "GMNY failed to make payment to Outfront under the terms of the Display Agreement. [ECF No. 38-1 at

5-6]. Thus, according to Huntington, that amount plus interest in the amount of $39,400 is now due from Defendants. *Id.* at 6.

Defendants argue that Huntington never mentioned in the Complaint that Defendants were liable for payment under the Letter of Credit. As a result, Defendants claim that they did not receive "'fair notice' of Huntington's claims concerning the LOC." [ECF No. 43-1 at 24 (citing *Mignault v. Ledyard Pub. Schs.*, 792 F. Supp. 2d 289, 301 (D. Conn. 2011) (holding that plaintiff waived claims not asserted in operative complaint)].

Huntington replies that the Complaint provides that Huntington seeks judgment for "all . . . amounts outstanding under the Lease Documents." [ECF No. 45 at 6-7 (citing Complaint ¶¶ 19, 22)]. Huntington notes that the Letter of Credit was extended for GMNY's benefit to secure its payment obligations under the Display Agreement with Outfront, and that GMNY's "default under the Display Agreement is a default under the Lease Agreement." *Id.* at 7 (citing Lease ¶ 17(g) ("It is an "*Event of Default*" by Lessee under this Lease if . . . Lessee is the subject of a Default under . . . the Display Agreement") (emphasis in original)]. Therefore, according to Huntington, GMNY and Defendants are "required to pay all sums due to Huntington as a result of its default under the Display Agreement." *Id.* (citing Lease ¶ 18(e) ("If an Event of Default is continuing, . . . Lessor may in its absolute discretion . . . Proceed by court action to enforce performance by Lessee . . . to recover all damages and expenses suffered by Lessor as a result of any Event of Default.")]. The Court agrees with Huntington.

First, the Complaint made clear that Huntington sought judgment for all amounts outstanding under the "Lease Documents."  Complaint ¶¶ 19, 22.

Second, Defendants' Guaranty stated that it was applicable to "any and all of the various agreements, . . . now _or hereinafter arising_, . . . including any . . . collateral agreements, or other agreements entered into in connection with or in furtherance of any of the foregoing or otherwise providing for additional collateral or security to [Huntington], in connection with a loan, lease, or other financial accommodation made by [Huntington] to or for [GMNY and/or GMCT], or in connection with any other transaction to which [GMNY and/or GMCT] is a party or otherwise bound."  Defendants' Guaranty ¶ 1.  This expansive language made the Letter of Credit, which supported the Display Agreement, part of the Lease Agreement Guaranty.  The Display Agreement was entered into in connection and in furtherance of the Lease.  Reimbursement of amounts advanced by Huntington under the Letter of Credit for GMNY'S nonpayment of the Display Agreement are therefore covered by the Guarantees.  Moreover, Paragraphs 17(g) and 18(e) of the Lease made breach of the Display Agreement a breach of the Lease Agreement, and authorized Huntington to seek redress in court.  As a result, Defendants are liable under the Guarantees to reimburse Huntington for amounts advanced under the Letter of Credit.

In addition to the amount advanced, Defendants are liable to Huntington for interest on that amount.  Because the Court is unable to replicate Huntington's calculation of interest on the Letter of Credit, it will require further briefing on that topic.

## V. Conclusion

For the foregoing reasons, the Court GRANTS Huntington's Motion for Summary Judgment and DENIES Defendants' Motion for Partial Summary Judgment. Huntington is directed to file a brief on the docket within 35 days of the date of this Memorandum of Decision showing exactly how it arrived at all of its calculations for all amounts owed by Defendants under the Lease Agreement. Following that, Defendants will have 21 days to respond, and Huntington may file a reply within 14 days of Defendants' response, if desired.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 24, 2020